

> to 9

FILED

FEB 1 5 2002

PER_____
HARRISBURG, PA   DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM HAZZARD,                        :

       Plaintiff,                       :        No. 1:CV-00-1758
                       :

       v.                              :        (Judge Rambo)
                       :

TIM CURTIS, MACK MCMURRAY,              :
AFSCME DISTRICT 90, and THE             :
HARRISBURG SCHOOL DISTRICT,             :

       Defendants.                      :


**<u>BRIEF IN SUPPORT OF THE MOTION FOR SUMMARY
JUDGMENT FILED BY DEFENDANTS HARRISBURG
SCHOOL DISTRICT AND TIMOTHY CURTIS</u>**

                    Rhoads & Sinon LLP
                    Shawn D. Lochinger
                    Stephanie E. DiVittore
                    One South Market Square, 12th Flr.
                    Harrisburg, PA  17108
                    (717) 233-5731

418378.4

# TABLE OF CONTENTS

Procedural History and Statement of Facts ................................................. 1

Statement of Questions Involved ....................................................... 10

Standard of Review ............................................................. 11

Argument ........................................................................ 12

    A.    Plaintiff Has Not Established A Prima Facie Case Of Discrimination Pursuant To Section 1981 ........................................ 12

    B.    Notwithstanding Plaintiff's Failure To Sufficiently Prove His Prima Facie Case, The Claims Also Fail Based On The Existence Of Legitimate, Nondiscriminatory Reasons For The Employment Decision ........................................................ 18

    C.    Plaintiff's Claims For Retaliation And Harassment, To The Extent Even Pled, Are Invalid Where Unsupported By Evidence And Specifically Contradicted By Plaintiff's Express Admissions ......................................................... 22

Conclusion ..................................................................... 25

# TABLE OF AUTHORITIES

## Cases:

Armstrong v. School Dist. of Philadelphia, 597 F. Supp. 1309, 1312 (E.D. Pa. 1984) ............................................................................................ 18

Bellairs v. Coors Brewing Co., 907 F. Supp. 1448, 1453, 1455-56, 1458-59 (D. Colo. 1995) ........................................... 11, 14, 15, 16, 17 n.5, 18

Board of Trustees v. Sweeney, 439 U.S. 24, 25 (1978).................................... 19 n.6

Bruno v. City of Crown Point, Indus., 950 F.2d 355, 364 (6th Cir. 1991)............. 20

Burton v. State of Ohio, 798 F.2d 164, 165-66 (6th Cir. 1986)........................ 19 n.6

Byers v. Dallas Morning News, Inc., 209 F.3d 419, 427 (5th Cir. 2000)... 16, 17 n.5

Carson v. Bethlehem Steel Corp., 82 F.3d 147, 159 (7th Cir. 1996)...................... 16

Cash v. Boeing Co., 76 F. Supp. 2d 1229, 1233 (D. Kan. 1999)...................... 17 n.5

Chock v. Northwest Airlines, Inc., 113 F.3d 861, 864 (8th Cir. 1997) .............21-22

Equal Employment Opp. Comm'n v. United Parcel Serv., Inc., 149 F. Supp. 2d 1115 (N.D. Cal. 2000)........................................................ 20 n.7

Flagg v. Control Data, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992) .......................... 18

Gibson v. Old Town Trolley Tours of Washington, D.C., Inc., 160 F.3d 177, 182 (4th Cir. 1998)........................................................................ 24

Guardians Ass'n v. Civil Serv. Comm'n, 633 F.2d 232, 264 (2d Cir. 1980) ... 15, 18

Haun v. Humana, Inc., 651 F. Supp. 120, 122-23 (W.D. Ky. 1986) ...................... 22

Hervey v. City of Little Rock, 787 F.2d 1223, 1231-32 (8th Cir. 1986)................ 22

Holder v. City of Raleigh, 867 F.3d 823, 826 (4th Cir. 1989).......................... 20 n.7

Jones v. School Dist. of Philadelphia, 198 F.3d 403, 412, 413
(3d Cir. 1999) ...................................................................... 19, 21 n.8

Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993) ............. 11

Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997)........ 19, 20

Lawrence v. University of Texas Med. Branch, 163 F.3d 309, 312 (5th Cir.
1999)..................................................................................... 21

Lewis v. New York Tel. Co., 643 F. Supp. 654, 660 (S.D.N.Y. 1984) .................. 13

Lujan v. National Wildlife Fed'n, 497 U.S. 871, 883 (1990) ................................. 11

Malacara v. City of Madison, 224 F.3d 727, 731 (7th Cir. 2000) .......................... 20

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-
87 (1986) .......................................................................... 11, 15

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)............................. 13

Notari v. Denver Water Dep't, 971 F.2d 585, 589 (10th Cir. 1992)....................... 14

Perry v. Woodward, 188 F.3d 1220, 1228 (10th Cir. 1999) .................................. 13

Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985) ........ 23

Smith v. Chevron USA, Inc., 876 F. Supp. 70, 74, 75 (E.D. Pa. 1995)...... 13, 21 n.8

## Statues & Rules

42 U.S.C. §1981 ..................................................................................... 12

FED. R. CIV. P. 56(c) ............................................................................ 56

## **PROCEDURAL HISTORY & STATEMENT OF FACTS**

On October 4, 2000, Plaintiff William Hazzard ("Plaintiff" or "Hazzard") instituted this action alleging that the Defendants, the Harrisburg School District ("School District"), Timothy Curtis ("Curtis"), Facilities Supervisors at the School District, Robert McMurray ("McMurray"), Head Custodian at the Rowland Intermediate School in the School District, and the American Federation of State, County and Municipal Employees, AFL-CIO, District Council 90 ("AFSCME"), violated his Constitutional rights. Because there are no genuine issues of material fact with respect to Plaintiff's claims against Defendants Curtis or the Harrisburg School District, these Defendants have moved for summary judgment in their favor and against Plaintiff William A. Hazzard through the accompanying Motion. This Brief is filed in support thereof. Because both of these Defendants are named as Defendants under only Count 1 of the Complaint, this Brief, and the accompanying Motion, address only issues raised in Count 1.

## **Background**

In order to fully understand Hazzard's allegations, it is necessary to set forth several background facts. There is no dispute that Hazzard is a Caucasian male who has been employed by the School District for more than thirty years and is currently employed as a head custodian within the District. (Hazzard Deposition dated October 19, 2001, p. 7, attached hereto as Exhibit "A") ("Pl.'s Dep."). There

is also no dispute that Hazzard was and continues to be a member of AFSCME. (Pl.'s Dep., pp. 13-14). Finally, it is clearly agreed that AFSCME and the School District are parties to a Collective Bargaining Agreement ("CBA") that covers various jobs at the District, including the head custodian position currently held by Hazzard. (Exhibit 8 to Pl.'s Dep.).

Under the CBA, head custodians at the School District are divided into two job classifications based upon the size of the building to which they are assigned. (Deposition of Tim Curtis dated November 19, 2001, pp. 23-25, attached hereto as Exhibit "B") ("Curtis Dep."). Head custodians working in larger buildings, commonly referred to as "major" or "large" buildings, are classified under the contract as Facility Service Foremen 1B; head custodians working in smaller buildings, commonly referred to as "minor" or "small" buildings, are classified as Facility Service Foremen 1A.[1] Id.; (Pl.'s Dep., pp. 165-67); (Exhibits 9 and 10 to Pl.'s Dep.).

There are, in essence, only two differences between 1A and 1B head custodian positions. Specifically, starting pay for head custodians in major buildings is fifty cents more per hour than head custodians employed in minor buildings. (Pl.'s Dep., pp. 151-52); (Exhibit 8 to Pl.'s Dep., p. 49). Raises are

---

[1] The job descriptions for the two positions are virtually identical, as each position is essentially responsible for cleaning and maintaining the building to which he is assigned by the School District. (See Exhibits 9 and 10 to Pl.'s Dep.).

standardized for all head custodians.  (Pl.'s Dep., pp. 151-152).  Second, 1B (major building) head custodians are usually responsible for the supervision of additional employees due to the increased area of the buildings.  (Pl.'s Dep., p. 32).

Prior to June 18, 1999, the School District employed Defendant McMurray as a head custodian 1B (major building) at the School District's William Penn School.  (Deposition of Robert McMurray dated October 18, 2001, p. 14, attached hereto as Exhibit "C") ("McMurray Dep.").  There is no dispute that William Penn is considered a major building by the School District.  (Pl.'s Dep., p.40); (Exhibit 10 to Pl.'s Dep.).  It is also undisputed that immediately prior to June 18, 1999, Plaintiff Hazzard was employed by the District as a head custodian at the Marshall School, a minor (1A) building.  (Pl.'s Dep., pp. 37-38); (Exhibit 9 to Pl.'s Dep.).

## Transfer Of All Head Custodians

In addition to the background, moreover, the substantive and material facts of this case are also essentially undisputed.  On June 18, 1999, Defendant Curtis, acting in his capacity as Facilities Supervisor for the School District, transferred all twelve head custodians in the District from their then current locations to alternate schools within the District.  (Pl.'s Dep., pp. 32-34).  These transfers are detailed in a memo by Defendant Curtis.  (Exhibit 1 to Pl.'s Dep.).  It is important to note that at the time of the transfer, only two of the twelve head custodians employed by the School District were Caucasian, Hazzard and Dan Rhoads.  (Pl.'s Dep., pp. 33, 35-

41).   The remaining ten head custodians were African-American or Hispanic. (Pl.'s Dep., pp. 35-41).  At the time the transfer occurred, the School District was in the process of renovating a recently purchased building into a new school.  The District intended to have the new school, the Rowland Intermediate School ("Rowland"), open for the beginning of the 1999-2000 school year.  (Deposition of Lance D. Freeman dated November 17, 2001, pp. 23, 43, attached hereto as Exhibit "D")("Freeman Dep.").

Thus, on June 18, 1999, Hazzard was transferred, along with all of the other head custodians, to a different building: from Marshall School to Shimmell School, also undisputedly classified as a minor building within the School District.  (Pl.'s Dep., pp. 35-41); (Exhibit 9 to Pl.'s Dep.).  In similar fashion, Dan Rhoads, the other white head custodian, was transferred from Shimmell to Foose, both minor buildings.  (Pl.'s Dep., pp. 39-40).  Neither Hazzard's, nor Rhoads', rate of pay was affected in any way by this transfer.[2]  (McMurray Dep., p. 11); (Pl.'s Dep., pp. 42-43).  Also, despite unsupported allegations by Hazzard to the contrary, at least two African-American head custodians, Clyde Dunson and Valence Barker, were

---

[2]    Based on the potential disparity in pay as a result of the transfers, AFSCME filed a grievance regarding these transfers.  (Pl.'s Dep., pp. 179-181).  The grievance was resolved by the School District's agreement to pay any head custodian who had been transferred from a major to a minor building according to the pay scale for the major building.  Id.  In essence, this allowed no head custodian to suffer a diminution in their rate of pay as a result of the transfers.  Id.

transferred from major buildings to minor buildings and thus saw a potential decline in their rate of pay. (Pl.'s Dep., pp. 35-41, 185-188); (Exhibit 1 to Pl.'s Dep.).

## Placement Of Defendant McMurray

Essential to the District's case, it is the <u>uncontradicted</u> testimony of Defendant Curtis, the individual responsible for making the transfer decisions, that <u>on June 18, 1999</u>, it was his intention to ultimately place McMurray at Rowland. (Curtis Dep., pp. 22, 23). As indicated, however, Rowland was not open for occupancy in June, 1999 and, therefore, McMurray could not be transferred into the Rowland position at the time the other transfers were made. (Freeman Dep., pp. 23, 43). An opening at Hamilton, however, a minor building, existed at that time. (Curtis Dep., p. 19).

Accordingly, Curtis transferred McMurray to Hamilton **on a temporary basis**. (Curtis Dep., pp. 19, 40, 41); (Freeman Dep., pp. 27, 28); (McMurray Dep., pp. 15, 16). This fact is not disputed among the Defendants, and it cannot be disputed by Hazzard as the three people involved in the Rowland decision, Curtis, Freeman, and McMurray, have all independently testified -- under oath -- that the transfer of McMurray to Hamilton was temporary and designed to be applicable only from June 18, 1999 until the opening of Rowland in August, 1999. <u>Id</u>.

Curtis has made clear that the sole reason he selected McMurray for the position at Rowland was McMurray's prior experience as a head custodian in a "major" building.[3]   (Curtis Dep., pp. 19, 22-23).   There is, quite simply, no evidence that Curtis' decision was based upon anything except McMurray's previous, satisfactory work as a head custodian in a major building.  In this regard, it is undisputed that Hazzard has <u>never</u> been a head custodian in a "major" building.  (Pl.'s Dep., pp. 182).

### Plaintiff's "Bid" For The Rowland Position

Because it was a well-known fact that the School District intended to open the Rowland School for the 1999-2000 school year, head custodians were generally anticipating that a Facility Service Foreman 1B (major building) job would be available at the time the building opened.   (Pl.'s Dep., pp. 50-52). Hazzard was also aware of this and admits that he expressed an interest in the position of the head custodian at the Rowland School on June 25, 1999 <u>despite the fact that the job had not yet been posted.</u>  (Pl.'s Dep., pp. 49-53).  Additionally, as of that date, no official announcement been made that the job would be open. (Pl.'s Dep., p.50).

---

[3]     The School District recognizes that Hazzard has more overall seniority with the District, having worked previously on grounds crew and in food services for approximately 10 years each.  (Pl.'s Dep., pp. 19-21).  McMurray, however, has greater seniority as a custodian with the District and, in fact, unlike Hazzard, served as a head custodian of a major building.  (Pl.'s Dep. p. 182).

There is no dispute, however, that in the past, as well as in this particular case, the District accepted the expression of interest as a "bid" on an "unposted" position. (Freeman Dep., p. 53). The District's policy was (and is) to accept bids on jobs even if the job had not yet been posted. Id. As a result, despite the fact that Hazzard expressed an interest prior to any official posting, his letter was accepted by the School District as a bid for the Rowland position. (Pl.'s Dep., p.67); (Freeman Dep., p.53). As set forth above, however, at the time that Hazzard submitted his letter to the District, Curtis had already made his decision to fill the Rowland position with Mr. McMurray. (Curtis Dep., p.39).

On July 8, 1999, the School District erroneously posted the Roland School head custodian position. (Curtis Dep., p. 39). The posting was erroneous because the School District had exercised its management rights under the CBA and transferred Mr. McMurray into the position – there was no "opening" to post. Frankly, however, whether the posting was erroneous or not is wholly immaterial in this case. Because Hazzard's June 25, 1999 letter was considered a proper "bid," the posting of the job was irrelevant – Hazzard had expressed an interest in the job that was accepted by the School District regardless of the timing of and intent behind the posting. (Pl.'s Dep., pp.88-89); (Curtis Dep., pp.39-40).

It is undisputed that following the erroneous posting, nobody applied for or expressed an interest in the Rowland position. Instead, the only expression of

interest in the position was Hazzard's bid <u>prior</u> to the erroneous posting.  Because the decision to place McMurray at Rowland had already been made, however, Hazzard did not receive the Rowland position.  In August, 1999, as originally decided, McMurray was transferred into the position.  (Curtis Dep., pp. 22-23).

Hazzard, previously unaware that the decision to transfer McMurray into the Rowland job was made even before Hazzard had submitted his "bid," learned of McMurray's transfer to Rowland at a general meeting of head custodians sometime in either late July or early August, 1999.  (Pl.'s Dep., p.55); (Curtis Dep., p.38).  As a result, Hazzard filed a grievance through AFSCME on August 12, 1999 against the School District.  (Pl.'s Dep., pp. 83-85, 176); (Exhibit 3 to Pl.'s Dep.).

Hazzard's position in the grievance was that he was the only person to bid on the Rowland job and, therefore, should have received the job under the terms of the CBA.  <u>Id</u>.  The grievance did not mention, or allege in any way, that race played a role in the decision to transfer McMurray into the job instead of Hazzard.  <u>Id</u>.  The School District and AFSCME proceeded through the grievance process pursuant to the terms of the CBA.  In this regard, Hazzard admits that there was at least one formal meeting in which the School District explained to AFSCME that the decision to transfer McMurray to the Rowland position had been made <u>prior to</u> the time the bid was posted, and that the bid had been posted erroneously.  (Pl.'s Dep., pp. 86-89).

On March 14, 2000, AFSCME, after proceeding through three of the four steps in the mandated grievance procedure, unilaterally withdrew the Hazzard grievance for lack of merit. (Pl.'s Dep., pp. 103-104, 238-239); (Exhibit 4 to Pl.'s Dep.). The written notice from AFSCME to the School District expressly provided that AFSCME was withdrawing the grievance for lack of merit and intended to take no further action with respect to Hazzard's claim. Id. The School District obviously did not attempt to further pursue the grievance. Also, as previously indicated -- and as admitted by Hazzard -- at no time before or during the grievance procedure did Hazzard ever state, intimate, or even suggest that his race was, in any way, a factor in the transfer of McMurray to Rowland and/or the withdrawal of the grievance. (Pl.'s Dep., pp. 92, 121-22).

On April 18, 2000, despite the conclusion that the grievance was without merit, Hazzard continued to seek redress by filing a Complaint with the School District. (Pl.'s Dep., p.130); (Exhibit 5 to Pl.'s Dep.). The Complaint, filed in accordance with the School District's internal complaint procedure, essentially continued the grievance argument previously set forth by Hazzard: that he was the only bidder for the Rowland position and, therefore, entitled to the job. Id.

As set forth in the School District's Complaint Policy, the internal complaint procedure consists of four steps. (A copy of the March 26, 1983 Complaint Policy is attached as Exhibit "E"). Hazzard availed himself of all four steps of the

procedure, culminating in a hearing before the School Board. (<u>See</u> District-Hazzard Correspondence regarding internal complaint, attached as Exhibit "F"). On June 1, 2000, two School Board members, Joseph Brown and Ricardo Davis, heard testimony and received evidence concerning Hazzard's internal complaint. (Pl.'s Dep., pp. 230-39). Hazzard testified on his behalf, along with two witnesses, Messrs. McCullum and Tapper (who are both District employees and AFSCME representatives). (Pl.'s Dep., pp. 131-33). Freeman and Defendant Curtis testified on behalf of the District. <u>Id</u>.

The Board members formally denied Hazzard's internal complaint by letter dated June 26, 2000. (Exhibit 6 to Pl.'s Dep.); (<u>See</u> <u>also</u> Exhibit F). No further action was taken by any of the parties with respect to the grievance or internal complaint. Instead, Hazzard instituted this action alleging, in Count I, that the School District, AFSCME, Curtis, and McMurray discriminated against him because he is Caucasian. As set forth below, Plaintiff's claims, wholly unsupported by any evidence, are devoid of merit.

## STATEMENT OF QUESTIONS INVOLVED

I.   Whether Plaintiff's claims for intentional discrimination pursuant to Section 1981 must be denied where he failed to prove his prima facie case, including the existence of any evidence of discrimination.

   Answer:   YES.

- 10 -

II.  Whether Plaintiff's claims for intentional discrimination must be denied where Defendants have established legitimate, nondiscriminatory reasons for their employment decision.

Answer:    YES.

III.  Whether Plaintiff's claims for retaliation and harassment, to the extent even pled, must be denied where they are specifically contradicted by the express admissions of Plaintiff.

Answer:    YES.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c);  Lujan v. National Wildlife Fed'n, 497 U.S. 871, 883 (1990); Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 637 (3d Cir. 1993).  Additionally, summary judgment is also mandated "when the court concludes that no reasonable juror could find for the non-moving party based on the evidence present in the motion and response." Bellairs v. Coors Brewing Co., 907 F. Supp. 1448, 1453 (D. Colo. 1995) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  In reviewing the evidence, facts and inferences must be viewed in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co., 475 U.S. at 587.  Summary judgment must be entered in favor of the moving party

- 11 -

"[w]here the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party. . . ." Id. at 586-87 (citations omitted).


## ARGUMENT

In Count I of the Complaint, Plaintiff alleges violations of his Constitutional

rights pursuant to the Thirteenth and Fourteenth Amendments in accordance with

Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. §1981.  As a result, despite

Plaintiff's posturing, the present action concerns, legally and factually, one issue:

whether Hazzard has shown that his race was the "but for" cause in the decision to

promote Defendant McMurray, an African-American, over Hazzard, a Caucasian,

for the head custodian position at Rowland Intermediate School.  Because Plaintiff

has failed to produce any evidence of discrimination or refute the School District's

legitimate, nondiscriminatory reasons for its employment decision, summary

judgment must be granted in favor of the Defendants.  Additionally, Plaintiff's own

express admissions mandate dismissal of any claim of retaliation and/or harassment.

**A.**   **Plaintiff Has Not Established A Prima Facie Case Of Discrimination Pursuant To Section 1981**

Section 1981 provides, in part, that "[a]ll persons within the jurisdiction of the

United States shall have the same right in every State and Territory to make and

enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit

of all laws and proceedings for the security of persons and property as is enjoyed by

- 12 -

white citizens. . . ." 42 U.S.C. §1981(a).  In this case, however, there is no direct evidence of racial discrimination.  As such, this Court must employ the <u>McDonnell Douglas</u> framework to evaluate Hazzard's claims.  <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).  <u>See</u> <u>Perry v. Woodward</u>, 188 F.3d 1220, 1228 (10th Cir. 1999) (holding <u>McDonnell Douglas</u> framework applies to claims brought pursuant to Section 1981); <u>Smith v. Chevron USA, Inc.</u>, 876 F. Supp. 70, 74 (E.D. Pa. 1995) (same).

Under <u>McDonnell Douglas</u>, the initial burden is with the plaintiff to establish a prima facie case of discrimination by presenting evidence demonstrating a connection between his status and an adverse employment action.  411 U.S. at 802.  In order to demonstrate a prima facie case of discrimination under Section 1981 based on an employer's alleged failure to promote the employee, a typical plaintiff must show: (1) that he was part of a protected group; (2) that he was qualified and applied for a job for which the employer sought applicants; (3) that he was rejected notwithstanding his qualifications; and (4) after he was rejected the position remained open, and the employer sought other applicants with similar qualifications.  <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802; <u>Lewis v. New York Tel. Co.</u>, 643 F. Supp. 654, 660 (S.D.N.Y. 1984).

Because the Plaintiff in this action is white, however, and thus not a member of a racial minority, instead of proving he belongs to a protected group and was

rejected despite his qualifications, Hazzard must produce **"direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability that but for the plaintiff's status, the challenged employment decision would have favored the plaintiff."** Bellairs v. Coors Brewing Co., 907 F. Supp. 1448, 1456 (D. Colo. 1995) (citing Notari v. Denver Water Dep't, 971 F.2d 585, 589 (10th Cir. 1992)) (emphasis added).

In the Complaint, the only allegations of discrimination posited by Plaintiff with respect to the School District are that (1) McMurray, who is African-American, received the head custodial position at Rowland over Plaintiff, who is Caucasian; and (2) the School District failed to provide an opportunity to appeal the employment decision notwithstanding that it is the regular practice to allow minority persons to appeal. (Pl.'s Complaint, ¶¶16, 18). Even if supported by evidence, these allegations are insufficient to maintain a claim for discrimination by a white individual under Section 1981.[4]

---

[4]     Plaintiff's claims regarding his ability to appeal to the School Board must be disregarded, as they are expressly contradicted by his deposition testimony wherein he admitted that he was permitted to file a complaint, outside of the union grievance procedure, with the District, and the District responded by holding a hearing with two School Board members, Joseph Brown and Ricardo Davis. (Pl.'s Dep., pp. 130-31). Hazzard testified, moreover, that a hearing with two Board members was fully within the Board's right and complied with District procedure. (Pl.'s Dep., pp. 125-26). Nor did Plaintiff present any evidence that race played any role whatsoever in any action taken/not taken by the Board. As a result, the only remaining, allegedly discriminatory conduct by the District is the transfer of Defendant McMurray to the position of head custodian at the Rowland.

- 14 -

Because there are no genuine issues of material fact regarding Plaintiff's claims, summary judgment in favor of the School District is appropriate. Specifically, the allegations of discrimination actually posited by Hazzard are wholly without evidentiary support. Despite the fact that Plaintiff has had a full and complete opportunity to conduct discovery and develop his case, Hazzard has produced no direct or indirect evidence *whatsoever* that would enable a reasonable fact-finder to determine that either Curtis or the School District purposefully discriminated against Plaintiff on account of his race. Therefore, the School District is entitled to summary judgment in its favor. <u>Bellairs</u>, 907 F. Supp. at 1453; <u>Matsushita Elec. Indus. Co., Ltd.</u>, 475 U.S. at 587.

Specifically, in order to successfully prove his claim, Hazzard must do more than offer vague and conclusory allegations of racial bias. <u>See</u> <u>Bellairs</u>, 907 F. Supp. at 1455 (holding "the allegations of discrimination must be supported by facts indicating purposeful discrimination on the basis of color"); <u>Guardians Ass'n v. Civil Serv. Comm'n</u>, 633 F.2d 232, 264 (2d Cir. 1980) (citations omitted) (explaining rule "that discriminatory purpose must be pleaded and proven in actions brought under §1981"). In this case, the only evidence produced to support Plaintiff's claims is that he, a white male, did not receive the position at Rowland, while McMurray, an African-American, did:

Q    Now, I need to go back over and ask you. Do you think that all five of these people [decision makers identified by Hazzard] took your race into account

when they were making this decision to move McMurray into the job and not
you?

A    Yeah.

***

Q    **What did Mr. Freeman say or do that leads you to believe that he
specifically took your race into account**?

A    **By transferring Mack McMurray into that position**, not even giving me the
opportunity of saying thank you for bidding on the job, Mr. Hazzard, you
know, you've done a good job but we decided – you know, I would have
accepted that completely.

(Pl.'s Dep., p. 188) (emphasis added).  See also (Pl.'s Dep., p. 114) (emphasis added)

(stating, with respect to Mr. Freeman's decision, "I'm saying it's based – **it's based**

**on race for the fact that they chose Mack McMurray over me**").

The mere fact, however, that a minority received the position is insufficient to

support the vague and conclusory allegations of discrimination set forth in the

Complaint: "[w]hile the fact that one's replacement is of another national origin 'may

help to raise an inference of discrimination, it is neither a sufficient nor a necessary

condition.'" Byers v. Dallas Morning News, Inc., 209 F.3d 419, 427 (5th Cir. 2000)

(quoting Carson v. Bethlehem Steel Corp., 82 F.3d 147, 159 (7th Cir. 1996)).  For

example, in Bellairs v. Coors Brewing Co., the plaintiff alleged he was discriminated

against "based on his status as a Caucasian male" because he was discharged for

certain misconduct while minority employees were not discharged for the same

misconduct.  907 F. Supp. at 1456.  The Court granted  summary judgment for the

employer finding this evidence insufficient under Section 1981.[5]  See id. at 1456, 1458-59 (rejecting allegation that "but for the fact he is a Caucasian male, he would not have terminated" as insufficient to establish the third element of the Section 1981 prima facie case).

In his deposition, Plaintiff admitted that, except for the fact that a minority, McMurray, received the Rowland position, there was no other evidence of discrimination:

Q     At any time during this was your race actually mentioned by anybody as a reason for the decision?

A     No.

***

Q     . . . .You said that mister – I'm sorry – that you were never told specifically that your race was a factor; am I correct on that? Is that what you –

A     Yes.

Q     That's what you testified about before?

A     Uh-huh.

Q     So what evidence do you have that tells you that you race really was a factor?

A     I kind of like weighed it. . . .

***

Q     Okay.  Now, of the three – of those three people – Mr. Freeman, Mr. Curtis, Mr. Brown – and you talked about all these things that are leading you to

---

[5]     The Bellairs decision constitutes the universal interpretation of Section 1981.  See e.g., Byers, 209 F.3d at 427 (finding, where only evidence is that position sought by white male filled by minority, plaintiff "fails to establish a prima facie case of race discrimination" pursuant to Title VII and 1981); Cash v. Boeing Co., 76 F. Supp. 2d 1229, 1233 (D. Kan. 1999) (granting summary judgment for defendant employer where plaintiff "has not attempted to provide any direct evidence of discriminatory intent").

believe your race was a factor.  Did any of them ever specifically say to you that your race was a factor?

A     No.

Q     Did any of them ever put in writing anywhere that your race was a factor?

A     No.

(Pl.'s Dep., pp. 72, 78, 122-23).

Decisions interpreting Section 1981 have conclusively established that in order to maintain a claim for reverse discrimination, a plaintiff must produce direct evidence of discrimination, mere conclusory allegations of racial bias such as proffered by Hazzard are insufficient.  See Flagg v. Control Data, 806 F. Supp. 1218, 1223 (E.D. Pa. 1992) (holding "[c]onclusory allegations of generalized racial bias do not establish discriminatory intent"); Armstrong v. School Dist. of Philadelphia, 597 F. Supp. 1309, 1312 (E.D. Pa. 1984); Bellairs, 907 F. Supp. at 1455; Guardians Ass'n, 633 F.2d at 264.  Absent the necessary evidence of racial discrimination by the School District and Curtis in the transfer of McMurray to Rowland, Plaintiff is unable to establish a prima facie case under Section 1981.  Therefore, the Motion for Summary Judgment filed by Defendants Harrisburg School District and Curtis must be granted.

**B.     Notwithstanding Plaintiff's Failure To Sufficiently Prove His Prima Facie Case, The Claims Also Fail Based On The Existence Of Legitimate, Nondiscriminatory Reasons For The Employment Decision**

Even in the unlikely event that this Court determines that Plaintiff has established each of the four requisite elements of his 1981 claim against the

Defendants, summary judgment in favor of the School District is still mandated where, as here, there are legitimate, nondiscriminatory reasons for the District's employment decision.    That is, although Curtis and the School District ardently dispute that Plaintiff has set forth facts sufficient to prove his prima facie case, for purposes of this section they will assume Plaintiff met his initial burden.    Plaintiff's claim still fails, however, as there are legitimate, nondiscriminatory reasons for the failure to appoint Hazzard to the position of head custodian at the Rowland School.

In resolving Section 1981 cases, once a plaintiff has set forth his prima facie case, the burden shifts to the defendant "to articulate a legitimate nondiscriminatory reason for the adverse employment action at issue."[6] Jones v. School Dist. of Philadelphia, 198 F.3d 403, 412 (3d Cir. 1999) (quoting Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)).

In reviewing the facts in this instance to determine whether Curtis and the School District had a legitimate, nondiscriminatory reason for its decision to transfer McMurray instead of Plaintiff, it is important to note that *any* reason is

---

[6]    Although it is true that the burden shifts to the defendant during this juncture, the ultimate burden always remains with the plaintiff: "[s]ignificantly, the burden of persuasion remains with the plaintiff at all times; only the burden of production shifts between the parties. . . . The burden of production imposed on the defendant is only that of articulating a legitimate, nondiscriminatory reason, 'not of proving the absence of discriminatory notice.'" Burton v. State of Ohio, 798 F.2d 164, 165-66  (6th Cir. 1986) (quoting Board of Trustees v. Sweeney, 439 U.S. 24, 25 (1978)).

sufficient provided it is not discriminatory.  See Malacara v. City of Madison, 224

F.3d 727, 731 (7th Cir. 2000) (citing Bruno v. City of Crown Point, Indus., 950

F.2d 355, 364 (6th Cir. 1991)) (upholding summary judgment for employer

because legitimate non-discriminatory reason may be "'for a good reason, a bad

reason, a reason based on erroneous facts, or for no reason at all, as long as its

action is not for discriminatory reason'"); Keller, 130 F.3d at 1108-09 (holding

plaintiff must do more than "show that the employer's decision was wrong or

mistaken").

As fully set forth in the Statement of Facts above, the decision to transfer

McMurray, not Hazzard, to Rowland was based on McMurray's experience as a

head custodian in a major building similar to Rowland.[7]  (Freeman Dep., pp. 23-25,

39-40); (Curtis Dep., pp. 19, 22-23).  There is, quite simply, no evidence that the

---

[7]     Another legitimate, nondiscriminatory reason for the School District's decision
-- a reason proffered by the Plaintiff during his deposition -- is based on the
relationship between McMurray and the decision-makers.  In that regard, Plaintiff
expressly admitted that it is his belief that McMurray was given the position not
because of his race, but because Defendants Curtis and McMurray were friends and,
therefore, McMurray received preferential treatment.  (Pl.'s Dep., pp. 60-61, 143).

Decisions interpreting Section 1981 have concluded, however, that
employment decisions for reasons such as friendship and nepotism constitute
legitimate, nondiscriminatory reasons.  See Holder v. City of Raleigh, 867 F.2d 823,
826 (4th Cir. 1989), *disapproved on other grounds as stated in* Equal Employment
Opp. Comm'n v. United Parcel Serv., Inc., 149 F. Supp. 2d 1115 (N.D. Cal. 2000)
(explaining "[a] racially discriminatory motive cannot, as a matter of law, be
invariably inferred from favoritism" such as nepotism).  Pursuant to caselaw directly
on point, then, the existence of this legitimate, nondiscriminatory reason also
mandates that Hazzard's claim be dismissed.

decision was based upon anything except McMurray's previous, satisfactory work as a head custodian in a major building.  Therefore, while Hazzard has <u>never</u> been a head custodian in a major building, he specifically admitted that McMurray had such experience.  (Pl.'s Dep., pp. 110-11, 182).

Where, as here, there exists uncontroverted evidence that the individual placed in the position was more qualified than Plaintiff, the School District has proven a legitimate, nondiscriminatory reason exists sufficient for summary judgment, in its favor, under Section 1981.[8]  <u>See</u> <u>Lawrence v. University of Texas Med. Branch</u>, 163 F.3d 309, 312 (5th Cir. 1999) (upholding summary judgment for defendant employer in discrimination claim where defendant demonstrated that plaintiff "was not selected for the job because she was not the best qualified candidate"); <u>Chock v. Northwest Airlines, Inc.</u>, 113 F.3d 861, 864 (8th Cir. 1997)

---

[8]    Once a Section 1981 defendant has articulated a legitimate, nondiscriminatory reason for the employment action complained of, a plaintiff may still succeed where he can produce "sufficient evidence from which a jury could conclude that the purported reasons for defendant's adverse employment actions were in actuality a pretext for intentional race discrimination."  <u>Jones</u>, 198 F.3d at 412.  It is unnecessary to address pretext here, however, as the Plaintiff in this case, in addition to failing to satisfy the elements of his prima facie case, similarly failed to produce any evidence at all to demonstrate the proffered rationale for the School District's decision constitutes pretext.  Instead, Plaintiff has actually conceded that the basis for Curtis' decision is accurate.  (Pl.'s Dep., pp. 60-61, 110, 143, 182).  Where, as here, the only "evidence" of pretext is the testimony of the plaintiff, such "evidence" is insufficient to rebut the proffered legitimate, nondiscriminatory explanation as pretextual.  <u>See</u> <u>Jones</u>, 198 F.3d at 413; <u>Smith</u>, 876 F. Supp. at 75.

(same); <u>Hervey v. City of Little Rock</u>, 787 F.2d 1223, 1231-32 (8th Cir.) (same); <u>Haun v. Humana, Inc.</u>, 651 F. Supp. 120, 122-23 (W.D. Ky. 1986) (same).

Plaintiff has absolutely no evidence, outside of his own, unsubstantiated, allegations, to rebut or otherwise refute the School District's motive in transferring Defendant McMurray, instead of Plaintiff, to head custodian at the Rowland School. Instead, the evidence is clear that the Defendants, in an attempt -- at best -- to provide the most efficient transition with the most qualified employee, or -- at worst -- because the decision-makers were friends with McMurray, made the challenged employment decision. Because such allegations are wholly insufficient to create any issue of material fact, summary judgment should be granted in favor of the School District and Curtis.

## C. Plaintiff's Claims For Retaliation And Harassment, To The Extent Even Pled, Are Invalid Where Unsupported By Evidence And Specifically Contradicted By Plaintiff's Express Admissions

In his Complaint, Hazzard also alleges that he has been subject to harassment and retaliation by Defendant Curtis as a result of the filing of the grievance and internal complaint. (Pl.'s Complaint, ¶19). Despite the fact that Curtis and the District maintain that Hazzard has not properly pled a cause of action for retaliation or harassment in his Complaint, in the interest of efficiency and judicial economy they will respond to these allegations.

In his deposition, Hazzard cites only two examples of behavior that form the basis for the allegations of harassment and retaliation.   Specifically, Hazzard claims that Curtis "hassled" him for requesting bereavement leave. (Pl.'s Dep., pp. 138, 199-203).  As Hazzard testified, however, the leave was granted by the School District, thus negating Hazzard's claim that he was "harassed" for requesting the leave.  Id.  Second, Hazzard claims that Curtis "yelled" at him on one occasion and continued to do so until another custodian "intervened" in the incident. (Pl.'s Dep., pp. 139, 143-145). [9]

In order to prevail on a retaliation claim, a plaintiff must show that (1) he engaged in a protected activity; (2) he experienced some adverse action; and (3) there is a causal connection between the adverse action and the protected activity. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985). Hazzard's claims of harassment and/or retaliation fail, however, based on the fact that he expressly admitted during his deposition that the way he was treated by Curtis had nothing whatsoever to do with his filing of a grievance and internal complaint against the District:

Q   If you had never filed – and I know this is hard because it is not what happened, but **try to imagine if you had never filed your grievance and complaint for not getting the Rowland job.  Do you believe that Mr.**

---

[9]   Although unnecessary to defeat Plaintiff's claims as a matter of law, the sworn testimony of Defendant Curtis creates a different representation of these incidents.  (See Curtis Dep., pp. 44-46, 47-50).

> Curtis would have done the exact same thing for the bereavement leave that he did or would he have acted differently?

A    He would have done the same thing.

Q    So you're saying that even though you filed a complaint and a grievance, Mr. Curtis still would have made your life miserable in your mind over this bereavement leave issue?

A    Yes.

Q    Even if you had never filed a complaint?

A    Yes.

Q    How about the summer cleaning issue and you're (sic) saying his attitude towards you and his demeanor towards you. **Would his attitude and demeanor toward you have changed if you never filed the complaint?**

A    **It wouldn't have changed ...."**

(Pl.'s Dep., pp. 140-141) (emphasis added).

Where, as here, the express admissions of Plaintiff specifically refute any causal connection between the alleged harassment and/or retaliation and the protected activity, such claims, to the extent even pled, fail as a matter of law. See also Gibson v. Old Town Trolley Tours of Washington, D.C., Inc., 160 F.3d 177, 182 (4th Cir. 1998) (holding plaintiff must show causation between protected activity and alleged retaliation). Therefore, Defendants Curtis and the Harrisburg School District are entitled to summary judgment with respect to these claims.

## **CONCLUSION**

For the reasons set forth above, Defendant Harrisburg School District respectfully requests that this Honorable Court grant its Motion for Summary Judgment in its favor and against Plaintiff William Hazzard.

Respectfully Submitted,

RHOADS & SINON LLP

By: _____

Shawn D. Lochinger
Attorney I.D. No. 52795
Stephanie E. DiVittore
Attorney I.D. No. 85906
One South Market Square, 12th Flr.
Harrisburg, PA 17108
(717) 233-5731

Attorneys for Defendants Harrisburg
School District and Timothy Curtis

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of February, 2002 a true and correct copy of the foregoing "Brief in Support of the Motion for Summary Judgment filed by Defendants Harrisburg School District and Timothy Curtis" was served by first class mail, postage prepaid, upon the following:

Don Bailey
4311 North 6th Street
Harrisburg, PA 17110

Eric M. Fink
Willig, Williams & Davidson
1845 Walnut Street, 24th Floor
Philadelphia, PA 19103

Russell D. Fuller
Russell D. Fuller

IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM HAZZARD,        :
               :
     Plaintiff,        :    No. 1:CV-00-1758
               :
     v.           :    (Judge Rambo)
               :
TIM CURTIS, MACK MCMURRAY,    :
AFSCME DISTRICT 90, and THE     :
HARRISBURG SCHOOL DISTRICT,    :
               :
     Defendants.       :

## EXHIBITS TO BRIEF OF DEFENDANTS HARRISBURG SCHOOL DISTRICT AND TIMOTHY CURTIS

Deposition of William A. Hazzard dated October 19, 2001 ....................... Exhibit A

Plaintiff's Deposition Exhibits:

   Memo by Curtis re: Transfer of All Custodians .................................... 1

   Hazzard "Bid" for Rowland Position.................................................... 2

   Hazzard Grievance re: Rowland Position ............................................ 3

   AFSCME Written Notice of Withdrawal of Grievance........................ 4

   Hazzard Internal Complaint filed with School District ........................ 5

419477.1

Notice following School Board Hearing re: Hazzard Complaint.........6

Posting – Head Custodian at Rowland Intermediate School ...............7

CAB Agreement between AFSCME and School District ...................8

Job Description: Facility Service Foreman 1A .....................................9

Job Description: Facility Service Foreman 1B ..................................10

Grievance filed by All Head Custodians re: Transfer........................11

Hazzard Grievance re: Bereavement Leave.......................................12

AFSCME Response re: Bereavement Leave Grievance.....................13

AFSCME Written Notice re: Bereavement Leave Grievance............14

Grievance filed by All Head Custodians re: Vacation.......................15


Deposition of Timothy L. Curtis dated November 19, 2001 .......................Exhibit B


Deposition of Robert L. McMurray dated October 18, 2001.......................Exhibit C


Deposition of Lance D. Freeman dated November 17, 2001...................... Exhibit D


Harrisburg School District Internal Complaint Policy..................................Exhibit E


Collected Documents re: Hazzard Internal Complaint ................................ Exhibit F

# EXHIBIT A

1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3

 4

   WILLIAM A. HAZZARD,                    :
 5                    PLAINTIFF           :
                                          :
 6           VS.                          : NO. 1:CV-00-1758
                                          :
 7 TIM CURTIS, MACK McMURRAY, AFSCME,     :
   DISTRICT 90, AND THE HARRISBURG        :
 8 SCHOOL DISTRICT,                       :
                    DEFENDANTS            :
 9
10
11
12
13
14
            VIDEO
15       DEPOSITION OF:   WILLIAM A. HAZZARD
16       TAKEN BY:        DEFENDANTS HARRISBURG SCHOOL
                          DISTRICT AND TIM CURTIS
17
         BEFORE:          LISA A. HANSELL, REPORTER
18                        NOTARY PUBLIC
19                        ANTHONY MARCECA, LEGAL
                          VIDEO OPERATOR
20
         DATE:            OCTOBER 19, 2001, 8:58 A.M.
21
         PLACE:           LAW OFFICES OF DON BAILEY
22                        4311 NORTH SIXTH STREET
                          HARRISBURG, PENNSYLVANIA
23
24
25
```

**HAZZARD, WILLIAM**
**10/19/01**



**HAZZARD VS**
**CURTIS**

---

2

1 APPEARANCES:
2   LAW OFFICES OF DON BAILEY
      BY: DON BAILEY, ESQUIRE
3         FOR - PLAINTIFF
4   WILLIG, WILLIAMS & DAVIDSON
      BY: ERIC M. FINK, ESQUIRE
5         FOR - DEFENDANTS MACK McMURRAY,
           AFSCME AND DISTRICT 90
6
    RHOADS & SINON, LLP
7   BY: SHAWN D. LOCHINGER, ESQUIRE
         FOR - DEFENDANTS TIM CURTIS AND
8            THE HARRISBURG SCHOOL DISTRICT
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

4

1              INDEX TO EXHIBITS (CONT'D.)
2
3                           PRODUCED
     EXHIBIT NO.                  AND MARKED
4   10 - Position Guide for Facility Service
5      Foreman 1B
        (formerly Head Custodian I-Major)       167
6
    11 - Grievance Form dated 8/17/99           175
7
    12 - Grievance Form dated 6/7/00            209
8
    13 - Letter dated 2/6/01                    213
9
    14 - Letter dated 2/20/01                   213
10
    15 - Grievance Form dated 4/4/00            265
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

3

1              TABLE OF CONTENTS
2
                 WITNESS
3
    FOR DEFENDANTS          DIRECT   CROSS
4
    William A. Hazzard
5   By Mr. Lochinger:        5
    By Mr. Fink:            155
6   By Mr. Bailey:          --
7
8
9
10
11            INDEX TO EXHIBITS
12
                           PRODUCED
     EXHIBIT NO.                  AND MARKED
13
    1 - Memorandum dated 6/18/99               33
14
    2 - Memorandum dated 6/25/99               77
15
    3 - Grievance Form dated 8/12/99           84
16
    4 - Letter dated 3/14/00                  104
17
    5 - Complaint Form                        130
18
    6 - Letter dated 6/26/00                  131
19
    7 - Position Guide for Facility
20     Service Foreman 1B
        (formerly Head Custodian I-Major)     156
21
    8 - Agreement between the Board of
22     School Directors of the City of Harrisburg
        and AFSCME                            159
23
    9 - Position Guide for Facility Foreman 1A
24     (formerly Head Custodian I-Minor)      167
25

---

5

1        MR. BAILEY: Okay. Ladies and gentlemen, my
2 name is Don Bailey. I represent the plaintiff in this
3 matter. And so the transcribers can have a voice check, it
4 would help if the two attorneys would identify themselves.
5        MR. FINK: My name's Eric Fink, and I
6 represent Defendants McMurray and AFSCME.
7        MR. LOCHINGER: And my name is Shawn
8 Lochinger, and I represent The Harrisburg School District
9 and I guess the Defendant Tim Curtis.
10       MR. BAILEY: Okay. The plaintiff will be
11 recording the deposition today by alternative means. There
12 is a stenographer here. This deposition is being conducted
13 by which --
14       MR. FINK: Shawn is going to start.
15       MR. BAILEY: Okay. Shawn is going to begin,
16 so maybe the stenographer can swear the witness.
17
18       WILLIAM A. HAZZARD, called as a witness, being
19 sworn, testified as follows:
20
21       DIRECT EXAMINATION
22
23 BY MR. LOCHINGER:
24   Q   All right. Now, before we get started,
25 Mr. Hazzard, good to meet -- good to see you again.

2

**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

6

```
 1   A    Yes.
 2   Q    My name is Shawn Lochinger.  We met --
 3   A    Yes.
 4   Q    -- yesterday during depositions, and I have
 5  actually probably quite a number of questions here for you
 6  today.
 7   A    Okay.
 8   Q    But I'll give you the same -- I'll briefly
 9  give you the same admonition that Mr. Bailey gave yesterday
10  that you heard to the other witnesses, which is if you're
11  confused by any question I have for you, if you're not sure
12  of what I'm really asking you, please feel free to tell me
13  that, to ask me to repeat it or rephrase the question in
14  some way so you do understand it and you're -- so we're all
15  clear on what's going on.  Also, if there's things here that
16  I ask you that you legitimately do not know, tell me that.
17  Don't guess at something.  Don't try to make up something to
18  make it -- for an answer you think I want to hear or don't
19  want to hear.
20   A    Yes.
21   Q    If you really don't know, tell me that.
22   A    (Witness nods head affirmatively).
23   Q    Other than that I keep that brief, so we'll
24  get on with the questions here.  The first thing I want to
25  start with is when -- first of all, could you spell your
```

---

7

```
 1  name for us for the record and everything just so we have
 2  that?
 3   A    Hazzard, H-a-z-z-a-r-d.
 4   Q    And you're William A.; is that correct?
 5   A    Yes, sir.
 6   Q    And your address right now?
 7   A    Is 1021 South Progress Avenue.
 8   Q    In the city?
 9   A    Paxtang.
10   Q    Okay.  Is that a Harrisburg mailing address,
11  though?
12   A    Yeah.
13   Q    And the zip code?
14   A    17111.
15   Q    Okay.  Thanks.  All right.  You're currently
16  employed with The Harrisburg School District; correct?
17   A    Yes, sir.
18   Q    When was your original hire date with them?
19   A    About 1968.
20   Q    And what job were you originally hired into?
21   A    Grounds crew.
22   Q    The grounds crew doing what generally?
23   A    Cultivating, picking up trash and dumping it.
24   Q    And how long did you have that original job?
25   A    I'm not sure, but it may have been maybe ten
```

---

8

```
 1  years.
 2   Q    Okay.  What was the next job you had at the
 3  school district?
 4   A    I transferred to food service.
 5   Q    All right.  And was that a union job?
 6   A    Yes.
 7   Q    What union was that with?
 8   A    AFSCME.
 9   Q    Okay.  Do you recall about when that job
10  started?
11   A    I don't remember.
12   Q    You said about -- the first -- I'm sorry.  You
13  said the -- your grounds crew job lasted about 10 years.  So
14  was this around the late '70s -- around the late '70s, maybe
15  the early '80s?
16   A    Yes.
17   Q    Does that sound right?
18   A    Somewhere.
19   Q    Okay.  Do you recall at all who was your
20  supervisor in the food service job?
21   A    Mr. Brigry.
22   Q    How do you spell that, do you know?
23   A    No.  And Dave Lloyd was his assistant.
24   Q    And was that during the entire time you worked
25  in the food service area --
```

---

9

```
 1   A    Yes.
 2   Q    -- was he your supervisor?
 3   A    Yes.
 4   Q    What race was -- I'm sorry.  I still didn't
 5  quite get the name, Mr. Brigry?
 6   A    Brigry.
 7   Q    Brigry?
 8   A    Yes.
 9   Q    Was he white or black?
10   A    Black.
11   Q    Okay.  Did you have the same job in food
12  service for the entire time that you were in food service?
13   A    Yes; truck driver.
14   Q    And how long was that approximately?
15   A    The whole time that I was there.
16   Q    How many years was that about?
17   A    It may have been maybe ten years, close to ten
18  years.  I'm not sure.
19   Q    Okay.  Were you ever promoted during that
20  time?
21   A    Truck driver was about the highest, you know,
22  position there.
23   Q    All right.  So you were at the top of the food
24  service ladder so to speak during the time that you were
25  working for --
```

---

**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

10

1  A      Yeah.  Like managers weren't like full-time.
2  They didn't, you know, work during the summer, but then at
3  the time they changed us from 260 a year to 214.
4  Q      You were a manager?
5  A      No, I wasn't.  I was a truck driver.
6  Q      Okay.  I'm sorry.  You mentioned manager.  I
7  just wanted to clarify that.  So you're saying originally
8  you worked 260 days a year?
9  A      Yeah.
10  Q      That was eventually cut back to 214 days a
11  year?
12  A      Yes.
13  Q      Was that for all the truck drivers or just for
14  you?
15  A      All the truck drivers.
16  Q      How many truck drivers were there about?
17  A      About five.
18  Q      During this time that you were a truck driver
19  for food services, did you receive any raises at all during
20  that time?
21  A      Just the regular raises that all the school
22  district got because we were all one but different
23  departments.
24  Q      So you just got standard raises under the
25  AFSCME contract, is that what happened?

---

11

1  A      Yes.
2  Q      You didn't get promoted or singled out for a
3  raise or anything during that period of time?
4  A      No.
5  Q      Did anybody get promoted or -- you know, any
6  of the truck drivers.  I'm sorry.  Did any of the truck
7  drivers get singled out for a raise or promoted during that
8  period of time, do you recall?
9  A      No.
10  Q      The other truck drivers that were with you
11  there, were they all -- what was the race of the other truck
12  drivers, the other four of them or so?
13  A      Two of them were black, and one was white.
14  MR. BAILEY:  Before we go further, Bill, I
15  want to caution you.  I don't want to interfere with your
16  responses.  Your voice is extremely --
17  A      Low.
18  MR. BAILEY: -- soft.  And, quite frankly,
19  Shawn is coming through here at around four to five times
20  the decibel level that you are.  Try if you can -- so I got
21  the mike close to you.  I don't want you to hunch on the
22  mike.  Just try to think when you can to keep your answers
23  up just a little bit.  From time to time if you see me do
24  this --
25  A      Yeah.

---

12

1  MR. BAILEY: -- okay?  Please keep your voice
2  up, because these gentlemen have to hear you.
3  A      Okay.  Sorry.
4  MR. BAILEY:  That's all right.
5  BY MR. LOCHINGER:
6  Q      All right.  Do you recall when you moved out
7  of food service?
8  A      I don't remember the exact date.
9  Q      What job did you move into after food service?
10  A      I went to Marshall School.
11  Q      As what?
12  A      Custodian.
13  Q      Was that something that you decided, or was
14  that an involuntary move?
15  A      Something I decided.
16  Q      So you decided to move from a food service
17  worker into custodial work?
18  A      Yes, sir.
19  Q      Did you bid on the job?
20  A      Yes.
21  Q      And were there any other people that bid for
22  that job, do you recall?
23  A      No.  At the time I found out that the
24  supervisor there that was in charge of the custodians has
25  already moved somebody in that position and told me I

---

13

1  couldn't have it, so I told him that I bidded on the job and
2  I'm the senior man and I should get the job.
3  Q      Wait a minute.  I don't want to get confused.
4  This is the time you moved from food service worker, from
5  truck driver, to your first janitorial job?
6  A      Yes.
7  Q      Okay.  I'm sorry.  I just wanted to clarify
8  that we were on the same thing here.
9  A      Yeah.
10  Q      So you bid on the job?
11  A      And they wouldn't give it to me.
12  Q      And they did not give it to you even though
13  you contended at the time that you were the only person who
14  bid on it?
15  A      Yeah.
16  Q      Okay.
17  A      They finally gave it to me, though.  I had to
18  go to the union, though.
19  Q      I was going to say, did you file a grievance?
20  A      Yes.
21  Q      Do you recall -- did you actually -- did you
22  have a -- I'm sorry.  Did you actually have a hearing on this
23  grievance at some point?
24  A      No.  What happened was is I contacted
25  Mr. Simms, James Simms, that was in the highest union level

---



14

1 and I told him my problem, and he called down to the school
2 district and told them that according to the AFSCME contract
3 they can't just take some of their friends and put them in a
4 job opening, the job's got to be bidded on, and Mr. Hazzard
5 has bid on the job and he has seniority and you should give
6 him the job, and then they gave it to me.
7  Q    So that was -- the entire grievance procedure
8 was handled informally?
9  A    Yes.
10  Q    You never went to a formal hearing?
11  A    No.
12  Q    But you actually did file a grievance, you
13 actually filed a written document at some point?
14  A    No. I went to -- I called Mr. Simms, and I
15 told him that Mr. Somerford has given the job to one of his
16 friends and I wasn't going to get the job. So he called I
17 think it was Ms. Anna Hope at the administration building
18 and informed her what Mr. Somerford was doing, and so they
19 went into the contract and then they decided to put me into
20 the job.
21  Q    So the grievance was more informal from
22 beginning to end?
23  A    Yes.
24  Q    So the job you went into then was what?
25  A    Custodian.

15

1  Q    This was not head custodian?
2  A    No.
3  Q    This was just a custodian at which school?
4  A    Yes, at Marshall School.
5  Q    And this is a smaller school?
6  A    Yes.
7  Q    Okay.
8    MR. BAILEY:  Bill, make sure Shawn gets a
9 chance to finish his question. Sometimes you're a little
10 quick with the answer.
11  A    Yes, sir.
12    MR. BAILEY:  So, you know, let a little bit of
13 time pass there so the young lady can get it down.
14  A    Okay.
15    MR. BAILEY:  Okay. Thanks.
16 BY MR. LOCHINGER:
17  Q    How many people were on staff with you there
18 at Marshall in the custodial staff?
19  A    There was -- at that time there was Bud. He
20 was the head custodian.
21  Q    And Bud, do you remember his last name?
22  A    Swope.
23  Q    I'm sorry?
24  A    Swope.
25  Q    Swope?

16

1  A    Yeah.
2  Q    S-w-o-p-e?
3  A    Yeah.
4  Q    Okay. And what race was Mr. Swope?
5  A    He was a head custodian.
6  Q    Was he white or black?
7  A    Oh, he was white.
8  Q    Okay.
9  A    And then there was Mr. Gibson. He was black.
10 And then there was me.
11  Q    So there were three of you total?
12  A    Yeah.
13  Q    Mr. Swope was the head custodian, Mr. Gibson,
14 and you were the --
15  A    Yes. And then there was a lady during -- she
16 was day shift. I think her name was Mabel.
17  Q    You don't recall the last name?
18  A    No.
19  Q    Was she white or black?
20  A    Black.
21  Q    So there were four total on the job?
22  A    Yeah.
23  Q    While you were in this position -- I want to
24 concentrate just while you were in this position as janitor
25 at -- as custodian at Marshall. First of all, how long did

17

1 you have that job?
2  A    I was a regular head custodian maybe three
3 years.
4  Q    I'm sorry. You said a regular head custodian?
5  A    I'm sorry. A regular custodian.
6  Q    Okay. Good. I just wanted to clarify that.
7 So you were a regular custodian at Marshall?
8  A    Yes.
9  Q    For three years?
10  A    Yes.
11  Q    During that time did you receive any raises?
12  A    The regular raises that came with our
13 contracts, yes.
14  Q    Is there any component to that raise that is
15 determined by your performance? In other words, let me put
16 that another way. Is -- do you get the same raise whether
17 your performance is really good or really bad?
18  A    Yeah.
19  Q    Okay. So it doesn't matter. If you do a
20 wonderful job, your raise is still the same?
21  A    Yes.
22  Q    You don't get anything extra for doing an
23 exceptional job?
24  A    No.
25  Q    Who evaluated you during this time that you

5

18

1 were custodian at Marshall?
2　A　There was Ms. Dodd. Then there was Ms. Primm,
3 and then there was Ms. Antonsen.
4　　　MR. BAILEY: What was that name?
5　A　Anderson.
6　　　MR. BAILEY: Anderson?
7　A　Yeah. She's the principal at Rowland.
8　　　MR. BAILEY: Can you try to spell it for us?
9　　　MR. LOCHINGER: I can spell it for you. It's
10 A-n-t-o-n-s-e-n.
11　A　I never could pronounce it right.
12　　　MR. BAILEY: Okay.
13　　　MR. FINK: I know what he's talking about.
14 BY MR. LOCHINGER:
15　Q　Are you saying -- did they, all three of those
16 people, evaluate you each year you were in that position or
17 was it a different person?
18　A　It was a different person each time.
19　Q　Who was actually responsible for your
20 evaluation?
21　A　The principals were our boss at that time.
22　Q　Okay. So the principal of Marshall would be
23 responsible for your evaluation while you're the custodian
24 at Marshall?
25　A　Yes.

19

1　Q　And so then if I have you correctly, Ms. Dodd
2 was a principal there --
3　A　Yes.
4　Q　-- for awhile? Then Ms. Primm?
5　A　Yes.
6　Q　And then Ms. Antonsen?
7　A　Yes.
8　Q　And they all evaluated you. Do you recall
9 generally what those evaluations said?
10　A　Most of them were I could do improvements, I'm
11 doing a good job, keep up the good work.
12　Q　Was there anything in those evaluations that
13 stuck out in your mind that was a criticism of you or a
14 problem area?
15　A　Ms. Dodd wrote me a letter stating that when I
16 was cleaning I failed to put the trash can back in the
17 bathroom.
18　Q　Okay. I would -- I personally don't classify
19 that as a major violation, but is there anything more major
20 than that or was that really it?
21　A　That was it.
22　Q　Okay. So you were a janitor at Marshall for 3
23 years. Do you recall about what those 3 years were? I
24 mean, are we talking now the late '80s, is that what we're
25 up to, or the early '90s? I guess -- I guess if I have you

20

1 right you started in '68. You worked about 10 years on the
2 grounds crew; right?
3　A　Yes.
4　Q　Then you worked about 10 years as a truck
5 driver for food service?
6　A　Yes.
7　Q　So the way I figure that takes you up to
8 around the late '80s or maybe '90 or --
9　A　Yeah, around there. Yeah, close to there.
10　Q　Okay. You worked three years at Marshall as a
11 regular janitor. Now, what was the next job you had after
12 that?
13　A　Acting head custodian.
14　Q　Acting head custodian?
15　A　Yes.
16　Q　At what building?
17　A　Marshall. Mr. Swope became very ill and
18 couldn't perform his duties anymore.
19　Q　And did you ask for this job, or were you just
20 appointed into this job?
21　A　I was appointed.
22　Q　And who did that?
23　A　Ms. Anderson.
24　Q　Ms. Antonsen?
25　A　Yeah.

21

1　Q　Okay. The principal?
2　A　Wait. No, it wasn't Anderson. It was miss --
3 I think it was miss -- I'm not sure. It might have been
4 Miss Primm.
5　Q　Okay. But it was the principal of the
6 building at the time?
7　A　Yeah.
8　Q　You didn't apply for that job?
9　A　I asked for it, yes.
10　Q　And could you explain -- let's do this: let's
11 just back up. When Mr. Swope -- when you heard that
12 Mr. Swope was ill, what actions did you take at that point
13 in time that ended with you getting the acting head
14 custodian job?
15　A　Well, I was the most senior person there, and
16 so I went up to the office and said what do you want me to
17 do, and her response was, well, you can be acting head
18 custodian until Bud comes back, but he never came back.
19　Q　At the time that she appointed you acting head
20 custodian you thought Mr. Swope was coming back to work,
21 though?
22　A　Yes.
23　Q　How long did you think he was going to be out?
24　A　I thought maybe two to three months.
25　Q　What was wrong with him?

**22**

1  A    He had cancer.
2  Q    Okay. So when you took the acting head
3  custodian job you thought it was going to be just a
4  temporary thing?
5  A    Yeah.
6  Q    And was it temporary?
7  A    No. Then they started -- the principal
8  started -- which was Ms. Anderson started taking interviews
9  for head custodian, and I approached her, and I said,
10  Ms. Anderson, why wasn't I asked because I am acting head
11  custodian here and why haven't I been called in for an
12  interview, and at that time she interviewed me and I got the
13  job.
14  Q    So are you saying that you were not aware that
15  the acting head custodian job was in essence opened up?
16  A    I became aware it was opened up, and I thought
17  I was going to get it because I was acting head custodian
18  there.
19  Q    But --
20  A    But nobody asked me.
21  Q    Okay. How did you learn -- if I understand
22  what you're saying correctly, you learned --
23  A    Yes.
24  Q    -- that the job was being opened because other
25  interviews were being done?

**23**

1  A    Yeah.
2  Q    Was there ever a posting done?
3  A    Yes, there was a posting put up.
4  Q    Was that before these other people were
5  starting to be interviewed for the job?
6  A    No. Mr. Swope I think passed away at that
7  time, and so then the school district put a bid sheet out.
8  Q    Okay. I just want to make sure of the timing
9  of this. When -- what order did these things happen in?
10  Mr. Swope passed away?
11  A    Uh-huh.
12  Q    A bid sheet was put up. People were starting
13  to be interviewed for the job?
14  A    Yes.
15  Q    Is that the correct order that things went in,
16  or do I have those out of line?
17  A    No. That's about the way they went in.
18  Q    Did you ever sign up on the posting, on the
19  bid sheet?
20  A    I asked her who was going to be acting head --
21  who was going to be custodian because I am acting head
22  custodian, am I going to get the job, and she says that
23  decision will be made later. And they had interviews, but
24  they never called me in. So I finally went up and said,
25  hey, when am I going to be called in.

**24**

1  Q    Okay. You didn't work through the union in
2  this situation -- in that situation?
3  A    I worked with the union, yes.
4  Q    Did you file a grievance over it at all?
5  A    I don't think I did. I think I -- I think I
6  just kind of like went to Ms. Anderson and told her, hey,
7  you know, this isn't right, I should be in there too because
8  I am acting head custodian here, I have the most years of
9  service, why ain't I in here, and then she said, okay, come
10  on in, and she did the interview then.
11  Q    And do you know the other people that applied
12  for the head custodian job at Marshall?
13  A    She -- no, I don't. She told me they were
14  interviewing outside people. They weren't asking people
15  inside.
16  Q    Okay. So the other people you talked about
17  being interviewed were not --
18  A    School district employees.
19  Q    -- school district employees?
20  A    No.
21  Q    Okay. All right. So you became head
22  custodian at Marshall then. Do you recall the year that
23  this was? I mean, I'm still trying to pin down a year here,
24  if we could nail down one of these years.
25  A    It may have been between '95 and -- somewhere

**25**

1  around there.
2  Q    How long were you acting head custodian before
3  you actually became the regular head custodian at Marshall?
4  A    Maybe a year. Almost a year.
5  Q    Okay. Was the size of your staff still the
6  same? Was there three people under your control as head
7  custodian?
8  A    They brought in a sub -- another sub.
9  Q    To in essence take your place?
10  A    Yeah.
11  Q    So you had -- so it was you, two other people
12  on your shift and then one on the day shift; is that
13  correct?
14  A    Ms. Antonsen decided that it was best that I
15  would be daylight. That's the confrontation between me and
16  -- and then it was Tracy Bradshaw, John Strohm and Leonard
17  Jackson.
18  Q    Let me go back and hit your bosses at
19  Marshall. Your bosses while you were head -- while you were
20  custodian and head custodian at Marshall were the principal
21  of the building; correct?
22  A    Yes.
23  Q    The first principal you worked under was a
24  Ms. Dodd?
25  A    Yes.

**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

26

1  Q    Is she white or black?
2  A    **Black.**
3  Q    She's black?
4  A    **Black.**
5  Q    Okay. How about Ms. Primm?
6  A    **Black.**
7  Q    And how about Ms. Antonsen?
8  A    **She's Spanish.**
9  Q    Was Ms. Antonsen your -- the last principal
10 you had at Marshall? Was she there the whole time you were
11 there, or did other principals come through?
12 A    **She was there the whole time I was there then**
13 **the rest of the time until she went to the Rowland building.**
14 Q    Ms. Antonsen your direct supervisor the entire
15 time you were at Marshall?
16 A    **Yes.**
17 Q    What about -- what about Mr. Curtis, when did
18 he come into the picture?
19 A    **He came in probably maybe about the last year,**
20 **and he was kind of like up in the administration building.**
21 **What his duties were then I don't know but then he was --**
22 **then we were told that the principals were no longer our**
23 **boss, that Tim Curtis was.**
24 Q    Okay. That's what I was getting to. I just
25 wanted to see the chain of command here. Did that occur

---

27

1  while you were still at Marshall?
2  A    **Yes.**
3  Q    I'm getting ahead of myself here. Let me back
4  up one more time here. How long were you head custodian at
5  Marshall?
6  A    **Just a little over four years maybe.**
7  Q    And just to put kind of a date on it, were you
8  head custodian at Marshall until -- we heard some testimony
9  from Mr. McMurray about all of the head custodians being
10 transferred in -- what was that date, June of '99; is that
11 right?
12 A    **Yeah.**
13 Q    Were you head custodian at Marshall until that
14 time, until you were transferred by Mr. Curtis?
15 A    **Yeah.**
16 Q    Okay. So we know that you were head custodian
17 at Marshall until at least June of 1999?
18 A    **Yeah.**
19 Q    You believe you started there in about 1995?
20 A    **Yeah.**
21 Q    As the head custodian?
22 A    **I was a regular custodian first, maybe a year**
23 **or two when I was there.**
24 Q    Right. Okay. All right. During the time you
25 were head custodian, Ms. Antonsen is your supervisor. Did

---

28

1  you receive any raises during the time that she was
2  supervising you?
3  A    **No.**
4  Q    You had the same salary the whole time?
5  A    **Well, we just got the same salary that we got**
6  **through our contract with the school district. Everybody**
7  **got the same raise.**
8  Q    So you got raises, but it was all, again,
9  through the AFSCME contract?
10 A    **Yes.**
11 Q    Nothing above and beyond that?
12 A    **No.**
13 Q    Any commendations or awards or anything that
14 you got?
15 A    **Oh, I made more money when I went from food**
16 **service to custodian because I was only 214 days and now I'm**
17 **260 days so they had to pay me for those -- those days that**
18 **they brought me up to.**
19 Q    Okay. But once you became a custodian you
20 were always 260 days?
21 A    **Yes.**
22 Q    Okay. During the time you were head custodian
23 at Marshall, did you ever get any awards or commendations
24 or, you know, pats on the back from -- from Ms. Antonsen?
25 A    **Yes.**

---

29

1  Q    Could you tell us what those were?
2  A    **It was always thank you, Mr. Hazzard, I**
3  **appreciate your work, you know, or something like that.**
4  Q    So these are informal?
5  A    **Yes.**
6  Q    Anything formal that you actually were
7  recognized for anything or --
8  A    **No.**
9  Q    Okay. Your staff at the time at Marshall when
10 you were head custodian, what were their races?
11 A    **Tracy was black. Mabel was black, and**
12 **Mr. Gibson was black.**
13 Q    So all of your staff were black then at
14 Marshall?
15 A    **Yeah.**
16 Q    Your evaluations when you were the head
17 custodian, I'm assuming -- am I correct to assume that
18 Ms. Antonsen filled them out?
19 A    **Yeah.**
20 Q    Just generally, because I think we have copies
21 of some of them at least, but generally do you recall them
22 being good or average or poor?
23 A    **My own?**
24 Q    Yes.
25 A    **I'm pretty sure most of them were -- were**

---

30

1 good.
2 Q      Okay.  Do you recall the -- you told us before
3 that near the end of your time at Marshall Mr. Curtis -- you
4 were told that you would -- Mr. Curtis would be your boss
5 from that point on?
6 A      Yes.
7 Q      Did Mr. Curtis ever evaluate you when you were
8 a janitor -- when you were the head custodian at Marshall?
9 A      I don't know if it wasn't until I went to
10 Shimmell.  I'm not sure.
11 Q      Okay.  Mr. Curtis, by the way, is he white or
12 black?
13 A      He's black.
14 Q      Okay.  Now, now that we're up to -- so I've
15 got you through the end of Marshall now.  Now, tell us what
16 happened -- you said you went to Shimmell next?
17 A      Yeah, but it was -- it was like an illegal
18 transfer really because Tim Curtis sent out a letter stating
19 that I'm giving you all the transfer you asked for.  So
20 there was a grievance filed by the union because nobody
21 asked for this transfer that he did.  So the ones that went
22 from a high paying head custodian to a low, they couldn't
23 deduct their salary.  They had to keep them the same because
24 it was untrue what he did.
25 Q      And when you say went from a high paying job

31

1 to a low, why would you -- what's -- you're saying there is
2 two different salary structures for head custodians?
3 A      Oh, yeah.  If you go to a lower paying job,
4 then that's where your -- the difference that they'll deduct
5 your salary.
6 Q      What's -- what is the criteria for determining
7 what a lower paying job is?
8 A      A -- 1A, that's what I am, is a lower salary
9 than 1B.
10 Q      And is there any difference between the two
11 jobs, 1A and 1B, to make up for the difference in salary?
12 A      Yeah.
13 Q      What are those differences?
14 A      I think it's a nine percent raise.
15 Q      Okay.  So it's a nine percent raise, but is
16 there any difference in the actual work that you have to do?
17 A      It's a bigger building, more responsibility.
18 Q      So a 1B has a bigger building than a 1A?
19 A      Yes.
20 Q      Is there any difference in job
21 responsibilities?
22 A      They do the same work.  It's just the
23 buildings are bigger or smaller.
24 Q      So in essence a 1A and a 1B, from what you're
25 telling me, do the same work, it's just one has more

32

1 building to deal with?  1B has more building to deal with
2 than a 1A?
3 A      Yes.
4 Q      Are their staffs the same size?
5 A      The staffs are bigger or smaller.
6 Q      So 1B has a bigger staff?
7 A      Yeah.  There would probably be more kids or
8 less.
9 Q      And you say you think there's about a nine
10 percent difference in the salary?
11 A      Yes.
12 Q      When you were -- when Mr. Curtis transferred
13 you, you said you got transferred to Shimmell; am I correct?
14 A      Uh-huh.
15 Q      From what I'm hearing you say, though, he
16 transferred everybody, all head custodians; correct?
17 A      Yes.
18 Q      And you moved from Marshall to Shimmell.  Was
19 Shimmell the same size of a school?
20 A      Yes, but all the -- all the black head
21 custodians were promoted to high paying jobs, and the two
22 white head custodians were the only ones promoted to the
23 lower -- stayed at the lower paying jobs.
24 Q      I don't think I quite understand what you're
25 saying there.

33

1 A      Well, Mr. Curtis when he transferred all the
2 head custodians, all the black head custodians were actually
3 put into a higher rank.  They made more money.
4 Q      Okay.  So you're -- all of them -- you're
5 saying all of the black head custodians?
6 A      All the blacks except for the two whites, yes.
7 Q      Okay.  Do you know -- and I'll tell you what.
8 I think it would go a lot easier if I pull this out.
9       MR. BAILEY:  Are you going to mark it?
10      MR. LOCHINGER:  Yeah, I think.
11      MR. BAILEY:  I have a copy he can work from.
12      MR. LOCHINGER:  Okay.
13      MR. BAILEY:  Just a second.  Let me pull that
14 out.
15      MR. LOCHINGER:  Yeah, I think we'll mark this.
16      MR. BAILEY:  If you're going to use it, you
17 know.
18      MR. LOCHINGER:  Yeah.
19      MR. BAILEY:  Give me a second to pull this out
20 of here.
21      MR. LOCHINGER:  No problem.  If not, I
22 probably have an extra one here.
23      MR. BAILEY:  Oh, if you have -- okay.  No
24 problem if you've got one.
25      (Memorandum to Head Custodians from Tim Curtis

9

34

1 dated June 18, 1999 marked as Hazzard Exhibit 1.)
2 BY MR. LOCHINGER:
3     Q     Okay. The document I gave you, which we'll
4 mark as an exhibit, it's a -- and just to describe it here,
5 it's a memorandum to Head Custodians from Tim Curtis,
6 Facilities Supervisor, and it's dated June 18, 1999, RE:
7 Transferring of Head Custodians. Is this a memo that you
8 got that transferred you to Shimmell?
9     A     Yeah.
10    Q     All right. I want to go down this list since
11 you've brought this up, and let's talk about the race of
12 each person here, and if you can recall where they started
13 and where they ended.
14    A     I -- I -- I couldn't really -- I don't -- I --
15 some of them I haven't even met or even know.
16    Q     Okay. Well, let's -- let's just see -- you
17 know, we can go down these one at a time here, and if you
18 don't recall, you don't recall but --
19         MR. BAILEY: I -- I think this is on there.
20 Forgive me because I was looking for it. This is a
21 memorandum to Head Custodians from Tim Curtis, Facilities
22 Supervisor, dated June 18th, 1999, in RE: Transferring of
23 Head Custodians?
24         MR. LOCHINGER: Yes.
25         MR. BAILEY: Okay.

35

1 BY MR. LOCHINGER:
2     Q     All right. The first person listed here is
3 James Matthew. Do you recall if he's white or black?
4     A     No.
5     Q     He went to Downey. Is Downey a small or a
6 large school?
7     A     It's a small school.
8     Q     Do you know where Mr. Matthew was to start?
9 It doesn't say on here. I'm just -- that's why I'm
10 wondering if you remember.
11    A     No. My other papers had said that -- you
12 know, where they went, who they were and everything, and I
13 don't have that with me.
14    Q     Okay. So we don't know where he started?
15    A     No.
16    Q     Clyde Dunson. Do we know if he's white or
17 black, do you know?
18    A     He's black.
19         MR. BAILEY: Excuse me. Did you state the
20 race of Mr. Matthew?
21         MR. LOCHINGER: I think he said he did not
22 know.
23    A     I didn't know.
24         MR. BAILEY: Okay.
25 BY MR. LOCHINGER:

36

1     Q     Mr. Dunson is black. He went to Steele. Is
2 that a small or a large?
3     A     That's a small school. I think he was at Camp
4 Curtin, which was a big school.
5     Q     All right. The next one is Jaclyn Havior. I
6 don't know if I'm pronouncing that right, but is she white
7 or black?
8     A     She's black.
9     Q     And she went to?
10    A     Woodward.
11    Q     Woodward. Is that small or large?
12    A     Small.
13    Q     And do you know where she started?
14    A     No.
15    Q     Okay. Stanley Holton?
16    A     He's black.
17    Q     Okay. And he went to Lincoln?
18    A     Yes.
19    Q     Is that large or small?
20    A     That's about the same size as Shimmell.
21    Q     So that would still be classified -- when I
22 say large or small, I guess I'm talking a 1A versus a 1B.
23    A     Yeah. Yeah, that's a 1A.
24    Q     Okay. So Lincoln's still a small, or a 1A,
25 job?

37

1     A     Yeah.
2     Q     Do you know where Mr. Holton came from?
3     A     He came from maybe a slight bigger school,
4 Foose.
5         MR. BAILEY: Foose would be F-o-o-s-e?
6     A     Yeah.
7 BY MR. LOCHINGER:
8     Q     And Foose is -- are you saying that's a 1A
9 school or a 1B school?
10    A     I'm not sure what it is, but I know it's a
11 little bigger.
12    Q     I'm sure we can find all this out. Valence
13 Barker, white or black?
14    A     He's a Jamaican.
15         MR. BAILEY: What's the color of his skin, is
16 he -- or his race?
17    A     He's -- I think he's black.
18 BY MR. LOCHINGER:
19    Q     Marshall. Well, we know that's a small --
20 that's where you -- he moved into your school then,
21 Marshall?
22    A     Yeah. He came from John Harris to Marshall,
23 from a 1B to a 1A.
24    Q     I was going to say John Harris is a -- is a
25 larger school; right?

**38**

1  A      Yeah.
2            MR. BAILEY:  Did you say Marshall's a 1A?
3 He's been using this term 1B and 1A.  Is Marshall a 1A?
4  A      Yes.  Marshall is considered a small school.
5            MR. BAILEY:  Okay.
6 BY MR. LOCHINGER:
7  Q      Elaine Eden.  Is she white or black?
8  A      She's black.
9  Q      And I see here she went from Lincoln to Ben
10 Franklin.
11  A      Yeah.
12  Q      What was that -- is that size to size, do you
13 know?
14  A      Well, Ben Franklin I think is a B because Ben
15 Franklin -- when you clean Ben Franklin, you clean the
16 administration too.  So I think that's a big.
17  Q      Okay.  So Ben Franklin and the administration
18 building are considered one building in a sense?
19  A      Yes.
20  Q      And it's considered a 1B?
21  A      Yes.
22            MR. BAILEY:  And just so the record is clear,
23 Lincoln was a --
24 BY MR. LOCHINGER:
25  Q      And Lincoln's a small?

**39**

1  A      Yes.
2  Q      So she went from a small to a large?
3  A      Yeah.
4  Q      Next, William Hazzard.  I think we know you;
5 right?
6  A      Yeah.
7  Q      You went from Marshall to Shimmell, and
8 they're both smaller schools; right?
9  A      Yes.
10  Q      Robert Lanier.  He went from Melrose to John
11 Harris.  Well, first of all, is he black or white?
12  A      He's black.
13  Q      Is Melrose a small school?
14  A      Yeah.  He went to a large school.
15  Q      And John Harris is a large one?
16  A      Yeah.
17            MR. BAILEY:  Try to keep your voice up, Bill.
18  A      Yes.
19 BY MR. LOCHINGER:
20  Q      Three -- four more here.  Dan Rhoads.
21  A      He's white.
22  Q      And he went to Foose, which I think you
23 already said is a small school?
24  A      Yeah.
25  Q      Do you know where he came from?

**40**

1  A      Shimmell.
2  Q      So this is the person you took over his
3 position?
4  A      Yeah.
5  Q      At Shimmell.  So it was a small to a small
6 school?
7  A      Yeah.
8  Q      Dwight Adams.  White or black?
9  A      I think he's black.
10  Q      And he went from Steele to Camp Curtin?
11  A      Yeah.
12  Q      Steele is small?
13  A      Small.
14  Q      And Camp Curtin is small or large?
15  A      Large.
16  Q      Robert McMurray?
17  A      He went from Hamilton to --
18  Q      Right.  He went to Hamilton?
19  A      Yeah.  William Penn to Hamilton.
20  Q      And William Penn -- if I recall from
21 yesterday, William Penn is large --
22  A      Large.
23  Q      -- and Hamilton is small; is that right?
24  A      Small, right.
25  Q      And Mr. McMurray is black; correct?

**41**

1  A      Yes.
2  Q      All right.  Raymond -- the last one.  Raymond
3 Washington.  Is he white or black?
4  A      He's black.
5  Q      And I can't quite read that.  He -- where did
6 he -- he went from somewhere?
7  A      Woodward.
8  Q      Woodward?
9  A      A little school to a big school.
10  Q      So he went from Woodward, a small school, to
11 William Penn --
12  A      Yeah.
13  Q      -- a large.  Okay.
14            MR. BAILEY:  That's going to be Hazzard 1?
15            MR. LOCHINGER:  Yeah.  I'll have to give you
16 one that I didn't write on.
17            MR. BAILEY:  I have a copy here.  Well, you
18 know what --
19            MR. LOCHINGER:  No, not -- just for the
20 stenographer.
21            MR. BAILEY:  I have one that's partially been
22 -- I don't know if that's the copy everybody else has.
23            MR. LOCHINGER:  I guess we can use that then.
24            MR. BAILEY:  No.  That's the one I have.  I'll
25 make a copy for me as long as I know what number -- what it

42

1 is.
2 BY MR. LOCHINGER:
3 Q All right. Okay. I did want to do that to
4 clarify what you were saying about, you know, blacks and
5 whites getting the jobs. I mean, we still have one person
6 we're not sure about, but all right. So you were
7 transferred to Shimmell, and the union grieved all of the
8 transfers I think is where we left off; correct?
9 A Yes, because none of the custodians -- head
10 custodians asked for a transfer, none of them.
11 Q Okay. So you didn't ask to be moved to
12 Shimmell?
13 A No.
14 MR. BAILEY: Could we hold right there for 30
15 seconds?
16 MR. LOCHINGER: Sure. No problem.
17 MR. BAILEY: Miss, you may want to check
18 yours.
19 (Recess.)
20 MR. BAILEY: Okay.
21 MR. LOCHINGER: All right?
22 BY MR. LOCHINGER:
23 Q Did you -- did you actually report to Shimmell
24 despite the grievance?
25 A Yes.

43

1 Q How long did you work at Shimmell as a head
2 custodian?
3 A From the time that I was transferred till now.
4 Q So you're still there now?
5 A Yeah.
6 Q The grievance that was filed, what happened to
7 it?
8 A They made an agreement I guess with the union
9 that the head custodians that were B that went to a small
10 building they didn't lose nothing.
11 Q So you're saying the ones that were at a large
12 building that went to a smaller building stayed at the same
13 rate of pay as if they were at a large building?
14 A Yeah.
15 Q Okay. And that was -- and that essentially
16 ended the grievance?
17 A Yeah.
18 Q So the assignments that were made stayed in
19 effect?
20 A Yeah.
21 Q Okay. At Shimmell, who's your -- who's been
22 your supervisor at Shimmell?
23 A Just this summer started Dr. Jones.
24 Q When you first went there in June of '99, was
25 Mr. Curtis still acting as your supervisor at the time?

44

1 A Yeah.
2 Q Who was the principal at Shimmell at the time
3 you moved there?
4 A I don't know. I can't remember her name.
5 Q But you did not report directly to the
6 principal?
7 A Yes. She was my boss. No, Tim Curtis -- no.
8 Excuse me. I'm sorry. Tim Curtis was my boss.
9 Q Okay. So Tim Curtis -- that's what I was
10 asking. Tim Curtis -- when you first went to Shimmell, Tim
11 Curtis was your boss; correct?
12 A Yes, he was, yes.
13 Q The principal, obviously, had to direct you
14 during the day, but the principal was not evaluating you; am
15 I right on that?
16 A No, she evaluated me.
17 Q Okay. So the principal was in on your
18 evaluation or did the whole evaluation?
19 A She brought -- brought me in and talked to me.
20 Q Did Mr. Curtis play a role in your evaluation?
21 A No, I don't think so, but Mr. Curtis evaluated
22 me too.
23 Q Oh, okay. So you -- did you get a formal
24 evaluation from both the principal and Mr. Curtis?
25 A Yeah.

45

1 Q And what is your recollection -- let's start
2 with the one from the principal first. Do you recall --
3 before I do that, you don't recall the principal's name, but
4 you said it was a female?
5 A Yeah.
6 Q Is that correct?
7 A Yeah.
8 Q Was she white or black?
9 A Black.
10 Q Do you recall what your evaluation was from
11 her, was it generally positive, generally negative, in the
12 middle somewhere?
13 A There was a problem going on at the building
14 there, and she kind of didn't like me because one of the
15 custodians in there that was black wasn't doing his job so I
16 was writing him up. So she told me to do something about
17 it. So I did. I informed Mr. Curtis. We had a meeting,
18 and then she found out before that time that her husband was
19 related to Donald Thomas, the guy I was writing up, so when
20 Tim Curtis said, okay, let's get it on with what's going on,
21 she turned around and she said Mr. Hazzard doesn't clean my
22 monitor screen.
23 Q Had that ever been brought up before?
24 A No. We weren't supposed to be there for
25 that. If we're there for one person, that's what we're

46

1 supposed to stick, Donald Thomas. It was supposed to be a
2 hearing on Donald Thomas, and she skipped it and attacked
3 me.
4 Q    Oh, okay. You're saying this was at the
5 actual meeting you had had?
6 A    Yes.
7 Q    So am I taking it from what you're saying that
8 your evaluation was not all positive then --
9 A    It was --
10 Q    -- from the principal's point of view?
11 A    It was okay. It's just there was a problem
12 there that I couldn't write this guy up no more because if I
13 would write him up then she would come after me and say that
14 I didn't clean a certain area.
15 Q    Did she tell you that you couldn't write him
16 up anymore?
17 A    No.
18 Q    Did Mr. Curtis tell you that you couldn't
19 write him up anymore?
20 A    No, but I informed Mr. Curtis on what was
21 going on.
22 Q    And did Mr. Curtis give you any instructions
23 as to how to handle the situation?
24 A    No, he didn't. He was there at the meeting.
25 He knew the meeting there was for Donald Thomas, not me. He

47

1 was as shocked as I was when she said Hazzard didn't clean
2 my monitor screen.
3 Q    Okay. You said you also got evaluated by
4 Mr. Curtis, though, besides the principal.
5 A    Yes.
6 Q    Do you recall generally what your evaluation
7 was from Mr. Curtis?
8 A    I could -- I'm doing good, I could improve.
9 Q    So that sounds like it's not the best but not
10 the worst either?
11 A    Yeah.
12 Q    Did there come a point in time when you were
13 head custodian at Shimmell that Mr. Curtis was no longer
14 your immediate supervisor?
15 A    Yes. That happened I guess about a month or
16 so ago.
17 Q    And who is your supervisor now?
18 A    Dr. Jones.
19 Q    And what position does he have?
20 A    He's the principal.
21 Q    Okay. So Dr. Jones is now the principal of
22 Shimmell?
23 A    Yeah.
24 Q    And what's his race?
25 A    He's black.

48

1 Q    Has he evaluated your work yet?
2 A    No, but we talked.
3 Q    And is everything going okay?
4 A    Oh, yes. He is a very nice guy.
5 Q    How many people do you have on your staff
6 right now at Shimmell?
7 A    Donald Thomas, and they fired one girl. So I
8 have Allen Linwood -- Linwood Allen.
9 Q    So you have two people on your staff?
10 A    Two -- it's me and Allen at night and Donald
11 Thomas during the day.
12 Q    Those men, are they black or white?
13 A    Black.
14 Q    Both of them?
15 A    Yeah.
16 Q    So three of you --
17 A    Yeah.
18 Q    -- work in Shimmell now?
19 A    Uh-huh.
20 Q    All right. I think we've got enough
21 background stuff for the time being. Let's move on to the
22 actual complaint here. And before we even get to the actual
23 complaint -- I do want to walk you through that, but I just
24 want to get some general facts first. The job we're talking
25 about here, just so we're all straight, is the head

49

1 custodian job at Rowland School; correct?
2 A    Yes, sir.
3 Q    And Rowland is a large school?
4 A    Yes, sir.
5 Q    So could you explain to me how you applied for
6 this job?
7 A    Okay. When I was out at Shimmell School --
8 Q    Uh-huh?
9 A    -- Ms. Anderson told me that she was being
10 transferred to the Rowland building. And I really enjoyed
11 -- I had a good relationship with her in working, so I
12 said, well, I would like to transfer over there. So she
13 said, well, put a bid in on the head custodian job over
14 there. So she typed it up for me, and I signed it and sent
15 it in.
16 Q    So Ms. Antonsen actually typed up your -- your
17 formal bid --
18 A    Yeah.
19 Q    -- for the job? Had you actually seen a
20 posting for the job at that point in time?
21 A    Not at that time.
22 Q    So you put your bid in before you actually saw
23 a posting?
24 A    Yeah.
25 Q    You were going on the fact that Ms. Antonsen

---

50

1 was being transferred there, and you assumed there would be
2 an opening?
3    A    **Yeah.**
4    Q    Had you heard from anybody else besides
5 Ms. Antonsen that there would be an opening for the
6 custodian job at Rowland?
7    A    **Just among the head custodians.**
8    Q    Did they say that the job was definitely
9 opening, or was it more of a talk that I wonder what's going
10 to happen?
11   A    **It's going to open.**
12   Q    Okay.  When did you actually see the posting
13 for the job?  Or did you ever see a posting for the job I
14 should ask you.
15   A    **Yeah, June.**
16   Q    In June?
17   A    **Yeah.**
18   Q    Of what year, 2000?
19   A    **Yeah.**
20   Q    When -- put that in perspective for me in
21 terms of when this bid -- when you put in your bid for the
22 job.  Was it a week before, a month before, how long before
23 did you put in your bid?
24   A    **I -- I -- wait a minute.  The bid came out**
25 **July 8th I think.**

---

51

1    Q    The posting?
2    A    **Yeah, the posting.  And I put in -- put my bid**
3 **in on -- somewhere near the end of June.**
4    Q    And this was all in the year 2000?
5    A    **Yeah.**
6         MR. BAILEY:  1999?
7    A    **Or 1999.**
8         MR. BAILEY:  It was all 1999.
9         MR. FINK:  It was just after this.
10        MR. LOCHINGER:  Okay.  Yeah, okay.  That's a
11 good point.  Yeah, that's right.
12 BY MR. LOCHINGER:
13   Q    This happened literally -- you put your bid in
14 for Rowland very shortly after you got transferred to
15 Shimmell?
16   A    **Uh-huh, yeah.**
17   Q    Is that right?
18   A    **Yeah.**
19   Q    Okay.  So let me -- let me clarify my error
20 because that was my error.  You put your bid in near the end
21 of June -- you got transferred to Shimmell in the middle of
22 June, June 18th, 1999?
23   A    **Yeah.  I think on the 25th I put the bid in.**
24   Q    Then you put your bid in on June 25, 1999.
25 I'm being shown a document here that you actually put your

---

52

1 bid in on June 25th, 1999; is that right?
2    A    **Yeah.**
3    Q    You're telling me then about a week -- this
4 would be about a week -- a week and a half later is when you
5 actually saw the posting --
6    A    **Yeah.**
7    Q    -- for the -- for the job?
8    A    **Yeah.**
9    Q    Where did you see the posting, by the way?
10   A    **It was down in the teacher's lounge.**
11   Q    Is that the normal place where job postings
12 are put?
13   A    **Yeah, they put them down there.  Like -- they**
14 **have like a big corkboard.  The teachers put their stuff**
15 **there, and AFSCME puts their stuff there.**
16   Q    Okay.  Is there anyplace else the jobs are
17 posted that you would see them?
18   A    **They're supposed to be posted in every**
19 **building.**
20   Q    Would you have a reason to see them in other
21 buildings or --
22   A    **If you'd go into the area where they were**
23 **posted, yes.**
24   Q    But in this case did you see any other
25 postings for this job?

---

53

1    A    **No, just in my building.**
2    Q    Okay.  When you saw the posting did you --
3 what was your thoughts at the time when you actually saw the
4 posting?
5    A    **I was very happy.**
6    Q    And why was that?
7    A    **Because I knew that I had the experience, the**
8 **time, the seniority, and I didn't see any reason why I**
9 **shouldn't get the job.**
10   Q    When you saw the posting did -- let me
11 rephrase that.  Did you know the posting was going to happen
12 or was the posting -- did it kind of come out of the blue
13 for you?  I guess what I'm --
14   A    **I knew it was coming.  I knew it was coming,**
15 **that it was a matter of time, but I was glad when I saw it.**
16   Q    So when you bid on the job, did you know for
17 sure that it was going to be posted or was it just a good
18 educated guess on your part?
19   A    **It -- it's common procedure.  It's regular**
20 **procedures.  When a job opening is open, they're supposed to**
21 **put out a bid, and they did.**
22   Q    Okay.  But, again, at the time you actually
23 put in your bid there was no -- the physical posting hadn't
24 been put out yet?
25   A    **Huh-uh.**

---



HAZZARD, WILLIAM
10/19/01

HAZZARD VS
CURTIS

---

54

1   Q      Okay.
2          MR. BAILEY: Try to answer yes or no.
3   A      **Yes.**
4          MR. BAILEY: Yes, it had not been put out yet?
5   A      **(Witness nods head affirmatively).**
6          MR. BAILEY: Okay.
7 BY MR. LOCHINGER:
8   Q      Was there anything on the posting that talked
9 about the salary for the new job?
10  A      **I don't remember.**
11  Q      How did you know that it was a 1B job, a large
12 school job, instead of a 1A job that you were in?
13  A      **Oh, it said on — I think it said on it,**
14 **somewhere written on it, and I knew it anyway. I knew it**
15 **was a big building. Everybody was talking about it, you**
16 **know, that it was going to be a higher — you know, for a**
17 **higher custodian.**
18  Q      Okay. You talked to Ms. Antonsen before the
19 posting. Did you talk to anybody after the posting?
20  A      **I consulted with my two union stewards.**
21  Q      And who were they?
22  A      **Steve McCollum and Rob Tapper. They were the**
23 **only two that would represent me.**
24  Q      I'm not sure what you mean by that statement.
25 They were the only two that would represent you?

---

55

1   A      **Yeah. A time came when AFSCME just dropped my**
2 **grievance for no reason at all, no reason, nothing, just**
3 **dropped it.**
4   Q      Well, wait. I'm not there yet. I'm not there
5 yet. But at the time you actually first saw the posting you
6 didn't have a grievance pending, did you?
7   A      **No.**
8   Q      Okay. So when you first saw the posting, you
9 had already bid for the job?
10  A      **Uh-huh.**
11  Q      And is it at that point in time that you
12 contacted Mr. McCollum and Mr. Tapper?
13  A      **No. It was right after a head custodian**
14 **meeting. Mr. Curtis out of the blue said, oh, and by the**
15 **way, Mack Murray is the head custodian of the Rowland**
16 **building, and I'm like what.**
17  Q      Okay. Let's -- let's take this one step at a
18 time. Let me back up a little bit, too. When you put in
19 your bid, who do you actually send it to?
20  A      **Mr. Freeman's office.**
21  Q      Okay. And that's what you did in this case?
22  A      **Yes.**
23  Q      And in the normal course of events do you hear
24 anything back from Mr. Freeman's office that we got your bid
25 or your bid is in, is that a normal procedure?

---

56

1   A      **Yeah, but I didn't get anything.**
2   Q      Did that concern you in any way?
3   A      **Yes. That's when I went for union help.**
4   Q      Okay. So we're getting back to that point
5 again?
6   A      **Yes.**
7   Q      Okay. Then -- since we're there, why don't
8 you give me the -- when did this actual meeting occur with
9 head custodians, do you recall a date relative to -- you
10 know, relative to the day it was posted on July 8th?
11  A      **It must have been around -- it must have been**
12 **around July. Maybe the first week in July or somewhere.**
13  Q      Was the meeting before or after you first saw
14 the posting?
15  A      **It was after I saw the posting.**
16  Q      Okay. So --
17         MR. BAILEY: Keep your voice up, Bill.
18  A      **Yes.**
19 BY MR. LOCHINGER:
20  Q      Was it -- was it a couple days later, was it a
21 week later, was it a month later, do you have -- I mean, you
22 know, can you just give us a general idea how soon the
23 meeting was after you first saw the posting?
24  A      **It must have been about at least two weeks.**
25  Q      Okay. During that two week period of time,

---

57

1 from the time you saw the posting till the time you had the
2 head custodian meeting, did it concern you at all that you
3 had not heard anything back from Mr. Freeman in that two
4 week period?
5   A      **Yes. I kind of thought that Mr. Freeman**
6 **probably would have sent me something back, you know,**
7 **saying, hey, you know, you're a good custodian, thank you**
8 **for your years of service, but we decided to promote Mack**
9 **McMurray for whatever reasons, you know, professionally or**
10 **whatever. I kind of expected something like that rather**
11 **than there being a head custodian meeting and have Tim**
12 **Curtis just drop it in my lap.**
13  Q      Well, I understand that. I'm trying to get in
14 this period of time between the posting date, when your bid
15 is already in and the actual meeting. I'm trying to get in
16 those couple of weeks there that you talked about.
17  A      **Yeah.**
18  Q      During those couple weeks, did you do anything
19 to try to find out what was going on with your bid?
20  A      **Yes. I went to Steve McCollum.**
21  Q      And this was before the head custodian
22 meeting?
23  A      **Oh, no. This was after the head custodian**
24 **meeting.**
25  Q      Okay. I just want to do it -- I want to do it

---

15

**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

58

1 before the head custodian meeting.
2   A    Okay.
3   Q    Did you do anything at all to find out what
4 was going on with your bid?
5   A    No.  I was just waiting for it to happen.
6   Q    Okay.  All right.  The head custodian meeting
7 that we're talking about now, is this a regularly-scheduled
8 meeting?
9   A    Yes.
10   Q    Do they happen, what, once a month?
11   A    Yeah.  We have -- we're supposed to have one
12 once a month.
13   Q    Does that occur?  You said that like that
14 doesn't always occur.
15   A    Yeah.  Sometimes there is -- some people get
16 notices and some people don't.  And if he puts it out on the
17 computer and your computer's not working, then you don't
18 know, and he don't know your computer is not working so, you
19 know, sometimes people don't hear.
20   Q    So this is a regularly-scheduled meeting that
21 you have to --
22   A    Yes.
23   Q    -- to, what, keep informed of events?
24   A    Duties, supplies, things like that.
25   Q    Okay.  At this meeting, this is the first time

59

1 that you heard that Mr. McMurray was going to get the
2 Rowland job?
3   A    I heard rumors long before that that job
4 was going to be given to Mack McMurray.
5   Q    Long before that.  Like how long before?  Was
6 it -- put it back in perspective for me again.  You know,
7 between the time you actually put in your bid and the time
8 of that meeting, did you hear rumors during that period of
9 time?
10   A    I think when I was at Shimmell School I heard
11 rumors that Mack McMurray was gonna get the job.
12   Q    And who did you hear these rumors from?
13   A    Just custodians talking about it.
14   Q    Do you recall in particular who you heard it
15 from?
16   A    No.
17   Q    Do you recall if the people you heard it from
18 were white or black?
19   A    I think they may have been black.  I'm not
20 sure.
21   Q    Okay.
22       MR. BAILEY:  You need to keep your voice up,
23 Bill.  You're almost down to a whisper.  It's really hard to
24 pick you up.
25   A    Okay.

60

1 BY MR. LOCHINGER:
2   Q    So you heard rumors that Mr. McMurray was
3 going to get this, and you still hadn't heard back from
4 Mr. Freeman on your bid, and still to this point before,
5 before the meeting, before the meeting, you still didn't
6 actually check into it or try to figure out why your bid was
7 -- why you hadn't received a response?
8   A    No.  I figured Mr. Freeman -- you know, that's
9 his job and he -- he -- how he does it is how he does it,
10 you know.  If he's gonna send me a letter, all I can do is
11 wait for it.
12   Q    Did you think the rumors about Mr. McMurray
13 were true at the time?  And this is before your meeting you
14 had -- before your meeting with Mr. Curtis.  Did you think
15 the rumors were true that Mr. McMurray was going to get the
16 job?
17   A    I had a suspicion.  You know, it's like a gut
18 feeling.  There's like a group there, a click.
19   Q    A click in what sense?
20   A    Tim Curtis, Mack McMurray, a girl and Dunson,
21 they kind of like -- you know, they're close together.  He
22 sent the girl, Elaine, from the Scott building over to my
23 building, and the thing is that if you're a head custodian
24 and you come to my building, I'm the boss.  You have to do
25 what I say.  They came over, and their words were like F

61

1 you, F you, this and that, and I called Tim Curtis.  Tim
2 Curtis comes out and says, well, why don't you guys work
3 together.  I'm like, that's not the point.  The point is the
4 F words.  So he left, and she came back and told me, you
5 know, you leave me the F alone and I'll work and, you know
6 -- so I called Tim Curtis back again, and Tim Curtis said,
7 well, you're supposed to run it, and I said, well, she won't
8 listen to me, and he didn't do a thing about it.
9   Q    Now, before -- I don't want to get too far off
10 track here.  This was -- what you just described, did that
11 occur after the meeting that we're talking about here?
12   A    Yeah.
13   Q    Was that --
14   A    Yeah.
15   Q    -- fairly long after?
16   A    Long after.
17   Q    Okay.  Let's hold that then.  Let's hold
18 that.  We'll come back to that at some point here.  So the
19 meeting occurs.  Is -- I guess my question still remains.
20 Is that meeting with Mr. Curtis with all the other head
21 custodians, I'm assuming, sometime in July of 2000?
22   A    Yeah.
23   Q    Was that the first time you heard officially
24 that Mr. McMurray was going to get the Rowland job?
25   A    Yeah.

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



62

1 Q   What was your -- what was your reaction when
2 you heard this?  First of all, before I even say that, who
3 -- who actually told you?
4 A   Well, Tim Curtis told us all.  He was just
5 like telling us -- up and out of the blue he said, oh, by
6 the way, Mack McMurray, you're the head custodian at Rowland
7 building.  Oh.
8 Q   And did you say anything right then in the
9 meeting or did you -- did your reaction come after the
10 meeting?
11 A   I went back to my union steward and I asked
12 him, hey, I haven't -- I haven't received a response from
13 Freeman, what's going on, I feel that I -- I still feel that
14 I should have this job.  And so Freeman wouldn't respond,
15 and so we went through the grievance procedure.
16 Q   Who's the steward that you went to?
17 A   It was -- well, it was Mr. Epps and then Steve
18 McCollum and Robert Tapper.
19 Q   Could you give me the races of -- you know,
20 white or black of all of those people?
21 A   Okay.  Mr. Epps is black.
22 Q   Okay.  That's who you originally went to?
23 A   Yes.
24 Q   After the meeting with Mr. Curtis?
25 A   Yes.

63

1 Q   Okay.  And McCollum?
2 A   And Rob Tapper.
3 Q   What are the -- what's their races?
4 A   White.
5 Q   They're both -- McCollum and Tapper are both
6 white?
7 A   Yeah.
8 Q   Okay.  When Mr. Curtis made this announcement,
9 did he give any reason or did he just say it was a done
10 deal?
11 A   It was a done deal.
12 Q   Did he -- he did not give any reason as to why
13 McMurray was chosen?
14 A   No.
15 Q   Were you even mentioned at all during the
16 meeting?
17 A   No.
18 Q   So after the meeting is over you go to
19 Mr. Epps?
20 A   Yeah.
21 Q   And tell him -- is this the first time that
22 you told him that you bid on the job?
23 A   Yes.
24 Q   Had you told anybody else besides
25 Ms. Antonsen of course and of course Mr. Freeman -- had you

64

1 told anybody else that you had bid on the job?
2 A   Yeah; Steve McCollum.
3 Q   So you go to Mr. Epps, and you tell him that
4 you had bid on the job?
5 A   Uh-huh.
6    MR. BAILEY:  By the way, Epps is E-p-p-s?
7 A   Yes.
8 BY MR. LOCHINGER:
9 Q   And what was Mr. Epps' reaction when you told
10 him that?
11 A   How can he do that, you've got more time in
12 service than he got.
13 Q   And we're talking -- okay.  When you're
14 talking about time in service, you're talking about the
15 seniority issue here?
16 A   Yeah.
17 Q   Explain to me your understanding of the
18 contract in terms of seniority issues and bidding for a
19 job.
20 A   Well, the school board settled that at a
21 meeting at Marshall School.  Mr. Brown asked Mr. Freeman
22 directly concerning that situation, and Mr. Freeman's
23 response was is the man with the most senior time got the
24 job.  And there are other people that bidded on jobs.  You
25 can see in the contract the person with the most senior time

65

1 always got the job.
2 Q   That's my question to you, though.  Is -- your
3 most senior time, are you talking about time in a particular
4 job or time with the district in total?
5 A   Total.  Because some people had 30 years, but
6 maybe 15 of those years was maybe a lunch aide working 2
7 hours a day cleaning a table off, and they got that 15 years
8 seniority.
9 Q   That would be my question to you.
10 A   Yeah.
11 Q   So your interpretation of the contract is that
12 -- take the example that I am a lunch aide for 15 years,
13 and then I'm a custodian for 2 years.  I would get -- I
14 would get priority in the bidding process --
15 A   Yeah.
16 Q   -- over anybody who was a custodian, even if
17 they were a custodian for 10 years, because I had more
18 seniority in the district?
19 A   Yeah, yeah.
20 Q   Okay.  When you went to Mr. Epps and told him
21 about this, he expressed his displeasure.  What happened
22 next?
23 A   It seemed there was a problem here, so he went
24 to Rob Tapper and Steve McCollum because they're, you know,
25 high rank positions in the union.



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

66

1  Q    McCollum and Tapper, are they employed by the
2 district at all?
3  A    **Mr. Tapper quit.**
4  Q    At the time were they both employed by the
5 district?
6  A    **Yes.**
7  Q    They were union stewards?
8  A    **Yes.**
9  Q    But they were -- you said they have high
10 positions. Were they on the executive committee or
11 something?
12  A    **Yeah.**
13  Q    Okay.
14  A    **Mr. Tapper was I think vice-president or**
15 **something of the union.**
16  Q    And who actually made the decision then to
17 file a grievance?
18  A    **After I consulted with Mr. Tapper and Steve**
19 **McCollum.**
20  Q    So all three of you, is that what you're
21 saying?
22  A    **Yeah, yeah, all three of us.**
23  Q    That memo that Ms. Antonsen typed out for you,
24 is that the only -- the only thing you did to bid for the
25 job?

---

67

1        MR. BAILEY: The June 25th?
2 BY MR. LOCHINGER:
3  Q    The June 25th?
4  A    **Yes. At a hearing Mr. Freeman acknowledged**
5 **that, yes, he did accept my memo as a legal bid.**
6  Q    That's fine. I just wanted to know -- was
7 there anybody else that -- was there any other memo that you
8 sent in or any other person you told or any other thing at
9 all that you did to bid on the job or is that it?
10  A    **I just went through the grievance procedure.**
11  Q    No, no. I mean to actually bid on the job.
12 I'm just trying to make sure --
13  A    **No.**
14  Q    -- that that's the only thing we're talking
15 about here.
16  A    **Yeah, yes.**
17  Q    Okay. It is the only thing we're talking
18 about?
19  A    **Yes.**
20        MR. BAILEY: I'm going to object to the form
21 of the question. You may respond. From time to time, Bill,
22 I may -- we have an agreement I think as to the usual
23 stipulations are accepted at the time of trial. If I say --
24 you just -- follow my instructions. I may object, but you
25 go ahead and respond. I'll instruct you. Okay?

---

68

1  A    **Okay.**
2        MR. BAILEY: So you go ahead and respond.
3 It's just an objection noted. You go ahead and respond.
4 BY MR. LOCHINGER:
5  Q    All right. Let's move on to the complaint
6 itself. I'll tell you where I want to start with you is
7 Paragraph 12 really because a couple other things are going
8 to be captured in the other things we do.
9        Paragraph 12 says the defendant AFSCME and the
10 defendant school district decided not to promote you. Could
11 you just tell me on what basis you make this allegation that
12 they decided not to promote you?
13  A    **Mr. Freeman sent out a letter stating that we**
14 **didn't do anything in not giving me the job. Look, even**
15 **AFSCME dropped you. And AFSCME would turn around and say,**
16 **well, we weren't wrong. Look, the school district agrees**
17 **with us. They both agreed with each other.**
18  Q    Okay. So -- yeah. Let's walk through this
19 then. You're telling me that the way you got notice that
20 you were not being promoted, if I understand you correctly,
21 first of all, is at the meeting with Mr. Curtis. That's the
22 first time you heard that you were not getting the Rowland
23 job; correct?
24  A    **Yes.**
25  Q    After that, what was your next notification of

---

69

1 that? Did you get a formal notification? I'll ask it that
2 way.
3  A    **No.**
4  Q    You never got a letter saying that you -- your
5 bid had been turned down or that you were not getting this
6 job?
7  A    **Not until after I went through the grievance**
8 **procedure.**
9  Q    Prior to the grievance procedure did anybody
10 ever -- other than Mr. Curtis at this initial meeting, did
11 anybody tell you in any way you were not getting this
12 job other than the first time with Mr. Curtis?
13  A    **I don't recall.**
14  Q    You don't recall if anybody ever told you or
15 you don't recall -- scratch all that. You said that both
16 made the decision. Who are you accusing of actually making
17 the decision of not to promote you, what specific people?
18        MR. BAILEY: Objection to the form of the
19 question. You may respond.
20  A    **I -- from the material that I have, I came to**
21 **the conclusion that AFSCME and Mr. Freeman must be talking**
22 **and they both agreed together that, you know, we don't have**
23 **to give him the job.**
24 BY MR. LOCHINGER:
25  Q    Okay. So for the school district Mr. Freeman

---

18

**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

70

1  -- you're saying that Mr. Freeman made this decision;
2  correct?
3  A     Uh-huh.
4  Q     Anybody else for the school district --
5  A     Tim Curtis.
6  Q     -- that was involved?
7  A     Tim Curtis.
8  Q     We've already heard that Mr. Curtis is black.
9  Mr. Freeman, is he white or black?
10 A     Black.
11 Q     Anybody else for the school district that was
12 -- that you think was involved with this decision?  Go
13 ahead.
14 A         Just Nichelle Crevis, the union, Council 90.
15           MR. BAILEY:  Do you mean Nichelle Chivis?
16 A     Yeah.
17           MR. LOCHINGER:  Okay.  I think she's a union
18 person.
19           MR. BAILEY:  C-h-i-v-i-s, I believe it is.
20           MR. LOCHINGER:  I think she's a union person.
21 A     Yeah.
22 BY MR. LOCHINGER:
23 Q        Is there anybody else for the school district
24 that you're aware of that you think was involved in this
25 decision to promote Mr. McMurray instead of you?

---

71

1  A     I think the school board played a role in it.
2  Q     Okay.  Anybody specifically or the board as a
3  whole?
4  A     Mr. Brown seems to lead the way.
5  Q     Is Mr. Brown white or black?
6  A     Black.
7  Q     Anybody else you can think of for the school
8  district who you believe may be involved in the decision?
9  A     Mr. Tapper would probably know that more than
10 I would.
11 Q     Okay.
12 A     Because he had these meetings with them.
13 Q     I understand.  I'm just -- I'm asking you if
14 you -- what your opinion is.
15 A     Yeah.
16 Q     How about for the union, who do you think was
17 involved there with the decision?  You already said Nichelle
18 Chivis.
19 A     Yeah.
20 Q     Anybody else?
21 A     I have no idea.  I know there was something
22 going on out there with the union representation but I -- I
23 wasn't there.  Only Steve McCollum and Rob Tapper were
24 there.
25 Q     Nichelle Chivis, is she white or black?

---

72

1  A     Black.
2  Q     At any time during this was your race actually
3  mentioned by anybody as a reason for the decision?
4  A     No.
5  Q     In Paragraph 13 you said that the school
6  district decided instead to promote the defendant McMurray.
7  Are you saying the same people that you just went over that
8  were involved in the decision not to give you the job are
9  these the same people that decided to give it to McMurray?
10 A     Yeah.
11 Q     Did anybody ever tell you that they were
12 involved in the decision-making process?
13 A     Yes.
14 Q     Who was that?
15 A     Mr. Rob Tapper.
16 Q     Oh.  Don't let me put words in your mouth
17 here, but you're telling me that Mr. Tapper told you who
18 from the school district made the decision?  Is that what
19 you're really saying?
20 A     Oh, no, no.
21 Q     Or are you saying Mr. Tapper actually helped
22 make the decision?
23 A     No.  Mr. Tapper had meetings with the school
24 board about me and about my job, and they went over to
25 Sorrento's and they ate over there, and the school board,

---

73

1  Mr. Brown leading, stated that tell Mr. Hazzard not to
2  worry, he got the job, you know, he got the seniority.  And
3  then we were supposed to have a meeting with the school
4  board in which Mr. Brown changed his mind.
5  Q     Okay.  You're getting -- I think you're
6  getting a little ahead again.  Is this after you filed your
7  grievance you're talking about?
8  A     Yeah.
9  Q     Okay.  Again, we'll get back to that.  I
10 promise you we'll get back to that here because we're
11 getting to the -- we're getting to the part where you filed
12 your grievance here coming up.
13           MR. BAILEY:  Bill, try to stay if you can -- I
14 can understand a little of Shawn's frustration.  Try to give
15 some thought when you answer to where is he time-wise with
16 his line of questions.
17 A     Okay.
18           MR. BAILEY:  It will save us time.
19 A     Okay.
20           MR. BAILEY:  If you have any confusion,
21 remember he invited you to ask him.
22 A     Okay.
23           MR. BAILEY:  So -- because what's happening is
24 he's asking questions, and now and then you'll answer the
25 question sort of out of time sequence, and then he has to go

---



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

74

1 back over that ground.
2    A    Yeah. Okay.
3        MR. BAILEY: Okay. So try -- and if you have
4 a concern, just ask him, and he'll -- okay?
5    A    Okay.
6 BY MR. LOCHINGER:
7    Q    All right. McMurray got promoted. Were you
8 ever -- were you ever told a specific reason that McMurray
9 was promoted and you -- and I used the word promoted. I
10 guess I'm using it just because it's in your complaint. I
11 don't know if that's really the right word. But -- so let
12 me go back and say --
13        MR. BAILEY: We understand that you don't
14 agree --
15        MR. LOCHINGER: Correct.
16        MR. BAILEY: -- at all or necessarily in any
17 way with the word promoted.
18        MR. LOCHINGER: Correct.
19        MR. BAILEY: Okay. We'll stipulate that you
20 don't agree with that.
21 BY MR. LOCHINGER:
22    Q    Did anybody ever give you a reason that
23 Mr. McMurray was selected for this job instead of you?
24    A    Yes; Mr. Freeman's office.
25    Q    Okay. And who in Mr. Freeman's office

---

75

1 actually --
2    A    I think it was Mr. Freeman.
3    Q    And what specifically did he tell you?
4    A    He said that Mack McMurray was transferred
5 from William Penn to Rowland with the school.
6    Q    With the school meaning -- I'm not quite sure
7 what that means.
8    A    From William Penn to Rowland when the school
9 -- when William Penn moved, he said he went with the whole
10 school as -- you know, the whole group.
11    Q    Oh, okay. Let me make sure I understand
12 this. So William Penn, the school itself, and this includes
13 the teachers?
14    A    Uh-huh.
15    Q    And the students?
16    A    Yeah.
17    Q    In essence were transferred from the William
18 Penn building up to the new Rowland School?
19    A    Yeah.
20    Q    So Rowland took the place of William Penn --
21    A    Yeah.
22    Q    -- in the district?
23    A    Uh-huh.
24    Q    And Mr. Freeman told you that, what, the head
25 -- the custodian staff also was transferred?

---

76

1    A    Yeah.
2    Q    At the same time?
3    A    Yeah. He said he went from William Penn to
4 Rowland.
5    Q    Is that an accurate statement?
6    A    No.
7    Q    Why not?
8    A    Because Mack McMurray went to Hamilton.
9    Q    So McMurray was actually transferred from
10 Hamilton to Rowland?
11    A    To Rowland, yeah.
12    Q    But didn't we hear yesterday that it was
13 really the same summer --
14    A    Uh-huh.
15    Q    -- that the transfer for McMurray went from
16 William Penn to Hamilton to Rowland; is that correct?
17    A    When we were all transferred?
18    Q    Yes.
19    A    He was transferred to Hamilton.
20    Q    Correct. I understand. And then --
21    A    But Mr. Freeman said he went to Rowland. And
22 then when Mr. Freeman found out I guess he made a mistake he
23 rephrased it.
24        MR. BAILEY: Okay. All right. At this time
25 I'm going to ask everybody to suspend. We have to change a

---

77

1 tape.
2        THE VIDEO OPERATOR: We're going to stop --
3 it's 10:27 a.m. -- for a break.
4        (Recess.)
5        MR. BAILEY: Ladies and gentlemen, please be
6 advised that an electronically-activated, controlled and
7 functioning listening device is in operation.
8        THE VIDEO OPERATOR: The time is 10:32, and
9 we're resuming the deposition of Mr. Hazzard.
10 BY MR. LOCHINGER:
11    Q    Let me just go back. I pulled this during our
12 little break here just so that we have this on the record.
13 This is the -- the document I'm giving you, Mr. Hazzard, is
14 that -- is that your bid that you put in for the Rowland
15 job?
16    A    Yeah.
17    Q    It's dated June 25, 1999, memo to Mr. Freeman;
18 is that correct?
19    A    Yeah.
20        MR. LOCHINGER: Okay. I just want to put that
21 in, and we'll mark that as an exhibit just so we have it in
22 there.
23        (Bid for Head Custodian at Rowland School
24 dated June 25, 1999 marked as Hazzard Exhibit 2.)
25 BY MR. LOCHINGER:

---



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

78

1  Q     All right. I'm still stuck on this whole
2 Mr. McMurray got the job and you didn't allegation in the
3 complaint here. I believe you said that -- and now here's
4 -- I'll give you an opportunity. You were talking about
5 some of these things earlier, and I'll give you the
6 opportunity now. You said that mister -- I'm sorry -- that
7 you were never told specifically that your race was a
8 factor; am I correct on that? Is that what you --
9  A     Yes.
10  Q     That's what you testified about before?
11  A     Uh-huh.
12  Q     So what evidence do you have that tells you
13 that your race really was a factor?
14  A     I kind of like weighed it. When I first
15 became head custodian, I kind of like had to threaten to go
16 to the union to get the head custodian job. When I put in
17 for this job, I wasn't given consideration of somebody at
18 least writing me a letter back and saying why they didn't
19 give me -- you know, why I was passed over for the job. I
20 did hear rumors that Mack was gonna get the job. I didn't
21 think it was fair because I had more time, seniority, than
22 Mr. McMurray, and all the head custodians that were black
23 were promoted in his transfer and -- except for two whites,
24 and that was me and Mr. Rhoads.
25  Q     Rhoads -- Mr. Rhoads, is that what you said?

79

1  A     Yeah.
2  Q     Okay. So it was all those things taken
3 together that led you to believe that your race was really a
4 factor here?
5  A     Yeah, that, and there was another incident
6 where too many custodians were taking off, and so Mr. Curtis
7 asked Mr. Rhoads to ask me to recant on my vacation. Why
8 ask me, a person of 30 years, to recant on vacation for
9 somebody that wanted to take off? Why single me out?
10  Q     And I'm assuming what you're saying by talking
11 about it now is that you feel your race was a factor in
12 that?
13  A     Yeah.
14  Q     Anything else?
15  A     Yes. During the summer -- the year before
16 last when I was cleaning the building, I had summer school
17 all summer so I didn't have the convenience of having
18 custodians all summer long cleaning the building and getting
19 it ready. I had almost -- maybe less than three weeks. And
20 so Mr. Curtis comes over, and he walks in the room not
21 thinking that why -- he should have came in and said why
22 wasn't this room finished, it was like yesterday, and
23 then I would have told him, well, a truck came in and this
24 happened, you know, and we had to do other things so we
25 couldn't get this room. He came in there screaming and

80

1 yelling at me. And then as soon as Donald Thomas walked in
2 and told him to keep his voice down -- and Donald Thomas is
3 black -- then Mr. Curtis kind of like smiled and kept his
4 voice down. He's always got to get loud with me every time
5 he talks to me.
6  Q     Okay. I was going to say -- so you're saying
7 that whole incident took place and the way you were treated
8 because of your race?
9  A     Yeah.
10  Q     Anything else that you have that makes you
11 believe your race was a factor in not getting this position?
12  A     No. It was just little things off and on. I
13 can't even remember.
14  Q     Those are the ones you can remember right now
15 or --
16  A     Yeah.
17  Q     You think there are some others, though?
18  A     There may be, yeah.
19  Q     Yes, no, any --
20  A     Yeah.
21  Q     You think -- okay. Next -- your next
22 allegation is you were the only person to bid on the job.
23     MR. BAILEY: What paragraph?
24     MR. LOCHINGER: Paragraph 14. I'm sorry.
25 BY MR. LOCHINGER:

81

1  Q     Paragraph 14, you were the only person that
2 bid on the job. Can you explain to me what you mean by this
3 -- and let me explain my confusion. I'm not -- you say
4 you're the only person to bid. Does that mean you're the
5 only person that signed the sheet, you're the only person
6 you know about, you're positive you were the only guy to
7 bid? I'm not sure. I just -- I need you to explain.
8  A     When we went to the meeting with Mr. Freeman,
9 Mr. Epps asked Mr. Freeman has anybody else bidded on that
10 job, and he said, no, Hazzard is the only one that bid on
11 the job.
12  Q     Okay. So Mr. Freeman himself explained that
13 you were the only bidder?
14  A     Yeah.
15  Q     You were never told if Mr. McMurray bid or
16 requested the job or not?
17  A     He said -- when he was asked that question,
18 Mr. Freeman said that he was transferred with the school,
19 from William Penn to Rowland.
20  Q     So Mr. Freeman never said one way or another
21 whether Mr. McMurray actually asked for the transfer?
22  A     No.
23  Q     How did you know that you had more seniority
24 than Mr. McMurray?
25  A     I asked the union steward how many years he



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

82

1 had.
2 Q    Who did you ask, do you recall?
3 A    **Steve McCollum.**
4 Q    And did you ask how many years he had with the
5 district as a whole or just in that job?
6 A    **I wasn't worried about that. I asked him, you**
7 **know, how many years of service he had here.**
8 Q    With the district as a whole?
9 A    **Yeah.**
10    MR. BAILEY: Could we spell McCollum for the
11 record just to get it in there somewhere in this deposition?
12 A    **M-u-c-c-l-l-u-m.**
13    MR. BAILEY: McCollum?
14 A    **Yeah.**
15    MR. BAILEY: M-u-c-c --
16 A    **Yeah, l-l-u-m.**
17    MR. BAILEY: That's different. Okay.
18 BY MR. LOCHINGER:
19 Q    I think we talked about this briefly before,
20 but your understanding of the AFSCME contract with The
21 Harrisburg School District is -- when it talked about
22 seniority being a factor, what seniority are they talking
23 about in that contract, seniority in the district as a whole
24 or just in that particular job?
25 A    **Like I said, when we had that meeting out**

---

83

1 there at Marshall School, Mr. Brown, a board member, asked
2 Mr. Freeman the same question, and Mr. Freeman said the man
3 with the most senior time got the job.
4 Q    In the district?
5 A    **In the district.**
6 Q    Not just for the job?
7 A    **In the district everywhere.**
8 Q    · Okay. Paragraph 15. It says in 1999 you
9 filed a grievance with AFSCME against the district. How did
10 you start the grievance procedure in this case?
11 A    **Which grievance was that?**
12 Q    This is your grievance that you did not get
13 the Rowland job.
14 A    **Oh. I went to Steve McCollum, and I talked it**
15 **over with him, you know, and he told me according to the**
16 **contract that I should have that job and I should put a**
17 **grievance in on it and at least get a response from**
18 **Mr. Freeman.**
19 Q    And then who wrote up -- did somebody actually
20 write up the grievance then?
21 A    **Yeah.**
22 Q    Who did that?
23 A    **I'm not sure if it was Mr. Epps or McCollum.**
24 Q    Do you get to look at it before it goes out?
25 A    **Yeah.**

---

84

1 Q    And do you have to approve it before it goes
2 out?
3 A    **Yeah.**
4 Q    And I'm assuming you did in this case?
5 A    **Yeah.**
6 Q    All right. Hang on for one second. I'm
7 sorry.
8 A    **Okay.**
9 Q    All right. The grievance form I'm looking at
10 here is dated August 12, 1999. It looks like it's signed by
11 a Robert Epps.
12 A    **Yeah.**
13 Q    Does that make sense?
14 A    **Yeah, Mr. Epps.**
15    MR. BAILEY: Can I see it, please?
16    MR. LOCHINGER: Sure.
17    MR. BAILEY: Okay.
18    MR. LOCHINGER: Here you go. We'll mark that
19 one, too.
20    (Grievance dated August 12, 1999 marked as
21 Hazzard Exhibit 3.)
22 BY MR. LOCHINGER:
23 Q    Do you think mister -- did Mr. Epps actually
24 help write that or do you recall at all?
25 A    **I wrote it up and then he kind of like -- you**

---

85

1 know, if I misspelled something he corrected it.
2 Q    Okay. And then what happens with that
3 document right there, who gets that document?
4 A    **I guess they take it out to the union and then**
5 **Ms. Crevis takes --**
6 Q    Chivis?
7 A    **Chivis, yeah, takes it out to Mr. Freeman.**
8 Q    Okay. And then do you have any knowledge what
9 happens to it at that point in time once Mr. Freeman gets
10 it?
11 A    **I usually get a response. It comes back with**
12 **a response on it.**
13 Q    And are you kept -- were you kept informed
14 during this process of the paperwork going through, what was
15 going on?
16 A    **Yeah.**
17 Q    Who was keeping you informed?
18 A    **Steve McCollum and Rob Tapper.**
19 Q    Okay. And would they tell you that the
20 paperwork had been delivered to the school district?
21 A    **Yeah.**
22 Q    Things like that?
23 A    **Yeah. If it would come back, they'd say, hey,**
24 **you know, your grievance is back, you know, and whether**
25 **there was a response or not.**

---

22

 

86

1  Q      Now, did you ever have any -- were there ever
2  any meetings with the school district or the union about
3  this grievance?
4  A      Yeah, we had a meeting with Mr. Freeman and
5  Tim Curtis.
6         MR. BAILEY:  Bill, when you say we and use
7  pronouns like that --
8  A      Okay.
9         MR. BAILEY:  -- please tell the attorney --
10 name the individuals because he doesn't know what you mean
11 by that.
12 BY MR. LOCHINGER:
13 Q      I was going to ask that next.  Well, first I
14 was going to say this meeting with Mr. Freeman --
15 A      Yeah.
16 Q      -- was this the first meeting about the
17 grievance?
18 A      Yes.
19 Q      And who was present at the meeting?
20 A      Ms. Crevis, Rob Tapper, Mr. Epps and Steve
21 McCollum.
22        MR. BAILEY:  For the sake of the record,
23 again, because I don't want any confusion, when you say
24 Crevis, you mean Chivis.  I know you sort of got that in
25 your mind.  It's okay.  So we all understand that Crevis

87

1  equals Chivis; right?
2  A      Chivis.  I can't --
3         MR. BAILEY:  No.  I'm not trying to -- I'm not
4  trying to tease you.  You know, you're in a difficult
5  position, but that's who you mean; right?
6  A      Yeah.
7         MR. BAILEY:  You mean Nichelle Chivis when you
8  say Crevis.  You call her Crevis?
9  A      My tongue sometimes zip locks.
10        MR. BAILEY:  Okay.  That's all right.  As long
11 as we all understand, we all know what you mean.
12        MR. FINK:  We just wanted to make sure you
13 didn't mean somebody else.  So Chivis, Tapper, Epps and
14 McCollum?
15        MR. BAILEY:  That's what I got.
16 BY MR. LOCHINGER:
17 Q      And Mr. Freeman --
18 A      Yes.
19 Q      -- was there?
20 A      Yes.
21 Q      And were you there?
22 A      Yes.
23 Q      Anybody else?
24 A      Tim Curtis.
25 Q      And Tim Curtis.  So did we get them all?

88

1  A      Yeah.
2  Q      Okay.  Can you just give us a brief
3  description of what happened at this meeting?
4  A      Yes.  Nichelle Crevis spoke to Mr. Freeman and
5  asked him why Hazzard was overlooked in this promotion, and
6  his response was there was no opening, it was just a
7  transfer, Mr. McMurray was transferred from William Penn to
8  the Rowland building.
9  Q      Was there any response to that, did anybody
10 respond to Mr. Freeman?
11 A      Yes.  Mr. Tapper said, well, Mr. Hazzard's the
12 most senior man, and the job was put out on bid or wasn't
13 it.  He said, yes, it was put out on bid but it was -- it
14 was an accident.
15 Q      Mr. Freeman said that it was put out on bid,
16 but it was an accident?
17 A      Yeah.
18 Q      And did he explain at all what this -- what
19 the accident was?
20 A      No.  It was just an accident, and they weren't
21 going that way.  They -- first he explained that there was a
22 decision made on management level that -- that that was
23 already made that they was going to do it that way and
24 transfer them over.
25 Q      You said it was already made.  You mean it was

89

1  made prior to the bid being put out?
2  A      Management deserves or has the right on
3  certain circumstances to make decisions concerning the work
4  load and they used that for the reason why they or how they
5  transferred him.
6  Q      Okay.  So they said that the bid was put out
7  -- it was an accident that the bid was put out?
8  A      Yeah.
9  Q      And there was no real explanation as to what
10 the accident was?
11 A      No.
12 Q      Or how it occurred?
13 A      No.
14 Q      What else happened at this meeting?
15 A      That was it.  They just talked about how it
16 was brought out and how it wasn't -- and I wasn't getting
17 the job, and that was it.
18 Q      How long did the meeting last?
19 A      It probably only lasted maybe about maybe a
20 half-hour.
21 Q      Okay.  And this meeting -- just to clarify my
22 own mind, this was actually in response to your grievance;
23 correct?
24 A      Yes.
25 Q      So the grievance -- Mr. Freeman had notice of

23



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

90

1  the grievance at this point?
2  A      Yes.
3  Q      Did he render a decision as to that grievance
4  at that point?
5  A      Yes.  He says management has the right to do
6  what they want to do at such times.
7  Q      Okay.  It was -- it was verbal to you then?
8  A      Yes.
9  Q      Do you recall ever getting letters on that
10 that it was denied?
11 A      Later on I got some kind of letter that I
12 wasn't getting the job.
13 Q      But nothing -- you're saying you didn't get
14 anything directly from this meeting?
15 A      No.
16 Q      Okay.  After the meeting were there any other
17 -- any other times that there were discussions about this
18 grievance between --
19 A      Well, it was -- it was -- the grievance was
20 moved to the next step.
21 Q      Okay.  And what was the next step?
22 A      Which was somebody that was over Tim Curtis,
23 which was, again, Freeman.
24 Q      Okay.  So the first meeting -- let me -- you
25 know, maybe I got ahead of myself.  The first meeting you

91

1  had with Mr. Curtis and Mr. Freeman, was that considered the
2  first step of the grievance procedure?
3  A      Yeah.
4  Q      And that was really a meeting?
5  A      Concerning Tim Curtis.
6  Q      With Mr. Curtis?
7  A      Yes.
8  Q      So he was really the decision maker in that
9  first meeting?
10 A      Yeah.
11 Q      But according to you, Mr. Freeman did most --
12 A      Of the talking.
13 Q      -- of the talking?
14 A      Yeah.
15 Q      So that -- now you're saying the grievance is
16 moved to Step 2, which is to Mr. Freeman?
17 A      Yeah.
18 Q      Does the grievance go -- is there a decision
19 rendered at Step 2?
20 A      I think his decision was we made our decision,
21 you know, no prejudice against you in any way, but we just
22 made a management level decision.
23 Q      In either of these first two steps of the
24 grievance procedure did you ever bring up race as an issue?
25 A      No.

92

1  Q      Did anybody that was there on your behalf ever
2  bring up race as an issue?
3  A      No.
4  Q      Was race ever discussed in any way?
5  A      No.
6  Q      Okay.  So now we're through Step 2 of the
7  grievance to Step 3?
8  A      It went to Brenda Conner.
9  Q      Okay.  Brenda Conner is who?
10 A      The business manager.
11 Q      And her race?
12 A      White.
13 Q      Did she actually decide?
14 A      She refused to have anything to do with it.
15 Q      She refused to hear the grievance at all?
16 A      She didn't answer it or nothing.  She didn't
17 want to have nothing to do with it.
18 Q      Does the -- the contract provides for
19 situations like that, don't they, if people ignore --
20 A      Yeah.  Then they just write down would not
21 respond.
22        MR. BAILEY:  I'm not going to make any
23 objections to asking him his opinion of the contract at any
24 time, but, you know, we object that the contract has
25 specific written language and speaks for itself.  I have no

93

1  objection to your asking him his interpretation.
2        MR. LOCHINGER:  I understand.
3  BY MR. LOCHINGER:
4  Q      So Ms. Conner refused to make any decision?
5  A      Yeah.
6  Q      Now, where did the grievance go from there
7  then?
8  A      Mr. Freeman.
9  Q      It goes back to Mr. Freeman?
10 A      Mr. Freeman answers for the school board.
11 Q      Oh.  So now it goes to the school board at
12 this point?
13 A      Well, it goes to Freeman, and he answers for
14 the school board, and he answers also for the
15 superintendent.
16 Q      Okay.  And did it actually go back to
17 Mr. Freeman?
18 A      Yeah.
19 Q      Or -- okay.  And you'll have to tell me the
20 timing of this because your next allegation in Paragraph 16
21 is that at some point in time you were informed that it was
22 -- that the grievance was being withdrawn, you know, the
23 union was withdrawing the grievance.
24 A      Steve McCollum and Rob Tapper were proceeding
25 with the grievance even though the union dropped it.  They



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

94

1 picked it up on their own.
2 Q    Okay. We may be talking about two different
3 things here. Was that a grievance, or was that a complaint
4 through the school district itself?
5 A    Some of it was -- we took the grievance form
6 as far as it could go with Mr. Freeman. And then it went to
7 non-grievance, which was like letters of complaints to
8 forms.
9 Q    Okay. And that's what -- that's what I'm
10 talking about. So we're --
11 A    Yeah.
12 Q    Okay. So -- I'll get to that in a minute, the
13 actual complaint procedure and the non-grievance complaint,
14 the outside-of-the-contract complaint --
15 A    Yeah.
16 Q    -- let's call it that, but right now I want to
17 know where it fits in. At what point in time were you
18 informed that the grievance was being withdrawn? I mean in
19 terms of the steps that we're walking through.
20 A    I'm not sure but I think it was right -- it
21 may have been -- I may know the date. It may have been in
22 March. I'm not sure. I have it on my papers.
23 Q    Was it -- you walked us through at least the
24 first three steps, and we got to Ms. Conner, and she refused
25 to listen to the grievance?

---

95

1 A    Yeah.
2 Q    Did the grievance proceed for another step or
3 another two steps past that point?
4 A    Yeah. It went back to Mr. Freeman again.
5 Q    And this was Mr. Freeman acting on behalf of
6 somebody?
7 A    The school board.
8 Q    Of the school board. Okay. And what was the
9 result of that step then?
10 A    It was the same answer, that they did reserve
11 the right to manage the district.
12 Q    When it was going through all these steps up
13 to this point in time, were there any other meetings besides
14 that first meeting? Were there any other meetings either --
15 well, were there any other meetings concerning this
16 grievance?
17 A    There was private -- some private meetings.
18 Q    And who were involved in those private
19 meetings?
20 A    The school board, mostly Mr. Brown, Rob
21 Tapper.
22 Q    So you said the school board. Was it just
23 Mr. Brown or were there other school board members involved?
24 A    I don't know which school board members were
25 there, but I know Brown was there.

---

96

1 Q    Okay. So Brown was one. Were the -- do you
2 know if there were any other school board members there?
3 A    He said there were.
4 Q    Okay. You're just not sure of who they were?
5 A    Yeah.
6 Q    Do you know how many there were other than
7 Mr. Brown?
8 A    No.
9 Q    Mr. Tapper was there on your behalf?
10 A    Yes.
11 Q    Were you there?
12 A    No.
13 Q    Was anybody else there on your behalf?
14 A    It was such a meeting where -- I think
15 Mr. McCollum couldn't make it, and Rob Tapper was there.
16 And so he -- they had a flood in the building or something
17 so they had to -- they went over to Sorrento's Pizza. And
18 they went over there, and they talked. Mr. Brown said,
19 don't worry, Hazzard's gonna get the job.
20    THE VIDEO OPERATOR: Excuse me. It's 10:58.
21 We're going to go off line for just about 30 seconds to
22 change tapes.
23    (Recess.)
24    THE VIDEO OPERATOR: It's 10:58 and 30
25 seconds. We're back on line.

---

97

1    MR. BAILEY: Would you -- so I have the audio
2 tape, would you state the time again?
3    THE VIDEO OPERATOR: The time is 10:58 and 35
4 seconds.
5    MR. BAILEY: Oh. Well, you owe us five
6 seconds, and we're going to take that very serious.
7 BY MR. LOCHINGER:
8    Q    All right. So this meeting it was -- from
9 what you're describing, it was an informal meeting then?
10 A    Yeah.
11 Q    Was it -- despite its informality, was it
12 still considered an official meeting --
13 A    Yeah.
14 Q    -- for the grievance procedure?
15 A    Well, we -- a week later we had a meeting then
16 at the administration building in which Mr. Brown literally
17 came down on Mr. Freeman.
18 Q    Okay. Well, before I get to that, back to the
19 Sorrento's meeting.
20 A    Yeah.
21 Q    The Sorrento's meeting occurs. Do you know
22 what was discussed -- were you ever told what was discussed
23 at that meeting?
24 A    Mr. Tapper said that they said that it was
25 okay, that I was gonna get the job.

---



98

1    Q    And who said this to Mr. Tapper?
2    A    I think Mr. Brown.  I'm not sure.
3    Q    So in essence you were told that you were
4 going to win your grievance?
5    A    Yeah.
6    Q    Then to jump ahead now, you said the next
7 meeting occurred about a week later?
8    A    Yeah.
9    Q    In between those two meetings did you hear
10 anything about what was happening with the grievance?
11    A    No.
12    Q    Okay.  So at the next meeting that occurred --
13 first of all, where did that take place?
14    A    The administration building boardroom.
15    Q    And who was there?
16    A    Mr. Freeman, Mr. Brown, Mr. Tapper and
17 McCollum and myself.
18    Q    Was this at a formal school board meeting?
19    A    No.  It was just the ones I named.
20    Q    Okay.  But --
21    A    Yeah.
22    Q    So this was done outside the context of a
23 normal school board meeting; correct?
24    A    Well, I was given a letter that there was
25 going to be a meeting, so I went there.

99

1    Q    Okay.  And this letter that you were given, it
2 specifically said that it was dealing with your grievance
3 about the job at Rowland?
4    A    Yeah.
5    Q    Okay.  What happened at this meeting?
6    A    Mr. Brown he kind of like really came down on
7 Mr. Freeman and then --
8    Q    When you say -- I'm sorry to interrupt you,
9 but when you say came down on him, what do you mean by that?
10    A    He was kind of like pointing it out that
11 Mr. Freeman was wrong, he acted wrong.
12    Q    In what sense?
13    A    In the way he made the transfer and
14 everything.
15    Q    Was he saying he was wrong about putting
16 McMurray into the job or that he was wrong about the
17 posting?
18    A    He kept asking him questions like why -- why
19 Mack McMurray, why -- you know, why questions.  I didn't pay
20 too much attention.
21    Q    Okay.  So Mr. Brown comes down on
22 Mr. Freeman.  What happened after that?
23    A    A week later a got a letter from Mr. Brown.
24    Q    I'm sorry.  Before -- did anything else happen
25 at that meeting?  That's what I really meant.  I'm sorry.

100

1    A    No, no, no.
2    Q    So that was essentially -- the meeting was
3 essentially Mr. Brown --
4    A    And Freeman.
5    Q    -- telling Mr. Freeman that he somehow was not
6 doing something right?
7    A    Yeah.  He got mad, and he actually cursed.
8    Q    Was any decision made at that time --
9    A    No.
10    Q    -- as to your grievance?
11    A    No.
12    Q    Okay.  Now -- now what happened next after
13 that meeting?  And by the way, do we have any kind of -- and
14 I apologize.  This is my fault.  What kind of dates do we
15 have on any of this stuff?
16    A    It's -- I have it on my grievance forms.  It's
17 all on dates.
18        MR. LOCHINGER:  Okay.  All right.  And we have
19 those documents, don't we?
20        MR. BAILEY:  I think you do.  You know, we're
21 still looking for documents and stuff.  We've -- but,
22 actually, I think about everything is pretty much in your
23 records that's relevant to the case that we know of but I
24 have him -- you know, he's looking through the glove
25 compartment, under the seat, you know.

101

1        MR. LOCHINGER:  Okay.  I don't want to waste
2 time trying to pin down exact dates --
3    A    See, I just moved so.
4        MR. LOCHINGER:  -- if we have the dates.
5 BY MR. LOCHINGER:
6    Q    Okay.  So after the meeting with Mr. Brown
7 getting on Mr. Freeman, what happens next?
8    A    About a week later I got a letter from
9 Mr. Brown.  New evidence was presented, which was the same
10 language -- everybody in the school district from Tim Curtis
11 to Freeman, everybody we had a meeting with, new evidence.
12 What the evidence was, nobody -- we was never told what new
13 evidence was presented.  They just said new evidence was
14 presented, and I made my decision, and nobody was told what
15 that evidence was.  There was none.
16    Q    And you're saying this was in a letter to you?
17    A    Yeah.
18    Q    Was it signed by Mr. Brown?
19    A    Yes, it was.
20    Q    Was he writing on behalf of the school board?
21    A    Yup.
22    Q    And it was denying your grievance?
23    A    Uh-huh.
24    Q    Now, just to clarify because I don't want to
25 -- I don't want to confuse anything here, but are we



**HAZZARD, WILLIAM**
**10/19/01**

HAZZARD VS
CURTIS

---

102

1  talking about now -- are we still talking about your
2  grievance that you filed through the contract or are you
3  talking about the complaint that was filed outside of the
4  contract through the school district's own procedures?
5  A    I think about that time we expired the
6  contract and we were going through a letter -- formal
7  letters.
8  Q    The complaint --
9  A    Yeah.
10  Q    -- procedure through the district?
11  A    Yeah.
12  Q    So at some point in time your pursuit of this
13  goes outside of the contract, it goes into the school
14  district's complaint system?
15  A    Uh-huh.
16  Q    Is that correct?
17  A    Yeah.
18  Q    And let's talk a little bit about that here
19  because your next allegation in your complaint on Paragraph
20  16 is on or about March 2000 AFSCME, by and through Nichelle
21  Chivis, informed plaintiff they were unilaterally
22  withdrawing the grievances. And then you go on to say upon
23  information and belief told to the school board the
24  grievance had no merit even though the promotion of McMurray
25  over plaintiff was a clear violation of the contract, and I

---

103

1  might not have hit every word there but that's -- it's
2  Paragraph 16 of the complaint.
3  A    Yeah.
4  Q    Who told you that the complaint -- that your
5  grievance was being withdrawn?
6  A    Nichelle finally sent me a letter stating that
7  it was being dropped.
8  Q    And you say on or about March 2000 but that's
9  -- do you have an exact date on that, or do you have a copy
10  of that letter?
11  A    I think so. I think I might, yeah.
12  MR. LOCHINGER: Do we have a copy of that?
13  MR. BAILEY: I'm looking for it. It's in the
14  grievance file I think.
15  MR. FINK: Yeah, I have that.
16  MR. LOCHINGER: Do we have it? I can't quite
17  remember if I've seen it or not. Okay. Okay. Here's a
18  letter here and I know how -- I know what you're talking
19  about. I have that letter.
20  BY MR. LOCHINGER:
21  Q    It's dated March 14, 2000. Does that sound
22  right?
23  A    Yeah.
24  Q    About the right date?
25  MR. FINK: Do you want to mark that just to --

---

104

1  MR. LOCHINGER: Sure. Why don't we put that
2  in.
3  (Letter to Mr. Freeman from Nichelle Chivis
4  dated March 14, 2000 marked as Hazzard Exhibit 4.)
5  BY MR. LOCHINGER:
6  Q    Is that the letter you got from Nichelle
7  Chivis? It's actually addressed to Mr. Freeman, but you're
8  copied on it.
9  A    Yeah.
10  MR. LOCHINGER: Okay. We'll mark that one.
11  MR. BAILEY: Just to make sure, I'll identify
12  this. This is March 14th, 2000, Lance Freeman, Personnel
13  Director, RE: AFSCME grievance. Dear Mr. Freeman: A review
14  was made, very truly yours, Nichelle Chivis?
15  MR. LOCHINGER: Yes, correct.
16  MR. BAILEY: And that's Hazzard what, 3?
17  MR. FINK: That will be 4.
18  MR. LOCHINGER: That will be 4.
19  BY MR. LOCHINGER:
20  Q    Is that the first notification you received
21  that your grievance was being withdrawn?
22  A    From the union, yeah.
23  Q    Had anybody told you before that point in time
24  that the grievance was going to be withdrawn?
25  A    No.

---

105

1  Q    Did you question anybody about why this was
2  being done?
3  A    I went to Steve McCollum, and I said, hey,
4  Steve, what's going on.
5  Q    And what did he tell you?
6  A    They tried to get a response from her, and I'm
7  not sure if they got one from her or not.
8  Q    Did you ever try to contact her directly?
9  A    Yes. There was a time that we tried to
10  contact them, and I went out to her office, and she came in
11  and said that wasn't the time I was supposed to be there, so
12  then we left.
13  Q    Did you attempt to do anything to keep the
14  grievance going?
15  A    Yes.
16  Q    What did you do?
17  A    We went -- after the grievance expired, we
18  went to the letter form, and then we went to talking to
19  board members, which we talked to Mr. Brown, and Mr. Brown
20  agreed to bring up some questions to Mr. Freeman at the
21  meeting at Marshall School.
22  Q    Okay. So this -- at this point in time is
23  when you went to the, again for lack of a better term,
24  outside-the-contract complaint procedure through the
25  district?

---



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

106

1  A      Uh-huh.
2  Q      And this -- is it under that procedure that
3 the Sorrento's meeting took place?
4  A      Yeah.
5  Q      And the meeting at the administration
6 building, the same thing?
7  A      Yeah.
8  Q      Did you ever have -- I'm sorry. Before I get
9 to that, this paragraph also says that they -- and I'm
10 assuming in the context here it's the union -- told the
11 defendant school board the grievance had no merit. Do you
12 know who passed that information along to the board?
13  A      **I think that -- wasn't that a letter that was**
14 **sent from Nichelle to Mr. Freeman and I got a copy?**
15  Q      Okay. So you're talking about our --
16  A      **Yes.**
17  Q      -- Exhibit 4 that we just marked?
18  A      **Yeah.**
19  Q      Let's move on and -- let's move on to the -- I
20 don't know what -- the next Paragraph 16. It's the next
21 page, but there's another Paragraph 16.
22        MR. BAILEY: Boy, that's poor quality lawyer
23 work.
24        MR. LOCHINGER: The top of Page 4 of the
25 complaint is the easiest way to --

---

107

1        MR. BAILEY: We'll call that 16A.
2        MR. LOCHINGER: 16 junior or something.
3        MR. BAILEY: Okay.
4 BY MR. LOCHINGER:
5  Q      It says there that the only difference between
6 the plaintiff, you, Mr. Hazzard, and McMurray -- really it
7 lists three things. It claims that you had seniority over
8 him -- that we've already talked about -- that you were the
9 only person to put in a bid on the job -- and we already
10 talked about that -- and that Mr. McMurray is black and you
11 are white. Those are the three differences you listed?
12  A      Uh-huh.
13  Q      Are those the only differences between you
14 guys that you're aware of?
15  A      **No.**
16  Q      And what are the other differences?
17  A      **There was a very bad incident that happened**
18 **between me and Tim Curtis.**
19  Q      Oh, hang on. Okay. I guess I'm a little
20 confused here. I don't mean difference like a fight. I
21 mean difference like, you know, comparing you to
22 Mr. McMurray?
23  A      **Oh, no.**
24  Q      Comparing you to him, you list three things
25 here that are different about you. Number one, you have

---

108

1 more seniority. Number two, you bid on the -- you're
2 claiming you bid on the Rowland job, and he didn't?
3  A      Uh-huh.
4  Q      And number three, that he's black and you're
5 white?
6  A      Uh-huh.
7  Q      Are there any other -- if I compared you guys,
8 are there any other differences between you two that you're
9 aware of?
10        MR. BAILEY: I'm going to object to the form
11 of that question. Go ahead and respond to the best of your
12 ability.
13  A      **I can only react on the way in how Tim Curtis**
14 **treated me that I felt that I was, you know, being singled**
15 **out.**
16 BY MR. LOCHINGER:
17  Q      Okay. Let me maybe clarify a little bit
18 more. Do you feel that the two of you had the same relative
19 experience as a head custodian?
20  A      **Yeah.**
21  Q      To the best of your knowledge and information,
22 do you feel that you both performed your job in about the
23 same satisfactory manner?
24  A      **No.**
25  Q      No? Why not -- what's the difference there

---

109

1 between you and McMurray?
2  A      **Because I'm -- I've already been told that a**
3 **lot of times. I'm a workaholic. Sometimes I work and I**
4 **just forget to stop, where Mack McMurray is the type of guy**
5 **he doesn't feel he has to work unless somebody orders him**
6 **to.**
7  Q      So you feel that you were a better performer
8 than Mr. McMurray?
9  A      **Yes.**
10  Q      Okay. How about your disciplinary record, any
11 differences that you're aware of there between the two of
12 you?
13  A      **He respects me. I respect him.**
14  Q      Any times that -- were there times that --
15 going into the past now looking at both your records going
16 backwards -- again, as far as you know, were there times
17 when he was reprimanded?
18  A      **Yeah.**
19  Q      And were there times you were reprimanded?
20  A      **I don't remember.**
21  Q      And what I'm getting at here is, is there a
22 basic similarity between you two in terms of your records in
23 terms of reprimands?
24        MR. BAILEY: You mean disciplined by the
25 school district?

---

**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

110

1    MR. LOCHINGER: Disciplined by the school
2 district.
3    MR. BAILEY: I think he means your discipline
4 by the school district.
5    MR. LOCHINGER: I agree with that.
6    A    Yeah. In food service, I was wrote up because
7 I came to work too early.
8 BY MR. LOCHINGER:
9    Q    Okay. We'll move on because I don't know how
10 relevant it is. I figure I'm just muddying the water
11 there. Let's talk about these differences, though. Who's
12 been a head custodian longer, you or Mr. McMurray?
13    A    Mr. McMurray.
14    Q    Is it a small amount of time or a substantial
15 amount of time more to your knowledge?
16    A    Maybe three years.
17    Q    Okay. How about in terms of the men you're in
18 charge of, who's in charge of more men, Mr. McMurray or you?
19    A    Mr. McMurray.
20    Q    How many --
21    MR. BAILEY: Well, they're male and female
22 under --
23    MR. LOCHINGER: I mean men in terms of
24 employees.
25    MR. BAILEY: There is even, I think, a female

111

1 head custodian, isn't there?
2    A    Yeah. Sometimes it's what -- it's a
3 difference between me having five and him having six.
4    MR. LOCHINGER: I apologize for my sexist
5 attitude.
6    MR. BAILEY: No, no, no, it wasn't sexist.
7    MR. LOCHINGER: I was meaning employees --
8    MR. BAILEY: Right.
9    MR. LOCHINGER: -- under your control.
10    MR. BAILEY: There were some females I think
11 even a head custodian. I just wanted to -- I didn't mean to
12 --
13    MR. LOCHINGER: I understand.
14    MR. BAILEY: Yeah, I'm sorry.
15 BY MR. LOCHINGER:
16    Q    I'm sorry. I didn't quite get your response.
17 Who was in charge of -- who had supervision over more
18 employees?
19    A    He has had supervision over more employees.
20    Q    Okay.
21    A    But when I had summer school, I was in charge
22 of, you know, another school. I might have had maybe 15
23 people I was in charge of.
24    Q    All right. The next paragraph, 17, you say
25 that virtually every decision maker in this case is

112

1 African-American. Are there any people involved here at all
2 with this decision that were white that you're aware of?
3    A    Yes, Steve McCollum and --
4    MR. BAILEY: I'm going to object to his
5 response as not being responsive. He means who made the
6 decision.
7    MR. LOCHINGER: I was going to get to that.
8 BY MR. LOCHINGER:
9    Q    Those are people -- Mr. McCollum and Mr.
10 Tapper were people that were representing you throughout
11 this; correct?
12    A    Yeah.
13    Q    I'm talking about people who actually made the
14 decision with the school district and with the union here.
15 Were any of those people white at all that you're aware of?
16    A    No. Excuse me. I made a mistake.
17    Q    Go ahead.
18    A    When I was in food service, Helen Stroll was
19 white and so was Dave Lloyd.
20    Q    But they weren't involved in this decision for
21 the Rowland head custodian job?
22    A    No.
23    Q    Okay. I think earlier you told me -- and
24 correct me if I'm wrong, but I have four people listed that
25 you thought were decision makers here. You had Mr. Freeman?

113

1    A    Uh-huh.
2    Q    Mr. Curtis?
3    A    Uh-huh.
4    Q    Mr. Brown?
5    A    Uh-huh.
6    Q    And Ms. Chivis?
7    A    Yes.
8    Q    Is that right? Is that -- anybody else that
9 you can think of that should be on that list?
10    A    Probably Margaret Fuller. She's in charge of
11 2063.
12    Q    She's in charge of 2063?
13    A    Yeah.
14    Q    In charge of the union?
15    A    Yeah.
16    Q    Is she white or black?
17    A    Black.
18    Q    Anybody else?
19    A    No.
20    Q    All right. So we have one, two, three, four,
21 five people. Are you saying by this allegation that each
22 and every one of those people used your race as a factor in
23 their decision?
24    A    I don't know how to answer that.
25    Q    Well, let's go down the list. Mr. Freeman.

 
114

1 Do you think that Mr. Freeman used your race? Do you
2 think. I'm not saying you know, but do you think that
3 Mr. Freeman used your race as part of his decision?
4     A    I don't think he used my race. I just think
5 he picked an individual that he wanted there, and that was
6 it.
7     Q    So you're saying Mr. Freeman's decision had --
8     MR. LOCHINGER: I'm sorry. Do you want me to
9 wait?
10     MR. BAILEY: Yeah.
11     A    I think they all got together and decided what
12 they wanted to do, and that was it.
13 BY MR. LOCHINGER:
14     Q    Okay. But let's -- but I was walking down
15 these -- do I hear you correctly that you're saying
16 Mr. Freeman's decision was not based on race?
17     A    I'm saying it's based -- it's based on race
18 for the fact that they chose Mack McMurray over me.
19     Q    So you're saying that because they chose a
20 black individual over a white individual that's the basis
21 that you're saying that your race was a factor?
22     A    No. There's been harassment for years that
23 I've been going through.
24     Q    Before this decision was made?
25     A    Yes.

115

1     Q    All right. I think we had a partial list of
2 that before but let's -- you know, please, I want to hear
3 what your -- I want to know why you think that people are
4 basing this decision on your race, so if you've got a list
5 of things that point to that let me know.
6     A    Okay. My brother-in-law passed away, and I
7 went to Tim Curtis and asked him for the time off, and he
8 denied me, and then I opened up the union book and said,
9 well, it says if your brother-in-law is living in your
10 house. He said, I have that in my book, but I've made my
11 decision, and this is what Mr. Freeman wants, and this is
12 what we're going to do. So I had to go through a grievance
13 procedure to get that time granted to me that I could be off
14 for the five days.
15     Now, eight months go by and Tim Curtis comes
16 after me again and says -- after he okayed my time off he
17 comes after me again, brings up my brother-in-law, has me in
18 tears crying, you know, because my brother-in-law died and
19 rehearsing all this all over again and I'm trying to put it
20 behind me because I miss by brother-in-law, and he's
21 bringing this up again.
22     Q    Let me -- let me ask you this question: when
23 did this occur? Was this -- you know, at the time we're
24 talking about here, was this at the time your grievance was
25 withdrawn or was this after that or --

116

1     A    After that.
2     Q    Okay. So that's after the fact?
3     A    Yeah.
4     Q    At the time the decision was made, though.
5     A    Yeah.
6     Q    I want to know at the time this decision was
7 made that your grievance was being withdrawn, and you're
8 saying that everybody here was African-American, and I'm
9 asking you what basis do you have to believe that those
10 people took your race into account, those five people or six
11 people that we listed?
12     A    Well, all the black head custodians being
13 promoted for one, Tim Curtis' constant harassing me.
14     Q    And that was before the decision was -- before
15 the grievance?
16     A    Well, he's been bickering on me before that,
17 too.
18     Q    His bickering on you before that, how do you
19 think that was based on your race?
20     A    Well, because when he was yelling at me,
21 knowing that I only had three weeks and everybody had the
22 whole summer to do a building, and as soon as a black man
23 walked in and yelled back at him he got quiet and left the
24 room. He knew he was wrong. He knew I didn't have the
25 time. He was in there bickering at me for no reason at all.

117

1     Q    This is going back to your situation where the
2 other janitor came in and told him --
3     A    Yeah, yeah.
4     Q    The story you told me before?
5     A    Shirley came in -- came in and she said,
6 Hazzard, I just want -- I didn't want to interfere, but I
7 felt I had to come in because I don't think anybody should
8 talk to anybody that way, and he does that. He comes in the
9 building at night and starts an argument with me.
10     Q    All right. Well -- all right. Let's -- let
11 me back up because I really think we're getting off the
12 beaten path here, and I don't want to confuse the issue any
13 more than we have to. I want to get back to you said that
14 every entity and decision maker in this is African-American?
15     A    Yes.
16     Q    Okay. We've established this one, two, three,
17 four, five person list who you think were decision makers,
18 and they all are black; correct?
19     A    Yes.
20     Q    Now, I need to go back over and ask you. Do
21 you think that all five of these people took your race into
22 account when they were making this decision to move McMurray
23 into the job and not you?
24     A    Yeah.
25     Q    Okay. So Mr. Freeman took your race into

 

**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

118

1 account when he made the decision?
2   A    Uh-huh.
3   Q    Mr. Curtis took your race into account when he
4 made the decision?
5   A    Yes.
6   Q    Mr. Brown took your race into account when he
7 made the decision?
8   A    Yes.
9   Q    Ms. Chivis?
10   A    Yes.
11   Q    And Ms. Fuller?
12   A    Yes.
13   Q    Now -- okay.  Now, that we've established that
14 that's your belief, let's talk about Mr. Freeman.  What did
15 Mr. Freeman say or do that leads you to believe that he
16 specifically took your race into account?
17   A    By transferring Mack McMurray into that
18 position, not even giving me the opportunity of saying thank
19 you for bidding on the job, Mr. Hazzard, you know, you've
20 done a good job but we decided -- you know, I would have
21 accepted that completely.
22   Q    All right.  Anything else for Mr. Freeman?
23   A    Mr. Freeman kind of backed Tim Curtis up on --
24 on that bereavement situation that I went through.
25   Q    Okay.  All right.  Anything else specifically

119

1 for Mr. Freeman that you -- that leads you to believe that
2 he took your race into account?
3   A    I went into his office with the union steward
4 and asked to remove files that were extremely old that
5 should be removed from the files after so many years.
6   Q    And when did this occur?  Let's put a time
7 frame on this.  Is this before --
8   A    After.
9   Q    -- the grievance was withdrawn?
10   A    After.
11   Q    Oh, this is after the fact?
12   A    Yeah.
13   Q    Okay.  So I want to get stuff that happened
14 before the fact that -- you know, up to the time the
15 grievance was withdrawn because, obviously, they can't look
16 into the future.
17   A    Yeah.
18   Q    And think what's going to happen in the future
19 and use that as a basis for the decision.  So is there
20 anything else for Mr. Freeman before this time that the
21 decision was made to withdrawal your grievance and keep
22 McMurray in the job?
23   A    His attitude and his response to me from the
24 beginning is always -- I've always felt that he just didn't
25 want to give me the job.

120

1   Q    Anything else for Mr. Freeman?
2   A    No.
3   Q    All right.  I'm skipping Mr. Curtis for now
4 because I know that's a hot button here based on your
5 response.  Let's come back to him.  Let's talk about
6 Mr. Brown.  What did Mr. Brown say or do that leads you to
7 believe that your race was a factor with him?
8   A    Yes, Mr. Hazzard, don't worry, man, yeah,
9 Mr. Freeman's wrong but we're going to take care of him,
10 yeah, you know.  There was about a 11:30 late meeting out
11 there at Marshall School, and then later on Tapper had a
12 meeting with Mr. Freeman and he said, oh, yeah, we're going
13 to take care of Hazzard, oh, yeah, yeah, he's got the job,
14 and then he turned around and cut my throat there at that
15 board meeting.
16   Q    This is Brown you're talking about?
17   A    Yeah, this is Brown.
18   Q    So you're saying -- so you're --
19   A    So he played a game with me, the same game
20 that Freeman, Tim Curtis and all them play.
21   Q    So your belief that leads you to-- the
22 evidence you have that leads you to believe that Brown used
23 your race is the fact that he told you that you would be
24 taken care of and then changed his mind at the last minute?
25   A    Yeah.  It was a put on.

121

1   Q    Is there anything else you have for Mr. Brown?
2   A    It was a good show he put on.
3   Q    Besides that show that you're -- you know, the
4 "show" that you're talking about, is there anything else
5 that you have which leads you to believe that Mr. Brown was
6 taking your race into account?
7   A    No.
8   Q    Okay.  How about Mr. Curtis?  Now, again, I
9 want to try to limit you here because -- I'll give you a
10 chance to talk about what happened after the grievance, but
11 up to the point that the grievance was denied that we're
12 talking about now, up to the point where, you know, the
13 grievance was withdrawn and you were told that you were
14 stuck where you are, what did Mr. Curtis do or say to you up
15 to that point in time that leads you to believe that your
16 race was a factor in his decision?
17   A    Well, when he first -- the first thing he did
18 when he took over and took charge, he illegally transferred
19 the custodians and he promoted the blacks and not the
20 whites.
21   Q    Okay.  Anything else?  And it sounds -- it
22 sounds like you were -- you said before and -- because I
23 want to give you an opportunity here.  You said before that
24 he had been I think you used the words bickering on you --
25   A    Yeah.



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

122

1 Q    -- before this point in time. Was any of that
2 racially based in your mind?
3 A    Yeah. I think he kind of looked down at me.
4 He got loud with me, and then when Shirley walked in he got
5 quiet.
6 Q    Did you ever see Mr. Curtis get loud with
7 other employees?
8 A    No, just me.
9 Q    Okay. Anything else for Mr. Curtis that would
10 lead you to believe that your race was a factor in his
11 decision?
12 A    Yeah. There was an incident where an
13 individual came to me and told me that Tim Curtis went out
14 and talked to Mack McMurray and told him you're making too
15 much overtime, and Mack McMurray's response was so what, and
16 that was it.
17 Q    Okay. Anything else?
18 A    No.
19 Q    Okay. Now, of the three -- of those three
20 people -- Mr. Freeman, Mr. Curtis, Mr. Brown -- and you
21 talked about all these things that are leading you to
22 believe your race was a factor. Did any of them ever
23 specifically say to you that your race was a factor?
24 A    No.
25 Q    Did any of them ever put in writing anywhere

---

123

1 that your race was a factor?
2 A    No.
3 Q    Did anybody ever tell you that they heard one
4 of these three guys saying that your race was in any way a
5 factor?
6 A    I can't quote anybody that, you know, would
7 really give me their permission to bring up any of their
8 names or anything.
9 Q    So are you saying that somebody did tell you
10 that one of these three guys made a remark about your race?
11 A    No, that he knew that that's what it was. He
12 didn't get specific.
13 Q    Okay. I need you to explain because I'm a
14 little confused. Are you saying one -- that Mr. Freeman,
15 Mr. Curtis or Mr. Brown said something that --
16 A    No.
17 Q    -- led somebody to believe or they just said
18 something that led somebody to believe that your race was a
19 factor?
20 A    Yes.
21 Q    And what was that that was said?
22 A    That they believe that that was the whole
23 thing, that it was -- it was the type of move -- just like
24 when I'm in school. I hear teachers talk, and a lot of
25 teachers are talking saying, oh, man, it's about time we

---

124

1 start getting, you know, black teachers in here. You know,
2 there are a lot of black teachers, but it seems like there's
3 a move -- they're not hiring, you know, certain people.
4 Q    So what you're telling me is somebody that you
5 know said that this is their opinion?
6 A    Yeah.
7 Q    This is not the -- this was not coming
8 directly from Mr. Freeman, Mr. Curtis or Mr. Brown; am I
9 correct?
10 A    Right.
11 Q    Okay. All right. We're getting there. Let's
12 talk about now the Paragraph 18 where you say the defendant,
13 Harrisburg School District, denied the plaintiff an
14 opportunity to appeal to them and be heard even though they
15 promised him that opportunity. I guess my first question
16 here is what do you mean by this? What opportunity to be
17 heard didn't you get that you're entitled to?
18 A    Well, when I first -- first put in the bid I
19 expected to be told no or yes. I don't care. Just say yes
20 or no, something. They -- they didn't show me no respect of
21 saying yes or no or responding to me in any way.
22 Q    Okay. But then it says you had the right --
23 you were denied the right to appeal to the district. Again,
24 I'm not quite sure what that means, that you were denied the
25 opportunity to appeal to them. Didn't you file a grievance?

---

125

1 A    Yes, I did.
2 Q    Go ahead.
3 A    I was -- I was denied the right to proceed
4 with my grievance procedure from AFSCME, not the school
5 district.
6 Q    Well, but that's not what this says. This
7 says the defendant, Harrisburg School District, has even
8 denied the plaintiff an opportunity to appeal to them and be
9 heard even though they promised him that opportunity.
10 A    Oh, yeah, they wouldn't -- they didn't want to
11 -- they didn't want to set up any kind of meetings or
12 anything. Mr. Brown is the only one that set a meeting up,
13 and then that was just a game.
14 Q    So you're saying your right to be heard here
15 is through what? I mean -- again, I'm sorry. I'm confused
16 about this because you filed a grievance, didn't you?
17 A    Yeah.
18 Q    And from what you'd already described to me,
19 that was taken through at least the first, what, four steps?
20 A    Yeah. The board wouldn't hear it. They left
21 Freeman take care of it. See, he has the right to do that,
22 but I wanted it to go to the board. I wanted the board to
23 know what was going on, and they wouldn't hear it.
24 Q    But you're saying that they have the right to
25 give it to Mr. Freeman to hear instead?

---




126

1    A    Yeah, and Mr. Freeman already had his opinion.
2    Q    Okay.  But -- but it did go through -- your
3  grievance did go through -- again, I can't remember how many
4  steps you described before -- four or five steps?
5    A    Yeah.
6    Q    And isn't it also true you filed a complaint
7  outside of the contract through the school district's
8  complaint procedure?
9    A    Yeah.
10   Q    And there were at least a couple meetings on
11  that, correct, that you described earlier?
12   A    There was one with Mr. Freeman and Mr. Brown.
13  Those were the only two meetings.
14   Q    Okay.  You described a meeting -- you
15  described a meeting earlier where Mr. Brown in essence
16  yelled at Mr. Freeman?
17   A    Yeah.
18   Q    Is that one of them you're talking about?
19   A    Yeah.  That's the one when Mr. Brown held the
20  meeting on behalf of the school board.
21   Q    Okay?
22   A    And he was kind of like coming down on
23  Mr. Freeman.  He had to get Mr. Freeman mad because he got
24  mad and he cursed, and then the meeting was like kind of
25  over, and Mr. Brown said, well, I'll render my decision, and

127

1  then I got a letter from Mr. Brown stating that they turned
2  up new information.  Like everybody else has been saying all
3  along, they all used the same word.  Well, new information
4  was presented, but we're not going to show you what it is.
5        MR. LOCHINGER:  Let me show you here if I can
6  -- hopefully, this is the right one.  I think it's this.
7  No, shoot.  I apologize.
8        MR. BAILEY:  That's okay.
9        MR. FINK:  What is that, the complaint?
10        MR. LOCHINGER:  This is the complaint, right,
11  for the school district.
12  BY MR. LOCHINGER:
13   Q    I'll give you this.  Is this the -- you were
14  talking about this complaint procedure with the district.
15  Is that the complaint you filed with them to start the
16  procedure?
17   A    No.  Complaints are written on forms.  These
18  are grievances.
19   Q    That's a whole different thing?  I'm --
20   A    You must have a double -- it took like two
21  pieces, left and right.
22   Q    Well, but -- okay.  It's just a copy of
23  whatever it was, but is that the document that you filed
24  with the district?
25   A    That's the original form that I filed.  The

128

1  grievance for the job, yeah.
2    Q    But, again, I want to clarify, though.  We're
3  talking the grievance or the complaint with the district
4  through the district's complaint procedures?
5    A    That's -- that's not the complaint
6  procedures.  That's the grievance again.
7        MR. BAILEY:  Let me see that, Bill.
8    A    The same thing.
9        MR. LOCHINGER:  It says complaint on the top
10  of it.  That's why I'm --
11        MR. FINK:  Yeah.  This is the school board --
12  the school district complaint.  The grievance is different.
13  The grievance is what we marked as -- show him Number 3
14  again.
15        MR. BAILEY:  Bill, read over this, please, and
16  just see if it comes back to your memory.
17    A    Okay.
18        MR. BAILEY:  And look at some of the dates on
19  it, look at the form carefully.  I think counsel has some --
20    A    Oh, April 18th.  Okay.
21        MR. BAILEY:  Does that refresh your
22  recollection?  Look at it carefully now, and then think
23  about it.  I think counsel is making the point that that
24  appears at least to be a complaint outside -- as he's used
25  the phraseology, outside of the grievance procedure that was

129

1  filed with the district; am I correct?
2        MR. LOCHINGER:  Correct.
3    A    Yeah, you're right.  I think that's what it
4  was.
5        MR. BAILEY:  All right.  You keep that there.
6  He has questions for you.
7        MR. FINK:  Are we going to mark that?
8        MR. BAILEY:  Yeah.  I don't have that.  I need
9  a copy of that.
10        MR. LOCHINGER:  We'll mark that.
11        MR. BAILEY:  I don't think I have it anyway.
12  Let me double check.
13        MR. LOCHINGER:  I'm sure I have an extra one
14  here.
15        MR. BAILEY:  Okay.
16        MR. FINK:  That will be Hazzard 5.
17        MR. BAILEY:  Five, yeah.  I know I don't have
18  that.  I would like to have that to work from.  Can I make a
19  copy real quickly before we go further so that I can --
20        MR. FINK:  Sure.
21        (Discussion held off the record.)
22        MR. BAILEY:  Do you have a copy?
23        MR. FINK:  I have it.
24        MR. BAILEY:  Okay.  This is Hazzard 5.
25        MR. FINK:  Five, and it's two pages.

 

130

1    MR. LOCHINGER: Two pages, yes.
2    (Complaint marked as Hazzard Exhibit 5.)
3 BY MR. LOCHINGER:
4    Q    Okay. So that document that we've marked as
5 Hazzard 5 --
6    A    Yes.
7    Q    -- is that the form that you filed with the
8 district to start the complaint procedure through -- outside
9 of the grievance procedure through the district?
10    A    Yeah.
11    Q    Okay. Do you recall who you filed that with?
12    A    I don't know if we sent it to Freeman or Tim
13 Curtis and then started working our way back up again.
14    Q    Didn't that whole procedure eventually result
15 in an actual hearing before the board?
16    A    Mr. Brown, on behalf of the board, made a
17 decision.
18    MR. BAILEY: Okay. His question is did they
19 give you a hearing.
20    A    No.
21 BY MR. LOCHINGER:
22    Q    I understand that, but was there ever actually
23 a hearing before the board?
24    A    No.
25    Q    Was there ever actually a hearing when I think

131

1 -- when just two of the school board members were there,
2 Mr. Brown and Mr. Davis?
3    A    Mr. Brown and Mr. Davis was there, yeah.
4    Q    Okay. So I guess what I'm saying is, was
5 there a hearing then with those two there?
6    A    That was the hearing. They represented the
7 whole school board.
8    Q    Correct. Okay. And did you have people there
9 on your behalf?
10    A    There was Rob Tapper, Mr. McCollum.
11    Q    And -- now, you talked about you got a letter
12 then from Mr. Brown --
13    A    Yeah.
14    Q    -- at a later point in time?
15    A    Yeah.
16    MR. LOCHINGER: And I'll give you that one
17 here, too. Do you have this one?
18    MR. FINK: I don't think I have that either.
19 What's the date on that?
20    MR. BAILEY: This is June 26th, 2000?
21    MR. FINK: I haven't gotten that one either.
22    MR. BAILEY: Let me run out and make a couple
23 copies. It will take me two seconds.
24    (Recess.)
25    (Letter to Mr. Hazzard from Joseph Brown dated

132

1 June 26, 2000 marked as Hazzard Exhibit 6.)
2 BY MR. LOCHINGER:
3    Q    All right. The letter you're looking at there
4 addressed to you at Brookwood Street in Harrisburg dated
5 June 26th, 2000, and it's signed by Joseph Brown, Board
6 Member, and it looks like -- there is Ricardo Davis, Board
7 Member, but it looks like it's signed under the name board
8 member there. Is that -- is that the letter you're talking
9 about that you got from Mr. Brown?
10    A    Yeah.
11    Q    Okay. In that letter -- if you look in that
12 letter, in the first paragraph about halfway through it it
13 does say that at this meeting the committee received
14 evidence and heard testimony in support of your complaint
15 from you, Steve McCollum and Robert Tapper?
16    A    Uh-huh.
17    Q    And the last sentence says in response to your
18 complaint we received evidence and testimony from Tim Curtis
19 and Lance Freeman representing the administration. Isn't --
20 wasn't this really a hearing on this -- on your complaint?
21    A    Yeah. This was supposed to be the hearing
22 where he was supposed to give me the job.
23    Q    Who -- is this accurate that Mr. McCollum and
24 Mr. Tapper and you testified before the board -- before
25 these two -- before these two board members? Is that

133

1 accurate?
2    A    Mr. Brown did most of all -- I'd say about 90
3 percent of all the speaking there.
4    Q    Did he ask the three of you questions?
5    A    Yes.
6    Q    Okay. And all three of you answered?
7    A    Uh-huh.
8    Q    All right. So you received this letter back
9 from the district. It's dated June 26th. Did you receive
10 it shortly after that or around that time?
11    A    Yeah.
12    Q    Okay. Going back to your complaint now, it
13 said that the board denied you this opportunity to be
14 heard. Is there any other way that the board denied you a
15 chance to tell your side of the story in this?
16    A    Yeah. I was kind of getting the feeling that
17 they just wanted me to go away, and I'm like, hey, I want a
18 hearing before the board. Well, that ain't going to happen.
19    Q    Did you not consider this a hearing before the
20 board, the letter that we were talking about?
21    A    No. This was just an agreement that -- over
22 pizza and subs that they made an agreement they was going to
23 have a meeting there and I was gonna get the job.
24    Q    I understand, but that's the Sorrento's
25 meeting you're talking about?

34



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD  VS**
**CURTIS**

134

1  A    Yeah.
2  Q    But there was a subsequent meeting at the
3 administration building, wasn't there?
4  A    Yeah, that one there.
5  Q    The one discussed in this letter; correct?
6  A    Yeah.
7       MR. BAILEY: He's asking you if you considered
8 that your hearing.
9 BY MR. LOCHINGER:
10  Q    That's right. I'm asking if you considered
11 that your hearing.
12  A    No.
13  Q    Did anybody tell you that there would be an
14 additional hearing?
15  A    No. They said that was it.
16  Q    On what do you base your opinion that you were
17 entitled to another hearing then?
18  A    I -- all I wanted to do is confront all of
19 them face to face. They're making a decision that concerns
20 the school board, the school district, and I want -- I want
21 to look them all in the eye and say, well, why was I denied
22 this job.
23  Q    But do you have any specific contract
24 provision or anything else out there that would -- that
25 would give you the right to do that that you're aware of?

135

1  A    I'm -- I'm not sure if it's in the contract or
2 not.
3  Q    Okay. Let's move on then. The next part of
4 that paragraph talks about you were denied this right even
5 though "they promised him that opportunity". Who promised
6 you the opportunity to be heard?
7  A    Mr. Brown.
8  Q    Okay. And did he make that promise to you
9 directly?
10  A    No.
11  Q    Or was this at the Sorrento's meeting we're
12 talking about?
13  A    Yes.
14  Q    Okay. And you're telling me you do not
15 consider the meeting discussed in this June 26 letter as the
16 fulfillment of that promise?
17  A    No.
18  Q    Okay. Was there something promised beyond
19 that meeting that occurred in the administration building?
20       MR. BAILEY: Now, wait. I object. You're
21 assuming some facts not in evidence. Never mind. Never
22 mind. I object. You may respond.
23  A    What was your question again?
24       MR. BAILEY: I apologize.
25       MR. LOCHINGER: I don't know. I'm lost.

136

1       MR. BAILEY: I think the issue gets to -- he,
2 obviously, did not view this as a hearing apparently from
3 the standpoint of the defendants.
4       MR. LOCHINGER: Right. Let me ask you this --
5       MR. BAILEY: I think we need to find out what
6 a hearing is for school board purposes. There are two
7 people there. Are there issues of --
8       MR. LOCHINGER: I understand that. He's not
9 going to know that. I understand.
10       MR. BAILEY: No, probably not.
11 BY MR. LOCHINGER:
12  Q    What I'm curious about is, were you ever
13 specifically promised a meeting in front of the board as a
14 whole?
15  A    No.
16  Q    Okay. That's all I was after. Next -- in the
17 same paragraph you say it's the accepted procedure that
18 black persons in similar positions have a right to expect
19 and experience. Explain to me what that means. Are you
20 saying that black people have the opportunity to be heard
21 more than you did?
22  A    I'm saying other people went before the board,
23 and they were heard.
24  Q    And when you say went before the board, are
25 you saying they went before the entire board?

137

1  A    Uh-huh.
2  Q    Is that a yes?
3  A    Yes.
4  Q    Not just before two people?
5  A    I don't know everything that goes on with the
6 school board and how they do things. I know how things are
7 supposed to be.
8  Q    Do you have any specific examples you can give
9 me of black people that had their complaints heard by the
10 whole board?
11  A    I might have some at home. I don't know. I'd
12 have to go through some of my papers.
13  Q    Are you aware of any now? I mean, even if you
14 don't have the specifics, are you aware of any that occurred
15 that way?
16  A    No. Most of them were granted because they
17 had seniority.
18  Q    You mean the complaint was --
19  A    They never got to the board because they were
20 --
21  Q    -- upheld?
22  A    They had seniority. It said that they had
23 seniority and was given the job.
24  Q    Okay. I'm just looking for any specific
25 instances you can recall where a black employee in a

 

**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

138

1 situation similar to you was given more of a hearing than
2 you were.
3         MR. BAILEY: Objection to the form of the
4 question, but you can respond.
5    A    I'm not sure.
6         MR. LOCHINGER: Okay. All right. Paragraph,
7 I guess, 19 -- is that what we're up to?
8         MR. BAILEY: Uh-huh.
9 BY MR. LOCHINGER:
10   Q    You said you were denied -- here it says
11 plaintiff believes and avers he is being denied his
12 contractual rights and is even being harassed on the job by
13 Defendant Curtis in retaliation for complaining. Now's your
14 opportunity to get to some of these instances of what you
15 considered to be retaliation. I need you to explain here as
16 best you can the instances that you think that Mr. Curtis
17 retaliated against you because of filing this grievance and
18 the complaint and everything that you have done.
19   A    The instant with the bereavement.
20   Q    Okay.
21   A    The summer cleaning when he knows -- he knew
22 that I only had a short amount of time to clean the
23 building, and he come in there screaming. I mean, all he
24 had to do was come in there and say, well, Hazzard, you
25 know, this wasn't like this, what happened, and I would have

---

139

1 told him, well, we were unloading the truck, we had to put
2 the supplies away, the principal stopped us, and we had to
3 do this. He didn't do that. He came in there arrogant and
4 rude and yelled at me and --
5    Q    I'm sorry. I don't mean to interrupt you, but
6 you're saying that incident it was mainly his demeanor
7 towards you?
8    A    Yeah.
9    Q    That you considered to be harassment?
10   A    Yeah.
11   Q    Do you think he would have done that if you
12 had not filed a grievance?
13   A    Yes.
14   Q    You think --
15        MR. BAILEY: Bill, don't answer a question
16 like that. He can't tell -- he can't tell what you're
17 saying.
18 BY MR. LOCHINGER:
19   Q    Yeah, I'm not quite sure what you're
20 responding to. If you would have never filed your
21 grievance, would Mr. Curtis have treated you the same way?
22   A    I don't think so.
23   Q    Do you think he would have treated you better
24 or worse?
25   A    I'm not sure. Probably maybe the same. Like

---

140

1 I said, he -- he has his little click.
2    Q    Okay. Well, that was my next part of my
3 question, you know, if -- and I'm not sure you've even
4 completely responded to my question completely. Using these
5 two instances -- let's use the bereavement leave. Let's use
6 that specifically. The bereavement leave you're saying that
7 he denied you, and you had a number of confrontations with
8 him about the bereavement leave?
9    A    Yeah.
10   Q    If you had never filed -- and I know this is
11 hard because this is not what happened, but try to imagine
12 if you had never filed your grievance and complaint for not
13 getting the Rowland job. Do you believe that Mr. Curtis
14 would have done the exact same thing for the bereavement
15 leave that he did, or would he have acted differently?
16   A    He would have done the same thing.
17   Q    So you're saying that even though you filed a
18 complaint and a grievance, Mr. Curtis still would have made
19 your life miserable in your mind over this bereavement leave
20 issue?
21   A    Yes.
22   Q    Even if you had never filed a complaint?
23   A    Yes.
24   Q    How about the summer cleaning issue and you're
25 saying his attitude towards you and his demeanor towards

---

141

1 you. Would his attitude and demeanor toward you have
2 changed if you had never filed the complaint?
3    A    It wouldn't have changed because it was his --
4 it was his group that he was sending around helping to clean
5 buildings that I complained weren't doing a thorough job.
6 They were waxing around legs, waxing over bugs.
7    Q    So --
8    A    There was furniture stuck on the floor. And
9 when I complained, it was on deaf ears.
10   Q    So you're saying that a lot of his problem
11 with you is that you're not in his --
12   A    Group.
13   Q    -- click or group, as you call it?
14   A    Yeah.
15   Q    And his click or his group, does that include
16 all of the black head custodians or just some of them?
17   A    Some of them.
18   Q    I think you told me before, but how big is
19 this click or group that he has?
20   A    Well, it's Mack McMurray, Elaine.
21   Q    Do you have Elaine's last name or do you know?
22        MR. BAILEY: Is it on that one exhibit,
23 Exhibit 1?
24 BY MR. LOCHINGER:
25   Q    I don't see anybody named Elaine there. Oh,

---

**GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577**



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

142

1  yeah.  Elaine Eden?
2  A      Eden.
3  Q      I'm sorry.  Okay.  Mack McMurray, Elaine Eden?
4  A      Dunson.
5  Q      Clyde Dunson?
6  A      Yeah.
7  Q      All right.  Anybody else?
8         THE VIDEO OPERATOR:  I want to stop here for a
9  minute.  It's 12:00 exactly.
10        (Recess.)
11        THE VIDEO OPERATOR:  We're back on tape at
12  12:01.
13  BY MR. LOCHINGER:
14  Q      All right.  We were going over this click or
15  group that he has.
16  A      Yeah.
17  Q      And we got McMurray, Eden, Dunson.  Any
18  others?
19  A      There's other people that like they're not
20  head custodians.  Like one girl -- her name -- I don't know
21  her name is.  They call her Kat.
22  Q      Okay.  Is she black?
23  A      Yes.
24  Q      Okay.  Any other people?
25  A      I think Mr. Washington.

143

1  Q      Raymond Washington?
2  A      Yeah.
3  Q      And he's black as well; right?  I think you
4  told us that before.
5  A      Yeah.
6  Q      And so -- are you saying that a lot of his
7  treatment towards you is because you're not in that -- in
8  that click, not in that group?
9  A      I don't think I'd be able to get in that
10  click.
11  Q      Does he treat everybody outside the click
12  worse than he treats the people in the click?
13  A      Basically, yes.
14  Q      Okay.  I'm sorry.  I kind of interrupted your
15  list here.  You had the bereavement leave and the summer
16  cleaning thing and his attitude and demeanor towards you
17  when you were talking about the instances when you were
18  harassed on the job --
19  A      Yeah.
20  Q      -- as retaliation by Mr. Curtis.  Are there
21  any others?
22  A      He would come in the building and he would
23  look to see if there was some kind of dirt on a ledge, and
24  then he would use that to get into a conversation with me.
25  And he always looks down at me.  He gets loud, and he gets

144

1  up in front of me and, you know, kind of makes me shrink,
2  and I think he probably likes it.
3  Q      And have you ever seen him get loud with other
4  people?
5  A      Yeah, one.
6  Q      Who else?
7  A      Dan Rhoads.
8  Q      Dan Rhoads?
9  A      Yeah.
10  Q      Okay.  He's another head custodian; right?
11  A      Yeah.
12  Q      He's the other white head custodian; am I
13  right about that?
14  A      Yes.
15  Q      Okay.  Any other people you have seen him get
16  loud with or --
17  A      No.
18  Q      Anybody he's dressed down in front of
19  everybody?
20  A      No.
21  Q      Has he ever yelled at you in front of other
22  head custodians?
23  A      No.  It's usually by myself.
24  Q      Okay.  How about any of your staff, did he
25  ever yell at you in front of any of your staff?

145

1  A      Well, Shirley wasn't there, but she was out in
2  the hall and she came in.
3  Q      This is the incident you talked about before
4  where she came in and interrupted you and asked him to keep
5  his voice down?
6  A      Yeah, yeah.
7  Q      Any other times other than that?
8  A      No.
9  Q      Okay.  Does the district have any kind of
10  anti-harassment policy that you're aware of?
11  A      I'm not sure.
12  Q      So you're -- are you telling me you're not
13  aware of any anti-harassment policy?
14  A      Well, I wrote a grievance that he was
15  intimidating me and harassing me.
16  Q      Okay.  That was what I was going to ask you
17  next.  Have you ever complained about his harassment, and,
18  obviously, you have.  You filed a grievance?
19  A      Yes.  I don't know what happened to that.
20  Q      You filed this through AFSCME?
21  A      Yes.
22  Q      When was this?
23  A      This was probably near the time that -- not
24  too far from the time of the bereavement incident.
25  Q      What happened to that grievance?

37

 

**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

146

1  A      I think I have it. I think you have it. I'm
2 not sure.
3  Q      Is it still pending, has there ever been a
4 decision made?
5  A      Some -- I think I sent some -- some grievances
6 to Tim Curtis and they never came back and nobody checked on
7 them. If nobody checked -- if a union steward doesn't go
8 and check on them, they're gone.
9      MR. BAILEY: I don't see any grievance filed.
10 I don't know.
11  A      Well, I can probably find it at home.
12 BY MR. LOCHINGER:
13  Q      It's not ringing a bell to me. That's why I'm
14 asking. I don't --
15  A      And I -- it said remedy sought, and I wrote
16 down that he should go see somebody that could teach him how
17 to talk to people.
18      MR. LOCHINGER: Maybe this -- and I really
19 have no idea here but is this something --
20      MR. FINK: Yeah, I was going to get to that.
21 This is about the bereavement.
22      MR. LOCHINGER: You're going to handle that?
23      MR. FINK: Yeah.
24      MR. LOCHINGER: I'll let you handle that then.
25      MR. BAILEY: Could I get a copy of that?

---

147

1      MR. LOCHINGER: That was kind of floating
2 around. I'm not quite sure what -- okay. All right?
3      MR. BAILEY: Yeah. We don't have it. The
4 discovery that you folks provided, the disclosure didn't
5 include that or the complaint so maybe you want to re-check
6 and see --
7      MR. LOCHINGER: Okay.
8      MR. BAILEY: -- if there is some stuff we
9 should have here.
10      MR. LOCHINGER: I'll certainly do that.
11 BY MR. LOCHINGER:
12  Q      Okay. So you did file a grievance. You're
13 not sure what happened to it. Is that where we are right
14 now?
15  A      Yeah.
16  Q      Okay. Have you ever heard of Mr. Curtis
17 harassing other employees at the district?
18  A      No.
19  Q      Okay. All right. I guess one of the last
20 areas I want to cover here is the damages in this case or at
21 least what you perceive to be your damages. Let's talk
22 about the difference between the two jobs here. What did
23 you not get by being denied the Rowland job? What would you
24 have received in that job that you don't have now?
25  A      Okay. A nine percent raise.

---

148

1  Q      Is that a -- that's a one-time raise?
2  A      Huh?
3  Q      That's a one-time raise? I mean, it would
4 boost you about nine percent from where you are now --
5  A      Yeah.
6  Q      -- to that job?
7  A      Yeah.
8  Q      Okay. So a nine percent raise. Do you get
9 additional benefits?
10  A      Yeah. There's a lot of events that go on up
11 there, so there's a lot of overtime.
12  Q      Oh, so -- yeah. Explain this -- explain that
13 to me. The events, the head custodian of the school where
14 the event is has to work it?
15  A      Yeah. They have like -- they have skid ball,
16 girl's cheerleading, stuff like that, a baseball team.
17  Q      So are you saying there are more extra events
18 at Rowland than there are at Shimmell?
19  A      Yeah, yeah. They have the space. They have
20 the seating capacity. They have the auditorium and
21 everything.
22  Q      Okay. Are there a lot of all-school events
23 held there?
24  A      Just about all of them. It's the biggest.
25  Q      And the head custodian at Rowland --

---

149

1  A      He's the senior man. He gets to work the
2 overtime.
3  Q      What do you mean he's the senior man?
4  A      Well, when overtime is presented, it's usually
5 presented to the person with the most senior time.
6  Q      The most senior time in that building?
7  A      Service, years of service, years of service,
8 total years of service.
9  Q      Well, then I don't understand, because you
10 have said that you have more years of service than
11 Mr. McMurray?
12  A      No. That's his building, so whatever goes on
13 in the building goes on between him and his custodians.
14  Q      Okay. So you're saying by building. If an
15 extra event is at Rowland --
16  A      Yeah.
17  Q      -- the custodian with the most seniority in --
18 the most seniority gets first choice of overtime --
19  A      Yes.
20  Q      -- for that event?
21  A      Yes.
22  Q      Okay. So by being head custodian at Rowland,
23 you're saying you would have a lot more opportunities for
24 overtime work?
25  A      Yeah, a lot of overtime.

---

38


150

1 Q Okay. Okay. So we got a pay increase. We
2 got overtime. What else? Any other benefits or
3 opportunities for advancement from that job that you don't
4 have now?
5 A Oh, yeah, working in -- with a lot more
6 people. I enjoy working with Mrs. Antonsen.
7 Q Say so more staff. Ms. Antonsen is the
8 principal there?
9 A Yeah.
10 Q But you would work for whoever the principal
11 of that building is; correct?
12 A Yeah. That's my boss, yes.
13 Q Right. Okay. So you would have more staff
14 under your control?
15 A Uh-huh.
16 Q Anything else that you don't have now that you
17 would have at Rowland?
18 A No, just basically the overtime the -- all the
19 events, all the season programs and all the -- like things
20 that the board would have, guests, speakers coming in and
21 things like that, shops and all that.
22 Q Is there -- are there greater opportunities
23 for further advancement from Rowland than from Shimmell? In
24 other words -- let me rephrase that. Instead of answering,
25 let me rephrase that. Is there anywhere up from a head

151

1 custodian that you can go?
2 A Once I had been in Rowland, in having that
3 title I would have no harassment, no problem, no situation
4 going into William Penn or John Harris.
5 Q So you're saying that once you're in a large
6 building, a 1B building --
7 A Yeah.
8 Q -- then you can easily transfer to one of the
9 other 1B buildings?
10 A Yeah.
11 Q Okay. Anything else that you would receive --
12 I mean, is there any step above a head custodian, an
13 administrative job or anything else, that opens for you
14 because you're in a 1B building instead of a 1A building?
15 A No; just learning some of the programs,
16 setting up programs there, getting involved in the programs
17 I never got involved in before.
18 Q Okay. You're still working at Shimmell now?
19 A Yeah.
20 Q Does -- do the head custodians at large
21 buildings get the same rate increase each year as the head
22 custodians at the smaller buildings?
23 A We all get the same raise, whether it be 50
24 cents, or if it's percentage then the ones that make more
25 money get more.

152

1 Q Get more. But it's all -- but every -- it's
2 across the board, all the raises?
3 A Yeah, yeah.
4 Q You don't get a greater raise because you have
5 a bigger building?
6 A No.
7 Q Okay. How about anything like vacation time
8 and things like that. Do you get more vacation time
9 because --
10 A No.
11 Q -- you're at a bigger building?
12 A No. It's years of service.
13 Q Okay. That's purely based upon the years of
14 service with the district?
15 A Yeah.
16 Q And I'm assuming that goes for sick time and
17 personal time as well?
18 A Yeah.
19 Q Okay. How about seniority status? I think
20 you've told me that it's for years of service at the
21 district, so am I correct in assuming it doesn't matter for
22 your seniority status whether you're at a large building or
23 a small building?
24 A It doesn't matter, but let's say for some
25 reason they would need a head custodian to go to the Rowland

153

1 building because they couldn't get anybody else, I couldn't
2 go because I'm a 1A.
3 Q So only people that are already -- if they
4 have an emergency situation, is that what you're saying, or
5 just any situation?
6 A Yeah.
7 Q Which one is it, emergency or -- an emergency
8 situation?
9 A If there is nobody else, they'll go for
10 somebody that has the same classification.
11 Q Okay. But if the Rowland job opened tomorrow,
12 wouldn't they open up the bidding? I mean, isn't it
13 possible they would open up the bidding to everybody,
14 including you?
15 A Oh, yeah.
16 Q Okay. So you're talking about a situation
17 where -- like where you had before where Mr. Swope had to
18 leave suddenly?
19 A Yeah.
20 Q You're saying that they would go and take
21 another large building head custodian?
22 A If it would be a large building, but if it
23 would be a small building, you know, they could get a head
24 custodian, you know, to come in.
25 Q Okay. So that's -- you're saying that's




---

154

1 another opportunity you lose in the sense that if there is
2 another opening somewhere you cannot go there because you're
3 in a small building?
4    A    Yeah.
5        MR. LOCHINGER: Okay. I'll tell you what.
6 It's easy to stop right there.
7        MR. BAILEY: That's a good point.
8        MR. LOCHINGER: Why don't we stop there, and
9 we'll let Mr. Fink take over after lunch.
10        MR. FINK: Sounds good.
11        THE VIDEO OPERATOR: The time is 12:17. We're
12 going to stop the deposition at this -- or the deposition
13 has ended.
14        MR. FINK: No, no. We're going to pause.
15 We're going to come back and finish after --
16        MR. BAILEY: The deposition is suspended.
17 Yeah, he's still continuing. We'll reconvene.
18        MR. FINK: Yes.
19        THE VIDEO OPERATOR: It's 12:17 p.m.
20        (Luncheon recess.)
21
22            AFTERNOON SESSION
23
24        MR. BAILEY: The tape recording is on, ladies
25 and gentlemen. Go ahead, Tony. You can crank up.

---

155

1        THE VIDEO OPERATOR: It's 1:04 p.m., October
2 19th, 2001, and we're continuing the Hazzard deposition.
3
4            CROSS-EXAMINATION
5
6 BY MR. FINK:
7    Q    Okay. Mr. Hazzard, I think I introduced
8 myself yesterday, but I'm Eric Fink, and I represent AFSCME
9 in this case, and I'm going to continue asking some
10 questions. I'm going to go back over a couple of the things
11 that Mr. Lochinger covered with you, and then I'm going to
12 go over one or two additional areas.
13        And I'll tell you the same thing. If you need
14 a break for any reason, just let me know. That's fine. I'm
15 originally a New Yorker, so sometimes when I get going I
16 start talking real fast and you can't understand a word I'm
17 saying. So you just tell me slow down, and I'll do that.
18 And try to let me finish my questions before you answer, and
19 I'll do the same thing. I'll try not to interrupt you. And
20 if I do interrupt you, you just smack me and continue with
21 your answer. Okay?
22    A    Okay.
23    Q    And if you don't understand anything I say,
24 just let me know.
25    A    Okay.

---

156

1    Q    Is that all right?
2    A    That's all right.
3    Q    Okay. We were talking about the job -- the
4 posting of this job at the Rowland School earlier and you
5 remember that we were talking about that, obviously?
6    A    Yes.
7    Q    Okay. I'm going to show you -- and we can
8 mark this. I don't know what we're up to. Okay. I'm going
9 to show you -- we're going to mark this as Hazzard 7. Is
10 that the job posting that was posted in July of 1999, as you
11 recall?
12    A    Yeah.
13        MR. FINK: Okay. And, for the record, this is
14 headed at the top Employment Opportunities, Page 4, and it's
15 dated July 8th, 1999, and it contains a couple of items, but
16 the first item is Position of Faculty Service Foreman 1B,
17 and it's described as being at the new Rowland building.
18        MR. BAILEY: That would be Hazzard 7?
19        MR. FINK: This will be Number 7, I believe.
20 Okay. I just wanted to clear that up.
21        (Position Guide for Facility Service Foreman
22 1B, formerly Head Custodian I-Major, marked as Hazzard
23 Exhibit 7.)
24 BY MR. FINK:
25    Q    Now -- so this was posted -- at least the date

---

157

1 on it was July 8th. And does that accord with your
2 recollection, was it sometime in early July that you learned
3 of this posting?
4    A    Yes, sir.
5    Q    Okay. So you had already put in your request
6 for the Rowland building before this was posted; is that
7 right?
8    A    Yes.
9    Q    Okay. And you did that by your memo, and I
10 believe that was introduced already.
11        MR. BAILEY: Hazzard 2.
12 BY MR. FINK:
13    Q    As Hazzard 2. So you did that on June 25th;
14 is that right?
15    A    Yes.
16    Q    Okay. So at the time that you submitted this
17 memo, there was no actual posting yet; is that right?
18    A    Yes.
19    Q    Okay. And this may not matter very much, but
20 it's my understanding that within the school district I've
21 -- I've been told that there is a special form that people
22 sometimes call a bid sheet that people usually use when
23 they're bidding on a job. Are you familiar with that form?
24    A    Uh-huh.
25    Q    Okay. And in this case you didn't use the

 

HAZZARD, WILLIAM
10/19/01

HAZZARD VS
CURTIS

158

1 official bid sheet; is that right?
2   A     Yeah.
3   Q     You typed this all up just on your own paper?
4   A     Yeah.
5   Q     Okay.  Now, eventually -- I think you referred
6 to this earlier.  Somebody mentioned that they accepted
7 this, even though it wasn't on the form?
8   A     Mr. Freeman.
9   Q     Mr. Freeman.  So Mr. Freeman told you he
10 didn't -- he didn't care -- the reason he turned -- he
11 didn't give you -- as a reason for turning you down, he did
12 not say that it was because you didn't use the right piece
13 of paper; right?
14   A     Right.
15   Q     Okay.  Okay.  Now, the job that was posted at
16 the Rowland School, that job is described as Faculty Service
17 Foreman IB, Roman Number IB; is that correct?
18   A     Yes.
19   Q     Okay.  And we had some discussion -- I want to
20 go back over this just briefly.  Under the contract --
21 you're familiar with the contract between AFSCME and The
22 Harrisburg School District?
23   A     Yeah.
24   Q     Okay.  And that contract has a lot of things
25 in it; right?

159

1   A     Uh-huh.
2   Q     But one of the things that that contract has
3 is a list of job categories or job titles; is that right?
4   A     Uh-huh.
5       MR. FINK:  Okay.  And, actually, why don't we
6 mark this.
7       (Agreement between the Board of School
8   Directors of the City of Harrisburg School District and
9   AFSCME marked as Hazzard Exhibit 8.)
10 BY MR. FINK:
11   Q     I'm going to show you that.  Can you identify
12 that?  Is that a copy of the contract for The Harrisburg
13 School District?
14   A     Yes, it is.
15       MR. FINK:  Okay.  And, again, let the record
16 reflect this is a document that's described as Agreement
17 between the City of Harrisburg School District and AFSCME,
18 District Counsel 90, and it's dated July 1, 1997 to June 30,
19 2001.
20 BY MR. FINK:
21   Q     So this would be the contract that was in
22 place in '99 when your grievance was filed; is that right?
23   A     Yes.
24       MR. FINK:  Okay.  So we can mark this as
25 Hazzard 8.

160

1 BY MR. FINK:
2   Q     Now, if you'll look at the back few pages,
3 starting at Page 46 and going on, the contract has a list of
4 the different job titles in the school district; is that
5 right?
6   A     Yeah.
7   Q     Okay.  And I think if you go to the very last
8 page.
9   A     Here?
10   Q     Yeah.  Let's see.  No.  I guess I'm wrong.
11 It's -- okay.  Here.  On Page 49, there's a Category XVI and
12 it says Faculty Service Foreman -- oh, no.  That's not it
13 either.  Where are we?  Here we go.  We have a Category XII
14 on Page 49, and that says Faculty Service Foreman 1A; is
15 that right?
16   A     Yes.
17   Q     Okay.  And that gives a starting salary of
18 $9.50 an hour; is that right?
19   A     Yes.
20   Q     Okay.  And the hours for that are eight hours?
21   A     Yes.
22   Q     I assume that's eight hours a day, not eight
23 hours a week or something?
24   A     Yeah, eight hours a day.
25   Q     Okay.  And then it says days per year 260; is

161

1 that right?
2   A     Yes.
3   Q     Okay.  And then a little further down here,
4 Category XIV, it says Faculty Service Foreman 1B.  Do you
5 see that?
6   A     Uh-huh.
7   Q     Okay.  Now, the starting salary for that is
8 $10 per hour; is that right?
9   A     Yes, sir.
10   Q     So that's 50 cents an hour more than 1A; is
11 that right?
12   A     Yes.
13   Q     Okay.  And that's the starting salary
14 difference; is that right?
15   A     Uh-huh.
16   Q     Okay.  And the hours and the days per year are
17 the same for 1B and 1A under the contract; is that right?
18   A     Yes.
19   Q     Okay.  So in terms of the -- the terms and
20 conditions of employment, the wages and hours, the only
21 difference is 50 cents an hour in the starting salary; is
22 that right?
23   A     Yes.
24   Q     Okay.  The hours are the same and the days --
25 the hours per day and the hours per year are the same,

 

**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

162

1 straight time hours?
2  A     Unless you're transferred.
3  Q     Okay.  How do you mean unless you're
4 transferred?
5  A     Well, if I was transferred as an A to a B,
6 it's a nine percent raise.
7  Q     Okay.  You get -- yeah, but -- if you -- we'll
8 come to that, if you get converted from an A to a B but --
9  A     Yes.
10  Q     -- if you have -- if one person is an A and
11 one person is a B and if they have the same years of
12 experience, the same years -- that's cool.  Dick Tracy.  If
13 they have -- let me start again.  If you have one person who
14 is a 1A and one person who is a 1B and they have exactly the
15 same amount of service, the difference in their pay should
16 be 50 cents an hour; is that right?
17  A     Yeah.
18  Q     Okay.  Now, just to finish up with this book,
19 there's -- there are little asterisks before the titles
20 facility service -- I might have said faculty earlier.  I
21 should have said facility.  There are little asterisks
22 before the titles Facility Service Foreman 1A and Facility
23 Service Foreman 1B.  Do you see the asterisks?
24  A     Yes.
25  Q     Okay.  And if we go to Page 50, there is an

---

163

1 explanation for those asterisks, is there not?
2  A     Yeah.
3  Q     Okay.  And on -- in this explanation we see
4 that Facility Service Worker 1 -- it says formerly -- excuse
5 me -- Facility Services Foreman 1A.  It says formerly Head
6 Custodian Minor.  Do you see that?
7  A     Yeah.
8  Q     Okay.  And Facility Service Foreman 1B, it
9 says formerly Head Custodian Major; is that right?
10  A     Yes.
11  Q     Okay.  So do I understand then that these job
12 titles changed, that the 1A position used to be called Head
13 Custodian Minor?
14  A     It was just Head Custodian.
15  Q     Okay.  So 1A and 1B, they were previously
16 called Head Custodian?
17  A     Yeah.
18  Q     And then the distinction -- what used -- the
19 distinction between A and B used to be called the
20 distinction between Minor and Major.  Would that be right?
21  A     Tim Curtis brought that in, yes.
22  Q     Okay.  The distinction between Minor and
23 Major, Tim Curtis brought that in?
24  A     Yes.
25  Q     And the distinction between Minor and Major,

---

164

1 does that coincide with what we've been talking about about
2 the size of the building?
3  A     Yes.
4  Q     So there's -- buildings above a certain size
5 are classed as Major?
6  A     Uh-huh.
7  Q     And buildings below a certain size are classed
8 as Minor?
9  A     Yes.
10  Q     Okay.  You don't know what that -- what the
11 size cutoff is, do you?
12  A     No, I don't.
13  Q     Okay.  Okay.  That's fine.  So if I use the
14 term Minor, that would be the equivalent to 1A.  Would that
15 be accurate?
16  A     Yes, sir.
17  Q     Okay.  And if I use the term Major, that would
18 be equivalent to 1B?
19  A     Yes, sir.
20  Q     Okay.  Good.  Let's mark this I guess it will
21 be 9.  Do you recognize that?  Do you know what that
22 document is?
23  A     Report to school principal.
24  Q     Have you ever seen that before?
25  A     Yeah.

---

165

1      MR. BAILEY:  May I see it, Bill?  I haven't
2 had a chance to see it.
3 BY MR. FINK:
4  Q     Do you know what it is?
5  A     Yeah, our work duties.
6  Q     Okay.  If I told you that was a job
7 description for the 1A job, would you agree with me?
8  A     Yeah.
9  Q     Okay.
10      MR. BAILEY:  Do you have copies for us?
11      MR. FINK:  I have -- this was actually -- I
12 got this from the documents you gave me.
13      MR. BAILEY:  Oh, you did?
14      MR. FINK:  Yeah, that's where I got it from.
15      MR. BAILEY:  That's funny.  You may have
16 gotten it from Shawn because I don't think I have that.
17      MR. LOCHINGER:  No.  I think that's where I
18 got it, too.
19      MR. FINK:  Yeah.  This was in the packet -- in
20 the stack of documents you gave me.
21      MR. BAILEY:  Let me double check.
22      MR. FINK:  So we'll mark this as 9.  I may
23 have an extra one.
24      MR. LOCHINGER:  I have it here.
25      MR. BAILEY:  Are you going to give him both?

---

42



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

166

1    MR. FINK: Well, I was going to give him --
2 oh, wait. I don't have an up-to-date one for 1B. Do you
3 have an up-to-date one for 1B? Oh, very nice. Let me do
4 that then.
5    MR. BAILEY: Gentlemen, I honestly do not have
6 that. Let me double check over here. It could be
7 misplaced. Yeah. If you can give me one, I would
8 appreciate it. Okay. I don't know what I did with it.
9 BY MR. FINK:
10   Q    Okay. Why don't we mark this next one as
11 Hazzard 10. And have you ever seen that one before,
12 Mr. Hazzard?
13   MR. BAILEY: Which one is that?
14   MR. FINK: The one I'm showing him now is the
15 one that says Facility Service Foreman 1B (formerly Head
16 Custodian I-Major).
17   MR. BAILEY: Oh, I see. Okay.
18   A    I'm not sure.
19 BY MR. FINK:
20   Q    You're not sure. If -- I'm going to -- I will
21 represent to you that this is a job description for the job
22 of Facility Service Foreman 1B. Does that seem right to
23 you?
24   A    Yeah, okay.
25   MR. FINK: Okay. And so we'll mark this one

167

1 as Number 10.
2    (Position Guide for Facility Service Foreman
3 1A, formerly Head Custodian I-Minor, marked as Hazzard
4 Exhibit 9.)
5    (Position Guide for Facility Service Foreman
6 1B, formerly Head Custodian I-Major, marked as Hazzard
7 Exhibit 10.)
8 BY MR. FINK:
9    Q    Take a look at these two documents. On number
10 -- on the one that's marked as Hazzard 9, the one that is
11 for the 1A job, is -- there's a list on there of what are
12 called -- so-called minor schools; is that right?
13   A    Yes.
14   Q    Okay. And why don't you just read off the
15 list for us?
16   A    Okay. Baton-Felton, Downey, Foose, Lincoln,
17 Marshall, Melrose, Riverside, Shimmell, Steele and Woodward.
18   Q    And do you agree that those -- that all
19 of those are in the minor category, in the 1A category?
20   A    Yeah. Now, they are.
21   Q    They all are at the present time?
22   A    Yeah.
23   Q    And back in 1999 were all of these in the 1A,
24 minor, category?
25   A    Yeah.

168

1    Q    Okay. Then if you look at Number 10, there's
2 a list of major schools; is that right?
3    A    Administration, Camp Curtin, William Penn and
4 John Harris.
5    Q    Okay. And do you agree that all of those are
6 considered major buildings?
7    A    Yes.
8    Q    Okay. And in 1999 were all of those
9 considered major buildings?
10   A    Yes.
11   Q    Okay. Now, one of the things that you didn't
12 mention is Rowland. Is that because Rowland was -- strike
13 that. Rowland is not included on either of those lists, is
14 that right, on these documents?
15   A    No.
16   Q    Okay. But you said before -- you agree that
17 Rowland is in the major category; is that right?
18   A    Yeah.
19   Q    Okay. So that the custodian who would be
20 assigned as head custodian for Rowland, that would be a 1B
21 job; is that right?
22   A    Yes.
23   Q    Okay. Now, Rowland opened when?
24   A    I'm not sure of the exact date.
25   Q    Was it -- at the time that you put in your job

169

1 bid, what's marked as Hazzard Exhibit 2, the school wasn't
2 opened yet at that time, was it?
3    A    No.
4    Q    Okay. And in July when this posting was
5 posted --
6    A    Uh-huh.
7    Q    -- the school still wasn't open; is that
8 right?
9    A    I don't think it was.
10   Q    Did it open up for the fall of '99?
11   A    Yeah.
12   Q    Okay. So sometime -- it opened for the
13 beginning of the 1999-2000 school year. Would that be
14 right?
15   A    Yeah.
16   Q    Okay. And Rowland was a new school at that
17 time; is that correct?
18   A    Yeah.
19   Q    Okay. The building already existed but it was
20 some -- it had some other use before. It wasn't a school in
21 the past; is that right?
22   A    Yeah. It was an insurance company.
23   Q    Okay. And the school district, I imagine they
24 bought the building and converted it?
25   A    Yeah.




HAZZARD, WILLIAM
10/19/01

HAZZARD  VS
CURTIS

---

170

1 Q    Okay. And they turned it into Rowland
2 Intermediate School?
3 A    Yes.
4 Q    Okay. We had some discussion about people
5 transferring from William Penn to Rowland. Do I have that
6 correctly?
7 A    Yes.
8 Q    Okay. William Penn is also an intermediate
9 school?
10 A    It's a minor -- I mean a major.
11 Q    Okay, no, but --
12 A    Yeah.
13 Q    But I mean in terms of the grade years -- in
14 terms of the year -- the age of the school children who go
15 there, what grades is William Penn?
16 A    They were vo-tech, so I guess they were
17 probably seventh, eighth, ninth.
18 Q    Okay. And those are the same grades as
19 Rowland; is that right?
20 A    I think so.
21 Q    So they're both middle schools or intermediate
22 schools?
23 A    Yeah.
24 Q    Okay. Where I come from they call it junior
25 high school, but that's a dumb name. So I want to see if I

---

171

1 understand this. Is William Penn -- does that school still
2 exist now?
3 A    Yes.
4 Q    Okay. So William Penn didn't shut down when
5 they opened Rowland School?
6 A    No. They just changed.
7 Q    William Penn changed how? William Penn
8 changed how?
9 A    I think they put kids from all over in there
10 now.
11 Q    Okay. So it became -- so it changed in the
12 type of students that they have or it changed in which
13 students they have?
14 A    Yeah.
15 Q    Okay. But we heard some of this yesterday
16 with Mr. McMurray, and you referred to it today. Some
17 people from William Penn, when Rowland opened they went --
18 did some people go from William Penn into Rowland?
19 A    Uh-huh.
20 Q    And that would be some of the staff, some of
21 the employees?
22 A    Yeah.
23 Q    Okay. And do you know which staff or do you
24 know which employees went from William Penn? I don't mean
25 their names.

---

172

1 A    No. All I know is what Freeman said, that
2 they were all transferred over there. That's all I know.
3 Q    Okay. So all you know about it is what
4 Mr. Freeman told you?
5 A    Yeah.
6 Q    And what Mr. Freeman told you was that all of
7 the people from William Penn were transferred over to
8 Rowland; is that correct?
9 A    Yes, sir.
10 Q    Okay. And you have no reason to disbelieve
11 Mr. Freeman, do you?
12 A    No.
13 Q    Okay. Now, Mr. McMurray, you know that he was
14 at one time at William Penn School; is that right?
15 A    Yes.
16 Q    Okay. And then in June of 1999 when
17 Mr. Curtis transferred all the head custodians, Mr. McMurray
18 got transferred from William Penn to --
19 A    Hamilton.
20 Q    -- Hamilton; is that right?
21 A    Yes.
22 Q    Okay. And that was by a memo June -- that was
23 June 18th of 1999; is that right?
24 A    Yes.
25 Q    So at that time Rowland School was not open

---

173

1 yet?
2 A    No.
3 Q    Okay. So there was no head custodian at
4 Rowland School before it opened, was there?
5 A    No.
6 Q    Okay. Now, William Penn, that's in the major
7 category or the minor category?
8 A    That was the big kids at that time. It's a
9 big school.
10 Q    A big school. So that would be a 1B, a major?
11 A    Yeah, yeah.
12 Q    Okay. And Hamilton, that's a minor, isn't it?
13 A    I don't know, see, because when they go by
14 square foot, Hamilton goes up.
15 Q    Uh-huh?
16 A    So I don't know what Hamilton is classified
17 as.
18 Q    Okay. And, actually, Hamilton is not listed
19 on either of these two documents either, is it? If we go
20 back to Exhibit 9 and Exhibit 10, I don't think that
21 Hamilton is listed on either one of these documents.
22 A    No.
23 Q    Okay. Is Hamilton still open?
24 A    Yes.
25 Q    Okay. So they haven't shut down that school?

---

44

 

**HAZZARD, WILLIAM**
**10/19/01**

HAZZARD VS
CURTIS

174

1    A    Huh-uh.
2    Q    Okay. How interesting. They haven't changed
3 the name of it, have they?
4    A    No. They probably just forgot to put it on.
5    Q    Okay. Well, we would have to ask the person
6 who wrote this. We don't know who wrote this. Okay. So
7 you don't -- so do you know -- you don't know whether
8 Hamilton is in the 1B category or the 1A category?
9    A    No, I don't.
10    Q    Okay. Okay. Now, you mentioned a grievance
11 that was filed -- not your personal grievance over not
12 getting the Rowland job, but you mentioned another grievance
13 that was filed when Mr. Curtis issued this memorandum in
14 June of 1999 and transferred all of the head custodians.
15    A    Yes.
16    Q    Okay. And I'm going to show you another
17 document. We can mark this Hazzard 11. This was also in
18 the stuff that I got from your attorney, although I had it
19 as well. Is this the grievance that you're talking about
20 here, the grievance over the transfer of all the head
21 custodians?
22        MR. BAILEY: Is that 00095?
23        MR. FINK: Well, that's the grievance fact
24 sheet. This was the grievance form, but that's right, it's
25 Number 95, yeah, the actual grievance form.

176

1    Q    Okay. So if it's done on behalf of everybody,
2 you don't necessarily have to have someone sign it?
3    A    No.
4    Q    If it's done on behalf of an individual, that
5 individual would sign it him or herself?
6    A    Yes.
7    Q    Okay. And, in fact, if we look at your
8 grievance, I believe you did sign it. If we look at
9 Hazzard 3 you signed -- you signed at the bottom over
10 employee; is that right?
11    A    Yeah.
12    Q    And then Mr. Epps signed as the steward?
13    A    Yes.
14    Q    Okay. We'll come back to that. So this one
15 is Hazzard 11. And this is the grievance that was filed
16 over the fact that Mr. Curtis transferred all of the
17 employees -- all of the head custodians to different
18 schools; is that right?
19    A    Yeah.
20    Q    Okay. And who's the -- which -- who's the
21 union steward who signed that?
22    A    It looks like Steve McCollum.
23    Q    Yeah, it looks like that to me too. I think
24 it is Mr. McCollum. And that was -- and the date on here,
25 it says August -- 8/17/99; is that right?

175

1        MR. BAILEY: Okay. And this is Hazzard 11?
2        MR. FINK: Yeah.
3        (Grievance Form dated 8/17/99 marked as
4 Hazzard Exhibit 11.)
5    A    Well, yeah, I guess this is probably -- in the
6 response right there.
7 BY MR. FINK:
8    Q     Okay. So this is the grievance that was --
9 this -- I mean -- let me take a step back. This document,
10 it says grievance form at the top; right?
11    A    Yeah.
12    Q    And this is the kind of form -- forget about
13 what's handwritten in here. The form itself, this is what
14 anybody would use to file an AFSCME grievance in the
15 Harrisburg School District; is that right?
16    A    Yes.
17    Q    Okay. And at the bottom there's a place for a
18 steward's signature and for an employee's signature; is that
19 right?
20    A    Uh-huh.
21    Q    Okay. So I take it then that -- that you
22 would have either -- it says and/or so I guess you can
23 either have an AFSCME -- steward or the union steward?
24    A    I don't think anybody would have signed there
25 because it was done on behalf of everybody by the union.

177

1    A    Yeah.
2    Q    And does that sound right to you?
3    A    Yeah.
4    Q    Okay. So this transfer happened in June, but
5 in August Mr. McCollum filed a grievance over this mass
6 transfer; is that correct?
7    A    Yes.
8    Q    Okay. And he did that on behalf of -- under
9 grievant it says class action. Do you know what he means by
10 that?
11    A    For everybody.
12    Q    Okay. And everybody being who?
13    A    All the head custodians.
14    Q    Okay. So all the head custodians who were
15 transferred -- all of whom were transferred by Mr. Curtis?
16    A    Yes.
17    Q    Okay. And what was the beef, what was the
18 subject of the grievance, what were you -- what were you --
19 what were people unhappy about?
20    A    Nobody asked for it.
21    Q    Okay. So one thing is that nobody asked to be
22 transferred. Okay. Anything else?
23    A    Yeah. I was upset that I was discriminated
24 against.
25    Q    Okay. You were personally unhappy because you




**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

178

1 didn't get put into Rowland School; is that right?
2 A Yes.
3 Q Okay. But that -- but that wasn't in this --
4 this grievance here on Exhibit 11, this wasn't about your --
5 this wasn't about your dissatisfaction of not going to the
6 Rowland School, was it?
7 A Yes. I was upset about it, yes.
8 Q Okay. But was that part of the -- was that
9 part of this class action grievance, or was that just in
10 your own individual grievance?
11 A Oh, that was -- that was a class action.
12 Steve filled that out.
13 Q Okay. So the class action -- this wasn't
14 about your -- this wasn't about your individual case, was
15 it?
16 A No.
17 Q Okay. And so what it says in here is -- well,
18 can you -- in the middle it says statement by grievant or
19 union. Why don't you read that into the record?
20 A Where at?
21 Q In the middle where it says statement by
22 grievant or union.
23 A Effective June 28th, 1999 all head custodians
24 were transferred to other buildings by management. August
25 12th, 1999 a letter was sent to all head custodians that

179

1 stated this is to inform you that your transfer was
2 approved. This is not accurate. No head custodian
3 requested a transfer.
4 Q Okay. So this is explaining that nobody
5 wanted to be transferred. Would you agree with that
6 description?
7 A Yes, yes.
8 Q Okay. And then at the bottom there's a
9 section that says relief or remedy sought. What did the
10 union want to happen as a result of this grievance?
11 A Well, what would have happened was is that the
12 ones that were from the high schools that went to a small
13 school would have -- the salaries would have been deducted.
14 So they're saying we didn't ask for it so you shouldn't take
15 that money off of us. So that's what they agreed with.
16 Q Okay. Now -- so you said that as a result of
17 this transfer some people's salary would have been
18 deducted. Why would that have happened?
19 A Because the school district already
20 established that if you transfer to a lower paying job you
21 will come down to that salary.
22 Q So are you saying if somebody transferred from
23 a 1B school to a 1A school, is that what you're talking
24 about?
25 A Yes.

180

1 Q Okay. And some of the people who were
2 transferred were transferred from large -- from major
3 schools, 1B schools, to minor schools, 1A schools; is that
4 right?
5 A Yes.
6 Q And the school district cut their pay by the
7 50 cents an hour, is that what they did?
8 A They participated I think and filed that
9 grievance that that's the procedure that's going to take
10 place and if that is then they can't do it, they can't
11 transfer them or else they have to give them the money.
12 Q Okay. So the goal of the grievance was either
13 don't transfer the people or don't cut their pay?
14 A Yes.
15 Q And do you know whether -- was there any
16 result -- was this grievance resolved?
17 A Yeah. Everybody liked where they were except
18 me.
19 Q Okay. So the transfers were not undone; is
20 that right?
21 A No.
22 Q But what about the issue of people's pay being
23 cut, was that settled as a result of this grievance, do you
24 know?
25 A Their pay wasn't cut.

181

1 Q Okay. So, in fact, nobody lost pay as a
2 result of these transfers; is that right?
3 A Yeah.
4 Q Okay. And that was by an agreement between
5 the union and the school district; is that right?
6 A Yes.
7 THE VIDEO OPERATOR: Excuse me. I have to
8 change the tape. It's 1332. We're going to go off-line
9 right now.
10 (Recess.)
11 THE VIDEO OPERATOR: Okay. It's 1339, and
12 we're back on record.
13 MR. FINK: Okay. Tell me what was the last
14 thing I said before we went off.
15 (Question read.)
16 BY MR. FINK:
17 Q Oh, all right. When you got transferred from
18 -- you were -- I've forgotten. You were originally at
19 Marshall?
20 A Yeah.
21 Q Okay. When you got transferred from Marshall
22 to Shimmell, you didn't get any pay cut in that transfer,
23 did you?
24 A It was the same level.
25 Q Okay. So those were both -- and those are

 

**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

182

1 both minor schools or 1A schools; is that right?
2    A    Yes.
3    Q    Okay. And you've never worked as a custodian
4 or a head custodian in a major building, have you?
5    A    No.
6    Q    Okay. You've always been in a minor or a 1A
7 building; is that right?
8    A    Yes.
9    Q    Now, Mr. McMurray, he was -- at least at
10 William Penn, he was in a major building, a 1B building; is
11 that right?
12    A    Uh-huh.
13    Q    And at Hamilton we're not sure. We don't know
14 whether that was major or minor; is that right?
15    A    William Penn?
16    Q    No, Hamilton.
17    A    Hamilton?
18    Q    Where he was transferred to.
19    A    Epps is over there, and he's a 1A.
20    Q    A 1A?
21    A    Yeah.
22    Q    So Mr. Epps is at Hamilton right now?
23    A    Yeah.
24    Q    Okay. So based on that, you think Hamilton is
25 a 1A, a minor school?

---

183

1    A    Yeah.
2    Q    Okay. So when Mr. McMurray was transferred
3 from William Penn to Hamilton, that would have been going
4 from a 1B to a 1A; is that right?
5    A    Yes, sir.
6    Q    Now, under this -- under the settlement of
7 this grievance, the grievance that's marked as Exhibit 11 --
8    A    It means he won't lose any money.
9    Q    Okay. That -- so Mr. McMurray was one of the
10 people who was protected from losing money by this
11 grievance; is that right?
12    A    Yes.
13    Q    Okay. So -- or to look at it another way:
14 based on the settlement of this grievance, the school
15 district had to pay Mr. McMurray as a 1B, even though he was
16 doing a 1A job; is that right?
17    A    Yes.
18    Q    Okay. When we -- when you talked earlier
19 about this mass transfer of all the head custodians in June
20 of 1999 --
21    A    Yeah.
22    Q    -- you made the statement, and you said it a
23 few times, that all of the black head custodians were -- I
24 don't remember if you used the word promoted or increased
25 and the two white head custodians were not.

---

184

1    A    Right.
2    Q    Do you remember saying that?
3    A    Yes, sir.
4    MR. FINK: Okay. Let's take a look again at
5 Hazzard Exhibit 1. Let me dig it out here. I bet it's not
6 at the bottom. Zippity dooda. Here we go. Okay. You
7 didn't write down zippity dooda, did you?
8    MR. BAILEY: We got it down.
9    MR. FINK: You see transcripts like that.
10    MR. BAILEY: When you do the transcript from
11 the video, unfortunately it does.
12    MR. FINK: Yeah, yeah.
13 BY MR. FINK:
14    Q    Okay. Mr. Matthew, you didn't know his race;
15 is that right?
16    A    Yeah.
17    Q    Okay. So never mind him. Mr. Dunson. You
18 said that Mr. Dunson is black; is that right?
19    A    (Witness nods head affirmatively).
20    Q    You have to speak loud.
21    A    Yes.
22    Q    Especially to compete with me because I
23 shout.
24    MR. BAILEY: I'll tell you what. You should
25 see this microphone. You're going off the top, and he's

---

185

1 barely registering.
2 BY MR. FINK:
3    Q    I'll tell you what. I'll try not to shout,
4 and you try to shout. We'll swap.
5    A    Okay.
6    Q    Okay. Mr. Dunson went to the Steele School;
7 is that right?
8    A    Yes.
9    Q    And Steele is minor, it's 1A; right?
10    A    Yes.
11    Q    Okay. But he was at Camp Curtin; right?
12    A    Which was a larger school.
13    Q    Which is a large school. So Mr. Dunson didn't
14 get a promotion, did he? He didn't go from a small school
15 to a big school, did he?
16    A    He went from a big school to a small school.
17    Q    To a small school. So in terms of the
18 contract, that's a step down, isn't it?
19    A    But he didn't lose anything.
20    Q    He didn't -- right. He didn't lose any pay
21 because of the grievance settlement; right?
22    MR. BAILEY: I'm going to object to the form
23 of that question. You can go ahead and respond. Object to
24 the form of the question.
25 BY MR. FINK:

---

 

HAZZARD, WILLIAM
10/19/01

HAZZARD VS
CURTIS

186

1 Q    Okay. He didn't lose any money -- he didn't
2 lose any pay because of the grievance settlement; right?
3 A    Right.
4 Q    Okay. But he did go from a major school to a
5 minor school; right?
6 A    Yes.
7 Q    Okay. So when you said that all the black
8 head custodians were promoted as a result of this transfer,
9 how was Mr. Dunson promoted when he went from Camp Curtin to
10 Steele?
11 A    Because the blacks that went in -- that
12 already had the position didn't lose it. So you have blacks
13 that have -- they're 1B and then you have the other blacks
14 that weren't 1B -- or they were 1A. They went to 1B. Why
15 couldn't you take at least one white person and make him a
16 1B? They didn't -- they didn't take Rhoads or myself
17 because we were white.
18    MR. BAILEY: Was that Rhoads?
19 A    Yeah.
20    MR. BAILEY: R-h-o-a-d-s?
21 A    Yeah.
22    MR. BAILEY: He's Dan Rhoads?
23 A    Dan Rhoads, yeah.
24    MR. BAILEY: Okay.
25 BY MR. FINK:

187

1 Q    Okay. But you agree that Mr. Dunson went from
2 a big school to a small school?
3 A    Yes.
4 Q    Okay. So he went from 1B to 1A?
5 A    Yeah.
6 Q    Okay. And if you go down to Valence Barker,
7 is that a man or a woman?
8 A    Valence Barker is Jamaican.
9 Q    A male or female, though?
10 A    He's a male.
11 Q    It's a he?
12 A    Yeah.
13 Q    Okay. So he went to the Marshall School; is
14 that right?
15 A    Yes.
16 Q    That's where you used to be?
17 A    Yes.
18 Q    Okay. So that's a minor, that's a 1A; is that
19 right?
20 A    Yes.
21 Q    Okay. Before going to Marshall, he was at
22 John Harris; is that right?
23 A    Yes.
24 Q    Okay. And John Harris is a major, it's a 1B;
25 is that right?

188

1 A    Yes, sir.
2 Q    So Mr. Barker went from a 1B school to a 1A
3 school; is that right?
4 A    Yes.
5 Q    Okay. Okay. And then Mr. McMurray, he also
6 went -- he went from William Penn, a 1B, to Hamilton, which
7 is a 1A. So he also went from a 1B to a 1A; is that right?
8 A    Yes, but it took the school district almost
9 four months to admit that.
10 Q    Okay. But he -- well, what do you mean by
11 that, it took the school district four months to admit that?
12 A    Well, they kept saying that he went straight
13 to the Rowland building, and he didn't. He went to
14 Hamilton.
15 Q    Okay. In fact, in June of 1999, as part of
16 the mass transfer, Mr. McMurray went from William Penn to
17 Hamilton; right?
18 A    Yes.
19 Q    And then eventually he went from Hamilton to
20 Rowland; is that right?
21 A    Right.
22 Q    Okay. When he went from William Penn to
23 Hamilton, that was a move from a 1B to a 1A; right?
24 A    Yes.
25 Q    Okay. Okay. Besides yourself, do I

189

1 understand the only other head custodian who is white is Dan
2 Rhoads; is that correct?
3 A    Then, yes.
4 Q    Okay. At that time?
5 A    Yes, sir.
6 Q    Okay. And all of the others were --
7 A    Black.
8 Q    Black. Okay.
9    MR. BAILEY: You need to keep your voice up,
10 Bill.
11 A    Okay.
12    MR. BAILEY: You're really dropping off. I
13 don't know if it's registering or not.
14 BY MR. FINK:
15 Q    Let me take a step back now. You mentioned
16 when you were talking to Mr. Lochinger and he was going
17 through your job history that you transferred from food
18 service driver to a custodian --
19 A    Yes.
20 Q    -- at Marshall School; is that right?
21 A    Yes, sir.
22 Q    And that was sometime we think in the late
23 1980s; is that right?
24 A    Yes.
25 Q    I'm sorry?

 

**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

190

1  A    Yes, sir.
2  Q    Okay.  Thank you.
3      MR. BAILEY:  One second.  Okay, Eric.  Thank
4  you.
5      MR. FINK:  Okay.
6  BY MR. FINK:
7  Q    And you mentioned that when you bid on that
8  job you had to go to the union before you actually got the
9  job; isn't that right?
10  A    Yes.
11  Q    Okay.  And I think you said you spoke to a
12  James Simms?
13  A    Yes.
14  Q    Okay.  And Mr. Simms was -- do you know what
15  position he held in the union?
16  A    He was head union steward.
17  Q    Okay.  So he was a steward of AFSCME?
18  A    Yeah.
19  Q    Is Mr. Simms black or white?
20  A    Black.
21  Q    Okay.  And you approached him.  Why did you
22  pick Mr. Simms to go to?
23  A    Because he was in food service where I was.
24  Q    So he was the food service steward, or you
25  knew him from food service?

---

191

1  A    Yeah.
2  Q    Okay.  Just because you knew him from food
3  service?
4  A    Yeah.  We worked together.  He was one truck
5  driver, and I was one truck driver.
6  Q    Okay.  And you knew that he was a steward?
7  A    Yes.
8  Q    And did you say he was the head steward?
9  A    Yes.
10  Q    Okay.  And you told him about your problem?
11  A    Yes.
12  Q    And then he went and spoke to somebody at the
13  school district about the problem; right?
14  A    Yes.
15  Q    And I don't remember if you knew who he spoke
16  to.
17  A    Yes; Anna Hope.
18  Q    Okay.  And is she black or white, if you know?
19  A    I don't know.
20  Q    Okay.  Do you remember ever meeting her?
21  A    I met her, but I couldn't tell if she was, you
22  know.
23  Q    Okay.  From looking at her you couldn't tell?
24  A    Yeah.
25  Q    Okay.  Now, in that case you never had to

---

192

1  actually fill out a grievance form; is that right?
2  A    No.
3  Q    No, it's not right or no, you didn't have to
4  --
5  A    I didn't have to fill it out.
6  Q    Okay.  I asked the question in a bad way.
7  Okay.  So Mr. Simms took care of the situation for you?
8  A    Yes, he did.
9  Q    And he did that acting as your union steward?
10  A    Yes.
11  Q    Okay.  And as a result of what Mr. Simms did,
12  you got the appointment as a custodian?
13  A    Yes.
14  Q    Okay.  When you went from food service to
15  being a custodian, did you consider that a promotion?
16  A    Yes, it was.
17  Q    Okay.  Was it an increase in pay?
18  A    Yes, it was.
19  Q    Okay.  Do you remember how much of an increase
20  in pay?
21  A    Maybe 4,000, something like that.
22  Q    4,000 bucks over the course of the year?
23  A    Up 4,000.
24  Q    You increased $4,000?
25  A    Yeah.

---

193

1  Q    Over a year, not over a week; right?
2  A    Oh, no, no, no.
3  Q    Okay.  I was going to say maybe I'm in the
4  wrong profession.  Okay.  Besides the time that you went to
5  see Mr. Simms and going up to -- I want to give you a time
6  period.  From the time you became a custodian at Marshall
7  School up to the time you got transferred to Shimmell
8  School.
9  A    Uh-huh.
10  Q    Okay?
11  A    Marshall you mean?
12  Q    Up to the time you got transferred from
13  Marshall to Shimmell School.
14  A    Oh.
15  Q    Okay?  Up to that time.  During the -- so from
16  the day you started as a custodian at Marshall until the day
17  you left Marshall to go to Shimmell, did you file any other
18  -- ever file any other grievances through the union?
19  A    I went to Ms. Anderson and told her that I was
20  going to file a grievance because I wasn't asked to come in
21  and be interviewed for the head custodian position at
22  Marshall.  So at that time she invited me in, she
23  interviewed me, and I told her that I have seniority over
24  everybody, I have experience, you know, I've been acting
25  head custodian, and I'm applying for the job, and I got it.

---



**HAZZARD, WILLIAM**
10/19/01

**HAZZARD VS**
**CURTIS**

---

194

1 Q     So in that case you didn't have to go to the
2 union, did you?
3 A     **Right.**
4 Q     Okay. But you said you would have gone to the
5 union if she hadn't interviewed you?
6 A     **Yes.**
7 Q     Okay.
8 A     **I read the contract to her.**
9 Q     Okay. And you felt that under the contract
10 you were entitled to be interviewed for the position?
11 A     **Yes.**
12 Q     Okay. Any other cases during the time you
13 worked at Marshall School that you ever filed a grievance or
14 considered filing a grievance?
15 A     **At Marshall School?**
16 Q     While you were working at Marshall School.
17 A     **I don't think -- I didn't file any grievances.**
18 Q     Okay. And did you ever have a situation where
19 you might have filed a grievance but you didn't bother?
20 A     **I'm not sure.**
21 Q     Okay. Do you remember having any problems
22 that you thought were violations of your rights under the
23 contract while you were at Marshall School besides what
24 you've already mentioned?
25 A     **Yes. I was kind of like being intimidated and**

---

195

1 **harassed down at Marshall School.**
2 Q     Okay. Who was intimidating or harassing you?
3 A     **Mack McMurray.**
4 Q     Okay. Was Mr. McMurray working at Marshall
5 School also at that time?
6 A     **No. He was, I guess, up at William Penn.**
7 Q     Okay. And you felt that he was harassing or
8 intimidating you?
9 A     **Yeah.**
10 Q     Okay. Did you do anything about it?
11 A     **Yeah. I said let's take it into the**
12 **principal, so we went into the principal's office.**
13 Q     When you say we, you and Mr. McMurray?
14 A     **Yes.**
15 Q     What happened with the principal?
16 A     **The principal said, Mr. Hazzard, do you have a**
17 **problem, and I said no. She said, did you invite him here,**
18 **and I said no. And so she said, well, will you please**
19 **leave. And he said, well, Mr. Hazzard's not supposed to be**
20 **daylight. And she said, I'm in charge of this building, and**
21 **I make those decisions, not you, leave. So Mr. McMurray's**
22 **kind of like had it on me for awhile about that.**
23 Q     Okay. So you think that as a result of that
24 Mr. McMurray had a problem with you?
25 A     **Yes.**

---

196

1 Q     Okay. Do you think that Mr. McMurray had a
2 problem with you because you're white?
3 A     **Yes.**
4 Q     Okay. What makes you think that he had a
5 problem with you because you're white?
6 A     **Because there was a black girl, Tracy**
7 **Bradshaw. Ms. Anderson came to me several times and**
8 **complained that she wasn't doing her job and I need to start**
9 **doing my job, so I wrote her up, and she went and told the**
10 **whole school district, all the blacks, and they all came to**
11 **me, different departments, blacks, telling me that I'm**
12 **picking on her, you know, and I shouldn't be writing her up**
13 **and she wants the daylight job. And I said, well, I don't**
14 **make those decisions, I am not daylight because I decided to**
15 **do that on my own. Ms. Anderson evaluated the situation,**
16 **the people that do the work, and she said she determined**
17 **that I was most qualified for doing that work in the**
18 **daylight, so she wanted me to go daylight. And Mr.**
19 **McMurray, he wanted me to dispute with the principal, and**
20 **I'm like, why, she didn't do nothing to me. I'm doing -- I**
21 **do what I'm told. The principal is my boss. She's my boss.**
22 Q     Okay. And you never thought about filing a
23 grievance in any of those cases, did you?
24 A     **No. I just thought he had a problem and he --**
25 Q     Okay.

---

197

1 A     **-- dealt with it and then left.**
2 Q     Okay. Since you've left from Marshall
3 -- after you got transferred from Marshall to Shimmell, one
4 grievance that you filed was over the fact that you did not
5 get the job at Rowland School; is that right?
6 A     **Yes, sir.**
7 Q     Okay. Have you filed -- and then you were one
8 of the people in the class action grievance over the mass
9 transfer; is that right?
10 A     **Yeah.**
11 Q     I mean, it included you and all the other
12 heads; is that right?
13 A     **Yeah.**
14 Q     Okay. Besides those grievances, since you've
15 left Marshall have you filed or tried to file or asked to
16 file any other grievances with AFSCME?
17 A     **I've filed a grievance against Tim Curtis.**
18 Q     Okay. And when was that?
19 A     **I'm not sure what date it was. I have a**
20 **form. I think he couldn't find it when he asked me that**
21 **question.**
22 Q     Okay. What was that grievance about?
23 A     **I felt that he was intimidating me and**
24 **harassing me because I tried to show him the contract, you**
25 **know, during the bereavement situation and he didn't want to**

---

50



198

1 hear it. He said I have it marked. And I said, well, right
2 -- I'll show you right where it's written, you know, if
3 your brother-in-law is living with you, and he said, well,
4 Freeman already made the decision. Now Freeman jumps in.
5 Q    So this was about the situation you'd talked
6 about earlier with Mr. Lochinger where your brother-in-law
7 passed away --
8 A    Yeah.
9 Q    -- and you took the bereavement leave?
10 A    So they settled it -- finally settled it
11 through the grievance. Then I had to file an intimidation
12 grievance again against Tim Curtis because eight months
13 later he brought the same thing up and said I want your
14 vacation days for that bereavement time, and I said we
15 settled this already.
16 Q    Okay.
17 A    And now I'm at home crying and bawling, I'm
18 going to the doctors, my nerves are shot. My doctor tells
19 me he can't give me no more nerve pills because when I go to
20 work I go back into the same situation. In other words, I
21 have maintenance people, I have custodians, that are black
22 that are coming in there and telling me, you know, that I'm
23 wrong.
24 Q    Okay. So let me go back over this then. Do
25 you remember when it was that your brother-in-law died, do

199

1 you remember about what time that was?
2 A    It must have been I think somewhere around
3 October.
4 Q    Of 1999?
5 A    Or later. I'm not sure.
6 Q    Okay. But this was in 1999, just after the --
7 was this close in time with the dispute over the Rowland --
8 A    With the dispute and everything, yeah.
9 Q    Okay. So sometime in the fall of 1999?
10 A    Yeah. So I'm going through all this
11 intimidation, I'm freaked, my nerves are shot, I hate to go
12 to work --
13 Q    Uh-huh?
14 A    -- because I'm afraid because even walking
15 down the halls people are looking at me because everybody in
16 the school district knows what's going on.
17 Q    Okay. So -- so in the fall of 1999 when your
18 brother-in-law passed away -- and what did you do, did you
19 put in a slip for bereavement time, how did you request
20 bereavement time?
21 A    I put in a slip for bereavement time, and
22 Mr. Curtis told me no. He said you go up there and you put
23 in for vacation. So I put in for vacation, and then when I
24 got up there Sharon Johnson that was in payroll said your
25 brother-in-law lives with you, doesn't he, and I said, yes,

200

1 he does. She said, you don't put your vacation in, that's
2 bereavement time. So she changed it to bereavement time.
3 Q    And who is she, what's her -- what's her
4 title, do you know?
5 A    She was at that time working in payroll.
6 Q    Okay. She was like a clerical person up
7 there?
8 A    Yeah.
9 Q    Okay. So, in fact, in the fall of '99 your
10 time went in as bereavement time; is that right?
11 A    Yeah.
12 Q    And then -- so then I guess you said sometime
13 several months later Mr. Curtis came back to you about this?
14 A    Yeah, and asked me for them same vacation
15 days.
16 Q    Okay. And do you remember when was it that
17 Mr. Curtis -- oh, actually before we get to that -- so in
18 the fall of '99 did you have to go to the union to get your
19 bereavement time or did you not get the union involved then?
20 A    I got the union involved.
21 Q    In the fall of '99?
22 A    Yeah.
23 Q    And who did you go to from the union at that
24 time?
25 A    Steve McCollum.

201

1 Q    Okay. And Steve McCollum was -- he was a
2 union steward; is that right?
3 A    Yes.
4 Q    Okay. And why did you pick Mr. McCollum in
5 particular to go to?
6 A    Because he was white. He was the only one
7 that wanted to represent me.
8 Q    Okay. So you went to Mr. McCollum, and what
9 did you ask him to do?
10 A    I told him my brother-in-law died, and he
11 lives with me, and I can prove it.
12 Q    Okay.
13 A    And Tim Curtis refuses even -- or even refuses
14 to give me the time.
15 Q    And what did you ask Mr. McCollum to do for
16 you?
17 A    Well, he said right aways pull the book open,
18 let's read it. He said, yes, you're entitled to the time,
19 so we'll file a grievance.
20 Q    Okay. And did you file an actual grievance at
21 that time?
22 A    Yes, I did.
23 Q    Okay. And what was the result of that
24 grievance?
25 A    The first time?

51



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

202

1  Q    Yes.
2  A    They gave -- they -- Tim Curtis signed --
3  Q    Yes.
4  A    -- for me to get the bereavement time. He
5  signed it.
6  Q    Okay. So --
7  A    And then --
8  Q    I'm sorry -- I'm sorry to interrupt, but this
9  is in the fall of '99?
10  A    Yeah.
11  Q    Okay. And Mr. Curtis signed on -- he settled
12  the grievance?
13  A    Yeah.
14  Q    Okay. And he agreed that you were entitled to
15  the bereavement?
16  A    Yes, and then he came back eight months later
17  and asked me for that same vacation time for that
18  bereavement. He said I owe it to him.
19  Q    Okay.
20  A    So I filed an intimidation and harassment
21  grievance on him.
22  Q    Before we get to that -- so you went to
23  Mr. McCollum, and Mr. McCollum helped you file a grievance?
24  A    Yes.
25  Q    And did you talk to anybody else from the

203

1  union at that time about the bereavement issue?
2  A    Yes; Rob Tapper.
3  Q    Okay. And Mr. Tapper was also a steward?
4  A    He's like vice principal.
5  Q    Vice principal or vice-president?
6  A    I mean vice-president.
7  Q    Yeah, he wouldn't be vice principal. He would
8  be --
9  A    No, vice-president.
10  Q    He's vice-president of the local; is that
11  right?
12  A    Yes.
13  Q    Okay. And you spoke to him also?
14  A    Yes.
15  Q    And why did you speak to Mr. Tapper as well as
16  Mr. McCollum?
17  A    Because they were both white.
18  Q    Okay. And why did that matter?
19  A    Because I went to Terry Mathis, he's black,
20  and I told him about my grievance that I wanted to file, and
21  he said it doesn't look like a grievance.
22  Q    Was this about the bereavement?
23  A    No.
24  Q    What was that about?
25  A    That was about the bid on the job.

204

1  Q    The Rowland School?
2  A    Yeah. So I couldn't -- you know, everybody
3  was going behind my back, whispering that I'm a racist, you
4  know, and trying to get this Rowland job and all that, and I
5  just was getting tired of hearing it.
6  Q    So because Mr. Mathis told you that the
7  Rowland situation didn't sound like a grievance --
8  A    Yes.
9  Q    -- for that reason you decided you would go to
10  white people to take care of the bereavement grievance?
11  A    Yes.
12  Q    Okay. And Mr. Mathis, I assume, is black?
13  A    Yes.
14  Q    Yeah. Okay. I think you said that but I just
15  didn't -- wasn't sure. Okay. So besides Mr. Tapper and
16  Mr. McCollum on the bereavement grievance, did you talk to
17  anybody else from AFSCME about the bereavement grievance?
18  A    It was brought to Nichelle Chivis' --
19  Q    Nichelle Chivis, yeah.
20  A    -- attention.
21  Q    Okay. Who brought it to her attention, do you
22  know?
23  A    I think it was Rob Tapper.
24  Q    Okay. And did she have any response, or did
25  she have any involvement in it?

205

1  A    It took a long time before she, you know,
2  responded.
3  Q    And what was her response to the bereavement
4  -- in the bereavement grievance?
5  A    I don't know if I even got a response. I
6  think the grievance that I filed Tim Curtis just signed it.
7  Q    Okay. So the grievance was eventually
8  resolved in your favor?
9  A    Yeah.
10  Q    Okay. Okay. And no one from AFSCME told you
11  -- when you came to -- with the bereavement grievance --
12  A    Yeah.
13  Q    Strike that. Let me ask a sentence in
14  grammatical English. When the situation with the
15  bereavement arose --
16  A    Yes.
17  Q    -- and you decided you wanted to file a
18  grievance, no one from AFSCME told you go away, we won't
19  represent you about this bereavement situation?
20  A    No.
21  Q    Okay. And no one told you you're not allowed
22  to file a grievance on this?
23  A    No.
24  Q    Okay. All right. So you file a grievance,
25  Mr. Curtis approves the grievance, you get your bereavement


206

1  time, and then you said about eight months later --
2  A      He came back again.
3  Q      With a different song?
4  A      The same song.
5  Q      Okay.  Well, with the -- I guess with the same
6  original song.
7  A      Yeah.
8  Q      And that is that you're not entitled to
9  bereavement leave for this time in the fall of '99?
10  A      Yes.
11  Q      Okay.  And eight months later -- so would that
12  be about June of 2000?
13  A      I think it was from October to maybe around
14  like February or something like that.
15  Q      Okay.  Okay.  And do you have any idea what
16  prompted him to come up all of a sudden -- after he settled
17  your grievance and told you you were entitled to the
18  bereavement time, any idea why he then months later turned
19  around and said, no, you're not entitled to it?
20  A      He was picking on me because I was white.
21  Q      Okay.  I mean, that's your assumption; right?
22  A      Yeah.
23  Q      He didn't say I'm doing this because you're
24  white, did he?
25  A      No, but he was always intimidating me,

207

1  sneaking around in my building, yelling at me, saying things
2  he shouldn't say.
3  Q      Did he give -- did he offer you any other
4  explanation for why he was bringing this up again?
5  A      No, he didn't.
6  Q      Okay.  He just said I've been looking through
7  these records and I see that you had bereavement time and
8  you weren't entitled to it, something like that?
9  A      Yeah.  I'm like, well, you signed it.
10  Q      Okay.  And after you -- did you show him that
11  he had signed off on the grievance?
12  A      No.  I just -- he just argued — kept arguing
13  with me on the phone so I left him go and filed a grievance.
14  Q      Okay.  So then you filed another grievance; is
15  that right?
16  A      Yes.
17  Q      And how did you file that grievance?
18  A      Through the union.
19  Q      Okay.  And did you do that with the assistance
20  of a union steward?
21  A      Yes.
22  Q      Which steward?
23  A      Steve McCollum.
24  Q      Okay.  And besides Mr. McCollum, did anybody
25  else from AFSCME get involved with this grievance, the

208

1  second bereavement grievance?
2  A      Mr. Tapper was involved in it, too.
3  Q      Mr. McCollum and Mr. Tapper?
4  A      Yes.
5  Q      And besides Mr. McCollum and Mr. Tapper,
6  anyone else from AFSCME get involved in the second
7  bereavement grievance?
8  A      No.  They kind of straightened it out then.
9  Q      They took care of it all.  Okay.  I'm going to
10  mark this next -- what are we up to?  Okay.  Hazzard 12.
11  I'll ask you to look at that, and tell me if you recognize
12  that document?
13        MR. BAILEY:  Let me see it again.  I've got
14  things missing.
15        MR. FINK:  Okay.  This is Grievance
16  Number 118.
17        MR. BAILEY:  All right.
18        MR. FINK:  This was also in the documents --
19  in the packet of documents that I got from you.
20        MR. BAILEY:  Okay.
21  A      Yeah.
22  BY MR. FINK:
23  Q      Okay.  Yes, you recognize it?
24  A      Yeah.
25  Q      Okay.  And is that the grievance that you

209

1  filed -- what I've called the second bereavement grievance?
2  Is this the -- let me ask it a different way.  Is this the
3  grievance you filed after Mr. Curtis came back to you a
4  second time and told you you weren't entitled to that
5  bereavement time?
6  A      Yeah.
7  Q      Okay.  And this grievance was filed when?
8  A      6/7/00.
9  Q      Okay.  So that would be June 7th of 2000?
10  A      Yes.
11        MR. FINK:  Why don't we put the sticker on it
12  before we lose track.  I'm paranoid.
13        (Grievance Form dated 6/7/00 marked as Hazzard
14  Exhibit 12.)
15  BY MR. FINK:
16  Q      And in the bottom over -- where it says
17  employee signature, is that your signature?
18  A      Yes, it is.
19  Q      Okay.  Where it says steward signature, is
20  there a signature there?
21  A      Mr. Epps.
22  Q      Okay.  Mr. Epps.  And Mr. Epps is an AFSCME
23  steward; is that right?
24  A      Yes, sir.
25  Q      Okay.  And Mr. Epps, is he black or white?



---

**210**

1 A   He's black.
2 Q   Okay. So Mr. Epps signed your grievance, what
3 we're calling the second bereavement grievance; is that
4 right?
5 A   Yeah.
6 Q   Okay. So how did he -- how did he come about
7 to sign it, did you ask him to sign it?
8 A   I was over at Lincoln School seeing
9 Mr. McCollum about it. Mr. McCollum's response was I have a
10 lot of grievances to take care of now, and then Mr. Epps
11 said, well, I'll take care of it.
12 Q   So Mr. Epps volunteered to help you with your
13 grievance?
14 A   Yes.
15      MR. BAILEY: Incidently, that particular
16 grievance is not in the stuff that I provided. I'm not sure
17 where you got some of that, but I'll get a copy when we're
18 done. It's no problem.
19      MR. FINK: Okay. Okay.
20 BY MR. FINK:
21 Q   Mr. Epps volunteered to help you with the
22 grievance?
23 A   Yes.
24 Q   Okay. And then you and he wrote up this
25 grievance --

---

**211**

1 A   Yes.
2 Q   -- about Mr. Curtis?
3 A   Yes.
4 Q   Okay. Was there a result to this grievance?
5 A   I don't think so.
6 Q   Okay.
7      MR. BAILEY: What's the number on the last
8 one?
9      MR. LOCHINGER: 12.
10      MR. BAILEY: I owe you an apology, Mr. Fink.
11 I found it.
12      MR. FINK: There we go. Okay. I knew it came
13 from somewhere.
14      MR. BAILEY: I apologize to you. It's my
15 error.
16 BY MR. FINK:
17 Q   Did you -- do you know -- were you ever
18 required to give back the bereavement time?
19 A   He asked me to on the phone --
20 Q   Who's he?
21 A   Tim Curtis.
22 Q   Uh-huh?
23 A   Asked me on the phone to put in for my
24 vacation time to cover the bereavement days.
25 Q   Uh-huh. And did you do that?

---

**212**

1 A   No, I didn't.
2 Q   Okay. And did you ever do that?
3 A   I did it the first time when I saw him in the
4 hall. He told me I had to and I couldn't -- I didn't have
5 the book, contract with me or nothing. He said I can't have
6 it, he's going to deny me. He said fill the vacation slip
7 out.
8 Q   This was -- I'm sorry to interrupt. This was
9 back in October?
10 A   Yeah.
11 Q   Okay. Go on.
12 A   So I filled the vacation out. And then when I
13 went up to Sharon and was telling her, you know, what
14 happened and everything, she said, no, this is the wrong --
15 this is the wrong form, you're entitled to five days.
16 Q   So she put in bereavement time and not
17 vacation time?
18 A   Yes.
19 Q   Okay. And then after that it never got
20 changed back from bereavement time back to vacation time,
21 did it?
22 A   No.
23 Q   Okay. So -- okay. I'm going to mark this
24 one. I guess that will be Hazzard 13. And this is a letter
25 dated February 6th. It's signed by Nichelle Chivis, and

---

**213**

1 it's addressed to Lance Freeman. Have you ever seen this
2 letter before?
3      MR. BAILEY: Well, that one I know -- we have
4 a February 2nd letter.
5 A   I think I did, yes.
6      MR. BAILEY: Let me see that one, Bill,
7 please. Oh, go ahead.
8      MR. FINK: Okay. And one more -- I guess --
9 well, let's sticker this one first so I know where we are.
10 Let's do this one, too. Okay.
11      (Letter to Mr. Freeman from Nichelle Chivis
12 dated February 6, 2001 marked as Hazzard Exhibit 13.)
13      (Letter to Mr. Hazzard from Nichelle Chivis
14 dated February 20, 2001 marked as Hazzard Exhibit 14.)
15 BY MR. FINK:
16 Q   I'll show you now what's been marked as
17 Hazzard Exhibit 14. This is a letter dated February 20th
18 from Nichelle Chivis to William Hazzard. Have you seen this
19 one before?
20 A   No.
21 Q   Okay. You see that the letter is addressed to
22 you?
23 A   Yeah.
24 Q   Okay. But you don't think you ever got it?
25 A   There was a letter like that but not worded



HAZZARD, WILLIAM
10/19/01

HAZZARD VS
CURTIS

214

1 like that.
2 Q    Okay. When you say a letter like that, like
3 it how?
4 A    It went this is to notify you that there -- we
5 went over your grievance and we determined that there is no
6 merit to your grievance and it was being dropped.
7 Q    Okay. That was for the -- that was for the
8 Rowland School grievance; right?
9 A    Yes.
10 Q    Okay. This -- on this letter that's marked as
11 Exhibit 14, do you see where it says RE, and then it says
12 grievance and it has a number; right?
13 A    Yeah.
14 Q    Okay. What grievance number does that refer
15 to? Just read it out.
16 A    The grievance number?
17 Q    Uh-huh.
18 A    90-2063-0118.
19 Q    Okay. Now, just to interpret these, the
20 grievance numbers, the first two digits are 90?
21 A    Yeah.
22 Q    And if I represent to you that that means that
23 this is from AFSCME District Council 90, does that sound
24 right to you?
25 A    I guess, yeah.

215

1 Q    And then the next 4 letters -- 4 numbers are
2 2063. That's the local number; is that right?
3 A    2063, yeah.
4 Q    That's -- your union is AFSCME Local 2063; is
5 that right?
6 A    Yeah.
7 Q    And then the last 4 digits are 0118; is that
8 right?
9 A    Yeah.
10 Q    Okay. This grievance -- the second -- what
11 I've called the second bereavement grievance, does this one
12 have a number as well?
13       MR. BAILEY: What's the number on the February
14 20th?
15       MR. FINK: February 20th --
16       MR. BAILEY: Hazzard what?
17       MR. FINK: 118.
18       MR. BAILEY: I know. Hazzard what?
19       MR. FINK: Oh, Hazzard 14.
20 A    Okay. It's 0018, yeah
21       MR. BAILEY: I have a copy of Hazzard 14,
22 Bill.
23 BY MR. FINK:
24 Q    So this is -- so this grievance is Grievance
25 Number 118; is that right?

216

1 A    Yeah.
2 Q    The second bereavement grievance?
3 A    Yeah.
4 Q    And that -- and this letter, this is about the
5 same grievance, Number 118 --
6 A    Yes.
7 Q    -- right?
8 A    They took care of it, yeah.
9 Q    Okay. So this letter says that the grievance
10 has been resolved; right?
11 A    Yeah.
12 Q    Do you remember now getting this letter?
13 A    Yeah.
14 Q    Okay. So -- and when you got the letter from
15 Nichelle, the one that's marked as Exhibit 14, there was a
16 copy of Exhibit 13 in with it, wasn't there?
17 A    What was that?
18 Q    The letter from Ms. Chivis to Mr. Freeman.
19 Did she provide a copy of that letter to you?
20 A    Yeah. I think I read that, yeah.
21 Q    Yeah. And the one that's marked as
22 Exhibit 13, do you think -- let me ask it this way: on
23 Exhibit 14 it says enclosed is a copy of the signed
24 settlement. Do you remember this February 6th letter being
25 enclosed with this February 20th letter when you got it?

217

1 A    I'm not sure if they came separately or
2 together.
3 Q    Okay.
4 A    I'm not sure.
5 Q    But you got both of them?
6 A    I think so.
7 Q    Okay.
8 A    Yeah.
9 Q    Okay. So based on this, would you agree that
10 your grievance over the bereavement leave that was settled
11 in your favor; is that right?
12 A    Yes.
13 Q    Okay. Okay.
14       MR. BAILEY: Let me see that.
15 A    It took eight months, but it was, yeah.
16       MR. FINK: Which do you want, 13, 14?
17       MR. BAILEY: Hazzard 13. We have 14. We do
18 not have 13.
19       MR. FINK: I got them altogether in the same
20 --
21       MR. BAILEY: All right. I'll have to get a
22 copy later.
23       MR. FINK: Yeah. She'll give us all copies.
24 BY MR. FINK:
25 Q    So it took awhile, but it was eventually



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

218

1 resolved; right?
2 A Yes.
3 Q Okay. And it was resolved in your favor?
4 A Yeah.
5 Q Okay. And Mr. Epps participated in that
6 grievance; is that right?
7 A Uh-huh.
8 Q And Ms. Chivis participated in that grievance
9 at some point; is that right?
10 A Yes.
11 Q And Mr. Epps and Mr. Chivis, they're both
12 black; is that right?
13 A Yes.
14 Q Okay. Okay. They never told you you had to
15 withdrawal that grievance, did they?
16 A No, they didn't.
17 Q Okay. They never told you we're not going to
18 handle this grievance for you?
19 A No.
20 Q Okay. Besides the grievances over the
21 bereavement, have there been any other grievances that
22 you've filed or tried to file?
23 A No.
24 Q Okay. So you've never gone to anybody from
25 AFSCME and said, I have a problem, I want to file a

219

1 grievance, and had them say to you, no, we won't file your
2 grievance?
3 A When I went to the grievance I -- I had a
4 grievance where I wrote Donald Thomas up, and Tim Curtis was
5 there, and I had a black steward there.
6 Q Uh-huh?
7 A From the paint crew.
8 Q Okay. I'm sorry to interrupt. When you say
9 you wrote him up, you mean you were his supervisor and you
10 gave him a disciplinary write-up?
11 A Yeah.
12 Q Okay. Go on.
13 A And that's when the principal changed her mind
14 all of a sudden and said Hazzard didn't, you know, clean my
15 monitor screen. He fell asleep.
16 Q Who fell asleep?
17 A The union steward.
18 Q He fell asleep during that meeting?
19 A The whole meeting he slept.
20 Q Okay. That meeting was not about -- that
21 meeting wasn't supposed to be about Mr. Hazzard; right?
22 A No. It was supposed to be Donald Thomas.
23 Q That meeting was about -- you gave Mr. Thomas
24 a reprimand or a write-up?
25 A Yes.

220

1 Q And the meeting was supposed to be discussing
2 Mr. Thomas' write-up?
3 A Yeah, and the principal is the one that made
4 the complaint.
5 Q Uh-huh. And the steward was there to
6 represent Mr. Thomas, not to represent you; right?
7 A Yeah.
8 Q Okay. And the steward fell asleep while
9 representing Mr. Thomas?
10 A Yeah.
11 Q Okay. And that was the meeting when the
12 principal made --
13 A No, no. Excuse me.
14 A Go ahead.
15 A The guy in the paint crew is for our head
16 custodians. He represented me.
17 Q The steward who was there. Why did you need a
18 steward at the meeting to talk about Mr. Thomas' write-up?
19 A Because I didn't trust Ms. Cobb. That's her
20 name.
21 Q She was the principal?
22 A Yes.
23 Q So you asked the steward to be there to
24 represent you?
25 Q

221

1 Q Okay. And you fell asleep during the meeting?
2 A Yeah.
3 Q Did you complain to anybody about that?
4 A No.
5 Q Okay. The steward who fell asleep, was he
6 black or white?
7 A Black. It just shocked me that Ms. Cobb
8 turned around and attacked me at that hearing for no
9 justifiable reason.
10 Q Did you file a grievance over her doing that?
11 A There's too many people that are coming after
12 me. Ms. Cobb is black. Tim Curtis is black. There's too
13 many blacks coming after me. I can't --
14 Q So you didn't file a grievance over that?
15 A No. I just said let me get out of here.
16 Q By the way, when did that happen, do you
17 remember? Was that before or after you filed the grievance
18 about Rowland School?
19 A That was after.
20 Q Afterwards?
21 A Yeah.
22 Q Okay. Did you talk to anybody about filing a
23 grievance over that? When I say over that, over what this
24 woman principal said to you about the computer screen.
25 A Well, I was told that I wasn't supposed to go

56

 

HAZZARD, WILLIAM
10/19/01

HAZZARD VS
CURTIS

**222**

1  to Steve McCollum because he's not -- he doesn't represent
2  head custodians.
3    Q    Who told you that?
4    A    **Mack McMurray and Terry.**
5    Q    Terry who?
6    A    **I don't even know his name. Terry. He's in**
7  **the maintenance crew.**
8    Q    And Mr. McMurray, we know who he is. Who is
9  Terry, is he a union steward also?
10   A    **Yes.**
11   Q    Okay. And Terry and Mr. McMurray told you you
12  shouldn't be going to McCollum?
13   A    **Yeah.**
14   Q    When did they tell you that?
15   A    **It was sometime during the summer.**
16   Q    Sometime during this summer?
17   A    **No.**
18   Q    Oh, during the summer of '99?
19   A    **While the grievance was going on.**
20   Q    While the grievance was going on. Okay. And
21  did they tell you why you shouldn't go to Mr. McCollum?
22   A    **Because he doesn't rep -- he doesn't represent**
23  **my area.**
24   Q    Okay. And did they tell you who you should go
25  to?

**223**

1    A    **Yes.**
2    Q    Who did they tell you you should go to?
3    A    **The guy -- I can't remember his name -- on the**
4  **paint crew.**
5    Q    Okay. The man who fell asleep?
6    A    **Yeah.**
7    Q    Okay.
8    A    **And, like I said, I did talk to Terry about**
9  **it, and he said it didn't look like I had a grievance. So I**
10  **went to McCollum and Rob Tapper, and it goes down through.**
11   Q    This is over the Rowland School?
12   A    **Yeah.**
13   Q    Not over the -- not over what the principal
14  said to you in the meeting?
15   A    **No.**
16   Q    Okay. Put aside -- set aside the Rowland
17  School issue for a second. Okay? The time that the
18  principal -- you were at the meeting and the principal said
19  to you -- complained that you didn't clean the computer
20  screen, did you talk to anybody about filing a grievance
21  over the principal's remark?
22   A    **I talked to Steve about it, but I said I was**
23  **afraid to file a grievance because every time I go after**
24  **Donald Thomas she comes after me. If I write Don Thomas up**
25  **today, tomorrow there will be in my mailbox a letter stating**

**224**

1  that I didn't clean a certain area, and I know it was
2  cleaned.
3    Q    Okay. And who would that letter be from?
4    A    **Ms. Cobb.**
5    Q    Okay. But you said you spoke to who, to
6  McCollum, about that problem?
7    A    **Yes.**
8    Q    And did he tell you not to file a grievance?
9    A    **No. He told me I should file a grievance.**
10   Q    He told you you should. And did he offer to
11  help you file that grievance?
12   A    **Yes.**
13   Q    Okay. But you decided not to?
14   A    **No.**
15   Q    No meaning you decided not to?
16   A    **No. I'm afraid.**
17       THE VIDEO OPERATOR: We're going to take a 30
18  second break here. It's 2:24.
19       (Recess.)
20       THE VIDEO OPERATOR: It's 1425, and we're back
21  on.
22  BY MR. FINK:
23   Q    Okay. So to backtrack a little bit,
24  Mr. McCollum said he would help you file a grievance?
25   A    **Yes.**

**225**

1    Q    But you decided --
2    A    **I didn't want to.**
3    Q    Okay. Okay. And nobody from AFSCME told you
4  not to file a grievance?
5    A    **No. I was afraid to.**
6    Q    You were personally afraid to?
7    A    **Yes.**
8    Q    But nobody from AFSCME told you they wouldn't
9  help you with a grievance?
10   A    **No.**
11   Q    Okay. So -- let me ask you about -- okay.
12  Let's talk about the Rowland grievance now. Okay? And let
13  me get it out here in case we need to -- I doubt we'll need
14  to refer to it, but just in case we'll put it up top here,
15  Exhibit 3. When you learned that Mr. McMurray had gotten
16  the job at Rowland School, you decided to file a grievance;
17  is that right?
18   A    **Yes, sir.**
19   Q    Okay. What was the first thing you did in
20  order to file a grievance?
21   A    **I had to fill out a form.**
22   Q    Okay. And where did you get that form?
23   A    **I got the form from Steve McCollum.**
24   Q    Okay. And Steve McCollum, you went to him
25  because he's a steward?

 

**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

226

1   A      Yes.
2   Q      Okay.  And besides Mr. McCollum, who else did
3 you speak to initially from AFSCME about filing a grievance?
4   A      Mr. Tapper.
5   Q      Okay.  You spoke to Mr. McCollum and mister --
6 Mr. McCollum and Mr. Tapper?
7   A      Mr. Tapper because he's in a position where he
8 would understand and know those things more.
9   Q      What do you mean by that?
10  A      Well, he's -- he's a good union steward.
11  Q      Oh, okay.  In your experience, he represents
12 people well, doesn't he?
13  A      Yes.
14  Q      Okay.  And so you felt he would be helpful to
15 you in filing a grievance over the issue of the Rowland
16 School?
17  A      Yes.
18  Q      Okay.  When you filled out the form, Mr. Epps
19 signed the grievance; is that right?
20  A      Yes.
21  Q      As the steward?
22  A      Uh-huh.
23  Q      Okay.  How did it happen that Mr. Epps signed
24 the form rather than somebody else?
25  A      When I went over there to see Steve and was

227

1 telling Steve about the problem and everything, Steve was
2 telling me that he was all overloaded with grievances, and
3 Epps was there, and he says, well, Mr. Epps, why don't you
4 take care of this, and he said okay.
5   Q      Okay.  And Mr. Epps -- again, just like with
6 the bereavement grievance, in this case Mr. Epps agreed to
7 help you with the Rowland grievance; right?
8   A   ·  Yes.
9   Q      Okay.  And so you and Mr. Epps together you
10 wrote -- you wrote out the grievance and that's what we see
11 as Exhibit 3 here?
12  A      Yeah.
13  Q      Okay.  So when you were preparing this
14 grievance, you spoke to Mr. McCollum, you spoke to
15 Mr. Tapper, and you spoke to Mr. Epps?
16  A      Yes.
17  Q      Did you speak to anybody else before you
18 handed in the grievance, anybody else from the union?
19  A      I talked to Terry.
20  Q      Okay.  And Terry is the person whose last name
21 you don't remember?
22  A      Yeah.
23  Q      Okay.  And Terry is a steward?
24  A      Yes.
25  Q      He's the painter guy?

228

1   A      He's on the maintenance crew.
2   Q      The maintenance crew.  Okay.  When did -- did
3 you speak to Terry before or after you spoke to these
4 others?
5   A      Before.
6   Q      Okay.  What did you speak -- when you went to
7 speak to Terry, why did you go to Terry first?
8   A      He was at the building, Shimmell, so I walked
9 up to him and I told him about my problem, about the
10 grievance, and asked him what he thought.
11  Q      And what did he say?
12  A      And he said it don't look like you can win
13 this.
14  Q      Did he say any -- did he say why he didn't
15 think you could win it?
16  A      No, he didn't.
17  Q      Okay.  You've probably told me this at least
18 twice, and I don't remember.  Is Terry white or black?
19  A      Black.
20  Q      Okay.  Did he tell you -- did he tell you that
21 you shouldn't file a grievance, or did he just tell you he
22 didn't think you could win?
23  A      He said you can do whatever you want to,
24 Mr. Hazzard.
25  Q      Okay.  So he didn't tell you not to file?

229

1   A      No.
2   Q      Okay.  And I take it you were dissatisfied
3 with what he had to say?
4   A      Yes.
5   Q      Okay.  So what did you do next?
6   A      I went over to Lincoln School to see Steve
7 McCollum.
8   Q      Okay.  And when you saw Mr. McCollum and then
9 eventually you got passed to Mr. Epps; is that right?
10  A      Yes.
11  Q      Okay.  And after you signed this grievance, it
12 got turned in.  Do you know who -- who did it get -- who
13 does it get turned in to, do you know?
14  A      The union steward has the responsibility to
15 turn it in, I'm pretty sure, to Nichelle Chivis.
16  Q      Okay.  So you gave it -- Mr. Epps took the
17 piece of paper, and he took care of it for you?
18  A      Yeah.
19  Q      Okay.  And Mr. Epps filed this grievance --
20 and you don't necessarily know how, but you believe that
21 Mr. Epps did what he's supposed to do with this grievance;
22 right?
23  A      Yes.
24  Q      Okay.  And at some point it got to somebody
25 from the school district, right, got a copy of it; right?



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

230

1   A      Uh-huh.
2   Q      Okay.  And you believe that Ms. Chivis also
3 got a copy of it; right?
4   A      Yeah.
5   Q      Okay.  At any point did you ever speak
6 yourself with Nichelle Chivis about your grievance?
7   A      She called me once at Shimmell, and then when
8 I called she wasn't there, and then Mr. Epps called me and
9 said we have a meeting with her out there at the union hall.
10  Q      Uh-huh?
11  A      And when we went out she was -- she was coming
12 in and said that it was the wrong time and she had to
13 leave.  So she left.
14  Q      Okay?
15  A      So there was never -- we never got together on
16 it.
17  Q      So you ended up not having that meeting?
18  A      Yeah.
19  Q      Okay.  Now, eventually you had a first step
20 hearing for this grievance; right?
21  A      Yeah.
22  Q      And who -- you told us before, but just remind
23 me.  Who was at that hearing?
24  A      She was there, Nichelle.
25  Q      Nichelle, Ms. Chivis.  Okay?

231

1   A      Tapper.
2   Q      Okay?
3   A      McCollum.
4   Q      Okay?
5   A      Mr. Epps.
6   Q      Okay?
7   A      Myself, Freeman and Tim Curtis.
8   Q      Okay.  And where did this meeting take place,
9 do you remember?
10  A      This was in the boardroom.
11  Q      Okay.  At the school district?
12  A      Yes.
13  Q      Like in the administration building or
14 something?
15  A      Yeah, in the administration building.
16  Q      Okay.  Okay.  So you were represented by
17 Mr. McCollum, Mr. Epps, Mr. Tapper and Ms. Chivis; right?
18  A      Yeah.
19  Q      They were -- all of them are AFSCME
20 people; right?
21  A      Uh-huh.
22  Q      Okay.  But Ms. Chivis, she doesn't work for
23 the school district; right?
24  A      Right.
25  Q      She works for AFSCME; right?

232

1   A      Yes.
2   Q      And she's like the representative from AFSCME
3 to your local?
4   A      Uh-huh.
5   Q      Okay.  But Tapper, Epps and McCollum, they all
6 work in the school district?
7   A      Yes.
8   Q      And they're all officials or stewards of your
9 local?
10  A      Yes.
11  Q      Okay.  What happened at that meeting?
12  A      Freeman and Tim Curtis both said that the job
13 wasn't open for bid.
14  Q      Okay.  Did they explain what they meant by
15 that?
16  A      They said that management has a right to move
17 its forces and work areas the way they see fit in the
18 contract.
19  Q      Okay.  By the way, do you remember when this
20 meeting took place?
21  A      I don't remember the exact date.
22  Q      Could it have been sometime in the fall of
23 1999?  Would it have been after the school year started
24 already?
25  A      It might have been, yeah.

233

1   Q      Okay.  Okay.  You filed your grievance it says
2 on August 12th of '99; is that right?
3   A      Yeah.
4   Q      So that would be just -- I assume that's
5 before the school year started.
6   A      Yeah.
7   Q      Okay.  But you think that this meeting
8 happened sometime after the school year got rolling?
9   A      Yeah.
10  Q      Okay.  Do you remember -- let me ask you this:
11 do you have one meeting with Mr. Freeman and Mr. Curtis, or
12 were there more than one meeting with Mr. Freeman and
13 Mr. Curtis about this grievance?
14  A      There was that one --
15  Q      Uh-huh?
16  A      -- and then there was the one where Mr. Brown
17 and Davis representing the school board.
18  Q      Okay.  So that was at the -- at the -- further
19 on.  That was in response to your complaint; right?
20  A      Yeah.
21  Q      Not in response to the grievance; right?
22  A      Yeah, to the grievance.
23  Q      Okay.
24  A      But what happened was is there was other
25 grievances that were no response, that came back no


---

234

```
 1  response, like Brenda Conner's.
 2  Q      Uh-huh?
 3  A      She refused to even look at it so --
 4  Q      She just handed it back?
 5  A      Yeah.
 6  Q      Okay.
 7         MR. BAILEY: Okay. Hold it right there,
 8  please. Thank you.
 9  BY MR. FINK:
10  Q      I think you mentioned this name before. Do
11  you know who Doris Manning is?
12  A      Yeah.
13  Q      Who is she?
14  A      She's in the union.
15  Q      Okay. Is she -- she's an official officer of
16  the union?
17  A      Yeah.
18  Q      Do you know what position she holds?
19  A      She was in charge.
20  Q      Like the president?
21  A      Yeah.
22  Q      The president of the local?
23  A      Yeah.
24  Q      Okay. Did she ever get involved in this
25  grievance over the Rowland School?
```

---

235

```
 1  A      She was at -- didn't I say she was at that --
 2  Q      The meeting with Mr. Freeman and Mr. Curtis?
 3  A      Yeah.
 4  Q      You didn't mention her. Was she there too?
 5  A      I think she was.
 6  Q      Okay.
 7  A      Okay. Yeah.
 8  Q      Okay. So Doris was also there. Black or
 9  white, Ms. Manning?
10  A      She's black.
11  Q      Okay. Now, at this meeting did Ms. Chivis say
12  anything?
13  A      She told Mr. Freeman that Mr. Hazzard has a
14  good work record and he's been here so many years and he's
15  qualified for this job, the job was a legal bid, it was put
16  out, and Mr. Hazzard was the only one that bidded on the
17  job, and, therefore, Mr. Hazzard should be awarded the job.
18  Q      Okay. So Ms. Chivis spoke in your favor at
19  this meeting, didn't she?
20  A      At that meeting she did.
21  Q      Okay. Did any of the other AFSCME
22  representatives speak at the meeting, or did Ms. Chivis do
23  all the talking for AFSCME?
24  A      She did all the talking.
25  Q      Okay. So Tapper, Epps, McCollum and Manning,
```

---

236

```
 1  they were just there as observers?
 2  A      Yeah.
 3  Q      Okay. So up to this time -- up to this
 4  meeting, nobody from AFSCME told you they wouldn't represent
 5  you in this grievance, did they, up to this meeting?
 6  A      Yeah.
 7  Q      Yeah, you agree with me that nobody --
 8  A      Yes.
 9  Q      Okay. Okay. Again, I don't ask the question
10  in the best way, and it makes it hard for you. I'm not --
11  A      Yeah. I don't know what -- I don't know -- I
12  can't remember when the date was she sent me that letter
13  that she wouldn't represent me.
14  Q      Okay. Eventually something different
15  happened, but up to the point of this meeting everybody who
16  you went to from AFSCME agreed to represent you?
17  A      Yeah.
18  Q      And Ms. Chivis at this meeting represented you
19  and spoke in your behalf?
20  A      Yes.
21  Q      Okay. At that meeting do you remember
22  Ms. Chivis making any suggestion on how to settle or how to
23  resolve your grievance?
24  A      I think she said, well, maybe Mr. Hazzard
25  would settle for some kind of a -- like maybe a pay
```

---

237

```
 1  adjustment or something.
 2  Q      Okay. Did she propose -- do you remember that
 3  she proposed that you get paid as a 1B instead of as a 1A,
 4  do you remember her proposing that?
 5  A      No. I didn't hear that.
 6  Q      Okay. But you do remember that she proposed
 7  somehow that you get some pay difference to settle this
 8  grievance?
 9  A      Yes, and Freeman was quick to answer.
10  Q      And what was his answer?
11  A      No, the job was not open to bid.
12  Q      Okay. So Freeman rejected that?
13  A      Yes, completely.
14  Q      Okay. After that meeting what happened next
15  as far as you remember with your grievance?
16  A      Sometime later I got a letter in the mail from
17  Nichelle Crevis.
18  Q      Okay. And what did that letter say?
19  A      It said that he was dropping my grievance
20  because it had no merit.
21         MR. FINK: Okay. And we'll mark this 15.
22         MR. BAILEY: I hate to interfere with proper
23  procedure, but would you identify them before --
24         MR. FINK: Sure.
25         MR. BAILEY: -- so I can get an idea? This is
```



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

238

1 a March -- I think I have that one.
2        MR. FINK: Yeah.
3 BY MR. FINK:
4    Q       This is the March 14th letter from Nichelle
5 Chivis marked as Exhibit 15. Is this the letter that you
6 just referred to?
7        MR. BAILEY: That's Grievance 0094?
8    A    Yes.
9        MR. BAILEY: Yeah, is that it?
10        MR. FINK: Yes.
11        MR. BAILEY: And that's number -- that's
12 actually Hazzard 4; right?
13        MR. FINK: Oh, was that marked already?
14        MR. BAILEY: That's what had me going. It's
15 0094.
16        MR. FINK: Oh, yes, it is. Never mind. Let's
17 de-mark this. Here. I even got the sticker off without
18 damaging it. Okay. I forgot. So never mind.
19 BY MR. FINK:
20    Q       When I referred to that as Hazzard whatever, I
21 was, in fact, referring to Hazzard 4, and that's the letter
22 -- that's the letter that you got telling you that AFSCME
23 was withdrawing the grievance; right?
24    A    Yeah.
25    Q       Okay. Now, the letter is addressed to

239

1 Mr. Freeman, but you got a copy of this letter; right?
2    A    Yeah.
3    Q    Okay. Did you say yes?
4    A    Yes.
5    Q    Okay. I'm sorry. Before you got this letter,
6 did anybody from AFSCME tell you that they were withdrawing
7 the grievance?
8    A    ·No.
9    Q    Okay. So the first you learned about it was
10 when you got a copy of the letter?
11    A    Yeah.
12    Q    Okay. After you got the letter, did you have
13 any contact with anybody from AFSCME about your grievance?
14    A    Yes. I asked Mr. Tapper and McCollum if they
15 could find out from Nichelle why my grievance was dropped.
16    Q    Okay. And what happened?
17    A    I don't think they got a response.
18    Q    Okay. Did you ever contact Ms. Chivis
19 directly yourself?
20    A    I tried to call, and she wasn't there.
21    Q    Okay. Did you ever make any other efforts to
22 contact her?
23    A    Yes. I think that's when me and Mr. Epps went
24 out to the union hall.
25    Q    Okay.

240

1    A       And she said she had an appointment, we'd have
2 to make another appointment, and I'm like, well, I took off
3 from work to come out here, you know.
4    Q    Okay?
5    A    So there was nothing happening after that.
6    Q    Okay. Did you make any other attempts to
7 communicate with her about the grievance?
8    A    No. When she dropped that grievance, I
9 believe that she didn't want to represent me, didn't want to
10 have anything to do with me.
11    Q    Okay. Did you try -- did you contact anybody
12 else from AFSCME -- after you got the letter from Ms. Chivis
13 on March 14th of 2000, or the March 14th letter, did you
14 contact anybody else from AFSCME besides Mr. McCollum,
15 Mr. Tapper or Ms. Chivis?
16    A    No. I kind of tried not to get into any
17 trouble arguing with anybody or anything, so I stayed with
18 Mr. Tapper and McCollum and let them, you know, go through
19 the procedure with me.
20    Q    Okay. So you didn't call anybody from AFSCME
21 other than trying to call Ms. Chivis?
22    A    Yeah.
23    Q    And you didn't write to Ms. Chivis at all?
24    A    No.
25    Q    And you didn't write to anybody else from

241

1 AFSCME?
2    A    No.
3    Q    Okay.
4    A    The union dropped me a long time ago.
5    Q    When you say the union dropped you a long time
6 ago, what does that mean? What do you mean by that?
7    A    I wrote them a letter, and I said I don't
8 think Council 90 is representing us fairly.
9    Q    Was this before or after you got this --
10    A    This was long -- this was when the union first
11 came in.
12    Q    Okay.
13    A    And they dropped me just because I asked them
14 a question. I said you're not helping us with our contract
15 negotiations, you know, I don't think we really need
16 Council 90, and they dropped me.
17    Q    What do you mean -- when you say they dropped
18 you, what do you mean by that?
19    A    They said you're not in the union, you're
20 gone.
21    Q    They removed you as a member of the union?
22    A    Yeah, and Betty Boyer picked me back up.
23    Q    Who's Betty Boyer?
24    A    She's was the union president.
25    Q    Okay. Is she black or white?



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

242

1  A    She's white.
2  Q    Okay.  When was she president?
3  A    **Pretty much when the union started.**
4  Q    Okay.  When would that be, do you remember?
5  A    **Maybe about 15, 20 years ago.**
6  Q    Okay.  So that -- all of that happened before
7  you became a custodian at the Marshall School; right?
8  A    **Yeah.**
9  Q    And all of that happened before you ever filed
10 any of the grievances that we talked about?
11 A    **Yeah.**
12 Q    Okay.
13 A    **I was a union steward when I was in food**
14 **service.**
15 Q    You were a union steward at one time?
16 A    **Yes, I was.**
17 Q    Okay.  We'll talk about that.  We'll come back
18 to that.  But to get back to the -- to get back to the
19 Rowland grievance after -- so after Ms. Chivis wrote to you
20 on March 14th, 2000, besides trying to call her a couple of
21 times and going out to the office, you didn't write to her
22 and you didn't write to anybody else at the union?
23 A    **Right.**
24 Q    Okay.  Okay.  Now, in your complaint --
25 actually, before we come to that, let's pick up that point

243

1  that you made.  You said when you worked at food service you
2  were a union steward?
3  A    **Yeah.**
4  Q    So you started in food service sometime around
5  1978; right?
6  A    **Yeah.**
7  Q    Okay.  And you worked there for about ten
8  years?
9  A    **Yeah.**
10 Q    Were you a steward that whole time or part of
11 that time, when were you a steward?
12 A    **Maybe a couple years.**
13 Q    Two, three years, four, five years, do you
14 remember?
15 A    **No.  Maybe a couple years.**
16 Q    A couple years?
17 A    **Yeah.**
18 Q    Okay.  At the beginning of the time you were
19 at food service, at the end of the time, in the middle, any
20 idea what years?
21 A    **Probably around the middle.**
22 Q    Okay.  So sometime in the early '80s, the mid
23 '80s?
24 A    **Yeah.**
25 Q    Okay.  How did you become a steward?

244

1  A    **They was going around asking people, Fred**
2  **Lombardi and them guys, asking people if they wanted to be a**
3  **union steward.**
4  Q    You said Fred Lombardi and them guys.  Who's
5  Fred Lombardi?
6  A    **He's the one that got the union in.**
7  Q    Okay.  So he was an employee of the school
8  district?
9  A    **Yes.**
10 Q    And was he an officer of the union?
11 A    **He was our union president.**
12 Q    He was the president of the local?
13 A    **Yeah.**
14 Q    Is he black or white?
15 A    **White.**
16 Q    Okay.  Fred Lombardi.  Then you said some
17 other people, too.  Do you remember specifically who?
18 A    **Neil Scheibley.**
19 Q    Okay.  Is he black or white?
20 A    **White.**
21 Q    Okay.  And what was -- do you remember what
22 title he had or what position he had?
23 A    **He was in charge of the warehouse.**
24 Q    Okay.  What -- he was like a steward or
25 something?

245

1  A    **I think he was vice-president.**
2  Q    Vice-president.  Okay.  So those people --
3  they were going around asking for people to get involved as
4  stewards?
5  A    **Yeah.**
6  Q    And you responded to that?
7  A    **Yeah.**
8  Q    Did they approach you or did you approach
9  them?
10 A    **They approached me.**
11 Q    They asked you to become a steward?
12 A    **Yeah.**
13 Q    And you said yes?
14 A    **Yes.**
15 Q    Okay.  And when you became a steward did you
16 have to get any training or anything or you just got
17 appointed?
18 A    **Then we -- at first we didn't have to, but**
19 **then we was supposed to get training.  I was supposed to get**
20 **training, but I ended up quitting.**
21 Q    You quit as a steward?
22 A    **Yeah.**
23 Q    I skipped something before.  When you became
24 steward, you didn't have to get elected by the members, did
25 you, you were just appointed as a steward by the president;



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

---

246

1 right?
2 A    Yeah.
3 Q    Okay. And then you said you were -- you would
4 have gone to training but you quit?
5 A    Yeah.
6 Q    Why did you quit?
7 A    A guy in food service filed a grievance, which
8 was a just grievance.
9 Q    It was a just grievance?
10 A    And I went in -- before I -- I said before I
11 file a grievance I'm going to talk to Mr. Brigry.
12 Q    Who's that?
13 A    He was our boss.
14 Q    Okay.
15 A    And Ms. Roby Randolph was supposed to sign the
16 grievance.
17 Q    And who is she?
18 A    He's -- he worked in food service.
19 Q    Okay. Was that a union person or a management
20 person?
21 A    He was -- they called him a utility worker.
22 Q    This is Mr. Randolph?
23 A    Yeah.
24 Q    But was he -- but, I mean, was he a supervisor
25 or a union person?

---

247

1 A    No. He was a regular worker.
2 Q    A regular worker. Why was he supposed to sign
3 the grievance?
4 A    Well, I signed the grievance.
5 Q    Oh, he was the person who was -- he was the
6 person who the grievance was for?
7 A    Yeah.
8 Q    Oh, okay.
9 A    So I --
10 Q    So Mr. Randolph came to you and said he had a
11 grievance?
12 A    Yeah.
13 Q    And you were supposed to sign it. And what
14 happened?
15 A    I went in and chewed out Mr. Brigry and
16 Mr. Brigry told me -- he said, hear, them guys out there
17 laughing? And I did, I heard them. They were all out there
18 laughing. And then I came back out, and I said, Roby, did
19 you sign that grievance, and he said no.
20       MR. BAILEY: Can you spell that name for us,
21 please?
22 A    Roby? I think it's R-o-b-y.
23       MR. BAILEY: Okay.
24 BY MR. FINK:
25 Q    Okay. Do you know why he didn't sign the

---

248

1 grievance?
2 A    I have no idea.
3 Q    So -- and that led you to quit. Why did you
4 quit because of that?
5 A    Well, because I'm giving all my everything to
6 help this person --
7 Q    Uh-huh?
8 A    -- and I'm taking a chance and I'm going in
9 there and chewing my boss out --
10 Q    Uh-huh?
11 A    -- and finding out they're all out there
12 laughing. You know, Hazzard's in there getting chewed out
13 by his boss, you know, and then find out he -- he didn't
14 sign the grievance.
15 Q    Okay. So you were frustrated or --
16 A    Well, he made a fool out of me, yeah.
17 Q    So you decided to quit as a steward?
18 A    Yeah.
19 Q    Okay. After that, did you ever hold any other
20 position in the union?
21 A    Yeah. I was Sergeant of Arms.
22 Q    Sergeant of Arms. When was that?
23 A    That was maybe about 20 years ago I guess.
24 Q    And how did you become Sergeant at Arms, is
25 that an elected position?

---

249

1 A    Fred Lombardi asked me to check people's cards
2 coming in and stuff like that.
3 Q    Okay. He was the president at the time?
4 A    Yeah.
5 Q    And he appointed you?
6 A    Yeah.
7 Q    Okay. And how long were you Sergeant at Arms,
8 do you remember?
9 A    About a year.
10 Q    Okay. And why did you stop, your term just
11 ended or --
12 A    No. It was just -- I'm -- my -- like working
13 night shift. When you work night shift, you know, I -- if I
14 take off, I know the work power that I have at school and I
15 know the guy there can't finish the job, I just tell him I
16 can't take off, I can't be there.
17 Q    So you didn't have time to --
18 A    Yeah.
19 Q    -- go to all the meetings?
20 A    Yeah.
21 Q    Okay. In your complaint -- and I don't know
22 -- oh, yeah, you've got it right there. Okay. First of
23 all, besides -- one of the people that you sue -- besides
24 suing the school district and AFSCME, you've named Mack
25 McMurray, and we agree that that's Robert McMurray; right?

---



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

250

1   A      Yes, sir.
2   Q      Okay. Mack is just his familiar name?
3   A      Yeah.
4   Q      Okay. And you named Mack McMurray, Robert
5 McMurray, as a defendant in this lawsuit; is that right?
6   A      Yes, sir.
7   Q      Okay. What did Mr. McMurray do wrong that led
8 you to sue him?
9   A      As a union steward, if I would have saw what
10 was going on I would have -- I would have dropped out right
11 aways. I would have said, he's got more seniority, you
12 know, let him have it. And if my boss would have said, no,
13 I'm going to put you there, I would have insisted, no, he
14 has the seniority. It's my job as a union steward no matter
15 what's -- what's going down. Seniority is seniority whether
16 you're white or black, no matter what you are.
17   Q      So you think that Mr. McMurray -- Mr. McMurray
18 was a union steward at that time; right?
19   A      Yes.
20   Q      Okay. And you think that Mr. McMurray should
21 have done something in his role as union steward?
22   A      Yes.
23   Q      Okay. What specifically would you -- do you
24 think Mr. McMurray should have done as a union steward?
25   A      He should have told Freeman and Tim Curtis

251

1 that, no, he can't take that job.
2   Q      Okay. Did you ever approach Mr. McMurray
3 about this issue, did you ever go to him directly and speak
4 to him?
5   A      No. There was a conflict of interest at the
6 time, so I didn't feel that I should talk to him or approach
7 him except through the union.
8   Q      When you say conflict of interest, what do you
9 mean?
10   A      Well, he was getting the job that I was
11 bidding on and so I couldn't go file a grievance against
12 himself.
13   Q      Okay. So you didn't think he would be
14 impartial because he got the job that you were asking for?
15   A      Yeah.
16   Q      And that's why you didn't ask him to file the
17 grievance for you?
18   A      Right.
19   Q      Okay. Mr. McMurray was the steward for the
20 head custodians; right?
21   A      Yes.
22   Q      So normally -- if there had been no conflict
23 of interest, normally Mr. McMurray would have been the
24 person you would go to; right
25   A      The first person I would have went to, yes.

252

1   Q      Okay. But -- okay. That's fair enough. So
2 you never -- so you never -- you never asked Mr. McMurray to
3 file the grievance for you in this case; right?
4   A      Right.
5   Q      And the reason for that is you felt that there
6 was a conflict -- he had a conflict of interest?
7   A      Yes.
8   Q      Okay. Did you ever speak -- besides the
9 grievance, did you ever go and just speak to him man to man
10 about the situation?
11   A      No. I didn't want to get into spreading
12 gossip or anything like that.
13   Q      Okay. So you never asked him, hey, you know,
14 McMurray, you know I have more seniority, will you, you
15 know, back me up in this situation? You never asked him to
16 step aside from that position in favor of you?
17   A      Well, I kind of like knew that him and Tim
18 Curtis were real close friends, so they were sticking
19 together. They weren't going to give me the job.
20   Q      But so you never asked -- you never
21 asked Mr. McMurray if he would let you have the job over
22 him?
23   A      No.
24   Q      Okay. And you never asked Mr. McMurray to do
25 anything about this job at the Rowland School?

253

1   A      No.
2   Q      Okay. So what you think Mr. McMurray did
3 wrong is you think he didn't fulfill his duties as a union
4 steward, is that what you're saying?
5   A      That, among other things.
6   Q      Okay. What other things? What else did he do
7 wrong?
8   A      I think they was giving him the job because he
9 was black.
10   Q      Okay. So another thing that you think he did
11 wrong is he got the job?
12   A      Yeah.
13   Q      Okay. Do you think that he made some special
14 arrangement with Curtis so that he would get the job?
15   A      My feeling is yes.
16   Q      And what do you base that feeling on?
17   A      Things that go wrong in the district, Tim
18 Curtis intimidating me, see all the freedom that these
19 certain head custodians have that they don't have to work.
20   Q      Okay. You mentioned that about Mr. Curtis
21 intimidating or you characterized it as retaliating against
22 you or harassing you. Mr. McMurray hasn't done anything to
23 you since you filed this grievance, has he?
24   A      No, he hasn't.
25   Q      Okay. He's -- he's left you alone; right?

64

**HAZZARD, WILLIAM**
**10/19/01**



**HAZZARD VS**
**CURTIS**

254

1   A      Yes.
2   Q      Okay.  Okay.  Oh, so I was asking you about
3 Mr. McMurray's involvement in the appointment.  I mean,
4 Mr. Curtis -- as far as you know, Mr. Curtis is the one who
5 made the decision to appoint Mr. McMurray to the Rowland
6 School; is that right?
7   A      Mr. Curtis won't do anything that Freeman
8 doesn't give him certification to do.
9   Q      Okay.  So as far -- so from your perspective,
10 as far as you know, Mr. Curtis and Mr. Freeman would have
11 had to be in on that decision?
12   A      Yes.
13   Q      Okay.  And then at some point that decision
14 has to be approved by the school board; right?
15   A      Right.
16   Q      Okay.  But in the initial instance you think
17 it was Curtis and Freeman who made that decision?
18   A      Yeah.
19   Q      Okay.  And are you claiming that Mr. McMurray
20 got together with them to convince them to give him the job,
21 or do you think that they just gave him the job because they
22 favored him over you?
23   A      Yes.
24   Q      Okay.  It wasn't a yes or -- it wasn't a very
25 well asked question, so let me ask it again.

255

1   A      Okay.
2   Q      Why do you think they gave Mr. McMurray the
3 job over you?
4   A      Because he was black.
5   Q      Okay.  And do you think that he asked them to
6 do that, or do you think they just did it?
7   A      They just did it.
8   Q      Okay.  So he didn't -- you don't think that
9 Mr. McMurray went to them and said give me the job because
10 I'm black and Mr. Hazzard is white?
11   A      The principal asks me to take mail down to the
12 administration building.  Every time I go down there taking
13 the mail down to the administration building I see -- I see
14 all those guys coming out of Tim Curtis' office and
15 Freeman's office.
16   Q      All which guys?
17   A      Dunson, Mack McMurray, the girl, all of them.
18   Q      All who, all head -- all the other head
19 custodians?
20   A      The black head custodians.
21   Q      All the black head custodians?
22   A      Right.
23   Q      Okay.  But never -- never -- you or Mr. Rhoads
24 are never in there?
25   A      I went down there for mail purposes.

256

1   Q      Okay.  Okay.  Do you think it's possible that
2 -- strike that.  You say that the reason -- you believe
3 that the reason they gave Mr. McMurray the job over you is
4 because you're white and he's black; is that right?
5   A      Yes, sir.
6   Q      Couldn't it be that they just like
7 Mr. McMurray better than they like you?
8   A      Probably because they're the same color.
9   Q      You think it's because they're the same color?
10   A      Yes.
11   Q      You don't think it's just personal, that they
12 just personally dislike you?
13   A      No.
14   Q      Okay.  Do you know -- there's one other head
15 custodian, and that's Mr. Rhoads; is that right?
16   A      Yes.
17   Q      Has he ever applied to work at a major school?
18   A      I'm not sure.  I wouldn't know that.
19   Q      Okay.  And other than the Rowland School,
20 you've never -- there wasn't any other time when you applied
21 to work at a major school, is there?
22   A      No.
23   Q      Okay.  Okay.  In the school district -- in the
24 whole school district, do you know of any other case where a
25 more junior black person got a job over a more senior white

257

1 person?
2   A      I don't have the paperwork on that.  I
3 wouldn't know.
4   Q      Okay.  So you never heard of any such case?
5   A      Mack McMurray.
6   Q      Okay.  Besides -- Mack McMurray and you?
7   A      Yeah.
8   Q      Okay.  Besides your case, besides Mr. McMurray
9 getting the Rowland job over you, there is no other case in
10 the school district of a more junior black employee getting
11 a job over a more senior white employee; right?
12   A      Not white, but Dr. Poteat brought a teacher in
13 and gave him a head custodian job over a custodian that had
14 a lot of years of service that put a bid in on it.
15   Q      Okay.  So a teacher went from being a teacher
16 to a head custodian?
17   A      Yeah.
18   Q      Is that promotion?
19   A      That's Mr. Dunson.
20   Q      Mr. Dunson.  And the other custodian, was he
21 black or white?
22   A      He was black.
23   Q      Okay.  So that was two black people --
24   A      Yeah.
25   Q      -- in that case?


258

1  A        Poteat brought him in there and just stuck him
2  in there and did what he wanted to do.
3  Q        And what happened in that case, did anybody
4  file a grievance?
5  A        Yeah.
6  Q        Who filed a grievance?
7  A        Mr. Simms.
8  Q        And Mr. Simms was the black custodian who had
9  more experience?
10  A        Yeah.
11  Q        And what was the result of that grievance?
12  A        Poteat made the statement that -- something
13  new, came out of the blue, that sometimes people can
14  negotiate jobs based on their education.
15  Q        Uh-huh?
16  A        I've never heard of that.
17  Q        Okay.  So did this -- did this teacher end up
18  keeping the job or --
19  A        Yes.  He's still here.
20  Q        Okay.  And who is that?
21  A        Mr. Dunson.
22  Q        Oh, that's Mr. Dunson.  Okay.  So in that case
23  the grievance was not settled in favor of the other
24  employee; right?
25  A        Right.

259

1  Q        Okay.  Now, in Paragraph 16 you talk about
2  AFSCME through its union representative, Nichelle Chivis,
3  told you that they were unilaterally withdrawing your
4  grievance; right?
5  A        Yes.
6  Q        Okay.  Now, actually in Paragraph 16 it says
7  grievances, but there was really only one grievance; right?
8  A        Yeah.
9  Q        Okay.  That's just a typo I guess.  Okay.  And
10  at that time -- you say at that time upon belief and
11  information they told the defendant school board the
12  grievance had no merit?
13  A        Right.
14  Q        And that's what Ms. Chivis said in her letter
15  to Mr. Freeman that she gave you a copy of?
16  A        Yeah.
17  Q        Okay.  And you -- you -- when the union --
18  when Ms. Chivis says that the reason that they're
19  withdrawing your grievance is that it has no merit, you
20  don't believe her, do you?
21  A        No.
22  Q        Okay.  What do you think the real reason was
23  that Ms. Chivis withdrew your grievance?
24  A        I think her and Mr. Freeman and Tim Curtis got
25  together.

260

1  Q        Okay.  What evidence do you have that the
2  three of them actually got together?
3  A        Well, both of them seems to be pointing the
4  finger at each other.  Look, he dropped the grievance so
5  that's why we did.  Oh, they dropped the grievance so that's
6  why we did.
7  Q        In other words, you're saying each one -- the
8  union is saying that the school district dropped the
9  grievance, and the school district is saying that the union
10  did?
11  A        My mind is kind of like saying to me it looks
12  like some kind of collusion going on here between the two of
13  them.
14  Q        So you believe that Ms. Chivis and Mr. Freeman
15  and Mr. Curtis actually colluded together, and they agreed
16  to pull your grievance?
17  A        That's what I felt.
18  Q        Okay.  Do you have any evidence of that?
19  A        No.
20  Q        Okay.  Did anybody ever tell you that they saw
21  Ms. Chivis meeting with Mr. Curtis and mister --
22  A        Mr. McCollum and Mr. Tapper said there was a
23  meeting in where such a thing may have happened, and they
24  asked for the printouts that correspond to that meeting, and
25  they were either lost or don't have them.

261

1  Q        And Mr. McCollum and Mr. Tapper are the ones
2  who told you --
3  A        Yes, and they were there.
4  Q        They said they were at that meeting?
5  A        They were there.
6  Q        Okay.  And what did they say happened at that
7  meeting?
8  A        There supposedly was a meeting between
9  Nichelle and Freeman.
10  Q        Uh-huh.  But McCollum and Tapper were at the
11  meeting with Nichelle and with Freeman?
12  A        I don't know.
13  Q        Okay.  Okay.  Other than that, you don't have
14  any evidence that Ms. Chivis and Mr. Curtis and Mr. Freeman
15  got together and agreed that they would drop your grievance;
16  right?
17  A        No.  They're all black, so they agreed
18  together.
19  Q        They're all black.  You think because they're
20  all black they must have agreed with each other?
21  A        Yes.
22  Q        Okay.  Do you think all black people always
23  agree with each other?
24  A        No.
25  Q        Okay.  But in this case because they're black



**HAZZARD, WILLIAM**
**10/19/01**

**HAZZARD VS**
**CURTIS**

262

1 they would have agreed with each other?
2　A　Yes.
3　Q　Okay.  So -- okay.  Now, Ms. Chivis, she works
4 for AFSCME District Council 90.  You know that; right?
5　A　Yes, sir.
6　Q　Okay.  Do you know who the head of AFSCME
7 District Council 90 is?
8　A　The head?
9　Q　Who's in charge of District Council 90?
10　A　Nichelle.  I thought Nichelle was.
11　Q　Okay.  Have you ever heard of somebody named
12 Judy Hay?
13　A　No.
14　Q　Okay.  Okay.  You've never -- so you've never
15 -- you've never dealt with Ms. Hay?
16　A　No.  I always thought she was the top person
17 there.
18　Q　Okay.
19　A　I've never known anything else.
20　Q　Okay.  I'm getting close to done here.  Hold
21 on just a bit.  I'm getting tired.  Are you getting hired?
22　A　I have a headache.
23　Q　We'll finish up quickly.  One more thing I
24 wanted to ask you about because I think you mentioned this
25 earlier, I believe when you were -- when Mr. Lochinger was

263

1 asking you questions, you mentioned something about someone
2 asking you to take back a vacation request or something
3 about vacation requests?  Do you know what I'm talking
4 about?
5　A　Tim Curtis or -- oh, Tim Curtis wanted me to
6 take my -- the second time he came back -- vacation and turn
7 it in for -- to reimburse the bereavement time.
8　Q　Okay.  Right.  There was that.  We already
9 talked about that, but wasn't there another situation where
10 you had put in a vacation request and Mr. Curtis suggested
11 that somebody else --
12　A　Yeah.
13　Q　What happened in this case with --
14　A　Okay.  He called Rhoads and asked Rhoads to
15 call me and ask me to recant on my vacation because somebody
16 else was going to be off on that time.
17　Q　Okay.  Who's Rose?
18　A　He's the other white head custodian.
19　Q　Oh, Rhoads, Mr. Rhoads?
20　A　Yeah.
21　Q　Oh, okay.  So Curtis told -- asked Rhoads to
22 ask you if you would rescind your vacation?
23　A　Yes.
24　Q　And the reason for that was that somebody else
25 wanted to take vacation on the same days?

264

1　A　Yeah.
2　Q　And who was this somebody else, was it
3 Mr. Rhoads or was it --
4　A　Nobody would tell me.
5　Q　Nobody would tell you who it was?
6　A　No.
7　Q　Do you know why he asked Mr. Rhoads to pass on
8 the request?
9　A　I kind of think he was trying to kind of like
10 approach me through a white person maybe, thinking that
11 maybe I wouldn't respond to him.
12　Q　So you think Mr. Curtis picked Mr. Rhoads to
13 be a go-between because Mr. Rhoads is also white?
14　A　Yeah.
15　Q　And so did Mr. Rhoads actually come to you and
16 talk to you about this?
17　A　He called me on the phone, and I said why
18 would you do this?  You know I got 30 some years here.  Why
19 would you ask me that for?  Why did you single me out?  He
20 said I didn't single you out, Hazzard, Tim Curtis singled
21 you out.
22　Q　Uh-huh.  So you -- I take it you said you
23 didn't want to rescind your vacation so that somebody else
24 could take theirs?
25　A　No, no.

265

1　Q　Okay.  Did you file a grievance over this
2 issue?
3　A　I don't think I did.
4　　　MR. FINK:  Okay.  I'm going to -- let's mark
5 another -- I'm marking as Exhibit 15 a grievance form dated
6 4/4/00 -- I guess that's April 4th, 2000 -- and it's Local
7 2063, Grievance Number 115.
8　　　(Grievance Form dated 4/4/00 marked as Hazzard
9 Exhibit 15.)
10 BY MR. FINK:
11　Q　Have you ever seen that document before?
12　　　MR. BAILEY:  Do I have that?
13　　　MR. FINK:  Yeah.  This is something else that
14 came from you.
15　　　MR. BAILEY:  Yeah, I have a copy somewhere.
16 If you don't need it --
17　　　MR. LOCHINGER:  No.  I was just showing you.
18　　　MR. BAILEY:  Oh.  Yeah, I do have it.  It's
19 Number 15; right.
20　　　MR. FINK:  Yeah, 115.
21　　　MR. BAILEY:  And it's also Hazzard 15.
22　　　MR. FINK:  Oh, it's -- you're confusing.
23 There's two different types of numbers.
24　　　MR. BAILEY:  Right, a little extra one in
25 there.



266

1    MR. FINK: I'm easily confused. If I was good
2 at numbers, I wouldn't have been a lawyer. I would have
3 been an engineer.
4    A    I brought this — I brought this to several
5 people's attention, and I guess maybe that was going on
6 around the district. I don't know.
7 BY MR. FINK:
8    Q    Okay. So -- so this is a grievance form over
9 the issue of head custodians not being permitted to take
10 their vacation; is that right?
11   A    Yeah.
12   Q    And it mentions head custodians are being
13 asked to rescind their vacations so others can go on
14 vacation?
15   A    Yeah.
16   Q    Okay. And that's referring to your situation?
17   A    Yeah.
18   Q    Okay. And who submitted this grievance, if
19 you can tell from the form?
20   A    It looks like Epps.
21   Q    Robert Epps?
22   A    Yeah.
23   Q    And he's -- he -- again, he's a steward;
24 right?
25   A    Yeah.

267

1    Q    Okay. And Mr. Epps is black?
2    A    Yeah.
3    Q    Okay. I keep saying that, but I just want to
4 make sure.
5    A    I think he had that problem.
6    Q    Okay. You think he had the same problem --
7    A    He had the same problem.
8    Q    -- of being asked to rescind his vacation?
9    A    Yeah.
10   Q    Okay. So you -- there wasn't just -- so it
11 wasn't just you who was asked to rescind vacation, other
12 head custodians were also asked to rescind their vacation?
13   A    But he went directly to them and asked them.
14       Mr. Curtis went directly to Mr. Epps and --
15   A    And asked him, and he went directly to Bobby
16 Lanier and asked him because Bobby told me. And me, he
17 didn't come to me. He got Rhoads to call me and ask me to
18 rescind my vacation.
19   Q    Okay. Stanley Holton, do you know who he is?
20   A    Yeah.
21   Q    Who's he?
22   A    He's the head custodian at Ben Franklin
23 building now.
24   Q    Okay. Black or white?
25   A    He's black.

268

1    Q    Okay. Do you know whether he had any problem
2 with his vacation requests?
3    A    I don't know.
4    Q    Okay. Fair enough. Do you know whether there
5 has been any resolution of this grievance over the vacation
6 requests?
7    A    I don't -- no, I didn't hear the response on
8 that, and it would probably go back to whoever, you know.
9    Q    So you haven't heard anything about it?
10   A    No, I haven't heard anything.
11   Q    But in your specific case you didn't have to
12 -- in the end, you didn't have to rescind your vacation,
13 you got to take your vacation; right?
14   A    Yeah.
15   Q    Okay. Nobody forced you to rescind it?
16   A    No. He just asked.
17       MR. FINK: He asked. Okay. I think that's
18 enough. I'm exhausted. Thank you for being so patient,
19 Mr. Hazzard.
20   A    Thank you.
21       THE VIDEO OPERATOR: It's 1512, and this
22 deposition has now ended. We're going to turn off the
23 cameras.
24       (The deposition was concluded at 3:12 p.m.)
25

269

1 STATE OF PENNSYLVANIA  :
                          : ss
2 COUNTY OF YORK        :
3
4      I, Lisa A. Hansell, a Reporter Notary-Public,
5 authorized to administer oaths within and for the
6 Commonwealth of Pennsylvania and take depositions in the
7 trial of causes, do hereby certify that the foregoing is the
8 testimony of WILLIAM A. HAZZARD.
9      I further certify that before the taking of
10 said deposition, the witness was duly sworn; that the
11 questions and answers were taken down stenographically by
12 the said reporter, Lisa A. Hansell, a Reporter
13 Notary-Public, approved and agreed to, and afterwards
14 reduced to typewriting under the direction of the said
15 Reporter.
16      I further certify that the proceedings and
17 evidence contained fully and accurately in the notes by me
18 on the within deposition, and that this copy is a correct
19 transcript of the same.
20      In testimony whereof, I have hereunto
21 subscribed my hand this 8th day of November, 2001.
22
23      _____
                 Lisa A. Hansell, Reporter
24               Notary Public
25 My commission expires:
    May 20, 2004

# EXHIBIT - 1

## Memorandum

To: Head Custodians

From: Tim Curtis, Facilities Supervisor

Date: June 18, 1999

RE: Transferring of Head Custodians

Effective June 28, 1999 the following transfers listed below will occur. These transfers are being done to restructure our custodial staff. These transfers have nothing to do with current job performance nor is it to be taken in a negative aspect. The head custodian duties will remain the same; the only thing that will change is location. I believe that we have the appropriate personnel that can adapt to this change and meet these new challenges head on. The head custodians need more of a change and a challenge, so look at this transfer as a challenge. Some of you that will be transferring will be transferring to renovated schools and summer school programs. With this will come even more additional duties put upon you. So I challenge you to look at this transfer as a positive outlook and move forward in making this school district the best school district possible.

| | |
|---|---|
| James Matthew | Downey |
| Clyde Dunson | Steele |
| Jaclyn Havior | Woodward |
| Stanley Holton | Lincoln |
| Valence Barker | Marshall |
| Elaine Eden    *FROM LINCOL    TO* | Ben Franklin    *~ Scott* |
| *W* William Hazzard | Shimmell |
| Robert Lanier    *MELROSE    TO* | John Harris |
| *W* Dan Rhoads | Foose |
| Dwight Adams    *STEELE    TO* | Camp Curtain |
| Robert Mcmurray | Hamilton |
| Raymond Washington    *WW    TO* | William Penn |

CC: Brenda Connor
    Personnel



**EXHIBIT**

*Hazzard-1*

*10-19-01*

# EXHIBIT - 2

June 25, 1999

TO:         Mr. Lance Freeman
FROM:       Mr. William A. Hazzard, Head Custodian
RE:         Bid for Head Custodian at Rowland Int. School

  Please consider this memorandum as a bid request for the Head Custodian position at Rowland Intermediate School.

  I have worked for the District for 30 years.  I was the Head Custodian at Marshall Elementary for 7 years.  I am now the Head Custodian at Shimmell.

  Thank you.

EXHIBIT

*Hazzard-2*

*10-19-01*

# EXHIBIT - 3



# COUNCIL 13
## AMERICAN FEDERATION OF STATE, COUNTY
### AND MUNICIPAL EMPLOYEES, AFL-CIO



RECEIVED
PERSONNEL OFFICE

# GRIEVANCE FORM 99 AUG 12 AM 9:29

## *(Type or print information, filling in all blanks.)*

District Council ___90___  Local Union ___2063___  ___00094___

Grievant (s) __WILLIAM A. HAZZARD__  Social Security No. __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__

Employer __HBG. SCHOOL DIST.__

Department _____  Job Title __CUSTODIAN__

Supervisor __TIM CURTIS__  Work Location __SHIMMELL__

## VIOLATION

Article # ___20___  Section # ___7___

## STATEMENT BY GRIEVANT OR UNION

I HAVE WORKED FOR THE HBG. SCHOOL DIST. FOR 31 YEARS, I
AM A HEAD CUSTODIAN AT SHIMMELL BEFORE I WAS TRANSFERED
TO SHIMMELL, I WAS HEAD CUSTODIAN FOR 7 YRS AT MARSHALL
SCHOOL I HAVE PUT IN MY BID FOR THE HEAD CUSTODIAN
POSITION FOR THE NEW ROWLAND BLDG. I AM QUALIFIED FOR
SAID POSITION.

```
EXHIBIT
Hazzard-3
ed      10-19-01
```

## RELIEF OR REMEDY SOUGHT

IN ACCORDANCE WITH A.F.S.C.M.E. CONTRACT ARTICLE 20 SEC. 7

BASED ON TOTAL SCHOOL DIST. SERVICE WHO BIDS ON THE JOB
AND WHO HAS THE ABILITY WILL BE AWARDED THE JOB.

_____  8-12/99  _____  8-12-99
Steward Signature    Date    and/or    Employee Signature    Date

**EXHIBIT - 4**



# AFSCME ®

American Federation of State, County, and Municipal Employees • AFL-CIO

## Dauphin County Pennsylvania Public Employees District Council 9

4031 Executive Park Drive  •  Harrisburg, Pennsylvania 17111-1599  •  717-564-51
FAX 717-564-49

**JUDITH HEH**
Council Director

**TYRONE MITCHELL**
President

**TERI FREY**
Vice President

**KATHY MUMMA**
Secretary

**JOYCE CULPEPPER**
Treasurer

**Executive Board:**
KARLA HODGE
DALE KICHMAN
GERALDINE SHAMMO
JOHN WATERS, JR.

**Trustees:**
TYRAN COBB (2002)
MARTHA MYRICK (2000)
CHARLOTTE SMITH (2001)

**LENORA WILBON**
Vice President
Council 13

March 14, 2000

Lance Freeman, Personnel Director
Harrisburg School District
1201 North Sixth Street
Harrisburg, PA 17102

Re:   AFSCME Grievance #90-2063-0094   William Hazzard

Dear Mr. Freeman:

A review was made of the above grievance by this office and it was determined that no further action will be taken.

Therefore, this grievance will be withdrawn from the grievance procedure.

This withdrawal is made without prejudice or precedent.

Very truly yours,

*M. Nichelle Chivis*

M. Nichelle Chivis
Staff Representative

cc:   Council 13 Grievance Department
      Doris Manning
      Robert Epps √
      William Hazzard
      File

---

**EXHIBIT**

*Hazzard-4*

*she*      10-19-01

# EXHIBIT - 5

C O M P L A I N T

APR 18 2000

FACILITIES/
DEPARTMENT

I, the undersigned, do hereby state:

1.  MY NAME    WILLIAM HAZZARD

    ADDRESS    1940 BROOKWOOD ST    HBG. PA.

    PHONE NO.

2.  I AM A    HEAD CUSTODIAN    AT    SHIMMELL
    PARENT, STUDENT, TEACHER, OTHER            SCHOOL

3.  I ACCUSE    MANAGEMENT    , A
    PARENT, STUDENT, TEACHER,

    AT    ADM. BLDG.    OF THE FOLLOWING:
           SCHOOL

(STATE SPECIFICALLY THE ACTS OR CONDUCT OF WHICH COMPLAINT IS MADE.)

I AM THE HEAD CUSTODIAN AT SHIMMELL SCHOOL, ON JULY 8, 19

THE POSITION FOR A HEAD CUSTODIAN AT THE NEW ROWLAND BLDG

WAS POSTED. I BIDDED FOR SAID POSITION. I HAVE 31 YEARS OF

SERVICE WITH THE HBG. SCHOOL DIST. WHICH MAKES ME THE

MOST SENIOR QUALIFIED PERSON FOR SAID POSITION. I WOU

LIKE TO KNOW WHY I WAS NOT AWARDED THE HEAD CUSTODIAN

POSITION AT THE NEW ROWLAND BLDG.

4.  THE ACTS OR CONDUCT OF WHICH I COMPLAIN OCCURRED ON OR ABOUT ·

    AUG. 99    AT    ADM. BLDG.
        DATE               PLACE

5.  THE NAMES AND ADDRESSES OF WITNESSES, IF ANY, OF THE ACTS OR CONDUCT OF WHICH
    COMPLAINT IS MADE.

    (1)                                    (3)

    (2)                                    (4)

EXHIBIT
Hazzard-5
fa        10-19-01

6. THE NAME AND ADDRESS OF THE PERSON WHOM I HAVE SELECTED TO ASSIST
PREPARATION AND FILING OF THIS COMPLAINT IS:

STEVEN T. McCOLLUM

127 N. MAIN ST. MARYSVILLE PA 17053

Therefore I request that the charge be investigated.

DATE 4-19-2000 _____      SIGNATURE OF COMPLAINANT:

                                SIGNATURE OF PARENT OR GUARDIAN

PARENT/COMMUNITY COMPLAINTS MAY BE FILED IN ANY SCHOOL OFFICE TO BE
                    SUPERINTENDENT
STAFF COMPLAINTS SHOULD BE FILED WITH IMMEDIATE SUPERVISOR

ADMINISTRATORS RECEIVING COMPLAINTS AT FIRST LEVEL MUST PROMPTLY FO
COMPLAINT TO ALL INVOLVED PARTIES AND THE APPROPRIATE HEA OR AFSCME

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

R E S P O N S E · L E V E L I

HEARING REQUIRED/REQUESTED    YES  (NO)   DATE (IF CONDUCTED)

IN Response to your complaint,
matter was Already Addressed An
responded to. Please see Attached

April 25, 2000  Facilities Supervisor  [signature]
DATE            TITLE                   SIGNATURE

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

C O M P L A I N A N T   R E S P O N S E

I do by signing below indicate that - (check one)

_____   I  AM  satisfied with the disposition that has been m
             complaint or my case.

  X      I  AM NOT satisfied with the disposition that has been
             complaint or my case.  I wish to appeal to

DATE 4-22-00 _____      [signature] William A. Hand Sr.
                              SIGNATURE OF COMPLAINANT

# EXHIBIT - 6



# HARRISBURG·SCHOOL·DISTRICT

**1201 NORTH SIXTH STREET**

**(717) 703-4019 Office**

HARRISBURG, PENNSYLVANIA 17102-1406

**P.O. BOX 2645 - MAILING ADDRESS**

**(717) 703-4130 Fax**

**OFFICERS**
Wanda R. D. Williams, President
Linda M. Cammack, Vice President
Mark D. Pisco, Acting Secretary
Mellon Bank, Treasurer
Dr. Lucian Yates, III, Superintendent
Royce L. Morris, Solicitor

**BOARD OF SCHOOL DIRECTORS**

| | |
|---|---|
| Joseph C. Brown | 2001 |
| Linda M. Cammack | 2003 |
| Clarice L. Chambers | 2001 |
| Ricardo A. Davis, Sr. | 2001 |
| Barton A. Fields | 2003 |
| Judith C. Hill | 2003 |
| Ken M. Lester | 2003 |
| Gloria E. Martin-Payne | 2003 |
| Wanda R.D. Williams | 2001 |

Mr. William Hazzard
1940 Brookwood Street
Harrisburg, PA 17104

June 26, 2000

Dear Mr. Hazzard:

This letter is written in response to your complaint regarding the administration's denial of your promotion request to a Facilities Service Foreman 1B position at Rowland School in August 1999. In accordance with the district complaint procedure, a hearing before a committee of board members (Joseph Brown, Ricardo Davis) was held June 1, 2000. At this meeting the committee received evidence and heard testimony in support of your complaint from you, Steve McCollum and Robert Tapper. In response to your complaint we received evidence and testimony from Tim Curtis and Lance Freeman representing the administration.

After careful consideration of the evidence and testimony provided, it is the decision of the committee that the administration acted within its managerial rights when it did not promote you as you requested. It is also the opinion of the committee that your rights regarding this matter were not violated by the administration. In conclusion, it is our decision that your complaint has been properly addressed in accordance with Board Policy No. 326, Complaint Procedure.

We appreciate your service to the district and your efforts to resolve this matter accordingly.

Sincerely,

*Joseph Brown*

Joseph Brown
Board Member

Ricardo Davis
Board Member

cc:     Wanda R. D. William, President, School Board
        Dr. Lucian Yates III, Superintendent
        Steven McCollum
        Robert Tapper
        Tim Curtis
        Lance Freeman
        Brenda Conner
        Board Secretary
        file

**EXHIBIT**
Hazzard-6
aa        10-19-01

**EXHIBIT - 7**

EMPLOYMENT OPPORTUNITIES
Page 4
July 8, 1999

## POSITION - FACILITY SERVICE FOREMAN IB
### (formerly Head Custodian I-Major)

OBJECTIVE: Maintain the physical school plant and grounds in a condition of operating excellence so that full educational use may be made at all times

QUALIFICATIONS: High school diploma or GED, five (5) years experience as a school custodian or the equivalent in custodial service in other institutions or firms, demonstrate knowledge in the basic techniques of general repairs and maintenance, physically able to perform essential functions of job, satisfactory work record, Criminal History and Child Abuse Clearances

LOCATION: NEW ROWLAND BUILDING (PNI)

MINIMUM SALARY RATE: $10.00 per hour

CONTRACT YEAR: 260 days work year – 8 hours per day

## POSITION - FACILITY SERVICE WORKER I (formerly Custodian)

OBJECTIVE: Maintain the physical school plant and grounds in a condition of operating excellence so that full educational use may be made at all times

QUALIFICATIONS: High school diploma or GED, ability to read basic operating instructions and write reports, demonstrated aptitude for successful fulfillment of assigned performance responsibilities, must be able to lift 35 lbs, be in good health and physically able to perform essential job functions, satisfactory work record with Criminal History and Child Abuse Clearances.

LOCATION: William Penn (Intermediate School), Foose Elementary School, Rowland (PNI) and Melrose Elementary School

MINIMUM SALARY RATE: $ 7.50 per hour

CONTRACT YEAR: 260 days work year – 8 hours per day

## CAMPUS SECURITY OFFICER

OBJECTIVE: As members of Safety and Security Division, Campus Security Officers must regard themselves as part of a team dedicated to the safety and security of persons and property.



**EXHIBIT**
*Hazzard-*

# EXHIBIT - 8

# AGREEMENT

between the

## BOARD OF SCHOOL DIRECTORS
### OF THE
### CITY OF HARRISBURG SCHOOL DISTRICT

and the

## AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, DISTRICT COUNCIL 90

July 1, 1997 – June 30, 2001

**EXHIBIT**

Hazard - 8

10-19-0

# KNOW YOUR RIGHTS AND USE THEM

Under your AFSCME contract and federal law, you are guaranteed certain rights to union representation. Know them. Use them.

1. You have a right to union representation, not a specific union representative, at any meeting with management which could possibly result in disciplinary action against you.

2. Whenever you are called to a meeting with management, explicitly ask about the specific nature of the meeting.

3. Before beginning the meeting, or at any time you believe the meeting is covering areas that might result in discipline, you must explicitly ask for union representation.

4. Prior to proceeding with the meeting, confer with your union representative and discuss the matters at issue in the meeting.

5. If you have any questions, ask your union representative.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| PREAMBLE | .................................. | 1 |
| ARTICLE I | RECOGNITION ................ | 1 |
| ARTICLE II | UNION SECURITY ............ | 2 |
| ARTICLE III | DUES DEDUCTION ........... | 3 |
| ARTICLE IV | PEACE AND STABILITY ..... | 4 |
| ARTICLE V | HOURS OF WORK ............ | 5 |
| ARTICLE VI | SALARIES AND WAGES ..... | 6 |
| ARTICLE VII | MEAL PROGRAMS ........... | 8 |
| ARTICLE VIII | REST PERIODS .............. | 9 |
| ARTICLE IX | INSURANCE ................. | 10 |
| ARTICLE X | PAL DEDUCTIONS .......... | 11 |
| ARTICLE XI | CALL TIME ................. | 12 |
| ARTICLE XII | OVERTIME ................. | 12 |
| ARTICLE XIII | SICK LEAVE ............... | 14 |
| ARTICLE XIV | VACATION ................. | 18 |
| ARTICLE XV | HOLIDAYS ................. | 20 |
| ARTICLE XVI | PERSONAL LEAVE DAYS .... | 21 |
| ARTICLE XVII | BEREAVEMENT PAY ........ | 22 |
| ARTICLE XVIII | LEAVES OF ABSENCE ...... | 22 |
| ARTICLE XIX | CLASSIFICATION/ RECLASSIFICATION ........ | 25 |

ARTICLE XX      SENIORITY .................. 26

ARTICLE XXI     NON-DISCRIMINATION ....... 30

ARTICLE XXII    DISCIPLINE ................ 30

ARTICLE XXIII   SUCCESSORS ............... 31

ARTICLE XXIV    SEVERABILITY ............. 31

ARTICLE XXV     UNION BUSINESS ........... 31

ARTICLE XXVI    RETIREMENT BONUS
                AND BENEFITS ............. 32

ARTICLE XXVII   TRAVEL EXPENSES .......... 33

ARTICLE XXVIII  WORK RELATED
                INJURIES/ACCIDENTS ....... 34

ARTICLE XXIX    UNIFORMS ................. 36

ARTICLE XXX     GRIEVANCE AND ARBITRATION
                PROCEDURE ................ 37

ARTICLE XXXI    MANAGEMENT RIGHTS ....... 40

ARTICLE XXXII   MISCELLANEOUS PROVISIONS ... 40

ARTICLE XXXIII  TERMINATION .............. 43

MEMORANDUM OF UNDERSTANDING ............. 44

WAGES .................................. 46

## PREAMBLE

This agreement entered into by the School Board of the School District of Harrisburg, hereinafter referred to as the employer, and the American Federation of State, County and Municipal Employees, District Council 90, hereinafter referred to as the union, has as its purpose the promotion of harmonious relations between the employer and the union; the establishment of an equitable and peaceful procedure for the resolution of differences; and the establishment of rates of pay, hours of work, and other conditions of employment.

## ARTICLE 1
## Recognition

Section 1. The American Federation of State, County and Municipal Employees, District Council 90, is recognized as the sole and exclusive representative for collective bargaining purposes for employees within the classification established by certification of the Pennsylvania Labor Relations Board, PERA-R-10; 551-C, April 27, 1978, excluding first level supervisors which are covered under a separate agreement.

Section 2. This agreement pertains only to those employees falling within the certification referred to in Section 1. of this Article.

Section 3. The term "employee", when used in this agreement, refers only to those persons falling within the classification of the certification referred to in Section 1. of this Article.

Section 4. A temporary employee is one who is hired for a period of up to five (5) months, and is so informed at the time of hire. Temporary employees are excluded from the provisions of

this agreement. If an employee, hired in a temporary capacity, continues to work after five (5) months, the employee shall become a regular employee and a member of the bargaining unit and shall be credited with seniority back to the initial date of hire.

A long term substitute is an employee who is hired for a period of up to twelve (12) months and is so informed at the time of hire. Long term substitutes shall only be hired to temporarily replace a regular employee who has been granted a leave of absence. An employee who continues to work in this capacity after five (5) months shall be covered by all provisions of this agreement. However, the School District retains the right to discharge such employee within said twelve (12) month period without recourse.

## ARTICLE 2
## Union Security

Section 1. Each member of the bargaining unit who, on the effective date of this agreement is, or in the future becomes a member of the union shall, after the effective date of the agreement, be required to maintain their membership in the union for the term of this agreement provided that such employee may resign from the union, in accordance with the following procedure:

a. The employee shall send a certified letter, return receipt requested, of resignation to AFSCME, District Council 90 and a copy of the letter to the School District. The official membership card, if available, shall accompany the letter of resignation.

b. The letter shall be postmarked during the fifteen (15) day period prior to the expiration of this agreement and shall state that the employee is resigning membership in the union and is revoking check-off authorization.

Section 2. The employer and the union hereby agree that all non-members of the union shall be subject to a fair share fee as provided for in Act 84 of 1988 (S.B. 291) and any amendments thereto.

Section 3. The union shall indemnify and hold the employer harmless against any and all claims, demands, suits and other forms of liability, including liability for reasonable counsel fees and other legal costs and expenses that may arise out of, or by reason of any action taken or not taken by the employer, in conformance with this provisions.

Section 4. The employer shall provide the union and local president, on a quarterly basis (July, October, February, April), a list of all employees in the bargaining unit represented by the union. This list shall contain the following information: full name, address, social security number, job title and work site.

## ARTICLE 3
## Dues Deduction

Section 1. The employer agrees to deduct the union by-weekly membership dues, if any, from the pay of those employees who individually request in writing that such deduction be made. The amount to be deducted shall be certified to the employer by the union, and the aggregate deductions of all employees shall be remitted together with an itemized statement to the union by the last day of the succeeding month, after such deductions are made. The aforementioned itemized statement shall include the employee's full name, address, social security number and the amount of dues deducted. This authorization shall be irrevocable during the term of this agreement, as long as the employee is in a classification included with the certification of the unit.

Section 2. The employee's written authorization for dues deductions shall contain the employee's name, social security number and the name of the union.

Section 3. The employer further agrees to deduct fair share fee bi-weekly from all employees in the bargaining unit who are not members of the union. Authorization from non-members to deduct fair share fees shall not be required. The amounts to be deducted shall be certified to the employer by the union, and the aggregate deductions of all employees shall be remitted together with an itemized statement to the union by the last day of the succeeding month after such deductions are made.

Section 4. The union shall indemnify and hold the employer harmless against any and all claims, suits, orders, or judgements brought or issued against the employer as a result of action taken or not taken by the employer under the provisions of this Article.

## ARTICLE 4
## Peace and Stability

Section 1. It is understood that there shall be no strike, as that term is defined under the Public Employee Relations Act, during the life of this agreement, nor shall any officer, representative or official of the union authorize, assist or encourage any such strike during the life of this agreement.

Section 2. Should a strike occur not authorized by the union, the union, within twenty-four (24) hours following the request of this employer, shall:

a. Publicly disavow such action by the employees;

b. Advise the employer in writing that such employee action has not been authorized or sanctioned by the union; and

-4-

c. Post notices on all bulletin boards advising employees that it disapproves of such action and instruct them to return to work immediately.

Section 3. The employer reserves the right to discipline, demote or discharge any employee or employees who violate the provisions of Section 1. of this Article, subject to the grievance and arbitration procedures.

Section 4. The employer will not engage in any lockout during the life of this agreement.

## ARTICLE 5
## Hours of Work

Section 1. The work week for full-time employees shall consist of five (5) consecutive work days beginning on Monday and ending on Friday. In the event the Board utilizes Saturday or Sunday as a work day for certain operations, no person employed on or before July 1, 1975, will be scheduled for such work on Saturday or Sunday unless such person bids on such job.

Section 2. a. The regular work day for all full-time employees working less than eight (8) hours per day shall be consecutive except that they may be interrupted by a non-paid meal period not to exceed one (1) hour in length. This sub-section shall not apply to positions currently working split shifts, or to positions where pre-established practices conflict with this provision.

b. The regular work day for all full-time eight (8) hour per day employees covered by this agreement shall be consecutive.

Section 3. Work schedules showing the employees' work days and hours shall be posted on appropriate bulletin boards.

-5-

Except for emergencies, changes shall be posted two (2) weeks in advance. Where changes are to be made by the employer for other than emergency reasons, or where schedules are to be adopted for new programs, the employer agrees to notify the union of the change or new schedules and, upon request, meet and discuss with the union prior to the implementation of the change or new schedule.

Section 4. Employees will be considered full-time if they are regularly scheduled to work the hours in a work day as set forth in Exhibit A for their classification.

Section 5. The term part-time employees refers to employees who are regularly scheduled to work less than twenty (20) hours per week, exclusive of meal periods, in any classification.

Section 6. Employees required to attend in-service training programs shall be considered working during such programs and shall be paid their appropriate hourly rate for the time spent in such programs.

Section 7. Bargaining unit employees at the Administration Building shall be eligible to participate in the flexible scheduling of work hours during the summer.

## ARTICLE 6
## Salaries and Wages

Section 1. Effective July 1, 1997, there will be a 3% across the board increase for all employees.

Effective July 1, 1998, there will be a 3% across the board increase for all employees.

Effective July 1, 1999, there will be a 3% across the board increase for all employees.

Effective July 1, 2000, there will be a 3% across the board increase for all employees.

Effective July 1, 2001, there will be a 3% across the board increase for all employees.

Section 2. For the purpose of calculating and implementing the salary/wage provisions outlined in Section 1. of this Article, a year shall be defined as twelve (12) months from the employee's date of hire.

Section 3. Each full-time employee shall receive a three hundred ($300) dollar service payment for each five (5) years of complete continuous service to be paid as a cash bonus in the following July. Said service increment shall not be compounded or included in the base salary of the employee.

Example:  5 year of service - $300 payment
10 year of service - $600 payment
15 year of service - $900 payment
20 year of service - $1200 payment, etc.

Section 4. A demotion is defined as a personnel action in which an employee is moved to a position with a lower minimum rate of pay. Employees transferred into a classification paying a lower minimum hourly rate of pay shall be reduced by 9% or the starting rate of the minimum of the lower pay grade, whichever is lesser reduction.

Section 5. A promotion is defined as a personnel action in which an employee is moved to a position with a higher minimum rate of pay. Employees transferred or bidding into a clas-

sification paying a higher minimum hourly rate of pay shall receive an increase of 9% or to the starting rate of the new classification, whichever is greater.

Section 6. A lateral transfer is defined as a personnel action in which an employee is moved to a position with the same minimum rate of pay as the position from which the employee was transferred.

Section 7. In order to be eligible for a pay increase, employees must have been permanent employees the following number of consecutive days:

180-190 day employee - 105 minimum days worked
191-214 day employee - 134 minimum days worked
215-224 day employee - 144 minimum days worked
225-260 day employee - 180 minimum days worked

## ARTICLE 7
## Meal Programs

Section 1. a. All full-time employees working less than eight (8) hours per day shall be granted a non-paid meal period during their work day. The required hours of work during the work day shall be exclusive of this period.

b. All employees in full-time eight (8) hour per day classifications shall be granted a non-paid meal period one-half (½) hour in length during their work day.

Section 2. All employees will be allowed a paid meal period of one-half (½) hour in length for each four (4) hours worked beyond their regular quitting time.

-8-

Section 3. If an employee works four (4) or more hours after his/her scheduled quitting time and has not had notice of such work requirement at least two (2) hours before commencement of his/her regular shift, the employer shall either furnish a meal or reimburse the employee for a meal in an amount not to exceed seven (7) dollars.

Section 4. An employee who is required to work during the meal period shall be compensated at the appropriate hourly rate for such time.

Section 5. The employer shall provide lunchroom, rest room and lounge facilities for classified employee use in each building where such facilities currently exist.

## ARTICLE 8
## Rest Periods

Section 1. Except as provided hereafter, all employees will be entitled to a fifteen (15) minute rest period during each one-half (½) shift of three (3) or more hours.

Section 2. No employee, with the exception of maintenance, painters and grounds personnel, shall be entitled to rest periods when they work outside of their normal work site.

Section 3. The regular scheduling of rest periods immediately before or after meal periods or at the beginning or ending of the work day is permissible in certain operations where the Union and Employer agree to such a practice or where the present practice is to schedule rest periods in that manner.

-9-

# ARTICLE 9
## Insurance

Section 1. The present Blue Cross and Blue Shield Program, or an equal program including health maintenance organizations mutually agreed to by the union and the Board, for employees and their dependents shall be provided.

The following provisions will be added to the plan:
- Routine Pap Testing - 12 months,
- Out-patient physical therapy and occupational therapy.
- Implement a pre certification and utilization review procedure as part of the existing indemnity program.

Effective November 1, 1997, the parties agree that a third health care option shall be instituted which shall be the Blue Cross/Blue Shield Custom Blue program. The Custom Blue program shall be 100% paid for by the employer as shall the current HMO options. Effective with the 1997-98 school year, all new employees must choose either the Custom Blue or the HMO programs. Employees hired prior to the beginning of the 1997-98 school year shall continue to have the right to three (3) health care options (Blue Cross/Blue Shield Indemnity Program, Custom Blue, and/or an HMO). Effective November 1, 1997, employees who choose to remain in the Blue Cross/Blue Shield Indemnity program shall be responsible for 10% of the cost of the monthly premiums.

Section 2. Dental, vision and prescription coverage for the 1989-90 contract year shall remain in effect for the duration of this contract for employees and their dependents.

Section 3. Group term life insurance coverage shall be maintained at the nearest thousand to the employee's salary, including base and longevity only.

Section 4. The benefits in this Article are not effective while an employee is on any leave of absence without pay, unless the premium is paid by the employee.

Section 5. Benefit Waiver. Up to twenty-five percent (25%) of the District's employees can choose to opt out of any or all of the District's benefit programs on a first-come basis. If employees elect to withdraw from any of the District's health care programs, they must notify the District by the first of May for the upcoming school year. Employees can return to the waived benefit program after one year or at the beginning of any program cycle (July 1) or immediately in the event the employee loses access to other health insurance. Employees who elect to withdraw from any benefit program shall receive twenty-five (25%) of the premium savings of the District.

# ARTICLE 10
## PAL Deductions

Section 1. The employer agrees to deduct voluntary political and legislative (PAL) contributions from the pay of those employees who individually request in writing that such deductions be made. Such written request shall specify the amount the employee is authorizing the employer to deduct. The employer shall remit the aggregate deductions of all employees authorizing such deductions together with an itemized statement to the union by the last day of the succeeding month after such deductions are made. The aforementioned itemized statement shall be titled "PAL Deductions", and shall include each employee's full name, address, social security number and the amount of the deduction.

Section 2. The employee's written authorization for PAL deductions shall be revocable at any time by the employee. An

employee desiring to cancel PAL deductions shall file a written withdrawal of authorization with the employer and the union.

Section 3. It is clearly understood by the employer and the union that an employee must be a dues paying member of the union to be eligible to authorize the PAL deductions outlined in Section 1, of this Article.

Section 4. The union shall indemnify and hold the employer harmless against any and all claims, suits, orders of judgements brought or issued against the employer as a result of action taken or not taken by the employer under the provisions of this Article.

## ARTICLE 11
## Call Time

Section 1. Any employee who has been called to work outside of his/her regular shift shall be guaranteed a minimum of four (4) hours pay. Employees receiving call time assignments shall be credited for beginning work when they arrive at the work site. There shall be no duplication of hours.

Section 2. Call time shall be paid for at whatever hourly rate is appropriate.

## ARTICLE 12
## Overtime

Section 1. Time and one-half of the employee's regular hourly rate of pay shall be paid under the following conditions:

a. For any work performed in excess of eight (8) hours in any work day, or in excess of forty (40) hours in any work week. In

the event of a mutually agreed to four-day work week during the months when school is closed, the eight (8) hour rule shall be waived.

b. Overtime shall be voluntary except where it is necessary to assign employees because of a lack of volunteers. In assigning such overtime work, it will be done in the inverse order of seniority.

c. The employer shall attempt to allocate overtime work in a way as to equalize such work among the appropriate employees during each six (6) month period of the calendar year. The employer's obligation in this regard shall not pertain to those employees who refuse overtime work when offered. Furthermore, the employee who normally performs certain work on his/her regular shift shall have the first opportunity to perform such work in an overtime capacity.

Section 2. The following items will be regarded as hours worked for the purpose of computing overtime hours.

a. Hours worked, including the rest period
b. Holidays
c. Annual Leave
d. Personal Holidays
e. Sick Leave
f. Bereavement Leave
g. Civil Leave
h. Military Leave
i. Paid Leave of Absence
j. Call Time
k. Paid Lunch Periods
l. Compensatory Leave

Section 3. Double the employee's regular hourly rate of pay shall be paid for all hours worked in excess of twelve (12) hours

in any work day or in excess of sixty (60) hours in any work week.

Section 4. There shall be no duplication of overtime pay for the same hours worked.

Section 5. By mutual agreement between the employer and employee involved, compensatory time at the appropriate rate may be granted in lieu of overtime pay.

## ARTICLE 13
## Sick Leave

Employees shall earn paid sick days on a pro-rated basis in accordance with the following schedule:

Section 1. Full-time employees shall be entitled to annual sick leave as follows:

a. Those employees who are scheduled to work less than 185 days shall receive eight (8) days annually.

b. Those employees who are scheduled to work at least 185 days, but less than 230 days shall receive ten (10) days annually.

c. Those employees who are scheduled to work 230 days or more shall receive thirteen (13) days annually.

Section 2. Unused sick leave shall be cumulative year to year in the School District.

Section 3. a. Sick leave shall be earned by full-time employees (after the probationary period) on a pro-rated basis for all time such employees are in a compensable status during the contract year.

-14-

b. For the purpose of computing earned sick leave entitlement at a given time during the contract year, said entitlement shall be rounded off to the nearest half-day.

c. All sick leave to which an employee will become entitled to during a given contract year may be used at any time during said contract year.

Section 4. At the time of termination of employment of any employee, any used but unearned sick leave shall be repaid by such employee to the employer in cash, or the employer shall be entitled to deduct such sum from the final compensation due the employee.

Section 5. A doctor's certificate is required for an absence from work due to sickness for three (3) or more consecutive work days. For an absence of less than three (3) consecutive work days, a doctor's certificate may be required for an absence where, in the opinion of the employer, the employee has been abusing his/her sick leave privileges.

Section 6. Sick leave may be taken for a one-half (1/2) day or one (1) full day. Absences for lesser periods will be unpaid leave.

Section 7. Where an employee's paid sick leave entitlement has been used, the employee may use vacation or emergency leave entitlement.

Section 8. a. Employees who retire on or after the effective date of this agreement shall be paid 35% of their accumulated unused sick leave up to a maximum of 100 days, if they retire under the conditions set forth in sub-section b.

b. Eligibility for payment of benefits under sub-section a. is as follows:

-15-

1. Superannuation retirement with at least ten (10) years credited service in the Public School Retirement System.

2. Disability retirement regardless of service, or

3. Other retirement with at least twenty-five (25) years of credited service in the Public School Retirement System.

4. In the event of the death of an employee with at least five (5) years of credited service in the Public School Retirement System, unused sick leave entitlement shall be paid to such employee's beneficiary.

c. No payments under this section shall be construed to add to the credited service of the retiring member or to the retirement covered compensation of the member.

Section 9.   Employees who work 260 days per year may use up to five (5) days of their sick leave entitlement for the illness of a family member.

Section 10.   Less than 260 day employees may use up to three (3) days of their sick leave entitlement for the illness of a family member.

Section 11.   SICK LEAVE BANK

a. All members of the bargaining unit may become members of a sick leave bank through the voluntary and irrevocable donation of one (1) day of accumulated personal sick leave each year to the sick leave bank.

Such donation and membership shall be effected by the signing of an enrollment form by each individual. Membership shall then be continuous from year to year unless the business office

-16-

and the AFSCME president are notified, otherwise within ten (10) days of the opening of classes in any successive school year.

b. The bank shall be maintained and replenished in the future by subsequent one day donations of sick leave from each member.

c. Use of days shall be determined by a Review Committee consisting of three (3) members:

one (1) from the bargaining agent,
one (1) from district administration, appointed by superintendent
one (1) appointed by the Board of School Directors

d. Requests for use of days from this bank for short-term disability shall be made in writing to the Review Committee, which may grant or refuse such requests at its discretion based on flexible criteria in each individual case and to include consideration of:

1. the nature of the illness or disability;

2. the exhaustion of regular personal sick leave by the applicant;

3. the severity of hardship imposed by possible loss of pay.

All decisions by the Review Committee are final and are not subject to the grievance process.

e. Whenever an employee uses a day from the bank, he/she shall be paid at his/her daily rate.

f. The union shall indemnify and save the District harmless against any and all claims, demands, suits or other forms of liability that shall arise out of or by reason of action or not taken by

-17-

the District in the implementation of any of the provisions of this section or in reliance on any list, notice of assignment furnished under any of such provisions.

## ARTICLE 14
## Vacation

Section 1. Full-time, twelve (12) month employees shall be eligible for paid vacation on a pro-rated basis in accordance with the following schedule:

| SERVICE REQUIREMENT: | VACATION ENTITLEMENT: |
| --- | --- |
| Upon completion of | employee shall earn |
| One (1) year service | 5 days per year |
| Over two (2) and up to five (5) years service | 10 days per year |
| Over five (5) years and up to fifteen (15) years of service | 15 days per year |
| Over fifteen (15) years and up to twenty-five (25) years of service | 20 days per year |
| Over twenty-five (25) years of service | 25 days per year |

The above eligibility requirements will be pro-rated in order to determine the amount of vacation the employee shall be entitled to during the year.

-18-

Section 2. Vacation shall be scheduled and granted for periods of time requested by the employee subject to management's responsibility to maintain efficient operations. If the nature of the work makes it necessary to limit the number of employees on vacation at the same time the employee with the greatest seniority as it relates to total years of continuous service with the employer shall be given his choice of vacation period in the event of any conflict in selection. Vacations shall be scheduled forty-eight (48) hours in advance and granted for periods of time requested.

Section 3. If a holiday occurs during the work week in which a vacation is taken by an employee, the holiday shall not be charged to annual leave.

Section 4. Employees who are required by the employer to work during their scheduled vacation period and are unable to reschedule their vacation during the contract year due to the demands of their work shall be paid for such time. The amount that the employee is paid for such a day shall be the regular rate of pay, which excludes overtime and call-time hours.

Section 5. Employees separated from the service of the employer for any reason prior to taking their vacation shall be compensated at the employee's current regular rate of pay for the unused vacation in the year of termination.

Section 6. Employees shall be required to schedule vacation during the period of entitlement except that (10) days of unused leave may be carried forward to a succeeding fiscal year.

Section 7. If an employee is required to return to work after commencement of a pre-scheduled vacation, he shall be compensated at one and one-half (1-1/2) times his regular hourly rate

-19-

of pay for all hours required to work on the pre-scheduled vacation day or days. The employee shall be permitted to reschedule such vacation day(s) in accordance with Section 2, above. If the employee is unable to reschedule the vacation during the fiscal year due to the demands of his/her work, the provisions of Section 4, above shall be applicable.

Section 8. Vacation pay shall be the employee's regular straight time daily rate of pay in effect at the time of taking vacation.

Section 9. For those unit personnel employed for less than a twelve (12) month per year basis, the vacation entitlement as set forth in this article shall not be applicable.

## ARTICLE 15
## Holidays

Section 1. The following days shall be recognized as paid holidays for full-time, twelve (12) month employees:

a. Independence Day
b. Labor Day
c. Veterans' Day
d. Thanksgiving Day
e. Day after Thanksgiving
f. Christmas Eve
g. Christmas Day
h. New Year's Eve
i. New Year's Day
j. Martin Luther King's Birthday
k. Presidents' Day
l. Employee's Birthday
m. Memorial Day

Section 2. Monday shall be recognized as a holiday for all holidays occurring on a Sunday, and Friday shall be recognized as a holiday for all holidays occurring on a Saturday. Where this system causes holidays to overlap, said holidays shall be observed on date(s) mutually recognized.

Section 3. If any employee works on any of the holidays as set forth in Section 1, of this Article, such employee shall, at the option of the employee, either be paid time and one-half (1-1/2) their regular rate of pay for all hours worked in addition to their holiday pay, or compensatory leave at the rate of time and one-half (1-1/2) all hours worked on said holiday in addition to the holiday to which the employee is entitled.

Section 4. If a holiday is observed while a full-time, twelve (12) month employee is on sick, vacation or other paid leave status, he/she will receive his/her holiday pay and the day will not be charged against sick, vacation or any other paid leave.

Section 5. A full-time, twelve (12) month employee shall be paid for any holiday listed in Section 1, of this Article, provided he/she was in regularly scheduled compensable status on the afternoon of the work day immediately prior and the morning of the work day immediately subsequent thereto.

Section 6. All full-time, other than twelve (12) month employees, will continue to observe the same holidays during the school year (September-June) as the teachers and the pupils.

## ARTICLE 16
## Personal Leave Days

Section 1. An employee shall be entitled to three (3) days per year without justification, except that at no time may there be more than 5% of staff in any one unit taking leave under this section.

Section 2. Personal leave days not used by an employee in a school year shall be converted to sick days at a ratio of one (1) personal leave day to one(1) converted sick leave day.

-20-

-21-

# ARTICLE 17
## Bereavement Leave

Section 1. Absence from duty because of a death in the immediate family or of a near relative shall be granted in accordance with the following provisions:

a. Whenever an employee shall be absent from duty because of a death in the immediate family of said employee, there shall be no deduction in salary of said employee for an absence not in excess of five (5) school days in conjunction with (immediately following) the death and/or funeral. The Board of School Directors may extend the period of absence, with pay, at its discretion as the exigencies of the case may warrant. Members of the immediate family shall be defined as father, mother, brother, sister, son, daughter, husband, wife, parent-in-law, grandchild and grandparent. This also applies to a near relative or immediate step relative who resides in the same household or any person with whom the employee has made his/her home.

b. Whenever an employee is absent because of the death of a near relative, there shall be no deduction in the salary of said employee for absence on the day of the funeral. The Board of School Directors may extend the period of absence, with pay, at its discretion as the exigencies of the case may warrant. A near relative shall be defined as first cousin, aunt, uncle, niece, nephew, brother-in-law, sister-in-law, son-in-law and daughter-in-law.

# ARTICLE 18
## Leaves of Absence

Section 1. ALL LEAVES

a. All requests for leave under this section must be submitted

in writing to the employee's immediate supervisor or department head and shall be answered in writing within three (3) working days. Requests for leaves under this section shall be answered before the end of the shift on which the request is made.

b. Employees who apply for and receive a leave of absence without pay at the end of such leave will be entitled to return to a position in their same classification or to a position in a comparable classification with an equivalent rate of pay. The employee shall retain all accrued benefits earned, but not used prior to taking such leave.

c. Fringe benefits and service credit shall continue to accrue during paid leaves of absence, but shall not accrue during unpaid leaves of absence. However, employees shall be entitled upon their return from leave of absence without pay to all fringe benefits and service credits earned up to the date the leave commenced.

d. The provisions of subsections a, b and c of this Section shall apply to all leave outlined in this Article, except where said provisions are specifically modified by other sections of this Article.

Section 2. CHILDBIRTH LEAVE

a. All permanent employees who become pregnant or whose spouse becomes pregnant and/or adopts an infant shall be granted leave in accordance with the Family and Medical Leave Act of 1993 (FMLA).

b. Requests for childbirth leave shall be granted for a period of up to six (6) months, and may be renewed for an additional six (6) months by submission of another written request.

c. An employee who is on childbirth leave is entitled to use all accrued sick, vacation and emergency leave during such childbirth leave. All other periods of childbirth leave shall be leave without pay.

Section 3. CIVIL LEAVE Employees called for jury duty or subpoenaed as a witness (not a party) to attend court shall be granted leave with pay while attending court. In addition, an employee subpoenaed to testify by any government entity possessing subpoena powers shall be granted leave with pay while honoring said subpoena. Evidence of such duty in the form of a subpoena or other written notification shall be presented to the employee's immediate supervisor as far in advance as practical. In addition, the employee shall be required to reimburse the District any witness or jury fees received by the employee.

Section 4. EDUCATION LEAVE    After completing five (5) years of service, an employee may be granted a leave of absence without pay at the sole discretion of the employer for the employee's educational purposes. Such leave shall not exceed two (2) years and shall not be granted more than once every four (4) years.

Employees shall receive tuition reimbursement for up to six (6) credits per fiscal year at the appropriate level of assignment, with prior approval by management.

Section 5. MEDICAL LEAVE Employees who have completed their probationary period shall be entitled to an unpaid medical leave of absence. A written request for such leave is required in all instances. Proof of illness in the form of a doctor's certificate shall be required, which includes a prognosis and expected date of return. The request for leave may be granted for a period of up to six (6) months, and may be renewed by the submission of additional written request in accordance with this

-24-

Section for each period of six (6) months thereafter; provided the total length of such leave does not exceed two (2) years.

Section 6. MILITARY LEAVE Employees who are members of the Pennsylvania National Guard/Reserves are entitled to leave with pay up to fifteen (15) calendar days during which they shall, as members of the National Guard/Reserves, be engaged in the active service of the Commonwealth or in authorized field training consistent with the School Code of 1949 or Federal Forces, provided such active service does not occur during the period of the year when the employee is not in compensable status.

Section 7. OFFICIAL MEETINGS Attendance at official meetings, during an employees regular scheduled work hours, including grievance under contract, labor/management and negotiations between the employer and the union shall be considered as time on duty and paid for such. Employees shall notify their supervisor or designee before leaving the job to attend such functions. Said meeting must be a mutually scheduled meeting.

Section 8. UNION BUSINESS LEAVE The Executive Board and the Officers, not to exceed seven (7) members, shall be provided two (2) days per year with pay for union delegates or representatives to attend conventions and educational workshops. If the employer is notified in writing at least one (1) week in advance, such leave shall be scheduled and granted for periods of time requested by the union, subject to management's responsibility to maintain efficient operations.

## ARTICLE 19
### Classification/Reclassification

Section 1. If an employee temporarily performs the normal duties and functions in the position of a person in a higher clas-

-25-

sification, he/she shall be paid an amount equal to the difference in the minimum hourly rate of pay of his/her classification and the minimum hourly rate of pay of the higher classification after performing duties in the higher classification. Differential will begin with the first full day of performing the duties in the higher classification.

Section 2. If the employer assigns an employee on a temporary basis to a lower classification, or if an employee performs some duties and functions assigned to a lower classification, the person so assigned shall not be reduced in compensation because of such assignment.

Section 3. The employer shall notify the union prior to establishing any new jobs or classifications which would be covered by the certification of the Pennsylvania Labor Relations Board. The employer agrees to meet with the union and negotiate any new classifications and the rate of pay applicable to them.

Section 4. The employer and the union shall meet during the length of this agreement, upon request of either party, to negotiate a procedure to identify and accommodate reclassifications, and/or promotions.

## ARTICLE 20
## Seniority

Section 1. For the purpose of this agreement, the term "seniority" means a preferred position for a specific purpose which one full-time employee may have over another full-time employee because of a greater length of continuous service.

Section 2. The following shall constitute a break in continuous service: resignation, separation for just cause, retirement,

-26-

absence without leave for five (5) days, failure to report within three (3) days of recall, failure to report to job after leave, and acceptance of other permanent employment while on leave. If continuous service is broken by any of the above, the employee shall lose seniority credits. This shall not restrict the employer's right to take whatever personnel action it deems warranted for any of the above, subject, however, to the grievance procedure. If an employee is returned within one (1) year of such break in service, the employee shall be entitled to credit, for seniority purposes, for the time accrued up to the time the break in service occurred, but shall not be entitled to any credit for the time represented by such break in service.

Section 3. Seniority lists shall be prepared for full-time employees for each job classification and revised, where necessary, every twelve (12) months. Such lists shall be posted on the appropriate bulletin boards and a copy provided to the local president.

Section 4. The employer agrees to post at appropriate work locations unit vacancies that are to be filled. Said postings shall be done at least five (5) working days prior to the filling of such vacancies. The posted notice shall include the salary for the position. A copy of the notice shall be given to the president of the union. If the employer decides not to fill the posted vacancy, the employer agrees to meet and discuss with the union the reason for its decision.

Section 5. Layoffs or furloughs of full-time employees shall be made in inverse order of seniority within the job classification affected by the layoff/furlough. If the affected employees previously worked in another job classification within the unit, the employee shall be entitled to bump back into the job classification previously held, if the affected employee's seniority status exceeds the seniority status of any employee in the prior job classification.

-27-

If an affected employee is unable to bump into a previously held position, he/she may bump into any equal or lower paying job classification in the District, provided he/she has the ability to perform the job, and he/she has seniority status in excess of an employee within the affected classification. Except for previously held positions, the determination of qualifications shall not be grieved. However, if a vacancy occurs in an affected employee's previously held classification, said employee shall be able to exercise recall rights to such vacancy according to seniority.

Section 6. The employer shall establish a preference list for those full-time employees who have been furloughed or laid off under the provisions of this Article in inverse order of such layoff/furlough. This list shall remain in effect for a period of one (1) year and shall be used in order of seniority to fill vacancies within a classification from which the persons on the preference list may have been furloughed or laid off. In the event a person refuses an offer of a position under this Section, that person shall be removed from the list.

Section 7. When a vacancy in a position occurs and the position is posted in accordance with Section 4 of this Article, any employee in the bargaining unit may bid for such job vacancy provided they have passed their initial probationary period. However, preference in hiring will be given to employees within the same or a lower classification bids as the vacancy, provided the employee meets the minimum qualifications of the classification. If no such employee meets the minimum qualifications, then the most senior qualified employee based on total School District service who bids on the job and has the ability will be awarded the job. If there are no employees as described above who bid on the job and are qualified, then the employer may fill the vacancy by hiring outside of the bargaining unit. The employee may be given a thirty (30) work

-28-

day trial period in order to be evaluated on their ability to do the job. If it is determined during this period the employee is unable to perform the duties of the position, he/she will be returned to his/her old position or one with similar duties and pay.

Section 8. Except for employees assigned the vehicles for special education and physically handicapped children, bus drivers shall be permitted to bid for runs prior to each school year. In the event of duplication of bids for the same run, preference shall be granted on a seniority basis. The employer is not restricted from altering routes during the school year.

Section 9. For the purpose of furlough, the seven (7) officers of the local union shall have super-seniority. The union shall notify the employer of the names of the individual employees who are entitled to super-seniority under this Section. The employer is entitled to rely upon the last notification from the union received prior to issuing any furlough notices.

Section 10. When the employer deems it necessary to transfer any employee to a different classification, the employer shall meet and discuss said transfer with the union. Transfers of bargaining unit employees shall only be made by the School Board, or by the Superintendent, where authorized by the School Board.

Section 11. All employees shall serve a forty-give (45) work day probationary period. During such probationary period, the employee shall not have access to the grievance procedure of this contract. Upon completion of the probationary period, employees will be credited with seniority retroactive to their date of hire.

-29-

## ARTICLE 21
## Non-Discrimination

Both the employer and the union agree not to discriminate against any employee on the basis of race, creed, color, age, sex, national origin, union membership, political affiliation, residency, marital status, sexual preference, orientation, non-job related handicap, or job classification.

## ARTICLE 22
## Discipline

Section 1. The employer shall not demote, suspend, discharge or take any disciplinary action against any employee without just cause. An employee may appeal any disciplinary action beginning at the second step of the grievance procedure. The union shall be notified in writing of any disciplinary action taken by the employer within five (5) days of its occurrence. A copy of any disciplinary letters will be sent to the union.

Section 2. All disciplinary action instituted by the employer shall be implemented within a reasonable period of time after the event giving rise to such disciplinary action.

Section 3. When it is necessary to implement disciplinary action, the employer agrees to discipline employees in an appropriate manner for all related infractions.

Section 4. The employer will attempt to discipline employees in such a manner so as not to embarrass the employee before the public or other employees. It must be kept in mind, however, that when insubordination or flouting of authority by an employee in public and in the presence of other employees takes place, the employer shall not be restricted by the operation of this

-30-

Section. Disciplinary action and personnel matters shall be confidential, and shall not be discussed at public gatherings or in the presence of students, parents or teachers.

Section 5. In the event an employee is intimidated, harassed or interfered with during the performance of his/her professional duties, by a parent, student, or other person(s), the Board shall investigate the matter and take such corrective action as it deems appropriate. The result of any investigation or action taken, if any, shall be treated on a case by case basis, and the determination in one case shall not be deemed precedent for any other. The Board's existing complaint procedures shall apply to this Section.

## ARTICLE 23
## Successors

This agreement shall be binding upon the parties hereof, and the heirs, executors, administrators, successors and assigns of each.

## ARTICLE 24
## Severability

If any provisions of this agreement or the application thereof to any person or circumstance is held invalid, the remainder of this agreement or the application of any such provision to any other person or circumstance shall not be affected thereby, and the provisions of this agreement are hereby declared to be severable.

## ARTICLE 25
## Union Business

Section 1. The employer agrees to provide space on bulletin boards to the union for the announcement of meetings, election

-31-

officers of the union and any other material related to union business. Furthermore, the union shall not post material detrimental to the labor-management relationship nor of a political or controversial nature. The union may send mail or interoffice correspondence related to union business to local official union representatives at appropriate facilities to which mail or interoffice correspondence is delivered.

Section 2. The union shall be allowed the reasonable use of School District buildings for meetings before or after school hours provided such meetings are held during scheduled hours of custodial service and do not interfere with scheduled programs. Employees shall not attend such meetings during their working hours. Arrangements for such meetings shall be made with the Secretary of the Board. The use of the Board Room for such meetings shall be at the sole discretion of the employer.

## ARTICLE 26
## Retirement Bonus and Benefits

Section 1. MONETARY PAYMENT Any full-time employee covered by this contract who is 55 years of age or older and who has fifteen (15) years or more of total service with the Harrisburg City School District, shall be entitled to twenty (20) percent of their highest salary with the District, upon retirement from the District. One-half of the total payment shall be made on October 15 of the school year following retirement, and one-half of the total payment shall be made on the following February 15.

Section 2. HEALTH BENEFITS The District shall pay until the recipient reaches age 65, the following health care benefits:

a. Enrollment in a recognized health maintenance organiza-

tion (HMO) of the employee's choice, or the District's medical insurance, whichever is less costly.

b. Prescription drug expense benefits, as provided employees covered by this contract.

Section 3. ADMINISTRATION

a. No more than ten (10) employees may receive a retirement bonus in any one fiscal year.

b. Eligibility for this retirement bonus shall be determined at the conclusion of the fiscal year by ranking according to seniority in the School District, those employees who have retired during the fiscal year and selecting the ten (10) most senior.

c. No retired employee who has received a retirement bonus, except as a substitute, may be rehired by the School District, unless they pay back in full the retirement bonus. Such employees shall be eligible for the retirement bonus if they retire a second time.

The insurance provided herein shall not apply to any employee who retired before August 1, 1997.

## ARTICLE 27
## Travel Expenses

Section 1. Employees who are required by the employer to use their personal vehicle for the business of the employer shall be granted an allowance at the rate currently approved by the Board. An employee who is required to be on overnight travel status shall be reimbursed in accordance with the Board Policy. The employee shall provide detailed proof of such expenditures to the employer.

Section 2. The amounts set forth in Section 1. will be increased in amount at the time when travel expenses for other employees in the District are increased.

Section 3. Employees in the maintenance department shall not be required to use their personal vehicles for transportation during the work day. Employees, however, may agree to the use of their vehicles. Employees may be required to report directly to work sites at the beginning of the work day rather then the present reporting location.

## ARTICLE 28
## Work Related Injuries/Accidents

Section 1. WORKERS' COMPENSATION   All employees of the Harrisburg School District in compensable status are eligible for Pennsylvania Workers' Compensation.

a. For a period of up to thirty (30) work days, an employee shall not lose any sick leave days, emergency leave days, benefits or salary as a result of being absent from work due to an injury received from an assault during the time said employee is acting in the performance of his/her duties or if the assault arises from the performance of his/her duties. The foregoing thirty (30) work day entitlement shall only be used if the employee is unable to report to work and shall not continue after the point in time the employee recovers from his/her assault-related injury. In cases of a work-related accident unrelated to an assault, an employee shall be entitled to up to fifteen (15) work days of pay and benefits without a reduction of sick or emergency or vacation leave, provided that such leave shall not continue after the point in time the employee recovers from his/her work-related injury. In the event that an employee's workers' compensation claim is denied a deduction of sick and/or emergency and/or

vacation leave to compensate for the fifteen (15) days or a portion thereof shall be made.

b. On the thirty-first (31) or sixteenth (16) work day following a compensable injury, an employee's sick leave shall be reduced by one-third (1/3) of a sick leave day for each work day the employee is absent and receives workers' compensation payments and supplemental payments from the District. Coincident with receipt of workers' compensation benefits, the District agrees to pay the difference between the amount payable under the Workers' Compensation Act and the employee's take-home pay. This "supplemental benefit" is to be paid directly to the injured employee. The employee shall be paid full pay reduced by the amount that yields a net pay including workers' compensation that is equal to the employee's net pay. Net pay is defined as the gross base pay minus the federal, state and local taxes, social security and retirement contributions.

c. Once an employee exhausts his/her sick leave in accordance with paragraph (b) herein, the District shall not have any further salary obligation, except in cases of medical leave, to the employee.

d. The District shall pay an employee's health care and other insurance premiums as if he/she were reporting to work for the entire period of disability or until the employee's sick or medical leave is exhausted, whichever is later.

e. An employee shall be entitled to maintain his/her employment status with the District while receiving workers' compensation payments for a period of two (2) years or until such employee's sick leave and/or medical leave is exhausted whichever is later. A second medical leave only will be considered when medical evidence obtained by the District strongly suggests that the employee can return to active service following

the second medical leave. The Board's decision regarding the award of a second medical leave shall be discretionary, non-precedential, final and binding. The employee shall be entitled to receive his/her medical leave salary and benefit payments and workers' compensation. At the end of two (2) years, or upon the exhaustion of an employee's sick leave and medical leave, if the employee is unable to return to work, his/her employment with the District shall be severed.

## ARTICLE 29
## Uniforms

Section 1. The employer shall provide coveralls for employees who are regularly assigned as trash collectors, painters, custodians, maintenance helpers and groundsmen. New employees will be provided with two (2) sets of coveralls. Coveralls shall be replaced as needed by the employer after one (1) year of service, provided the employer shall not be required to provide more than two (2) sets of coveralls for any employee in any contract year. The employees furnished with such coveralls shall be responsible for their maintenance and cleaning. Employees who have received two (2) sets of coveralls and replacements, as needed, shall return two (2) sets of coveralls to the employer at the time of termination.

Section 2. Cafeteria helpers will be provided with two (2) uniforms each contract year. The employees furnished with such uniforms shall be responsible for their maintenance and cleaning. The School District will pay for cleaning once a month.

Section 3. Lunch Aides will be provided with smocks which are to be used during the work day. The employer will continue the present practice of providing uniforms and jackets for truck drivers in the cafeteria department.

Section 4. The employer will provide jackets for bus drivers, bus monitors and hall monitors. The employees furnished with such jackets shall be responsible for their maintenance and cleaning. Jackets shall be replaced as needed by the employer, provided that the employer shall not be required to provide more than one (1) jacket for any employee in any contract year.

## ARTICLE 30
## Grievance and Arbitration Procedure

Section 1. The parties hereto agree that an orderly and expeditious resolution of grievance arriving out of the applications and interpretation of the terms of this agreement shall be provided for in accordance with the following process:

STEP 1 An employee, either alone or accompanied by a union representative, or the union where entitled, shall present the grievance in writing to his/her department head within twelve (12) work days of the date of its occurrence, or knowledge of its occurrence. The department head shall attempt to resolve the matter and report his/her decision to the Union, in writing, within ten (10) work days of its presentation.

STEP 2 In the event the grievance is not settled at STEP 1, any appeal must be presented in writing by the employee or his/her union representative to the Superintendent within ten (10) work days after the department head's response is due under STEP 1. The Superintendent or his/her designee shall respond in writing to the employee and the union representative within ten (10) work days after receipt of the appeal.

STEP 3 Any appeal from an unfavorable decision at STEP 2 shall be initiated by the union serving upon the employer a notice in writing of its intent to appeal the decision to the Harrisburg

School Board. Upon receipt of such appeal, the School Board shall respond in writing within ten (10) days after their next regularly scheduled meeting.

STEP 4 Any appeal from an unfavorable decision at STEP 3 shall be initiated by the union serving upon the employer a notice in writing of its intent to proceed to arbitration within ten (10) work days after receipt of the STEP 3 decision is due. Said notice shall include a copy of the grievance.

The arbitrator is to be selected by the parties jointly within ten (10) work days after the notice has been given. If the parties fail to agree on an arbitrator, either party may request the Bureau of Mediation to submit a list of seven (7) possible arbitrators.

The parties shall, within ten (10) work days of receipt of said list, meet for the purpose of selecting the arbitrator by alternately striking one name from the list until one name remains. The employer shall strike the first name.

Each case shall be considered on its own merits and the collective agreement shall constitute the basis upon which decision shall be rendered. The decisions at STEPS 1, 2 and 3 shall not be used as a precedent for any subsequent case. The arbitrator shall neither add to, subtract from, nor modify the provisions of this agreement. The arbitrator shall be confined to the precise issue submitted for arbitration and shall have no authority to determine any other issues not so submitted.

The decision of the arbitrator shall be final and binding on both parties, except where the decision would require an enactment of legislation, in which case it shall be binding only if such legislation in enacted. The arbitrator shall be requested to issue his decision within thirty (30) days after the hearing or receipt of the transcript of the hearing.

-38-

All of the time limits contained in this section may be extended by mutual agreement.

All fees and expenses of the arbitrator shall be divided equally between the parties. Each party shall bear the costs of preparing and presenting its own case. Either party desiring a record of the proceedings shall pay for the record and make a copy available without charge to the arbitrator.

Section 2. Where the parties agree to a meeting during working hours to discuss a grievance at any step, an employee shall be permitted to have a representative of the union present, subject, however, to Section 606, Article VI, of the Public Employees Relations Act. The aggrieved employee and union representative, if an employee, shall suffer no loss of pay or leave time if such meeting is held during working hours.

Employees selected by the union to act as union representative shall be known as stewards. The union shall furnish the employer with the names and work locations of grievance representatives and shall notify the employer of any changes.

An aggrieved employee and union representative, if employees of the employer, shall be granted reasonable time during working hours to process grievances in accordance with this Article without loss of pay or leave time.

A reasonable number of witnesses, when required, shall be allowed to participate in the grievance procedure.

-39-

# ARTICLE 31
## Management Rights

Section 1. It is understood and agreed that the employer, at its sole discretion, possesses the right, in accordance with applicable laws, to manage all operations including the direction of the working force and right to plan, direct and control the operation of all equipment and other property of the employer, except as modified by the agreement.

Matters of inherent managerial policy are reserved exclusively to the employer. These include, but shall not be limited to, such areas of discretion or policy as the functions and programs of the employer, standards of service, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel.

Section 2. The listing of specific rights in the agreement is not intended to be, nor should be considered restrictive or a waiver of any of the rights of management not listed and not specifically surrendered herein, whether or not such rights have been exercised by the employer in the past provided such rights do not violate provisions of the labor agreement.

# ARTICLE 32
## Miscellaneous Provisions

Section 1. The employer agrees that it will not contract out any bargaining unit work that would result in the layoff of any regular bargaining unit employee.

Section 2. Employees and/or their union representative shall be accompanied by the employee shall be entitled to see the contents of their personnel file (except confidential information such

-40-

as letter of recommendation) and shall be entitled to insert into the personnel file written comments concerning any material contained therein. All personnel files shall be kept in the Personnel Office in the Administration Building.

Section 3. It shall be the duty of the employer to remedy all unsafe or unhealthy conditions within a reasonable time after notification by the union of the existence of such conditions.

Section 4. A copy of all Board Reports shall be given to the union president, and a copy sent to AFSCME District Council 90's representative.

Section 5. Committees composed of representatives of the union and the employer are to be established to discuss labor management problems that may arise. Any such labor management meetings held during the employees work day shall not result in the loss of any pay by the employee as a result of attending such meetings.

Section 6. The Board shall continue present practice in regard to benefits for part-time employees.

Section 7. Beginning with the first day, any employee who at the request of the employer performs the work of a supervisor on a temporary basis, will receive the minimum salary of said supervisor or fifty (50) cents an hour over and above their regular rate of pay for all hours worked as a supervisor, whichever is greater.

Section 8. All departments of the employer will establish a standardized procedure for late reporting. This procedure will be posted on all departmental bulletin boards.

Section 9. All affected employees will be provided a "reasonable assurance letter" prior to the end of the school year

-41-

whether or not they will be returning to their jobs at the beginning of the new school year.

Section 10.   The employer agrees that if an emergency day is declared by the employer resulting in the closing of the entire District including the Administration Building, then those employees, who because of the nature of their work are required to work on said day, will be given compensatory time off at the option of the employer.

The Union and the School District agree to establish a policy regarding provisions for all employees in the event of school closings.

Section 11.   Employee benefits and working conditions now existing and not in conflict with agreement shall remain in full force and effect.

Section 12.   The employer shall provide all maintenance, grounds, commissary, truck drivers and utility person employees with steel toes safety shoes, and shall replace said shoes as needed. The employer shall not be obligated to supply more the one (1) pair of shoes per employee per contract year, except the grounds crew shall receive two (2) pair of shoes.

Section 13.   Early dismissals given on Thanksgiving and Christmas holidays to other School District employees shall also be given to bargaining unit employees.  Employees required to remain on duty by management shall be given compensatory time.

# ARTICLE 33
## Termination

This agreement shall be affective as of July 1, 1997, and shall continue in full force and effect up to and including June 30, 2001. It shall automatically be renewed from year to year, thereafter, unless the union notifies the employer in writing by such time as would permit the parties to comply with the collective bargaining schedule established under the Public Employee Relations Act.

Intending to be legally bound, the parties hereto have hereunto set their hands and seals this  30th  day of April, 1998.

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 90

THE SCHOOL BOARD OF THE SCHOOL DISTRICT OF THE CITY OF HARRISBURG



AFSCME Council 90
Attest

School Board President
Attest   4-30-98

## MEMORANDUM OF UNDERSTANDING

From July 1 to July 31, 1997, the District will provide special retirement bonus and benefits pursuant to ARTICLE 26 of this Agreement as follows:

1. The same level of benefits provided in Article 26, with the exception that the negotiated insurance benefits effective July 1, 1997 shall be provided to the employee.

2. There shall be no cap on the number of employees eligible for this special ERIP for the above stated period.

3. There shall be no cap on the number of employees eligible for the regular ERIP pursuant to Article 26 pursuant to the above stated time period. After July 31, 1997 the cap of ten (10) as provided in Article 26, Section 3(2), shall apply.

4. Eligibility requirements shall be 50 years of age and 25 years of services to the District.

5. This Agreement shall not constitute a past practice nor shall it be construed as a past practice or subject to the arbitration procedure provided herein.

6. This Agreement shall expire and terminate at midnight August 1, 1997.

## MEMORANDUM OF UNDERSTANDING

In consideration of the Agreement by an between Harrisburg City School District and AFSCME Council 90, regarding the contracting out of transportation services pursuant to Article 32, Section 1, the parties hereby agree that:

1. The District shall guarantee placement of four (4) full time employment positions for transportation employees on seniority basis.

2. Effective July 1, 1997, full time employees shall have recall rights based upon seniority for three (3) years for vacancies in the District if the employee meets the minimum qualifications.

3. Effective July 1, 1997, part time employees shall have recall rights for eighteen (18) months for vacancies in the District if they meet the minimum qualifications.

4. If not reasonably related to the vacant position prior experience shall not be a requirement for eligibility.

5. This Agreement shall not constitute a past practice, nor shall it be construed as a past practice.

6. This Agreement shall expire and terminate at midnight July 1, 2000.

**HARRISBURG SCHOOL DISTRICT**
**EXHIBIT A**
**STARTING SALARIES FOR CLASSIFIED POSITIONS**
**LISTED BY SALARY CATEGORY**

| Category | Job Title | Starting Salary | Hours | Days Per Year |
|---|---|---|---|---|
| Category I | Substitute Lunch Aide | 6.00 per hour | 2.5/4.0/5.0/8.0 | On call as needed |
| Category I | Lunch Aide | 6.00 per hour | 2.5/4.0/5.0/8.0 | 184 |
| Category I | Lunch Aide | 6.00 per hour | 2.5/4.0/5.0/8.0 | 184 |
| Category II | Hall Monitor | $6.25 per hour | 8.0 | 184 |
| Category II | Cafeteria Helper I | $6.25 per hour | 4.0 | 184 |
| Category II | Cafeteria Helper II | $6.25 per hour | 8.0 | 184 |
| Category III | Lunch Aide Leader | $6.50 per hour | 5.0 | 184 |
| Category IV | Courier/Mail Clerk | $7.00 per hour | 7.5 | 260 |
| Category IV | Instructional Aide | $7.00 per hour | 7.5 | 184 |
| Category IV | ESL Aide | $7.00 per hour | 7.5 | 184 |
| Category V | Assistant Cafeteria Manager | $7.25 per hour | 8.0 | 204 |

**HARRISBURG SCHOOL DISTRICT**
**EXHIBIT A**
**STARTING SALARIES FOR CLASSIFIED POSITIONS**
**LISTED BY SALARY CATEGORY**

| Category | Job Title | Starting Salary | Hours | Days Per Year |
|---|---|---|---|---|
| Category VI | Substitute Custodian | $7.50 per hour | 8.0 | On call as needed |
| Category VI | *Facility Service Worker I | $7.50 per hour | 8.0 | 260 |
| Category VI | Clerk-Typist I | $7.50 per hour | 7.5/8.0 | 214/260 |
| Category VII | Special Education Aide | $7.75 per hour | 7.5 | 184 |
| Category VII | Parent Coordinator | $7.75 per hour | 7.5 | 260 |
| Category VIII | Community Liaison Worker | $8.00 per hour | 8.0 | 260 |
| Category VIII | Warehouse Person | $8.00 per hour | 7.5 | 260 |
| Category VIII | *Facility Service Leader | $8.00 per hour | 8.0 | 260 |
| Category VIII | Reprographic Specialist | $8.00 per hour | 8.0 | 260 |

**HARRISBURG SCHOOL DISTRICT**
**EXHIBIT A**
**STARTING SALARIES FOR CLASSIFIED POSITIONS**
**LISTED BY SALARY CATEGORY**

| Category | Job Title | Starting Salary | Hours | Days Per Year |
|----------|-----------|-----------------|-------|---------------|
| Category IX | Clerk-Typist II | $8.50 per hour | 7.5 | 214/260 |
| Category IX | Library Aide | $8.50 per hour | 7.5 | 184 |
| Category IX | *Facility Service Worker II | $8.50 per hour | 8.0 | 260 |
| Category IX | Cafeteria Manager | $8.50 per hour | 8.0 | 204 |
| Category IX | Production Manager | $8.50 per hour | 8.0 | 260 |
| Category X | Facility Service Driver | $8.75 per hour | 8.0 | 260 |
| Category X | Stenographer | $8.75 per hour | 7.5 | 260 |
| Category X | Warehouse Person Driver | $8.75 per hour | 8.0 | 260 |
| Category X | Truck Driver | $8.75 per hour | 8.0 | 260 |
| Category XI | Substitute Secretary | $9.75 per hour | | |
| Category XI | Secretary | $9.75 per hour | 7.5 | 214/260 |
| Category XI | School Secretary | $9.75 per hour | 7.5 | 214/260 |

-48-

**HARRISBURG SCHOOL DISTRICT**
**EXHIBIT A**
**STARTING SALARIES FOR CLASSIFIED POSITIONS**
**LISTED BY SALARY CATEGORY**

| Category | Job Title | Starting Salary | Hours | Days Per Year |
|----------|-----------|-----------------|-------|---------------|
| Category XII | *Facility Service Worker III | $9.50 per hour | 8.0 | 260 |
| Category XII | *FacilityService Foreman 1A | $9.50 per hour | 8.0 | 260 |
| Category XIII | Campus Security | $9.75 per hour | 7.5 | 184 |
| Category XIII | Health Aide | $9.75 per hour | 7.5 | 184 |
| Category XIV | *Facility Service Foreman 1B | $10.00 per hour | 8.0 | 260 |
| Category XIV | Junior Accountant | $10.00 per hour | 7.5 | 260 |
| Category XV | PC Support Specialist | $10.50 per hour | 7.5 | 260 |
| Category XVI | *Facility Service Foreman II | $10.75 per hour | 8.0 | 260 |

-49-

-50-

## HARRISBURG SCHOOL DISTRICT
## EXHIBIT A
## STARTING SALARIES FOR CLASSIFIED POSITIONS
## LISTED BY SALARY CATEGORY

| Category | Job Title | Starting Salary | Hours | Days Per Year |
|---|---|---|---|---|
| Category XVII | *Facility Service Foreman III | $12.00 per hour | 8.0 | 260 |
| Category XVIII | Unix Operator | $12.25 per hour | 7.5 | 260 |
| Category IX | *Facility  Service Foreman IV | $12.50 per hour | 8.0 | 260 |
| Category XX | Accountant | $14.50 per hour | 7.5 | 260 |

| | |
|---|---|
| *Facility Service Worker I | formerly Custodian |
| Facility Service Leader | formerly Custodian Leader |
| Facility Service Worker II | formerly Groundskeeper/Painter |
| Facility Service Worker III | formerly Maintenance Mechanic/Fireman |
| Facility Service Foreman 1A | formerly Head Custodian Minor |
| Facility Service Foreman 1B | formerly Head Custodian Major |
| Facility Service Foreman II | formerly Grounds/Painter Foreman |
| Facility Service Foreman III | formerly Head Maintenance/Fireman  Foreman |
| Facility Service Worker IV | formerly HVAC Mechanic |

# KNOW YOUR RIGHTS AND USE THEM

Under your AFSCME contract and federal law, you are guaranteed certain rights to union representation. Know them. Use them.

1. You have a right to union representation, not a specific union representative, at any meeting with management which could possibly result in disciplinary action against you.

2. Whenever you are called to a meeting with management, explicitly ask about the specific nature of the meeting.

3. Before beginning the meeting, or at any time you believe the meeting is covering areas that might result in discipline, you must explicitly ask for union representation.

4. Prior to proceeding with the meeting, confer with your union representative and discuss the matters at issue in the meeting.

5. If you have any questions, ask your union representative.

# EXHIBIT - 9

**Position Guide**

**TITLE:**          **Facility Service Foreman 1A** (formerly Head Custodian I-Minor)

**REPORTS TO:**     School Principal

**JOB GOAL:**       Maintain the physical school plant and grounds in a condition of
operating excellence so that full educational use may be made at
all times.

**WORK ENVIRONMENT:** Works inside and outside the building, sometimes in
uncomfortably warm, cold or inclement weather.

**PHYSICAL DEMANDS:**

1. Constant bending, lifting, pushing, pulling and reaching necessary.
2. Walking for extended/limited periods of time.
3. Climbing ladders.

**MINOR SCHOOLS:**     Baton-Felton Academy
Downey Elementary School
Foose Elementary School
Lincoln Elementary School
Marshall Elementary School
Melrose Elementary School
Riverside – Math/Science Academy
Shimmell Elementary School
Steele Elementary School
Woodward Elementary School

**ESSENTIAL JOB FUNCTIONS:**

1. Keeps buildings and premises, including sidewalks, driveways and play areas neat and
clean at all times.
2. Plans and oversees all maintenance and repair work, maintenance of a high standard of
safety, cleanliness and efficiency.
3. Assigns, schedule, evaluates and trains members of the facility staff.
4. Scrubs, hoses and disinfects toilet floors daily and cleans all sanitary fixtures and
drinking fountains daily.
5. Shovels snow from walks, doorways, entranceways and steps and spreads ice melting
materials and can operate snow removal equipment.
6. Monitors the time recorders of all custodial employees in the school and certifies them
for salary payment.
7. Maintains an inventory, recommends purchase and orders of suitable supplies, tools, and
equipment.
8. Opens and closes school and raises and lowers flags.
9. Checks on work of shift crews.
10. Checks fire extinguishers, and emergency generators weekly.

**EXHIBIT**

Hazzard - 9

faL    10-19-01



Page 2
Position Guide
Facility Service Foreman 1A

## ESSENTIAL JOB FUNCTIONS (Cont'd):

11. Washes all windows inside and out.
12. Keeps all floors in a clean, attractive condition and in a good state of preservation.
13. Moves heavy boxes to storage areas, i.e., books, supplies, etc.
14. Checks roof areas for debris and removes when necessary.
15. Uses low and high ladder as required.
16. Assumes responsibilities for all employees on this shift, i.e., their cleaning habits, giving additional instructions when needed and resolving problems necessary.
17. May work days, evenings and weekends.
18. Performs other duties as assigned.

**Also, since Head Custodians are first line supervisors, they shall perform the following duties:**

1. Implement school district policies in the area of assigned work.
2. Schedule work for assigned personnel and ensure that work is accomplished in a satisfactory manner.
3. Evaluate personnel assigned to them according to school district policies.
4. Implement changes needed to improve employee performance.
5. Institute disciplinary measures where needed to improve job performance for assigned personnel.
6. Participate, upon request, in the screening and interviewing of employees for hiring and promotion.
7. Participate in the process of terminating employees when necessary.
8. Perform other duties customary of first line supervisors,

**OTHER JOB FUNCTIONS:** Other duties that fall within the framework of this general guideline as may be assigned.

## MINIMUM QUALIFICATIONS:

1. High School Diploma or GED.
2. Five (5) years' experience as a school custodian or the equivalent in custodial service in other institution or firms.
3. Demonstrates knowledge in the basic techniques of electrical repair and maintenance.
4. Physically able to perform essential functions of job.
5. Satisfactory work record.
6. Criminal history/child abuse clearances (Acts 34 and 151).

## TERMS OF EMPLOYMENT:

Salary according to current AFSCME Basic Labor Agreement.
260 day work year – 8.0 hours per day.

REVISED: JULY, 1998
FSVFMN1A.DOC/LDF/dgt

**EXHIBIT - 10**



EXHIBIT
*Hazzard - 10*
*Jch.*      10-19-01

Position Guide

**TITLE:**                    Facility Service Foreman 1B (formerly Head Custodian I-Major)

**REPORTS TO:**               Manager of School Facilities and School Principal

**JOB GOAL:**                 To maintain the physical school plant and grounds in a condition
                              of operating excellence so that full educational use may be made
                              at all times.

**WORK ENVIRONMENT:** Works inside and outside the building, sometimes in
                      uncomfortably warm, cold or inclement weather.

**PHYSICAL DEMANDS:**

1.  Constant bending and reaching necessary.
2.  Walking for extended/limited periods of time.

**MAJOR SCHOOLS:**        Administration Building/Ben Franklin Academic Prep School
                          Camp Curtin Early Childhood Center
                          William Penn Intermediate School
                          John Harris Campus

**ESSENTIAL JOB FUNCTIONS:**

1.  Keeps buildings and premises, including sidewalks, driveways and play areas neat and
    clean at all times.
2.  Plans and oversees all maintenance and repair work, maintenance of a high standard of
    safety, cleanliness and efficiency.
3.  Assigns, schedule, evaluates and trains members of the facility staff.
4.  Scrubs, hoses and disinfects toilet floors daily and cleans all sanitary fixtures and
    drinking fountains daily.
5.  Shovels snow from walks, doorways, entranceways and steps and spreads ice melting
    materials and can operate snow removal equipment.
6.  Monitors the time records of all custodial employees in the school and certifies them for
    salary payment.
7.  Maintains an inventory, recommends purchase of suitable supplies, tools and equipment.
8.  Opens and closes school and raises and lowers flags.
9.  Checks on work of shift crews.
10. Checks fire extinguishers and emergency generators weekly.
11. Washes all windows inside and out.
12. Keeps all floors in a clean, attractive condition and in a good state of preservation.
13. Moves heavy boxes to storage areas, i.e., books, supplies, etc.
14. Checks roof areas for debris and removes when necessary.
15. Uses low and high ladder as required.
16. Assumes responsibilities for all employees on this shift, i.e., their cleaning habits, giving
    additional instructions when needed and resolving problems necessary.

**Also, since Facility Service Foremen are first line supervisors, they shall also perform the following duties:**

1. Implement school district policies in the area of assigned work.
2. Schedule work for assigned personnel and ensure that work is accomplished in a satisfactory manner.
3. Evaluate personnel assigned to them according to school district policies.
4. Implement changes needed to improve employee performance.
5. Institute disciplinary measures where needed to improve job performance for assigned personnel.
6. Participate, upon request, in the screening and interviewing of employees for hiring and promotion.
7. Participate in the process of terminating employees when necessary.
8. Perform other duties customary of first line supervisors.

## MINIMUM QUALIFICATIONS:

1. High School Diploma or GED.
2. Five (5) years' experience as a school custodian or the equivalent in custodial service in other institutions or firms.
3. Demonstrates knowledge in the basic techniques of electrical repair and maintenance.
4. Physically able to perform essential functions of job.
5. Satisfactory work record.
6. Criminal history/child abuse clearances (Acts 34 and 151).

## TERMS OF EMPLOYMENT:

Salary according to current AFSCME Basic Labor Agreement.
260 day work year – 8.0 hours per day.

REVISED: APRIL, 1998

FSVFMN1B.DOC/LDF/dgt

# EXHIBIT - 11



**COUNCIL 13**
**AMERICAN FEDERATION OF STATE, COUNTY**
**AND MUNICIPAL EMPLOYEES, AFL-CIO**

RECEIVED
PERSONNEL OFFICE

# GRIEVANCE FORM

99 AUG 17 PM 2: 12

*(Type or print information, filling in all blanks.)*

District Council __90__      Local Union __2063__     __00095__

Grievant (s) __CLASS ACTION__     Social Security No. _____

Employer __HBG. SCHOOL DIST.__

Department __SCHOOL FACILITIES__     Job Title _____

Supervisor __TIM CURTIS__     Work Location _____

> **EXHIBIT**
> Hazzard - 11
> Reh    10-19-01

## VIOLATION

Article # __19__     Section # __1__

### STATEMENT BY GRIEVANT OR UNION

EFFECTIVE JUNE 28, 1999 ALL HEAD CUSTODIAN'S WERE TRANSFERED TO OTHER BLDGS. BY MANAGEMENT. AUGUST 12, 1999 A LETTER WAS SENT TO ALL HEAD CUSTODIAN'S. IT STATED / THIS IS TO NOTIFY YOU THAT YOUR TRANSFER WAS APPROVED. THIS IS NOT ACCURATE. NO HEAD CUSTODIAN REQUESTED A TRANSFER

### RELIEF OR REMEDY SOUGHT

ALL HEAD CUSTODIAN'S WHO WENT FROM MINOR CUSTODIAN TO A MAJOR HEAD CUSTODIAN POSITION SHALL BE PAID IN ACCORDANCE WITH ARTICLE 19 SECTION 1 OF A.F.S.C.M.E. CONTRACT RETROACTIVE PAY STARTING BACK TO JUNE 28, 1999. AND MADE WHOLE.

__Steven T. McCollum__    __8-17-99__

Steward Signature     Date    and/or    Employee Signature     Date

93

UNION

# EXHIBIT - 12




**COUNCIL 13**
**AMERICAN FEDERATION OF STATE, COUNTY**
**AND MUNICIPAL EMPLOYEES, AFL-CIO**

# GRIEVANCE FORM

*(Type or print information, filling in all blanks.)*

District Council __90__   Local Union __2063__   |__JO118__|

Grievant (s) __WILLIAM HAZZARD__   Social Security No. __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__

Employer __HBG. SCHOOL DIST__

Department __SCHOOL FACILITIES__   Job Title __F.S.F. 1A__

Supervisor __TIM CURTIS__   Work Location __SHIMMEL__

## VIOLATION

Article # __22__   Section # __5__

| EXHIBIT |
|---|
| Hazzard-12 |
| JH (0190) |

### STATEMENT BY GRIEVANT OR UNION

ON JUNE 6, 2000 MR. CURTIS CALLED ME AT WORK AND STATED THAT HE HAD A PROBLEM WITH A BEREAVEMENT THAT OCCURED IN OCT. OF 99. MY BROTHER IN LAW PASSED AWAY, MY BROTHER IN LAW WAS RESIDING IN MY HOME AT THE TIME OF HIS DEATH. ACCORDING TO AFSCME CONTRACT I AM PERMITTED 5 DAYS OF BEREAVEMENT LEAVE. MR. CURTIS INSIST THAT I PUT IN A VACATION SLIP TO COVER THESE DAY. I FEEL AS THOUGH MR. CURTIS IS HARRASSING AND TRYING TO INTIMINATE ME. MY BROTHER IN-LAW PASSED AWAY IN OCTOBER, EIGHT MONTHS AFTER HIS DEATH MR. CURTIS STILL INSIST I SEND A VACATION SLIP

### RELIEF OR REMEDY SOUGHT

TO STOP IMMEDIATELY, THE CONSTANT HARRASSMENT AND INTIMINATION THAT HAS OCCURED, ALSO TO SEEK PROFESSIONAL HELP IN DEALING WITH SUCH CRISIS

_____   _____
Steward Signature   Date   and/or   Employee Signature William A. Hazzard   Date 6-7-0

Tombo 93

**UNION**

# EXHIBIT - 13



# AFSCME ®

American Federation of State, County, and Municipal Employees • AFL-CIO
## Dauphin County Pennsylvania Public Employees District Council 9
4031 Executive Park Drive • Harrisburg, Pennsylvania 17111-1599 • 717-564-512
FAX 717-564-491

RECEIVED
PERSONNEL OFFICE
01 FEB -8 PM 5:31

JUDITH HEH
*Council Director*

TYRONE MITCHELL
*President*

JOYCE CULPEPPER
*Vice President*

JOHN WATERS, JR.
*Secretary*

KARLA HODGE
*Treasurer*

**Executive Board:**
CHARLOTTE SMITH
DALE KICHMAN
GEORGE L. FULTZ
TODD SINGER

**Trustees:**
ELIZABETH HOLLERN (2001)
TYRAN COBB (2002)
RACHELLE REID (2003)

LENORA WILBON
*Vice President
Council 13*

February 6, 2001

Lance Freeman, Chief
Human Resources
Harrisburg School District
1201 North Sixth Street
Harrisburg, PA 17102

Re: AFSCME Grievance #90-2063-00118    William Hazzard

Dear Mr. Freeman:

The response from Management in this matter is as follows:

While not conceding a violation of the Agreement, the Harrisburg
School District agrees that mutual respect and dignity should
prevail at all times in employee relationships.

Please affix your signature and return original or copy to me within five
(5) days. Should you have any questions, comments or concerns, please contact
me at 561-7084.

Very truly yours,

*M. Nichelle Chivis*

M. Nichelle Chivis
Staff Representative

cc:    File

*Lance Freeman*    2/9/01
Lance Freeman    Date



**EXHIBIT**
Hazzard - 13
10-19-01

# EXHIBIT - 14



# AFSCME®

American Federation of State, County, and Municipal Employees • AFL-CIO
## Dauphin County Pennsylvania Public Employees District Council 90
4031 Executive Park Drive    •    Harrisburg, Pennsylvania 17111-1599    •    717-564-5123
FAX 717-564-4914

JUDITH HEH
*Council Director*

TYRONE MITCHELL
*President*

JOYCE CULPEPPER
*Vice President*

JOHN WATERS, JR.
*Secretary*

KARLA HODGE
*Treasurer*

**Executive Board:**
CHARLOTTE SMITH
DALE KICHMAN
GEORGE L. FULTZ
TODD SINGER

**Trustees:**
ELIZABETH HOLLERN (2001)
TYRAN COBB (2002)
RACHELLE REID (2003)

LENORA WILBON
*Vice President*
*Council 13*

February 20, 2001

William Hazzard
1940 Brookwood Street
Harrisburg, PA 17104

Re: Grievance #90-2063-0118

Dear Mr. Hazzard:

This is to notify you that the above referenced grievance has been settled to our satisfaction and we are withdrawing this grievance from the grievance procedure.

Enclosed is a copy of the signed settlement.

If you have any questions, comments or concerns, please feel free to contact me at 564-5123.

Very truly yours,

*M. Nichelle Chivis*

M. Nichelle Chivis
Staff Representative

Enclosure

cc:    Margaret Fuller
       Rob Tapper
       File

EXHIBIT
Hazzard-14
10-19-0

# EXHIBIT - 15




**COUNCIL 13**
**AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO**

RECEIVED
BUSINESS SERVICES
2019 APR -5 AM 9: 58

# GRIEVANCE FORM

*(Type or print information, filling in all blanks.)*

District Council **90**       Local Union **2063**       **00115**

Grievant (s) **ALL HEAD CUSTODIANS / CLASS ACTION**       Social Security No. _____

Employer **HBG SCHOOL DIST.**

Department **SCHOOL FACILITIES**       Job Title **HEAD CUSTODIANS MAJOR & MINOR**

Supervisor **TIM CURTIS**       Work Location **ALL SCHOOLS**

## VIOLATION

Article # **14**       Section # **2**

> **EXHIBIT**
> Hazzard-15
> LL 10-19-01

### STATEMENT BY GRIEVANT OR UNION

HEAD CUSTODIANS ARE NOT BEING PERMITTED TO TAKE VACATION FOR PERIODS OF TIME REQUESTED. HEAD CUSTODIANS ARE BEING ASKED TO RESCIND THERE VACATIONS SO OTHERS MAY GO ON VACATION

(EXAMPLE)- LINCOLN'S HEAD CUSTODIAN MAY NOT BE PERMITTED TO GO ON VACATION BECAUSE WM. PENNS & DOWNEYS HEAD CUSTODIANS ARE SCHEDULED FOR THE SAME TIME

EACH BLDG. HAS A HEAD CUSTODIAN

### RELIEF OR REMEDY SOUGHT

VACATIONS TO BE GRANTED FOR PERIODS OF TIME REQUESTED

STOP PITTING ONE EMPLOYEE AGAINST ANOTHER BY ASKING ONE HEAD CUSTODIAN TO CHECK AND SEE IF ANOTHER HEAD CUSTODIAN WILL RESCIND AND OR CHANGE HIS OR HER VACATION

_____       4-4-00       ALL HEAD CUSTODIANS       4-4-00
Steward Signature       Date       and/or       Employee Signature       Date

93       **UNION**

# EXHIBIT B

1

1                    IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3   WILLIAM A. HAZZARD,                    :
                     PLAINTIFF            :

4                                          :

              VS.                   : NO. 1:CV-00-1758

5                                          :

    TIM CURTIS, MACK MCMURRAY,             :

6   AFSCME, DISTRICT 90, AND THE           :

    HARRISBURG SCHOOL DISTRICT,            :

7                     DEFENDANTS           :

8

9

10

11

12

13

            VIDEO
14      DEPOSITION OF:   TIMOTHY L. CURTIS

15      TAKEN BY:        PLAINTIFF

16      BEFORE:          LISA A. HANSELL, REPORTER
                          NOTARY PUBLIC

17
                          CRYSTAL M. LYDE, VIDEO OPERATOR

18
        DATE:            NOVEMBER 19, 2001, 3:01 P.M.

19
        PLACE:           LAW OFFICES OF DON BAILEY

20                       4311 NORTH FRONT STREET
                          HARRISBURG, PENNSYLVANIA

21

22

23

24

25

CURTIS, TIMOTHY
11/19/01

HAZZARD VS
CURTIS

---

**2**

1 APPEARANCES:
2 LAW OFFICES OF DON BAILEY
  BY: DON BAILEY, ESQUIRE
3     FOR - PLAINTIFF
4 RHOADS & SINON, LLP
  BY: SHAWN D. LOCHINGER, ESQUIRE
5   FOR - DEFENDANTS HARRISBURG SCHOOL DISTRICT
      AND TIM CURTIS
6
  WILLIG, WILLIAMS & DAVIDSON
7 BY: ERIC M. FINK, ESQUIRE
      FOR - AFSCME, MACK MCMURRAY
8       AND DISTRICT 90
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**3**

1          TABLE OF CONTENTS
2
             WITNESS
3
  FOR PLAINTIFF        DIRECT  CROSS
4
  Timothy L. Curtis
5  By Mr. Bailey:      4
    By Mr. Fink:         --
6  By Mr. Lochinger:       --
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**4**

1       THE VIDEO OPERATOR: Mr. Bailey, can we get a
2 sound check, please?
3       MR. BAILEY: Yes. My name is Don Bailey. I'm
4 an attorney for plaintiff, Mr. William Hazzard. And let's
5 see, Eric -- Mr. Fink, could you --
6       MR. FINK: Yes. Eric Fink, attorney for
7 AFSCME, District Counsel 90.
8       MR. BAILEY: Shawn Lochinger?
9       MR. LOCHINGER: Shawn Lochinger for The
10 Harrisburg School District.
11      MR. BAILEY: Okay. Thank you.
12
13      TIMOTHY L. CURTIS, called as a witness, being
14 sworn, testified as follows:
15
16          DIRECT EXAMINATION
17
18 BY MR. BAILEY:
19   Q     Welcome, Mr. Curtis. We have a deposition
20 we're conducting this afternoon. As I'm sure you know, you
21 are represented by counsel, Mr. Fink, here so --
22      MR. FINK: Mr. Lochinger, actually.
23      MR. BAILEY: I'm sorry. I apologize.
24      MR. FINK: That's all right. We didn't know
25 for months.

---

**5**

1 BY MR. BAILEY:
2   Q     Mr. Lochinger with the school district. So
3 I'm going to be very brief in the instructions. I don't
4 know if you want to do a read and sign. I guess it's your
5 deposition, so it doesn't make any difference, but we do --
6 we are conducting the deposition by videography this
7 afternoon. As a result of doing so, particularly because
8 you have a stenographic recorder and because there's going
9 to be a transcript made from the proceeding, try to make
10 sure that you don't respond too quickly to the questions,
11 even when they're obvious. They may seem plain and simple.
12      And if I somehow interrupt or step on the toes
13 of your answers and don't give you an opportunity to respond
14 fully and completely, make sure that you stop me or
15 interrupt me and get me on the straight and narrow.
16 Mr. Curtis, from time to time you may have a curiosity or
17 you may feel uncertain about a question, either where I'm
18 going with some questions or what a particular question
19 means. Please feel no compunction about asking me where I'm
20 going, what I mean or what direction I might be going with a
21 question, even if you're just curious. We're after a good
22 factual record. We have no interest in any kind of trick
23 questions or anything of that sort. So we want to get a
24 good factual record. Okay?
25   A     Okay.

---

2




**CURTIS, TIMOTHY**
**11/19/01**

HAZZARD VS
CURTIS

6

1 Q All right. Now, let's begin. How are you
2 employed, and just tell us how long you have been with your
3 present employer?
4 A I'm employed with The Harrisburg School
5 District, located at 1201 North 6th Street, Harrisburg, PA
6 17102. I have been with them since March of '99. Yeah,
7 like 2 years going -- it's over 2 years, maybe close to 3.
8 Q All right, sir. And what did you do before
9 you went to work with the school district?
10 A I was employed with O'Brien Kreitzberg, a
11 construction management firm. I was a project inspector.
12 Q And with O'Brien Kreitzberg, what -- as a
13 project inspector, tell us just a little bit about your
14 duties.
15 A Okay. As a project inspector, I was the
16 inspector for the Hamilton School regarding the renovation
17 portion of that, then received a promotion to site manager
18 within O'Brien Kreitzberg, and that employment was for about
19 a year.
20 Q Who was the general contractor on that
21 project?
22 A The general contractor was Ritter Brothers.
23 Q Now, at some point you came to be employed by
24 The Harrisburg School District?
25 A Uh-huh.

7

1 Q Can you tell us in what capacity?
2 A I became employed with The Harrisburg School
3 District as the facilities supervisor.
4 Q Now, tell us just a little bit about what a
5 facility supervisor does.
6 A The facilities supervisor is responsible for
7 the grounds department, the maintenance department and the
8 paint department. My main role is to maintain efficiency of
9 the school buildings and the administration office.
10 Q And as facilities manager or facilities
11 supervisor -- I'm sorry -- you have -- facility basically
12 refers to building or work site?
13 A Uh-huh.
14 Q How many do you have?
15 A I have -- right now I have 18 buildings. No,
16 17, 17. We do not have Baton-Felton anymore.
17 THE COURT REPORTER: I'm sorry. What's the
18 name?
19 A Baton, B-a-t-o-n, hyphen, Felton,
20 F-e-l-t-o-n.
21 BY MR. BAILEY:
22 Q Now, tell us what -- the 17 buildings, how
23 many of them are schools?
24 A Sixteen.
25 Q And how many of them have custodial services

8

1 in them?
2 A All 16.
3 Q Now, of those 16, how many of them have been
4 utilized by the district for a period of time exceeding say
5 3 years?
6 A I can only go for the time part that I was
7 there for, so you're going past my time frame.
8 Q All right. During your time frame, did any
9 new facilities come on line?
10 A Yes, two buildings came on -- actually, two
11 buildings were renovated -- were being renovated.
12 Q And they are?
13 A They are Rowland School and Scott School.
14 And Rowland, for the record, is spelled R-o-w
15 --
16 A L-a-n-d.
17 Q And the work forces -- where did you get the
18 work force for Rowland School?
19 Q Where did we get the work force from?
20 Q Sure. How did you acquire -- I mean -- let me
21 go back. Rowland was a new school for you. I mean, it was
22 an older building that was renovated, but from the school
23 district's point of view it was a new educational facility?
24 A That is correct.
25 Q Okay. Where did you get the work force for

9

1 it?
2 A Looked at the square footage of the building
3 and the amount of work that was going to be determined that
4 was going to be needed and came up with a figure on how many
5 personnel would be needed to maintain the efficiency of that
6 building.
7 Q And how many did you come up with?
8 A Six.
9 Q And I assume you did the same for Scott?
10 A That is correct.
11 Q And how many were needed for Scott?
12 A Four.
13 Q Now, that work force would be a head custodian
14 and then whatever appropriate number of --
15 A Correct.
16 Q -- support staff were necessary?
17 A That is correct.
18 Q Okay. Now, where did you get the six for
19 Rowland School?
20 A Again, based on the square footage of the
21 building and the amount of work that's going to be needed to
22 complete and maintain the efficiency of that building, I
23 came up with the number of six.
24 Q Well, I know how you come up with the number,
25 but where did you get the like living, breathing, DNA



10

1 organisms that did that work though?
2    A    Well, we --
3    Q    The people, where did you get them?
4    A    From within the school district.
5    Q    Okay. Now, Mr. Curtis, in both cases you got
6 people from within the school district?
7    A    Uh-huh.
8    Q    Now, why did you do that? I mean, it seems
9 like a simple question. I'll tell you where I'm going. I'm
10 assuming you have options. You can promote from within.
11    A    Uh-huh.
12    Q    You're two head janitors short. I assume you
13 are, anyway. You know, you need some help there. You have
14 a need for support staff. You're short there. Where did
15 you come up -- how did you promote from within? Did you
16 thin your ranks in other schools, did you hire from outside,
17 did you supplement lower positions from outside and promote
18 from within at the top? Just explain what you did to come
19 up with 10 individuals to fill those positions.
20    A    Okay. Well, Scott School would be very easy.
21 Scott staffing came from Ben Franklin because Ben Franklin
22 was being renovated, so we just transferred those personnel.
23    Q    Okay.
24    A    So there's no need to hire for additional
25 personnel there.

11

1    Q    All right.
2    A    As far as Rowland School came about, a lot of
3 the employees from within the school district knew that
4 Scott was a brand new facility, and some employees requested
5 to transfer to that building.
6    Q    You mean Rowland or Scott?
7    A    Rowland.
8    Q    I'm sorry.
9    A    That's okay. And then as far as -- also, I
10 believe there was a generic posting done for the schools
11 too.
12    Q    What's a generic posting?
13    A    Basically, it's a posting that's put out there
14 that says there is openings for Facility Service Worker 1's,
15 which is a custodian.
16    Q    Yeah, but I mean --
17    A    They don't make them building specific. That
18 makes it generic.
19    Q    Okay. So if somebody's applying, it's not for
20 a vacancy at a particular place, it's as we need?
21    A    Correct.
22    Q    Okay. Did you end up hiring totally from
23 within or did you, you know, cause vacancies which led you
24 to supplement from the outside or what eventually happened?
25    A    For Rowland School, that was basically from

12

1 within, transferring of personnel, and then those -- then
2 those personnel when they transferred over, one position was
3 not completed due to the closure of a whole wing, and that
4 was from William Penn School when that gentleman had
5 requested a transfer over, and the other ones from the
6 various schools that transfer over then we fulfill those
7 positions with the substitute custodians.
8    Q    Where did you get the substitute custodians?
9    A    Substitute custodians are hired directly from
10 me.
11    Q    Where do you hire them from?
12    A    From the applications that they submit.
13    Q    Why are they called substitutes?
14    A    Because they're not entitled to any -- it's
15 basically part-time. It's on an as needed basis. When
16 custodians call off sick, vacation, they go in and fill out.
17    Q    Did AFSCME ever argue about that issue with
18 you?
19    A    No. They kind of like it because if you don't
20 fill that position when somebody takes off for a whole week,
21 you have a whole week's worth of work that is needed by
22 other personnel to pick up on and it's kind of hard,
23 especially when you have like two personnel in a building at
24 night.
25    Q    Do you go to some particular temp service or

13

1 something for those people?
2    A    Huh-uh.
3    Q    Just advertise in the newspaper or --
4    A    I've only had to advertise so far since I've
5 been here three times. A lot of people -- a lot of persons
6 just submit applications, and then once they get the
7 applications they forward them down to my office.
8    Q    So you have a good, healthy file in there of
9 applications?
10    A    I wish I had a good, healthy file but
11 unfortunately --
12    Q    Okay. Whatever. How many of those temporary
13 positions do you maintain?
14    A    Oh, they stay on -- a substitute will stay on
15 board for as long as possible until they can actually get an
16 opportunity to fulfill a vacancy. A vacancy will either
17 come by by termination, resignation.
18    Q    How is it you have substitutes, though? I
19 mean, do you have -- is it to avoid paying overtime, is it a
20 business practice?
21    A    No, because I do pay overtime also when -- I
22 have -- there's approximately 68 custodians within The
23 Harrisburg School District.
24    Q    Okay.
25    A    So out of 68 personnel you only have X amount

4

**14**

1 of people as substitutes. Now, unfortunately, I don't have
2 this very large roll of substitutes so I can only dish out
3 what I have. If 7 people call off and I only have 4, then
4 there are 3 vacancies that are within a school. So that
5 leaves that school short staffed. And sometimes we offer
6 the overtime for those personnel who are on the day shift
7 because those would be the only ones applicable to apply
8 because all the other ones are night.
9    Q    So the only need for substitutes is occasioned
10 by the -- the only reason you have a need for substitutes is
11 because people are ill or they take leaves of absence or
12 maternity leave or family leave, things like that?
13    A    **Personal reasons and so.**
14    Q    Personal. Okay. All right. Now, I want to
15 take you back to the summer of 1999.
16    A    **Okay.**
17    Q    And it is my understanding from testimony
18 we've had here that at that time there was an apparent need
19 -- and I say apparent. I would like to tell -- I would
20 like you to tell me why there was a need to do some
21 transferring on the custodial staff at all throughout the
22 entire district. Do you remember that?
23    A    **Well, as far as transferring goes, The**
24 **Harrisburg School District has -- management has the right**
25 **to transfer any employee within the school district as long**

**16**

1 evaluating everything that I determined, I went about and,
2 again, made a management decision because everybody was in
3 such a complacency mode to transfer everybody. I gave
4 everybody the two weeks' notice, and the transfer took
5 effect. I didn't want to shift a lot of the personnel
6 around, so I figured the best way of shifting it and getting
7 some new ideas and new, innovative creativity is to move the
8 supervisors.
9    Q    What is innovative creativity in the realm of
10 custodial functions?
11    A    **Because if I'm working with you constantly all**
12 **the time, I'm only basically doing things your way. Now, if**
13 **I have somebody else who comes on board and they have**
14 **something different, they can shed new light onto it. It's**
15 **kind of like fresh blood.**
16    Q    Okay. Can you give me an example of what --
17 wait one second, please. Can you give me an example of what
18 you experienced that caused you to believe that you should
19 literally across the board transfer everyone?
20    A    **Again, too much complacency.**
21    Q    Mr. Curtis, you're testifying that every
22 single one of your head custodians was -- I hesitate to use
23 the word guilty, but was practicing complacency. Is that
24 what you're saying?
25    A    **Well, if you're trying to use it as a negative**

**15**

1 as they are not demoting them. So if I have a custodian at
2 one school, I can transfer that person to another school.
3 The only requirement by contract is they're given a two
4 weeks' notice.
5    Q    Okay. Well, I'm sure that Harrisburg School
6 District has a variety of positions on the contract and that
7 from time to time AFSCME has a variety of positions on the
8 contract, but not so much in terms of what you view your
9 contract rights to be but could you -- could you tell me
10 what occurred in the summer of 1999 to cause a wholesale
11 policy of transfers to occur? And I said wholesale policy
12 because it's been described that way.
13    A    **You need to describe that to me.**
14    Q    Okay. I've had somebody come in here and
15 testify that virtually all -- all custodians were
16 transferred at one time to different schools.
17    A    **All head custodians were transferred, that is**
18 **correct.**
19    Q    Why was that?
20    A    **Because complacency became a fact. See, at**
21 **the time when I was brought on in March I was later -- I**
22 **think it was April or May all the custodians were put**
23 **underneath me --**
24    Q    Uh-huh.
25    A    **-- for supervision. At that time point, after**

**17**

1 type of aspect, I wouldn't go that way, but I would just say
2 that everybody was just too -- had too much of a warm and
3 fuzzy and really needed to take a different look at what
4 they were doing and try to be a little bit more innovative.
5    Q    Okay. Did you have a meeting with everybody
6 and say you folks are becoming too complacent or something
7 like that, whatever you told them?
8    A    **Uh-huh.**
9    Q    Did you have --
10    A    **No. I had a meeting and told them that they**
11 **were going to be transferring.**
12    Q    But I mean did you tell them beforehand to
13 give them an opportunity to interact with you or talk about
14 what their strengths or weaknesses might be or to ask
15 questions about what they were doing wrong?
16    A    **Well, I wouldn't say that there was anything**
17 **that -- they had strengths or weaknesses or things that they**
18 **were doing wrong all the time. I just wanted to have a**
19 **mixture.**
20    Q    Okay. Now, so this meant that -- strike
21 that. At the different institutions where these custodians
22 served there was in place, I assume, a staff?
23    A    **Every building had one, correct.**
24    Q    And did you transfer them, any of them?
25    A    **No.**

18

1 Q    We had some testimony that an entire staff
2 from one school may have been transferred to Rowland, and it
3 later came out that that's because one of the schools was
4 being renovated or something.  Did that occur?
5 A    That the entire staff transferred out?
6 Q    I thought there may -- I could be mistaken,
7 but I thought there was testimony that -- did that happen,
8 that an entire staff or most of an entire staff was
9 transferred from one school to another?
10 A    One, two, three -- one, two, three.  There
11 were three individuals that transferred initially to
12 Rowland, and then there was one hire.
13 Q    How was that transfer effected, did they just
14 come to you about that or --
15 A    No.  They submit a transfer request.
16 Q    Okay.  And those transfers were always
17 lateral, from an equal position to an equal position?
18 A    That is correct.
19 Q    Now, so mister -- Mr. Hazzard at one point, I
20 understand, had submitted a request or some sort to bid on
21 the Rowland street -- the Rowland School position.  Do you
22 have a recollection of that?
23 A    Yes.
24 Q    Or that he wanted that position?
25 A    Yup.

19

1 Q    Okay.
2 A    Yes, I do.
3 Q    Okay.  Now, Mr. McMurray if I -- if my memory
4 serves me correctly, when you did your transferring had been
5 transferred to Hamilton?
6 A    Correct.
7 Q    Now, when Mr. McMurray was transferred to
8 Hamilton, Mr. Hazzard was transferred to another school;
9 right?
10 A    To Shimmell, correct.
11 Q    To Shimmell.  Then Mr. McMurray was
12 transferred to Rowland?
13 A    Correct.
14 Q    Had he demonstrated competency and a lack of
15 complacency at Hamilton, is that why you transferred him to
16 Rowland?
17 A    No.  He was transferred to Rowland because he
18 was put at Hamilton on a temporary basis because he was
19 going to be moving to Rowland because Rowland has the same
20 classification as he does, which is a Facility Service
21 Worker 1B.
22 Q    Okay.  Well, when you -- before you came here
23 to testify, did you have any discussions with Mr. McMurray
24 about his deposition, aside of any meetings you might have
25 had with your lawyer?

20

1 A    That I talked to him about it?  Nope.
2 Q    Well, when did you tell him -- when did you
3 first tell Mr. McMurray that his sojourn at Hamilton was
4 going to be temporary?
5 A    I couldn't tell you a specific time.
6 Q    And your testimony here today is neither you,
7 nor Mr. Freeman, nor Mr. McMurray, aside from a discussion
8 you may have had -- well, you would have had a discussion
9 with your lawyer, but your lawyer is not Mr. Fink; right?
10 A    Regarding?
11 Q    This litigation, your --
12      MR. FINK: I'm not your lawyer for anything,
13 am I?
14 A    No.
15 BY MR. BAILEY:
16 Q    Your lawyer is the honorable Mr. Lochinger;
17 right?
18 A    That is correct.
19 Q    Well, without saying what was discussed
20 therein, did you ever have a sit down discussion where you
21 and Mr. Lochinger met with Mr. Fink and any of his clients?
22 A    No.
23 Q    Okay.  So before you came here today, you and
24 Mr. McMurray, represented by Mr. Fink, never had any
25 discussions about his deposition or your coming here today;

21

1 right?
2 A    I have not ever sat down with Mr. McMurray,
3 nor Mr. Fink regarding Mr. McMurray's deposition.
4 Q    Don't worry about Mr. Fink.
5 A    But you included him.
6      MR. FINK: No one cares about me.  I'm nobody.
7      MR. BAILEY: I'm not worried about -- because
8 there's a little thing called privilege, and if Mr. Fink is
9 there, it ain't.  So I'm not worried about that.  So just
10 let me --
11 A    But you included -- but you said Mr. Fink and
12 Mr. McMurray.
13 BY MR. BAILEY:
14 Q    Yeah, I did, but this time I'm excluding him.
15      MR. FINK: Leave me out of it.
16 A    Okay.  Me and Mr. McMurray never sat down to
17 discuss his deposition.
18 BY MR. BAILEY:
19 Q    Well, did you ever talk on the phone?
20 A    Did I talk on the phone about his deposition?
21 Q    Yeah.
22 A    Mr. McMurray did call me and said that, yes,
23 he had a deposition because I did not want to know any
24 particulars about that, and he said that, yes, we had our
25 talk.  I said are you okay, and he said, yes, I'm fine.  And

CURTIS, TIMOTHY
11/19/01

HAZZARD VS
CURTIS

---

**22**

1 that was the extent of it.
2    Q      That was the extent of it.  And is the same
3 true with Mr. Freeman?
4    A      I haven't talked with Mr. Freeman about the
5 deposition at all.
6    Q      Okay.  Now, at some point I had asked you --
7 you had indicated that you told Mr. McMurray that his
8 position -- his transfer to Hamilton was going to be
9 temporary; right?
10    A      At some point.  I just don't know the specific
11 time frame of that.
12    Q      Well, that would indicate to me -- and I may
13 be in error, and if so please correct me because you know
14 the facts and I don't.  That would indicate to me that
15 sometime prior to the transfers you had already decided that
16 Mr. McMurray was going to -- going to Rowland; is that
17 right?
18    A      Pretty much, that's correct.
19    Q      Well, who did you share that with, if anyone?
20    A      No one.
21    Q      And so you and Mr. Freeman didn't get together
22 on that or you or any board members or anything like that?
23    A      No need to.
24    Q      Okay.  Because it was your decision?
25    A      That is correct.

---

**23**

1    Q      And you made it?
2    A      That is correct.
3    Q      Why did you make the decision to put
4 Mr. McMurray in Rowland School?
5    A      Because Mr. McMurray has a classification of a
6 1B, and that school was a 1B.
7    Q      And that was your reason?
8    A      That is correct.
9    Q      Does the contract say that that's the way
10 you're supposed to make that decision or that doesn't apply
11 in this case or --
12    A      It doesn't apply.  It's a lateral position.
13    Q      Well, but you didn't -- but you said it's not
14 a lateral position unless I guess -- now, wait.
15 Mr. McMurray was a 1B?
16    A      That is correct.
17    Q      Does the contract address the issue of
18 qualifications as between 1B's and I guess a 1A?
19    A      Yes, there is a difference.
20    Q      No, that's not -- that's not my question.
21    A      Does the contract -- say that again.  Does the
22 contract --
23    Q      Yeah.  If I've got a vacancy in a 1B --
24    A      Uh-huh.
25    Q      -- according to the contract, is a 1A or a 1B

---

**24**

1 equally qualified for that position?  According to the
2 contract now, not you, but the contract.
3    A      No, they wouldn't be equally qualified.
4    Q      Oh, the contract differentiates their
5 qualifications?
6    A      Yes.
7    Q      Are you certain of that?
8    A      Well, we can find out real quick.  We can look
9 right in that book.
10    Q      Well, no, we can't decide it here.  Judges
11 have to decide those -- judges and arbitrators decide those
12 kind of things.  But I mean in terms of your -- your
13 position is that based upon your knowledge of the contract
14 if there is a vacancy in a 1B position, which is called a
15 major --
16    A      Uh-huh.
17    Q      -- custodial position, that the contract says
18 that as a matter of qualification 1B's would be better
19 qualified than 1A's and I assume would have a right of first
20 refusal, regardless of seniority with the district.  Is that
21 your position?
22    A      No.  I think you're putting too much into it.
23    Q      Okay.  What am I putting into it?
24    A      I think -- I think what you're trying to
25 elaborate to is that is a 1B more qualified than a 1A.

---

**25**

1    Q      No, I'm not trying to do that, sir.  I'm --
2    A      By the contract?
3    Q      Yes, sir, there you go.
4    A      You're trying to say is a 1B more qualified
5 than a 1A --
6    Q      Yes, sir.
7    A      -- by the contract to fulfill a 1B's
8 position?
9    Q      Yes, sir.  My understanding of the contract --
10 and I don't have your knowledge and experience with it, but
11 my understanding of the contract tells me that if a person
12 is a head custodian --
13    A      Uh-huh.
14    Q      -- be it 1A or 1B and there is a vacancy in a
15 major custodial position that the -- each would be equally
16 qualified according to contract, sir.
17    A      If they're meeting the minimum requirements.
18    Q      That's right.  And that seniority is the next
19 issue.  Now, that's my understanding.
20    A      No, that's not true.
21    Q      Okay.
22    A      Because it is, again, management's right to
23 transfer any personnel they deem.  And if I have a person
24 that's already in a 1B spot and I want to transfer him to
25 that 1B spot, I may do so.

---

**26**

1 Q    Okay. Well, what do you use postings for and
2 why do you need a union? I mean -- or maybe you don't need
3 a union.
4 A    That would be for Mr. Fink to answer that.
5 Q    Well, AFSCME has apparently already answered
6 it, but I'm curious from you if -- and -- I'm curious to
7 know from you if the -- if there is a need for postings, if
8 it serves any purpose.
9 A    Well, because by the AFSCME contract, which it
10 is stipulated in there regarding transfer, management has
11 the right to do so. So that's a part of their contract. As
12 regarding a posting, the postings are done based on
13 vacancies. Now, vacancies can be filled from within or
14 outside.
15 Q    Well, was the position for Rowland School ever
16 posted?
17 A    To my knowledge it was done generically, yes.
18 Q    Well, this word generic is a new one in this
19 litigation, so we're going to have to explore that just a
20 little bit. Now, you told me --
21 A    Generically meaning not school specific.
22 Q    Not school specific?
23 A    That is correct.
24 Q    Okay. Well -- so that means that the position
25 wasn't posted for Rowland School?

**27**

1 A    Correct.
2 Q    It was just posted for a head janitor's
3 position?
4 A    I do believe that is correct.
5 Q    Well, hadn't -- as a head custodian, though,
6 hadn't Mr. Hazzard written about the Rowland position?
7 A    He put in a transfer request. Yes, he did.
8 Q    A transfer request?
9 A    Uh-huh.
10 Q    Is there any such thing as a -- I mean, what
11 is a posting, what meaning does it have to you, your
12 interpretation of the contract?
13 A    That informs me that there is a vacancy within
14 a specific job.
15 Q    Well, do you ever use the posting procedure
16 and seniority to fill any positions in the school?
17 A    Yes, we do.
18 Q    Why? Why do you bother with it? Why not just
19 go out and transfer? Why waste time posting?
20 A    Because that's part of AFSCME's contract, to
21 post.
22 Q    But you can transfer and just eliminate a
23 posting as a meaningless thing; right?
24 A    Yeah, but you have to also realize something.
25 If I have School A and I transfer somebody from School B,

**28**

1 guess what I have in School B, a vacancy.
2 Q    Yeah. But, I mean, you can transfer somebody
3 from below to that position; right?
4 A    Transfer from somebody below?
5 Q    Can't -- you can only transfer laterally?
6 A    That's correct.
7 Q    So your position is that the contract allows
8 you to transfer 1B's to 1B's, 1A's to 1A's, but the contract
9 does not allow you to transfer from a 1A to a 1B?
10 A    That is correct.
11 Q    Hmm. Where -- do you know what part of the
12 contract says that?
13 A    Because that's a different job classification.
14 Q    That's a different job classification?
15 A    A 1A and a 1B is a totally different job
16 classification. That's why they have 1B.
17 Q    Well, why did you transfer a bunch of 1B's to
18 1A positions when you did the transfer then?
19 A    Because I can do that because I am not
20 demoting anybody.
21 Q    Oh, you're not demoting anybody in that case.
22 Is that why the union had to come back and request that you
23 pay the differential, or did you let them know beforehand
24 that you were going to pay the differential?
25 A    I let them know right up front that nobody was

**29**

1 going to lose any pay.
2 Q    Okay. So in effect did you create new major
3 positions or did you just pay minor custodians -- you know,
4 the minor school custodians out of their position?
5 A    Repeat that again. Did I pay minor custodians
6 --
7 Q    Sure. Did you pay them out of their pay rate,
8 out of their class? You know, if I'm in the State Police --
9 A    Uh-huh.
10 Q    -- and I'm trooper --
11 A    Uh-huh.
12 Q    -- and I work as corporal, they pay me as a
13 corporal.
14 A    Okay?
15 Q    And if I'm a corporal and I assign the
16 corporal to patrol duties, I can't cut that corporal down to
17 a trooper's pay. I've got to pay the corporal the corporal
18 pay.
19 A    Okay?
20 Q    Okay? So before you did these transfers back
21 in the summer of 1999 --
22 A    Uh-huh.
23 Q    -- your testimony is that you told all the
24 folks that you're not going to lose any money, which means
25 that the 1B's are going to be paid the same as the 1A's?

30

1   A   That is correct.
2   Q   If they're put into a 1A position?
3   A   That is correct.
4   Q   In other words, a 1B is going to maintain
5   their pay, and a 1A is going to get a jump in pay?
6   A   That would be correct.
7   Q   Okay. Now, at some point Mr. Hazzard grieved
8   your decision on Rowland School, your decision to put mister
9   --
10   A   McMurray.
11   Q   -- Mr. McMurray into that head custodian's
12   position; right?
13   A   Uh-huh.
14   Q   Now, how -- what role did you play in that
15   process?
16   A   The same role I'm playing now. I just gave
17   the facts. They -- actually, AFSCME found no -- nothing
18   violated the contract on that decision. And then -- let's
19   see. Then we went to the EEO board, and I haven't really
20   heard anything from that yet.
21   Q   So when Mr. McMurray -- excuse me. When
22   Mr. McMurray went to Rowland --
23   A   Uh-huh.
24   Q   -- and Mr. Hazzard was the only person who bid
25   on that position; right?

31

1   A   Okay. Correct.
2   Q   Yeah, he was the only, my understanding from
3   that.
4   A   Well, no, because there was a -- well, yes,
5   that's correct, but I do believe Mr. McMurray did put in a
6   request also.
7   Q   Well, why would he put in a request -- if you
8   temporarily assigned him to Hamilton just as a temporary
9   because he was going to Rowland, why would he put -- well,
10   when did he put this request in?
11   A   I don't know. That's why I said I think. I'm
12   not quite sure.
13   Q   Oh, okay. All right. Now, let's go back over
14   here. We got mister -- Mr. Hazzard is unhappy because
15   Mr. McMurray, to use your words, has been transferred to
16   Rowland.
17   A   Uh-huh.
18   Q   And Mr. McMurray, consistent with practices in
19   the school district, has bid upon this position. He sent in
20   a written request. Regardless of whether that was honored,
21   the fact is that the -- that the job was posted. It was
22   posted; right?
23   A   Okay.
24   Q   Now, when it was posted, did it say any
25   qualified or the best qualified 1B?

32

1   A   No.
2   Q   It didn't say that, did it?
3   A   It always says must meet the minimum
4   qualifications.
5   Q   Right, right. Well, minimum qualifications is
6   not some arbitrary and capricious thing, to borrow from a
7   few Supreme Court cases, it's something that's based upon
8   established fact and customs and practices; right?
9   A   Okay.
10   Q   Okay. Well, if it is, is it your testimony
11   here today that you have never filled a vacancy or the
12   school district hasn't -- strike that. Is it your testimony
13   here today to the best of your knowledge the school
14   district has never filled a 1B vacancy with a 1A person?
15   A   Has the school district ever filled a 1A body,
16   person, to a 1B position?
17   A   A 1B position with a 1A person. I'm sorry. I
18   probably stated it erroneously. Let me go back and
19   rephrase.
20   A   No, I understand what you said.
21   Q   Okay.
22   A   I think it was just saying that a 1A person
23   would be hired as a 1B.
24   Q   Sure.
25   A   Yes. I think they've done that in the past.

33

1   Q   All right. But in this case the reason you
2   transferred Mr. McMurray, a 1B to a 1B --
3   A   Uh-huh.
4   Q   -- is it because you -- not to be facetious
5   now. Is it because you didn't have a good, as Mr. Cosby
6   used to put it -- in other words, you didn't have a 1A that
7   could do that job out there at Rowland and fulfill the role
8   as a 1B? Is that why you put Mr. McMurray in there? Is
9   that what you're telling us?
10   A   Well, I'm telling you that Mr. McMurray was
11   put in there because he held a 1B's position.
12   Q   Okay. All right. Now, when mister -- knowing
13   that the decision to transfer Mr. McMurray to Rowland had
14   been made before the job was posted, you made that decision
15   before that Rowland position was posted or -- no. Strike
16   that. You said it was generically --
17   A   It was a generic posting, correct.
18   Q   Okay. So it was like -- what were you
19   generically advertising it for?
20   A   You just put a generic posting saying that
21   there is a position available for this position.
22   Q   Okay.
23   A   And you're just not being school specific.
24   Q   Okay. Well, how many did you have -- how many
25   openings did you have?

34

1    A        I do not recall at that -- how many that
2  posting was for.
3    Q        Okay. But regardless of how many that posting
4  was for, the only one that you had was Mr. Hazzard; right?
5    A        No. You're talking about the only --
6    Q        Well, no, no. Mr. Curtis, you've told us that
7  the posting to which Mr. Hazzard -- that Mr. Hazzard grieved
8  was generic. You've testified to that a number of times.
9    A        I'm not saying that I didn't, but I guess what
10  I'm trying to explain is that I don't know what else was on
11  that posting. There could have been other items on there.
12  There could have been other custodians on that one. I just
13  don't know because no matter how you look at it numbers
14  wise, if that's a brand new school with six there's going to
15  be six personnel needed. Whether it comes from within and
16  other schools transfer to, those positions will need to be
17  filled. So I don't know if that posting had the other
18  custodians on there also.
19    Q        Well, is that why when AFSCME originally saw
20  Mr. Hazzard's grievance that they immediately said, well,
21  there's no merit to this grievance?
22    A        I can't speak for AFSCME.
23    Q        Well, but what -- you can speak for what they
24  did because you were involved in the process.
25    A        No, I can't. The only thing I can tell you is

35

1  that they said we had no fault in the contract. That was
2  it.
3    Q        But when did they do that?
4    A        When he did the grievance, when we had the
5  meeting.
6    Q        When did they withdraw it?
7    A        I don't know if they -- I don't know. You'll
8  have to ask AFSCME.
9    Q        You don't know when they withdrew the
10  grievance?
11    A        The only thing I know is that they said that
12  there was no violation of the contract, and that was it.
13    Q        Well, when did they say there was no violation
14  of the contract?
15    A        When the meeting was held, and I do not know
16  the specific date of that.
17    Q        Well, the first meeting that was held, was
18  Mr. Hazzard there?
19    A        To my knowledge, he was.
20    Q        And so right there at that first meeting is
21  when -- was it Nichelle Chivis who said there's no merit to
22  this?
23    A        I don't know. It's two and a half years ago,
24  and I can't remember that, whether she said no merit to this
25  at all. I just know they said there was no violation of the

36

1  contract. That's what I remember.
2    Q        Okay. And your best recollection is that was
3  done at Step 1?
4    A        No, that would have been -- that would have
5  been -- no. Step 1 is the person meeting with -- no. That
6  would have been about 2 or 3, Step 2 or 3.
7    Q        Okay. And did Nichelle Chivis send a letter
8  out or something on that or --
9    A        If she did, it would have been to Mr. Freeman.
10    Q        Okay. So you don't have any awareness of that
11  as you sit here today whether she sent a letter out or
12  anything like that?
13    A        Uh-huh.
14    Q        You don't know?
15    A        That is correct.
16    Q        Okay. Now, this -- when you posted this
17  position generically -- you say you posted it generically?
18    A        I don't do the postings.
19    Q        Who does?
20    A        Personnel.
21    Q        Personnel does that? Well, who -- but you
22  would be the guy -- you're the head guy in facility
23  supervision. You'd be the one that would tell them that
24  there's a vacancy; right?
25    A        That is correct.

37

1    Q        So you told them there was a vacancy of some
2  kind?
3    A        Oh, by all means, but as far as actually doing
4  the posting, that's not done by me.
5    Q        Well, how did this posting take effect? I
6  mean, what do these people do -- how do the posters post,
7  what do they do?
8    A        They type it on a sheet of paper, and they
9  send it out through via e-mail to all the main stewards, and
10  they ask them to post it on the bulletin board for everybody
11  to review. Excuse me.
12            (Discussion held off the record.)
13  BY MR. BAILEY:
14    Q        Okay. Now, when you saw the letter -- you saw
15  the letter that Mr. Hazzard sent in; right?
16    A        What letter?
17    Q        That he was interested in this Rowland School
18  position.
19    A        That's just -- yes, I seen -- I have seen the
20  transfer request, yes.
21    Q        Okay.
22    A        Well, for him it would be a bid, correct.
23    Q        Okay. Did you call him up and say,
24  Mr. Hazzard, you're making a mistake here, this is already
25  -- this is already done?

38

1  A   No, I did not.
2  Q   Why not?  Why not just a courtesy of calling
3 him up and saying, Bill, you're making a mistake here?
4  A   Why would I say he's making a mistake?
5  Q   Well, or saying, Bill, there is some things
6 you don't know?
7  A   Okay.  At that time point -- I mean, again,
8 we're talking two and a half years.  Renovations are going
9 on.  I can't give you a specific answer why I didn't call
10 Mr. Hazzard and tell him that, Mr. Hazzard, there is some
11 things going on.
12  Q   Okay.  But you know that you didn't contact
13 him and tell him?
14  A   I know that he did not -- he didn't find out
15 until we had a meeting.  We had a head custodians meeting
16 when I gave all the assignments out for everybody as far as
17 what they were going -- what they were going to be doing.
18 He found out in a meeting that we had -- in a head custodian
19 meeting.
20  Q   My recollection of the record here is that his
21 letter is dated -- the letter about being interested in the
22 Rowland School position is dated June 25th, 1999.  Do you
23 remember when the meeting was when you talked to all the
24 head custodians and told them that they were being
25 transferred around?

39

1  A   Not specifically, no.
2  Q   Do you remember if it was in July, Mr. Curtis,
3 or June or --
4  A   I'd have to -- I'd have to check my minutes.
5  Q   Do you know whether it was after or before
6 Mr. McMurray had reported to Rowland School?
7  A   Well, I know the meeting would have happened
8 prior to Mr. McMurray reporting to that school.
9  Q   Okay.  And in light of all of this, did you
10 reach the conclusion that the posting was an error or a
11 mistake?
12  A   Yes, because there was -- yes, because that --
13 yes.  That posting was not supposed to have been put out.
14  Q   Hold on just one second.
15  A   Okay.
16  Q   Okay.  Now, let me ask you.  Didn't you just
17 tell us, though, that it was a generic posting?
18  A   Uh-huh.
19  Q   Then why was it an error if it was a generic
20 posting?
21  A   Because the position had already been
22 fulfilled, and there really was no need to post it.
23  Q   Did mister -- Mr. Freeman agreed with you, I
24 assume, as the resource -- I mean, he's the resource guy.
25  A   Uh-huh.

40

1  Q   He agreed with you, I assume?
2  A   Yeah.  Me and him talked about that, yes.
3  Q   Okay.  Now, did you tell -- did you inform
4 Nichelle Chivis of that?
5  A   No, I did not.
6  Q   Do you know whether he did?
7  A   I can't answer that.
8  Q   Do you remember when it was that you first
9 learned that AFSCME had withdrawn the grievance?
10  A   I have no idea when they withdrew it.
11  Q   Do you know whether it was in the fall or
12 winter of '99 or early in 19 -- the year 2000?  You don't --
13 you have no knowledge?
14  A   No clue.
15  Q   No clue?  Tell me about the discussion you had
16 with Mr. Freeman.
17  A   In regards to?
18  Q   The posting being a mistake.
19  A   Well, because Mr. McMurray was temporarily at
20 a 1A's position and the posting went out for a 1B and
21 Mr. McMurray was going to be transferred to a 1B, it should
22 not have been posted for a 1B.
23  Q   When you -- when Mr. McMurray was at the 1 --
24 was at the 1A, that would be the minor, that would be
25 Hamilton; right?

41

1  A   Yes, sir.
2  Q   Did you have any 1A's working at 1B schools?
3  A   No, because you can't be a 1A in a 1B.  You're
4 either going to be a 1A or a 1B.
5  Q   Well, let me tell you where I'm going here.
6 Okay?  You transferred Mr. McMurray temporarily from a 1B
7 school to a 1A position?
8  A   Uh-huh.
9  Q   In a 1A school?
10  A   Uh-huh.
11  Q   Now, was he the only temporary transfer you
12 did when you did your transferring?
13  A   Ms. Eden, she was temporary because she had to
14 go to Scott School.
15  Q   Okay.  And she was also temporary?
16  A   Yup.
17  Q   And you told her she was temporary?
18  A   Well, she knew that her school was going to go
19 to Scott School because Ben Franklin was the next school to
20 get renovated.
21  Q   Yeah.  I was going to say -- that was a wash.
22  A   That's correct.
23  Q   Okay.  But at that time --
24  A   No, there were no other temporary positions.
25  Q   Right.  That's my understanding, too.  Now,

11

42

1 let me ask you this: at the time that you transferred 1B,
2 McMurray --
3 A      Uh-huh.
4 Q      -- to 1A school Hamilton --
5 A      Uh-huh.
6 Q      -- did you transfer any 1A custodians to any
7 1B schools?
8 A      Yes, I did.
9 Q      And since you did those transfers, have any of
10 those 1A custodians in 1B schools continuously since your
11 transfers worked at those assignments?
12 A      That is correct.
13 Q      And have they been paid at a 1B rate?
14 A      That is correct.
15 Q      Have they been reclassified as 1B's?
16 A      That is correct.
17 Q      They have been?
18 A      That is correct.
19 Q      What's wrong with Mr. Hazzard, Mr. Curtis?
20 What's wrong with him?
21 A      I don't know. I think it's Mr. Hazzard who
22 says that I'm the person who classifies myself or -- I'm
23 sorry. He's classifying me as a racist, that I don't like
24 Mr. Hazzard because of the color of his skin, and that's
25 very -- you know, somewhat annoying, you know. And it's

43

1 kind of very hard to swallow when somebody wants to try to
2 classify you as a racist. And the simple fact of all this,
3 you know, is pretty ironic because this is all after the
4 fact that because Mr. Hazzard did not get Rowland School,
5 which he felt that he should have had, I became a racist.
6 Q      Do you think he's calling you a racist just
7 because he's trying to hurt you or get after you?
8 A      Well, I can tell you right now it's not
9 hurting me, you know, emotionally. You know, it's just kind
10 of annoying to be someone thinks that I'm a racist, but, I
11 mean, I'm living, I'm moving on.
12 Q      Okay.
13 A      But I have to be here to almost defend myself,
14 because I'm not a racist.
15 Q      Okay. Is it fair to say -- and, obviously,
16 you feel very strongly about this, and I respect your
17 feelings -- that you feel that Mr. Hazzard's allegation that
18 you are a racist is a -- is erroneous and absolutely wrong
19 and incorrect?
20 A      I would definitely say so.
21 Q      All right. Have you ever had any personal
22 conflicts or personal difficulties with Mr. Hazzard in the
23 employer/employee work relationship?
24 A      Well, I've spoken with Mr. Hazzard when I
25 would go out and do inspections at his school, and I have

44

1 even told him that when I'm doing these inspections how is
2 it possible that his area could be very good but yet his
3 subordinate's area I'm finding a lot of difficulty with.
4 Why would you want to bust your butt and do a very good job
5 but would accept less from your subordinates? I hold you
6 accountable for that.
7 Q      Okay.
8 A      So, yes, we've had discussions like that.
9 Q      Okay. During those discussions were they --
10 you know, were they difficult -- well, let me do it this
11 way: did anyone during those discussions raise their voice?
12 A      No.
13 Q      Did you specifically ever raise your voice and
14 holler or angrily address in a very -- with a large volume
15 of voice, you know, at Mr. Hazzard during any of these
16 things?
17 A      Not to my recollection, but then, again, how
18 would that classify me as a racist?
19 Q      Well, you know, I -- what I'm trying to do
20 during this litigation -- and it's a fair question to ask.
21 I'm trying to explore these allegations, and the racist
22 issue is one we're going to explore more as we talk here.
23 You will certainly get an opportunity to respond, but on
24 this particular question I don't -- I want you to know at
25 least from the standpoint of where I'm coming from with the

45

1 questions they're not based upon race.
2 A      I understand that so far.
3 Q      Okay. Okay. Now, if you can go back. During
4 the period of time that the discussions took place between
5 yourself and Mr. Hazzard on the job, if I understand your
6 testimony there is no time that you can recollect where you
7 raised your voice or hollered at him. I mean in a berating
8 manner. I don't mean just like you raised your voice once
9 or -- you know, I mean like a major sort of letting it go
10 and letting him have it, so to speak. You know, I guess
11 that's the way I would put it in my normal speech.
12 A      I understand.
13 Q      Letting him have it, you know, verbally,
14 nothing physical or threatening.
15 A      Let me just reassure you that if I had ever
16 yelled, which I have yet -- I have been very fortunate
17 enough that I have yet -- someone would really know if I was
18 really upset.
19 Q      Okay. Do you have a recollection of any other
20 employee of the district ever actually coming into a
21 situation where you were correcting Mr. Hazzard or giving
22 him a strong version of your views and opinion of the kind
23 of job he was doing and ask you what was wrong or ask you to
24 tone down or not to treat him in that manner? Did that ever
25 happen?

12



CURTIS, TIMOTHY
11/19/01

HAZZARD VS
CURTIS

---

**46**

1  A    No. I take too much -- I do not -- for my
2  head custodians and my foremen, I have a very strong pet
3  peeve, and one is insubordination. I will suspend somebody
4  immediately if a subordinate is being -- how shall we say --
5  disrespectful to a head custodian when somebody is around.
6  If they take that stuff behind closed doors and they work it
7  out and then a write-up happens up after that, I back the
8  head custodians up once I find out all the facts. But if
9  somebody is immediately yelling at a foreman in the presence
10  of anybody else, that's immediate suspension. I don't
11  tolerate it. So if that's my firm belief, how can I go
12  around doing the opposite?
13  Q    Okay. Do you remember where you were when you
14  first learned that this litigation had been filed?
15  A    This one here? No. Actually, I received a
16  phone call from Shawn telling me that I need to be down here
17  that other day, and that was it.
18  Q    Okay. Your -- the rules are such that you're
19  not -- I'm not asking about conversations you had with your
20  attorney and you should for your own -- you should avoid
21  that. Okay? That's not -- I know that's not what you meant
22  but I'm just saying -- anyway, you learned it from your
23  attorney?
24  A    Fair enough.
25  Q    Fair enough. Now, since the time that you

---

**47**

1  learned about this litigation, about this lawsuit, have you
2  had any difficult personnel relationship problems with
3  Mr. Hazzard? By difficult I mean, you know, where you and
4  he disagreed on an application of the contract or the terms
5  and conditions of employment to any issues of leave, I'm
6  thinking specifically of a bereavement situation, or
7  anything like that. Could you respond to that?
8  A    Well, let's be specific then. We'll stick
9  with the bereavement situation.
10  Q    Okay. Let's talk about that.
11  A    Mr. Hazzard submitted an application for
12  bereavement.
13  Q    All right.
14  A    And submitted it for five days, and it was
15  asked why was he submitting because it was his sister's --
16  I'm thinking sister-in-law or sister. Correct me.
17      MR. HAZZARD: My sister's husband.
18  A    Her sister's husband had moved in two to three
19  days prior and had an unfortunate death. Okay. Now, I'm
20  trying to evaluate -- as a matter of fact, it may have even
21  been two or three weeks. I'll give the benefit, two or
22  three weeks.
23      Now, the IRS stipulates that you must be
24  living in X amount of months in order to be classified as a
25  dependent. The contract stipulates that your sister-in-law

---

**48**

1  -- your -- or your sister you're entitled to five days.
2  Brother-in-law I think it's only one day you're allowed for
3  the funeral. But because this person had moved in two or
4  three weeks, Mr. Hazzard was asking for a dependent because
5  they were living under the household, and I totally
6  disagreed, and I informed him of such.
7      And then later we asked Mr. Hazzard to provide
8  proof that this person was residing, and as soon as
9  Mr. Hazzard provided the proof then Mr. Hazzard's
10  bereavement was -- those days were granted as bereavement
11  days. But I find it very hard to swallow that just because
12  somebody is living with you two to three weeks that
13  classifies them as being a dependent.
14  BY MR. BAILEY:
15  Q    Do you know any families that have been
16  riddled by cancer where people pulled together to look after
17  each other, in-laws, brothers, sisters, parents? Have you
18  ever experienced anything like that?
19  A    If that would have been his sister, that would
20  have been a totally different avenue, sir.
21  Q    You say you required Mr. Hazzard to produce
22  proof. What kind of proof are you talking about?
23  A    What Mr. Hazzard provided was a death
24  certificate that stipulated that that person had resided
25  there, and it was over.

---

**49**

1  Q    A death certificate?
2  A    That's what he provided. I didn't ask for a
3  death certificate. I just asked for proof, and that's what
4  he provided.
5  Q    Okay. How many similar situations as a
6  management person have you had like that, like the one you
7  had with Mr. Hazzard, if any?
8  A    None.
9  Q    Do you have any reason to believe that
10  Mr. Hazzard was not genuinely distraught over the death of
11  his brother-in-law?
12  A    I have no reason to disbelieve that, no.
13  Q    Do you have any reason to believe that they
14  were not very close and very good friends?
15  A    I have no idea what the relationship was.
16  Q    What was the ultimate outcome of the
17  disagreement between you and Mr. Hazzard about the
18  bereavement situation?
19  A    Mr. Hazzard was granted the bereavement.
20  Q    Did you ultimately make that decision or was
21  that made by someone -- any of your superiors or was it made
22  by you?
23  A    It was a collaboration between myself and
24  Mr. Freeman.
25  Q    Did you recommend to Mr. Freeman that the

---

13



50

1 bereavement be granted?
2    A    Yes. Once proof was provided, yes. I mean,
3 once proof was provided -- that's all we asked Mr. Hazzard
4 to do. And once it was provided, it was done, it was over.
5    Q    What had, if anything, Mr. Hazzard ever done,
6 if I understand you correctly and I may not --
7    A    Uh-huh.
8    Q    -- that would cause you not to believe him?
9    A    It wasn't a matter not to believe him. I had
10 to go by what the contract stipulated, and the contract
11 stipulated a brother-in-law you were only entitled one day.
12    Q    How many years did Mr. Hazzard give to the
13 school district?
14    A    You can ask him. I don't know.
15    Q    I mean, 5 days of bereavement leave in 30
16 years of service. In fairness to you, you had responded to
17 some questions earlier about being charged with racism --
18    A    Uh-huh.
19    Q    -- by Mr. Hazzard, allegations of racism.
20    A    That is correct.
21    Q    All right. If you were to evaluate the number
22 -- the relationships you have with the entire number of
23 head custodians, would you classify any of the
24 management/employee relationships as poor or, you know,
25 where you can't really communicate, where there is just very

51

1 poor communication or very poor -- a very poor relationship?
2    A    I cannot speak for other people. I can only
3 speak for myself.
4    Q    Yes, sir.
5    A    As far as my relationship with the custodians
6 or are we speaking with all AFSCME personnel that come in
7 contact with me?
8    Q    No. I would assume that the head custodian
9 position is a difficult -- I mean, you have got to manage --
10 there's a lot of work to do, I would assume. Each of them
11 has a staff, a lot of facilities. I'm sure it's not an easy
12 job for you. I'm trying to concentrate on the --
13    A    Head custodians?
14    Q    Yes, sir, yes.
15    A    Okay. Do I have a good rapport with them?
16    Q    Yeah.
17    A    Well, some like me, some hate me.
18    Q    Okay. So it runs the gamut, pretty much as in
19 most situations, there are some that are easier to get along
20 with and some that are not as easy to get along with?
21    A    Pretty much.
22    Q    Is that fair to say?
23    A    I would say that's fair.
24    Q    And I would agree with you, incidently.
25 That's fairly typical in a matter where human beings are

52

1 involved.
2    A    You can't please everybody.
3    Q    Yes, sir. Now, Mr. Hazzard is -- how does he
4 fit in there, is he somebody -- if you'd look at the group,
5 is it an average relationship, do you and he have a hard
6 time understanding each other, does he have a hard time
7 understanding you, how would you classify it?
8    A    I think Mr. Hazzard understands me pretty
9 much. I think I'm very direct on what my intents are to
10 be. I know Mr. Hazzard calls me when he has a lot of
11 concerns and things that I think he is able to take care of,
12 but he calls me just for whatever reason he does, especially
13 dealing with disciplinary actions, and I do my best to help
14 support him.
15    Q    How much of a staff does he have?
16    A    He has two other personnel.
17    Q    Okay. And he's at a small school?
18    A    That is correct.
19    Q    Okay. Now, have you ever had discussions with
20 -- strike that. Let's go back to 1999 before you did your
21 transfers. Where had Mr. Hazzard been working, what school
22 was he in?
23    A    He was at Marshall.
24    Q    And do you recollect how long -- recollect how
25 long he had been at Marshall?

53

1    A    I have no idea.
2    Q    And is Marshall -- what grades are in
3 Marshall?
4    A    The same as Shimmell. What is it, one through
5 six, one through seven.
6    Q    And how many students at Marshall?
7    A    I couldn't tell you that.
8    Q    How many square feet? What's the square
9 footage, if you remember?
10    A    I have a binder that has all that. I don't
11 know it off the top of my head.
12    Q    Okay. Does -- is Shimmell and Marshall pretty
13 much the same square footage, if you remember?
14    A    I would say Marshall would be larger because
15 Marshall has the gym. Without the gym, classroom-wise I
16 would say they're pretty close. I think we have -- let's
17 see. The second floor has, what, six classrooms. The first
18 floor has I think eight or ten along with the bottom and
19 kindergarten wing. So I would say classroom-wise they're
20 pretty similar. I think they're pretty close. I think
21 Marshall may beat them by three classrooms because I think
22 there is only eight classrooms per wing at Marshall School.
23    Q    All right. Now, when you did the transfer, I
24 know the general group of employees, the custodians, were
25 not -- were displaying complacency. Was Mr. Hazzard and

14



**CURTIS, TIMOTHY**
**11/19/01**

**HAZZARD VS**
**CURTIS**

---

54

1 Mr. McMurray -- were they both -- one as complacent as the
2 other in your view or was either one of them more
3 dysfunctional or less creative than the other, if you could
4 compare them for me, before you did the transferring. If
5 you remember, can you compare them for me?
6  A   No, because I did not do any comparison
7 amongst any of the custodians to see who was a weakling, who
8 was a strong individual, who had this type of innovative --
9 it was just a lot easier to just switch everyone.
10  Q   Okay. Now, I want to turn my attention to the
11 issue of race now. Okay? How many custodians -- 1A's, 1B's
12 -- do you have that are white?
13  A   Head custodians?
14  Q   Yes, sir, head custodians.
15  A   Mr. Hazzard would be the only one.
16  Q   Okay. Now, as -- and going back to the summer
17 of 1999, how many were white at that time?
18  A   The summer of 19 -- Mr. Hazzard.
19  Q   During your tenure, is Mr. Hazzard the only
20 white head custodian that you have had to supervise?
21  A   That is correct.
22  Q   All right. Now, at Shimmell did -- does
23 Mr. Hazzard have the same size work force that he had at
24 Marshall?
25  A   I think he has one less.

---

55

1  Q   One less?
2  A   Yeah. I think there were -- were there four
3 at Marshall? I believe there were four at Marshall.
4      MR. HAZZARD: There was. They took one from
5 every school.
6  A   So then he had the same.
7 BY MR. BAILEY:
8  Q   Okay. So there was four at Marshall.
9  A   No, not if they took one.
10  Q   Well, okay, but I mean -- do you know when --
11 you're not allowed to testified.
12  A   Let me think real quick.
13  Q   Okay.
14  A   There was -- let's see. No, there were four,
15 there were four.
16  Q   At Marshall?
17  A   That is correct. There were four at Marshall.
18  Q   Mr. Curtis, there were four at Marshall when
19 you took the position with the school board. When you took
20 -- when you assumed the position of facility supervisor,
21 there were four at Marshall in addition to the head
22 custodian?
23  A   No, a total of four with.
24  Q   Okay. Okay. I got it now.
25  A   A total of four with the head custodian.

---

56

1  Q   I got a clearer picture now.
2  A   A total of four with the head custodian.
3  Q   Okay. And when mister -- then they took one
4 away from every school, just sort of a reduction in force?
5  A   I think that was prior to --
6  Q   Okay.
7  A   -- because there were still four. When I took
8 over, there were still four there.
9  Q   Now, when Rowland opened up, how many total
10 force did it have, was it six?
11  A   That is correct.
12  Q   Six. And that would have included the head
13 custodian?
14  A   That is correct.
15  Q   So the difference prior to the cut being made
16 would have been the difference between four and six, and
17 after the cut would have been the difference between three
18 and six between Marshall and Rowland and between Shimmell
19 and Rowland?
20  A   Okay. So I understand, between Marshall and
21 Shimmell there would have been one. Between Marshall and
22 Rowland there would have been two. Between Shimmell and
23 Rowland there would have been three.
24  Q   Okay.
25  A   Difference.

---

57

1  Q   All right. Thank you. Now, Mr. McMurray, if
2 I remember correctly, had been at Franklin?
3  A   No. Mr. McMurray was at Hamilton.
4  Q   No, no, I mean before Hamilton. I'm sorry.
5  A   He was at William Penn.
6  Q   William Penn, that's correct. Now, how many
7 were at William Penn?
8  A   Eight.
9  Q   And how many were at Hamilton?
10  A   Three.
11  Q   And how many were at Rowland, six?
12  A   Correct.
13  Q   Now, at William Penn there were eight, but
14 then there was one taken away from every school so that went
15 to seven?
16  A   No. Get rid of the one taken away, just lose
17 that --
18  Q   Okay.
19  A   -- because all that happened way before me.
20  Q   Okay. I read you. I see. All right. Okay.
21 So eight to three to six; right? Now, do you know whether
22 Mr. McMurray was a union official?
23  A   I think he's a steward for the head
24 custodians.
25  Q   Well, how do you -- okay. Have you ever

---

15



**58**

1 interacted with him on that basis?
2    A    **Oh, of course. Yes, I have.**
3    Q    Okay. Has he ever represented Mr. Hazzard?
4    A    **That, I'm not sure of. I don't -- no, I don't**
5 **-- I don't know. I would have to check my log for that.**
6    Q    Mr. Hazzard is alleging that he was singled
7 out, that he was treated the way that he was treated and
8 that no one else was treated that way but him. It's a thing
9 -- it's a thing in civil rights law in employment
10 discrimination that forms the basis of a theory called
11 disparate treatment. Okay? He's treated differently than
12 other people in a similar situation. Based upon the
13 knowledge and experience -- and not that I can't presume the
14 answer to this, but I want to give you an opportunity to
15 respond to this.
16    A    **Okay. Before you go, I just want to make sure**
17 **that I'm understanding where you're leading to this.**
18    Q    Here's where I'm going. Let me give you some
19 --
20    A    **In layman's terms.**
21    Q    Yeah, okay. One of the basis in civil rights
22 law is that you look at a bunch of circumstances and if the
23 circumstances show that two people in the same situation are
24 treated differently -- okay?
25    A    **Uh-huh.**

**59**

1    Q    They're treated differently. And the only
2 reason -- the only apparent reason is the color of their
3 skin, their race -- okay -- then a presumption arises. And
4 without getting into all that, because Mr. Fink and
5 Mr. Lochinger know this law very well -- without getting
6 into all that --
7    A    **Excuse me.**
8        **(Discussion held off the record.)**
9 BY MR. BAILEY:
10    Q    Okay. Mr. Hazzard is complaining that he was
11 treated differently, that I'm the only white person -- and I
12 deal with this frequently, naturally, because I represent
13 many more black people in these kind of situations than I do
14 white people. This is reverse discrimination. And he's
15 saying in effect -- and this is going to form the basis of
16 my question -- that, you know -- I've looked for a reason
17 for why Mr. Hazzard experienced the things that he did.
18        I want to give you an opportunity to do two
19 things. I'm going to ask you about his job performance.
20 I'm letting you know very honestly, laying my cards on the
21 table where I'm coming from. I'm going to ask you questions
22 about his job performance, how well he did, how well he did
23 in your view compared to other custodians, and, you know,
24 you need to answer those questions, and I'm sure you will
25 fully and completely. Number two, I want to give you an

**60**

1 opportunity to respond to the allegations he made on race
2 based on his analysis of the facts, which are that he was
3 treated differently with no other explanation other than the
4 color of his skin.
5        Now, let's go to his first part of this and
6 ask you about his job performance. You had alluded earlier
7 to the fact that when you might go to a facility that he was
8 managing and you might find -- or he was working at -- that
9 his area was okay but his subordinates' areas were not. Do
10 you remember that?
11    A    **Uh-huh.**
12    Q    Okay. Did you ever ascertain a reason for
13 that?
14    A    **Of course.**
15    Q    What was it?
16    A    **I don't know.**
17    Q    All right. Did you ever discuss that?
18    A    **I want you to understand. That was the answer**
19 **given to me.**
20    Q    Oh, I'm sorry. I thought that was -- okay.
21 Did you ever reach any conclusions in your own mind as to
22 what the reason for that was?
23    A    **Did I reach -- oh, yeah, I reached a good**
24 **conclusion.**
25    Q    Okay.

**61**

1    A    **And that conclusion was that he was not**
2 **getting them to perform to the level that he was at.**
3    Q    Okay. Did he ever -- did you ask him why they
4 were not performing? I mean, his level was fine, we
5 understand that, but he has a duty to oversee these other
6 folks.
7    A    **That is correct.**
8    Q    Now, my understanding is he was not -- they
9 were not performing to a proper level, and you inspected and
10 whatnot and found they were not -- these subordinates of his
11 were not performing to a proper level. Did he ever offer
12 you an explanation as to why they were not performing to a
13 proper level?
14    A    **Well, I knew that Mr. Hazzard had personnel**
15 **problems with some of his people, but, I mean, it was**
16 **nothing that -- if somebody doesn't come to work, you can't**
17 **do nothing about them not showing up for work. But when I**
18 **was there for the day of the inspections and looking at**
19 **their work and their performance that they're doing, they**
20 **knew when I was coming for the inspections so they knew that**
21 **they had to have their areas taken care of. And if I'm a**
22 **supervisor, I'm going to make sure that my area is good, and**
23 **I'm also going to make sure that my peoples' areas are**
24 **good. So that's his responsibility to do so and why he did**
25 **not do that -- Mr. Hazzard would just shake his head and**

16

62

1 say, yes, I understand what you're saying, I understand what
2 you're saying.
3    Q    Did he ever indicate to you that the
4 subordinates would not respond to him because -- did he ever
5 complain to you because of how you treated him?
6    A    How I treated who, Mr. Hazzard?
7    Q    Yes, about the perceptions that they may have
8 gathered from how you treated Mr. Hazzard?
9    A    No, no, nothing was ever told to me that they
10 would not perform due to the way that I would treat
11 Mr. Hazzard.
12   Q    Do you know if Mr. Hazzard ever had any
13 difficulty or problem with, you know, one of his principals
14 or vice principals or one of the people that ran the
15 building where he worked?
16   A    I know Mr. Hazzard and Mrs. Cobb-Jones did not
17 get along.
18   Q    And did you have any conversations with her
19 about Mr. Hazzard?
20   A    Yes, I would.  As a matter of fact,
21 Mr. Hazzard would call me up and say that she's requesting
22 this and I can't do this, and then I would intervene.
23   Q    Okay.  Was Mr. Hazzard at fault or give me
24 some circumstances where he was at fault in those situations
25 or was it -- basically was he between a rock and a hard

63

1 place or was he --
2    A    No, he was never between a rock and a hard
3 place because he knew exactly where his supervision was at,
4 which lied underneath me, and he knew that he also had to
5 work with the principals in order to accommodate their
6 needs, which I had to inform the principals that they have a
7 job that they need to maintain and do and you can't keep
8 pulling custodians to take care of other issues, but the
9 problem that would occur some custodians, heads, would take
10 it to a different level and say I'm not gonna do this.
11   Q    Is that what Mr. Hazzard did?
12   A    Yes, Mr. Hazzard did that a couple times.
13   Q    And was it -- well, what was this -- was it
14 Mrs. Jones, did you say?
15   A    Cobb-Jones.
16   Q    Okay.  Was Mrs. Jones -- do you believe she
17 was unfair to Mr. Hazzard?
18   A    No, because I know that she would speak to
19 Mr. Hazzard prior to -- the principals only contact me when
20 there was a problem.  As I told the head custodians and I
21 told the principals at the principals meeting, I prefer you
22 two work it out.  You two are at the building.  Okay?  Head
23 custodians, you talk to the teacher first who you're having
24 a problem with.  If you don't get no resolution, you go to
25 the principal.  If you don't get resolution to the

64

1 principal, then you come see me.  Principals, when you have
2 a problem with one of the custodians, talk to the head
3 custodian at that building.  If you don't get resolution
4 from them, then contact me.
5    Q    Did any principal or person -- I don't know
6 who's in charge of a building.  You're in charge for certain
7 functions, obviously, and the principal is in charge, I
8 guess, of general functions and for education I guess or
9 administration of education; is that right?
10   A    They take care of education.  I maintain
11 efficiencies of it.
12   Q    And when there's a conflict between you and a
13 principal over what a custodian does, who wins?
14   A    Let's just put it this way:  I've never had
15 that.
16   Q    Okay.  Now, did you ever have any principals
17 or assistant principals who stood at bat for Mr. Hazzard?
18   A    No, because there is no assistant principal at
19 Shimmell.
20   Q    Well, did you ever have any principal disagree
21 with you about how you treated Mr. Hazzard?
22   A    Not to my knowledge.
23   Q    Did you ever have any employee or any union
24 official disagree with you about how you treated
25 Mr. Hazzard?

65

1    A    Well, if you're going to talk about
2 grievances, yes, there were people that disagreed with me
3 based on grievances that he's filed, but as far as anybody
4 personally come up to Tim Curtis and say I don't think
5 you're treating Mr. Hazzard fairly, no.
6    Q    I don't mean those particular words, but I do
7 mean more in terms of how he was treated.  I mean, I am
8 talking about personal management style.
9    A    No one has come up to Tim Curtis and said
10 you're treating Mr. Hazzard unfairly.
11   Q    Okay.  Now, have you and Mr. Hazzard ever had
12 for want of a better description an argument?
13   A    I don't know if we've had arguments.  I know
14 Mr. Hazzard would call me when he would be frustrated with
15 situations, and then I would have to tell him this is how
16 you have to handle it but as far as him -- no, not to my
17 knowledge.
18   Q    Okay.
19   A    Unless you have a specific one you can
20 recollect my memory here.
21   Q    Something comes to my mind, a woman named
22 Shirley, some situation where you were talking to mister --
23 talking to Mr. Hazzard and a woman named Shirley --
24   A    Uh-huh.
25   Q    -- who was a custodian or --

17

66

1  A    **Right.**
2  Q    Do you remember that situation?
3  A    **Well, we've had quite a few with Shirley, so**
4 **you really need to be specific.**
5  Q    Well, I understand she's been dismissed.
6  A    **That is correct.**
7  Q    And -- but -- do you have a recollection at
8 any time her intervening in a situation where you were
9 dealing with Mr. Hazzard?
10  A    **Oh, no. The only thing that I can recall —**
11 **let's see. We talked with Shirley down in the basement. We**
12 **talked with Shirley in the one room in the nurse's area.**
13 **Those are the two that I recall where there was actual**
14 **meetings held due to write-ups Mr. Hazzard had done.**
15  Q    Well, have you ever disciplined Mr. Hazzard?
16  A    **I think Mr. Hazzard may have — I think he has**
17 **one. I think he has one. I'm not quite sure. I would have**
18 **to check his file.**
19  Q    Was it a major or minor discipline? In other
20 words, was it a verbal warning, was it some kind of
21 suspension?
22  A    **Oh, no, it wasn't -- no, it wasn't a**
23 **suspension. It would have been — it would have been a**
24 **verbal or written warning.**
25  Q    Okay. And there was no situation where there

---

67

1 was a docking of pay or anything like that?
2  A    **Nope.**
3  Q    Are you familiar with his disciplinary
4 history?
5  A    **With?**
6  Q    Are you familiar with Mr. Hazzard's
7 disciplinary history as an employee for The Harrisburg
8 School District?
9  A    **Not verbatim right now. I mean, it's nothing**
10 **for me to go take a look at his personnel file to find out.**
11  Q    No, but I mean are you at least -- I would
12 assume that you review personnel, and some people may be
13 more troublesome for you than others, and I'm just looking
14 for -- I know you've only been there a few years --
15  A    **The only time I look at somebody's -- not to**
16 **cut you off, but the only time I look at somebody's**
17 **personnel record when there's a disciplinary is when I'm**
18 **going to have a hearing. I don't have the time to go and**
19 **check -- and spot check personnel's records.**
20  Q    All right. Did you ever have any discussions
21 at all in any context, official or unofficial, with Nichelle
22 Chivis about Mr. Hazzard?
23  A    **I would say yes.**
24  Q    And when was the last time you had a
25 discussion with her about Mr. Hazzard?

---

68

1  A    **That would have been about the grievance in**
2 regarding what we're discussing today.
3  Q    Well, did you ever have any discussion with
4 Nichelle about the -- about whether AFSCME should withdrawal
5 the grievance? I can't speak for AFSCME. That's up to
6  A    **No. I can't speak for AFSCME. That's up to**
7 **them.**
8  Q    No, no. My question is did you ever have any
9 discussions -- now, AFSCME -- AFSCME -- I mean, there's no
10 doubt about the fact that union leaders are very good at
11 speaking for themselves. I don't mean to imply that they
12 wouldn't. My question is, did you ever have any discussions
13 with Nichelle Chivis about withdrawing the grievance,
14 whether she should or should not withdraw the grievance?
15  A    **No.**
16  Q    Do you know whether Mr. Freedom ever had --
17 Mr. Freeman ever had any discussions with Ms. Chivis about
18 whether she should withdrawal the grievance?
19  A    **Not to my knowledge. I can't speak on that.**
20  Q    Okay. Did you ever -- tell us then what you
21 -- what discussions you had with Ms. Chivis about
22 Mr. Hazzard.
23  A    **We were sitting -- actually, that would have**
24 **been Step 3 that we were at because Lance Freeman would have**
25 **been involved, and he would be representing the**

---

69

1 superintendent. So at that level in a grievance we're at
2 Step 3. The only thing that came about is Mr. Hazzard said
3 what he had to say, we said what we had to say and why we
4 did the transfer, and no decision was ever made right then.
5 They always respond later, you know, whether they concur,
6 they not concur, are they going to go to Step 4 with it. So
7 no decision was made at that time point.
8  Q    Well, did you or Mr. Freeman or anyone else
9 with the school district say to Nichelle Chivis that posting
10 was a mistake, it was an error?
11  A    **I don't think I said anything to Nichelle**
12 **about that, no.**
13  Q    And isn't it correct, Mr. Curtis, that you
14 were never in any discussion where you heard Mr. Freeman say
15 to Nichelle Chivis that was a mistake, the posting was a
16 mistake, it was an error?
17  A    **No, not to my knowledge, no.**
18  Q    You never heard that, did you?
19  A    **Not to my knowledge, no.**
20  Q    Do you know where Nichelle Chivis got the idea
21 that Mr. Hazzard's grievance had no merit?
22  A    **Again, you would have to ask Nichelle. I**
23 **can't speak for her. I don't know where she got the -- I**
24 **would assume based on our testimony that we transferred a 1B**
25 **person to a 1B's position.**

18

70

1  Q      You think that AFSCME bought that?
2  A      You can ask her.
3         MR. BAILEY:  Well, I did.  Hold on just a
4  second.
5  A      Okay.
6         MR. BAILEY:  I have to change the tape here.
7  It will only take me one minute.  Okay.  Thank you very
8  much.
9  BY MR. BAILEY:
10  Q     Okay.  Now, the -- Nichelle Chivis, I believe,
11  sent some kind of a letter saying that the grievance was
12  withdrawn?
13  A      Okay.
14  Q      Okay.  You didn't -- you never saw that?
15  A      Again, as I said earlier, all they told me is
16  that we did not violate the contract.
17  Q      Okay.  And who was they, Mr. Freeman?
18  A      That's correct.
19  Q      Okay.  So you took what AFSCME did as
20  precedence.  You took it as, hey, this is -- I did the right
21  thing, the posting was something that, you know, for
22  whatever it meant, whatever was worded, whatever, we're not
23  going to grieve this any further, the transfer that I did
24  with McMurray was okay under these circumstances; right?
25  A      To be very honest with you, I didn't -- I

71

1  didn't take it like it was like gospel or anything.  They
2  just said that we did not violate the contract.  That was --
3  and continued to move on.
4  Q      Well, you took from that that if that
5  situation arose again you could behave that way again, you
6  could do the same thing again because it --
7  A      Well, what do you mean behave?
8  Q      Well, let's take the word behave out of
9  there.  That if the same situation ever arose again that you
10  could act as you had acted because it was consistent with
11  the contract and, after all, AFSCME agreed?
12  A      That's a fair statement.
13  Q      Okay.  Now, one of the things you said a
14  little earlier was it was Step 3.
15  A      Uh-huh.
16  Q      We had a prior witness, I believe, testify
17  that Step 3 was a step where you went to the board.
18  A      I think that's 4.  I think Step 4 is when you
19  go to the board.
20         MR. FINK:  Can we show Mr. Curtis the
21  contract?  Maybe that will --
22         MR. BAILEY:  No.  I don't want to waste the
23  time because the contract will speak for itself, and I know
24  these folks are just going from memory.  We're not holding
25  you to that.  That's your best recollection, and we

72

1  understand.  It's the facts that count.
2  BY MR. BAILEY:
3  Q      The point is that at some point there was some
4  sort of a board committee or something.  Mr. Freeman has
5  described it as a board committee, and I think he indicated
6  that attendees at least were Mr. Brown and Mr. Davis.
7  A      That is correct.
8  Q      Are you familiar with that?
9  A      That was at Step 4.  That's correct.
10  Q      That's what you're referring to as Step 4?
11  A      Uh-huh.
12  Q      And you were at -- whatever -- whether Step 3
13  or Step 4, the point is you were at that meeting?
14  A      That's correct.
15  Q      And this is what I need to know based on your
16  interpretation, is that step -- is that the last step or can
17  you go to the full board after that, if you know, by -- just
18  by custom of what you do?
19  A      No, that's -- that is the last step for the
20  board.
21  Q      Okay.  Why is it only two members of the board
22  or is that not --
23  A      I have no answer for that.  I mean, it's --
24  they -- all four of them could have been busy or out of town
25  or somewhere and that date was set and only two made it

73

1  there.  No clue.
2  Q      Well, that's what I want to ask you.  The
3  board, the --
4  A      Committee.
5  Q      The board committee has how many members?
6  A      Actually, to be very honest -- well, there is
7  -- you have your board panel, which there are one, two,
8  three, four -- there are five members right now.
9  Q      Okay.  Now, does that mean five board members
10  or five --
11  A      That is correct.  No, five board members.
12  Q      That's it?
13  A      Total.
14  Q      That's the total group?
15  A      That's correct.
16  Q      So is the board committee in a case like
17  Mr. Hazzard's a committee of two or a committee of three or
18  a committee of four or a committee of five?
19  A      I can't answer that.
20  Q      You don't know?
21  A      I don't know.
22  Q      Did Nichelle Chivis actually say at the --
23  what you referred to as the Step 4 meeting --
24  A      She wasn't there.
25  Q      She was not there?

**74**

1    A    Huh-uh.
2    Q    Okay. You were there?
3    A    Myself, Mr. Freeman, Mr. Hazzard and
4 Mr. Tapper and I believe even Mr. McCollum.
5    Q    Okay. And at that point -- do you remember
6 what month that was or what year?
7    A    Huh-uh.
8    Q    At that point AFSCME had not withdrawn the
9 grievance?
10    A    I don't know.
11    Q    Well, that's part of the grievance procedure,
12 isn't it?
13    A    No.
14    Q    Was that a complaint?
15    A    That is correct. Let me think this through
16 here.
17    Q    Yeah, try to think about that.
18    A    Mr. Hazzard went -- see, Mr. Hazzard filed
19 this like three or four different ways.
20    Q    Okay.
21    A    He filed a grievance on it, and then the
22 grievance was taken all the way up to AFSCME, and then they
23 found no fault. Then Mr. Hazzard filed a complaint.
24 Correct. He filed a complaint, and then that had to get the
25 board to review it. That's right. He filed a complaint.

**75**

1    Q    So that board committee was about the
2 complaint?
3    A    That's correct.
4    Q    That's not part of the grievance procedure?
5    A    It had nothing to do with the grievance. It's
6 just -- that's through -- anybody can file a complaint
7 within the school district if they want to file a complaint.
8    Q    All right. Now, is there any part of the
9 grievance procedure where an employee can go to the board?
10 Now, grievance now, Mr. Curtis, not the complaint. I
11 understand the complaint is something that happens --
12    A    I have to look at that to see.
13    Q    You don't know?
14    A    It's spelled out. I mean, whatever it is,
15 that's what it is.
16    Q    I don't want you to interpret the contract
17 here today. I don't think that's fair to you. I mean, it's
18 really not. A lot of attorneys do that kind of thing. I
19 don't -- that's not fair. I think the contract will speak
20 for itself, and we can argue about that.
21    A    Okay.
22    Q    It's your perception of -- and not even today
23 what the contract means. It's really your perception as of
24 that time that's important. At that time do you have a
25 recollection of being aware, if indeed it is the case, that

**76**

1 an appeal to the board was part of the grievance procedure
2 itself? Do you understand what I'm asking?
3    A    Yeah, I know -- I understand what you're
4 asking, but I don't think Mr. Hazzard did that. I don't
5 think Mr. Hazzard fought -- I don't think Mr. Hazzard
6 appealed to the board. He went and filed a complaint to the
7 board to the best of my recollection because I think that
8 was for lack of a better word a ploy in order to get to the
9 board a lot quicker to hear his case.
10    Q    Okay. Do you remember a meeting before the
11 board where Mr. Epps appeared on behalf of Mr. Hazzard?
12    A    No, he wasn't there at that grievance hearing.
13    Q    Was that a grievance or a complaint hearing
14 now to totally confuse things?
15    A    No. The grievance -- no because the grievance
16 --
17        MR. HAZZARD: It was a board meeting.
18    A    No. Epps wasn't at the board -- at the
19 complaint hearing at that time.
20 BY MR. BAILEY:
21    Q    Yeah. He has testified -- not to interrupt
22 you. He has --
23    A    Okay.
24    Q    He has testified that once the grievance was
25 over it was out of his hands. I think he indicated that on

**77**

1 a number of different occasions in fairness to him. So that
2 is very consistent with what you're saying. What I'm trying
3 to do is sort the two out and --
4    A    They're basically the same. It's just that
5 one's at -- one's still within the district following up
6 with AFSCME's grievance procedures.
7    Q    But here's the distinction, sir, and this is
8 what I'm trying to ascertain so our record can be more
9 clear, the board committee is something that deals with
10 complaints.
11    A    Uh-huh?
12    Q    The board committee is not something that is
13 set up as part of dealing with the grievance procedure, if I
14 understand the testimony of all the different witnesses
15 we've had. Now, if you know the answer to that or you can
16 confirm that, fine. If not --
17    A    I'm going to have to just take an I don't know
18 at this point.
19    Q    Okay.
20    A    Because to the best of my recollection you go
21 all the way up with the grievance.
22    Q    To the board itself?
23    A    To the board. You can go all the way up --
24    Q    Right.
25    A    That's like the final step on a grievance

20



78

1 procedure. You can go up to the board for that.
2  Q    All right. Mr. Epps had testified that -- he
3 opined, he gave an opinion --
4  A    Okay.
5  Q    -- that when he appeared before the board it
6 had to be the grievance because it was still in his hands,
7 it was a grievance, and later Mr. Fink asked him some
8 questions and I think it became a little confused so --
9  A    See, I don't think -- go ahead. I'm sorry.
10 Q    Yeah. All I need factually -- were you
11 present when Mr. Epps attempted to talk to the board about
12 Mr. Hazzard?
13 A    No.
14 Q    Okay.
15 A    The only one that I remember appearing before
16 Mr. Brown and Mr. Davis is when Mr. Hazzard had Mr. Tapper
17 and Mr. McCollum present for the complaint.
18 Q    Okay.
19 A    And that was strictly the complaint. That's
20 the best of my recollection.
21 Q    Okay. Do you attend board -- school board
22 meetings?
23 A    I try not to, but sometimes they make me
24 attend them, yes.
25 Q    Okay. All right. Did you attend any school

79

1 board meetings where Mr. Hazzard attended that you can
2 recollect?
3  A    Not to my knowledge. I don't -- I don't
4 know. I may have been sitting in one aisle, and he could
5 have been in the back. I have no idea. I can't answer
6 that.
7  Q    Okay. Now, did you ever attend any school
8 board meeting where a discussion about a grievance or an
9 employee grievance was aired before the committee -- I'm
10 sorry -- before the board. Did you ever attend a board
11 meeting -- not a complaint now, but a board meeting.
12 A    See, I've never been at a board where that's
13 been --
14 Q    Okay.
15 A    Because they handle those separately. They
16 don't do them in public.
17 Q    Now, of your own knowledge at that time, were
18 you aware that the end of the grievance procedure before it
19 went to arbitration may have been a procedure where the
20 board itself was involved as a board?
21 A    The only thing that I know that has transpired
22 is the grievance was first, a complaint was next, an EEO was
23 done, and now I'm here for a lawsuit. That -- those are the
24 only four steps that I have seen so far. Regarding the
25 board and any other board meeting, I haven't seen that in a

80

1 public meeting because they will not discuss those at that
2 time.
3    MR. BAILEY: Okay. Let me step out with
4 Mr. Hazzard. Oh, wait a minute. Attorneys, do you have
5 questions?
6    MR. FINK: I don't have any questions.
7    MR. LOCHINGER: No, I don't have anything.
8    MR. BAILEY: Let me step out for just one
9 moment -- I'm going to leave the tape running -- with
10 Mr. Hazzard and see if maybe we can finish up here. I'll
11 just be one moment.
12    (Recess.)
13    MR. BAILEY: Okay. We're done. We're
14 finished. I would like to thank you very much for appearing
15 here today.
16 A    All right.
17    MR. BAILEY: And I appreciate your providing
18 testimony.
19 A    No problem.
20    MR. BAILEY: Thank you. She has to sign you
21 off the camera, and then we're done.
22    THE VIDEO OPERATOR: Okay. It's 4:39 p.m.
23 The deposition of Timothy Curtis has concluded.
24    (The deposition was concluded at 4:39 p.m.)
25

81

1 STATE OF PENNSYLVANIA  :
2 COUNTY OF YORK        :              : ss
3
4    I, Lisa A. Hansell, a Reporter Notary-Public,
5 authorized to administer oaths within and for the
6 Commonwealth of Pennsylvania and take depositions in the
7 trial of causes, do hereby certify that the foregoing is the
8 testimony of TIMOTHY L. CURTIS.
9    I further certify that before the taking of
10 said deposition, the witness was duly sworn; that the
11 questions and answers were taken down stenographically by
12 the said reporter, Lisa A. Hansell, a Reporter
13 Notary-Public, approved and agreed to, and afterwards
14 reduced to typewriting under the direction of the said
15 Reporter.
16    I further certify that the proceedings and
17 evidence contained fully and accurately in the notes by me
18 on the within deposition, and that this copy is a correct
19 transcript of the same.
20    In testimony whereof, I have hereunto
21 subscribed my hand this 12th day of December, 2001.
22
23
                    _____
                    Lisa A. Hansell, Reporter
24                  Notary Public
25 My commission expires:
    May 20, 2004

21

# EXHIBIT C

1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3

 4  WILLIAM A. HAZZARD,                   :

                 PLAINTIFF               :

 5                                       :

                 VS.                     :  NO. 1:CV-00-1758

 6                                       :

    TIM CURTIS, MACK MCMURRAY,           :

 7  AFSCME, DISTRICT 90, AND THE         :

    HARRISBURG SCHOOL DISTRICT,          :

 8                 DEFENDANTS            :

 9

10

11

12

13

            VIDEO

14      DEPOSITION OF:   ROBERT L. MCMURRAY

15      TAKEN BY:        PLAINTIFF

16      BEFORE:          LISA A. HANSELL, REPORTER

                         NOTARY PUBLIC

17

                         ANTHONY MARCECA, LEGAL

18                       VIDEO OPERATOR

19      DATE:            OCTOBER 18, 2001, 10:09 A.M.

20      PLACE:           LAW OFFICES OF DON BAILEY

                         4311 NORTH SIXTH STREET

21                       HARRISBURG, PENNSYLVANIA

22

23

24

25
```

**2**

1 APPEARANCES:
2     LAW OFFICES OF DON BAILEY
    BY: DON BAILEY, ESQUIRE
3       FOR - PLAINTIFF
4     WILLIG, WILLIAMS & DAVIDSON
    BY: ERIC M. FINK, ESQUIRE
5       FOR - DEFENDANTS MACK McMURRAY,
      AFSCME AND DISTRICT 90
6
    RHOADS & SINON, LLP
7     BY: SHAWN D. LOCHINGER, ESQUIRE
      FOR - DEFENDANTS TIM CURTIS AND
8       THE HARRISBURG SCHOOL DISTRICT
9
10 ALSO PRESENT:
11     WILLIAM A. HAZZARD
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1          TABLE OF CONTENTS
2
3         WITNESS
FOR PLAINTIFF     DIRECT    CROSS
4 Robert L. McMurray     5     --
5
6
7
8
          PRODUCED
9 EXHIBIT NO.         AND MARKED
10 1 - Letter to Mr. McMurray from
    Lance Freeman dated 8/12/99     97
11
    2 - Envelope from letter dated 8/12/99     97
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1     MR. BAILEY: Let me just -- before we start
2 with that, first of all, I think we had been on the -- as to
3 the caption, they have Mack McMurray down here, and I think
4 we have been corrected. It's Robert McMurray; is that
5 correct?
6     MR. McMURRAY: Yes, it is.
7     MR. BAILEY: Okay. Mack is a sometime
8 nickname sort of thing; right?
9     MR. McMURRAY: Yes.
10     MR. BAILEY: Okay. We apologize for that, by
11 the way, but I do want to bring that to the attention of the
12 -- and also before we begin if we can get a voice check,
13 first of all, because there will be a transcript made from
14 this, and we have a stenographer here, by the way, also. I
15 want to make that clear on the record.
16     My name is Don Bailey. I represent the
17 plaintiff, Mr. Hazzard. Mr. McMurray has already identified
18 himself on the record and one of the two lawyers here -- the
19 additional -- the other two lawyers can identify themselves.
20     MR. LOCHINGER: Sure. I'm Shawn Lochinger,
21 and I represent The Harrisburg School District.
22     MR. FINK: And I'm Eric Fink, and I represent
23 AFSCME and Mr. McMurray.
24     MR. BAILEY: Okay. And since I know the --
25 there is a separate stenographic record being made, why

**5**

1 don't we have the stenographer swear him in because they're
2 going to be getting transcripts from the stenographer and
3 then, Tony, we can just do the alternative means on this and
4 go from there. So, Miss, if you want to swear him in.
5
6     ROBERT L. McMURRAY, called as a witness, being
7 sworn, testified as follows:
8
9       DIRECT EXAMINATION
10
11 BY MR. BAILEY:
12 Q    Mr. McMurray, I believe I've been introduced
13 to you as the attorney for the plaintiff, Mr. Hazzard. What
14 we're doing here today -- just let me give you some
15 preparatory things here. I am going to assume that you
16 haven't done many depositions. Have you ever done any
17 before?
18 A    No.
19 Q    All right, sir. Here's what we're trying to
20 achieve here today: this is -- first of all, we want you to
21 feel relaxed and comfortable. I am not -- you see all these
22 things on television. I don't want you to worry about those
23 kind of things. I like to be very relaxed in the
24 depositions that I do. I don't want you to be concerned or
25 unhappy. You do have counsel here. I don't object if at

2



MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

6

1 some time during the deposition you want to stop and you
2 want to check with counsel. If you have a concern, you feel
3 free to do that. Okay? And if at any time during the
4 deposition you feel uncomfortable, you know, there's a need
5 to use the rest room or take a break, I want you to please
6 feel free to speak up, and we will certainly accommodate
7 you.
8       Now, because the deposition is being taken --
9 not only being taken on audio but because we have a young
10 lady here who is taking down the testimony, it's very
11 important that you respond verbally and in a clear way so
12 that we know what your answer or response to a question
13 would be. You can't answer with your hands or with a shake
14 of the head. You know, you have to verbalize. You have to
15 speak up.
16      Mr. McMurray, I do something a little
17 different than most lawyers do. If I ask you a question and
18 you either don't understand what I'm asking you, if you're
19 not sure about what I'm asking or even if you're curious
20 about what I'm getting to, I want you to feel free to ask me
21 and I will be very happy to provide you with a response. I
22 have absolutely no interest in any kind of trick question.
23 I have no desire to prevent you from answering fully and
24 completely to the best of your ability, and we want you to
25 do that and to feel comfortable doing that. And in that

7

1 vein I think it's only fair if you figure -- you know,
2 sometimes you sit there and it's sort of difficult in these
3 situations for witnesses because they wonder where the
4 attorney is going or what the attorney is, you know, trying
5 to do or get at, and I don't want you to have those
6 anxieties.
7       Now, with those things being said, do you have
8 any questions of me before we begin, and we'll start the
9 formal process of asking you questions and that sort of
10 thing?
11 A     No.
12 Q     All right. And remember, try to keep your
13 voice up so we can, you know, get your responses down. And
14 also the last thing, Mr. McMurray, from time to time I may
15 ask a question that seems almost foolish to you. It's going
16 to seem like a dumb question. It's just that -- it probably
17 will be, quite frankly, but, you know, it's a job that I
18 have to do and it also sometimes is just sort of basic facts
19 that we've got to get into the record. Okay? So if you'll
20 put up with me, I'd really appreciate it. Okay?
21 A     Yes.
22 Q     All right, sir, we're going to begin now.
23 Mr. McMurray, how are you employed?
24 A     The Harrisburg School District.
25 Q     And can you briefly describe for us your

8

1 duties there, sir?
2 A     I'm the first line supervisor of the custodial
3 department for Rowland School.
4 Q     And how long have you served in that capacity?
5 A     Since 1991.
6 Q     Okay. Since 1991 --
7 A     I've been a head custodian.
8 Q     Yes, sir. I was going to differentiate that.
9 You have been a head custodian since 1991. Have you worked
10 at Rowland Middle School since 1991?
11 A     No.
12 Q     And when did you start working at Rowland
13 Middle School?
14 A     August the 16th, 1999.
15 Q     Now, what are your duties as a head custodian?
16 A     To supervise the cleaning and the fixing of
17 the school.
18 Q     Okay. And -- so it's not just custodial
19 services, but there is also some maintenance and that sort
20 of thing?
21 A     Yes.
22 Q     Now, let's -- I'm going to change a little bit
23 of a direction here, and I'm going to ask you some questions
24 that more or less rotate around that date of August 16th,
25 1999. Okay? So they're going to be related to that. You

9

1 had indicated I believe in response to one of my previous
2 questions that you assumed the job as head custodian at
3 Rowland on August 16th, 1999; right?
4 A     Yes.
5 Q     Was it '99 or 2000?
6 A     '99.
7 Q     1999. Now, where did you work -- strike
8 that. You worked for the school district before August 16,
9 1999; right?
10 A    Yes.
11 Q    And -- but what was your work site before
12 August 16th, 1999?
13 A    Hamilton School.
14 Q    Hamilton School. Now, what was your work
15 title at Hamilton School?
16 A    Supervisor.
17 Q    You were a supervisor. Now, you described the
18 position at Rowland, if I remember correctly, as head
19 custodian; right?
20 A    Yes.
21 Q    And the position at Hamilton you've described
22 as supervisor?
23 A    Head custodian. Supervisor and head
24 custodian, they're all the same.
25 Q    They are the same?

3

MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

**10**

1   A    Yes.
2   Q    Okay. So at Hamilton you were a head
3 custodian, and that's the same as supervisor. And at
4 Rowland you were a head custodian, and that's the same as
5 supervisor?
6   **A    Yes.**
7   Q    Okay. Now, the -- how long had you worked at
8 Hamilton before you went over to Rowland?
9   **A    About three to four weeks.**
10   Q    Okay. You had been at Hamilton for three to
11 four weeks?
12   **A    Yes.**
13   Q    And at Hamilton you were producing the -- you
14 were working as the head custodian, the same thing?
15   **A    Yes.**
16   Q    Which is a supervisor?
17   **A    Yes.**
18   Q    Now, how large is Hamilton?
19   **A    It's a small school. It's a -- it's a small**
20 **school.**
21   Q    And how many -- what was the size of the
22 custodial work force that was there?
23   **A    About three to four people.**
24   Q    Three to four people. Now, at Rowland, how
25 large was that job?

**11**

1   **A    We have -- I have six. There's six of us all**
2 **total.**
3   Q    Six. Okay. Now, for the record, is there any
4 pay difference between Hamilton and Rowland?
5   **A    Yes.**
6   Q    Now, did you make more money at Hamilton or
7 more money at Rowland?
8   **A    My paycheck -- my pay status never changed.**
9   Q    Well, did you make more money at Rowland or at
10 Hamilton?
11   **A    Neither one. My pay status never changed.**
12   Q    Okay. Do you qualify to make more money or
13 can you qualify to make more money at Rowland?
14   **A    No.**
15   Q    Okay. I'm a little confused by your response
16 earlier to my question. Does -- did the Rowland job pay
17 more?
18   **A    No.**
19   Q    Okay. But you had six people there?
20   **A    Yes.**
21   Q    And you had four -- three to four people at
22 Hamilton?
23   **A    Yes.**
24   Q    And how was the job from Rowland any different
25 from the job at Hamilton, if it was? I'm not saying it was,

**12**

1 but how were they different?
2   **A    No different.**
3   Q    Okay. Is there any difference in terms of
4 overtime?
5   **A    No.**
6   Q    Is there any difference in terms of the -- of
7 any incentive or shifts, that sort of thing?
8   **A    No.**
9   Q    Is there any difference in terms of the amount
10 of work that needed to be done?
11   **A    Yes. There's more work in a larger school**
12 **than there is in a smaller school.**
13   Q    Okay. So you went to Rowland because you
14 wanted to do more work for the same amount of money?
15   **A    No.**
16   Q    Oh, okay. Why did you go to Rowland?
17   **A    I was transferred.**
18   Q    You were transferred. Okay. So you didn't
19 want to go to Rowland necessarily, but you were transferred?
20   **A    Yes, I wanted to go to Rowland.**
21   Q    Well -- in other words, you asked to be
22 transferred?
23   **A    Yes.**
24   Q    Okay. There's more work at Rowland than there
25 is at Hamilton, it pays the same amount of money, and you

**13**

1 asked to be transferred because you like to do more work for
2 the same amount of money. Now, is that correct?
3   **A    For the question you asked me, yes.**
4   Q    Okay. Why though? Can you tell me why?
5   **A    Can I confer with my lawyer?**
6   Q    Not in the middle of a question you can't.
7      MR. FINK: No, no, not in the middle of a
8 question.
9      MR. BAILEY: Not in the middle.
10      MR. FINK: Just answer the question.
11   **A    Could you repeat the question?**
12 BY MR. BAILEY:
13   Q    Yes, yes. Let me go back and redo them
14 because I noticed your reaction to them, and I don't want
15 you to think I'm trying to get at something. It's very,
16 very simple. I'm trying to understand why you wanted to go
17 to Rowland. It's really very simple. Why did you want -- I
18 think you indicated you wanted to be transferred to Rowland?
19   **A    Yes.**
20   Q    Okay. And I'm simply asking why. You know,
21 the bottom line why. You explained that it doesn't -- let's
22 see where we are. My understanding is that Rowland -- that
23 there is more work to do there because it's -- in your words
24 it's a larger school so that brings more work with it. I
25 don't really know the reason for that, and we're going to

MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

14

1 explore that a little bit, but my understanding from your
2 testimony is that Rowland represented more work. Okay. You
3 had been at Hamilton. You were careful to advise me that
4 the word to describe the change -- you know, your change to
5 go to Rowland was transferred, okay, and that there was more
6 work but your pay status didn't pay, and I asked a number of
7 questions from that. So I'm assuming that you got paid the
8 same.
9  A    Yes.
10 Q    There's no difference in money. You're
11 confirming that. Now my question is very, very simple. You
12 wanted to go to Rowland, it's more work, it's the same pay.
13 Why did you want to go to Rowland from Hamilton?
14 A    **Because I wanted to go to that school.**
15 Q    Okay. Just -- okay. Can you tell us why you
16 just wanted to go to that school?
17 A    **Yes.**
18 Q    Okay.
19 A    **Can I back up a little bit?**
20 Q    Oh, yes, sir, no problem during the deposition
21 if you need to, sure.
22 A    **I was originally the head custodian at William**
23 **Penn. During the summer of 1999, Tim Curtis transferred all**
24 **the custodians to different schools.**
25 Q    The summer of '99, sir?

15

1  A    **Yes.**
2  Q    Okay. I'm going to come back to that period
3 of time that you were at Hamilton, so you're a little ahead
4 of me, but you go right ahead.
5  A    **Tim Curtis transferred all the custodians to**
6 **different schools. I was transferred to Hamilton**
7 **temporarily until Rowland opened up with the same amount of**
8 **pay that I would be getting at William Penn I get at**
9 **Rowland. I was only down there for three or four weeks**
10 **because Hamilton had no head custodian.**
11 Q    All right. Let's look at this now. You had
12 been at Hamilton two to three weeks, three to four weeks,
13 whatever it might have been, a short period of time; right?
14 A    **Yes.**
15 Q    Before you went to Rowland. And we're talking
16 about sometime in July, August of 1999; right?
17 A    **Yes.**
18 Q    Where were you before you were temporarily as
19 I understand you have testified -- where were you before you
20 were temporarily placed at Hamilton?
21 A    **William Penn Intermediate School.**
22 Q    And can you tell us why Mr. Curtis had caused
23 you to be placed at Hamilton temporarily?
24 A    **Because -- no, I can't tell you that. I don't**
25 **-- the transfer --**

16

1  Q    Let me say this to you because there's an
2 instruction I failed to give you that I should have. From
3 time to time I may ask a question and you don't know the
4 answer to the question. If it's truthful and it's a
5 thorough answer and you don't know the answer, it's a
6 perfectly legitimate answer. A lot of times witnesses have
7 a tendency because they get into -- you know, again, it's
8 tough being a witness. They feel that they have to respond
9 and come up with something. Don't do that. If you don't
10 know the answer and that's truthful, that's fine. Let me go
11 back and ask it again because you seemed to express some
12 doubt. At least you looked that way to me. I think I had
13 asked the question why -- why Mr. Curtis had temporarily
14 placed you at Hamilton. You had been at Penn; right?
15 A    **Yes.**
16 Q    Okay. Why did he temporarily place you at
17 Hamilton?
18 A    **Because during the transfer Hamilton School**
19 **had no head custodian. The head custodian there had**
20 **resigned.**
21 Q    Okay. I think you had indicated that.
22 A    **Yes.**
23 Q    Okay. Now, let's take that just a step
24 further. That begs a question. Mr. Curtis for whatever
25 reason -- we can question him about this when he gets an

17

1 opportunity to testify -- had temporarily placed you at
2 Hamilton because the head custodian at Hamilton had resigned
3 or left or quit or something like that; right?
4  A    **Yes.**
5  Q    All right, sir. Mr. McMurray, why me?
6  A    **Because I was -- why me?**
7  Q    Yes, sir. Why you?
8  A    **Because William Penn High School was going to**
9 **Rowland School. They were sending all the eighth graders to**
10 **Rowland School, and the whole staff was going to Rowland**
11 **School.**
12 Q    Okay?
13 A    **And at that particular time Rowland School had**
14 **not been finished with the construction. As a head**
15 **custodian at that time I had no place else to go, so he**
16 **transferred me to Hamilton because Hamilton had no head**
17 **custodian until Rowland opened up.**
18 Q    So you had been the head custodian at William
19 Penn?
20 A    **Yes.**
21 Q    Okay. And he had transferred you to Hamilton
22 temporarily knowing -- he had to have known that he was
23 going to put you in at Rowland; right?
24 A    **Yes.**
25 Q    And you had to have known that; right?

5

18

```
1    A       Yes.
2    Q       All right.  Mr. McMurray, when did you know
3  that you were going to go over to Rowland Middle School?
4  You've already explained -- and I'm going to ask some
5  questions about this -- that at William Penn the entire
6  staff was going to go --
7    A       Yes.
8    Q       -- to Rowland?
9    A       Yes.
10   Q       Now, let's start there.  Let's start there
11 with these questions, and I'll strike that previous
12 question.  Let me try to sort of build -- build a wall here,
13 if I can.  William Penn you had indicated was going to send
14 a certain number of students over to Rowland Middle School?
15   A       Yes.
16   Q       Rowland Middle School was in the process of a
17 renovation?
18   A       Yes.
19   Q       Now, the entire custodial staff at William
20 Penn was going to be transferred to Rowland according to
21 what you're telling me?
22   A       They had an opportunity to go.
23   Q       Okay.  They had an opportunity to go if they
24 wanted to?
25   A       Yes.
```

19

```
1    Q       Now, to your knowledge, was the work force for
2  the entire district going to be increased by any number
3  after the Rowland Middle School had been fixed up?
4    A       What do you mean by increased?
5    Q       Were they going to hire new or additional
6  people?
7    A       To my knowledge?
8    Q       Yes, to your knowledge.
9    A       No.  To my knowledge, no, but they would have
10 to.
11   Q       Who was the head custodian at Rowland before
12 the renovations?
13   A       No one.
14   Q       Was Rowland a brand new school?
15   A       Yes.
16   Q       So it was new construction?
17   A       Yes.
18   Q       It wasn't a renovation?
19   A       Yeah -- yes, it was a renovation.  It wasn't a
20 school at all.  It was an insurance building.
21   Q       And it had been converted.  So the building
22 was being converted, but as far as it being a school is
23 concerned it was brand new?
24   A       Yes.
25   Q       Were they going to close William Penn?
```

20

```
1    A       No.
2    Q       Were they going to make you clean more with
3  less, or were they going to hire some additional people, if
4  you know?
5    A       I don't know.
6    Q       All right.  Was that ever discussed with any
7  of you on the work force?
8    A       No.
9    Q       Now, when Mr. Curtis made this decision to
10 place you at William -- Hamilton temporarily did he have a
11 meeting with all of the custodians?
12   A       I don't know.
13   Q       But he had a meeting with you?
14   A       No, he did not.
15   Q       So he just contacted you by telephone or
16 letter or what and said you're going over there to do that
17 or how did he inform you?
18   A       Back it up.  Yeah, we did have a meeting that
19 we was going to be transferred -- that the custodians was
20 being transferred.
21   Q       And was that meeting with just the William
22 Penn work force or was it with all the custodians?
23   A       The meeting was with all the head custodians.
24   Q       All the head custodians?
25   A       Yes.
```

21

```
1    Q       How were the other custodians at William Penn
2  given information about their option to go to Rowland?
3    A       I don't know.
4    Q       You were the head custodian?
5    A       Yes.
6    Q       Right?  Who discusses work matters with the
7  work force?  Does Mr. Curtis do that with or without your
8  presence?
9    A       Me.
10   Q       Why didn't you tell them then?
11   A       I did.
12   Q       Okay.  So you did tell the work force at
13 William Penn that they would have an opportunity to transfer
14 over to Rowland when it opened up?
15   A       Yes.
16   Q       Okay.  Now, who was going to replace the
17 people at William Penn, or was it going to be closed down?
18   A       William Penn was going to still be opened.
19   Q       Who was going to work there?
20   A       Raymond Washington transferred over as the
21 head custodian.
22   Q       Okay.  And -- he transferred over as the head
23 custodian.  Now, where were the additional custodians going
24 to come from that were going to be needed at Rowland?
25   A       I have no idea.
```

6

**22**

1 Q Did you ever discuss that with Mr. Curtis?
2 A No.
3 Q All right. When did Mr. Curtis tell you in
4 relation to when you had to go by the way -- not the
5 specific date, but when did Mr. Curtis tell you that you
6 were going to go to Hamilton for the temporary assignment?
7 In other words, how much warning did he give you?
8 A About a week, a couple of weeks.
9 Q Okay. A couple weeks. So we're now talking
10 about your being at Hamilton. I think you had indicated --
11 and we need to maybe re-correct this. Think back how long
12 you were at Hamilton, how many weeks.
13 A I think the transfer took place in June. I
14 think the transfer took place in June, and I was transferred
15 in August to Rowland.
16 Q Okay. So sometime in June. That's when you
17 went to Hamilton?
18 A Yes.
19 Q And then August 16th you went to Rowland?
20 A Yes.
21 Q Now, a couple of weeks before that date in
22 June that you went to Hamilton you were told you were going
23 to be going to Hamilton by Mr. Curtis. You knew a couple
24 weeks ahead of time.
25 A That I was going to be going to Hamilton?

**23**

1 Q Hamilton.
2 A No.
3 Q All right. So you didn't know a couple weeks
4 ahead of time?
5 A No.
6 Q How much warning did you have that you were
7 going to be sent to Hamilton?
8 A Nobody had any warning at all.
9 Q Well, I mean, did he just say one day report
10 to Hamilton? You had indicated earlier that you knew a
11 couple weeks ahead of time that you were going to Hamilton,
12 if I remember correctly. Now, if I'm wrong, correct me or
13 -- you know, what's the response to that? When did you
14 know you were going to Hamilton, the day that you were
15 transferred or a week or two before, a month before, a day
16 before?
17 A About a week before.
18 Q A week before. Okay. Do you remember when in
19 June you went to Hamilton?
20 A No. I don't have that specific date.
21 Q Early or late?
22 A It was after school -- after the school
23 closed.
24 Q After school let out and closed for the
25 summer?

**24**

1 A Yes.
2 Q Do you remember when school let out that year?
3 A No.
4 Q June 7th?
5 A I have no idea. I don't remember.
6 Q Okay. All right. Now, when you went to
7 Hamilton as head custodian -- they needed a head custodian
8 at Hamilton. A small school, but they needed a head
9 custodian because the head custodian had quit there; right?
10 A Yes.
11 Q Now, that meant there was a vacancy in head
12 custodians; right?
13 A No, there wasn't any vacancy at that time.
14 Q There wasn't any vacancy?
15 A Yeah. Okay. Yes, there was a vacancy.
16 Q Right. There was a vacancy at that time. Who
17 filled that vacancy?
18 A Later?
19 Q Yes, sir. Whenever it -- well, let me ask it
20 this way, sir, if I can: you had indicated that there was a
21 vacancy that occurred at Hamilton in the head custodian
22 slot?
23 A Yes.
24 Q And Mr. Curtis transferred you into that slot?
25 A Yes.

**25**

1 Q And there was going to be an opening because
2 it wasn't -- it didn't exist yet sometime in August in
3 Rowland; right?
4 A Yes.
5 Q So there was a vacancy sometime on or about
6 June of 1999 at Hamilton, and there's another vacancy that's
7 going to be created because someone was going to be needed
8 at Rowland?
9 A Yes.
10 Q Okay. So now there's two. How were those
11 positions filled?
12 A How are they filled?
13 Q Yes, sir. How are they filled?
14 A Either transfer or put in a bid sheet.
15 Q Either transfer or put in a bid sheet?
16 A Yes.
17 Q Okay. Now, you're a union official; is that
18 correct?
19 A Not now I'm not. Yes, I am. I'm a steward.
20 Q You're a steward. Okay. How are stewards
21 appointed or elected by the membership? Are they appointed
22 by union leadership, or are they elected by the membership?
23 A If you want to be a steward, you go to steward
24 training.
25 Q Okay, sir. And you did that?

26

1 A Yes.
2 Q And when did you do that, Mr. McMurray?
3 A **Back in '90 -- '89, '90, somewhere around in**
4 **there.**
5 Q 1989 or 1990, around that time?
6 A Yes.
7 Q All right. Now, have you continuously since
8 that time been a union steward, or are you a union steward
9 today?
10 A **I'm a union steward today.**
11 Q Okay. And so you have continuously been a
12 union steward since 1989 or 1990; is that correct?
13 A Yes.
14 Q All right. Now, the -- when I had asked you a
15 question about those vacancies, I had asked you how they
16 were filled. My recollection of your response -- and I'm
17 going to underline the word or -- bid sheet or transfer?
18 A Yes.
19 Q Who decides what method you use to fill a
20 vacancy for a head custodian?
21 A **If the person -- you mean who decided in the**
22 **administration building or who decides you as a person?**
23 Q Well, let me try to lay a foundation for it
24 this way. If a vacancy occurs, how are the people affected
25 by the vacancy? How are they notified? Let me give you an

27

1 example of what I mean. You're going to have a brand new
2 position at Rowland. Okay? You're going to need new people
3 I assume; is that fair to say? New people were going to be
4 needed out there, there were going to be new positions?
5 A Yes.
6 Q And in all likelihood, including the head
7 custodian, at least by my arithmetic based on your responses
8 at least six, maybe seven; is that correct?
9 A Yes.
10 Q All right, sir. Now, how do the membership --
11 strike that. Does the membership -- what is the name --
12 what's the name of the labor organization that represents
13 you?
14 A **Local 2063.**
15 Q And is it part of a larger -- an international
16 union?
17 A Yes.
18 Q And what is the name of the international
19 union?
20 A **Council 90.**
21 Q And Council 90 is a -- is it made up of a
22 group of locals?
23 A Yes.
24 Q And Council 90 is part of what international?
25 A **Federation --**

28

1 Q American Federation of State, County and
2 Municipal Employees, AFSCME?
3 A Yes.
4 Q All right, sir. Now, when these vacancies or
5 these new positions -- when one was a vacancy and then there
6 were like six or seven, whatever the numbers were, new
7 positions at Rowland that were going to arise here, how is
8 -- how is the membership, if indeed they are, notified
9 about that? I mean, do they get a newsletter, do you have a
10 meeting with management, you know, how are you told about
11 this, how do you learn about it?
12 A **The Harrisburg School District puts out a**
13 **classified sheet that jobs are opening up.**
14 Q Okay. All right. And how is hiring done in
15 the district by Harrisburg School District?
16 A **It's done from outside, or if you work within**
17 **the district you can transfer from one job to another.**
18 Q So being a member of the collective bargaining
19 unit brings certain rights with it. You have certain
20 rights?
21 A **Yeah. Being in the union, yes.**
22 Q Yes, sir. So if a vacancy occurs, before the
23 school district is allowed to go out and hire they have to
24 give -- if it's a union position or it's going to be a
25 collective bargaining -- a position covered by contract they

29

1 have to give the union employees, provided they're
2 qualified, the first opportunity for those jobs; right?
3 A Yes.
4 Q Now, explain the difference between transfer
5 or bid. I'm going to take that quote out of one of your
6 responses, transfer or bid. I don't walk in your shoes. I
7 don't know how you do things in your local. And your local
8 covers Harrisburg School District; is that right?
9 A Yes.
10 Q Does it cover any other school districts?
11 A **Steel High.**
12 Q All right. So it covers Steel High and
13 Harrisburg?
14 A Yes.
15 Q And I'm going to assume in your responses that
16 the procedures are the same at Steel High as they are at
17 Harrisburg, and if they're different would you tell me?
18 A Yes.
19 Q If you know. What's the difference between
20 transfer or bid from the standpoint of the union or the
21 union worker?
22 A **If you bid on a job, that means that you're**
23 **bidding on a job for a higher salary. If you transfer from**
24 **a job, it means that you're moving from one department to**
25 **another. Do you understand?**

8

30

1 Q Yeah, I think I do. In other words, if a
2 vacancy opens up and it's because let's say somebody leaves
3 or quits?
4 A Yes.
5 Q Okay. And there is no new position created.
6 Let's say that there was some kind of an agreement, and the
7 union and the school district knew that by attrition as
8 people retire or leave the positions are going to die out
9 let's say so maybe they agree that we can transfer people
10 into those positions.
11 A **The job has to be bidded on or transferred**
12 **from. If a person retires, the job pops open. If you're**
13 **working for The Harrisburg School District, you put in a bid**
14 **sheet or a transfer sheet to get that position.**
15 Q Okay. Was a bid sheet put up for the Hamilton
16 position?
17 A **No.**
18 Q Why not?
19 A **Because, like I stated before, Tim Curtis at**
20 **that particular time transferred all the head custodians**
21 **from all the schools to different schools.**
22 Q I'm not trying to be funny when I say this, so
23 don't be upset with my question. I'm not trying to be
24 humorous.
25 A **I'm not.**

31

1 Q Okay? Can Mr. Curtis create a body for a
2 vacancy if there is no one there to fill it?
3 A **Can he create a body?**
4 Q You know, if you've got a vacancy because
5 somebody is leaving and a new position is coming open and
6 you know -- I don't know the arithmetic. I don't know how
7 many positions there are. I guess we can do it the long
8 way, but if you got ten positions and eight people, how do
9 you transfer eight people into ten positions? Isn't that
10 what he did?
11 A **No.**
12 Q Didn't he transfer you into a new position?
13 A **Where?**
14 Q Well, what happened when you left Hamilton
15 School? Who became the head custodian? Did he transfer
16 another head custodian into that?
17 A **No. A guy -- they put a person in there**
18 **temporarily until the job was put up for bid.**
19 Q Well, when was that job put up for bid?
20 A **Sometime after I went to Rowland. No.**
21 Q How long after?
22 A **No. He came before I went to Rowland, and I**
23 **turned over the keys to him before I went to Rowland and**
24 **Hamilton School.**
25 Q Okay. All right. Well, let's look at the

32

1 head custodians. Okay? And let's go back in our minds --
2 let's go back to June of 1999. Okay? How many head
3 custodians were there?
4 A **Sixteen.**
5 Q Sixteen. Were there sixteen schools?
6 A **Yes, but I think one of them was closing.**
7 Q Sixteen but one closing. Which one was
8 closing, and is it in Harrisburg or Steelton?
9 A **It was in Harrisburg. I think Ben Franklin**
10 **was closing.**
11 Q That's Ben Franklin?
12 A **Yes.**
13 Q All right. Now, when was Ben Franklin
14 closing?
15 A **It was closing that summer.**
16 Q Of 2000?
17 A **'99.**
18 Q Closing in 1999?
19 A **Yeah, for renovation.**
20 Q And how long was it going to be out of the
21 system?
22 A **It was out of the system to this past year.**
23 Q Okay. Now, the -- there is 16 head custodian
24 positions?
25 A **Uh-huh.**

33

1 Q Right? What does seniority mean in your
2 local?
3 A **It means -- seniority in your local? It means**
4 **that you have first bid on a job if you're qualified to bid**
5 **it.**
6 Q Seniority means that if all things being
7 equal, that everybody is equally qualified, seniority, I
8 assume, can be the deciding factor?
9 A **Yes.**
10 Q Now, in August -- June, July, August of 1999
11 where were you on the seniority listing with custodians --
12 head custodians? Excuse me.
13 A **On the seniority list of head custodians?**
14 Q Yes.
15 A **You mean in time as being a head custodian or**
16 **in time of years being in the district?**
17 Q Well, explain to me what the difference is and
18 then answer -- give me the answer for each one of those.
19 A **Well, in time of being a head custodian, I was**
20 **about number three in the district. As far as being the**
21 **head custodians I think I would have been -- I think there**
22 **was only two people in the district that have been a head**
23 **custodian longer than I have.**
24 Q Okay.
25 A **Two people. I'm number three.**

9



MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

**34**

1 Q    All right. And the other issue with seniority
2 had to do with time in service, right, how long you've been
3 with the district?
4 A    **Yes.**
5 Q    In any capacity; right?
6 A    **Yes.**
7 Q    Where were you seniority-wise on that?
8 A    **I have no idea. I have 18 years in -- 17, 18**
9 **years in.**
10 Q    Okay. Now, at some point there was a posting
11 of a bid for the position at Rowland; is that correct?
12 A    **It was illegally posted. Yes, but it was**
13 **illegally posted.**
14 Q    It was illegally posted. All right. Now, how
15 does a position become posted?
16 A    **Through The Harrisburg School District.**
17 Q    Okay. Who does that?
18 A    **Mr. Freeman.**
19 Q    Mr. Freeman. What's Mr. Freeman's title?
20 A    **He's the Director of Human Resources.**
21 Q    What's Mr. Curtis' title?
22 A    **He's the Supervisor of Facilities.**
23 Q    Well, do Mr. Furman and Mr. Curtis talk?
24 A    **His name is Freeman.**
25 Q    I mean Mr. Freeman. I'm sorry. Do Mr. Curtis

**35**

1 and Mr. Freeman -- well, what did I say?
2 A    **Furman.**
3 Q    Oh, I'm sorry.
4 A    **Apology is accepted.**
5 Q    An apology? Well, let me tell you something,
6 my friend. If you did as much civil rights work as I do on
7 behalf of African-American citizens, you'd probably thank me
8 and understand why some of those things run in my mind. But
9 the point is Mr. Freeman and Mr. Curtis -- to the best of
10 your knowledge, do they talk?
11 A    **They would almost have to being in the same**
12 **building.**
13 Q    All right. Do you know how this --
14 Mr. Freeman did the posting; right?
15 A    **Yeah. He does the posting.**
16 Q    Well, let me ask a more specific question. Do
17 you know -- did Mr. Freeman do the posting for the Rowland
18 Middle School that you referred to as illegal?
19 A    **No. I think his secretary did it by mistake.**
20 Q    His secretary. What is her name?
21 A    **I can't remember her name.**
22 Q    How could such a -- I mean, you've got a
23 union. Having been a past union member, I know how these
24 things -- you know, this is a job, and it's a good one. How
25 did the secretary make a mistake like bidding a position?

**36**

1 A    **I have no idea.**
2 Q    Well, how did you learn -- how did you learn
3 that it was a mistake? How did you come to the knowledge
4 that it was a mistake by the secretary? Who told you that?
5 Let me start there. Who told you that the secretary made a
6 mistake?
7 A    **Mr. Freeman.**
8 Q    Mr. Freeman told you that his secretary made a
9 mistake?
10 A    **Yes.**
11 Q    When did Mr. Freeman tell you that his
12 secretary made a mistake?
13 A    **At a meeting that we held with him.**
14 Q    Who's we?
15 A    **The president of the local, a steward, chief**
16 **steward.**
17 Q    And can you give me those peoples' names,
18 please?
19 A    **Doris Manning.**
20 Q    Doris Manning?
21 A    **Terry Mathis, Margaret Fuller.**
22 Q    Margaret Fuller?
23 A    **Uh-huh. I forget all the people that was**
24 there.
25 Q    Okay. You were there?

**37**

1 A    **Yes.**
2 Q    Why were you there?
3 A    **Because I was representing -- a representative**
4 **of AFSCME local.**
5 Q    Because you were a steward?
6 A    **Yes.**
7 Q    Are there any other stewards in the local?
8 A    **Yes.**
9 Q    How many?
10 A    **Sixteen.**
11 Q    Where weren't they there?
12 A    **Because all the stewards can't -- we have a**
13 **management meeting.**
14 Q    Okay.
15 A    **It's because of management.**
16 Q    Okay.
17 A    **And we go to see Mr. Freeman I guess about**
18 **once a month.**
19 Q    Okay. I'm having a hard time understanding
20 how that's an answer to the question, though. Why weren't
21 the other stewards at this meeting where Mr. Freeman
22 informed you that --
23 A    **Because when you have a collective bargaining**
24 **unit you -- certain people go to -- you don't send the whole**
25 **country to see the president. You send representation.**

MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

**38**

1    MR. BAILEY: Yeah. Well, okay. Can you hold
2 on just one second? I'm going to flip some tapes here. It
3 will just take two seconds.
4 BY MR. BAILEY:
5    Q    Okay. Let me try to explore this a little
6 better. Apparently at some point there was a meeting
7 attended by Mr. Freedom -- Freeman, Ms. Manning,
8 Mr. Masters and --
9    A    Mathis.
10    Q    I'm sorry.
11    A    Terry Mathis.
12    Q    Matthews?
13    A    Yes. Mathis.
14    Q    Mathis. M-a-t-h-i-s?
15    A    Yes.
16    Q    Let me -- I want to get you on the spelling.
17 Just one second. M-a-n-n-i-n-g for Doris Manning?
18    A    Yes.
19    Q    Freeman I assume is F-r-e-e-m-a-n?
20    A    Yes.
21    Q    And Margaret Fuller is F-u-l-l-e-r?
22    A    U --
23    Q    F-u-l-l-e-r?
24    A    Yes.
25    Q    Probably. At least phonetically it sounds

**39**

1 that way. I have trouble with those things. Okay. And
2 aside from those people -- Freeman, Manning, Mathis, Fuller
3 and you, Mr. McMurray -- do you remember who else was at
4 this meeting?
5    A    No, not right offhand. I think Regina was
6 there.
7    Q    Is Regina the secretary?
8    A    She used to be.
9    Q    Used to be. Is she the one that made the
10 mistake?
11    A    No. That's not Freeman's secretary.
12    Q    Okay. Who is Regina, at least what --
13    A    She was the secretary for our Local 2063.
14    Q    Okay. Secretary for 2063, Local 2063. All
15 right. Now, we got Regina, Mathis, Fuller, Manning, Freeman
16 and McMurray. Who else is there?
17    A    I can't remember at the time.
18    Q    Were there other people there?
19    A    I think so.
20    Q    But you're not sure?
21    A    No.
22    Q    Where was the meeting held?
23    A    In the administration building.
24    Q    Okay. And, Mr. McMurray, do you remember when
25 it was held, when?

**40**

1    A    No, I don't.
2    Q    Let's see if we can try to put some time
3 perimeters around in here. Is it fair to say that the
4 meeting was held after the -- what you referred to as the
5 illegal posting?
6    A    Yes.
7    Q    All right. Do you have a recollection of how
8 long afterwards --
9    A    No.
10    Q    Okay. Do you remember whether school was in
11 session?
12    A    I don't think so.
13    Q    What was the purpose of the meeting?
14    A    To discuss things that was happening in the
15 school district that the union did not like that management
16 was doing.
17    Q    Well, who brought up the posting issue then,
18 you know, the illegal posting, because nobody in that group
19 would be unhappy with your getting that position; right?
20    A    You're funny.
21    Q    No. I'm not trying to be funny. I'm
22 serious. Why would it -- it's a very simple question. Why
23 would it come up, if you know?
24    A    I have no idea. I forget why would it -- why
25 it came up.

**41**

1    Q    Do you know whether a grievance had been filed
2 at that point by anyone to include Mr. Hazzard?
3    A    No.
4    Q    Do you remember when a grievance was first
5 filed, if indeed one was filed?
6    A    No.
7    Q    Do you know if a grievance was ever filed?
8    A    For the unfair posting?
9    Q    Okay. I may not agree with you on the words
10 of that, but, yeah, on the posting -- what you referred to
11 as the unfair posting.
12    A    I don't think one was ever filed because if
13 you go to management and talk to management about certain
14 things you don't need to file a grievance. As long as they
15 uphold the things that you're discussing, you don't need to
16 file a grievance.
17    Q    Okay. Well, do you know whether anyone was
18 complaining about the posting, which you say was unfair, was
19 illegal or whatever, in error or whatever it was?
20    A    No.
21    Q    Okay. When did you first become aware of the
22 posting?
23    A    In the meeting.
24    Q    In that meeting?
25    A    Uh-huh.



---

42

1  Q      You didn't know it had been posted before
2 that?
3  A      **No, because I didn't get a thing on that.**
4  Q      You didn't get a thing on that.
5  A      **I didn't get a paper on that.**
6  Q      Okay.  Well, a paper, whatever, but I mean --
7 I mean, you just flat didn't know, nobody told you and you
8 hadn't seen it?
9  A      **No.**
10  Q      Okay.  Well, let's talk about how a posting --
11 I mean, that's an important word because it has to do with
12 notice; right?
13  A      **Yes.**
14  Q      It has to do with letting people know.  It's
15 like you know -- it's an important concept in our law
16 obviously and let's look at the facts surrounding this
17 posting here if there -- you know, this improper, unlawful
18 posting, whatever it was.  At some time you learned that
19 there had been a posting?
20  A      **Yes.**
21  Q      Now, let's talk about postings and the way
22 they're supposed to work ideally.  Okay?  How is a posting
23 done?  In other words, is it -- are things mailed to folks,
24 is it scotch taped to the door of the union hall, you know,
25 like the old town hall posting or whatever?  How is a

---

43

1 posting done?
2  A      **Postings are done -- now they're done through**
3 **computers.  I think before then and during that summer they**
4 **were sent out in inter-district mail, and they were sent to**
5 **schools for secretaries to put up on the walls.**
6  Q      All right.  So at the time -- let's talk about
7 what the procedure was for posting in August of 1999.
8  A      **The procedure never changes.**
9  Q      Okay.  Then that's going to make it easier for
10 us to talk about what occurs and what was supposed to have
11 occurred in August of 1999.  Do you deny -- although it may
12 not have been proper to do it, do you deny that there was a
13 posting of a bid for the head custodian position at Rowland
14 School in August of 1999?  I understand you're saying it was
15 illegal and unlawful and improper.  I understand that that's
16 what you're telling us.  All I'm asking is even though it
17 may have been improper in your view, was there a posting of
18 that position in August of 1999 for head custodian at
19 Rowland School?  Was there a posting in the school district
20 for that job?
21  A      **I didn't see a posting.**
22  Q      No, no.  Have you learned since then that a
23 position to the best of your knowledge -- you're not here to
24 certify it.  You're just here to tell us what you know.
25  A      **What I heard.**

---

44

1  Q      What you -- that's fine, sir, what you heard.
2 Tell us.  Was there a posting?
3  A      **I heard there was one.**
4  Q      All right, sir.  Now, who did you hear that
5 from?
6  A      **From Doris Manning.**
7  Q      Doris Manning.
8  A      **Terry Mathis.**
9  Q      Terry Mathis.  Who else?
10  A      **That's it.**
11  Q      Okay.  Mr. McMurray, when did you hear from
12 them that there had been a posting?
13  A      **Maybe sometime in August, September.**
14  Q      But that would have been after you assumed the
15 position on August 16th at Rowland Middle School?
16  A      **Yes.**
17  Q      Okay.  Now, what did those folks -- Manning
18 and Mathis, what did they say to you about the posting?
19  A      **They just said there was a poster for Rowland**
20 **School and it was illegal, and it should have been Hamilton**
21 **School posted for the head custodian job.**
22  Q      Okay.  So they said that Hamilton -- that
23 there was a mistake?
24  A      **And it should have been Hamilton instead of**
25 **Rowland.**

---

45

1  Q      And it should have been Hamilton School?
2  A      **Instead of Rowland.**
3  Q      Instead of Rowland?
4  A      **Yes.**
5  Q      But I asked you earlier if Hamilton School had
6 ever been posted maybe -- and my question probably caused
7 confusion.  Was Hamilton School ever posted?
8  A      **Yes.**
9  Q      Okay.  And when was that?
10  A      **Sometime in August, September.**
11  Q      Before?  Was that before Mr. Mathis and/or
12 Ms. Manning told you that there was an error in posting
13 Rowland, that it should have been posted at Hamilton?
14  A      **I think so.**
15  Q      Where were you when they told you that this
16 posting error had been made?
17  A      **At a executive board meeting.**
18  Q      An executive board meeting?
19  A      **Yes.**
20  Q      Executive board meeting of the school district
21 or --
22  A      **Executive board meeting of Council 2063.**
23  Q      Did they mention any grievance or any
24 complaints from any members of the union?
25  A      **No.**

---



MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

---

46

1 Q    Did there come a time when you heard that
2 Mr. Hazzard was unhappy with what had occurred?
3 A    **Was there a time when I knew -- no.**
4 Q    Okay. You're a union steward?
5 A    **I was the union steward for the first line**
6 **supervisors, yes.**
7 Q    And remember I asked you the question about
8 union stewards?
9 A    **Yes.**
10 Q    Now, you're a union steward for the first line
11 supervisors?
12 A    **Yes.**
13 Q    Well, is there a union steward in the
14 Harrisburg school system for -- who represents AFSCME for
15 folks other than the first line supervisors?
16 A    **Yes.**
17 Q    Okay. Is there a union steward in every
18 school?
19 A    **Yes.**
20 Q    Okay. Is there more than one union steward in
21 any school?
22 A    **Some of them, yes.**
23 Q    All right. And for purposes of our
24 discussion, we're talking about The Harrisburg School
25 District and not Steelton?

---

47

1 A    **Yes.**
2 Q    Well, are there 16 for Harrisburg or does that
3 include Steelton?
4 A    **That doesn't include Steelton.**
5 Q    Are you the head steward?
6 A    **No.**
7 Q    Are you on an equal footing with other
8 stewards?
9 A    **Yes.**
10 Q    At the meeting where Mathis and Manning were
11 -- that they told you there had been this error, how many
12 other stewards were at that executive board meeting?
13 A    **Let's see. About four.**
14 Q    Were all the stewards invited?
15 A    **No, not to executive board meeting, no.**
16 Q    Why were you invited to that executive board
17 meeting?
18 A    **Because I was a member of the executive board.**
19 Q    And is that a position where you're appointed?
20 A    **Yes, I was appointed.**
21 Q    Now, let's talk about what happens with
22 postings in general of positions. Does human resources do
23 the posting of positions?
24 A    **Yes. To a certain extent, yes.**
25 Q    Well, does the union post positions?

---

48

1 A    **Human resources they -- when the job pops**
2 **open, human resources knows the jobs are open and they copy**
3 **papers and send them around to all the schools to**
4 **secretaries and principals and stewards so they could be**
5 **posted in the building.**
6       (Discussion held off the record.)
7 BY MR. BAILEY:
8 Q    Mr. McMurray, let me go try -- let me tell you
9 where I'm coming from here. I think you probably -- I think
10 you're a pretty savvy fellow so you know where I'm coming
11 from. I want to try to find out as much as I can about this
12 posting thing, and I want to find out when you learned about
13 it. You know, I want to find out how you learned about it,
14 who knew about it, etcetera, and I can do that by asking
15 little bitty tiny questions and building all these things
16 together, but if you can just tell me what you know about
17 how this posting error occurred we can start with that
18 question, and then I have a couple more questions about the
19 posting. Do you know how the mistake occurred? The reason
20 I ask that is because I assume that human resources doesn't
21 just go flipping out postings without checking with the
22 union. I've never known that to happen. Maybe that does
23 happen with the school district, though. I don't know. Can
24 you tell me how the mistake happened?
25 A    **No, I cannot.**

---

49

1 Q    All right. As a normal practice -- let's say
2 human resources becomes aware of a vacancy or that there's
3 going to be a new position. In my experience, unions are on
4 top of that stuff all the time, but let's assume you're
5 not. Okay? Before human resources does a posting, do they
6 contact the union, check with them and let them know, talk
7 about it?
8 A    **I guess. I don't know. I'm not -- I don't**
9 **know.**
10 Q    Okay. That's fair enough. And let me tell
11 you why I asked that so you understand. You had indicated
12 this thing about transfer or bid.
13 A    **Yes.**
14 Q    It's hard for me to believe that without some
15 communication between human resources and AFSCME that human
16 resources is going to know whether to bid or wait and see if
17 there's a transfer.
18       Now, let me tell you why I make that
19 assumption. When you bid something and folks start putting
20 in their bids and stuff like that, you create expectations
21 in people, don't you? Folks get excited. Maybe I can get a
22 new job, maybe I can make a little more money, maybe I can
23 advance my career. Don't they?
24 A    **I guess.**
25 Q    Well, don't you?

---



MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

---

50

1  A    Me?
2  Q    Yeah, you.
3  A    Yeah.
4  Q    Of course.  Now, if I go out and post a job
5  and put that job up for a bid, I know that there is a
6  likelihood in most cases that folks are going to say, hey, I
7  want to give that a shot, I'm going to try that; right?
8  A    Yes.
9  Q    All right.  Now, a transfer on the other hand
10 that's something management does or is a transfer also
11 advertised, is it posted?  Is a transfer posted?
12 A    The job is posted.  Transfers are not posted.
13 You only transfer if you want to be transferred.  A transfer
14 is basically -- is probably just the same.  It's just that
15 if you're bidding on a job you put in a bid sheet, a
16 transfer sheet, and this is what you do when you get in
17 front of the administration building.  You just fill out a
18 sheet.  You don't fill out an application.  If you're
19 working for The Harrisburg School District, you go in the
20 administration building and get a bid sheet or transfer
21 sheet and you fill it out, and you give it to Mr. Freeman or
22 Mr. Curtis.
23 Q    Mr. McMurray, a transfer is the kind of thing
24 where people can go down and do from time to time.  Maybe
25 they hear something is going on or they want to try to get

---

51

1  in someplace or etcetera.  That's different than when a
2  position is bid like there's an opening, isn't it?
3  A    No.
4  Q    There's a difference.  There's not?
5  A    Huh-uh.
6  Q    So you have seen positions posted for
7  transfer?
8  A    It wouldn't -- okay.  Maybe I'm wording it
9  wrong.  It wouldn't be a position open for transfer.  It
10 would be a bid sheet.  Bid sheet, transfer sheet, it's all
11 --
12 Q    Well, let's get it straightened out.
13 A    Bid sheet and transfer sheet is all the same.
14 Q    Okay.  They're all the same for the person
15 that's putting in the bid or the person that's making a
16 request for transfer --
17 A    Yes.
18 Q    -- right?  But a position is not posted as a
19 transfer, it's posted as a position.
20 A    Posted as a position, yes.
21 Q    Okay.  So you didn't even seek the Rowland
22 position, did you?
23 A    Yes.
24 Q    Oh, you did?
25 A    Yes.

---

52

1  Q    I thought Mr. Curtis came down and talked to
2  you about it.
3  A    You have to understand.  When that building
4  was first being built, you understand what I'm talking
5  about, everybody was talking about it.  All the head
6  custodians was talking about going there or bidding,
7  transferred there.  Some wanted to go there.  Some didn't
8  want to go there.  Some of the people wanted to stay where
9  there was.  You know what I mean?  And to me -- for me I
10 wanted to go there because my school was being transferred
11 there.
12 Q    Now, that's what I meant I guess when I said
13 it's difficult to believe that human resources wasn't aware
14 of all of this, isn't it?
15 A    Aware of all of what?
16 Q    The interest in the Rowland School position.
17 A    It wasn't -- you can't bid a job until it goes
18 up for -- you really can't bid a job until it goes up.
19 Q    But you did.  You transferred into the Rowland
20 School before it was bid or anybody knew about it.  Didn't
21 you tell us that?
22 A    No.
23 Q    You didn't?
24 A    No.
25 Q    All right.  Well, you knew back in June that

---

53

1  you were temporarily sent to Hamilton.  So you had to know
2  if you were going to be temporarily sent to Hamilton from
3  Penn that Rowland School was waiting for you.
4  A    Because I know the school was going -- eighth
5  grade was going there.
6  Q    How did you know you were going to get the
7  Rowland position?
8  A    I didn't.
9  Q    Well, then how did you know you were only
10 going to be transferred temporarily to Hamilton?
11 A    I didn't.
12 Q    Okay.  Well, when did the folks learn at West
13 Penn that the whole work force was going to move over to
14 Rowland?
15 A    At a meeting that Mr. Freeman had with the
16 president of the union.
17 Q    And when was that?
18 A    I don't remember the exact date.
19 Q    Well, was it before you went over to Hamilton?
20 A    No.
21 Q    Was it afterwards?
22 A    Yes.
23 Q    Well, it would have been before you went to
24 Rowland?
25 A    Yes.

14

MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

---

**54**

1  Q    So it was while you were at Hamilton?
2  A    Yes. While I was at William Penn I put in a
3  transfer sheet to go to Rowland, but the job hadn't even
4  been posted then, but we know the school was popping open.
5  Q    Well, actually, it wasn't popping open. It
6  was going to be a new position; right?
7  A    Yes. It wouldn't have been a new position for
8  me. I wouldn't have gotten no more money because I -- for
9  me going to -- from Penn to Rowland it was a lateral
10  transfer. I didn't get no more money.
11  Q    Well, it was a lateral transfer in terms of
12  your money, but it was a bigger job with more work.
13  A    No, it wasn't, not from William Penn, no.
14  William Penn was a bigger school than Rowland.
15  Q    It was a bigger job with more work from
16  Hamilton?
17  A    Yes.
18  Q    And Hamilton was only temporary anyway?
19  A    Yes.
20  Q    Now, you didn't want to be in Hamilton
21  permanently?
22  A    No.
23  Q    Did anybody want to be in Hamilton
24  permanently?
25  A    I guess anybody that wanted a head custodian

---

**55**

1  job, yes.
2  Q    Well, you told us that Hamilton was bid.
3  A    Uh-huh.
4  Q    It was posted, and then it was bid.
5  A    After I left.
6  Q    After you left, but it was posted you said.
7  A    Yes.
8  Q    In fact, you said Hamilton -- if I remember
9  correctly -- and, remember, it's what you say that counts,
10  not my characterization of testimony. I believe you had
11  indicated that Hamilton was posted after you went to
12  Rowland.
13  A    Yes.
14  Q    And why was that?
15  A    I don't know.
16  Q    I mean, I'm just thinking in terms of
17  efficiency. Why wasn't it posted so that people knew -- I
18  mean, people knew it was going to be open; right?
19  A    No, because it --
20  Q    They didn't know you were temporary at
21  Hamilton?
22  A    I don't know what people knew.
23  Q    Okay. Well, but certainly human resources or
24  Mr. Curtis would know because your transfer to Rowland was
25  on file, it was there before you went to Hamilton, and that

---

**56**

1  request for transfer was there before the Rowland position
2  was posted and subsequently bid on by Mr. Hazzard. So
3  somebody knew that the Hamilton position was only temporary,
4  at least Mr. Curtis did.
5  A    I guess.
6  Q    And that you were only going to be there until
7  the Rowland thing, to use your terms, popped open; right?
8  A    Yes, I guess.
9  Q    All right. Now, Mr. McMurray, who eventually
10  got the Hamilton position?
11  A    For the head custodian job?
12  Q    Yes.
13  A    Robert Epps.
14  Q    Robert Epps. Okay.
15  A    They had a temporary head custodian down there
16  after I left, but he was only assigned down there
17  temporarily. Robert Epps bidded on the job, and he got it.
18  Q    Now, the head custodian pays the same no
19  matter what school you have. That position pays the same?
20  A    Wrong.
21  Q    Oh. Oh, boy. Well, how is -- what you get
22  paid as a head custodian, how does that vary?
23  A    For a bigger building you get paid more than a
24  minor building.
25  Q    But Rowland you didn't get paid more than --

---

**57**

1  A    Because I made a lateral move.
2  Q    West Penn is the same size?
3  A    Yes.
4  Q    William Penn is the same size as --
5  A    It's bigger than Rowland, but it's a major
6  building.
7  Q    Okay. So it's in the category of a major
8  building?
9  A    Yes.
10  Q    And Hamilton wasn't?
11  A    No.
12  Q    That explains it. Okay. Thank you. I
13  appreciate your explanation. Now, going back to the
14  Hamilton -- the transfer at Hamilton. When did the
15  individual leave there at Hamilton, whatever -- do you know
16  why he left or --
17  A    She.
18  Q    -- she left?
19  A    She said she didn't want to be head custodian
20  anymore.
21  Q    Did she stay in the work force?
22  A    Yes. She was transferred -- yes, she stayed
23  in the work force.
24  Q    And she resigned that -- so she just didn't
25  want that position?

---

MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

**58**

1   A       Not anymore, no.
2   Q       Not anymore.  And when did she resign?
3   A       I think she resigned before school or right
4 after school was out for the summer of 1999.
5   Q       And was there anyone who was an acting head
6 custodian at Hamilton between her resignation and when you
7 took over?
8   A       I don't know.
9   Q       But -- this is the thing that was confusing in
10 your responses for me.  Did you ask Mr. Curtis to put you in
11 the Hamilton temporarily?
12   A       No.
13   Q       He just put you there?
14   A       Yes.
15   Q       Okay.  Did you and he talk then about, you
16 know, hey, everybody knows Rowland is coming up, am I going
17 to get Rowland?  I mean, did you have any conversation with
18 him?
19   A       No.
20   Q       You just got the word.  Was it written, a
21 phone call?  Who delivered the good news?
22   A       About what?
23   Q       Going to Hamilton.
24   A       I think I had a letter and we also -- I was
25 also told at a meeting that I had with Mr. Curtis that I was

**59**

1 going to Hamilton.  That year Mr. Curtis transferred all the
2 head custodians.  Everybody in the -- every head custodian
3 in the district was transferred at the same time that I was
4 transferred to Hamilton.  Mr. Hazzard was at Marshall.  He
5 went to Shimmell.  He was transferred.  The head custodian
6 at -- all the head custodians transferred to different
7 schools at that particular time that I went to Hamilton.
8   Q       Well, you have -- you have seniority on
9 Mr. Hazzard, though; right?
10   A       As far as being a head custodian, yes.
11   Q       Okay.  And how long had you been a head
12 custodian for 1990 --
13   A       Since 1991.
14   Q       1991.  And how long had you been with -- 18
15 years with the district?
16   A       Yes.
17   Q       And how long had he been with the district?
18   A       I have no idea.  I know he was --
19       MR. BAILEY:  You can't respond.  He has to.
20   A       I met Mr. Hazzard when I was driving school
21 bus and he was working for the kitchen department at the old
22 middle school.  He was -- yeah.  He was working for the
23 kitchen.  What do you call it?  I forget the name of it
24 now.
25 BY MR. BAILEY:

**60**

1   Q       If I indicated to you that Mr. Hazzard had
2 worked for the district for over 30 years, have you ever
3 come upon -- across that kind of information?  Are you aware
4 of that?
5   A       That he was there -- no, I wasn't.  I know he
6 was there a long time, but I didn't know he was there for 30
7 years.
8   Q       All right.  What size is Shimmell?
9   A       Shimmell is a smaller school.
10   Q       Okay.  And he had been custodian -- head
11 custodian at Shimmell?
12   A       Yes, he -- yeah.  When he got transferred from
13 Melrose, yes.
14   Q       And the school that he got transferred from,
15 what size was that?
16   A       The same size as Shimmell, a smaller school.
17   Q       And Mr. Curtis when he did these transfers,
18 was that the same time that you went to Hamilton?
19   A       Yes.
20   Q       And so part of this series of transfers was
21 you taking this temporary position at Hamilton?
22   A       Yes.
23   Q       Well, were any of the head custodians
24 consulted about these transfers?
25   A       Yes.  We all were at a meeting with Mr.

**61**

1 Curtis.
2   Q       Okay.  Well, did you have some kind of deal
3 that you knew you were going to go to --
4   A       Excuse me.  Say that again.
5   Q       Did you know some kind of a deal that you knew
6 you were going to Rowland?
7   A       No, sir.
8   Q       See, I can't -- forgive me, please.  And I
9 don't mean to -- but that's why I don't understand why --
10 how you know Hamilton is temporary.  If there is no
11 discussion with anyone and this is a transfer to go to
12 Rowland, why you?  I mean --
13   A       Why did I think Hamilton was temporarily for
14 me?
15   Q       Yeah.
16   A       Because I -- my expectations are high, and I
17 didn't want to stay at Hamilton, and I wanted to go to a
18 larger school and I -- for me -- I said myself, I mean, I'm
19 not going to be here forever.
20   Q       Okay.  Okay.
21   A       And another thing, why would they take the
22 talent that I have as being a head custodian in larger
23 schools and put me in a smaller school?  It wouldn't do the
24 school district any good.
25   Q       Well, was that -- was all of that explained to

16

MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

62

1 you?
2 A    No. It's in here.
3 Q    Well, did Mr. Curtis give you any reason about
4 that?
5 A    No.
6 Q    So you didn't ask or talk to anybody about
7 being the head custodian at Rowland?
8 A    No, I did not.
9 Q    But you had put a transfer in even before you
10 were put into the temporary position at Hamilton?
11 A    Yes.
12 Q    Who has more seniority as a head custodian
13 than you? I'm sorry, sir. Let me rephrase that, please.
14 As of June, July, August of 1999, who had at that time more
15 seniority as a head custodian than you? I think you had
16 indicated that --
17 A    James Matthews and the head custodian at Camp
18 Curtin, Dwight Adams.
19 Q    What school was James Matthews head custodian
20 at?
21 A    At that time I think he was at the
22 administration building and he got transferred to Downey. I
23 think Dwight Adams was at Steele, and he got transferred to
24 Camp Curtin.
25 Q    Are either one of those major -- considered a

63

1 major building? I assume the administration is.
2 A    The administration building was a major
3 building, and Camp Curtin is a major building.
4 Q    Well, did anybody consult with them about
5 Rowland?
6 A    We all talked about Rowland. All the head
7 custodians kicked it around.
8 Q    Well, did you talk with Mr. --
9 A    Curtis, no.
10 Q    -- Hazzard about it?
11 A    No.
12 Q    Do you talk to Mr. Hazzard?
13 A    Do I talk to him?
14 Q    Yeah.
15 A    Sometimes.
16 Q    Do you like him?
17 A    The truth?
18 Q    The truth.
19 A    I don't like his attitude. I like him as a
20 person, but he has a bad attitude.
21 Q    Okay.
22 A    I think. My opinion.
23 Q    All right. Now, when -- did Mr. Mathews or
24 Mr. Adams express any interest in Rowland?
25 A    I don't know because we was all talking about

64

1 it and we was asking did anybody want to go there, and they
2 was saying basically no they like it where they were, you
3 know.
4 Q    Yeah. Now, how did you come to be on the
5 union's executive board?
6 A    I was appointed.
7 Q    By?
8 A    The president of AFSCME of our local.
9 Q    Who is?
10 A    At that time it was James -- I can't remember
11 his name. He was the president before last because he
12 retired. What is James' name? Simms. James Simms.
13 Q    Mr. Simms. I knew a fellow named Lou Simms
14 once up this way. We'll be changing tapes in about six
15 minutes. When were you put on the executive board by the
16 president of the union?
17 A    1997, '98.
18 Q    Were you recruited for that purpose or did you
19 seek it because you wanted to do union business, you know,
20 you wanted to help the union?
21 A    No. They needed someone on the executive
22 board from the head custodian from the first line
23 supervisor's position.
24 Q    Okay.
25 A    And they asked me did I want to be on it and I

65

1 said yeah, so the executive board voted me on.
2 Q    Okay. Who else applied, if anybody?
3 A    For what?
4 Q    For a position. I understand --
5 A    I don't know.
6 Q    Okay. All right. All right. And the -- so
7 you're privy to what is discussed at the executive board
8 meetings, you're an appointee, you attend?
9 A    Yes.
10 Q    All right. Do they ever talk about positions
11 that are going to be posted before they're posted?
12 A    They really don't know there is a position. I
13 mean, we always know someone quit so everybody in the
14 district knows someone quit so -- or retires. Yes, we know
15 that.
16 Q    Well, everybody knew that the Rowland thing
17 was going to come open; right?
18 A    Everybody into the district did.
19 Q    And everybody in the district knew that there
20 were going to be positions opened at Rowland; right?
21 A    Yes.
22 Q    Well, the other positions other than the head
23 custodian, were they filled by transfer?
24 A    The -- yes.
25 Q    Were any of them bid?

17

MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

---

66

1    A    No.
2    Q    None of them were bid.  They were all
3 transfers?
4    A    Yeah.  I took my whole -- I took my team with
5 me when I left.
6    Q    You took your whole team with you when you
7 left?
8    A    The people that wanted to go, yes.
9    Q    Okay.  How about the -- well, did everybody
10 want to go?
11   A    No.
12   Q    And all of those transfers were lateral at the
13 time; right?
14   A    Yes.
15        MR. BAILEY:  What do you have left?
16        THE VIDEO OPERATOR:  Three minutes.  We're not
17 going off camera.  We're just going to switch tapes.
18        MR. BAILEY:  Go ahead and quote the time so
19 that the change --
20        THE VIDEO OPERATOR:  Okay.  The time right now
21 is 11:34, and we're going to go off for just a second.
22        MR. BAILEY:  All right.  Let's take a
23 five-minute break here.
24        (Recess.)
25        THE VIDEO OPERATOR:  The time is 11:38.  We're

---

67

1 resuming with a new tape in Camera 1.
2 BY MR. BAILEY:
3    Q    Okay.  So none of the positions out at the --
4 for the Rowland School, none of them then were bid?
5    A    Yes.
6    Q    Oh, some of them were bid?
7    A    Yes.
8    Q    Oh, okay.  Which ones were bid and which ones
9 weren't?
10   A    I took Robert Stroll with me.  He was at
11 William Penn.  He works daylight.  And I took Karen Oliver
12 with me -- Karen Oliver with me.  She also worked daylight.
13 And two other jobs was bidded upon, yes.
14   Q    Why were some bid and why were some
15 transferred?
16   A    Because I wanted my team to go with me and I
17 requested it, so they put in transfer sheets.  When Rowland
18 was first opened up -- nothing.
19   Q    Did you provide a -- do you know the transfer
20 sheet that you put in for Rowland?
21   A    Yes.
22   Q    And when did you first put it in?
23   A    Sometime in -- let's see.  Either in May or
24 June.
25   Q    Now, when you put in that transfer sheet, were

---

68

1 the other members of your same position, that filled the
2 same position you did, notified that you had requested a
3 transfer?
4    A    Was they notified?
5    Q    Yeah.
6    A    No.  I didn't notify them.
7    Q    Did anyone else notify them?
8    A    Why should they?  No.
9    Q    I don't know.
10   A    No.
11   Q    It seems to me that --
12   A    The answer is no.
13   Q    Okay.  The reason that I asked that is that
14 the union contract says all things being equal.  You know,
15 people are to have an equal opportunity at positions and
16 then there is certain deciding factors, qualifications and
17 seniority for example.  If people don't know that positions
18 are available to them how can they apply, whether it's by
19 transfer or bid, and I'm just asking if -- you know, does
20 anyone come out and say we're accepting transfers or bids or
21 we're accepting transfers?  That's something you do all the
22 time.
23   A    No, they didn't say that.
24   Q    All right.  The -- you learned from Mathis and
25 you learned from Doris Manning that there had been an

---

69

1 erroneous posting?
2    A    Yes.
3    Q    And that was the first you knew that the
4 position had been posted?
5    A    Yes.
6    Q    And that was sometime -- it could have been in
7 August or September?
8    A    Yes.
9    Q    Was that at an executive board meeting of the
10 union?
11   A    I don't remember.  It could have been, but I
12 don't remember.
13   Q    Did you ever attend any school board meetings
14 where Mr. Hazzard's unhappiness about the Rowland School
15 position was expressed or talked about?
16   A    No.  If Mr. Hazzard was unhappy with his
17 position, me, being the first line supervisor steward, he
18 should have came to me.
19   Q    Did he ever, in fact, come to you or say
20 anything to you?
21   A    No.
22   Q    Did he say anything to any other union
23 official?
24   A    I don't know.  I guess he did.
25   Q    Well, do you know of all the grievances that

---

70

1  are filed in the union?
2  A      No.
3  Q      You mean a head -- Mr. McMurray, are you
4  telling us that a head custodian first line supervision
5  under the AFSCME contract could file a grievance and you
6  wouldn't know about it?
7  A      Yes.
8  Q      Okay.  Who would?
9  A      The person he filed a grievance with because
10 most of those grievances are kept under wraps.
11 Q      Well, who keeps them under wraps?
12 A      The people that they file with.
13 Q      And who do they file them with?
14 A      I don't know who he filed with.
15 Q      Have you ever learned who he filed it with?
16 A      Yeah.  Robert Epps.
17 Q      Okay.  And why -- is Robert Epps a union
18 steward?
19 A      He is now.
20 Q      Was he then?
21 A      I don't know.
22 Q      Well, was he wrong in filing it with Mr. Epps?
23 A      Yes.
24 Q      Why?
25 A      Because he should have filed it with me.  I

71

1  was the first line supervisor steward.
2  Q      Wasn't there a conflict?
3  A      Conflict of what?  No.
4  Q      Were you angry because he filed it with
5  Mr. Epps?
6  A      No.  As long as he filed a grievance that he
7  feel that The Harrisburg School District did him unfair,
8  no.  As a brother of the union, no, I wasn't upset.
9  Q      Then you weren't offended by that?
10 A      No.
11 Q      And you're not offended as you sit here today?
12 A      Am I offended?  Yes.
13 Q      Why?
14 A      Because he is suing me, and I didn't do
15 anything to him.
16 Q      Well, I understand you're offended because
17 he's suing you, and that's I'm sure a normal reaction but
18 -- we're talking about the grievance.  As you sit here talking
19 about the grievance.  As you sit here today you don't know
20 whether he filed a grievance?
21 A      No.  He didn't file one with me.  Yes, I know
22 he filed a grievance, yes.
23 Q      You made it very clear that he didn't file it
24 with you.
25 A      Yes.

72

1  Q      My question is, do you know that he filed a
2  grievance about the matter?
3  A      Yes.
4  Q      When did you first learn?
5  A      Maybe about a year or so ago.
6  Q      A year or so ago?
7  A      Yes.
8  Q      Well, how does the grievance procedure work?
9  One sits down and fills out a form?
10 A      Yes.
11 Q      All right.  And then you turn that in to
12 somebody?
13 A      Yes.
14 Q      Typically it's turned in, it's given to a
15 union official?
16 A      Yes.
17 Q      And in this case he gave it to Mr. Epps
18 according to your knowledge?
19 A      Yes.
20 Q      When did you learn that he gave it to
21 Mr. Epps?
22 A      About a couple days ago.  As a matter of fact,
23 yesterday I found out that Epps -- he filed a grievance with
24 Epps.  Yesterday.
25 Q      Have you ever discussed Mr. Hazzard with

73

1  Mr. Epps?
2  A      No.
3  Q      If the grievance is filed and it goes to
4  Mr. Epps or let's say a grievance goes to you, what do you
5  do with it?
6  A      The grievance don't go to me.  I -- if someone
7  has a problem with anyone in the district management, they
8  come to me and they say, hey, I have a problem, I want to
9  file a grievance.  I set down with them and fill out a
10 grievance, call someone and get a number, talk to the
11 president of the union, give it to them, and they send it to
12 the -- they give it to Nichelle.  Then Nichelle takes it
13 downtown to Lance Freeman, and that's how a grievance is
14 started.
15 Q      How is Nichelle?
16 A      Nichelle is -- she represents Council 90 for
17 Local 2063.
18 Q      Did you learn at some point that this
19 grievance -- that the union was not going to accept this
20 grievance or anything like that?
21 A      I don't know anything about Hazzard's
22 grievance.
23 Q      Have you discussed Mr. Hazzard's grievance
24 with anyone in the union?
25 A      I did yesterday, yes.

MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

**74**

1  Q    That was the first time?
2  A    Yes.
3  Q    And who was that?
4  A    **Doris Manning and Nichelle Chivis, Margaret**
5  **Fuller and Terry Mathis, and then later on I talked to him**
6  **about 6 -- about 4 or 5:30 yesterday evening.**
7  Q    Well, before you talked to him -- and I don't
8  even know which one of the two attorneys represents you but
9  I don't want to --
10      MR. FINK: That would be me.
11 BY MR. BAILEY:
12 Q    I have no need to go into --
13 A    **Let me back it up a second.**
14 Q    Sure.
15 A    **Did I know about Hazzard's grievance? Yes, I**
16 **knew about Hazzard's grievance because one of -- a lawyer**
17 **came to me from the school district or something and asked**
18 **me about -- told me that I was being sued by Hazzard. This**
19 **was maybe about six months ago, and he told me I was being**
20 **sued by Hazzard. I asked him what for, and he said behind**
21 **the fact of Rowland School. You know what I mean? And then**
22 **that's when I learned that I was being sued and Hazzard had**
23 **a grievance in for that but other -- as far as anything else**
24 **-- as far as discussing the grievance, the only time I**
25 **discussed the grievance with anyone was yesterday, about 3,**

**75**

1 **3:30 yesterday.**
2  Q    Mr. McMurray, the first time you ever learned
3  that Mr. Hazzard had filed a grievance over the Rowland
4  School position was when you talked with these union
5  officials yesterday, a day or two ago, whatever --
6  A    **No. I backed that up. I talked to a lawyer.**
7  Q    Well, the lawyer told you about a grievance or
8  a lawsuit?
9  A    **A lawsuit. He told me about a lawsuit.**
10 Q    Well, forget the lawsuit. Did he tell you
11 about a grievance?
12 A    **No.**
13 Q    No?
14 A    **Because if --**
15 Q    Then the first time you learned about the
16 grievance was a couple days ago?
17 A    **Yesterday.**
18 Q    Yeah. That was my question.
19 A    **Yeah, yesterday.**
20 Q    Not about the lawsuit, about the grievance.
21 A    **Yesterday, yesterday.**
22 Q    All right. It was yesterday?
23 A    **Yes.**
24 Q    Tell me what was said.
25 A    **Nichelle told me that Hazzard had filed a**

**76**

1 grievance and a lawyer was coming here and talked to me
2 about I was being sued and AFSCME -- I didn't have to worry
3 about anything because AFSCME would provide me with a
4 lawyer.
5  Q    Okay. All right. But that was the first time
6 that you learned that there was a grievance?
7  A    Yes. To put it mildly, yes, a grievance --
8 yeah, a grievance, yes.
9  Q    Okay. Do you know any school board members?
10 A    Not per se, no. I mean, I know them just to
11 know them, but I don't have anything to do with them, no.
12 Q    You're aware of who they are, but you don't
13 know them in the sense of knowing them personally that well
14 or anything like that?
15 A    No.
16 Q    Have you ever attended any meetings where any
17 school board members were present other than, you know, a
18 general public school board meeting kind of thing? Maybe
19 you never attended one of those. I don't know.
20 A    I have.
21 Q    Okay. Have you ever attended any private
22 meetings or non --
23 A    No.
24 Q    -- public meetings --
25 A    No.

**77**

1  Q    -- where school board members have been
2 present?
3  A    No, no.
4  Q    Do you know whether the union meets with
5 school board members?
6  A    No. I have no idea.
7  Q    Does the executive board ever meet with any
8 school officials, whether they be school board members, a
9 superintendent, a business agent, whatever?
10 A    Executive board?
11 Q    Yeah.
12 A    Yes. No, no.
13 Q    They don't -- the executive board of the union
14 never meets -- I'm not talking about contract negotiations.
15 It never meets for any reason with any staff or officials
16 with the school board?
17 A    Not the executive board. Not to my knowledge,
18 no.
19 Q    Okay. Do any of the stewards?
20 A    Not to my knowledge, no.
21 Q    Have you ever met with any officials or staff
22 members of the administration of the school district?
23 A    No.
24 Q    Do you know of any meetings in which any
25 Council 90 or Local 2063 officials met with any school board

MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

78

1 officials about Mr. Hazzard?
2 A    No. I have no knowledge of that.
3 Q    To the best of your knowledge -- well, you
4 don't know one way or another whether there were any
5 meetings?
6 A    No.
7 Q    You had no input into any meetings -- if there
8 were any meetings, you had no role in providing information
9 and had no knowledge of them?
10 A    No.
11 Q    Okay. Have you read the complaint?
12 A    No.
13 Q    Okay. Well, I'm going to ask you some
14 questions that have to do with race because there are
15 allegations that race has played a role in this. Okay? As
16 I had indicated to you, I'm a civil rights lawyer. I do
17 many race-based cases. Okay? And this is what is called a
18 reverse discrimination case, and it's a rare situation, I
19 admit, in the United States when black people mistreat white
20 people because most often it's white people mistreating
21 black people, although, quite frankly, I've sued quite a few
22 black people for mistreating black people because that
23 happens unfortunately a lot based on race.
24        Now, I had hoped that you had read the
25 complaint, but since you hadn't I'm going to change some of

79

1 my questions here. Okay? And I'm going to try to keep them
2 strictly -- and I say this so that counsel knows. I'm going
3 to try to keep them limited as best I can to fact
4 questions. Okay? Let me ask you some questions about the
5 union leadership right now. You said there were 16
6 stewards; right?
7 A    Yes.
8 Q    How many of them are white?
9 A    I don't know.
10 Q    Do you know if any of them are white?
11 A    Yes.
12 Q    Some of them are white, but you don't know how
13 many?
14 A    No.
15 Q    Is the answer that some of them are white; is
16 that correct?
17 A    Yes.
18 Q    But you do not know how many?
19 A    No.
20 Q    Do you know if there are two or three who are
21 white?
22 A    Yes.
23 Q    Do you know the names of any white stewards?
24 A    Yes.
25 Q    Give us the names of any white stewards you

80

1 know of in Local 2063.
2 A    Linda Mallory, Steve McCollum. Tapper was
3 there. He's gone. He was the vice-president. He resigned.
4 Q    Do you know why he resigned?
5 A    No, I do not. I guess -- no.
6 Q    Have you ever discussed Mr. Hazzard with
7 Mr. McCollum?
8 A    No.
9 Q    Has any white steward ever complained to you
10 that white employees are mistreated because of their color
11 at The Harrisburg School District?
12 A    No.
13 Q    Have you ever seen an act of discrimination
14 against a white employee at The Harrisburg School District
15 that was based upon race, the color of their skin?
16 A    No.
17 Q    Have you seen discrimination at Harrisburg
18 School District against any black employee because of the
19 color of their skin, black?
20 A    No.
21 Q    All right. Now, name for us the
22 union officials -- by that I mean the president and the
23 officers -- of Local 2063.
24 A    I don't know if I can do that.
25 Q    Well, let me -- I can make -- let me strike

81

1 that question then. Okay? I'll save you some time. Are
2 any of the -- not stewards. Any of the officers in Local
3 2063, are any of them white?
4 A    Yes.
5 Q    Who?
6 A    The secretary.
7 Q    What's her name?
8 A    I don't know. She's at Downey School. She's
9 a secretary at Downey School. Linda Mallory is white.
10 Q    What position does Linda Mallory hold?
11 A    She's on the executive board.
12 Q    Of Local 2063?
13 A    Yes.
14 Q    And to the best of your knowledge she's a
15 union steward?
16 A    Yes.
17 Q    Okay. All right. Linda Mallory.
18 M-a-l-l-o-r-y?
19 A    I think so, yes.
20 Q    Okay. Anyone else?
21 A    Not as I can recall at this present time.
22 Q    All right. Now, you think there may be some
23 other white individuals that are union officials, but as
24 best you can recollect right now Linda Mallory -- excluding
25 stewards now. Linda Mallory would be the one that comes to


82

1 your mind?
2  A    Yeah.
3  Q    Steve McCollum. M-c-C-u-l-l-o-u-g-h, whatever
4 it might be. I think we have him down as a witness anyway
5 so your counsel would be aware of it, but he's white.
6 Anybody else you can think of?
7  A    I think there is a guy that is on the
8 maintenance department. He's a steward, and he's white.
9  Q    Okay. All right. Now, Council 90 -- okay?
10 Who is the president of Council 90?
11  A    I don't know.
12  Q    Who is the president of Local 2063?
13  A    Margaret Fuller.
14  Q    You had mentioned a name Chivis?
15  A    Nichelle Chivis.
16  Q    Nichelle Chivis. Is she white or black?
17  A    She's black.
18  Q    She's black. Is she Hispanic?
19  A    No.
20  Q    What position does Nichelle Chivis hold?
21  A    She's a representative for Council 90. I
22 don't know the exact -- I don't know her exact position that
23 she holds.
24  Q    Okay. Is she elected by 2063?
25  A    No. I think she was appointed by Council 90.

83

1  Q    Okay. She's appointed by Council 90?
2  A    I think. I think.
3  Q    I'm sorry. You think?
4  A    I think.
5  Q    Okay. That's all right. Do you know what her
6 title is?
7  A    No, not right offhand.
8  Q    Now, she's one of the people you said you met
9 with a couple days ago?
10  A    Yesterday.
11  Q    Yesterday. What did she say specifically
12 about any of this?
13  A    She said that I would be meeting with the
14 lawyer from AFSCME because I was being sued by Hazzard.
15  Q    Well, you already knew you were being sued by
16 Hazzard. You knew that a long time ago.
17  A    Uh-huh.
18  Q    Okay. That wasn't anything new about that;
19 right?
20  A    No.
21  Q    Okay. Paragraph 6 -- I want to read
22 Paragraph 16 from the complaint to you. It's an allegation
23 that Mr. Hazzard is making. It says in Paragraph 16 that on
24 or about March 2000 the defendant AFSCME -- the union is a
25 defendant in this action also -- by and through union staff

84

1 representative -- and down here it's N-i-c-e-l-l-e, is that
2 correct, or is it Michelle?
3  A    It's Nichelle.
4  Q    All right.
5      MR. FINK: I can tell you. It's
6 N-i-c-h-e-l-l-e, and the last name is C-h-i-v-i-s.
7      MR. BAILEY: Okay. Let the record -- thank
8 you very much. So it's Nichelle Chivis.
9 BY MR. BAILEY:
10  Q    And I'll read the paragraph again for you. On
11 or about March 2000 the defendant, AFSCME, by and through
12 union staff representative Nichelle Chivis,
13 African-American, informed plaintiff they were unilaterally
14 withdrawing plaintiff's grievances. At that time, upon
15 belief and information, they told the defendant school board
16 the grievance had no merit even though the -- and there's a
17 misspelling there. It has he, but it should be the --
18 promotion of McMurray over plaintiff was a clear violation
19 of the contract.
20      Now, aside from when this happened -- let me
21 just ask you some basic questions if, indeed, it did
22 happen. Do you have any knowledge of any union officials
23 telling the school board that the grievance had no merit?
24  A    No.
25  Q    Did anyone ever tell you that?

85

1  A    No.
2  Q    Before you saw that information in the
3 complaint, whether it's accurate or not --
4  A    I've never seen the complaint.
5  Q    Okay. That's right. And that's why it's
6 important -- this thing about when you heard that
7 Mr. Hazzard had filed a grievance, when you first heard
8 that, that's still confusing to me, I've got to be honest
9 with you, because your answer was to a different question.
10 Let's try to clear that up one last time.
11      When did you first become aware that
12 Mr. Hazzard had filed a grievance about the position at
13 Rowland School? Think back on it now. When did you first
14 become aware of it?
15  A    When a lawyer came to me and told me that I
16 was being sued.
17  Q    Okay. All right. I'm sorry. I owe you an
18 apology. I remember that now. Was that lawyer a solicitor
19 for the school board, do you know?
20  A    I think so.
21  Q    Okay. Do you remember when that was,
22 Mr. McMurray?
23  A    No, I don't.
24  Q    Okay.
25  A    It was either the early part of this year or



---

86

1 the latter part of last year.
2 Q    All right. Yeah. We had some -- yeah. We
3 had some problems. Okay. Now, one of the allegations that
4 Mr. Hazzard makes here says that they told the defendant
5 school board, the union officials, that the grievance had no
6 merit -- and, you know, that's something that, you know,
7 perhaps will be resolved to some degree in this litigation
8 -- even though the promotion of McMurray over plaintiff was
9 a clear violation of the contract.
10         Is it your position that you were not promoted
11 over Mr. Hazzard, that you were properly transferred into
12 that position? That's your position, right, your view?
13 A    Was I properly -- yes.
14 Q    You were properly --
15 A    Transferred to that position.
16 Q    -- transferred?
17 A    Yes.
18 Q    Now, if somebody requests a transfer and a
19 transfer is made and someone else in the union is unhappy
20 with it, can they grieve it, can they complain about it, you
21 know, can they come to a union official? How do they
22 express dissatisfaction with a transfer? The reason why I
23 say that is a transfer doesn't have to be posted you told
24 me; right? A transfer does not have to be posted; am I
25 correct?

---

87

1 A    Yes. Yes, it does.
2 Q    Okay. So I assume -- Mr. McMurray, I assume
3 from time to time that a transfer occurs and people complain
4 about a transfer. Does it ever happen?
5 A    Yes.
6 Q    Okay. Now, I think your attorney was going to
7 -- one of the attorneys was going to object because I had
8 interrupted you. Did I interrupt any answer that you had
9 made?
10 A    No, except that you said we stated that bid
11 and transfer are basically the same. You have a bid -- you
12 have a sheet that you fill out to bid on the job, and then
13 you are transferred from one place to another after the
14 sheet is filled out.
15 Q    Okay. All right. Do you know when other
16 people -- by that I mean people other than you -- were made
17 aware that you had been transferred into the Rowland
18 position?
19 A    I guess it was after the board meeting because
20 it would have been in a board report.
21 Q    And let me tell you why I asked that. Okay?
22 The -- you have supplied us information in response to
23 certain questions that the position was illegally bid or
24 illegal posted. Do you remember that?
25 A    Yes.

---

88

1 Q    Well, in response to that posting Mr. Hazzard
2 -- Mr. Hazzard responded. He did make out a bid on the
3 position; right?
4 A    Yes.
5 Q    Okay. Do you know anything about how he was
6 told that there was an error or a mistake made?
7 A    No.
8 Q    Do you know when he was told that?
9 A    No.
10 Q    Well, when would the board have decided that
11 you were the guy for the job?
12 A    The board wouldn't -- I don't know.
13 Q    Well, are black employees favored in the
14 school district for positions over white employees?
15 A    The position -- no.
16 Q    Did race play any role in the --
17 THE VIDEO OPERATOR: Let's stop one minute.
18 A    Can I go to the bathroom?
19 MR. BAILEY: Yes. We can suspend right now.
20 THE VIDEO OPERATOR: It's 12:05. We're going
21 to go off camera.
22 (Luncheon recess.)
23
24         AFTERNOON SESSION.
25

---

89

1 MR. BAILEY: Ladies and gentlemen, please be
2 advised there is a tape recorder in operation.
3 THE VIDEO OPERATOR: The time is 12:53 p.m.,
4 18 October 2001, and we're starting -- we're going to
5 continue the deposition of Mr. McMurray.
6 MR. BAILEY: Okay. Thank you.
7 BY MR. BAILEY:
8 Q    Hello again there, Mr. McMurray.
9 A    Good evening. Good afternoon.
10 Q    Right. Glad to see you again. I'm sure
11 you're delighted to be back. Now, when we had left off --
12 just to provide a little bit of a bridge here, I was asking
13 some questions -- we were into an area asking questions
14 about race, the role of race, and whether there was any role
15 that you can recollect that race may have played in your
16 getting the decision -- getting the position with Rowland
17 School, and in a nutshell you said that you knew of no
18 race-related reasons had anything to do with what happened,
19 so I want to leave that area now. I want to ask you a few
20 questions about the union contract as you understand it. If
21 you remember, I asked you questions that had to do with --
22 (Discussion held off the record.)
23 BY MR. BAILEY:
24 Q    I want to ask you some questions now that have
25 to do -- have more to do with the union contract and have to

---



**MCMURRAY, ROBERT**
**10/18/01**

**HAZZARD VS**
**CURTIS**

90

1 do with the seniority issue for just a few minutes. Okay?
2 You had indicated that you were -- you had been a head
3 custodian longer than Mr. Hazzard. Do you remember that?
4    A    Yes.
5    Q    But that he had been an employee out there
6 longer -- with the school district longer than you had
7 been.
8    A    Yes.
9    Q    How does the union contract deal with that
10 seniority issue?
11    A    Seniority, best qualified.
12    Q    It doesn't say seniority in your position. It
13 talks about best qualified as a general issue, and then it
14 talks about seniority; right?
15    A    Uh-huh.
16    Q    Okay. Now, how -- if you were, how were you
17 more qualified than Mr. Hazzard or did you ever really sit
18 down and examine that issue?
19    A    I am better qualified than Mr. Hazzard because
20 I have been a custodian longer than he has, and I have been
21 in a major building longer than he has. He has never been
22 in a major building.
23    Q    Okay. What's the difference between a major
24 building and a smaller building?
25    A    The footage -- the footage of the building and

91

1 the size of the building and the staff of the building.
2    Q    Are you making more today at Rowland than you
3 would have been making today at William Penn?
4    A    No.
5    Q    But you have more work -- you continue to have
6 more work?
7    A    In a bigger building there is going to be more
8 work than a smaller building because of the size of the
9 building.
10    Q    How many employees were under you at William
11 Penn?
12    A    Seven.
13    Q    And I thought it was the same number at
14 Rowland.
15    A    I said we only got six.
16    Q    So you have less --
17    A    There is six of us in Rowland now.
18    Q    Total?
19    A    A total of six, including me. There is six.
20    Q    And there was seven of you at William Penn?
21    A    Yes.
22    Q    Okay. And what was the largest -- how many
23 was in administration, if you know, in August of 1999?
24    A    I don't understand the question.
25    Q    How many custodians?

92

1    A    Was in --
2    Q    In administration in 1999.
3    A    In the administration building?
4    Q    Yes. How many -- what work force was there to
5 take care of custodial and maintenance work in
6 administration?
7    A    In the whole entire district or just at the
8 administration building?
9    Q    At the administration building.
10    A    I think there was only two people at the
11 administration building.
12    Q    Okay. What makes a big building and a small
13 building, what makes the difference?
14    A    The size of the building in square footage.
15    Q    Square footage?
16    A    And the size and the staff that you have.
17    Q    And the staff that you have?
18    A    Yes.
19    Q    Now, the administration is a major building;
20 right?
21    A    The administration building is a major -- no,
22 no, it's not.
23    Q    It's not?
24    A    No, it's not.
25    Q    Well, where is the criteria, where is the --

93

1 where is it written down what makes a building a major
2 building and a minor building?
3    A    I don't know if there's any written documents
4 that says so.
5    Q    It's just like sort of a custom or something?
6    A    Yes. Like John Harris is a major building.
7 William Penn is a major building. Camp Curtin is a major
8 building because these buildings have -- William Penn has
9 221,000 square feet. John Harris has 180 some thousand
10 square feet. Camp Curtin has 118,000 square feet. Rowland
11 has 118,000 square feet.
12    Q    Rowland has 118?
13    A    Yes.
14    Q    William Penn has 200?
15    A    221,000 square feet.
16    Q    And the work force at Rowland is one less?
17    A    Yes.
18    Q    Who makes the decision on what the size of a
19 work force is in a building?
20    A    The board, Lance Freeman. It says in -- well,
21 years ago it says that the building was maintained by the
22 personnel by the square footage. So many people should be
23 in a building by the square footage. Somehow or another --
24 I don't know. Something happened. I don't know what
25 happened.

**94**

1 Q William Penn is twice as large as Rowland?
2 A Yes.
3 Q How many square footage at the Hamilton?
4 A I have no idea, not at this particular time.
5 I have the footage, but I don't have it with me.
6 Q Have you ever been to a Council 90 executive
7 board meeting?
8 A Once upon a time.
9 Q When?
10 A Oh, it's been years ago.
11 Q Now, the -- remember we had -- I had asked you
12 some questions about the school board?
13 A Uh-huh.
14 Q And asked if you knew any school board
15 members?
16 A Uh-huh.
17 Q Is it fair to say that you have never been at
18 any meeting with the school board where Mr. Hazzard and his
19 complaints about the Rowland situation were discussed?
20 A I have not.
21 Q Now, let me take you again -- we had -- when
22 we had left off, there had been some questions on the floor
23 about race that I had asked and you had responded, and then
24 there was some questions about the meaning of the word
25 transfer and the meaning of the word posting. Do you

**95**

1 remember that?
2 A Uh-huh.
3 Q All right. Now, you had responded to one
4 question I thought that what happens with a transfer is
5 let's say somebody does a bid on a position, there's a
6 posting, something does a bid, they might -- actually, that
7 might just be a transfer request on that particular bid.
8 A Yes.
9 Q Is that right?
10 A Yes, sir.
11 Q Okay. Now, in the case with Rowland it wasn't
12 a transfer, though, was it? It wasn't a transfer. It was
13 -- the error that they made, according to you, would be
14 that when human resources posted it they posted it as a new
15 position?
16 A I don't know how it was posted.
17 Q You also indicated that you didn't know about
18 that posting, you didn't learn about that, until much later?
19 A Yes.
20 Q And that your transfer had been in for some
21 months and -- when did you first learn that you were going
22 to be going to Rowland?
23 A When I got this letter.
24 MR. BAILEY: Could I see it, please? Okay.
25 Let the record show I have in my hand a letter dated August

**96**

1 12th, 1999 that's just been given to me by Mr. Robert
2 McMurray.
3 BY MR. BAILEY:
4 Q It says this letter is to notify you that your
5 transfer to the position of Facility Service Foreman 1B --
6 what does that stand for, 1B, is that just a classification?
7 A Yes.
8 Q At Rowland Intermediate School was approved.
9 This transfer effective date is August 16th, 1999. We wish
10 you much success in your new assignment. It's signed by
11 Lance D. Freeman, Chief of Human Resources/Equal
12 Opportunity. Do you know when the posting was?
13 A No, I do not.
14 Q The erroneous posting, when that was?
15 A No, I do not. I do not.
16 Q And it has here carbon copy. It's blank, and
17 it's a file. There's no names after that. Do you know
18 where this letter was distributed, where it went?
19 A No, I do not.
20 Q And could I see the envelope? Okay. And I
21 think you'd probably agree with me that it comes from the
22 personnel department?
23 A Does it say that at the top?
24 MR. BAILEY: I'll pass it back to you. And it
25 has an August 13th, 1999 post date or date on it. Just mark

**97**

1 those and have them made exhibits. We might as well.
2 Apparently, they're going to pop up.
3 (Letter to Robert McMurray from Lance D.
4 Freeman dated August 12, 1999 marked as McMurray Exhibit 1.)
5 (Photocopy of envelope marked as McMurray
6 Exhibit 2.)
7 BY MR. BAILEY:
8 Q Did you at any time ever find out when the
9 position was posted?
10 A No.
11 Q And as you sit here today you don't know when
12 it was posted?
13 A No.
14 Q Do you know of anyone else who bid on the
15 position?
16 A No.
17 Q At Rowland Middle School?
18 A That doesn't usually come out.
19 Q That's something that no one is told who bids
20 on it or anything like that?
21 A Huh-uh.
22 Q Now, who makes the decision -- here I notice
23 it's Mr. Freeman, and he is with human resources at the
24 school district. At least he was at the time; right?
25 A Yes.

98

1 Q    Okay.  Now, does he -- you had indicated to me
2 that it took board action.  Do you remember?
3 A    **Board approval, yes.**
4 Q    Yeah.
5 A    **Any job --**
6 Q    All right.
7 A    **Yes, board approval.**
8 Q    Yeah.  You indicated to me that it was -- now,
9 when did the board approve that?
10 A    **I don't know.**
11 Q    Well, do you know if the board did?
12 A    **No, I don't.**
13 Q    I'm trying to figure out -- when are the
14 school board meetings held?
15 A    **Every third Wednesday I think.  Every third**
16 **Wednesday, every second Wednesday.  It might have changed**
17 **since they got -- since Mayor Reed came in.  I don't know.**
18 Q    Every second or third Wednesday?
19 A    **Of the month.**
20 Q    Of the month.  Well, certainly the 13th of
21 August could cover the second Wednesday.  It would be pretty
22 tough to cover the third I would think.  We'll have to find
23 that out, but is it your recollection that there was board
24 action approval of your position?
25 A    **Yes, there would have had to be.**

99

1 Q    Well, there needs to be a resolution or
2 something; right?
3 A    **I don't understand the question.**
4 Q    The board needs to in most of these school
5 districts that I am familiar with -- although I do more work
6 with to be very honest with you, sir, with intermediate
7 units -- approval of certain positions -- it requires board
8 approval?
9 A    **Yes.**
10 Q    And the things are submitted to the board,
11 they're discussed -- usually they're pretty much, you know,
12 sort of perfunctory kind of things, you know, pretty much a
13 routine kind of thing but then -- but the board does have to
14 approve either some kind of resolution or board action?
15 A    **Yes.**
16 Q    Okay.  And somebody has to make a motion and
17 all that sort of thing?
18 A    **Yes.**
19 Q    Do you know if that was done in your case?
20 A    **Not firsthand knowledge, no.  I wasn't there**
21 **when it was done.**
22 Q    Well, there would have been board action --
23 needed to have been board action prior to August 12th, the
24 date of that letter, wouldn't there be?
25 A    **Not necessarily.**

100

1 Q    Well, that's what I don't understand.  The
2 letter says -- excuse me -- from Mr. Freeman says that you
3 have the position; right?
4 A    **Yes.**
5 Q    It congratulates you on having that position?
6 A    **Yes.**
7 Q    Now, Mr. Freeman didn't send you that letter
8 out before the position was posted; is that correct?
9 A    **No.**
10 Q    And --
11 A    **I don't know.**
12     MR. BAILEY:  You don't know.  Excuse me just
13 one second.
14     MR. FINK:  I may be able to --
15     MR. BAILEY:  Yeah.  Can you help us on that?
16     MR. FINK:  -- help you out on that.
17     MR. BAILEY:  I was almost certain it was
18 August.
19     MR. FINK:  It looks like it was on July 8th.
20 The posting -- I think this is the posting.
21     MR. BAILEY:  Okay.
22     MR. FINK:  It's dated July 8th.
23     MR. BAILEY:  Okay.
24 BY MR. BAILEY:
25 Q    Now, if the position were posted on July 8th,

101

1 you went to -- here we have employment opportunities, and
2 this document right here indicates that there is a location,
3 new Rowland building, and the position is a Facility Service
4 Worker 1, formerly custodian.  Now, I don't know if that's
5 the same position but the date here -- oh, the position up
6 above is the Facility Service Foreman.  That's the position
7 that you hold; right?
8 A    **Yes.**
9 Q    At Rowland; right?
10 A    **Yes.**
11 Q    And it says formerly Head Custodian I Major;
12 right?
13 A    **Yes.**
14 Q    Okay.  And that's on July 8th, 1999 that
15 that's posted.  At least that's what it's indicating here.
16 Now, if the process goes through or that you sent -- you
17 sent in as a transfer.  If that process goes through and
18 it's approved by Mr. Freeman, all right, does a transfer
19 require board approval?  Do you see where I'm coming from?
20 If a transfer requires board approval -- now, let me tell
21 you where I'm coming from.  I'm here making an assumption
22 that a mere transfer does not require board approval but
23 putting somebody in a new position typically it does or a
24 promotion does.
25 A    **All transfers require board approval.**

102

1  Q    Okay.
2  A    **As far as my knowledge is concerned. All**
3  **transfers and all movement of Harrisburg School District**
4  **personnel goes into the board report.**
5  Q    All right. When Mr. Curtis sent you
6  temporarily to the assignment there over at -- what is the
7  small school that he sent you to there?
8  A    **Hamilton.**
9  Q    Hamilton. That was it. Hamilton. Now, when
10 he sent you to Hamilton, he told you that was temporary, but
11 that was sometime I thought you said in June and the board
12 had not acted then. That's why I asked this question. In
13 other words -- in other words if -- here's what I'm trying
14 to get at. If he sent you to Hamilton on a temporary
15 assignment knowing you were going to go to Rowland, that you
16 were just going there temporarily and that the whole team
17 was going to go -- all of the people that went over to
18 Rowland with you that was part of your team would have had
19 an opportunity to say yes or no I'm going to go over there.
20 Let me see if I can rephrase this. Mr. Curtis does not have
21 the power to act without board approval?
22 A    **No, he does not.**
23 Q    All right.
24 A    **At certain things, you know.**
25 Q    I mean as far as placing someone in a new

103

1  position or transferring someone. You've told us a transfer
2  required board approval and a new position -- if a new
3  position was created that would require board approval too?
4  A    **Yes.**
5  Q    Okay. Now, given those circumstances, when
6  mister -- when this group that went over with you, over to
7  the new school, Rowland, were they temporarily assigned to
8  Hamilton also or did they -- they just stayed over at
9  William Penn until the time?
10 A    **Yes.**
11 Q    Okay. So you went to Hamilton temporarily
12 because they needed somebody to be in charge.
13 A    **They transferred all the head custodians at**
14 **that particular time, not only me.**
15 Q    Yeah, but you --
16 A    **Tim Curtis transferred everybody in the**
17 **district, all the head custodians in the district.**
18 Q    Yeah, but yours was temporary. That's the
19 difference with yours because you told us that. I'm not
20 saying there might have been somebody somewhere else in that
21 group that was temporary, but you told us yours was
22 temporary. You said that a number of times. Do you
23 disagree with me?
24 A    **No, I don't.**
25 Q    Okay. And that's not to say they didn't

104

1  transfer everybody at the time. That's correct. You've
2  testified to that that they made a lot -- you know,
3  everybody went to different -- he went to Shimmell for
4  example. There were a lot of different changes; right?
5  A    **Uh-huh.**
6  Q    But yours was temporary, and the reason for
7  that is because you were going to go to Rowland. How did
8  Mr. Curtis do that without board approval, or was it just
9  assumed that board approval was going to be there?
10 A    **I don't know.**
11 Q    Did you ever discuss it with him?
12 A    **No, sir.**
13 Q    Where is Mr. Curtis' office?
14 A    **It's in the administration building.**
15 Q    And what is his title?
16 A    **Supervisor of Facilities.**
17 Q    And Mr. Freeman is in charge of human
18 resources?
19 A    **Yes.**
20 Q    And how close are their offices?
21 A    **Mr. Curtis -- Mr. Freeman's office is**
22 **upstairs. Mr. Curtis' office is downstairs on the lower**
23 **level.**
24 Q    Okay. And how many people does Mr. Curtis
25 supervise, if you know?

105

1  A    **He supervised the whole custodial department,**
2  **grounds crew, maintenance crew, HVA -- HVC. He supervises**
3  **-- anything that has anything to do with facility he**
4  **supervised.**
5  Q    Does the union just rubber stamp whatever
6  management wants to do at the school? I mean, do they just
7  rubber stamp it and do whatever is asked of them or --
8  A    **No.**
9  Q    Was Mr. Hazzard's grievance denied?
10 A    **I don't know anything about Mr. Hazzard's**
11 **grievance.**
12 Q    But he should have -- I think you've indicated
13 he should have filed that grievance with you?
14 A    **Yes.**
15 Q    How would you know that?
16 A    **How do I know what?**
17 Q    That he should have filed the grievance with
18 you.
19 A    **Because I was the first line supervisor.**
20 Q    But wasn't it about you? I mean, didn't it
21 have to do with you?
22 A    **It didn't have anything to do with me. If**
23 **he's filing a grievance against The Harrisburg School**
24 **District, it doesn't have anything to do with me. If he's**
25 **filing a grievance against management, it doesn't have**

106

1 nothing to do with me.
2    Q    But if you were to -- if you were to let's say
3 -- if he were to file the grievance with you and let's say
4 you read or evaluated his grievance and agreed with him you
5 would be -- you'd be removing yourself or inclined to remove
6 yourself or agree to remove yourself from that position,
7 wouldn't you?
8    A    No.  If he filed a grievance as him being a
9 brother of AFSCME union, I would have had to take it as far
10 as it went.  And if it meant that me had to step down from
11 the job then.  If the grievance was held up, then that's
12 what I had to do.
13    Q    Sure.  But he never got a chance to --
14    A    No.  He had a chance.  As far as I understand,
15 he had a chance.
16    Q    What chance?
17    A    To file with me if he had a grievance.
18    Q    Okay.  So he made a mistake in not filing with
19 you?
20    A    I wouldn't say it was a mistake, but he didn't
21 file.
22    Q    Well, you know, I don't mean to be -- I
23 honestly do not understand.
24    A    Neither do I.
25    Q    Okay.  But he didn't file?  What do you mean

107

1 he didn't file?
2    A    I am -- was the union's first line supervisor
3 representative for AFSCME local in the Harrisburg School
4 District.
5    Q    All right.  I understand that.  Okay.  Don't
6 beat on the table because you'll make the mike vibrate.
7 It'll mess up the sound.
8    A    I apologize.
9    Q    I know you didn't mean to.  I understand it
10 wasn't -- you weren't being difficult.  What I'm asking
11 though, Mr. McMurray, are you saying he made a mistake?
12    A    I'm not saying he made a mistake.  I'm saying
13 he didn't file with me or he didn't come to me and ask me
14 about the position there at all.  He never talked to me
15 about that position, none at all, at no time.
16    Q    I'm not trying to be facetious or rude, but so
17 what.  I mean -- you know, I don't mean that in a
18 contentious way, but so what.  What difference does that
19 make?
20    A    It doesn't make any difference to me at all.
21 As long as he got representation from the union, that's
22 cool.
23    Q    I understand that it doesn't make any
24 difference to you, and you've made that clear that it's not
25 personal.  I understand that.  What difference would that

108

1 make -- speaking as a union official, what difference does
2 that make as far as the union is concerned?
3    A    Well, as far as the union is concerned, those
4 laws and those things were set down so that other
5 representatives would not be bogged down with union issues.
6 As a head custodian, as a first line supervisor, we see
7 different kinds of complaints than regular people because we
8 are first line supervisors.  We deal with principals and
9 management.  As first line supervisors, we deal with
10 principals and we deal with Tim Curtis, and that means that
11 other custodians deal with -- on a lower level basis with
12 management and teams.  We deal strictly with -- as, like I
13 said, Tim Curtis was our boss.
14    Q    Okay.
15    A    Okay?
16    Q    Uh-huh.
17    A    If he had anything to do with Hazzard, I had
18 something to do with Hazzard.  I went to Hazzard a couple
19 times, one time, and asked him about certain obligations
20 that he was doing that he wasn't supposed to be doing that
21 the Harrisburg School District said not to do.
22    Q    What were those?  What was he doing?
23    A    Harrisburg School District says all head
24 custodians work night shift.
25    Q    Okay.

109

1    A    Hazzard was working daylight.  I went to
2 Mr. Hazzard and asked him why was he working daylight and if
3 he had a letter from the Harrisburg, Brenda Conner stating
4 that he could work the shift that he was working, and the
5 reason that I went to him and asked him that was behind the
6 fact I was trying to protect him because the letter stated
7 all head custodians work daylight.
8    As I asked Mr. Hazzard that, he said he had a
9 letter.  I asked him for a letter to -- could I have a copy
10 of the letter.  He told me that he had to see management,
11 which was not his boss.  Tim Curtis was his boss, but he
12 told me he had to see Ms. Antonsen in order to get a letter
13 to let me know why he worked daylight -- you know, for where
14 he said that he was told to work night -- daylight.  I never
15 received a letter and I was actually -- where Ms. Antonsen
16 told me to leave her school.  But as a union representative
17 and as a union AFSCME personnel, he had no right at all
18 asking Mrs. Antonsen for anything when a representative was
19 there trying to help him.
20    Q    Well, did he want you to be there helping him?
21    A    It doesn't make any difference.  The union is
22 there to help.  If he feels -- if I felt that there was
23 something wrong, I was there to help him.  If there was any
24 questions about anything about --
25    Q    How did you learn about that situation?



MCMURRAY, ROBERT
10/18/01

HAZZARD VS
CURTIS

110

1  A    People talk.
2  Q    Okay. That's what I'm trying to get at with
3 the questions that I'm asking you about this grievance. You
4 didn't know anything about this grievance until -- until
5 this attorney stopped down to see you sometime ago, I guess,
6 but well after all of this went down.
7  A    Uh-huh.
8  Q    And yet -- and you wouldn't know anything
9 about this. That is I think you'll see as this case goes on
10 there were an awful lot of letters written, people
11 contacted, that sort of thing. You didn't hear anything
12 about it, yet you showed up over there with -- apparently,
13 Anderson is a principal or something?
14  A    Uh-huh.
15  Q    Okay. And at what school?
16  A    At Marshall.
17  Q    Okay. Apparently, Mr. Hazzard was head
18 custodian at Marshall?
19  A    Yes.
20  Q    And so you showed up over there. How did you
21 become involved, I mean, by what authority, the union sent
22 you over there?
23  A    No.
24  Q    All right. As a union official you made a
25 decision?

111

1  A    Yes.
2  Q    Okay. To become involved. And -- but
3 actually you were talking about a -- talking about a
4 management -- a management directive or issue or position,
5 weren't you?
6  A    I don't understand the question.
7  Q    Well, didn't you say that head custodians were
8 to work --
9  A    Night shift.
10  Q    -- night shift and not daylight?
11  A    Yes.
12  Q    And that there was a letter?
13  A    A letter was sent around to all head
14 custodians --
15  Q    Yes?
16  A    -- by Ms. Conner, e-mailed to every school in
17 the district.
18  Q    Right?
19  A    All head custodians work night shift.
20  Q    Okay. And so you're trying to give that
21 information to Bill?
22  A    No. I was trying to find out why he was
23 working daylight.
24  Q    Why did you -- okay. And he indicated he had
25 some kind of approval from somebody?

112

1  A    Yes.
2  Q    And that wasn't correct?
3  A    Well, he didn't show it to me. I never got
4 it.
5  Q    Why did it concern you?
6  A    Because I'm a union representative.
7  Q    Okay. Okay. When did this happen?
8  A    Let's see. Kimber was principal at 1998 --
9 1998 -- somewhere around 1998.
10  Q    1998?
11  A    Yes. Was it?
12      MR. HAZZARD: About five years ago.
13  A    Okay.
14 BY MR. BAILEY:
15  Q    Okay. What did Hazzard do wrong in that
16 situation, if anything?
17  A    In what situation?
18  Q    Involving this daylight versus nighttime
19 shift?
20  A    What did he do wrong?
21  Q    Yeah.
22  A    If anything he was working -- the business
23 manager said work night shift, and he was working daylight,
24 and Tim Curtis didn't tell him to work daylight as far as
25 I'm concerned. The principals requested him to work

113

1 daylight or either he worked daylight on his own.
2  Q    Okay. Why did that concern you as a union
3 official?
4  A    Because it concerned me as a union official as
5 Brenda Conner, the business manager, if she stated that
6 person was supposed to do something, it should have been
7 done. Now, if he was doing it on his own or if he was doing
8 it because somebody asked him to, I wanted to know in case
9 if he'd had to have been called down or if he had to have
10 been reprimanded for doing something he was supposed to be I
11 wanted to be prepared if that situation ever came up.
12  Q    Okay. Has he ever been a union steward?
13  A    Who?
14  Q    Mr. Hazzard.
15  A    I don't know.
16  Q    Did you ever ask him?
17  A    No.
18  Q    As you sit here today, you don't know whether
19 he ever has been?
20  A    No.
21  Q    What if I told you he has been?
22  A    It would be news to me.
23  Q    Would that affect your thinking on any of
24 these matters?
25  A    No.



114

1 Q      You had indicated that Mr. Hazzard had an
2 attitude. What kind of attitude, Mr. McMurray?
3 A      **He just has an attitude.**
4 Q      What kind of attitude? Is he a racist?
5 A      **I don't know.**
6 Q      Does he have a racist attitude sometimes?
7 A      **Not towards me.**
8 Q      Does he have a racist attitude towards any
9 people of color that you know of?
10 A      **Not that I know of.**
11 Q      All right.  Then does he have an attitude
12 towards people in authority?
13 A      **I don't know.**
14 Q      Is he unfriendly?
15 A      **He can be at times.**
16 Q      Is he rude or discourteous?
17 A      **He can be that at times.**
18 Q      Is he ever offensive to people, aggressive
19 towards them, threatening, anything like that?
20 A      **No.**
21 Q      Can you describe for us what you mean by his
22 attitude?
23 A      **Hazzard as a head custodian he seems not to**
24 **know exactly what he's doing all the time because he always**
25 **involved I think management and he doesn't ask questions or**

115

1 **seek advice from other custodians or head custodians about**
2 **the things that are going on.  That's my opinion.  My**
3 **opinion from what I can -- from what I see and from what I**
4 **hear him being -- asking questions in board -- in meetings**
5 **that we have with Tim Curtis he seems to be hesitant in**
6 **knowing what exactly he is supposed to do in my opinion.**
7 Q      As far as union business is concerned, his
8 chain of command, if that means that much -- I realize
9 that's not a formal thing -- his chain of command would
10 normally be through you?
11 A      **No.**
12 Q      All right.  How about as an employee, is his
13 chain of command through you?
14 A      **No.**
15 Q      Are you a supervisor of his of any kind?
16 A      **No.**
17        MR. BAILEY:  Ladies and gentlemen, I'm going
18 to impose upon you folks for a little bit of a break.
19 Okay?  I don't think we're going to be that much longer with
20 you to be honest with you, sir, but I have a Federal Court
21 Judge --
22        THE VIDEO OPERATOR:  The time is 1329, and
23 we're going to stop now.
24        (Recess.)
25        MR. BAILEY:  Ladies and gentlemen, please be

116

1 advised that there is a tape recorder running.
2        THE VIDEO OPERATOR:  Okay.  It's now 1348, 18
3 October, and we're resuming the deposition of Mr. McMurray.
4 BY MR. BAILEY:
5 Q      Mr. McMurray, have you ever witnessed
6 Mr. Curtis raising his voice and directing angry comments
7 towards any employee of The Harrisburg School District?
8 A      **No.**
9 Q      So it's fair to say that, obviously then, you
10 have never seen Mr. Curtis express any anger or act in a
11 condescending or unpleasant way with Mr. Hazzard; is that
12 fair to say?
13 A      **Yes.**
14 Q      Has Mr. Curtis ever mistreated you in the
15 sense of, you know, being angry with you or talking to you
16 as if you're a child or anything like that or in a mean way?
17 A      **He's reprimanded me.**
18 Q      All right, sir, what I'm looking for -- I can
19 understand that, and I know he has a job to do, and it's a
20 tough job, and I'm sure that if he reprimanded you he felt
21 the reprimand was justified, but how did he do it?  I mean,
22 he reprimanded you, and I was watching your face as you
23 responded to my question.  How did he behave when he did it?
24 A      **He treated me like a man, and we talked in his**
25 **office.**

117

1 Q      Well, then he didn't mistreat you.  He
2 reprimanded you, which is his job?
3 A      **Uh-huh.**
4 Q      But he didn't mistreat you?
5 A      **No, he did not.**
6 Q      All right.  Now, I had -- you had mentioned an
7 individual by the name of I think -- is it Tapper?
8 A      **Yes.**
9 Q      How do you know Mr. Tapper, who Mr. Tapper is?
10 A      **He once upon a time was the vice-president of**
11 **Local 6023, yeah.**
12 Q      And is -- Mr. Tapper is white; is that
13 correct?
14 A      **Yes.**
15 Q      And mister -- when did Mr. Tapper leave the
16 school district?
17 A      **I have no idea.**
18 Q      Well, I mean, can you tell -- a year ago?  Was
19 he there a year ago?
20 A      **Yes, I think so.  I think he left maybe the**
21 **early part of this year I think.  I'm not for sure.**
22 Q      His position when he left, he had been a
23 custodian foreman?
24 A      **No, no.**
25 Q      What was his position when he left?

118

1 A He was in the maintenance department.
2 Q The maintenance department. One of the things
3 that you had indicated when I asked you questions earlier
4 was that you have certain maintenance duties and
5 responsibilities; is that correct?
6 A Yes. All head custodians do.
7 Q All head custodians do. And what do those
8 consist of?
9 A Small things like fixing anything that you can
10 fix within your school.
11 Q Okay.
12 A That's -- that's in our job description.
13 Q Okay. And do you -- you do have a maintenance
14 department, though; right?
15 A Yes.
16 Q And they deal with more severe things?
17 A Yes.
18 Q Now, if you're in the maintenance department
19 are you assigned -- strike that. Are maintenance people
20 assigned to each school?
21 A No.
22 Q Maintenance people move around from school to
23 school?
24 A Yes.
25 Q So they have a tendency over a period of time

119

1 to interact at different schools with different people at
2 different levels?
3 A Yes.
4 Q Now, if a maintenance person reports to
5 Rowland Middle School, do they report to the head custodian
6 or who do they report to?
7 A They're supposed to -- when they first enter
8 the building, they're supposed to come to the office and
9 sign in to let the -- let people know that they're in the
10 building and what they're supposed to be doing. The head
11 custodian is not there during the daytime. A day time
12 person is. All head custodians are working nights.
13 Q I want you to listen very closely to this
14 question because it's -- it might seem a little confusing.
15 What if -- if I'm a maintenance person and I want to apply
16 for a position as a head custodian and I have been a
17 maintenance person for 15 years do I have -- do I qualify to
18 be a custodian or do I have to have been a custodian? Do
19 you understand what I'm asking?
20 A Uh-huh. I guess it all depends on who bids
21 for the job.
22 Q Well, let's say -- let's say I'm -- let's look
23 at the situation this way. Someone has been a custodian for
24 five years.
25 A Yes.

120

1 Q They're applying for head custodian at a small
2 school.
3 A Yes.
4 Q Another person has been in maintenance for 15
5 years, and they want to apply for that position as head
6 custodian at the small school. Is the person who has been a
7 maintenance person for 15 years qualified for purposes of
8 the union contract, at least basically qualified. I'm not
9 saying they're more qualified. I don't know the answer to
10 that, and that will be my next question, but are they a
11 qualified person to bid under those circumstances?
12 A A head custodian?
13 Q Sure.
14 A No.
15 Q All right. To apply for a position as a head
16 custodian, would one of the requirements be that you have
17 some background and experience as a custodian?
18 A I think that -- I think you have to have five
19 years of service as a custodian to become a head custodian.
20 Q Okay. And is that written into the contract?
21 A I think so.
22 Q But there is not a requirement -- and I call
23 this because of my military experience time in grade. The
24 military used to refer to it as time in grade. That was a
25 qualification. For example, in this case you were a head

121

1 custodian longer than Mr. Hazzard was; is that correct?
2 A Yes.
3 Q All right. And how long were you a head
4 custodian as of August the 12th, 1999?
5 A Nine years.
6 Q Nine years. How long had Mr. Hazzard been a
7 head custodian?
8 A I don't know.
9 Q I thought you said you were a head custodian
10 longer than he was.
11 A Yeah.
12 Q Okay. How do you know that?
13 A Because I remember when he transferred from --
14 I kind of remember when he transferred from the commissary
15 to the custodial department and then I kind of remember --
16 as I've been thinking about it, I kind of remember when he
17 got the head custodian job at Marshall, and I had already
18 been a head custodian at Foose School.
19 Q You know, I think I misunderstood. So you
20 became a -- you first entered the work force 18 years --
21 A As a bus driver.
22 Q Eighteen years ago.
23 A As a bus driver.
24 Q That's what made me. Okay. As a bus driver.
25 When did you start doing your custodial duties out there at



MCMURRAY, ROBERT                                    HAZZARD VS
10/18/01                                                 CURTIS

---

122

1 the school?
2 A    At what school?
3 Q    Any school, sir, in the -- I'm sorry.  That
4 was not a clear question.  When did you get into doing
5 custodial work out there at Harrisburg School District?
6 A    I think about 1987 -- 1987 -- '87, '88,
7 somewhere around in there.
8 Q    When did you become a union steward?
9 A    About '93, '94, '95, somewhere around in
10 there.
11 Q    And when did you become a head custodian, '91?
12 A    Uh-huh.
13 Q    How did you get your job?  By that I mean -- I
14 don't mean any negative by that, but who recommended you or
15 how did you learn of it, how did you come to work for the
16 school district?
17 A    How did I come to work for the school
18 district?
19 Q    Yeah.
20 A    Mr. Boutselis -- Mr. Boutselis was working for
21 The Harrisburg School District and he -- I was looking for a
22 job.  He told me to apply for Harrisburg School District as
23 a bus driver, and I did, and he recommended me, and I
24 interviewed with Lance Freeman, and I became a part-time bus
25 driver.

---

123

1 Q    Have you had any pay increases since you went
2 to the Rowland Middle School position?
3 A    Nothing except for union.  We get a raise
4 every year.
5 Q    What about overtime?  Any more overtime
6 available at Rowland than there would have been at Hamilton
7 or West Penn -- I'm sorry -- William Penn?
8 A    The head custodians usually make their own
9 way.
10 Q    Special events, anything like that?
11 A    Basketball.
12 Q    Who gets to choose those or do you assign
13 those?  Do you have a system of how you pass that work out?
14 A    Me?
15 Q    Yes.
16 A    Yes.
17 Q    How do you pass it out?
18 A    Seniority.
19 Q    Seniority?
20 A    Uh-huh.
21 Q    Right of first refusal, seniority?
22 A    Uh-huh.  My whole team works.  I work my whole
23 team.  I don't discriminate.  If we work, everybody works.
24 Q    And what if you decide you're not going to
25 work?

---

124

1 A    If I decide that I'm not going to work?
2 Q    Yes.
3 A    Then the next person seniority.  Ms. Oliver,
4 she has more seniority.  Well, I shouldn't say that.
5 Ms. Neely has more seniority than Ms. Oliver does, but based
6 on Ms. Oliver's know how and the way she do things --
7 Q    But you have a methodology?
8 A    Yes.
9 Q    You have a way of doing it?
10 A    Yes.
11 Q    And you follow the way of doing it on a
12 regular basis?
13 A    Yes.
14 Q    And it's consistent with your union contract?
15 A    Yes.
16    MR. BAILEY:  Okay.  I think I'm about
17 finished.  Let the equipment run.  Bill, step out for just a
18 minute.  Let's you and I talk, and I think maybe we're about
19 finished up here.
20    (Recess.)
21    MR. BAILEY:  Mr. McMurray, I would like to
22 express my gratitude for you coming here today.  I would
23 like to express my appreciation for your courtesy.  I don't
24 have any more questions for you.
25    (The deposition was concluded at 1:58 p.m.)

---

125

1 STATE OF PENNSYLVANIA  :
             : ss
2 COUNTY OF YORK         :
3
4    I, Lisa A. Hansell, a Reporter Notary-Public,
5 authorized to administer oaths within and for the
6 Commonwealth of Pennsylvania and take depositions in the
7 trial of causes, do hereby certify that the foregoing is the
8 testimony of ROBERT L. McMURRAY.
9    I further certify that before the taking of
10 said deposition, the witness was duly sworn; that the
11 questions and answers were taken down stenographically by
12 the said reporter, Lisa A. Hansell, a Reporter
13 Notary-Public, approved and agreed to, and afterwards
14 reduced to typewriting under the direction of the said
15 Reporter.
16    I further certify that the proceedings and
17 evidence contained fully and accurately in the notes by me
18 on the within deposition, and that this copy is a correct
19 transcript of the same.
20    In testimony whereof, I have hereunto
21 subscribed my hand this 6th day of November, 2001.
22
23    _____
        Lisa A. Hansell, Reporter
24       Notary Public
25 My commission expires:
    May 20, 2004

---

32



# HARRISBURG SCHOOL DISTRICT

1201 North Sixth Street • Harrisburg, PA 17102-1406

(717) 255-2511 • FAX (717) 233-1968

August 12, 1999

Robert McMurray
68 N. 12th Street
Harrisburg PA   17103

Dear  Mr. McMurray:

This letter is to notify you that your  transfer to the position  of Facilities Service Foreman IB at Rowland Intermediate School  was approved.  This transfer effective date is August 16 , 1999.

We wish you much success in your new assignment.

Sincerely,

Lance D. Freeman
Chief of Human Resources/Equal Opportunity

LDF/hvq

cc:

file

EXHIBIT
McMurray-1
10-18-01

*"An Equal Rights And Opportunity School District"*

PERSONNEL DEPARTMENT

# HARRISBURG SCHOOL DISTRICT
1201 North Sixth Street
Harrisburg, PA 17102-1406

**EXHIBIT**

McMurray-Z

10-18-01

Robert McMurray
68 N. 12th Street
Harrisburg  PA   17103



# EXHIBIT D

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM A. HAZZARD,                    :
              PLAINTIFF            :
                                   :
             VS                     :     NO.  1:CV-00-1758
                                   :
TIM CURTIS, MACK McMURRAY, AFSCME,     :
DISTRICT 90, AND THE HARRISBURG        :
SCHOOL DISTRICT,                       :
              DEFENDANTS              :

VIDEO
DEPOSITION OF:   LANCE D. FREEMAN
TAKEN BY:        PLAINTIFF
BEFORE:          SHERRY BRYANT, RMR, CRR
                 NOTARY PUBLIC

                 CRYSTAL M. LYDE, VIDEO OPERATOR

DATE:            NOVEMBER 17, 2001, 9:54 A.M.

PLACE:           LAW OFFICES OF DON BAILEY
                 431 NORTH SIXTH STREET
                 HARRISBURG, PENNSYLVANIA

APPEARANCES:
     LAW OFFICES OF DON BAILEY
     BY: DON BAILEY, ESQUIRE

        FOR - PLAINTIFF

     WILLIG, WILLIAMS & DAVIDSON
     BY: ERIC M. FINK, ESQUIRE
        FOR - DEFENDANTS MACK McMURRAY,
           AFSCME AND DISTRICT 90

     RHOADS & SINON, LLP
     BY: SHAWN D. LOCHINGER, ESQUIRE
        FOR - DEFENDANTS TIM CURTIS AND THE
           HARRISBURG SCHOOL DISTRICT

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577



**FREEMAN, LANCE**
**11/17/01**

**HAZZARD  VS**
**CURTIS**

2

INDEX

WITNESS

FOR PLAINTIFF        DIRECT   CROSS

Lance D. Freeman
    By Mr. Bailey:     3
    By Mr. Fink:        62
    By Mr. Lochinger:         83

GEIGER & LORIA REPORTING SERVICE - 1-800-222-4577

3

1            STIPULATION
2        It is hereby stipulated by and between counsel for
3    the respective parties that reading, signing, sealing,
4    certification and filing are waived; and that all objections
5    except as to the form of the question are reserved to the
6    time of trial.
7
8        THE VIDEO OPERATOR: State your name for the
9    record, please, and spell it.
10        MR. FREEMAN: My name is Lance D. Freeman,
11    L-a-n-c-e, middle initial D., F-r-e-e-m-a-n.
12
13        LANCE D. FREEMAN, called as a witness, being
14    sworn, testified as follows:
15
16        DIRECT EXAMINATION
17
18    BY MR. BAILEY:
19    Q        Mr. Freeman, before we get into the substance
20    of the deposition, just a few instructions, okay.  This is a
21    deposition.  This is a video deposition, by the way, but it's
22    also being taken by stenographic means and that places some
23    importance on you and I allowing each other to finish.  And
24    sometimes in the course of a deposition, although I'm usually
25    the violator, not the witness, folks tramp on each other's

4

1    toes, so to speak.  If you find me doing that or catch me
2    doing that, please -- I'm sure your attorney will also speak
3    up, but you also please feel free to correct me or stop me
4    and we'll continue on with the deposition.
5        MR. BAILEY:  Opposing counsel, usual
6    stipulations, objections except as to the form of the
7    question reserved until the time of trial, although sometimes
8    it's just as easy to take them out and get them resolved here
9    on the record.  Is that okay with everyone?
10        MR. FINK:  It's fine.
11        MR. LOCHINGER:  Yes, it is.
12    BY MR. BAILEY:
13    Q        Now, Mr. Freeman, I do do things a little bit
14    differently.  If at some time during the questioning in the
15    deposition, as I'm asking you questions, if you have a
16    curiosity as to what my reason for asking a question is or
17    you want to know what I'm trying to get at, I don't object to
18    your asking me.
19        I'll be pleased to share that information with
20    you.  I don't have any interest in tricking you with trick
21    questions or creating some kind of ambiguity on the record.
22    So we want to make sure what we get is very, very clear.  All
23    right?
24    A        That's fine with me.
25    Q        And if at any time one of the attorneys speaks

5

1    up or says something, I can tell already from talking to you
2    there's no need to remind you of these things, it's just we
3    need to go through it, I guess, make sure you let the
4    attorney finish and we get our little arguments or
5    discussions or whatever we do, although I don't expect
6    there's any kind of problem, down on the record, get that
7    clarified, then we'll move forward.  Okay?
8    A        Sounds good to me.
9    Q        And lastly, again, I don't think it's
10    necessary, but just in case, you need to answer verbally on
11    the record.  Gestures, uh-huhs, huh-uhs, shakes of the head
12    are not good procedure during a deposition.
13    A        I understand.
14    Q        And the last thing is that just as you have an
15    obligation to answer accurately, you have an obligation to
16    answer fully and completely.  And those are general
17    instructions.  I don't mean to condescend, but we have to do
18    that, okay.  Do you have any questions of me at all?
19    A        I have no questions.
20    Q        All right, sir.  Mr. Freeman, what's your
21    official address, and by that, I mean your business address,
22    at the current time?
23    A        At the current time, 36 Media Line Road,
24    Newtown Square, Pennsylvania.
25    Q        And you are represented by counsel here?

2



FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

6

1    A    Yes, I am.
2    Q    Now, that's really out of this area, isn't it?
3    A    Yes, it is.
4    Q    So you apparently have professionally moved
5 from what you did previously?
6    A    I have professionally moved to Marple Newtown
7 School District.
8    Q    And you will be in touch through your
9 attorney?
10    A    Yes, I will.
11    Q    He'll know where to reach you and everything.
12 Now, Mr. Freeman, I have a series of questions here and I
13 want to start off in the beginning with some questions that
14 have to do with you and your profession and your experience
15 and that sort of thing.  What's your age?
16    A    My age is 50 years old, 50 years of age,
17 correction.
18    Q    And what is your profession, what do you do?
19    A    I'm the director of personnel for the Marple
20 Newtown School District.  Prior to that I was the director of
21 personnel/human resources for the Harrisburg School District.
22    Q    Now, when did you leave the Harrisburg School
23 District?
24    A    My last day in the Harrisburg School District
25 was October 19th, 2001.

7

1    Q    How long had you been with the Harrisburg
2 School District before leaving October 19th, 2001?
3    A    I first became employed in the Harrisburg
4 School District in January 1985.
5    Q    Now, when you became employed at the
6 Harrisburg School District in January of 1985, in what
7 capacity were you hired?
8    A    I was hired as the coordinator of affirmative
9 action and equal opportunity.
10    Q    And how long did you hold that position?
11    A    Three years.
12    Q    So roughly '85 to '88 or so, you were an
13 affirmative action officer and then you moved on to another
14 position with the --
15    A    Then I moved on to the director of personnel,
16 and had been the director of personnel from 1988 till the day
17 of my leaving the school district.
18    Q    Now, when you initially described that
19 position, it was director of personnel/human resources?
20    A    In later years they changed it to human
21 resources.
22    Q    Human resources is more or less the current
23 buzz term for it; right?
24    A    Correct.
25    Q    But it's essentially the same kind of

8

1 position, director of personnel?
2    A    Yes, it is.
3    Q    Now, as director of personnel, who did you
4 answer to?
5    A    The superintendent of schools.
6    Q    And who was the superintendent of schools
7 during the years, if you can just go through them if they
8 changed, from 1988 to present -- till October 9th, 2001?
9    A    Donald M. Carroll, then Randolph Outen,
10 O-u-t-e-n.
11    Q    L-u-t-e-n?
12    A    O-u-t-e-n.
13    Q    Okay.
14    A    H. Major Poteat, Lucian Yates, Third,
15 Dr. Gerald Cohen.
16    Q    All right.  Now, can you describe for us
17 briefly what your duties as director of personnel/human
18 resources, what those duties consisted of?
19    A    Under my direction was the responsibility for
20 all the personnel and human resource functions, including the
21 recruitment, hiring of all employees, the handling of all of
22 their benefit programs, labor relations with respect to our
23 bargaining agreements and employee groups.  I handled all
24 grievances, matters of complaints.
25         I was responsible for and involved in

9

1 negotiations for all bargaining agreements and employment
2 plans for employees.  I was involved in recruitment,
3 determining of staffing levels, classification and pay
4 issues.  I was also involved in handling civil rights
5 compliance.  For a period of time I also was responsible in
6 the school district for handling all professional development
7 for all employees.
8    Q    Did you ever work with the board?
9    A    Yes, I did.
10    Q    Is it fair to say probably on pretty much,
11 particularly because you were dealing with personnel matters,
12 pretty much on a regular basis --
13    A    Yes, I did.
14    Q    -- you'd interact with the board; is that
15 correct?
16    A    Yes, I did.
17    Q    Did you attend board meetings?
18    A    Yes, I did.
19    Q    Did you frequently speak or prepare agendas or
20 presentations for the board?
21    A    Yes, I did.
22    Q    Did you have occasion from time to time to
23 interact officially and professionally with board members on
24 an individual basis?
25    A    Yes, I did.

**FREEMAN, LANCE**
**11/17/01**

**HAZZARD VS**
**CURTIS**

10

1    Q      And during this time and during this process,
2 you also worked directly with the superintendents that you
3 served with; is that correct?
4    A      **That is correct.**
5    Q      Were you responsible directly to the
6 superintendent, directly to the board, or directly to both,
7 based on how you did your work?  Do you understand that
8 question?
9    A      **Yes, I do.**
10    Q      Can you respond, please?
11    A      **I reported to the superintendent of schools.**
12    Q      Okay.  Now, did you ever report to the board
13 on anything?
14    A      **Report with respect to direction and**
15 **supervision?**
16    Q      Sure.
17    A      **No.**
18    Q      Did any board member ever give you any
19 directions or indicate that you were to carry out certain
20 duties or anything like that?
21    A      **Yes, they have, and I shared it with the**
22 **superintendent for his concurrence.**
23    Q      Now, did you ever have any periods of times
24 where there were gaps and you didn't have any superintendent?
25    A      **Yes, there were.**

11

1    Q      Are you familiar with the, at least generally
2 familiar with the complaint that was filed in this case?
3    A      **Yes, I am.**
4    Q      And you've had an opportunity to review or
5 read it?
6    A      **Yes, I have.**
7    Q      Now, I want to ask you some questions
8 connected with the complaint in a few minutes, but before we
9 get there I want to ask you some general questions about
10 policy in the school district in dealing with the union.  Do
11 you have more than one union you deal with at the district or
12 you dealt with at the district?
13    A      **Yes, there are more than one union in the**
14 **district.**
15    Q      And what unions were they?
16    A      **There was the AFSCME bargaining unit and there**
17 **was the Harrisburg Education Association bargaining unit.**
18    Q      Now, the jurisdiction of the Harrisburg
19 Education Association, those were teachers, educators?
20    A      **Teachers and other professional personnel by**
21 **school code.**
22    Q      And the AFSCME jurisdiction was?
23    A      **AFSCME jurisdiction was over support**
24 **personnel, like clerical, maintenance, support personnel.**
25    Q      Now, I assume there was some type of grievance

12

1 procedure with the setup with the union with AFSCME?
2    A      **Yes, there is.**
3    Q      And based on your recollection, how did that
4 work? Let's say an employee was unhappy with something and
5 felt that it was serious enough that they wanted to complain
6 about it.  How did the system work?
7    A      **As it's spelled out in their bargaining**
8 **agreement, the first step is to meet with their immediate**
9 **supervisor or with whom that matter of disagreement stems**
10 **from to see if there can be a quick and informal resolution**
11 **to that.  If not, they have a right to file a grievance in**
12 **accordance with the grievance procedure in their bargaining**
13 **agreement through their union.**
14    Q      Now, once they file that grievance in a more
15 formal procedure, is that step one or step two, the formal --
16    A      **It all depends on at what level they file the**
17 **grievance.**
18    Q      What happens then, do they meet with you at
19 that point or do they meet with someone that's below you in
20 the chain of command at the school?
21    A      **Again, it depends on at what level the**
22 **grievance is filed.**
23    Q      At some point, do you become directly
24 involved?
25    A      **At some point in most but not all grievances**

13

1 do I become involved.
2    Q      Now, let's -- I want to ask you some questions
3 about a Mr. Curtis.  Do you know Mr. Curtis?
4    A      **Yes, I do.**
5    Q      Is it Timothy, is that his name?
6    A      **Timothy Curtis is correct.**
7    Q      How long have you known Mr. Timothy Curtis?
8    A      **From the date of his first employment with the**
9 **Harrisburg School District.**
10    Q      And when was that?
11    A      **I don't know exactly when.**
12    Q      Number of years?  That's okay.
13    A      **I would say probably -- he's probably been**
14 **employed with the district maybe two and a half years, close**
15 **to three years.**
16    Q      That's okay.  And in what capacity,
17 Mr. Freeman?
18    A      **Responsible, in charge of our facilities**
19 **department, supervisor of facilities.**
20    Q      Supervisor of facilities.  Now, in that
21 capacity, what does he do?
22    A      **He's responsible for managing and supervising**
23 **the maintenance of all facilities, directing the -- he had --**
24 **directing all the facilities and maintenance staff.  He also**
25 **had responsibility for supervising custodial staff in the**



FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

14

1 buildings throughout the district.
2    Q        And what did he do before he assumed the
3 position as the manager of the super -- what was the title
4 again?
5    A        Supervisor of facilities or facilities
6 supervisor.
7    Q        Facilities supervisor, I think that's how I
8 remember.  What did he do before he became facilities
9 supervisor?
10   A        He worked for the private sector before coming
11 to the Harrisburg School District.
12   Q        Do you know what he did?
13   A        He worked for I believe it was O'Brien
14 Krietzberg, and he worked as working with respect to a
15 project manager for facilities projects that they had with
16 the district.
17   Q        And O'Brien Krietzberg is a management firm
18 that handled some of the renovation and construction projects
19 for the district; right, in other words, they were a
20 construction manager?
21   A        Yes.  That's O'Brien's Krietzberg's, one of
22 their functions, yes.
23   Q        They also do civil rights compliance, don't
24 they?
25   A        I don't know that O'Brien Krietzberg does

15

1 civil rights compliance.
2    Q        Do you know whether they consult with folks,
3 maybe some out of New Jersey, to do civil rights compliance?
4    A        Yes, they do.  They -- we also, the district
5 also had a relationship through O'Brien Krietzberg with
6 Contract Compliance, Incorporated.
7    Q        And they're headquartered in New Jersey;
8 right?
9    A        Yes, to my knowledge, they are.
10   Q        Did Mr. Curtis work with them at all?
11   A        Not to my knowledge.  He was not ever an
12 employee of theirs, to my knowledge.
13   Q        Do you know if when he was at O'Brien
14 Krietzberg he ever worked with them?
15   A        I don't know.  He may have worked with them,
16 but as a contracted service with the Harrisburg School
17 District, O'Brien Krietzberg had a responsibility to be
18 involved in contract compliance with respect to participation
19 and utilization of minority and women-owned businesses in the
20 projects involved with the Harrisburg School District.
21   Q        Was it one of Mr. Curtis' functions to review
22 or look at contact relationships between Harrisburg School
23 District and other vendors or entities to evaluate whether
24 they were in compliance with the civil rights, basic civil
25 rights standards in the United States, that are never

16

1 practiced but that we make speeches about on Memorial Day,
2 but, my comments aside, do you know whether he ever worked
3 with any of those in doing that kind of job or did you do
4 that kind of job?
5    A        Well, I don't know about not being practiced,
6 but I had that responsibility in Harrisburg School District
7 and I did follow that practice and I did work to include
8 minority and women participants in Harrisburg School District
9 projects.
10   Q        Did you?
11   A        Yes, I did.
12   Q        Okay.  Well, you and I may disagree about
13 whether civil rights are respected and practiced in the
14 United States.  I don't mean to be argumentative.
15   A        I know you weren't.
16   Q        Let me choose an example and I'll ask you.  I
17 appreciate your agreement with me.  For example, you would
18 review the relationship with the -- let me see if I can think
19 of one -- Capital Area Intermediate Unit; right?
20   A        Yes, that could be one.
21   Q        And they employed many black citizens and
22 black drivers in moving special needs children about in the
23 Harrisburg area, didn't they?
24   A        Would you say that again, they employed?
25   Q        Did they employ -- do you know whether the

17

1 Intermediate Unit, it's a -- Harrisburg School District was a
2 major user of Intermediate Unit functions and facilities;
3 right?
4    A        Yes.  Well, the Intermediate Unit serviced 25
5 school districts in the three-county area.  We were one of
6 the 25 school districts that they serviced and they did have
7 minority employees in some of their positions.
8    Q        What positions?
9    A        I don't know which positions they had.
10   Q        In this --
11   A        I don't know which positions they had.  I
12 don't know.
13   Q        What about transportation, did they have any
14 in transportation?
15   A        I don't know which positions they had filled
16 by minority students -- I mean minority employees.
17   Q        That was your job to review that?
18   A        No, it was not.
19   Q        Oh, I thought you'd indicated --
20   A        No, I said that I was familiar with it and I
21 knew that -- like the Capital Area Intermediate Unit, I said.
22   Q        Okay.  I did, I misunderstood you.  To the
23 best of my knowledge, they don't employ any black people,
24 haven't for years, and I just wondered if --
25   A        I knew of one that worked there, that's why I

FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

18

1 could say that.
2    Q      In transportation?
3    A      No.  That's why I said I don't know about
4 transportation when you asked me about transportation.
5    Q      Do you know who that person was that worked
6 there?
7    A      Oh, yes.  I remember Dr. Gail Edwards worked
8 there for the Capital Area Intermediate Unit.
9    Q      Dr. Dale Edwards?
10    A      Gail.
11    A      Gail Edwards.
12    A      In fact, after -- we hired Dr. Gail Edwards
13 from the Capital Area Intermediate Unit.
14    Q      When did you do that?
15    A      That must have been sometime in the mid to
16 early '90s.
17    Q      Mid to early '90s, okay.  That might be the
18 reason why I don't have a knowledge.  All right.  Anyway, so
19 you would look at those things and evaluate those kinds of
20 things?
21    A      Which kinds of things are you now talking
22 about?
23    Q      I'm talking about all aspects.  You had
24 indicated the affirmative action background.
25    A      Yes.

19

1    Q      What I'm trying to do, let me tell you what
2 I'm attempting to do.
3    A      Okay.
4    Q      I want to find out the knowledge and
5 experience that you have or try to evaluate maybe how much
6 time or effort you put into civil rights issues relating to
7 employment.  That's what I'm trying to do.  The reason I
8 asked, so you know, about the Intermediate Unit is that I
9 just by accident stumbled on some knowledge, have some
10 knowledge of that situation and, you know, you and I may not
11 agree on their having minorities there, but have had occasion
12 and opportunity to do some research on that and that's why I
13 raise that issue.
14          Let me be more specific as to this litigation
15 and the parties here.  You have or, excuse me, during the
16 period of time that you were director of personnel for the
17 Harrisburg School District, you had both white and black and
18 I assume Hispanic employees?
19    A      Yes, we -- yes, Harrisburg School District
20 does have white, black and Hispanic employees.
21    Q      And I assume it would be your testimony
22 that -- I'm a civil rights lawyer, for example, 99 percent of
23 the cases that I deal with that are race-based cases, 99.9
24 percent of them are cases where white citizens, sometimes
25 black supervisors incidentally, mistreat black citizens.

20

1 That's mostly what I deal with.
2          This, of course, is a reverse discrimination
3 complaint, so I want to ask you some questions about civil
4 rights issues on the job and hiring practices and employment
5 practices at Harrisburg School District, okay.  That's...
6          I assume it's fair to say that your policy, as
7 director of personnel, you personally for the Harrisburg
8 School District was such that you would not tolerate racism
9 in employment or hiring or promotion at the school; is that
10 fair to say, that's what your position would be?
11    A      That is fair to say, because that is illegal.
12    Q      Now, let me try to ask a few more direct
13 questions about Mr. Hazzard and his position there.  Again,
14 this is a reverse discrimination claim, so sometimes these
15 things get -- the normal most prejudice in this country is
16 directed towards black citizens, as I think we know, by white
17 citizens, typically.
18          But in this particular case, I'm going to
19 start asking you some questions about the work force, the
20 custodians.  I'm going to ask about this thing with the
21 posting of the job and, you know, your knowledge of that and
22 some of the negotiations on the grievance and that sort of
23 thing, okay?
24    A      Okay.
25    Q      So I'm sort of going to switch gears on you

21

1 here.  It's my understanding from testimony that we've had
2 that at some point in I believe the summer of 2000 there was
3 some type of decision made to transfer large numbers, to
4 reassign large parts of the custodian and maintenance work
5 force to different buildings.  Do I have that correct?  Do I
6 have that right?
7    A      Yes.
8    Q      And how would you describe that if that has
9 meaning to you as a question if that occurred?
10    A      Well, it means that you've commented on
11 something that within our bargaining agreement the employer
12 does have the right to assign employees.  And during the
13 summer of 2000, we did reassign employees, particularly
14 custodians, in the Harrisburg School District.
15    Q      Okay, we'll get to questions about the right
16 to do things, and those are things that typically are for
17 courts to decide.
18    A      I was just reciting from our contract.
19    Q      Well, I have a lot of questions about that,
20 but mostly I just want to concentrate on fact questions,
21 okay, just what occurred kind of questions.
22    A      Sure, go ahead.
23    Q      I apologize.
24          MR. FINK:  If I may, you've been referring to
25 summer of 2000.  I think we're talking about summer of 1999.

6

FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

---

**22**

1    MR. BAILEY: I'm sorry, we are.
2    MR. FINK: I just want to make sure the record
3 isn't confused.
4    MR. BAILEY: No, Eric, you're correct, that is
5 correct.
6 BY MR. BAILEY:
7    Q    Mr. Fink is correct. I didn't mean to mislead
8 you. I think I made an error. Sometime on or about the
9 summer of 1999, it's my understanding that, regardless of
10 what rights are in this situation, the judge will sort that
11 out for us, that a decision was made to transfer people that
12 were custodians; is that correct? I'll do this by little
13 building blocks here. These questions are getting a little
14 ponderous. There was a decision made to transfer people; is
15 that right?
16    A    That is correct.
17    Q    And can you describe for us, with as much
18 detail as you can recollect, what the transfer of custodians
19 involved or what it was about?
20    A    What it was about? It was about —
21    Q    Sure.
22    A    — reassigning and realigning staff to
23 different buildings, based on the needs of that building.
24    Q    And what was the need for doing the transfer
25 and reassignment work?

---

**23**

1    A    During the summer of '99, a part of it was the
2 fact that we had two buildings coming on-line that we did not
3 have possession of before, particularly the Roland building
4 and the Scott building. Those were two new districts that
5 the district — two buildings that the district had acquired
6 and they were opening up that summer.
7    Q    Were Scott and Roland, whether they're
8 renovation or new construction, I understand they were
9 renovated older buildings or different kind of buildings, but
10 the point in fact is, old or new, they were, as far as the
11 district was concerned, these were going to be new school
12 buildings, in other words, buildings that had not been used
13 for educational purposes before?
14    A    Correct.
15    Q    In the process of getting ready to move into
16 Roland and Scott, was the district abandoning or leaving any
17 other buildings behind or were these two additional newer
18 buildings?
19    A    We weren't leaving any behind. We were
20 changing the use of some other buildings.
21    Q    Okay. And let's talk about the change of use
22 in a context of the need for custodial services. Was there
23 any diminution in custodial services or was there going to be
24 a need for an increase in custodial services?
25    A    There would be a need in increase for

---

**24**

1 custodial services, because we now had two more buildings
2 that we did not have before.
3    Q    Well, how many more people, if any, was the
4 addition of the two new buildings — I'm going to refer to
5 them as new buildings, okay. They may or may not have been
6 new construction.
7    A    They were new to the Harrisburg School
8 District.
9    Q    Yes, sir, and that's the way I mean it. The
10 new buildings, what kind of personnel or staffing needs did
11 they require? I mean how many -- I'm sorry, strike that.
12 How many additional staff were required for custodial work
13 for those two buildings?
14    A    I can't recall how many, exactly how many
15 additional staff were needed.
16    Q    Do you have an approximate number?
17    A    I would — for the Scott building I would
18 think that we needed at least one head custodian and maybe
19 two or three custodians. For the Roland building, at least
20 one head custodian and maybe four, possibly five more
21 custodians assigned to it.
22    Q    So you needed two, two head custodians or two
23 people to be in charge of custodial services at those
24 buildings?
25    A    Yes.

---

**25**

1    Q    Where were you going to get those?
2    A    We could either reassign people that we
3 already had or we could employ folks or we could promote
4 folks.
5    Q    You could promote from within, that was an
6 option?
7    A    That was an option.
8    Q    Now we're talking about just those two head
9 positions, the leadership position of those two buildings?
10    A    Well, again, we had options of reassigning
11 existing staff. We had the option of hiring.
12    Q    From outside?
13    A    From outside. We had the option of promoting
14 from within. So we had three options at least available to
15 us.
16    Q    Do you have a recollection of hiring any new
17 head custodians from outside during that period of time?
18    A    Oh, gosh, I can't recall. I know we've hired
19 at least one or two head custodians from the outside. I
20 can't exactly recall at the time that it happened, but it was
21 around that time, yes.
22    Q    Now, based on your recollection, was it your
23 impression that you didn't have to check with the union on
24 how you did that? You were free, in other words, to either
25 go outside and hire new people, you were free to promote from

---

7



26

1 within or to transfer, but regardless of what you did you
2 were going to have to find two new head custodians, right, no
3 matter how you did it you were going to have to find two new
4 head custodians, or am I wrong? I may be wrong.
5     A     For those new buildings?
6     Q     Well, let's go hypothetical and say you have a
7 complement of -- I don't know what the numbers were, sir, to
8 be honest with you. Let's assume that you have ten
9 facilities and you have ten head custodians. I understand
10 you had categories of major and minor and that sort of thing,
11 but let's say you had ten. Well, now you're going to need
12 12. We just know it's going to be X plus two.
13         Well, at the time, sometime on or about the
14 summer of 1999, as Mr. Fink pointed out, it was 1999, you
15 realized, I mean it was only common sense that you were going
16 to need two more head custodians; isn't that fair to say?
17     A     It's fair, but I don't think it was accurate,
18 because I think that what we did do is we did not keep a head
19 custodian assigned to the administration building, so...
20     Q     Well, was the formula then X plus one?
21     A     Because that was the main building, so we had
22 our supervisor there. So he was responsible for what
23 happened in the administration building.
24     Q     Okay. So, well, then, the administration
25 building had been around for quite some time, though; right?

27

1     A     Right, but it was a part of the total number
2 of at one point head custodians that we had.
3     Q     Well, you're still going to need two new
4 persons?
5     A     And you are correct. And I think we did at
6 some point during that time promote a person. I know for
7 sure we promoted one person into a head custodian during that
8 period of time.
9     Q     Well, you had a vacancy, didn't you,
10 Mr. Freeman, you had a --
11     A     I really can't recall, Mr. Bailey.
12     Q     Okay.
13     A     I mean there were so many vacancies, so many
14 positions every year all the time, I can't recall one.
15     Q     I realize it taxes the -- I thought maybe you
16 had some chance to review documents or something before you
17 came. But let me ask you, do you have a recollection of
18 where Mr. McMurray was transferred?
19     A     Mr. McMurray was at the William Penn school at
20 the school year which preceded the acquisition and the
21 opening of Roland. He was the head custodian there. He was
22 the head custodian major, which is a head custodian for one
23 of our larger facilities.
24         He was the one that we selected, that was
25 selected to be the head custodian for Roland. So we had him

28

1 laterally moved. So he did not get promoted. He just got
2 transferred to Roland from his position as already classified
3 as a head custodian major.
4     Q     We had some testimony that he was at Hamilton.
5     A     He did for a short period of time at Hamilton,
6 because Roland was not ready for him until we took
7 acquisition of it.
8     Q     Well, did he displace or replace someone at
9 Hamilton or was there a vacancy there?
10     A     There was a vacancy there.
11     Q     And was the --
12     A     And after he went to Roland we hired
13 someone -- no, we promoted someone into Hamilton, from a
14 custodian to a head custodian got promoted into Hamilton once
15 we got Mr. McMurray into Roland to take over that
16 responsibility.
17     Q     Do you know when Mr. -- time frame-wise when
18 Mr. McMurray was at Hamilton and then when he went over to
19 Roland?
20     A     If so, it may have been a month or so, a
21 matter of weeks.
22     Q     A month or so or weeks that he was at
23 Hamilton, you mean?
24     A     Yes, because we had no one in Hamilton as a
25 head custodian, and summertime is a very busy time and

29

1 closing out schools and getting schools open and prepared.
2 So we needed some leadership at Hamilton.
3     Q     All right. And he was -- you put him over
4 there, and he was there for a while and at some point he goes
5 from Hamilton to Roland?
6     A     Yes.
7     Q     And that was a -- we've had testimony where
8 other witnesses have described it as a lateral transfer.
9     A     That's how I would describe it, too.
10     Q     Okay. Now, his position at, was it Penn or
11 West Penn?
12     A     William Penn.
13     Q     William Penn. His position at William Penn
14 was a head custodian position?
15     A     Correct, head custodian major.
16     Q     Because it's a major --
17     A     Because it was a large, one of our larger
18 buildings. There is a distinction between head custodians
19 for a smaller building or a larger building.
20     Q     Right. Now, does your contract recognize that
21 distinction?
22     A     We have a memorandum of understanding.
23 They're first level supervisory jobs. So we have a
24 memorandum of understanding that covers those head custodian
25 and supervisors.



**FREEMAN, LANCE**
11/17/01

HAZZARD VS
CURTIS

30

1 Q      Yes, but both the head custodian supervisors,
2 major or minor, are first level supervision?
3 A      **Yes, they are.**
4 Q      There's not a difference there, rank and file
5 as opposed to first line supervision on that one; right?
6 A      **They're both called first line supervisors,**
7 **you are correct.**
8 Q      Isn't it true that at some point Mr. Hazzard
9 wrote to you or to the district, perhaps more correctly, I'm
10 not sure who the addressee was, that he was interested in
11 being the head custodian at Roland?
12 A      **I believe he did.**
13 Q      And at some point, and I want to ask you some
14 questions, some more detailed questions about this, at some
15 point it's my understanding that the position at Roland was
16 posted. Now, before I ask you questions about that, what
17 does posted mean?
18 A      **Posted means announcement of a vacancy.**
19 **Posting is an announcement of a vacancy.**
20 Q      And if a position is posted, people are
21 allowed, I assume, qualified people are allowed to bid on
22 that position?
23 A      **Yes, they can.**
24 Q      Based on your recollection, assuming for the
25 moment that the district intended, because I do understand

31

1 there's a disagreement about intentions and errors and that
2 sort of thing and you'll get a perfect opportunity to respond
3 to questions about that, but we're going to assume for
4 purposes of this question that there had been an intention
5 and a desire to post that position.
6        How would a person qualify? Would one look to
7 the contract for example, would the job posting list the
8 qualifications, how does it work? How did it work as a
9 practical matter at Harrisburg School District to post that
10 position?
11 A      **The posting would be a document that would be**
12 **circulated and posted, meaning placed out for public review,**
13 **which would identify the classification title, its**
14 **qualifications. It would indicate -- it could indicate its**
15 **minimum hourly rate or make reference to the hourly rate in**
16 **the bargaining agreement.**
17 Q      Now, Mr. Freeman, let's talk about the
18 mechanics just for a moment, the mechanics. Now, you were
19 there for a number of years. I want to talk about the
20 mechanics of posting. Posting, do you put this on the
21 Internet?
22 A      **Not all of them.**
23 Q      Not all of them. Are some of them posted on
24 the Internet?
25 A      **Some are.**

32

1 Q      Do you, when you post, the practice of posting
2 at the school district at the time that you were in charge,
3 do you notify union officials by correspondence?
4 A      **Union officials get a copy of the posting.**
5 Q      So there's a distribution for the posting?
6 A      **To every building, including the union**
7 **stewards.**
8 Q      Now, the union stewards are notified -- well,
9 let's talk about that for a moment. Now, the distribution on
10 a posting, does it go -- do you mail it?
11 A      **It goes by e-mail.**
12 Q      E-mail.
13 A      **And it is also sent to -- and the school**
14 **secretaries receive them, make copies of them and put them**
15 **out for distribution or posting on the bulletin board.**
16 Q      Now, let's talk about, again, let's stick to
17 distribution for just a moment. Every school building has
18 a -- like a -- each employee would have a box, a place where
19 they could receive information; right? Maybe not each
20 employee.
21 A      **I don't know that.**
22 Q      You may not know that. Well, if I want to
23 reach the shop steward at Roland, how would I do that?
24 A      **How do you want to -- you go to visit them or**
25 **call them.**

33

1 Q      Well, I'm you. I'm Mr. Freeman.
2 A      **Right.**
3 Q      And I want to send a copy of a writing that I
4 find that I think might be of interest to the shop steward at
5 Roland. How do I contact that shop steward?
6 A      **By telephone or send him a note in the mail.**
7 Q      All right. Now, is there a school address or
8 are you talking about through the United States Post Office?
9 A      **I would send it to the school.**
10 Q      So the school gets this note in an envelope
11 and it's addressed to the -- to somebody let's say at Roland,
12 and does the secretary there deliver it or is it put in a
13 little box? If I want to reach a teacher, for example, at
14 Roland through my inside system, I don't go out and spend
15 tons of money on U.S. postage every day. Maybe I want to
16 send something or distribute materials for teachers to use,
17 it's sent to the district and they put it in pigeonholes,
18 don't they?
19 A      **Yes, they have boxes I believe for teachers in**
20 **the schools.**
21 Q      Okay. Now, do they have boxes for head
22 custodians?
23 A      **I don't know in every school whether or not**
24 **they do.**
25 Q      Okay. Do they have boxes for shop stewards?

9

FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

34

1    A    I don't know if they do.
2    Q    Now, when you do the posting, is the posting,
3 we know that the posting, it would normally be done by
4 e-mail; correct?
5    A    E-mail and we do send them through
6 interdepartment mail, which is mainly put in a standard
7 district envelope and sent to that building location or
8 office location or department location.
9    Q    That's a term I was looking for,
10 interdepartment.  What do you call that mail?
11    A    That means it's delivered by our own carrier,
12 not U.S. mail.
13    Q    Right.  And what was the term that you used?
14    A    I called it interdepartment mail.
15    Q    Interdepartment mail, all right.
16 Interdepartment mail.  Now, if you're going to do a job
17 posting, you do it through interdepartment mail, at least as
18 one means of distribution?
19    A    Yes, to the building.
20    Q    To the building.  Well, it would go to all
21 buildings so that all people could see it in the
22 applicable -- the people that the -- who could under the
23 contract qualify for bidding on a vacancy or new position, if
24 you had a desire to post it, it would be sent to their
25 attention and one of the methods used would be hard copy to

35

1 the different buildings and there it would be posted, and
2 what that really means is stuck up on a board somewhere;
3 right?
4    A    Yes.
5    Q    Where you can see it and read it; right?
6    A    Yes, that's how it was done in some buildings,
7 most buildings.
8    Q    And employees know that, you know, if they
9 want to keep up on things, you know, that's their
10 responsibility.  It's like posting a town meeting in the
11 state of Pennsylvania, most of the United States.  You know,
12 bingo, it's posted on the door of the municipality or it's
13 advertised, whatever, by certain means, and one of the means
14 that you use in that school district or that was used in that
15 school district was sticking her up on the board; right?
16    A    Yes, that's one of the means.
17    Q    Okay.  Now, are there any facts known to you,
18 and again we're going to get into the opportunity for you to
19 respond to questions about the, what we feel -- well, about
20 this idea that there was an error in the posting.  But until
21 we get there, are there any facts known to you that would
22 indicate that the posting, whether it was erroneous or not,
23 of the Roland school head custodial position, that that was
24 not distributed properly?  Do you understand it was
25 erroneous?

36

1    A    There was nothing known to me that it was not
2 distributed properly.
3    Q    And we do understand and, again, as I said, I
4 want to emphasize this, because I know it's a material issue
5 in this lawsuit, and that's about whether there was an error,
6 okay.  So we're going to give you a chance to get into that
7 fully and I'll get there in just a minute.  All right.
8         Now, we now know that at least, although it
9 may have been an error from the official position of the
10 school board, at the time, at some time in the summer of 1999
11 the head custodial position at Roland school was posted;
12 correct?
13    A    Correct.
14    Q    Who is the person mechanically responsible for
15 doing that, who is the person that makes, you know, the
16 person that does the real work in this world, you know, those
17 secretaries, those clerks and whatnot, how does that work?
18    A    It was done by a secretary under my direction.
19    Q    And what was her name?
20    A    Oh, gosh, '99.
21    Q    Try to remember, please.
22    A    It could have been Lana Mitchell or Donae
23 Thompson or...  Gosh, I even had -- I'm trying to recall,
24 because I've even had substitutes and temps during that time.
25    Q    I'm going to flip a tape.

37

1         (Pause.)
2 BY MR. BAILEY:
3    Q    The court reporter had asked you a question  I
4 think maybe to do with a spelling or something.  Let's go
5 back over this for just a second, okay?
6    A    Sure.
7    Q    Go back in your mind's eye, take a moment to
8 reflect, and if you can, the secretary who may have prepared,
9 who you think may have prepared or did prepare, if it comes
10 to you, the documents, the notification, the posting?
11    A    Again, it could have been Donae Thompson or
12 Lana Mitchell or it could have been Shirl Murphy.  I've even
13 had one or two temps from SHS Temp Service in that office
14 during that period of time.
15    Q    Donae, can you spell it for us?
16    A    D-o-n-a-e.
17    Q    And Shirl with an S or a C?
18    A    With an S, S-h-i-r-l.
19    Q    S-h-i-r-l.  And that was a Shirl Murphy?
20    A    Correct.
21    Q    All right.  Now, we have had testimony, sir,
22 to the effect that the school district at some point took the
23 position that they made an error in posting the head
24 custodial position at Roland.  When was that error?
25         Now, for the sake of this deposition and for

10

FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

38

1 the sake of my asking you questions, I want to make it very
2 clear on the record that plaintiff does not admit or agree
3 that it was an error, but I am not going to -- I don't want
4 to obfuscate the questions I ask you, because I know that, I
5 believe that your position is that it was an error. So we're
6 going to assume for the sake of these questions that it was
7 an error or I'm going to talk that way, but I want you to
8 know that we don't agree with that.
9        Now, this error, this error, when did you
10 first discuss the error about the posting?
11    A     Again, you're speaking of other testimony
12 about this was an error. I'm not privy to what testimony
13 there is about an error, but if you want to ask me about the
14 posting, I can answer about the posting, but whether or
15 not -- what other people testified, I can't speak on.
16    Q     No, I wasn't, I was trying to be helpful. I
17 apologize. I think I confused you and I apologize. Let me
18 just retract that.
19        At some point did you feel that the school
20 district had made some kind of an error in posting the
21 position for Roland school in the summer, the head custodial
22 position in the summer of 1999?
23    A     No.
24    Q     Well, did the school district rescind the
25 posting or --

39

1    A     No, we didn't rescind any posting. We didn't
2 send out anything saying this posting is rescinded.
3    Q     Okay. How many people bid on the job, if you
4 recollect?
5    A     I don't recollect. I don't see job bids.
6 They come in through the mail.
7    Q     Did you become aware at some point that
8 Mr. McMurray was the head custodian at Roland, and when was
9 that, if you recollect?
10    A     I don't recollect, I don't recollect exactly
11 when, but I do remember talking with Mr. Curtis about
12 Mr. McMurray being the head custodian at Roland.
13    Q     Okay, sir, Mr. Freeman, can you tell me
14 you remember talking with Mr. Curtis, as much as you can tell
15 us about that?
16    A     It was prior to him going there.
17    Q     And is there any way that you could put it on
18 a calendar for us, if you can?
19    A     I can't.
20    Q     But you say you had a discussion with
21 Mr. Curtis about that?
22    A     Yes.
23    Q     Okay. Can you tell us what you remember about
24 the discussion?
25    A     Yes, that he discussed that we were -- you

40

1 know, we were -- the need -- how we were going to staff the
2 building, particularly Roland and Scott. He indicated to me
3 that he wanted to assign Mr. McMurray there, how Mr. McMurray
4 had experience in working in a large building. He had done
5 well while at William Penn and William Penn was one of our
6 two largest buildings that we had at that time, with not only
7 it just being an instructional school for regular instruction
8 but also where our vocational programs and equipment were.
9 So he was very satisfied with how he managed to supervise
10 that building.
11        We had a new building coming on board, a new
12 facility. We wanted to make sure that we had the right folks
13 that he felt would be able to do what needed to be done in
14 there as a leader and directing the staff to keep that new
15 facility looking new as long as we possibly can, knowing what
16 needed to be done to maintain that building. So the decision
17 was Mr. McMurray was the guy for the job.
18    Q     You still, as you go back over that in your
19 mind, you don't remember when that was, though, even as to
20 the month? Could it have been June, July, August? Let me
21 try to give you some background and invite counsel to
22 disagree with me or to object at any point.
23        My best recollection is that sometime in late
24 June Mr. Hazzard writes a letter expressing an interest in
25 that position. My best recollection is that either sometime

41

1 before or shortly after that, I'm really not certain, to be
2 honest with you, there were some transfers made. And then at
3 some point later on Mr. Hazzard files a grievance, and then
4 I'm going to get into that later on to see what you know
5 about that process.
6        I'm not sure of the dates. I'm not sure if
7 any of the witnesses were sure of the exact dates on these
8 things, although the letter I think of Mr. Hazzard was I
9 think late June and my understanding is it was before Roland
10 opened. But if counsel disagrees with anything I've said,
11 please straighten me out.
12    MR. LOCHINGER: The date I have on the letter
13 here is June 25, 1999.
14    MR. BAILEY: Okay.
15    MR. LOCHINGER: The date the letter was --
16    MR. BAILEY: That was Mr. Hazzard's letter?
17    MR. LOCHINGER: Correct.
18    MR. BAILEY: Okay.
19 BY MR. BAILEY:
20    Q     Now, in fairness to you, you just don't
21 remember when that conversation took place, it's too hard to
22 go back, I mean it just doesn't -- you don't know for sure?
23    A     In all honesty, in fairness to myself, knowing
24 the number of meetings and discussions I had just daily,
25 hourly, no, I can't.

FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

**42**

1 Q    We understand. I mean I do understand that.
2 The press of business. I would be surprised if you
3 remembered it.
4        Do you keep any kind of schedule or book or
5 calendar of when you talk with people? Are you -- you know,
6 some folks in staff positions are fastidious note keepers and
7 schedule keepers, others aren't. Would you have any notes,
8 do you think, that would reflect when you may have spoken
9 with Mr. Curtis or is it the case where this is something
10 that may have happened just in the course of the day, do you
11 remember?
12 A    I do keep a calendar, but those are scheduled
13 appointments. But my -- I'm someone who will meet you at the
14 water fountain and discuss business. So I really can't say
15 that. It could be anywhere at any time that we've had a
16 discussion, him stopping in my office, me stopping in his
17 office to discuss some other matter and then get into
18 discussions about different things.
19 Q    Right.
20 A    So I really can't say that I have notes or
21 anything to call upon to help my memory.
22 Q    Okay. But there was -- but, anyway, there was
23 a decision made that the best person for this job was
24 Mr. McMurray?
25 A    Yes.

**43**

1 Q    And do you recollect whether -- and again,
2 this is not meant to be a facetious or contentious question,
3 sir, but do you remember if that was before or after
4 Mr. McMurray was actually transferred to the position?
5 A    Before or after?
6 Q    Yes, sir. Let me try --
7 A    Well, the decision to do it had to be before
8 he actually reported, because, again, the building was not
9 turned over to us, I don't think we actually got possession
10 of and able to start putting our folks in to begin doing
11 things until sometime I think it might have been August.
12 Q    Well, let me tell you why I ask that. I ask
13 that because apparently this idea of transferring people,
14 from my understanding, that involved large numbers of people
15 within the custodial work force. It didn't just involve head
16 custodians, it involved large numbers of staff. Am I in
17 error or did it involve at least a number of head, major and
18 minor? In fact, sir, my recollection is that there was even
19 a dispute over how they got paid, because some went from
20 major to a minor and there was a dispute over whether they
21 should continue to be paid as a major as opposed to a minor.
22 Does that bring any of this back to you?
23 A    Yes, there was some discussion about that,
24 but -- and there were changes made, but they were changes
25 made prior to that to buildings where we could already have

**44**

1 building people in it and occupied. But back to your comment
2 about when Mr. McMurray was officially transferred, we could
3 not put any people into that building until we were -- to go
4 in it to work until the building was turned over to us.
5        Now, there were changes of other staff members
6 who could go into other buildings sooner than he. So that
7 did happen, because it was not a problem with restricting our
8 use of the building or access to it.
9 Q    Well, when the decision was made that
10 Mr. McMurray was the man for the -- that's why I asked the
11 question about whether the discussion with Mr. -- it's
12 precisely. Actually, you've explained to me why, and the
13 reason why I ask the question, and that is that the movement
14 to Roland was anticipatory, that was something that you knew
15 was going to come and you had to plan for it; correct?
16 A    Correct.
17 Q    That's why I asked the question if you
18 remembered whether the meeting that you had or the
19 discussion, meeting or discussion, whatever it was, with
20 Mr. Curtis occurred before or after Mr. McMurray went over to
21 Roland. That's why I asked that question. If at some time
22 it comes to you, whether that discussion took place before or
23 after Mr. McMurray was already in there --
24 A    The discussion was before Mr. McMurray was
25 already in there.

**45**

1 Q    Okay. Then was it a part of overall
2 discussions about managing this custodial work force or was
3 it just about Mr. McMurray?
4 A    No, it was about the fact that we had to staff
5 all of our buildings, because we had to make other changes of
6 custodians as well, not just head custodians.
7 Q    So your best recollection is that the
8 discussion with Mr. Curtis where it was discussed and decided
9 to put Mr. McMurray in at Roland school was part of a broader
10 discussion about reassignment of custodial resources to
11 cover -- personnel resources in the custodial area to cover
12 those different institutions; right?
13 A    Yes.
14 Q    Okay. Now, do you remember if that was before
15 or after the position had been -- the Roland head custodial
16 position had been posted? Let me go back and rephrase that
17 so it's very clear. Did I interrupt you?
18 A    No, I was going to say go ahead.
19 Q    Do you remember if the discussion with
20 Mr. Curtis where it was decided to place Mr. McMurray in the
21 Roland school head custodial position, understanding that was
22 part of a broader general discussion about the reassignment
23 of custodial personnel, do you remember if that discussion
24 occurred before or after the job was posted?
25 A    I'm of the belief, the recollection that -- do

12

---

**46**

1 we have something indicating the date the posting was to help
2 me create some time line?
3    Q    You know what, honestly, sir, I don't know.
4 Maybe one of the other attorneys.
5        MR. FINK: I think we have it in the Hazzard
6 exhibits.
7        MR. BAILEY: I don't remember what it was.
8        MR. FINK: In the exhibits from Mr. Hazzard's
9 deposition, we introduced the posting and I believe the
10 posting was dated.
11    A    Because I know there was one, yes.
12        MR. LOCHINGER: That's it?
13        MR. FINK: No, that's the job description.
14 But the posting was dated. The posting was in there, too.
15        MR. BAILEY: You know, you fellows need -- one
16 of the promises that you guys made when we did that
17 deposition, you guys were going to get me the exhibits, a
18 copy of the exhibits, a copy of the exhibits, and nobody's
19 ever sent them to me.
20        MR. FINK: You didn't get a copy of the
21 transcript with the exhibits?
22        MR. BAILEY: No. All I had requested was a
23 copy of the exhibits.
24        MR. FINK: In Hazzard Deposition Exhibit
25 Number 7 is the posting and the date on that is July 8th,

---

**47**

1 1999, and that's the posting for the head custodian at
2 Roland.
3 BY MR. BAILEY:
4    Q    Well, that helps, okay, the posting in the
5 Hazzard case, according to Mr. Lochinger and Mr. Fink have
6 just looked up. Exhibit Number 7, we had a deposition here,
7 Mr. Hazzard was deposed, and apparently -- maybe I can look
8 at it. It might be helpful to let me see it. Yes, I
9 remember this now.
10        Could you take a look, this is Hazzard Number
11 7, Mr. Freeman, could you take a real quick look at that. It
12 might help.
13    A    I remember, I'm familiar with this.
14    Q    Now, I don't know if it helps or not, if it
15 does. Do you remember if the discussion with Mr. Curtis was
16 before or after July 8th, 1999?
17    A    That unfortunately didn't help me decide
18 whether it was before or after.
19    Q    I just wondered if maybe it would bring your
20 recollection back. Is it also fair to say that you don't
21 know exactly when Mr. McMurray began -- strike that. Do you
22 know when Roland school opened?
23    A    I don't know the exact date, but I do know
24 that prior to the opening Mr. McMurray was already informed
25 and notified that he would be the head custodian as well as

---

**48**

1 other custodians that would be assigned to the building. And
2 I recall we also made arrangements for temporary Labor Ready
3 help to be there assigned under his direction so that once
4 the building was turned over to us they could go in and do
5 what they needed to do to get the school ready, making sure
6 everything was in place.
7    Q    I would assume that when you get a new
8 building like that after construction and renovation, there's
9 still probably a lot of dust and cleanup.
10    A    And that's exactly the types of things. There
11 was cleaning the floors, the walls, getting classrooms set
12 up, furniture put in place, shelving, books, supplies,
13 materials. That's why not only was it he and the normal
14 assigned custodial staff, we had to hire people from Labor
15 Ready that reported under him to give us extra personnel to
16 get those things done.
17        We also, I believe we also pulled some other
18 staff where we could from other buildings just to help out
19 for not just Roland but also for Scott, which was right
20 across the street.
21    Q    Yes, I imagine that would be quite a task. Do
22 you have a recollection of when Mr. McMurray actually went
23 over there, though? I mean -- no?
24    A    I would not, to be honest with you. The exact
25 day he started, I would not know, there, because it did

---

**49**

1 not -- it wouldn't need for me because it didn't necessitate
2 me changing any dates as far as his pay or anything, because
3 it was a lateral move for him. All we -- all my staff would
4 do would just change the building code in his database.
5    Q    Yes. The interface with you, I mean this
6 might be a problem with Mr. Curtis getting people --
7    A    So not with me, it wasn't necessary with me.
8    Q    Okay. I read you. All right. Now, at some
9 point did you come to learn that Mr. Hazzard had grieved the
10 issue of the posting and his claim as a matter of contract
11 right to the head custodial position at Roland?
12    A    Yes, I'm aware of it. I received the
13 grievance.
14    Q    Do you have a recollection, Mr. Freeman, of
15 when you received that grievance?
16    A    No, but it would probably be date stamped, the
17 actual copy of the grievance, when it was received in my
18 office.
19    Q    And when it was received in your office, do
20 you remember what you did with it? And I realize this may be
21 something as a matter of routine, but if you could just tell
22 us.
23    A    Well, as a matter of routine, I would be
24 contacted, the union rep that was handling that grievance
25 would be getting with me to see about when we would be

---



FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

50

1 scheduling any kind of meeting on the matter.
2    Q    Okay.  And who was the union rep on it?
3    A    Gosh.  They had so many to handle grievances.
4 I don't know if it was Mr. Tapper or Mr. Mathis or, oh, gosh,
5 Mr. Shields.  If -- more often than not, it was the steward
6 who signed it.
7    Q    Okay.  Do you have a recollection of the first
8 meeting you had on it?
9    A    No.
10    Q    Do you have a recollection of what position
11 AFSCME took on it, AFSCME Council 90 took on it?
12    A    Their statement of their position is written
13 on the grievance in what they contend to be violated in the
14 bargaining agreement.
15    Q    And do you remember who you worked with
16 from -- or who you met with concerning
17 Mr. Hazzard's grievance?
18    A    Well, I think that with respect to
19 Mr. Hazzard's grievances, there is correspondence which would
20 have reported back to the union the position of the district
21 on the grievance.  And I believe that the correspondence may
22 make reference to the date of the meeting on it or the
23 hearing on that grievance.
24    Q    Well, going back, tell us what you recollect
25 about the grievance procedure, the process with Mr. Hazzard?

51

1    A    Because I can recall Mr. Hazzard having a
2 grievance hearing because we held it in the board room of the
3 administration building.
4    Q    Just tell me what you remember about it.  Just
5 go back and tell us everything that you remember about your
6 experiences.  I understand the dates may be difficult, but,
7 you know, substantively what do you remember about the
8 grievance procedure you went through with Mr. Hazzard?
9    A    Well, I remember -- with respect to the
10 grievance procedure, I remember establishing a hearing date
11 for the grievance that was held in the board room.  I
12 remember Mr. Hazzard being present with his union
13 representation.  I believe at that time it may have been, I
14 think it might have been Mr. Tapper and Mr. McCollum.
15    Q    Steven McCollum, okay.
16    A    I believe representing the district was myself
17 and Mr. Curtis.
18    Q    Okay.
19    A    And at that grievance hearing Mr. Tapper
20 presented the issues raised by the union, and I believe at
21 that time we had Mr. Hazzard provide some comments or
22 testimony.  Mr. Tapper spoke on behalf of Mr. Hazzard.
23 Mr. Curtis spoke.  We all asked each other
24 questions and we -- at the conclusion of that hearing the
25 administration or the district put in writing its response to

52

1 that grievance.
2    Q    And what was the district's position?
3    A    That we made the point that we did not violate
4 that article and section of the bargaining agreement.
5    Q    But you didn't take a position that you posted
6 it in error, you posted the position, you've already
7 testified to that?
8    A    No.  I think their position, they're grieved
9 at the fact that the promotion seniority provision was
10 violated.
11    Q    Okay.  And you took the position it was your
12 right to reassign the work force based upon the needs of
13 management?
14    A    We took the position that the promotion
15 seniority provision was not violated.  We took the position
16 that we made an administrative decision to reassign staff and
17 we reassigned Mr. McMurray to that position, which did not
18 make it available as a vacancy to be filled by -- either from
19 the outside or from promotion seniority.
20    Q    Mr. Freeman, did AFSCME ever ask you, the
21 AFSCME people, staff, you know, any level ask you, did any of
22 the AFSCME staff raise at any of these meetings a simple
23 question, why did you post?  I mean did anybody ever say to
24 you, why did you post the position?  And I'm going to ask you
25 that, too.

53

1    A    Well, the question was asked.  And my answer,
2 if you were to ask me, my answer to them would have been that
3 one of the things about posting is that -- and I've learned
4 from experience, you never know what the outcome might be.
5 Because we knew the school was going to open quickly, if
6 there was a decision that Mr. McMurray was not going to be
7 put there, nobody else was going to be assigned there, I had
8 to be prepared with other potential candidates.
9          But the posting itself is done, but we -- a
10 person can apply and bid on a job with or without a posting,
11 because what you've indicated to me today was with the
12 posting dated July 9th --
13    Q    July 8th, sir.
14    A    8th and Mr. Hazzard's letter being June 25th
15 is another indicator to me that people can apply every day of
16 the school year for anything that will come, might come, have
17 come to become available, and also as a means of informing
18 themself that if something does become available I want you
19 to know I'm interested in this.
20          So we did share with them that we did not deny
21 that it was posted.  That's a fact.  And, in fact, as far as
22 vacancies we need to post it if we intend to fill it through
23 promotion seniority or from the outside.  It needs to be
24 posted.  And I did not want to wait until the last minute to
25 do that should things not work out with Mr. McMurray.



FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

---

54

1 Q       Was Nichelle Chivas the person who was the
2 Council 90 staff rep involved in the grievance process?
3 A       After the initial level hearings, she got
4 involved later.
5 Q       Okay. Was that normal?
6 A       Yes. I mean it happens. It all depends on
7 the grievance. Oftentimes the local steward handles it.
8 Sometimes it could be handled by that steward assigned to
9 that building or assigned to that department. Sometimes it
10 could be handled by the local president or some other officer
11 of the local. And then at some point it could get to the
12 level where it would be handled by the Council 90 staff rep,
13 which would be Nichelle Chivas. And before her it was
14 handled by Mary Schwanger.
15 Q       I've been in the other, you know, in the
16 management position dealing with an AFSCME local. Most of
17 the grievances we had were handled by our -- well, sometimes
18 they had staff, that's true. It varies. I think it did
19 vary, as I remember.
20       Okay. Anyway, at some point did AFSCME say
21 that they were withdrawing the grievance?
22 A       At some point they did. I don't know if it
23 was withdrawing. I think the word might have been
24 withdrawing. But at some point I think we got indication
25 from them in writing that they weren't taking the grievance

---

55

1 any further.
2       And my position was that I took that as
3 indicating that they found that we had not violated the cited
4 article and section of the bargaining agreement for which
5 that grievance was filed.
6 Q       At the point that AFSCME indicated to you that
7 they were -- whether the word is withdrawing or refusing to
8 go forward or whatever the terminology is, in any event, at
9 some point AFSCME notifies you or communicates to you that
10 they are no longer going to support this grievance or that
11 they are going to withdraw it or for whatever reason AFSCME
12 is saying, nyet, this is not going forward, right, they say
13 that to you at some point?
14 A       Yes, they do.
15 Q       And what you're telling us is that from your
16 point of view that's a moot issue. You took that to mean,
17 okay, they recognize the fact that we are correct and we
18 didn't violate the agreement?
19 A       I took that as that grievance was not -- it
20 was not upheld and was not -- did not have merit.
21 Q       Do you have a recollection of any discussions
22 with Nichelle Chivas or any other AFSCME officials on that
23 point?
24 A       After that?
25 Q       Yes, sir. I mean, you know, I mean I'm

---

56

1 talking about some point you had indicated in earlier
2 testimony that this stuff is written down. I'm just asking
3 if there were any discussions about, hey, you know, a phone
4 call, a meeting, some communication you remember. Hey,
5 Lance, you know, we're not going to go forward with this,
6 we're not going to, you know. I mean you deal with these
7 people in labor negotiations, we know it's tough, you got to
8 go back and forth and talk and everybody, you know, you're
9 obviously a very professional man and, you know, Nichelle
10 Chivas is obviously also very professional and very adept at
11 doing these kind of things. You're dealing with problems all
12 the time. At some point you must have had some discussion
13 about this grievance.
14 A       Yes, we did. She let me know what the
15 position of AFSCME was and that -- and, as always, if that's
16 the case, we confirmed that she was going to put that in
17 writing and she did.
18 Q       Do you have a recollection of the discussion,
19 anything that she said, if there was a discussion or talk
20 about Mr. -- you know, Mr. Hazzard or if Nichelle Chivas
21 ever told you why AFSCME had come to this point of view?
22 A       Why? Yes.
23 Q       Mr. Freeman, look, through a certain part of
24 this process AFSCME is in there fighting for the grievant?
25 A       Yes, they were.

---

57

1 Q       They are presenting a point of view. They're
2 walking in the grievant's shoes. The grievant is their
3 member and you and I know how it works. Anyway, they're in
4 there fighting the good fight. And at some point, you know,
5 they change their position. I'm sure that's welcome news to
6 you, it's one more problem that you don't have to worry
7 about. Administratively, you're a busy man. You've got a
8 lot of things to do and you're opening two schools, I mean
9 you had to have your hands full just with that with all the
10 problems it would create, and I understand that and I'm sure
11 anybody that reads this record is going to understand that.
12       But during the discussion with Nichelle, I
13 mean did she give you a reason why they changed their
14 position, you know, why, you know, we have decided this or we
15 see it this way now or we agree this or agree that. I mean
16 there's got to be more substance. I'm not saying it was
17 shared with you, but there's got to be more substance to
18 this?
19 A       Well, she did share with me that Mr. Hazzard,
20 you know, really wants that job there. You know, she shared,
21 she was the one that shared with me that from her
22 understanding that Mr. Hazzard wanted that, that that was an
23 opportunity for him to get promoted. It was where he wanted
24 to be because it was near his home or something like that.
25       And my point, Nichelle, I understand, but I'm

---



FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

58

1 not looking to back off this grievance on a matter of
2 establishing the fact that we don't have the right to assign
3 people by me acknowledging and allowing this grievance to be
4 upheld. And I said -- and I'm not -- I said, and I even said
5 to her, well, Mr. Hazzard can put in for any other head
6 custodian job that we have available, but she's the one who
7 let me know but this is the one he wants.
8        I said, Nichelle, I'm sorry, but we want
9 Mr. McMurray to be the head custodian of that building. And,
10 yes, there was discussions like that, Don, after, you know,
11 when this whole thing was coming about. But before that
12 she -- they -- I admit they were maintaining their position
13 and I was maintaining mine, because I firmly believed that we
14 were right, and I do.
15   Q       I understand your sincerity. I do not
16 question your sincerity. Now, I understand that Nichelle
17 also was fighting -- strike that. Did Nichelle Chivas also
18 argue that Mr. Hazzard should have more pay -- let me
19 rephrase that one last time, because it's sort of a tough...
20        Did Nichelle Chivas argue that Mr. Hazzard
21 should have head custodian's pay if he didn't get the
22 position?
23   A       Yes, she asked that.
24   Q       Okay. And what was your reaction to that?
25   A       My reaction was that on what basis would I

59

1 give Mr. Hazzard an increase in pay when he's not a head
2 custodian major. I said, if I do that, I have other head
3 custodians that would like to have an increase in pay and I'm
4 just not comfortable with doing that and I don't think that's
5 the right thing to do.
6   Q       Now, you had indicated you had discussions
7 with Mr. Curtis about Mr. McMurray being the right man for
8 that job because of his prior experience at William Penn; am
9 I correct?
10   A       Yes, as well as his performance, yes.
11   Q       And that his performance was quite good; is
12 that correct?
13   A       That is correct.
14   Q       Was he an AFSCME official, do you know?
15   A       At one point he was during this time, but I
16 don't know whether or not he was at that time.
17   Q       Did you personally know Mr. McMurray?
18   A       Personally know him by seeing him at work.
19   Q       Did you personally know Mr. Hazzard?
20   A       Personally know him by seeing him at work.
21   Q       Did Mr. Curtis say anything to you about
22 Mr. Hazzard? Strike that. Let me rephrase that one also,
23 please.
24        Did Mr. Curtis express an opinion about
25 Mr. Hazzard's ability to perform on the job, did he express

60

1 an opinion to you about what he considered Mr. Hazzard's
2 ability to perform on the job as Roland head custodian?
3   A       Yes, he did, after Mr. -- after the issue of
4 Mr. Hazzard's grievance came about. He let me know that he
5 felt that Mr. McMurray was a better fit than Mr. Hazzard for
6 that assignment.
7   Q       Now, before Mr. Hazzard grieved the position,
8 did Mr. Curtis indicate to you that he felt Mr. Hazzard was
9 somehow not up to the job or couldn't perform at that
10 position or wasn't qualified in some way?
11   A       No, he emphasized that McMurray was the man
12 for the job.
13   Q       Did you conduct any interviews with either of
14 the two gentlemen prior to the lateral transfer decision
15 being made?
16   A       No, I did not.
17   Q       Beyond your discussions with Mr. Curtis, did
18 you do any investigations prior to the decision to assign
19 Mr. McMurray to the head custodial position at Roland school?
20   A       Investigations into what?
21   Q       Job capability, competence, skill, past
22 performance, anything.
23   A       No, I didn't find a need to do any
24 investigation in those areas.
25   Q       Now, do you have a recollection, Mr. Freeman,

61

1 of how long the negotiation process with AFSCME over
2 Mr. Hazzard's grievance went on before AFSCME made a decision
3 that they were going to withdraw? I think they use the word
4 "withdraw" in the grievance, by the way. That's the term I
5 think they use, and if counsel disputes that, let me know.
6        MR. FINK: No, I think that's what it says in
7 the letter.
8 BY MR. BAILEY:
9   Q       Do you know how much time passed, how much
10 time you spent negotiating at this thing?
11   A       A lot of time, because even -- we had
12 discussions between myself, Mr. Tapper, Mr. McCollum,
13 discussions on different days at different times even before
14 we even got to a hearing, even before Nichelle Chivas got
15 involved.
16   Q       Did you ever talk to the school board,
17 formally or informally, about Mr. Hazzard's complaint that
18 he -- now, I'm not talking necessarily about a grievance now.
19 I'm talking about a complaint and a grievance, okay -- that
20 he was entitled to this position at Roland school?
21   A       Yes, I talked to them that when I got notice,
22 when I was aware that he wanted to go through the complaint
23 process. And, yes, I did talk to the school board president
24 about establishing setting up a hearing at the board level to
25 hear Mr. Hazzard's complaint.

16



FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

---

62

1   Q      And that board president's name?
2   A      **I believe at that time it was Wanda Williams.**
3   Q      Wanda Williams.  And -- okay.  Now, as a
4   matter of -- let me -- the school district does have a
5   complaint process?
6   A      **Yes.**
7   Q      If one is unhappy, an employee can actually go
8   through a set process, can actually go to the district and
9   complain, am I correct, to the board?
10  A      **That is correct, there is a complaint process.**
11  Q      And it's my understanding that -- correct me
12  if I'm wrong -- that Mr. Hazzard availed himself of that
13  process?
14  A      **Yes, he did.**
15  Q      And that at some point there was a hearing set
16  up?
17  A      **Yes, there was.**
18  Q      And that you participated at -- at least you
19  attended that hearing?
20  A      **I represented the administration at that**
21  **hearing.**
22  Q      All right, sir.  Now, let me ask you, is it a
23  committee that goes through the hearing process, is it the
24  whole board, is there a need for a quorum, can you tell me
25  from a procedural due process point of view how a hearing is

---

63

1   conducted?
2   A      **A committee is set up and the committee holds**
3   **the hearing.**
4   Q      Do you remember who was on the committee that
5   heard the hearing of the complaint that was filed by
6   Mr. Hazzard?
7   A      **It was Joseph Brown and Ricardo Davis.**
8   Q      Joseph Brown and Ricardo Davis.  And they did
9   hold a hearing then?
10  A      **Yes, they did.**
11  Q      And was there any record made of that hearing?
12  By that, I mean electronically recorded, stenographically
13  recorded, or someone who perhaps was assigned to take notes,
14  anything like that?
15  A      **I believe there was.**
16  Q      Do you know who would have possession of those
17  notes or that information?
18  A      **If there was a transcript done, it would have**
19  **been provided to the board or the board secretary.  Well,**
20  **that board secretary is not there anymore, but...**
21  Q      But you're not sure, though?
22  A      **I'm not sure.  I am not.**
23  Q      You're not sure.  Do you have a recollection
24  of what occurred during that hearing, can you share your
25  recollection with us?

---

64

1   A      Sure.  Mr. Hazzard was at that hearing
2   represented by Mr. Tapper and Mr. McCollum, and they
3   presented to the board panel their position as outlined in
4   Mr. Hazzard's complaint and their -- any documents or any
5   comments or testimony that they want to provide.
6          And we provided our documentation and comments
7   and testimony.  And we also had a time to cross-examine or
8   ask questions of each other in that hearing.  The board was
9   able to ask questions and asked questions and we responded to
10  them.
11  Q      The committee?
12  A      **The committee.**
13  Q      The board wasn't there?
14  A      **Well, I'm sorry, the committee, the board**
15  **committee.**
16  Q      Board committee.  Now, so you did go through
17  that process?
18  A      **Yes.**
19  Q      There were questions asked, there were people
20  stating positions and offering opinions and viewpoints and
21  asking questions and facts and all that sort of thing?
22  A      **Yes, sir.**
23  Q      Relatively open process?
24  A      **Yes, it was.**
25  Q      What happens, in other words, what actually

---

65

1   happened next?  Does the board do a report, do they render --
2   I'm sorry, the board committee, do they do a report, render a
3   decision or what happens?
4   A      **Well, the board committee rendered a decision.**
5   Again, I can't -- I'm not party to their discussion or who
6   they discussed with, but from that came a letter indicating
7   their position on the complaint.
8   Q      Now, once that board committee renders the
9   decision, is that the end of it for the hearing process or
10  does one have the right to go --
11  A      **Well, in the board committee hearing**
12  **procedure, the board is -- that is -- that's the last level**
13  **internally that a complainant has.**
14  Q      So that board committee speaks for the board?
15  A      **Yes.  They represent the board.**
16  Q      They represent the board.  And that's the end
17  of the procedural due process.  I mean once that's decided,
18  you don't have some right to a full board hearing.  We have
19  appellate courts and they do panels, you know, and then
20  sometimes they do what they call en banc hearings, in which
21  you can, you know, if you're unhappy with the panel decision
22  you ask for a thing from the whole group.  You don't have
23  that kind of process?
24  A      **From my experience, after the board committee**
25  **hears something and makes a decision, I am not aware or**

---

17



FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

66

1 familiar where it then goes to if you don't like what the
2 board committee says then you take it to the full board.
3 I've not known that to happen.
4    Q    You have a recollection of the decision of
5 this board committee?
6    A    Yes. It was in writing.
7    Q    But do you remember what it was?
8    A    That they did not find Mr. Hazzard's complaint
9 to have merit, and those are my words.
10    Q    And do you remember when that decision was
11 rendered?
12    A    Gosh, I don't know the date of that letter.
13 But Mr. --
14    Q    Do you remember when the hearing -- I'm sorry.
15    A    I was going to say but I don't know whether or
16 not it may have been entered, whether or not Mr. Hazzard may
17 have presented it or have it entered in evidence or not, but
18 I don't recall the date of the letter.
19    Q    Is it uncommon for employees to -- let me
20 rephrase that, because it's easier to do it the other way.
21 How common is it for an employee to go through the grievance
22 process and lose the grievance process and file a complaint
23 as opposed to take the grievance to arbitration?
24    A    This is the only experience I've had with that
25 that I can recall.

67

1    Q    And if AFSCME had continued to disagree with
2 the district on the Hazzard grievance, do you believe that
3 the district would have grieved or would have arbitrated the
4 grievance?
5    A    Yes.
6    Q    That the board would have taken it to
7 arbitration?
8    A    I would definitely recommend that we did.
9    Q    And I'd like to ask you, because you had a
10 number of years of experience. Why did you feel -- let's
11 assume for the sake of argument there was a continuing
12 disagreement and that you'd gone through the entire formal
13 grievance process, and AFSCME had continued to present
14 Mr. Hazzard's cause and the district had continued to
15 disagree with Mr. Hazzard's position.
16    What do you base your response to to the
17 question I asked about arbitration, was it based upon any
18 particular arbitration decision that you can remember, your
19 experience with arbitrations, do you have a set arbitrator,
20 do you have an agreed upon arbitrator?
21    A    No. Arbitrators are, by law, mutually
22 selected from a list provided by the Pennsylvania Labor
23 Relations Board.
24    Q    Well, sometimes -- okay. I mean I've seen
25 cases where they have -- okay, anyway. But you would have

68

1 taken it, why would you have taken it that far?
2    A    Well, it wasn't about Mr. Hazzard.
3    A    No, no.
4    A    This was -- excuse me. Because it was not
5 about Mr. Hazzard. This was establishing, my concern would
6 be that this was the issue of whether or not the employer had
7 the right to assign personnel where it felt it best needed
8 them.
9    My concern was that foregoing or implying that
10 we did not have the right or that anyone, whether Mr. Hazzard
11 or anyone else, and the circumstances that he presented in
12 the grievance representing him would indicate that the
13 employer doesn't have the right to make those kinds of
14 assignments. I was not in favor of allowing that to stand.
15 And yes, there would be a concern that an arbitration ruling
16 would rule or its decision may impact other management
17 decisions relative to...
18    Q    Okay. But you felt, the fact is that you felt
19 that it was an important issue and that you felt very
20 strongly that a precedent, a negative precedent from the
21 standpoint of the district should not be allowed to stand or
22 be established?
23    A    I was concerned about a precedent being
24 established that would not be beneficial for the district
25 with respect to the interpretation of the contract language

69

1 and the opportunities for the employer to manage and assign
2 its staff.
3    Q    Okay. Now, did you ever ask Nichelle Chivas
4 or anyone else with AFSCME why they took up the cause of this
5 grievance to begin with? Now, the reason I ask that is it
6 seems to me that it's very, very clear to you that the
7 district had a clear right in this grievance and that you
8 believed that you had the proper legal position and
9 everything in the grievance, and you made that very, very
10 clear to us, did you ever point out to AFSCME your view that,
11 hey, you know, this is frivolous or superfluous to bring this
12 thing on and keep doing this, did you take that position with
13 AFSCME?
14    A    I've taken that position with AFSCME on many
15 grievances, because many grievances have been filed by AFSCME
16 within our district and -- but I respect and understand their
17 position. They're there to maintain the integrity of their
18 bargaining agreement, their belief about their employees'
19 rights, their employees' desires and employees' needs.
20    So, believe me, because of that, their
21 position on that, we field a lot of grievances, and there are
22 some that I do feel that are frivolous, but if that's what
23 they want to do to represent their employees, I have to
24 respond for the employer.
25    Q    Was this one frivolous?

FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

**70**

1  A    That was -- well, from my perspective, I saw
2 it as that's what Mr. Hazzard believed and that's what they
3 were supporting his rights of his belief as well as what they
4 believed as presented by Mr. Hazzard of their rights in their
5 bargaining agreement.  So I didn't take it as being
6 frivolous.  I don't take any grievance, once it's put on
7 paper as a grievance it's not frivolous, it merits serious
8 response to it.
9    Q    Why then did AFSCME change courses in
10 midstream?
11    A    Because they -- I believe because I put my
12 position out there clearly and accurately that I was right.
13    Q    But you did that from the beginning.  There
14 was never any doubt about your position.
15    A    Maybe AFSCME felt that they were going to keep
16 pushing and maybe I'll change my mind.
17    Q    In your view, what injury could AFSCME suffer
18 in taking this to arbitration?
19    A    I don't know what they would have thought
20 about that.
21    Q    Well, it was clear to you, based upon your
22 knowledge and experience, that you were right, the district
23 was right in its position; isn't that correct?
24    A    It was obvious to me when I got the letter.
25    Q    Okay.  From AFSCME?

**71**

1    A    From AFSCME.
2    Q    Now, that letter that you got from AFSCME, did
3 you give that to the board?
4    A    As a part of the complaint process, I believe
5 it was pieces of my evidence that I substantiate that the
6 position that the district was taking was not wrong or
7 incorrect.
8    Q    So if this situation rises again, you would
9 expect that the district would use that AFSCME letter and
10 AFSCME's agreement as an arguable position in support of a
11 similar fact situation that they would have the rights to
12 assign and the rights to -- the posting could be set aside.
13    A    I would always take the position that that
14 section of the bargaining agreement is -- clearly indicates
15 management rights.  I would -- yes.
16    Q    Sure, I understand that.  But isn't the letter
17 from AFSCME valuable evidence in support of your position?
18    A    With respect to the details of Mr. Hazzard's
19 situation, I'm not going to say that every situation is the
20 same.
21    Q    Well, if one were the same, wouldn't it be
22 valuable?
23    A    Would it be valuable?
24    Q    Sure.
25    A    For me, from a personal -- yes, I will use

**72**

1 everything and anything available to me that I believe
2 supports my position.
3    Q    How would a contrary -- under the fact
4 situation you confronted, how would an arbitrator's decision
5 against Mr. Hazzard have hurt AFSCME or hurt, you know, you
6 know what it would have done to Mr. Hazzard individually, but
7 how would that have hurt AFSCME at all?
8    A    I don't know.  It all depends on how that
9 arbitrator writes his opinion.
10    Q    And maybe they would have won?
11    A    Again, it doesn't -- I don't know what -- how
12 an arbitrator -- different arbitrators can write a different
13 opinion about the outcome, about their decision on an
14 arbitration case.  You don't know until you actually read
15 that arbitrator's decision to know what impact it's going to
16 have.
17    Q    I will agree with you on that.  Now, let me
18 ask you this:  At some point did Mr. Hazzard and some of his
19 colleagues come to a board meeting?
20    A    Yes, they were at board meetings.
21    Q    Did they complain or speak up at the board
22 meeting?
23    A    About Mr. Hazzard's situation?
24    Q    About Mr. Hazzard's situation.
25    A    To be honest with you, I can't really recall.

**73**

1 But yes, I do remember seeing Mr. Hazzard there, Mr. Tapper
2 there, Mr. McCollum there, but I can't recall whether or not
3 they asked to make a public comment or statement.  If they
4 did, I can't recall what they may have said.
5    Q    Do you ever remember being told or advised
6 that Mr. Hazzard and some AFSCME members might show up at a
7 board meeting?
8    A    No, but I'm not surprised, because Mr. Tapper
9 would show up often for sure.
10    Q    How about Mr. Hazzard?
11    A    Mr. Hazzard?  No, Mr. Hazard didn't often show
12 up, but someone from AFSCME often did.
13    Q    Officially from AFSCME or do you mean --
14    A    I don't know whether or not they were there
15 officially or not, but I don't mean an employee, I mean an
16 AFSCME steward or elected officer.  It's not unusual to see
17 one of them sitting in the audience.
18    Q    Well, before the committee, the board
19 committee meeting on Mr. Hazzard's complaint, did Mr. Hazzard
20 go to board meetings?
21    A    I can't recall.
22    Q    Can you name --
23    A    Because I'm at every meeting.
24    Q    I know.
25    A    Who knows how many people are sitting in that



FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

74

1 audience.
2    Q        I know. I understand. It's just the
3 questions I have to ask and I certainly know and understand
4 that you can't -- and I don't expect --
5    A        And I just wanted to share that I'm not
6 looking to avoid answering any question.
7    Q        No, I think you've been very, very decent in
8 responding. I would compliment your honest responses. They
9 sound to me like they're honest responses, for what that's
10 worth. My opinion doesn't count.
11   A        I understand.
12   Q        But it's a personal -- you know, it doesn't
13 mean anything. But, you know, let me...
14           Do you have any recollection of any board
15 member talking to you about Mr. Hazzard coming to a school
16 board meeting?
17   A        No.
18   Q        Do you have any recollection of Nichelle
19 Chivas talking to you about Mr. Hazzard coming to a school
20 board meeting?
21   A        No.
22   Q        Do you have any recollection of Mr. Tapper or
23 Mr. McCollum standing up at a school board meeting and
24 speaking to the issue of Mr. Hazzard's situation?
25   A        No, not really.

75

1    Q        When Nichelle Chivas testified, she testified
2 to a conversation with a board member regarding, I believe
3 she said there were AFSCME members coming to a school board
4 meeting. Do you have a recollection of the union ever
5 informing you that AFSCME members might show up at a school
6 board meeting and discuss certain items of union business?
7    A        No, because -- well, my thought -- no, I
8 don't, because, from my understanding, the practice of the
9 board is not to discuss personnel matters publicly. You may
10 get up -- Mr. Hazzard or Mr. Tapper or Ms. Chivas can get up
11 and say anything they want. It's been the practice of the
12 board, particularly with the advice of counsel, that you
13 don't respond and you ask the person speaking and you let
14 them know that if it's a personnel matter, they're not going
15 to discuss it publicly.
16   Q        Well, AFSCME would certainly be aware of that,
17 wouldn't they?
18   A        Oh, I would think the leadership. Now, I'm
19 not so sure that all the rank and file members know that.
20   Q        Have you ever had the union forewarn you that
21 members might be showing up to agitate or lobby or argue or
22 present positions and to be aware of it or to be on the
23 lookout for it?
24   A        Yes, I always hear from AFSCME that there
25 are -- that they or their membership don't like a situation

76

1 and that we just want you to know that, you know, we don't
2 like this and that, you know, that there's going to be some
3 people at a meeting. Not necessarily about Mr. Hazzard's
4 situation, but that's not unusual for me to hear that. And
5 my response is, you have -- everybody, anybody has a right to
6 come to a public board meeting.
7    Q        And, in fact, AFSCME gets involved in school
8 board policy and politics, because, you know, their position
9 is they have a stake in those things; right?
10   A        I don't know that they -- I don't know their
11 involvement in school board policy or politics.
12   Q        Of course, they get involved in supporting
13 school board members many times?
14   A        Oh, well, everybody has that right to do that.
15   Q        Absolutely. And I'd be the first one,
16 incidentally, to admit that right. I'm just saying that,
17 as a matter of fact, they do get involved. And, you know,
18 politics is a matter of public concern in America and,
19 unfortunately, it's maybe not taken seriously enough.
20           But the fact is that, you know, AFSCME does,
21 as a union and as an active participant in American
22 democracy, they do take positions on matters of public
23 concern or at least you've seen them do that or threaten to
24 do that or become active; isn't that fair to say?
25   A        Yes, I've heard rank and file members stand up

77

1 at a board meeting and say that, you know, we need to be
2 treated more fair.
3    Q        But you've never had the union warn you to be
4 on the lookout for its members?
5    A        I've had AFSCME members and AFSCME let me know
6 that you need to know that this member is still not happy and
7 they're not -- and they want to continue to pursue their
8 position on a matter. Yes, I've had that shared with me.
9    Q        And has AFSCME ever made any recommendations
10 to you on what to do about that?
11   A        No.
12   Q        Have they ever indicated that they shared that
13 information with the complaining member?
14   A        Share what information?
15   Q        Well, have they ever said, you know, member X,
16 Y and Z is not happy with this and, you know, we want to let
17 you know that, you know, we've told them and we're telling
18 you they're coming to the position, but -- to the meeting,
19 but it's not an AFSCME official position, or something like
20 that, has that kind of thing ever occurred?
21   A        I've been told that an employee wants to come
22 on their own to a meeting and I have no problem with that.
23 But whether or not AFSCME is letting me know that this is
24 what a person is going to do, what they are going to do,
25 they're going to talk, and if it's a matter of trying to



**78**

1 influence me, it doesn't.
2　Q　Well, you've never had the impression that
3 they were trying to influence you not to listen to their
4 employees, have you?
5　A　They're always trying to influence me to
6 listen to their employees and their issues.
7　Q　So you never had them, in your experience,
8 tell you not to listen to an employee?
9　A　No.
10　Q　Quite the contrary, right?
11　A　I've — I mean AFSCME has always let me know
12 their positions. They've never told me to ignore, because —
13 anybody.
14　Q　So they've always -- in your experience,
15 AFSCME always advocated for their employees, not to say they
16 always agreed with their employees?
17　A　And they haven't. But they -- and to be
18 honest with you, and I can't say that I've discussed it with
19 them, I don't always agree with every administrator and
20 supervisor that I worked with.
21　Q　Sure. But you never called AFSCME up and told
22 them that our supervisor's going to show up at a board
23 meeting and talk against the union, you need to be aware of
24 that or anything like that?
25　A　No, I haven't, but depending upon the

**79**

1 circumstances, I don't know that that's always wrong, because
2 if you establish some understanding mutually of
3 professionalism and being aboveboard in things and doing
4 things forthright that that may not necessarily be something
5 wrong to do. It all depends on the circumstances and the
6 situations.
7　Q　But your management employees don't pay you to
8 represent·them, do they?
9　A　My management employees don't pay me to
10 represent them?
11　Q　Yes.
12　A　No. Sometimes I wish I were on an hourly fee.
13　Q　Yes, I bet you do. I bet you do. Give me
14 just a couple minutes.
15　A　Sure.
16　Q　Mr. Freeman, in paragraph 16 of the complaint,
17 there's now -- let me read the paragraph. There's two
18 sentences to it. Let me read it. It's very brief. On or
19 about March 2000, the Defendant AFSCME, by and through union
20 staff representative, there's a misspelling here, it should
21 be Nichelle, N-i-c-h-e-l-l-e, Chivas, C-h-i-v-a-s,
22 African-American, informed plaintiff they were unilaterally
23 withdrawing plaintiff's grievances. At that time, upon
24 belief and information, they told the Defendant School Board
25 the grievance had no merit. And then Mr. Hazzard goes on to

**80**

1 allege, even though the promotion of McMurray over plaintiff
2 was a clear violation of the contract. You've already
3 answered many questions about this.
4　A　Yes, because it says he was promoted. He
5 wasn't promoted.
6　Q　I understand that and we're not going to --
7 I'm not going to ask you those questions, I understand what
8 your testimony has been, except for one thing. AFSCME did
9 tell you that the grievance had no merit; is that correct?
10　A　Had no —
11　Q　Or words to that effect, that the grievance
12 was without merit or had no merit?
13　A　The actual words used —
14　Q　And you relied upon that?
15　A　— were written in the letter, and I can't
16 recite the letter, but their actual words used was written in
17 the letter.
18　　MR. BAILEY: Okay, that will stand for itself.
19 Sir, if I may just take a moment to talk to my client, I
20 don't know if -- you want to just -- I don't think we need to
21 suspend. Let me step outside and talk to Bill. Just let
22 this stuff run. We may be finished, okay. So please be
23 advised that the electronic devices are still operating, are
24 still running.
25　　(Pause.)

**81**

1 BY MR. BAILEY:
2　Q　Okay, Mr. Freeman, just one last question. Do
3 you have a recollection of Mr. Hazzard or Mr. Tapper or
4 McCollum being at a school board meeting where they were not
5 allowed to speak or present their views?
6　A　As I stated earlier, I do recall them being
7 there.
8　Q　Right.
9　A　When I was asked whether or not they spoke on
10 anything, I indicated I could not recollect that. But based
11 on your question, I would think, from my previous testimony,
12 that the board would not have allowed them to speak publicly
13 on what may be considered a personnel or legal matter.
14　Q　And do you know how the board came to that
15 conclusion, were they allowed to state their complaint or
16 were they allowed to explain what they were complaining about
17 or --
18　A　I think that the board's position would be
19 that they were letting the person know that they would not
20 speak or respond to anything that they might say publicly,
21 because of it being a personnel or legal matter.
22　Q　And lastly, did they come to the full board
23 meeting after there had been a meeting with the board
24 committee that we discussed?
25　A　I really can't recall whether or not they were



FREEMAN, LANCE
11/17/01

HAZZARD VS
CURTIS

---

82

1 in the audience at any of those meetings following that
2 hearing.
3      MR. BAILEY:  Well, opposing counsel may have
4 questions for you at this time.  Do you have any, Eric?
5
6           CROSS-EXAMINATION
7
8 BY MR. FINK:
9   Q      Just on one issue and just a couple of
10 minutes.  Mr. Freeman, I introduced myself before.  I'm Eric
11 Fink and I represent the union.
12      You were mentioning that I mean Mr. Hazzard's
13 grievance was one of many grievances that AFSCME filed over
14 the years that you were working at the school district?
15   A      Correct.
16   Q      AFSCME doesn't take all of those grievances to
17 arbitration, do they?
18   A      No.
19   Q      And Mr. Hazzard's wasn't the only grievance
20 that AFSCME withdrew short of arbitration, was it?
21   A      No, it was not.
22   Q      Okay.  And do you recall AFSCME ever
23 withdrawing a grievance where the grievant was a person of
24 color?
25   A      Yes.

---

83

1   Q      And would you say that happened once, twice,
2 many times?
3   A      I would say it happened more often it being a
4 person of color than someone being white, and I think that
5 contributes to the makeup of the work force.
6   Q      The majority of the employees in the school
7 district are people of color; is that right?
8   A      In this bargaining unit.
9   Q      In the AFSCME bargaining unit?
10   A      In this bargaining unit.
11      MR. FINK:  That's all.
12 BY MR. LOCHINGER:
13   Q      I just wanted to clarify to make sure what you
14 were talking about.  When you were talking about the board
15 hearing, could you be a little more precise.  Was the board
16 telling Mr. Tapper and Mr. McCollum and Mr. Hazzard that they
17 could not speak or were they telling them they just would not
18 respond?
19   A      The board does not tell a person they can't
20 speak, because a person has a right to put in a slip to --
21 and say that they have something they want to address the
22 board on.  They have an opportunity to indicate whether it's
23 an agenda item or a nonagenda item.  And believe me, when
24 people stand up or step to the mike, it would depend upon the
25 forum it's in, you don't know what they're going to say until

---

84

1 they say it.
2      But when persons say some things that looking
3 for the board to respond or to answer them, the board does
4 have the practice of saying, we will not discuss a personnel
5 or legal matter at this time or publicly or they are advised
6 not to speak about a personnel or legal matter publicly or at
7 this time.
8      MR. LOCHINGER:  That's all I have.
9      MR. BAILEY:  Mr. Freeman, I don't have any
10 additional questions for you.  I'd like to thank you very
11 much for coming here today and cooperating.  In just one
12 moment the video operator will end the deposition officially
13 and I want to thank you.
14   A      Thank you, sir.
15      THE VIDEO OPERATOR:  It's 11:47 a.m.  The
16 deposition of Lance Freeman has concluded.  Thank you.
17      (The deposition was concluded at 11:47 a.m.)
18
19
20
21
22
23
24
25

---

85

1 STATE OF PENNSYLVANIA   :
                           : ss
2 COUNTY OF DAUPHIN       :
3      I, Sherry Bryant, a Reporter Notary-Public,
4 authorized to administer oaths within and for the
5 Commonwealth of Pennsylvania and take depositions in the
6 trial of causes, do hereby certify that the foregoing is the
7 testimony of LANCE D. FREEMAN.
8      I further certify that before the taking of
9 said deposition, the witness was duly sworn; that the
10 questions and answers were taken down stenographically by the
11 said reporter Sherry Bryant, a Reporter Notary-Public,
12 approved and agreed to, and afterwards reduced to typewriting
13 under the direction of the said Reporter.
14      I further certify that the proceedings and
15 evidence contained fully and accurately in the notes by me on
16 the within deposition, and that this copy is a correct
17 transcript of the same.
18      In testimony whereof, I have hereunto
19 subscribed my hand this 30th day of November 2001.
20
21
22           Sherry Bryant, RMR, CRR
23 My commission expires:
    December 13, 2001
24
25

---

22

# EXHIBIT - E

185.69

No. 526

| | |
|---|---|
| Section | CLASSIFIED EMPLOYES |
| Title | COMPLAINT POLICY |
| | |
| | |
| | |
| Date Adopted | March 21, 1983 |

# Harrisburg School District

| Guide | | Reference |
|---|---|---|

### 526.  COMPLAINT POLICY

**1.  Purpose**

It is the policy of the Board to establish reasonable and effective means of resolving difficulties which may arise among employes, to reduce potential areas of grievances and to establish and maintain recognized two-way channels of communication between supervisory personnel and classified employes not otherwise covered by the terms of a collective bargaining agreement.

**2.  Authority**

The Board intends in this complaint policy to expedite the process for all concerned parties.  The policy, therefore, has as its goal the following:

- The policy is intended to be used after an attempt has been made to resolve a difficulty on an informal basis between the parties concerned.

- The policy is to secure proper and equitable solutions to complaints at the lowest possible level, and to facilitate an orderly procedure within which solutions may be pursued.

- There shall be no reprisals of any kind against any employes or their representatives because of participation in a complaint or support thereof.

**3.  Definition**

For purposes of this policy, the terms used herein shall have the following definitions:

Complaint - A complaint is any unresolved problem concerning application or interpretation of

- State laws or regulations

- the policies, rules or regulations of the Board

- or written administrative procedures.

page 1/4



**Policy Guides**

526.   COMPLAINT POLICY - Pg. 2

<u>A Day</u> - A day is any day for which an employe is con-
tracted to work.

4.   <u>Procedures</u>

Complaints should be discussed in private, informal
conferences between the parties involved.

At least one such private meeting(s) should take
place between the parties before the complaint procedure
is invoked.

A complainant may be represented or accompanied by
any higher level of authority by anyone of his/her choos-
ing.

If the same complaint or substantially the same
complaint is made by more than one employe against
one respondent, only one employe on behalf of him/herself
and the other complainants may process the complaint
through the adjustment procedure.  Names of all complain-
ing parties shall appear on all documents related to the
settlement of the complaint.

The time limits provided for in this policy may be
extended by mutual agreement of the parties.  Any de-
cision not appealed within the limits from one level to
the next level in the complaint policy shall be consider-
ed settled on the basis of the last decision and not sub-
ject to further appeal.

<u>Level One, immediate supervisor</u>

A.   Within five(5) days after the occurrence of the act
or omission giving rise to the complaint, the complainant
must present his/her complaint in writing to the immedia-
te supervisor.

This statement shall be a clear concise expression
of the complaint, and

  - the policy or law for which there is an alleged
    violation

  - the circumstances on which the complaint is based

  - the person(s) involved

  - the decision rendered at the private conference,
    and

  - the remedy sought.

**Policy Guides**

526.  COMPLAINT POLICY - Pg. 3

B.   Within five days the immediate supervisor shall communicate his/her decision to the employe in writing. If the immediate supervisor does not respond with the time limit, the complainant may appeal to the next level.

Either party to the complaint shall have the right to request a personal conference in order to resolve the problem.  Either party may request the presence of one conferee.

Level Two, next higher level of authority

A.   If the employe is not satisfied with the decision at Level One, s/he may appeal the decision in writing to the appropriate assistant superintendent, within five days after receiving it.

B.   This written statement shall include

- a copy of the original complaint

- the decision rendered

- the name of the appellant's conferee, if any, and

- a clear, concise statement of the reasons for the appeal on the decision.

C.   The responding administrator shall communicate the decision to the complainant within five(5) days.

D.   Either party in the appeal may request a personal conference within the above time limits.  If the decision has not been rendered within the time limits, the complainant may appeal to the next level.

Level Three, next higher level of authority (Superintendent)

A.   Within five(5) days after receiving the decision of the administrator at Level Two, the complainant may appeal the decision of Level Two to the Superintendent or Assistant Superintendent.  The appeal shall be in writing and shall be accompanied by a copy of the decisions at Level One and Level Two.

B.   Within five days after the delivery of the appeal, the Superintendent shall investigate the complaint, giving all persons who participated in Levels One and Two a reasonable opportunity to be heard.



**Policy Guides**

526.  COMPLAINT POLICY - Pg. 4

C.  Within five (5) days after the delivery of the ap-
peal, the Superintendent shall submit his/her decision in
writing together with the supporting reasons, to the com-
plainant and the administrators involved.

<u>Level Four, the Board</u>

A.  Within five (5) days after receiving the decision of
the Superintendent, the complainant may appeal in writ-
ing to the Board.

B.  The Board shall schedule the matter for a hearing
at an executive session to be held at the next regularly
scheduled Board meeting.

The complainant and/or his/her conferee shall be present
at the hearing.

C.  Within ten days the Board will submit its decision
in writing together with supporting reasons to the com-
plainant.  A copy shall be furnished to the administra-
tors involved and the Superintendent.

The decision of the Board is final.

<u>Miscellaneous Provisions</u>

All documents, communications and records dealing
with the processing of a complaint shall be filed in a
separate file and shall not be kept in the personnel file
of any of the participants.

EXHIBIT - F



# HARRISBURG SCHOOL DISTRICT

**1201 NORTH SIXTH STREET**

HARRISBURG, PENNSYLVANIA 17102-1406

**P.O. BOX 2645 - MAILING ADDRESS**

**(717) 703-4019 Office**

**(717) 703-4130 Fax**

**OFFICERS**
Wanda R. D. Williams, President
Linda M. Cammack, Vice President
Mark D. Pisco, Acting Secretary
Mellon Bank, Treasurer
Dr. Lucian Yates, III, Superintendent
Royce L. Morris, Solicitor

**BOARD OF SCHOOL DIRECTORS**
Joseph C. Brown          2001
Linda M. Cammack         2003
Clarice L. Chambers      2001
Ricardo A. Davis, Sr.    2001
Barton A. Fields         2003
Judith C. Hill           2003
Ken M. Lester            2003
Gloria E. Martin-Payne   2003
Wanda R.D. Williams      2001

Mr. William Hazzard
1940 Brookwood Street
Harrisburg, PA 17104

June 26, 2000

Dear Mr. Hazzard:

This letter is written in response to your complaint regarding the administration's denial of your promotion request to a Facilities Service Foreman 1B position at Rowland School in August 1999. In accordance with the district complaint procedure, a hearing before a committee of board members (Joseph Brown, Ricardo Davis) was held June 1, 2000. At this meeting the committee received evidence and heard testimony in support of your complaint from you, Steve McCollum and Robert Tapper. In response to your complaint we received evidence and testimony from Tim Curtis and Lance Freeman representing the administration.

After careful consideration of the evidence and testimony provided, it is the decision of the committee that the administration acted within its managerial rights when it did not promote you as you requested. It is also the opinion of the committee that your rights regarding this matter were not violated by the administration. In conclusion, it is our decision that your complaint has been properly addressed in accordance with Board Policy No. 326, Complaint Procedure.

We appreciate your service to the district and your efforts to resolve this matter accordingly.

Sincerely,

*Joseph Brown*

Joseph Brown
Board Member

Ricardo Davis
Board Member

cc:  Wanda R. D. William, President, School Board
     Dr. Lucian Yates III, Superintendent
     Steven McCollum
     Robert Tapper
     Tim Curtis
     Lance Freeman
     Brenda Conner
     Board Secretary
     file

*"AN EQUAL OPPORTUNITY EMPLOYER"*                    *"EQUAL EDUCATION OPPORTUNITIES"*

*01*

TO:        All Board Members of the Harrisburg School District

FROM:      William Hazzard/Steven McCollum

RE:        Complaint

DATE:      May 17, 2000


On April 19, 2000 a Board Meeting was held at the Harrisburg School District. During the meeting we informed all of you that a complaint was filed. To refresh your memories it has to do with personal and school facilities. We also expressed to all of you that a position for a Head Custodian was posted for the new Rowland Building. The individual who bided on this position was not awarded the position. We asked you for an explanation on this issue. As of May 17, 2000 we have not received an explanation on this issue that is satisfactory or acceptable. Therefore, we are moving this complaint to Level 4 of the complaint procedure, which is now the board's responsibility to answer. The attached sheets indicate that we have gone through each level of the complaint procedure. We have given the Board Secretary a copy of the complaint for each one of you concerning this issue to look over and are waiting for your response.

Thank you for your cooperation.


                                    Mr. William Hazzard

                                    *William A Hazzard Sr*

                                    Mr. Steven McCullum

                                    *Steven T. McCollum*

Cc:   Ms. Brenda Conner, Business Manager
      Mr. Lance Freeman, Chief of Human Resources
      Mr. Timothy Curtis, Director of School Facilities



# HARRISBURG SCHOOL DISTRICT

**1201 NORTH SIXTH STREET • HARRISBURG, PA 17102-1406**
717.703.4000  •  FAX 717.703.4105

**LANCE D. FREEMAN**
Chief of Human Resources/EO
OFFICE 717.703.4006
FAX 717-.703.4105

May 11, 2000

Mr. William Hazzard
1940 Brookwood Street
Harrisburg, PA 17104

Dear Mr. Hazzard:

This is the Level 3 response to your complaint (enclosed). The response at this level is in agreement with the Administrations response to the grievance you filed through AFSCME.

Our response to your grievance (enclosed) and AFSCME's subsequent withdrawal of your grievance, confirms our belief that your rights were not violated or your job bid for a promotion with thirty-one years of service were not ignored. We made an administrative decision to move another person, with less years of service in the district than you, but who was currently classified as a Facility Service Forman 1B. This person also has a satisfactory performance record with more years of experience in the district as a "custodian" and "head custodian" than yourself. We felt this was the best move for Rowland School.

We realize that you have given a lot of years to the district, nearly eight of them as a "custodian" and "head custodian" but there will be other opportunities that will present itself for which we encourage you to bid. Possibly you may get the assignment you seek. It is our hope that although you may not agree with our decision, you accept this as our response to your complaint.

Sincerely,

Lance D. Freeman
Chief of Human Resources

LDF:lm
cc:      S. McCollum, Lincoln
         B. Conner, Business
         T. Curtis, Supervisor
         File

*"An Equal Rights And Opportunity School District"*

WHAZZARD051100/H/lm

RECEIVED
BUSINESS SERVICES
2000 MAY -9  PM 12: 04

TO:        Lance Freeman

FROM:      William Hazzard/Steven McCollum

RE:        Complaint

DATE:      May 9, 2000


This is to inform you that we are moving this complaint to the third level.

On April 18, 2000 a complaint was sent to Mr. Curtis (Director of School Facilities).  Mr. Curtis' response was not satisfactory; therefore we moved the complaint to the second level.  On April 28, 2000 the complaint was then sent to Brenda Conner (Business Manager) asking for her cooperation in this matter, with no response from Ms. Conner as of May 9, 2000.  We decided to bring this complaint to the third level.  We are now asking for you to look into this matter and get back to all parties involved.

Please keep in mind that this is **not** a grievance.  This is a complaint, which is to be answered by the Harrisburg School District not A.F.S.C.M.E. Local 2063 or District Council 90.

See attached sheets.

Thank you for your cooperation.



Mr. William Hazzard

*[signature]*

Mr. Steven McCollum

*[signature]*


Cc:    Mr. Curtis, Director of School Facilities
       Brenda Conner, Business Manager

4

To:   Brenda Connor / *NO RESPONCE – 5-9-2000*
From: Mr. Hazzard/ Mr. McCollum
Re:   Complaint
Date: April 28, 2000


      This is to inform you that we are moving this complaint to the second level.  This is a School District Complaint not a Grievance Procedure.  We are entitled to and looking forward to going through all levels of the complaint procedure.

      Please see Mr. Cutis for a response at the first level.

      Thank you for your cooperation.


                      Mr. Hazzard


                      Mr. McCollum


C.C. Director of School Facilities
     Mr. Curtis

## C O M P L A I N T

APR 18 2000

FACILITIES / DEPARTMENT 36

I, the undersigned, do hereby state:

1. MY NAME __WILLIAM HAZZARD__          PHONE NO. _____

   ADDRESS __1940 BROOKWOOD ST  HBG. PA.__

2. I AM A __HEAD CUSTODIAN__          AT __SHIMMELL__
          PARENT, STUDENT, TEACHER, OTHER          SCHOOL

3. I ACCUSE __MANAGEMENT__, A ____ PARENT, STUDENT, TEACHER,

   AT __ADM. BLDG.__ . OF THE FOLLOWING:
          SCHOOL

   (STATE SPECIFICALLY THE ACTS OR CONDUCT OF WHICH COMPLAINT IS MADE.)

   I AM THE HEAD CUSTODIAN AT SHIMMELL SCHOOL. ON JULY 8, 19__

   THE POSITION FOR A HEAD CUSTODIAN AT THE NEW ROWLAND BLDG

   WAS POSTED. I BIDDED FOR SAID POSITION. I HAVE 31 YEARS OF

   SERVICE WITH THE HBG. SCHOOL DIST. WHICH MAKES ME THE

   MOST SENIOR QUALIFIED PERSON FOR SAID POSITION. I WOULD

   LIKE TO KNOW WHY I WAS NOT AWARDED THE HEAD CUSTODIAN

   POSITION AT THE NEW ROWLAND BLDG.

4. THE ACTS OR CONDUCT OF WHICH I COMPLAIN OCCURRED ON OR ABOUT .

   __AUG. 99__          AT __ADM. BLDG.__
          DATE                              PLACE

5. THE NAMES AND ADDRESSES OF WITNESSES, IF ANY, OF THE ACTS OR CONDUCT OF WHICH
   COMPLAINT IS MADE.

   (1)_____          (3)_____

   _____

   _____

   (2)_____          (4)_____

**6.** THE NAME AND ADDRESS OF THE PERSON WHOM I HAVE SELECTED TO ASSIST
PREPARATION AND FILING OF THIS COMPLAINT IS:

STEVEN T. MCCOLLUM

127 N. MAIN ST. MARYSVILLE PA 17053

Therefore I request that the charge be investigated.

DATE 4-19-2000      SIGNATURE OF COMPLAINANT:

SIGNATURE OF PARENT OR GUARDIAN

PARENT/COMMUNITY COMPLAINTS MAY BE FILED IN ANY SCHOOL OFFICE TO BE
SUPERINTENDENT

STAFF COMPLAINTS SHOULD BE FILED WITH IMMEDIATE SUPERVISOR

ADMINISTRATORS RECEIVING COMPLAINTS AT FIRST LEVEL MUST PROMPTLY FO
COMPLAINT TO ALL INVOLVED PARTIES AND THE APPROPRIATE HEA OR AFSCME

- - - - - - - - - -

R E S P O N S E · L E V E L I

HEARING REQUIRED/REQUESTED    YES   (NO)   DATE (IF CONDUCTED)

IN Response to your complaint,
Matter was Already Addressed An
Responded to. Please see Attachm

April 25, 2000  Facilities Supervisor   SIGNATURE
DATE            TITLE

- - - - - - - - - -

C O M P L A I N A N T   R E S P O N S E

I do by signing below indicate that - (check one)

___ I AM satisfied with the disposition that has been ma
complaint or my case.

X  I AM NOT satisfied with the disposition that has been
complaint or my case. I wish to appeal to t

DATE 4-22-00      William A. Hand Sr.
SIGNATURE OF COMPLAINANT