

FILED
HARRISBURG

FEB 1 6 2002

MARY E. D'ANDREA, CLERK
Per Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

William Hazzard,

                 Plaintiff     Civil Action–Law

       v.                  No. 1:CV-00-1758

Tim Curtis, Mack McMurray,
AFSCME District 90, and the
Harrisburg School District,

               Defendants

RAMRO

### EXHIBITS TO MOTION OF DEFENDANTS
### AFSCME DISTRICT COUNCIL 90 AND ROBERT McMURRARY
### <u>FOR SUMMARY JUDGMENT</u>

**TAB**

Excerpts from Deposition of Robert L. McMurray, October 18, 2001 . . . . . . . . . . . . A

Exhibit to Deposition of Robert L. McMurray, October 18, 2001 . . . . . . . . . . . 1

Excerpts from Deposition of William A. Hazzard, October 19, 2001 . . . . . . . . . . . B

Exhibits to Deposition of William A. Hazzard, October 19, 2001 . . . . . . . B 1-15

Excerpts from Deposition of Nichelle Chivis, November 15, 2001 . . . . . . . . . . . . . . C

Excerpts from Deposition of Timothy L. Curtis, November 19, 2001 . . . . . . . . . . . . D

Exh A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


WILLIAM A. HAZZARD,                    :
                    PLAINTIFF          :
                                       :
            VS.                        : NO. 1:CV-00-1758
                                       :
TIM CURTIS, MACK MCMURRAY,             :
AFSCME, DISTRICT 90, AND THE           :
HARRISBURG SCHOOL DISTRICT,            :
                    DEFENDANTS         :


VIDEO
DEPOSITION OF:    ROBERT L. McMURRAY

TAKEN BY:         PLAINTIFF

BEFORE:           LISA A. HANSELL, REPORTER
                  NOTARY PUBLIC

                  ANTHONY MARCECA, LEGAL
                  VIDEO OPERATOR

DATE:             OCTOBER 18, 2001, 10:09 A.M.

PLACE:            LAW OFFICES OF DON BAILEY
                  4311 NORTH SIXTH STREET
                  HARRISBURG, PENNSYLVANIA

1    A        Yes.

2    Q        Okay.  I'm going to come back to that period

3  of time that you were at Hamilton, so you're a little ahead

4  of me, but you go right ahead.

5    A        Tim Curtis transferred all the custodians to

6  different schools.  I was transferred to Hamilton

7  temporarily until Rowland opened up with the same amount of

8  pay that I would be getting at William Penn I get at

9  Rowland.  I was only down there for three or four weeks

10  because Hamilton had no head custodian.

11    Q        All right.  Let's look at this now.  You had

12  been at Hamilton two to three weeks, three to four weeks,

13  whatever it might have been, a short period of time; right?

14    A        Yes.

15    Q        Before you went to Rowland.  And we're talking

16  about sometime in July, August of 1999; right?

17    A        Yes.

18    Q        Where were you before you were temporarily as

19  I understand you have testified -- where were you before you

20  were temporarily placed at Hamilton?

21    A        William Penn Intermediate School.

22    Q        And can you tell us why Mr. Curtis had caused

23  you to be placed at Hamilton temporarily?

24    A        Because -- no, I can't tell you that.  I don't

25  -- the transfer --

1    Q        Let me say this to you because there's an
2    instruction I failed to give you that I should have.  From
3    time to time I may ask a question and you don't know the
4    answer to the question.  If it's truthful and it's a
5    thorough answer and you don't know the answer, it's a
6    perfectly legitimate answer.  A lot of times witnesses have
7    a tendency because they get into -- you know, again, it's
8    tough being a witness.  They feel that they have to respond
9    and come up with something.  Don't do that.  If you don't
10   know the answer and that's truthful, that's fine.  Let me go
11   back and ask it again because you seemed to express some
12   doubt.  At least you looked that way to me.  I think I had
13   asked the question why -- why Mr. Curtis had temporarily
14   placed you at Hamilton.  You had been at Penn; right?
15       A        Yes.
16       Q        Okay.  Why did he temporarily place you at
17   Hamilton?
18       A        Because during the transfer Hamilton School
19   had no head custodian.  The head custodian there had
20   resigned.
21       Q        Okay.  I think you had indicated that.
22       A        Yes.
23       Q        Okay.  Now, let's take that just a step
24   further.  That begs a question.  Mr. Curtis for whatever
25   reason -- we can question him about this when he gets an

Exh 1



# HARRISBURG SCHOOL DISTRICT

1201 North Sixth Street • Harrisburg, PA 17102-1406

(717) 255-2511 • FAX (717) 233-1968

August 12, 1999

Robert McMurray
68 N. 12th Street
Harrisburg PA 17103

Dear Mr. McMurray:

This letter is to notify you that your transfer to the position of Facilities Service Foreman IB at Rowland Intermediate School was approved. This transfer effective date is August 16 , 1999.

We wish you much success in your new assignment.

Sincerely,

Lance D. Freeman
Chief of Human Resources/Equal Opportunity

LDF/hvq

cc:

file

EXHIBIT

McMurray-1

10-18-01

*"An Equal Rights And Opportunity School District"*

Exh B

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


WILLIAM A. HAZZARD,                    :
            PLAINTIFF                   :
                                        :
            VS.                         : NO. 1:CV-00-1758
                                        :
TIM CURTIS, MACK McMURRAY, AFSCME,     :
DISTRICT 90, AND THE HARRISBURG         :
SCHOOL DISTRICT,                        :
            DEFENDANTS                  :


        VIDEO
        DEPOSITION OF:   WILLIAM A. HAZZARD

        TAKEN BY:        DEFENDANTS HARRISBURG SCHOOL
                         DISTRICT AND TIM CURTIS

        BEFORE:          LISA A. HANSELL, REPORTER
                         NOTARY PUBLIC

                         ANTHONY MARCECA, LEGAL
                         VIDEO OPERATOR

        DATE:            OCTOBER 19, 2001, 8:58 A.M.

        PLACE:           LAW OFFICES OF DON BAILEY
                         4311 NORTH SIXTH STREET
                         HARRISBURG, PENNSYLVANIA

1  name for us for the record and everything just so we have

2  that?

3      A        Hazzard, H-a-z-z-a-r-d.

4      Q        And you're William A.; is that correct?

5      A        Yes, sir.

6      Q        And your address right now?

7      A        Is 1021 South Progress Avenue.

8      Q        In the city?

9      A        Paxtang.

10     Q        Okay.  Is that a Harrisburg mailing address,

11 though?

12     A        Yeah.

13     Q        And the zip code?

14     A        17111.

15     Q        Okay.  Thanks.  All right.  You're currently

16 employed with The Harrisburg School District; correct?

17     A        Yes, sir.

18     Q        When was your original hire date with them?

19     A        About 1968.

20     Q        And what job were you originally hired into?

21     A        Grounds crew.

22     Q        The grounds crew doing what generally?

23     A        Cultivating, picking up trash and dumping it.

24     Q        And how long did you have that original job?

25     A        I'm not sure, but it may have been maybe ten

1    years.

2        Q        Okay.  What was the next job you had at the

3    school district?

4        A        I transferred to food service.

5        Q        All right.  And was that a union job?

6        A        Yes.

7        Q        What union was that with?

8        A        AFSCME.

9        Q        Okay.  Do you recall about when that job

10   started?

11       A        I don't remember.

12       Q        You said about -- the first -- I'm sorry.  You

13   said the -- your grounds crew job lasted about 10 years.  So

14   was this around the late '70s -- around the late '70s, maybe

15   the early '80s?

16       A        Yes.

17       Q        Does that sound right?

18       A        Somewhere.

19       Q        Okay.  Do you recall at all who was your

20   supervisor in the food service job?

21       A        Mr. Brigry.

22       Q        How do you spell that, do you know?

23       A        No.  And Dave Lloyd was his assistant.

24       Q        And was that during the entire time you worked

25   in the food service area --

1    A        He had cancer.

2    Q        Okay.  So when you took the acting head

3    custodian job you thought it was going to be just a

4    temporary thing?

5    A        Yeah.

6    Q        And was it temporary?

7    A        No.  Then they started -- the principal

8    started -- which was Ms. Anderson started taking interviews

9    for head custodian, and I approached her, and I said,

10   Ms. Anderson, why wasn't I asked because I am acting head

11   custodian here and why haven't I been called in for an

12   interview, and at that time she interviewed me and I got the

13   job.

14   Q        So are you saying that you were not aware that

15   the acting head custodian job was in essence opened up?

16   A        I became aware it was opened up, and I thought

17   I was going to get it because I was acting head custodian

18   there.

19   Q        But --

20   A        But nobody asked me.

21   Q        Okay.  How did you learn -- if I understand

22   what you're saying correctly, you learned --

23   A        Yes.

24   Q        -- that the job was being opened because other

25   interviews were being done?

1      A         Yeah.

2      Q         Was there ever a posting done?

3      A         Yes, there was a posting put up.

4      Q         Was that before these other people were

5   starting to be interviewed for the job?

6      A         No.  Mr. Swope I think passed away at that

7   time, and so then the school district put a bid sheet out.

8      Q         Okay.  I just want to make sure of the timing

9   of this.  When -- what order did these things happen in?

10   Mr. Swope passed away?

11      A         Uh-huh.

12      Q         A bid sheet was put up.  People were starting

13   to be interviewed for the job?

14      A         Yes.

15      Q         Is that the correct order that things went in,

16   or do I have those out of line?

17      A         No.  That's about the way they went in.

18      Q         Did you ever sign up on the posting, on the

19   bid sheet?

20      A         I asked her who was going to be acting head --

21   who was going to be custodian because I am acting head

22   custodian, am I going to get the job, and she says that

23   decision will be made later.  And they had interviews, but

24   they never called me in.  So I finally went up and said,

25   hey, when am I going to be called in.

```
 1        Q         Okay.  You didn't work through the union in
 2   this situation -- in that situation?
 3        A         I worked with the union, yes.
 4        Q         Did you file a grievance over it at all?
 5        A         I don't think I did.  I think I -- I think I
 6   just kind of like went to Ms. Anderson and told her, hey,
 7   you know, this isn't right, I should be in there too because
 8   I am acting head custodian here, I have the most years of
 9   service, why ain't I in here, and then she said, okay, come
10   on in, and she did the interview then.
11        Q         And do you know the other people that applied
12   for the head custodian job at Marshall?
13        A         She -- no, I don't.  She told me they were
14   interviewing outside people.  They weren't asking people
15   inside.
16        Q         Okay.  So the other people you talked about
17   being interviewed were not --
18        A         School district employees.
19        Q         -- school district employees?
20        A         No.
21        Q         Okay.  All right.  So you became head
22   custodian at Marshall then.  Do you recall the year that
23   this was?  I mean, I'm still trying to pin down a year here,
24   if we could nail down one of these years.
25        A         It may have been between '95 and -- somewhere
```

1   around there.

2        Q        How long were you acting head custodian before

3   you actually became the regular head custodian at Marshall?

4        A        Maybe a year.  Almost a year.

5        Q        Okay.  Was the size of your staff still the

6   same?  Was there three people under your control as head

7   custodian?

8        A        They brought in a sub -- another sub.

9        Q        To in essence take your place?

10       A        Yeah.

11       Q        So you had -- so it was you, two other people

12  on your shift and then one on the day shift; is that

13  correct?

14       A        Ms. Antonsen decided that it was best that I

15  would be daylight.  That's the confrontation between me and

16  -- and then it was Tracy Bradshaw, John Strohm and Leonard

17  Jackson.

18       Q        Let me go back and hit your bosses at

19  Marshall.  Your bosses while you were head -- while you were

20  custodian and head custodian at Marshall were the principal

21  of the building; correct?

22       A        Yes.

23       Q        The first principal you worked under was a

24  Ms. Dodd?

25       A        Yes.

26

```
 1        Q        Is she white or black?

 2        A        Black.

 3        Q        She's black?

 4        A        Black.

 5        Q        Okay.  How about Ms. Primm?

 6        A        Black.

 7        Q        And how about Ms. Antonsen?

 8        A        She's Spanish.

 9        Q        Was Ms. Antonsen your -- the last principal

10   you had at Marshall?  Was she there the whole time you were

11   there, or did other principals come through?

12        A        She was there the whole time I was there then

13   the rest of the time until she went to the Rowland building.

14        Q        Ms. Antonsen your direct supervisor the entire

15   time you were at Marshall?

16        A        Yes.

17        Q        What about -- what about Mr. Curtis, when did

18   he come into the picture?

19        A        He came in probably maybe about the last year,

20   and he was kind of like up in the administration building.

21   What his duties were then I don't know but then he was --

22   then we were told that the principals were no longer our

23   boss, that Tim Curtis was.

24        Q        Okay.  That's what I was getting to.  I just

25   wanted to see the chain of command here.  Did that occur
```

1   while you were still at Marshall?

2       A       Yes.

3       Q       I'm getting ahead of myself here.  Let me back

4   up one more time here.  How long were you head custodian at

5   Marshall?

6       A       Just a little over four years maybe.

7       Q       And just to put kind of a date on it, were you

8   head custodian at Marshall until -- we heard some testimony

9   from Mr. McMurray about all of the head custodians being

10  transferred in -- what was that date, June of '99; is that

11  right?

12      A       Yeah.

13      Q       Were you head custodian at Marshall until that

14  time, until you were transferred by Mr. Curtis?

15      A       Yeah.

16      Q       Okay.  So we know that you were head custodian

17  at Marshall until at least June of 1999?

18      A       Yeah.

19      Q       You believe you started there in about 1995?

20      A       Yeah.

21      Q       As the head custodian?

22      A       I was a regular custodian first, maybe a year

23  or two when I was there.

24      Q       Right.  Okay.  All right.  During the time you

25  were head custodian, Ms. Antonsen is your supervisor.  Did

28

1    you receive any raises during the time that she was

2    supervising you?

3        A        No.

4        Q        You had the same salary the whole time?

5        A        Well, we just got the same salary that we got

6    through our contract with the school district.  Everybody

7    got the same raise.

8        Q        So you got raises, but it was all, again,

9    through the AFSCME contract?

10       A        Yes.

11       Q        Nothing above and beyond that?

12       A        No.

13       Q        Any commendations or awards or anything that

14   you got?

15       A        Oh, I made more money when I went from food

16   service to custodian because I was only 214 days and now I'm

17   260 days so they had to pay me for those -- those days that

18   they brought me up to.

19       Q        Okay.  But once you became a custodian you

20   were always 260 days?

21       A        Yes.

22       Q        Okay.  During the time you were head custodian

23   at Marshall, did you ever get any awards or commendations

24   or, you know, pats on the back from -- from Ms. Antonsen?

25       A        Yes.

1      Q      Could you tell us what those were?

2      A      It was always thank you, Mr. Hazzard, I

3  appreciate your work, you know, or something like that.

4      Q      So these are informal?

5      A      Yes.

6      Q      Anything formal that you actually were

7  recognized for anything or --

8      A      No.

9      Q      Okay.  Your staff at the time at Marshall when

10  you were head custodian, what were their races?

11     A      Tracy was black.  Mabel was black, and

12  Mr. Gibson was black.

13     Q      So all of your staff was black then at

14  Marshall?

15     A      Yeah.

16     Q      Your evaluations when you were the head

17  custodian, I'm assuming -- am I correct to assume that

18  Ms. Antonsen filled them out?

19     A      Yeah.

20     Q      Just generally, because I think we have copies

21  of some of them at least, but generally do you recall them

22  being good or average or poor?

23     A      My own?

24     Q      Yes.

25     A      I'm pretty sure most of them were -- were

1    good.

2        Q        Okay.  Do you recall the -- you told us before

3    that near the end of your time at Marshall Mr. Curtis -- you

4    were told that you would -- Mr. Curtis would be your boss

5    from that point on?

6        A        Yes.

7        Q        Did Mr. Curtis ever evaluate you when you were

8    a janitor -- when you were the head custodian at Marshall?

9        A        I don't know if it wasn't until I went to

10   Shimmell.  I'm not sure.

11       Q        Okay.  Mr. Curtis, by the way, is he white or

12   black?

13       A        He's black.

14       Q        Okay.  Now, now that we're up to -- so I've

15   got you through the end of Marshall now.  Now, tell us what

16   happened -- you said you went to Shimmell next?

17       A        Yeah, but it was -- it was like an illegal

18   transfer really because Tim Curtis sent out a letter stating

19   that I'm giving you all the transfer you asked for.  So

20   there was a grievance filed by the union because nobody

21   asked for this transfer that he did.  So the ones that went

22   from a high paying head custodian to a low, they couldn't

23   deduct their salary.  They had to keep them the same because

24   it was untrue what he did.

25       Q        And when you say went from a high paying job

1    to a low, why would you -- what's -- you're saying there is

2    two different salary structures for head custodians?

3        A        Oh, yeah.  If you go to a lower paying job,

4    then that's where your -- the difference that they'll deduct

5    your salary.

6        Q        What's -- what is the criteria for determining

7    what a lower paying job is?

8        A        A -- 1A, that's what I am, is a lower salary

9    than 1B.

10       Q        And is there any difference between the two

11   jobs, 1A and 1B, to make up for the difference in salary?

12       A        Yeah.

13       Q        What are those differences?

14       A        I think it's a nine percent raise.

15       Q        Okay.  So it's a nine percent raise, but is

16   there any difference in the actual work that you have to do?

17       A        It's a bigger building, more responsibility.

18       Q        So a 1B has a bigger building than a 1A?

19       A        Yes.

20       Q        Is there any difference in job

21   responsibilities?

22       A        They do the same work.  It's just the

23   buildings are bigger or smaller.

24       Q        So in essence a 1A and a 1B, from what you're

25   telling me, do the same work, it's just one has more

```
 1    building to deal with?  1B has more building to deal with
 2    than a 1A?
 3         A         Yes.
 4         Q         Are their staffs the same size?
 5         A         The staffs are bigger or smaller.
 6         Q         So 1B has a bigger staff?
 7         A         Yeah.  There would probably be more kids or
 8    less.
 9         Q         And you say you think there's about a nine
10    percent difference in the salary?
11         A         Yes.
12         Q         When you were -- when Mr. Curtis transferred
13    you, you said you got transferred to Shimmell; am I correct?
14         A         Uh-huh.
15         Q         From what I'm hearing you say, though, he
16    transferred everybody, all head custodians; correct?
17         A         Yes.
18         Q         And you moved from Marshall to Shimmell.  Was
19    Shimmell the same size of a school?
20         A         Yes, but all the -- all the black head
21    custodians were promoted to high paying jobs, and the two
22    white head custodians were the only ones promoted to the
23    lower -- stayed at the lower paying jobs.
24         Q         I don't think I quite understand what you're
25    saying there.
```

1    A        Well, Mr. Curtis when he transferred all the
2    head custodians, all the black head custodians were actually
3    put into a higher rank.  They made more money.
4    Q        Okay.  So you're -- all of them -- you're
5    saying all of the black head custodians?
6    A        All the blacks except for the two whites, yes.
7    Q        Okay.  Do you know -- and I'll tell you what
8    I think it would go a lot easier if I pull this out.
9              MR. BAILEY:  Are you going to mark it?
10             MR. LOCHINGER:  Yeah, I think.
11             MR. BAILEY:  I have a copy he can work from.
12             MR. LOCHINGER:  Okay.
13             MR. BAILEY:  Just a second.  Let me pull that
14    out.
15             MR. LOCHINGER:  Yeah, I think we'll mark this.
16             MR. BAILEY:  If you're going to use it, you
17    know.
18             MR. LOCHINGER:  Yeah.
19             MR. BAILEY:  Give me a second to pull this out
20    of here.
21             MR. LOCHINGER:  No problem.  If not, I
22    probably have an extra one here.
23             MR. BAILEY:  Oh, if you have -- okay.  No
24    problem if you've got one.
25             (Memorandum to Head Custodians from Tim Curtis

34

1   dated June 18, 1999 marked as Hazzard Exhibit 1.)

2   BY MR. LOCHINGER:

3        Q        Okay.  The document I gave you, which we'll

4   mark as an exhibit, it's a -- and just to describe it here,

5   it's a memorandum to Head Custodians from Tim Curtis,

6   Facilities Supervisor, and it's dated June 18, 1999, RE:

7   Transferring of Head Custodians.  Is this a memo that you

8   got that transferred you to Shimmell?

9        A        Yeah.

10       Q        All right.  I want to go down this list since

11  you've brought this up, and let's talk about the race of

12  each person here, and if you can recall where they started

13  and where they ended.

14       A        I -- I -- I couldn't really -- I don't -- I --

15  some of them I haven't even met or even know.

16       Q        Okay.  Well, let's -- let's just see -- you

17  know, we can go down these one at a time here, and if you

18  don't recall, you don't recall but --

19               MR. BAILEY:  I -- I think this is on there.

20  Forgive me because I was looking for it.  This is a

21  memorandum to Head Custodians from Tim Curtis, Facilities

22  Supervisor, dated June 18th, 1999, in RE: Transferring of

23  Head Custodians?

24               MR. LOCHINGER:  Yes.

25               MR. BAILEY:  Okay.

```
 1   BY MR. LOCHINGER:
 2       Q        All right.  The first person listed here is
 3   James Matthew.  Do you recall if he's white or black?
 4       A        No.
 5       Q        He went to Downey.  Is Downey a small or a
 6   large school?
 7       A        It's a small school.
 8       Q        Do you know where Mr. Matthew was to start?
 9   It doesn't say on here.  I'm just -- that's why I'm
10   wondering if you remember.
11       A        No.  My other papers had said that -- you
12   know, where they went, who they were and everything, and I
13   don't have that with me.
14       Q        Okay.  So we don't know where he started?
15       A        No.
16       Q        Clyde Dunson.  Do we know if he's white or
17   black, do you know?
18       A        He's black.
19                MR. BAILEY:  Excuse me.  Did you state the
20   race of Mr. Matthew?
21                MR. LOCHINGER:  I think he said he did not
22   know.
23       A        I didn't know.
24                MR. BAILEY:  Okay.
25   BY MR. LOCHINGER:
```

```
 1        Q        Mr. Dunson is black.  He went to Steele.  Is
 2   that a small or a large?
 3        A        That's a small school.  I think he was at Camp
 4   Curtin, which was a big school.
 5        Q        All right.  The next one is Jaclyn Havior.  I
 6   don't know if I'm pronouncing that right, but is she white
 7   or black?
 8        A        She's black.
 9        Q        And she went to?
10        A        Woodward.
11        Q        Woodward.  Is that small or large?
12        A        Small.
13        Q        And do you know where she started?
14        A        No.
15        Q        Okay.  Stanley Holton?
16        A        He's black.
17        Q        Okay.  And he went to Lincoln?
18        A        Yes.
19        Q        Is that large or small?
20        A        That's about the same size as Shimmell.
21        Q        So that would still be classified -- when I
22   say large or small, I guess I'm talking a 1A versus a 1B.
23        A        Yeah.  Yeah, that's a 1A.
24        Q        Okay.  So Lincoln's still a small, or a 1A,
25   job?
```

```
1        A        Yeah.

2        Q        Do you know where Mr. Holton came from?

3        A        He came from maybe a slight bigger school,

4   Foose.

5                 MR. BAILEY:  Foose would be F-o-o-s-e?

6        A        Yeah.

7   BY MR. LOCHINGER:

8        Q        And Foose is -- are you saying that's a 1A

9   school or a 1B school?

10       A        I'm not sure what it is, but I know it's a

11  little bigger.

12       Q        I'm sure we can find all this out.  Valence

13  Barker, white or black?

14       A        He's a Jamaican.

15                MR. BAILEY:  What's the color of his skin, is

16  he -- or his race?

17       A        He's -- I think he's black.

18  BY MR. LOCHINGER:

19       Q        Marshall.  Well, we know that's a small --

20  that's where you -- he moved into your school then,

21  Marshall?

22       A        Yeah.  He came from John Harris to Marshall,

23  from a 1B to a 1A.

24       Q        I was going to say John Harris is a -- is a

25  larger school; right?
```

```
 1          A       Yeah.
 2                  MR. BAILEY:  Did you say Marshall's a 1A?
 3     He's been using this term 1B and 1A.  Is Marshall a 1A?
 4          A       Yes.  Marshall is considered a small school.
 5                  MR. BAILEY:  Okay.
 6     BY MR. LOCHINGER:
 7          Q       Elaine Eden.  Is she white or black?
 8          A       She's black.
 9          Q       And I see here she went from Lincoln to Ben
10     Franklin.
11          A       Yeah.
12          Q       What was that -- is that size to size, do you
13     know?
14          A       Well, Ben Franklin I think is a B because Ben
15     Franklin -- when you clean Ben Franklin, you clean the
16     administration too.  So I think that's a big.
17          Q       Okay.  So Ben Franklin and the administration
18     building are considered one building in a sense?
19          A       Yes.
20          Q       And it's considered a 1B?
21          A       Yes.
22                  MR. BAILEY:  And just so the record is clear,
23     Lincoln was a --
24     BY MR. LOCHINGER:
25          Q       And Lincoln's a small?
```

```
1        A        Yes.

2        Q        So she went from a small to a large?

3        A        Yeah.

4        Q        Next, William Hazzard.  I think we know you;

5    right?

6        A        Yeah.

7        Q        You went from Marshall to Shimmell, and

8    they're both smaller schools; right?

9        A        Yes.

10        Q        Robert Lanier.  He went from Melrose to John

11   Harris.  Well, first of all, is he black or white?

12        A        He's black.

13        Q        Is Melrose a small school?

14        A        Yeah.  He went to a large school.

15        Q        And John Harris is a large one?

16        A        Yeah.

17                 MR. BAILEY:  Try to keep your voice up, Bill.

18        A        Yes.

19   BY MR. LOCHINGER:

20        Q        Three -- four more here.  Dan Rhoads.

21        A        He's white.

22        Q        And he went to Foose, which I think you

23   already said is a small school?

24        A        Yeah.

25        Q        Do you know where he came from?
```

40

```
1      A        Shimmell.

2      Q        So this is the person you took over his

3   position?

4      A        Yeah.

5      Q        At Shimmell.  So it was a small to a small

6   school?

7      A        Yeah.

8      Q        Dwight Adams.  White or black?

9      A        I think he's black.

10     Q        And he went from Steele to Camp Curtin?

11     A        Yeah.

12     Q        Steele is small?

13     A        Small.

14     Q        And Camp Curtin is small or large?

15     A        Large.

16     Q        Robert McMurray?

17     A        He went from Hamilton to --

18     Q        Right.  He went to Hamilton?

19     A        Yeah.  William Penn to Hamilton.

20     Q        And William Penn -- if I recall from

21  yesterday, William Penn is large --

22     A        Large.

23     Q        -- and Hamilton is small; is that right?

24     A        Small, right.

25     Q        And Mr. McMurray is black; correct?
```

```
 1          A        Yes.

 2          Q        All right.  Raymond -- the last one.  Raymond

 3   Washington.  Is he white or black?

 4          A        He's black.

 5          Q        And I can't quite read that.  He -- where did

 6   he -- he went from somewhere?

 7          A        Woodward.

 8          Q        Woodward?

 9          A        A little school to a big school.

10          Q        So he went from Woodward, a small school, to

11   William Penn --

12          A        Yeah.

13          Q        -- a large.  Okay.

14          MR. BAILEY:  That's going to be Hazzard 1?

15          MR. LOCHINGER:  Yeah.  I'll have to give you

16   one that I didn't write on.

17          MR. BAILEY:  I have a copy here.  Well, you

18   know what --

19          MR. LOCHINGER:  No, not -- just for the

20   stenographer.

21          MR. BAILEY:  I have one that's partially been

22   -- I don't know if that's the copy everybody else has.

23          MR. LOCHINGER:  I guess we can use that then.

24          MR. BAILEY:  No.  That's the one I have.  I'll

25   make a copy for me as long as I know what number -- what it
```

1    Q       How long did you work at Shimmell as a head

2    custodian?

3    A       From the time that I was transferred till now.

4    Q       So you're still there now?

5    A       Yeah.

6    Q       The grievance that was filed, what happened to

7    it?

8    A       They made an agreement I guess with the union

9    that the head custodians that were B that went to a small

10   building they didn't lose nothing.

11   Q       So you're saying the ones that were at a large

12   building that went to a smaller building stayed at the same

13   rate of pay as if they were at a large building?

14   A       Yeah.

15   Q       Okay.  And that was -- and that essentially

16   ended the grievance?

17   A       Yeah.

18   Q       So the assignments that were made stayed in

19   effect?

20   A       Yeah.

21   Q       Okay.  At Shimmell, who's your -- who's been

22   your supervisor at Shimmell?

23   A       Just this summer started Dr. Jones.

24   Q       When you first went there in June of '99, was

25   Mr. Curtis still acting as your supervisor at the time?

1    custodian job at Rowland School; correct?

2        A        Yes, sir.

3        Q        And Rowland is a large school?

4        A        Yes, sir.

5        Q        So could you explain to me how you applied for

6    this job?

7        A        Okay.  When I was out at Shimmell School --

8        Q        Uh-huh?

9        A        -- Ms. Anderson told me that she was being

10   transferred to the Rowland building.  And I really enjoyed

11   -- I had a good relationship with her in working, so I

12   said, well, I would like to transfer over there.  So she

13   said, well, put a bid in on the head custodian job over

14   there.  So she typed it up for me, and I signed it and sent

15   it in.

16       Q        So Ms. Antonsen actually typed up your -- your

17   formal bid --

18       A        Yeah.

19       Q        -- for the job?  Had you actually seen a

20   posting for the job at that point in time?

21       A        Not at that time.

22       Q        So you put your bid in before you actually saw

23   a posting?

24       A        Yeah.

25       Q        You were going on the fact that Ms. Antonsen

1    there at Marshall School, Mr. Brown, a board member, asked

2    Mr. Freeman the same question, and Mr. Freeman said the man

3    with the most senior time got the job.

4         Q         In the district?

5         A         In the district.

6         Q         Not just for the job?

7         A         In the district everywhere.

8         Q         Okay.  Paragraph 15.  It says in 1999 you

9    filed a grievance with AFSCME against the district.  How did

10   you start the grievance procedure in this case?

11        A         Which grievance was that?

12        Q         This is your grievance that you did not get

13   the Rowland job.

14        A         Oh.  I went to Steve McCollum, and I talked it

15   over with him, you know, and he told me according to the

16   contract that I should have that job and I should put a

17   grievance in on it and at least get a response from

18   Mr. Freeman.

19        Q         And then who wrote up -- did somebody actually

20   write up the grievance then?

21        A         Yeah.

22        Q         Who did that?

23        A         I'm not sure if it was Mr. Epps or McCollum.

24        Q         Do you get to look at it before it goes out?

25        A         Yeah.

1    A        Yeah.

2    Q        Okay.  Can you just give us a brief

3    description of what happened at this meeting?

4    A        Yes.  Nichelle Crevis spoke to Mr. Freeman and

5    asked him why Hazzard was overlooked in this promotion, and

6    his response was there was no opening, it was just a

7    transfer, Mr. McMurray was transferred from William Penn to

8    the Rowland building.

9    Q        Was there any response to that, did anybody

10   respond to Mr. Freeman?

11   A        Yes.  Mr. Tapper said, well, Mr. Hazzard's the

12   most senior man, and the job was put out on bid or wasn't

13   it.  He said, yes, it was put out on bid but it was -- it

14   was an accident.

15   Q        Mr. Freeman said that it was put out on bid,

16   but it was an accident?

17   A        Yeah.

18   Q        And did he explain at all what this -- what

19   the accident was?

20   A        No.  It was just an accident, and they weren't

21   going that way.  They -- first he explained that there was a

22   decision made on management level that -- that that was

23   already made that they was going to do it that way and

24   transfer them over.

25   Q        You said it was already made.  You mean it was

1    made prior to the bid being put out?

2        A          Management deserves or has the right on

3    certain circumstances to make decisions concerning the work

4    load and they used that for the reason why they or how they

5    transferred him.

6        Q          Okay.  So they said that the bid was put out

7    -- it was an accident that the bid was put out?

8        A          Yeah.

9        Q          And there was no real explanation as to what

10   the accident was?

11       A          No.

12       Q          Or how it occurred?

13       A          No.

14       Q          What else happened at this meeting?

15       A          That was it.  They just talked about how it

16   was brought out and how it wasn't -- and I wasn't getting

17   the job, and that was it.

18       Q          How long did the meeting last?

19       A          It probably only lasted maybe about maybe a

20   half-hour.

21       Q          Okay.  And this meeting -- just to clarify my

22   own mind, this was actually in response to your grievance;

23   correct?

24       A          Yes.

25       Q          So the grievance -- Mr. Freeman had notice of

1  had with Mr. Curtis and Mr. Freeman, was that considered the

2  first step of the grievance procedure?

3     A      Yeah.

4     Q      And that was really a meeting?

5     A      Concerning Tim Curtis.

6     Q      With Mr. Curtis?

7     A      Yes.

8     Q      So he was really the decision maker in that

9  first meeting?

10    A      Yeah.

11    Q      But according to you, Mr. Freeman did most --

12    A      Of the talking.

13    Q      -- of the talking?

14    A      Yeah.

15    Q      So that -- now you're saying the grievance is

16 moved to Step 2, which is to Mr. Freeman?

17    A      Yeah.

18    Q      Does the grievance go -- is there a decision

19 rendered at Step 2?

20    A      I think his decision was we made our decision,

21 you know, no prejudice against you in any way, but we just

22 made a management level decision.

23    Q      In either of these first two steps of the

24 grievance procedure did you ever bring up race as an issue?

25    A      No.

1    Q        All right.  I think we had a partial list of

2    that before but let's -- you know, please, I want to hear

3    what your -- I want to know why you think that people are

4    basing this decision on your race, so if you've got a list

5    of things that point to that let me know.

6    A        Okay.  My brother-in-law passed away, and I

7    went to Tim Curtis and asked him for the time off, and he

8    denied me, and then I opened up the union book and said,

9    well, it says if your brother-in-law is living in your

10   house.  He said, I have that in my book, but I've made my

11   decision, and this is what Mr. Freeman wants, and this is

12   what we're going to do.  So I had to go through a grievance

13   procedure to get that time granted to me that I could be off

14   for the five days.

15          Now, eight months go by and Tim Curtis comes

16   after me again and says -- after he okayed my time off he

17   comes after me again, brings up my brother-in-law, has me in

18   tears crying, you know, because my brother-in-law died and

19   rehearsing all this all over again and I'm trying to put it

20   behind me because I miss by brother-in-law, and he's

21   bringing this up again.

22   Q        Let me -- let me ask you this question: when

23   did this occur?  Was this -- you know, at the time we're

24   talking about here, was this at the time your grievance was

25   withdrawn or was this after that or --

1     Q        Is that all right?

2     A        That's all right.

3     Q        Okay.  We were talking about the job -- the

4  posting of this job at the Rowland School earlier and you

5  remember that we were talking about that, obviously?

6     A        Yes.

7     Q        Okay.  I'm going to show you -- and we can

8  mark this.  I don't know what we're up to.  Okay.  I'm going

9  to show you -- we're going to mark this as Hazzard 7.  Is

10 that the job posting that was posted in July of 1999, as you

11 recall?

12    A        Yeah.

13             MR. FINK:  Okay.  And, for the record, this is

14 headed at the top Employment Opportunities, Page 4, and it's

15 dated July 8th, 1999, and it contains a couple of items, but

16 the first item is Position of Faculty Service Foreman 1B,

17 and it's described as being at the new Rowland building.

18             MR. BAILEY:  That would be Hazzard 7?

19             MR. FINK:  This will be Number 7, I believe.

20 Okay.  I just wanted to clear that up.

21             (Position Guide for Facility Service Foreman

22 1B, formerly Head Custodian I-Major, marked as Hazzard

23 Exhibit 7.)

24 BY MR. FINK:

25    Q        Now -- so this was posted -- at least the date

1    on it was July 8th.  And does that accord with your

2    recollection, was it sometime in early July that you learned

3    of this posting?

4        A        Yes, sir.

5        Q        Okay.  So you had already put in your request

6    for the Rowland building before this was posted; is that

7    right?

8        A        Yes.

9        Q        Okay.  And you did that by your memo, and I

10   believe that was introduced already.

11               MR. BAILEY:  Hazzard 2.

12   BY MR. FINK:

13       Q        As Hazzard 2.  So you did that on June 25th;

14   is that right?

15       A        Yes.

16       Q        Okay.  So at the time that you submitted this

17   memo, there was no actual posting yet; is that right?

18       A        Yes.

19       Q        Okay.  And this may not matter very much, but

20   it's my understanding that within the school district I've

21   -- I've been told that there is a special form that people

22   sometimes call a bid sheet that people usually use when

23   they're bidding on a job.  Are you familiar with that form?

24       A        Uh-huh.

25       Q        Okay.  And in this case you didn't use the

1    explanation for those asterisks, is there not?

2       A        Yeah.

3       Q        Okay.  And on -- in this explanation we see

4    that Facility Service Worker 1 -- it says formerly -- excuse

5    me -- Facility Services Foreman 1A.  It says formerly Head

6    Custodian Minor.  Do you see that?

7       A        Yeah.

8       Q        Okay.  And Facility Service Foreman 1B, it

9    says formerly Head Custodian Major; is that right?

10      A        Yes.

11      Q        Okay.  So do I understand then that these job

12    titles changed, that the 1A position used to be called Head

13    Custodian Minor?

14      A        It was just Head Custodian.

15      Q        Okay.  So 1A and 1B, they were previously

16    called Head Custodian?

17      A        Yeah.

18      Q        And then the distinction -- what used -- the

19    distinction between A and B used to be called the

20    distinction between Minor and Major.  Would that be right?

21      A        Tim Curtis brought that in, yes.

22      Q        Okay.  The distinction between Minor and

23    Major, Tim Curtis brought that in?

24      A        Yes.

25      Q        And the distinction between Minor and Major,

164

1    does that coincide with what we've been talking about about

2    the size of the building?

3         A       Yes.

4         Q       So there's -- buildings above a certain size

5    are classed as Major?

6         A       Uh-huh.

7         Q       And buildings below a certain size are classed

8    as Minor?

9         A       Yes.

10        Q       Okay.  You don't know what that -- what the

11   size cutoff is, do you?

12        A       No, I don't.

13        Q       Okay.  Okay.  That's fine.  So if I use the

14   term Minor, that would be the equivalent to 1A.  Would that

15   be accurate?

16        A       Yes, sir.

17        Q       Okay.  And if I use the term Major, that would

18   be equivalent to 1B?

19        A       Yes, sir.

20        Q       Okay.  Good.  Let's mark this I guess it will

21   be 9.  Do you recognize that?  Do you know what that

22   document is?

23        A       Report to school principal.

24        Q       Have you ever seen that before?

25        A       Yeah.

```
1        Q        Okay.  Then if you look at Number 10, there's
2    a list of major schools; is that right?
3        A        Administration, Camp Curtin, William Penn and
4    John Harris.
5        Q        Okay.  And do you agree that all of those are
6    considered major buildings?
7        A        Yes.
8        Q        Okay.  And in 1999 were all of those
9    considered major buildings?
10       A        Yes.
11       Q        Okay.  Now, one of the things that you didn't
12   mention is Rowland.  Is that because Rowland was -- strike
13   that.  Rowland is not included on either of those lists, is
14   that right, on these documents?
15       A        No.
16       Q        Okay.  But you said before -- you agree that
17   Rowland is in the major category; is that right?
18       A        Yeah.
19       Q        Okay.  So that the custodian who would be
20   assigned as head custodian for Rowland, that would be a 1B
21   job; is that right?
22       A        Yes.
23       Q        Okay.  Now, Rowland opened when?
24       A        I'm not sure of the exact date.
25       Q        Was it -- at the time that you put in your job
```

1      Q        Okay.  And some of the people who were

2   transferred were transferred from large -- from major

3   schools, 1B schools, to minor schools, 1A schools; is that

4   right?

5      A        Yes.

6      Q        And the school district cut their pay by the

7   50 cents an hour, is that what they did?

8      A        They participated I think and filed that

9   grievance that that's the procedure that's going to take

10  place and if that is then they can't do it, they can't

11  transfer them or else they have to give them the money.

12     Q        Okay.  So the goal of the grievance was either

13  don't transfer the people or don't cut their pay?

14     A        Yes.

15     Q        And do you know whether -- was there any

16  result -- was this grievance resolved?

17     A        Yeah.  Everybody liked where they were except

18  me.

19     Q        Okay.  So the transfers were not undone; is

20  that right?

21     A        No.

22     Q        But what about the issue of people's pay being

23  cut, was that settled as a result of this grievance, do you

24  know?

25     A        Their pay wasn't cut.

1    Q        Okay.  So, in fact, nobody lost pay as a
2    result of these transfers; is that right?
3    A        Yeah.
4    Q        Okay.  And that was by an agreement between
5    the union and the school district; is that right?
6    A        Yes.
7             THE VIDEO OPERATOR:  Excuse me.  I have to
8    change the tape.  It's 1332.  We're going to go off-line
9    right now.
10            (Recess.)
11            THE VIDEO OPERATOR:  Okay.  It's 1339, and
12   we're back on record.
13            MR. FINK:  Okay.  Tell me what was the last
14   thing I said before we went off.
15            (Question read.)
16   BY MR. FINK:
17   Q        Oh, all right.  When you got transferred from
18   -- you were -- I've forgotten.  You were originally at
19   Marshall?
20   A        Yeah.
21   Q        Okay.  When you got transferred from Marshall
22   to Shimmell, you didn't get any pay cut in that transfer,
23   did you?
24   A        It was the same level.
25   Q        Okay.  So those were both -- and those are

1      A        -- dealt with it and then left.

2      Q        Okay.  Okay.  Since you've left from Marshall

3  -- after you got transferred from Marshall to Shimmell, one

4  grievance that you filed was over the fact that you did not

5  get the job at Rowland School; is that right?

6      A        Yes, sir.

7      Q        Okay.  Have you filed -- and then you were one

8  of the people in the class action grievance over the mass

9  transfer; is that right?

10     A        Yeah.

11     Q        I mean, it included you and all the other

12  heads; is that right?

13     A        Yeah.

14     Q        Okay.  Besides those grievances, since you've

15  left Marshall have you filed or tried to file or asked to

16  file any other grievances with AFSCME?

17     A        I've filed a grievance against Tim Curtis.

18     Q        Okay.  And when was that?

19     A        I'm not sure what date it was.  I have a

20  form.  I think he couldn't find it when he asked me that

21  question.

22     Q        Okay.  What was that grievance about?

23     A        I felt that he was intimidating me and

24  harassing me because I tried to show him the contract, you

25  know, during the bereavement situation and he didn't want to

1    he does.  She said, you don't put your vacation in, that's

2    bereavement time.  So she changed it to bereavement time.

3         Q        And who is she, what's her -- what's her

4    title, do you know?

5         A        She was at that time working in payroll.

6         Q        Okay.  She was like a clerical person up

7    there?

8         A        Yeah.

9         Q        Okay.  So, in fact, in the fall of '99 your

10   time went in as bereavement time; is that right?

11        A        Yeah.

12        Q        And then -- so then I guess you said sometime

13   several months later Mr. Curtis came back to you about this?

14        A        Yeah, and asked me for them same vacation

15   days.

16        Q        Okay.  And do you remember when was it that

17   Mr. Curtis -- oh, actually before we get to that -- so in

18   the fall of '99 did you have to go to the union to get your

19   bereavement time or did you not get the union involved then?

20        A        I got the union involved.

21        Q        In the fall of '99?

22        A        Yeah.

23        Q        And who did you go to from the union at that

24   time?

25        A        Steve McCollum.

201

```
1        Q        Okay.  And Steve McCollum was -- he was a
2   union steward; is that right?
3        A        Yes.
4        Q        Okay.  And why did you pick Mr. McCollum in
5   particular to go to?
6        A        Because he was white.  He was the only one
7   that wanted to represent me.
8        Q        Okay.  So you went to Mr. McCollum, and what
9   did you ask him to do?
10       A        I told him my brother-in-law died, and he
11  lives with me, and I can prove it.
12       Q        Okay.
13       A        And Tim Curtis refuses even -- or even refuses
14  to give me the time.
15       Q        And what did you ask Mr. McCollum to do for
16  you?
17       A        Well, he said right aways pull the book open,
18  let's read it.  He said, yes, you're entitled to the time,
19  so we'll file a grievance.
20       Q        Okay.  And did you file an actual grievance at
21  that time?
22       A        Yes, I did.
23       Q        Okay.  And what was the result of that
24  grievance?
25       A        The first time?
```

202

```
 1        Q        Yes.

 2        A        They gave -- they -- Tim Curtis signed --

 3        Q        Yes.

 4        A        -- for me to get the bereavement time.  He

 5   signed it.

 6        Q        Okay.  So --

 7        A        And then --

 8        Q        I'm sorry -- I'm sorry to interrupt, but this

 9   is in the fall of '99?

10        A        Yeah.

11        Q        Okay.  And Mr. Curtis signed on -- he settled

12   the grievance?

13        A        Yeah.

14        Q        Okay.  And he agreed that you were entitled to

15   the bereavement?

16        A        Yes, and then he came back eight months later

17   and asked me for that same vacation time for that

18   bereavement.  He said I owe it to him.

19        Q        Okay.

20        A        So I filed an intimidation and harassment

21   grievance on him.

22        Q        Before we get to that -- so you went to

23   Mr. McCollum, and Mr. McCollum helped you file a grievance?

24        A        Yes.

25        Q        And did you talk to anybody else from the
```

203

| | | |
|---|---|---|
| 1 | | union at that time about the bereavement issue? |
| 2 | A | Yes; Rob Tapper. |
| 3 | Q | Okay.  And Mr. Tapper was also a steward? |
| 4 | A | He's like vice principal. |
| 5 | Q | Vice principal or vice-president? |
| 6 | A | I mean vice-president. |
| 7 | Q | Yeah, he wouldn't be vice principal.  He would |
| 8 | | be -- |
| 9 | A | No, vice-president. |
| 10 | Q | He's vice-president of the local; is that |
| 11 | | right? |
| 12 | A | Yes. |
| 13 | Q | Okay.  And you spoke to him also? |
| 14 | A | Yes. |
| 15 | Q | And why did you speak to Mr. Tapper as well as |
| 16 | | Mr. McCollum? |
| 17 | A | Because they were both white. |
| 18 | Q | Okay.  And why did that matter? |
| 19 | A | Because I went to Terry Mathis, he's black, |
| 20 | | and I told him about my grievance that I wanted to file, and |
| 21 | | he said it doesn't look like a grievance. |
| 22 | Q | Was this about the bereavement? |
| 23 | A | No. |
| 24 | Q | What was that about? |
| 25 | A | That was about the bid on the job. |

204

1    Q        The Rowland School?

2    A        Yeah.  So I couldn't -- you know, everybody

3    was going behind my back, whispering that I'm a racist, you

4    know, and trying to get this Rowland job and all that, and I

5    just was getting tired of hearing it.

6    Q        So because Mr. Mathis told you that the

7    Rowland situation didn't sound like a grievance --

8    A        Yes.

9    Q        -- for that reason you decided you would go to

10   white people to take care of the bereavement grievance?

11   A        Yes.

12   Q        Okay.  And Mr. Mathis, I assume, is black?

13   A        Yes.

14   Q        Yeah.  Okay.  I think you said that but I just

15   didn't -- wasn't sure.  Okay.  So besides Mr. Tapper and

16   Mr. McCollum on the bereavement grievance, did you talk to

17   anybody else from AFSCME about the bereavement grievance?

18   A        It was brought to Nichelle Chivis' --

19   Q        Nichelle Chivis, yeah.

20   A        -- attention.

21   Q        Okay.  Who brought it to her attention, do you

22   know?

23   A        I think it was Rob Tapper.

24   Q        Okay.  And did she have any response, or did

25   she have any involvement in it?

1    sneaking around in my building, yelling at me, saying things

2    he shouldn't say.

3         Q         Did he give -- did he offer you any other

4    explanation for why he was bringing this up again?

5         A         No, he didn't.

6         Q         Okay.  He just said I've been looking through

7    these records and I see that you had bereavement time and

8    you weren't entitled to it, something like that?

9         A         Yeah.  I'm like, well, you signed it.

10        Q         Okay.  And after you -- did you show him that

11   he had signed off on the grievance?

12        A         No.  I just -- he just argued -- kept arguing

13   with me on the phone so I left him go and filed a grievance.

14        Q         Okay.  So then you filed another grievance; is

15   that right?

16        A         Yes.

17        Q         And how did you file that grievance?

18        A         Through the union.

19        Q         Okay.  And did you do that with the assistance

20   of a union steward?

21        A         Yes.

22        Q         Which steward?

23        A         Steve McCollum.

24        Q         Okay.  And besides Mr. McCollum, did anybody

25   else from AFSCME get involved with this grievance, the

1    second bereavement grievance?

2         A         Mr. Tapper was involved in it, too.

3         Q         Mr. McCollum and Mr. Tapper?

4         A         Yes.

5         Q         And besides Mr. McCollum and Mr. Tapper,

6    anyone else from AFSCME get involved in the second

7    bereavement grievance?

8         A         No.  They kind of straightened it out then.

9         Q         They took care of it all.  Okay.  I'm going to

10   mark this next -- what are we up to?  Okay.  Hazzard 12.

11   I'll ask you to look at that, and tell me if you recognize

12   that document?

13              MR. BAILEY:  Let me see it again.  I've got

14   things missing.

15              MR. FINK:  Okay.  This is Grievance

16   Number 118.

17              MR. BAILEY:  All right.

18              MR. FINK:  This was also in the documents --

19   in the packet of documents that I got from you.

20              MR. BAILEY:  Okay.

21        A         Yeah.

22   BY MR. FINK:

23        Q         Okay.  Yes, you recognize it?

24        A         Yeah.

25        Q         Okay.  And is that the grievance that you

209

1    filed -- what I've called the second bereavement grievance?

2    Is this the -- let me ask it a different way.  Is this the

3    grievance you filed after Mr. Curtis came back to you a

4    second time and told you you weren't entitled to that

5    bereavement time?

6        A         Yeah.

7        Q         Okay.  And this grievance was filed when?

8        A         6/7/00.

9        Q         Okay.  So that would be June 7th of 2000?

10       A         Yes.

11               MR. FINK:  Why don't we put the sticker on it

12   before we lose track.  I'm paranoid.

13               (Grievance Form dated 6/7/00 marked as Hazzard

14   Exhibit 12.)

15   BY MR. FINK:

16       Q         And in the bottom over -- where it says

17   employee signature, is that your signature?

18       A         Yes, it is.

19       Q         Okay.  Where it says steward signature, is

20   there a signature there?

21       A         Mr. Epps.

22       Q         Okay.  Mr. Epps.  And Mr. Epps is an AFSCME

23   steward; is that right?

24       A         Yes, sir.

25       Q         Okay.  And Mr. Epps, is he black or white?

1          A          He's black.

2          Q          Okay.  So Mr. Epps signed your grievance, what

3     we're calling the second bereavement grievance; is that

4     right?

5          A          Yeah.

6          Q          Okay.  So how did he -- how did he come about

7     to sign it, did you ask him to sign it?

8          A          I was over at Lincoln School seeing

9     Mr. McCollum about it.  Mr. McCollum's response was I have a

10    lot of grievances to take care of now, and then Mr. Epps

11    said, well, I'll take care of it.

12         Q          So Mr. Epps volunteered to help you with your

13    grievance?

14         A          Yes.

15              MR. BAILEY:  Incidently, that particular

16    grievance is not in the stuff that I provided.  I'm not sure

17    where you got some of that, but I'll get a copy when we're

18    done.  It's no problem.

19              MR. FINK:  Okay.  Okay.

20    BY MR. FINK:

21         Q          Mr. Epps volunteered to help you with the

22    grievance?

23         A          Yes.

24         Q          Okay.  And then you and he wrote up this

25    grievance --

```
1      A       Yes.

2      Q       -- about Mr. Curtis?

3      A       Yes.

4      Q       Okay.  Was there a result to this grievance?

5      A       I don't think so.

6      Q       Okay.

7              MR. BAILEY:  What's the number on the last

8      one?

9              MR. LOCHINGER:  12.

10             MR. BAILEY:  I owe you an apology, Mr. Fink.

11     I found it.

12             MR. FINK:  There we go.  Okay.  I knew it came

13     from somewhere.

14             MR. BAILEY:  I apologize to you.  It's my

15     error.

16     BY MR. FINK:

17     Q       Did you -- do you know -- were you ever

18     required to give back the bereavement time?

19     A       He asked me to on the phone --

20     Q       Who's he?

21     A       Tim Curtis.

22     Q       Uh-huh?

23     A       Asked me on the phone to put in for my

24     vacation time to cover the bereavement days.

25     Q       Uh-huh.  And did you do that?
```

1    A        No, I didn't.

2    Q        Okay.  And did you ever do that?

3    A        I did it the first time when I saw him in the

4 hall.  He told me I had to and I couldn't -- I didn't have

5 the book, contract with me or nothing.  He said I can't have

6 it, he's going to deny me.  He said fill the vacation slip

7 out.

8    Q        This was -- I'm sorry to interrupt.  This was

9 back in October?

10    A        Yeah.

11    Q        Okay.  Go on.

12    A        So I filled the vacation out.  And then when I

13 went up to Sharon and was telling her, you know, what

14 happened and everything, she said, no, this is the wrong --

15 this is the wrong form, you're entitled to five days.

16    Q        So she put in bereavement time and not

17 vacation time?

18    A        Yes.

19    Q        Okay.  And then after that it never got

20 changed back from bereavement time back to vacation time,

21 did it?

22    A        No.

23    Q        Okay.  So -- okay.  I'm going to mark this

24 one.  I guess that will be Hazzard 13.  And this is a letter

25 dated February 6th.  It's signed by Nichelle Chivis, and

1   it's addressed to Lance Freeman.  Have you ever seen this

2   letter before?

3           MR. BAILEY:  Well, that one I know -- we have

4   a February 2nd letter.

5       A       I think I did, yes.

6           MR. BAILEY:  Let me see that one, Bill,

7   please.  Oh, go ahead.

8           MR. FINK:  Okay.  And one more -- I guess --

9   well, let's sticker this one first so I know where we are.

10  Let's do this one, too.  Okay.

11          (Letter to Mr. Freeman from Nichelle Chivis

12  dated February 6, 2001 marked as Hazzard Exhibit 13.)

13          (Letter to Mr. Hazzard from Nichelle Chivis

14  dated February 20, 2001 marked as Hazzard Exhibit 14.)

15  BY MR. FINK:

16      Q       I'll show you now what's been marked as

17  Hazzard Exhibit 14.  This is a letter dated February 20th

18  from Nichelle Chivis to William Hazzard.  Have you seen this

19  one before?

20      A       No.

21      Q       Okay.  You see that the letter is addressed to

22  you?

23      A       Yeah.

24      Q       Okay.  But you don't think you ever got it?

25      A       There was a letter like that but not worded

214

1    like that.

2         Q        Okay.  When you say a letter like that, like

3    it how?

4         A        It went this is to notify you that there -- we

5    went over your grievance and we determined that there is no

6    merit to your grievance and it was being dropped.

7         Q        Okay.  That was for the -- that was for the

8    Rowland School grievance; right?

9         A        Yes.

10        Q        Okay.  This -- on this letter that's marked as

11   Exhibit 14, do you see where it says RE, and then it says

12   grievance and it has a number; right?

13        A        Yeah.

14        Q        Okay.  What grievance number does that refer

15   to?  Just read it out.

16        A        The grievance number?

17        Q        Uh-huh.

18        A        90-2063-0118.

19        Q        Okay.  Now, just to interpret these, the

20   grievance numbers, the first two digits are 90?

21        A        Yeah.

22        Q        And if I represent to you that that means that

23   this is from AFSCME District Council 90, does that sound

24   right to you?

25        A        I guess, yeah.

215

```
 1        Q        And then the next 4 letters -- 4 numbers are
 2   2063.  That's the local number; is that right?
 3        A        2063, yeah.
 4        Q        That's -- your union is AFSCME Local 2063; is
 5   that right?
 6        A        Yeah.
 7        Q        And then the last 4 digits are 0118; is that
 8   right?
 9        A        Yeah.
10        Q        Okay.  This grievance -- the second -- what
11   I've called the second bereavement grievance, does this one
12   have a number as well?
13                 MR. BAILEY:  What's the number on the February
14   20th?
15                 MR. FINK:  February 20th --
16                 MR. BAILEY:  Hazzard what?
17                 MR. FINK:  118.
18                 MR. BAILEY:  I know.  Hazzard what?
19                 MR. FINK:  Oh, Hazzard 14.
20        A        Okay.  It's 0018, yeah
21                 MR. BAILEY:  I have a copy of Hazzard 14,
22   Bill.
23   BY MR. FINK:
24        Q        So this is -- so this grievance is Grievance
25   Number 118; is that right?
```

1      A          Yeah.

2      Q          The second bereavement grievance?

3      A          Yeah.

4      Q          And that -- and this letter, this is about the

5  same grievance, Number 118 --

6      A          Yes.

7      Q          -- right?

8      A          They took care of it, yeah.

9      Q          Okay.  So this letter says that the grievance

10  has been resolved; right?

11     A          Yeah.

12     Q          Do you remember now getting this letter?

13     A          Yeah.

14     Q          Okay.  So -- and when you got the letter from

15  Nichelle, the one that's marked as Exhibit 14, there was a

16  copy of Exhibit 13 in there with it, wasn't there?

17     A          What was that?

18     Q          The letter from Ms. Chivis to Mr. Freeman.

19  Did she provide a copy of that letter to you?

20     A          Yeah.  I think I read that, yeah.

21     Q          Yeah.  And the one that's marked as

22  Exhibit 13, do you think -- let me ask it this way: on

23  Exhibit 14 it says enclosed is a copy of the signed

24  settlement.  Do you remember this February 6th letter being

25  enclosed with this February 20th letter when you got it?

```
 1        A        I'm not sure if they came separately or
 2   together.
 3        Q        Okay.
 4        A        I'm not sure.
 5        Q        But you got both of them?
 6        A        I think so.
 7        Q        Okay.
 8        A        Yeah.
 9        Q        Okay.  So based on this, would you agree that
10   your grievance over the bereavement leave that was settled
11   in your favor; is that right?
12        A        Yes.
13        Q        Okay.  Okay.
14             MR. BAILEY:  Let me see that.
15        A        It took eight months, but it was, yeah.
16             MR. FINK:  Which do you want, 13, 14?
17             MR. BAILEY:  Hazzard 13.  We have 14.  We do
18   not have 13.
19             MR. FINK:  I got them altogether in the same
20   --
21             MR. BAILEY:  All right.  I'll have to get a
22   copy later.
23             MR. FINK:  Yeah.  She'll give us all copies.
24   BY MR. FINK:
25        Q        So it took awhile, but it was eventually
```

1    resolved; right?

2        A        Yes.

3        Q        Okay.  And it was resolved in your favor?

4        A        Yeah.

5        Q        Okay.  And Mr. Epps participated in that

6    grievance; is that right?

7        A        Uh-huh.

8        Q        And Ms. Chivis participated in that grievance

9    at some point; is that right?

10       A        Yes.

11       Q        And Mr. Epps and Mr. Chivis, they're both

12   black; is that right?

13       A        Yes.

14       Q        Okay.  Okay.  They never told you you had to

15   withdrawal that grievance, did they?

16       A        No, they didn't.

17       Q        Okay.  They never told you we're not going to

18   handle this grievance for you?

19       A        No.

20       Q        Okay.  Besides the grievances over the

21   bereavement, have there been any other grievances that

22   you've filed or tried to file?

23       A        No.

24       Q        Okay.  So you've never gone to anybody from

25   AFSCME and said, I have a problem, I want to file a

236

1    they were just there as observers?

2        A        Yeah.

3        Q        Okay.  So up to this time -- up to this

4    meeting, nobody from AFSCME told you they wouldn't represent

5    you in this grievance, did they, up to this meeting?

6        A        Yeah.

7        Q        Yeah, you agree with me that nobody --

8        A        Yes.

9        Q        Okay.  Okay.  Again, I don't ask the question

10    in the best way, and it makes it hard for you.  I'm not --

11        A        Yeah.  I don't know what -- I don't know -- I

12    can't remember when the date was she sent me that letter

13    that she wouldn't represent me.

14        Q        Okay.  Eventually something different

15    happened, but up to the point of this meeting everybody who

16    you went to from AFSCME agreed to represent you?

17        A        Yeah.

18        Q        And Ms. Chivis at this meeting represented you

19    and spoke in your behalf?

20        A        Yes.

21        Q        Okay.  At that meeting do you remember

22    Ms. Chivis making any suggestion on how to settle or how to

23    resolve your grievance?

24        A        I think she said, well, maybe Mr. Hazzard

25    would settle for some kind of a -- like maybe a pay

1    adjustment or something.

2        Q        Okay.  Did she propose -- do you remember that

3    she proposed that you get paid as a 1B instead of as a 1A,

4    do you remember her proposing that?

5        A        No.  I didn't hear that.

6        Q        Okay.  But you do remember that she proposed

7    somehow that you get some pay difference to settle this

8    grievance?

9        A        Yes, and Freeman was quick to answer.

10       Q        And what was his answer?

11       A        No, the job was not open to bid.

12       Q        Okay.  So Freeman rejected that?

13       A        Yes, completely.

14       Q        Okay.  After that meeting what happened next

15   as far as you remember with your grievance?

16       A        Sometime later I got a letter in the mail from

17   Nichelle Crevis.

18       Q        Okay.  And what did that letter say?

19       A        It said that he was dropping my grievance

20   because it had no merit.

21               MR. FINK:  Okay.  And we'll mark this 15.

22               MR. BAILEY:  I hate to interfere with proper

23   procedure, but would you identify them before --

24               MR. FINK:  Sure.

25               MR. BAILEY:  -- so I can get an idea?  This is

*Exh 1*

## Memorandum

**To:** Head Custodians

**From:** Tim Curtis, Facilities Supervisor

**Date:** June 18, 1999

**RE:** Transferring of Head Custodians

Effective June 28, 1999 the following transfers listed below will occur. These transfers are being done to restructure our custodial staff. These transfers have nothing to do with current job performance nor is it to be taken in a negative aspect. The head custodian duties will remain the same; the only thing that will change is location. I believe that we have the appropriate personnel that can adapt to this change and meet these new challenges head on. The head custodians need more of a change and a challenge, so look at this transfer as a challenge. Some of you that will be transferring will be transferring to renovated schools and summer school programs. With this will come even more additional duties put upon you. So I challenge you to look at this transfer as a positive outlook and move forward in making this school district the best school district possible.

| | |
|---|---|
| James Matthew | Downey |
| Clyde Dunson | Steele |
| Jaclyn Havior | Woodward |
| Stanley Holton | Lincoln |
| Valence Barker | Marshall |
| Elaine Eden *FROM LINCOL TO* | Ben Franklin *~ Scott* |
| *w* William Hazzard | Shimmell |
| Robert Lanier *MELROSE TO* | John Harris |
| *w* Dan Rhoads | Foose |
| Dwight Adams *STEELE TO* | Camp Curtain |
| Robert Mcmurray | Hamilton |
| Raymond Washington *WW TO* | William Penn |

**CC:** Brenda Connor
      Personnel

**EXHIBIT**
Hazzard-1
tu      10-1901

Exh 2

June 25, 1999

TO:        Mr. Lance Freeman
FROM:    Mr. William A. Hazzard, Head Custodian
RE:        Bid for Head Custodian at Rowland Int. School

Please consider this memorandum as a bid request for the Head Custodian position at Rowland Intermediate School.

I have worked for the District for 30 years.  I was the Head Custodian at Marshall Elementary for 7 years.  I am now the Head Custodian at Shimmell.

Thank you.

EXHIBIT

Hazzard-2

_Lah_    10-19-01



**COUNCIL 13**
**AMERICAN FEDERATION OF STATE, COUNTY**
**AND MUNICIPAL EMPLOYEES, AFL-CIO**

Exh 3

RECEIVED
PERSONNEL OFFICE

# GRIEVANCE FORM 99 AUG 12 AM 9:29

*(Type or print information, filling in all blanks.)*

District Council __90__     Local Union __2063__     | 00094 |

Grievant (s) __WILLIAM A. HAZZARD__    Social Security No. __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__

Employer __HBG. SCHOOL DIST.__

Department _____     Job Title __CUSTODIAN__

Supervisor __TIM CURTIS__     Work Location __SHIMMELL__

## VIOLATION

Article # __20__     Section # __7__

### STATEMENT BY GRIEVANT OR UNION

I HAVE WORKED FOR THE HBG. SCHOOL DIST. FOR 31 YEARS, I
AM A HEAD CUSTODIAN AT SHIMMELL BEFORE I WAS TRANSFERED
TO SHIMMELL, I WAS HEAD CUSTODIAN FOR 7 YRS AT MARSHALL
SCHOOL I HAVE PUT IN MY BID FOR THE HEAD CUSTODIAN
POSITION FOR THE NEW ROWLAND BLDG. I AM QUALIFIED FOR
SAID POSITION.

| EXHIBIT |
| Hazzard-3 |
| bh        10-19-01 |

### RELIEF OR REMEDY SOUGHT

IN ACCORDANCE WITH A.F.S.C.M.E. CONTRACT ARTICLE 20 SEC. 7

BASED ON TOTAL SCHOOL DIST. SERVICE WHO BIDS ON THE JOB
AND WHO HAS THE ABILITY WILL BE AWARDED THE JOB.

Steward Signature     Date __8-12-99__   and/or   Employee Signature __William A. Hazzard Sr.__   Date __8-12-99__



Exh 4

## AFSCME®

American Federation of State, County, and Municipal Employees • AFL-CIO

### Dauphin County Pennsylvania Public Employees District Council 9

4031 Executive Park Drive    •    Harrisburg, Pennsylvania 17111-1599    •    717-564-51
FAX 717-564-49

JUDITH HEH
*Council Director*

TYRONE MITCHELL
*President*

TERI FREY
*Vice President*

KATHY MUMMA
*Secretary*

JOYCE CULPEPPER
*Treasurer*

**Executive Board:**
KARLA HODGE
DALE KICHMAN
GERALDINE SHAMMO
JOHN WATERS. JR.

**Trustees:**
TYRAN COBB (2002)
MARTHA MYRICK (2000)
CHARLOTTE SMITH (2001)

LENORA WILBON
*Vice President
Council 13*

March 14, 2000

Lance Freeman, Personnel Director
Harrisburg School District
1201 North Sixth Street
Harrisburg, PA 17102

Re:    AFSCME Grievance #90-2063-0094    William Hazzard

Dear Mr. Freeman:

A review was made of the above grievance by this office and it was determined that no further action will be taken.

Therefore, this grievance will be withdrawn from the grievance procedure.

This withdrawal is made without prejudice or precedent.

Very truly yours,

*M. Nichelle Chivis* jem

M. Nichelle Chivis
Staff Representative

cc:    Council 13 Grievance Department
       Doris Manning
       Robert Epps ✓
       William Hazzard
       File

EXHIBIT

Hazzard-4

lee        10-19-01

6.   THE NAME AND ADDRESS OF THE PERSON WHOM I HAVE SELECTED TO ASSI
     PREPARATION AND FILING OF THIS COMPLAINT IS:

STEVEN T. McCOLLUM

127 N. MAIN ST. MARYSVILLE PA 17053

*Therefore I request that the charge be investigated.*

DATE   4-19-2000 _____    SIGNATURE OF COMPLAINANT: _____

                            SIGNATURE OF PARENT OR GUARDIAN

PARENT/COMMUNITY COMPLAINTS MAY BE FILED IN ANY SCHOOL OFFICE TO BE
                              SUPERINTENDENT
STAFF COMPLAINTS SHOULD BE FILED WITH IMMEDIATE SUPERVISOR

ADMINISTRATORS RECEIVING COMPLAINTS AT FIRST LEVEL MUST PROMPTLY FO
COMPLAINT TO ALL INVOLVED PARTIES AND THE APPROPRIATE HEA OR AFSCME

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

R E S P O N S E · L E V E L   I

HEARING REQUIRED/REQUESTED    YES   (NO)    DATE (IF CONDUCTED)

IN Response to your complaint,
Matter was Already Addressed Au
Responded to. Please see Attachm

_____

April 25, 2000  Facilities Supervisor  _____
DATE            TITLE                   SIGNATURE

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

C O M P L A I N A N T   R E S P O N S E

*I do by signing below indicate that -  (check one)*

_____   I  AM  satisfied with the disposition that has been mad
             complaint or my case.

  X       I  AM NOT satisfied with the disposition that has been
             complaint or my case.  I wish to appeal to th

DATE   4-22-00 _____    William A. Hand Sr. _____
                          SIGNATURE OF COMPLAINANT

C O M P L A I N T      Exh5

APR 18 2000

FACILITIES DEPARTMENT

I, the undersigned, do hereby state:

1. MY NAME __WILLIAM HAZZARD__    PHONE NO. ____

   ADDRESS __1940 BROOKWOOD ST  HBG. PA.__

2. I AM A __HEAD CUSTODIAN__    AT __SHIMMELL__
   <small>PARENT, STUDENT, TEACHER, OTHER</small>        <small>SCHOOL</small>

3. I ACCUSE __MANAGEMENT__, A <small>PARENT, STUDENT, TEACHER,</small>

   AT __ADM. BLDG.__ . OF THE FOLLOWING:
       <small>SCHOOL</small>

   (STATE SPECIFICALLY THE ACTS OR CONDUCT OF WHICH COMPLAINT IS MADE.)

   I AM THE HEAD CUSTODIAN AT SHIMMELL SCHOOL, ON JULY 8, 19__
   THE POSITION FOR A HEAD CUSTODIAN AT THE NEW ROWLAND BLDG
   WAS POSTED. I BIDDED FOR SAID POSITION. I HAVE 31 YEARS O__
   SERVICE WITH THE HBG. SCHOOL DIST. WHICH MAKES ME THE
   MOST SENIOR QUALIFIED PERSON FOR SAID POSITION. I WOU__
   LIKE TO KNOW WHY I WAS NOT AWARDED THE HEAD CUSTODIA__
   POSITION AT THE NEW ROWLAND BLDG.

4. THE ACTS OR CONDUCT OF WHICH I COMPLAIN OCCURRED ON OR ABOUT

   __AUG. 99__    AT __ADM. BLDG.__
       <small>DATE</small>              <small>PLACE</small>

5. THE NAMES AND ADDRESSES OF WITNESSES, IF ANY, OF THE ACTS OR CONDUCT OF WHICH
   COMPLAINT IS MADE.

   (1) _____    (3) _____

   _____    _____

   _____    _____

   (2) _____    (4) _____

EXHIBIT
Hazzard-5
ja    10-19-01

 

Exh 6

# HARRISBURG SCHOOL DISTRICT

**1201 NORTH SIXTH STREET**

HARRISBURG, PENNSYLVANIA  17102-1406

**(717) 703-4019 Office**

**P.O. BOX 2645 - MAILING ADDRESS**

**(717) 703-4130 Fax**

**OFFICERS**
Wanda R. D. Williams, President
Linda M. Cammack, Vice President
Mark D. Pisco, Acting Secretary
Mellon Bank, Treasurer
Dr. Lucian Yates, III, Superintendent
Royce L. Morris, Solicitor

**BOARD OF SCHOOL DIRECTORS**
| | |
|---|---|
| Joseph C. Brown | 2001 |
| Linda M. Cammack | 2003 |
| Clarice L. Chambers | 2001 |
| Ricardo A. Davis, Sr. | 2001 |
| Barton A. Fields | 2003 |
| Judith C. Hill | 2003 |
| Ken M. Lester | 2003 |
| Gloria E. Martin-Payne | 2003 |
| Wanda R.D. Williams | 2001 |

Mr. William Hazzard
1940 Brookwood Street
Harrisburg, PA  17104

June 26, 2000

Dear Mr. Hazzard:

This letter is written in response to your complaint regarding the administration's denial of your promotion request to a Facilities Service Foreman 1B position at Rowland School in August 1999. In accordance with the district complaint procedure, a hearing before a committee of board members (Joseph Brown, Ricardo Davis) was held June 1, 2000. At this meeting the committee received evidence and heard testimony in support of your complaint from you, Steve McCollum and Robert Tapper. In response to your complaint we received evidence and testimony from Tim Curtis and Lance Freeman representing the administration.

After careful consideration of the evidence and testimony provided, it is the decision of the committee that the administration acted within its managerial rights when it did not promote you as you requested. It is also the opinion of the committee that your rights regarding this matter were not violated by the administration. In conclusion, it is our decision that your complaint has been properly addressed in accordance with Board Policy No. 326, Complaint Procedure.

We appreciate your service to the district and your efforts to resolve this matter accordingly.

Sincerely,

Joseph Brown

Joseph Brown
Board Member

Ricardo Davis
Board Member

cc:     Wanda R. D. William, President, School Board
        Dr. Lucian Yates III, Superintendent
        Steven McCollum
        Robert Tapper
        Tim Curtis
        Lance Freeman
        Brenda Conner
        Board Secretary
        file

EXHIBIT

Hazzard-6
ss          10-19-01

*"AN EQUAL OPPORTUNITY EMPLOYER"*                    *"EQUAL EDUCATION OPPORTUNITIES"*

Exh 7

**EMPLOYMENT OPPORTUNITIES**
**Page 4**
July 8, 1999

## POSITION - FACILITY SERVICE FOREMAN IB
### (formerly Head Custodian I-Major)

OBJECTIVE: Maintain the physical school plant and grounds in a condition of operating excellence so that full educational use may be made at all times

QUALIFICATIONS: High school diploma or GED, five (5) years experience as a school custodian or the equivalent in custodial service in other institutions or firms, demonstrate knowledge in the basic techniques of general repairs and maintenance, physically able to perform essential functions of job, satisfactory work record, Criminal History and Child Abuse Clearances

LOCATION: NEW ROWLAND BUILDING (PNI)

MINIMUM SALARY RATE: $10.00 per hour

CONTRACT YEAR: 260 days work year – 8 hours per day

## POSITION - FACILITY SERVICE WORKER I (formerly Custodian)

OBJECTIVE: Maintain the physical school plant and grounds in a condition of operating excellence so that full educational use may be made at all times

QUALIFICATIONS: High school diploma or GED, ability to read basic operating instructions and write reports, demonstrated aptitude for successful fulfillment of assigned performance responsibilities, must be able to lift 35 lbs, be in good health and physically able to perform essential job functions, satisfactory work record with Criminal History and Child Abuse Clearances.

LOCATION: William Penn (Intermediate School), Foose Elementary School, Rowland (PNI) and Melrose Elementary School

MINIMUM SALARY RATE: $ 7.50 per hour

CONTRACT YEAR: 260 days work year – 8 hours per day

## CAMPUS SECURITY OFFICER

OBJECTIVE: As members of Safety and Security Division, Campus Security Officers must regard themselves as part of a team dedicated to the safety and security of persons and property.



**EXHIBIT**
Hazzard- 7
10-

*Exh 8*

EXHIBIT

*Hazzard - 8*

*LA        10-19-01*

# AGREEMENT

### between the

## BOARD OF SCHOOL DIRECTORS
## OF THE
## CITY OF HARRISBURG SCHOOL DISTRICT

### and the

## AMERICAN FEDERATION OF STATE,
## COUNTY AND MUNICIPAL EMPLOYEES,
## DISTRICT COUNCIL 90

### July 1, 1997 - June 30, 2001

# KNOW YOUR RIGHTS AND USE THEM

Under your AFSCME contract and federal law, you are guaranteed certain rights to union representation. Know them. Use them.

1. You have a right to union representation, not a specific union representative, at any meeting with management which could possibly result in disciplinary action against you.

2. Whenever you are called to a meeting with management, explicitly ask about the specific nature of the meeting.

3. Before beginning the meeting, or at any time you believe the meeting is covering areas that might result in discipline, you must explicitly ask for union representation.

4. Prior to proceeding with the meeting, confer with your union representative and discuss the matters at issue in the meeting.

5. If you have any questions, ask your union representative.

## TABLE OF CONTENTS

PREAMBLE .................................................... 1
ARTICLE I    RECOGNITION ............................. 1
ARTICLE II    UNION SECURITY ........................ 1
ARTICLE III    DUES DEDUCTION ...................... 2
ARTICLE IV    PEACE AND STABILITY ............... 3
ARTICLE V    HOURS OF WORK ........................ 4
ARTICLE VI    SALARIES AND WAGES ............... 5
ARTICLE VII    MEAL PROGRAMS ..................... 6
ARTICLE VIII    REST PERIODS .......................... 8
ARTICLE IX    INSURANCE ................................ 9
ARTICLE X    PAL DEDUCTIONS ...................... 10
ARTICLE XI    CALL TIME ................................ 11
ARTICLE XII    OVERTIME ................................ 12
ARTICLE XIII    SICK LEAVE ............................ 12
ARTICLE XIV    VACATION ................................ 14
ARTICLE XV    HOLIDAYS ................................ 18
ARTICLE XVI    PERSONAL LEAVE DAYS .......... 20
ARTICLE XVII    BEREAVEMENT PAY ............... 21
ARTICLE XVIII    LEAVES OF ABSENCE ............ 22
ARTICLE XIX    CLASSIFICATION/
                        RECLASSIFICATION ................. 25

ARTICLE XX      SENIORITY ................26

ARTICLE XXI     NON-DISCRIMINATION .........30

ARTICLE XXII    DISCIPLINE ...............30

ARTICLE XXIII   SUCCESSORS ..............31

ARTICLE XXIV    SEVERABILITY .............31

ARTICLE XXV     UNION BUSINESS ...........31

ARTICLE XXVI    RETIREMENT BONUS
                AND BENEFITS .............32

ARTICLE XXVII   TRAVEL EXPENSES ..........33

ARTICLE XXVIII  WORK RELATED
                INJURIES/ACCIDENTS .......34

ARTICLE XXIX    UNIFORMS ................36

ARTICLE XXX     GRIEVANCE AND ARBITRATION
                PROCEDURE ...............37

ARTICLE XXXI    MANAGEMENT RIGHTS ........40

ARTICLE XXXII   MISCELLANEOUS PROVISIONS ...40

ARTICLE XXXIII  TERMINATION .............43

MEMORANDUM OF UNDERSTANDING ............44

WAGES ....................................46

## PREAMBLE

This agreement entered into by the School Board of the School District of Harrisburg, hereinafter referred to as the employer, and the American Federation of State, County and Municipal Employees, District Council 90, hereinafter referred to as the union, has as its purpose the promotion of harmonious relations between the employer and the union; the establishment of an equitable and peaceful procedure for the resolution of differences; and the establishment of rates of pay, hours of work, and other conditions of employment.

## ARTICLE 1
### Recognition

Section 1. The American Federation of State, County and Municipal Employees, District Council 90, is recognized as the sole and exclusive representative for collective bargaining purposes for employees within the classification established by certification of the Pennsylvania Labor Relations Board, PERA-R-10, 551-C, April 27, 1978, excluding first level supervisors which are covered under a separate agreement.

Section 2. This agreement pertains only to those employees falling within the certification referred to in Section 1, of this Article.

Section 3. The term "employee", when used in this agreement, refers only to those persons falling within the classification of the certification referred to in Section 1, of this Article.

Section 4. A temporary employee is one who is hired for a period of up to five (5) months, and is so informed at the time of hire. Temporary employees are excluded from the provisions of

-i-

this agreement. If an employee, hired in a temporary capacity, continues to work after five (5) months, the employee shall become a regular employee and a member of the bargaining unit and shall be credited with seniority back to the initial date of hire.

A long term substitute is an employee who is hired for a period of up to twelve (12) months and is so informed at the time of hire. Long term substitutes shall only be hired to temporarily replace a regular employee who has been granted a leave of absence. An employee who continues to work in this capacity after five (5) months shall be covered by all provisions of this agreement. However, the School District retains the right to discharge such employee within said twelve (12) month period without recourse.

## ARTICLE 2
## Union Security

Section 1. Each member of the bargaining unit who, on the effective date of this agreement is, or in the future becomes a member of the union shall, after the effective date of the agreement, be required to maintain their membership in the union for the term of this agreement provided that such employee may resign from the union, in accordance with the following procedure:

a. The employee shall send a certified letter, return receipt requested, of resignation to AFSCME, District Council 90 and a copy of the letter to the School District. The official membership card, if available, shall accompany the letter of resignation.

b. The letter shall be postmarked during the fifteen (15) day period prior to the expiration of this agreement and shall state that the employee is resigning membership in the union and is revoking check-off authorization.

-2-

Section 2. The employer and the union hereby agree that all non-members of the union shall be subject to a fair share fee as provided for in Act 84 of 1988 (S.B. 291) and any amendments thereto.

Section 3. The union shall indemnify and hold the employer harmless against any and all claims, demands, suits and other forms of liability, including liability for reasonable counsel fees and other legal costs and expenses that may arise out of, or by reason of any action taken or not taken by the employer, in conformance with this provisions.

Section 4. The employer shall provide the union and local president, on a quarterly basis (July, October, February, April), a list of all employees in the bargaining unit represented by the union. This list shall contain the following information: full name, address, social security number, job title and work site.

## ARTICLE 3
## Dues Deduction

Section 1. The employer agrees to deduct the union by-weekly membership dues, if any, from the pay of those employees who individually request in writing that such deduction be made. The amount to be deducted shall be certified to the employer by the union, and the aggregate deductions of all employees shall be remitted together with an itemized statement to the union by the last day of the succeeding month, after such deductions are made. The aforementioned itemized statement shall include the employee's full name, address, social security number and the amount of dues deducted. This authorization shall be irrevocable during the term of this agreement, as long as the employee is in a classification included with the certification of the unit.

-3-

Section 2. The employee's written authorization for dues deductions shall contain the employee's name, social security number and the name of the union.

Section 3. The employer further agrees to deduct fair share fee bi-weekly from all employees in the bargaining unit who are not members of the union. Authorization from non-members to deduct fair share fees shall not be required. The amounts to be deducted shall be certified to the employer by the union, and the aggregate deductions of all employees shall be remitted together with an itemized statement to the union by the last day of the succeeding month after such deductions are made.

Section 4. The union shall indemnify and hold the employer harmless against any and all claims, suits, orders, or judgements brought or issued against the employer as a result of action taken or not taken by the employer under the provisions of this Article.

## ARTICLE 4
## Peace and Stability

Section 1. It is understood that there shall be no strike, as that term is defined under the Public Employee Relations Act, during the life of this agreement, nor shall any officer, representative or official of the union authorize, assist or encourage any such strike during the life of this agreement.

Section 2. Should a strike occur not authorized by the union, the union, within twenty-four (24) hours following the request of this employer, shall:

a. Publicly disavow such action by the employees;

b. Advise the employer in writing that such employee action has not been authorized or sanctioned by the union; and

c. Post notices on all bulletin boards advising employees that it disapproves of such action and instruct them to return to work immediately.

Section 3. The employer reserves the right to discipline, demote or discharge any employee or employees who violate the provisions of Section 1. of this Article, subject to the grievance and arbitration procedures.

Section 4. The employer will not engage in any lockout during the life of this agreement.

## ARTICLE 5
## Hours of Work

Section 1. The work week for full-time employees shall consist of five (5) consecutive work days beginning on Monday and ending on Friday. In the event the Board utilizes Saturday or Sunday as a work day for certain operations, no person employed on or before July 1, 1975, will be scheduled for such work on Saturday or Sunday unless such person bids on such job.

Section 2. a. The regular work day for all full-time employees working less than eight (8) hours per day shall be consecutive except that they may be interrupted by a non-paid meal period not to exceed one (1) hour in length. This sub-section shall not apply to positions currently working split shifts, or to positions where pre-established practices conflict with this provision.

b. The regular work day for all full-time eight (8) hour per day employees covered by this agreement shall be consecutive.

Section 3. Work schedules showing the employees' work days and hours shall be posted on appropriate bulletin boards.

Except for emergencies, changes shall be posted two (2) weeks in advance. Where changes are to be made by the employer for other than emergency reasons, or where schedules are to be adopted for new programs, the employer agrees to notify the union of the change or new schedules and, upon request, meet and discuss with the union prior to the implementation of the change or new schedule.

Section 4. Employees will be considered full-time if they are regularly scheduled to work the hours in a work day as set forth in Exhibit A for their classification.

Section 5. The term part-time employees refers to employees who are regularly scheduled to work less than twenty (20) hours per week, exclusive of meal periods, in any classification.

Section 6. Employees required to attend in-service training programs shall be considered working during such programs and shall be paid their appropriate hourly rate for the time spent in such programs.

Section 7. Bargaining unit employees at the Administration Building shall be eligible to participate in the flexible scheduling of work hours during the summer.

## ARTICLE 6
## Salaries and Wages

Section 1. Effective July 1, 1997, there will be a 3% across the board increase for all employees.

Effective July 1, 1998, there will be a 3% across the board increase for all employees.

Effective July 1, 1999, there will be a 3% across the board increase for all employees.

Effective July 1, 2000, there will be a 3% across the board increase for all employees.

Effective July 1, 2001, there will be a 3% across the board increase for all employees.

Section 2. For the purpose of calculating and implementing the salary/wage provisions outlined in Section 1. of this Article, a year shall be defined as twelve (12) months from the employee's date of hire.

Section 3. Each full-time employee shall receive a three hundred ($300) dollar service payment for each five (5) years of complete continuous service to be paid as a cash bonus in the following July. Said service increment shall not be compounded or included in the base salary of the employee.

Example:  5 year of service - $300 payment
10 year of service - $600 payment
15 year of service - $900 payment
20 year of service - $1200 payment, etc.

Section 4. A demotion is defined as a personnel action in which an employee is moved to a position with a lower minimum rate of pay. Employees transferred into a classification paying a lower minimum hourly rate of pay shall be reduced by 9% or the starting rate of the minimum of the lower pay grade, whichever is lesser reduction.

Section 5. A promotion is defined as a personnel action in which an employee is moved to a position with a higher minimum rate of pay. Employees transferred or bidding into a clas-

sification paying a higher minimum hourly rate of pay shall receive an increase of 9% or to the starting rate of the new classification, whichever is greater.

Section 6. A lateral transfer is defined as a personnel action in which an employee is moved to a position with the same minimum rate of pay as the position from which the employee was transferred.

Section 7. In order to be eligible for a pay increase, employees must have been permanent employees the following number of consecutive days:

180-190 day employee - 105 minimum days worked
191-214 day employee - 134 minimum days worked
215-224 day employee - 144 minimum days worked
225-260 day employee - 180 minimum days worked

## ARTICLE 7
## Meal Programs

Section 1. a. All full-time employees working less than eight (8) hours per day shall be granted a non-paid meal period during their work day. The required hours of work during the work day shall be exclusive of this period.

b. All employees in full-time eight (8) hour per day classifications shall be granted a non-paid meal period one-half (½) hour in length during their work day.

Section 2. All employees will be allowed a paid meal period of one-half (½) hour in length for each four (4) hours worked beyond their regular quitting time.

-8-

Section 3. If an employee works four (4) or more hours after his/her scheduled quitting time and has not had notice of such work requirement at least two (2) hours before commencement of his/her regular shift, the employer shall either furnish a meal or reimburse the employee for a meal in an amount not to exceed seven (7) dollars.

Section 4. An employee who is required to work during the meal period shall be compensated at the appropriate hourly rate for such time.

Section 5. The employer shall provide lunchroom, rest room and lounge facilities for classified employee use in each building where such facilities currently exist.

## ARTICLE 8
## Rest Periods

Section 1. Except as provided hereafter, all employees will be entitled to a fifteen (15) minute rest period during each one-half (½) shift of three (3) or more hours.

Section 2. No employee, with the exception of maintenance, painters and grounds personnel, shall be entitled to rest periods when they work outside of their normal work site.

Section 3. The regular scheduling of rest periods immediately before or after meal periods or at the beginning or ending of the work day is permissible in certain operations where the Union and Employer agree to such a practice or where the present practice is to schedule rest periods in that manner.

-9-

## ARTICLE 9
### Insurance

Section 1. The present Blue Cross and Blue Shield Program, or an equal program including health, maintenance organizations mutually agreed to by the union and the Board, for employees and their dependents shall be provided.

The following provisions will be added to the plan:

- Routine Pap Testing - 12 months,
- Out-patient physical therapy and occupational therapy,
- Implement a pre certification and utilization review procedure as part of the existing indemnity program.

Effective November 1, 1997, the parties agree that a third health care option shall be instituted which shall be the Blue Cross/Blue Shield Custom Blue program. The Custom Blue program shall be 100% paid for by the employer as shall the current HMO options. Effective with the 1997-98 school year, all new employees must choose either the Custom Blue or the HMO programs. Employees hired prior to the beginning of the 1997-98 school year shall continue to have the right to three (3) health care options (Blue Cross/Blue Shield Indemnity Program, Custom Blue, and/or an HMO). Effective November 1, 1997, employees who choose to remain in the Blue Cross/Blue Shield Indemnity program shall be responsible for 10% of the cost of the monthly premiums.

Section 2. Dental, vision and prescription coverage for the 1989-90 contract year shall remain in effect for the duration of this contract for employees and their dependents.

Section 3. Group term life insurance coverage shall be maintained at the nearest thousand to the employee's salary, including base and longevity only.

-10-

Section 4. The benefits in this Article are not effective while an employee is on any leave of absence without pay, unless the premium is paid by the employee.

Section 5. Benefit Waiver. Up to twenty-five percent (25%) of the District's employees can choose to opt out of any or all of the District's benefit programs on a first-come basis. If employees elect to withdraw from any of the District's health care programs, they must notify the District by the first of May for the upcoming school year. Employees can return to the waived benefit program after one year or at the beginning of any program cycle (July 1) or immediately in the event the employee loses access to other health insurance. Employees who elect to withdraw from any benefit program shall receive twenty-five (25%) of the premium savings of the District.

## ARTICLE 10
### PAL Deductions

Section 1. The employer agrees to deduct voluntary political and legislative (PAL) contributions from the pay of those employees who individually request in writing that such deductions be made. Such written request shall specify the amount the employee is authorizing the employer to deduct. The employer shall remit the aggregate deductions of all employees authorizing such deductions together with an itemized statement to the union by the last day of the succeeding month after such deductions are made. The aforementioned itemized statement shall be titled "PAL Deductions", and shall include each employee's full name, address, social security number and the amount of the deduction.

Section 2. The employee's written authorization for PAL deductions shall be revocable at any time by the employee. An

-11-

employee desiring to cancel PAL deductions shall file a written withdrawal of authorization with the employer and the union.

Section 3. It is clearly understood by the employer and the union that an employee must be a dues paying member of the union to be eligible to authorize the PAL deductions outlined in Section 1. of this Article.

Section 4. The union shall indemnify and hold the employer harmless against any and all claims, suits, orders of judgements brought or issued against the employer as a result of action taken or not taken by the employer under the provisions of this Article.

## ARTICLE 11
### Call Time

Section 1. Any employee who has been called to work out-side of his/her regular shift shall be guaranteed a minimum of four (4) hours pay. Employees receiving call time assignments shall be credited for beginning work when they arrive at the work site. There shall be no duplication of hours.

Section 2. Call time shall be paid for at whatever hourly rate is appropriate.

## ARTICLE 12
### Overtime

Section 1. Time and one-half of the employee's regular hourly rate of pay shall be paid under the following conditions:

a. For any work performed in excess of eight (8) hours in any work day, or in excess of forty (40) hours in any work week. In

-12-

the event of a mutually agreed to four-day work week during the months when school is closed, the eight (8) hour rule shall be waived.

b. Overtime shall be voluntary except where it is necessary to assign employees because of a lack of volunteers. In assigning such overtime work, it will be done in the inverse order of seniority.

c. The employer shall attempt to allocate overtime work in a way as to equalize such work among the appropriate employees during each six (6) month period of the calendar year. The employer's obligation in this regard shall not pertain to those employees who refuse overtime work when offered. Furthermore, the employee who normally performs certain work on his/her regular shift shall have the first opportunity to perform such work in an overtime capacity.

Section 2. The following items will be regarded as hours worked for the purpose of computing overtime hours.

a. Hours worked, including the rest period
b. Holidays
c. Annual Leave
d. Personal Holidays
e. Sick Leave
f. Bereavement Leave
g. Civil Leave
h. Military Leave
i. Paid Leave of Absence
j. Call Time
k. Paid Lunch Periods
l. Compensatory Leave

Section 3. Double the employee's regular hourly rate of pay shall be paid for all hours worked in excess of twelve (12) hours

-13-

in any work day or in excess of sixty (60) hours in any work week.

Section 4. There shall be no duplication of overtime pay for the same hours worked.

Section 5. By mutual agreement between the employer and employee involved, compensatory time at the appropriate rate may be granted in lieu of overtime pay.

## ARTICLE 13
### Sick Leave

Employees shall earn paid sick days on a pro-rated basis in accordance with the following schedule:

Section 1. Full-time employees shall be entitled to annual sick leave as follows:

a. Those employees who are scheduled to work less than 185 days shall receive eight (8) days annually.

b. Those employees who are scheduled to work at least 185 days, but less than 230 days shall receive ten (10) days annually.

c. Those employees who are scheduled to work 230 days or more shall receive thirteen (13) days annually.

Section 2. Unused sick leave shall be cumulative year to year in the School District.

Section 3. a. Sick leave shall be earned by full-time employees (after the probationary period) on a pro-rated basis for all time such employees are in a compensable status during the contract year.

-14-

b. For the purpose of computing earned sick leave entitlement at a given time during the contract year, said entitlement shall be rounded off to the nearest half-day.

c. All sick leave to which an employee will become entitled to during a given contract year may be used at any time during said contract year.

Section 4. At the time of termination of employment of any employee, any used but unearned sick leave shall be repaid by such employee to the employer in cash, or the employer shall be entitled to deduct such sum from the final compensation due the employee.

Section 5. A doctor's certificate is required for an absence from work due to sickness for three (3) or more consecutive work days. For an absence of less than three (3) consecutive work days, a doctor's certificate may be required for an absence where, in the opinion of the employer, the employee has been abusing his/her sick leave privileges.

Section 6. Sick leave may be taken for a one-half (1/2) day or one (1) full day. Absences for lesser periods will be unpaid leave.

Section 7. Where an employee's paid sick leave entitlement has been used, the employee may use vacation or emergency leave entitlement.

Section 8. a. Employees who retire on or after the effective date of this agreement shall be paid 35% of their accumulated unused sick leave up to a maximum of 100 days, if they retire under the conditions set forth in sub-section b.

b. Eligibility for payment of benefits under sub-section a. is as follows:

-15-

1. Superannuation retirement with at least ten (10) years credited service in the Public School Retirement System.

2. Disability retirement regardless of service, or

3. Other retirement with at least twenty-five (25) years of credited service in the Public School Retirement System.

4. In the event of the death of an employee with at least five (5) years of credited service in the Public School Retirement System, unused sick leave entitlement shall be paid to such employee's beneficiary.

c. No payments under this section shall be construed to add to the credited service of the retiring member or to the retirement covered compensation of the member.

Section 9. Employees who work 260 days per year may use up to five (5) days of their sick leave entitlement for the illness of a family member.

Section 10. Less than 260 day employees may use up to three (3) days of their sick leave entitlement for the illness of a family member.

Section 11.  SICK LEAVE BANK

a. All members of the bargaining unit may become members of a sick leave bank through the voluntary and irrevocable donation of one (1) day of accumulated personal sick leave each year to the sick leave bank.

Such donation and membership shall be effected by the signing of an enrollment form by each individual. Membership shall then be continuous from year to year unless the business office

-16-

and the AFSCME president are notified, otherwise within ten (10) days of the opening of classes in any successive school year.

b. The bank shall be maintained and replenished in the future by subsequent one day donations of sick leave from each member.

c. Use of days shall be determined by a Review Committee consisting of three (3) members:

one (1) from the bargaining agent,
one (1) from district administration, appointed by superintendent
one (1) appointed by the Board of School Directors

d. Requests for use of days from this bank for short-term disability shall be made in writing to the Review Committee, which may grant or refuse such requests at its discretion based on flexible criteria in each individual case and to include consideration of:

1. the nature of the illness or disability;

2. the exhaustion of regular personal sick leave by the applicant;

3. the severity of hardship imposed by possible loss of pay.

All decisions by the Review Committee are final and are not subject to the grievance process.

e. Whenever an employee uses a day from the bank, he/she shall be paid at his/her daily rate.

f. The union shall indemnify and save the District harmless against any and all claims, demands, suits or other forms of liability that shall arise out of or by reason of action or not taken by

-17-

the District in the implementation of any of the provisions of this section or in reliance on any list, notice of assignment furnished under any of such provisions.

## ARTICLE 14
## Vacation

Section 1. Full-time, twelve (12) month employees shall be eligible for paid vacation on a pro-rated basis in accordance with the following schedule:

| SERVICE REQUIREMENT: | VACATION ENTITLEMENT: |
|---|---|
| Upon completion of | employee shall earn |
| One (1) year service | 5 days per year |
| Over two (2) and up to five (5) years service | 10 days per year |
| Over five (5) years and up to fifteen (15) years of service | 15 days per year |
| Over fifteen (15) years and up to twenty-five (25) years of service | 20 days per year |
| Over twenty-five (25) years of service | 25 days per year |

The above eligibility requirements will be pro-rated in order to determine the amount of vacation the employee shall be entitled to during the year.

-18-

Section 2. Vacation shall be scheduled and granted for periods of time requested by the employee subject to management's responsibility to maintain efficient operations. If the nature of the work makes it necessary to limit the number of employees on vacation at the same time the employee with the greatest seniority as it relates to total years of continuous service with the employer shall be given his choice of vacation period in the event of any conflict in selection. Vacations shall be scheduled forty-eight (48) hours in advance and granted for periods of time requested.

Section 3. If a holiday occurs during the work week in which a vacation is taken by an employee, the holiday shall not be charged to annual leave.

Section 4. Employees who are required by the employer to work during their scheduled vacation period and are unable to reschedule their vacation during the contract year due to the demands of their work shall be paid for such time. The amount that the employee is paid for such a day shall be the regular rate of pay, which excludes overtime and call-time hours.

Section 5. Employees separated from the service of the employer for any reason prior to taking their vacation shall be compensated at the employee's current regular rate of pay for the unused vacation in the year of termination.

Section 6. Employees shall be required to schedule vacation during the period of entitlement except that ten (10) days of unused leave may be carried forward to a succeeding fiscal year.

Section 7. If an employee is required to return to work after commencement of a pre-scheduled vacation, he shall be compensated at one and one-half (1-1/2) times his regular hourly rate

-19-

of pay for all hours required to work on the pre-scheduled vacation day or days. The employee shall be permitted to reschedule such vacation day(s) in accordance with Section 2, above. If the employee is unable to reschedule the vacation during the fiscal year due to the demands of his/her work, the provisions of Section 4, above shall be applicable.

Section 8. Vacation pay shall be the employee's regular straight time daily rate of pay in effect at the time of taking vacation.

Section 9. For those unit personnel employed for less than a twelve (12) month per year basis, the vacation entitlement as set forth in this article shall not be applicable.

## ARTICLE 15
## Holidays

Section 1. The following days shall be recognized as paid holidays for full-time, twelve (12) month employees:

a. Independence Day  
b. Labor Day  
c. Veterans' Day  
d. Thanksgiving Day  
e. Day after Thanksgiving  
f. Christmas Eve  
g. Christmas Day  

h. New Year's Eve  
i. New Year's Day  
j. Martin Luther King's Birthday  
k. Presidents' Day  
l. Employee's Birthday  
m. Memorial Day  

Section 2. Monday shall be recognized as a holiday for all holidays occurring on a Sunday, and Friday shall be recognized as a holiday for all holidays occurring on a Saturday. Where this system causes holidays to overlap, said holidays shall be observed on date(s) mutually recognized.

-20-

Section 3. If any employee works on any of the holidays as set forth in Section 1, of this Article, such employee shall, at the option of the employee, either be paid time and one-half (1-1/2) their regular rate of pay for all hours worked in addition to their holiday pay, or compensatory leave at the rate of time and one-half (1-1/2) all hours worked on said holiday in addition to the holiday to which the employee is entitled.

Section 4. If a holiday is observed while a full-time, twelve (12) month employee is on sick, vacation or other paid leave status, he/she will receive his/her holiday pay and the day will not be charged against sick, vacation or any other paid leave.

Section 5. A full-time, twelve (12) month employee shall be paid for any holiday listed in Section 1. of this Article, provided he/she was in regularly scheduled compensable status on the afternoon of the work day immediately prior and the morning of the work day immediately subsequent thereto.

Section 6. All full-time, twelve (12) month employees, will continue to observe the same holidays during the school year (September-June) as the teachers and the pupils.

## ARTICLE 16
## Personal Leave Days

Section 1. An employee shall be entitled to three (3) days per year without justification, except that at no time may there be more than 5% of staff in any one unit taking leave under this section.

Section 2. Personal leave days not used by an employee in a school year shall be converted to sick days at a ratio of one (1) personal leave day to one(1) converted sick leave day.

-21-

## ARTICLE 17
## Bereavement Leave

Section 1. Absence from duty, because of a death in the immediate family or of a near relative shall be granted in accordance with the following provisions:

a. Whenever an employee shall be absent from duty because of a death in the immediate family of said employee, there shall be no deduction in salary of said employee for an absence not in excess of five (5) school days in conjunction with (immediately following) the death and/or funeral. The Board of School Directors may extend the period of absence, with pay, at its discretion as the exigencies of the case may warrant. Members of the immediate family shall be defined as father, mother, brother, sister, son, daughter, husband, wife, parent-in-law, grandchild and grandparent. This also applies to a near relative or immediate step relative who resides in the same household or any person with whom the employee has made his/her home.

b. Whenever an employee is absent because of the death of a near relative, there shall be no deduction in the salary of said employee for absence on the day of the funeral. The Board of School Directors may extend the period of absence, with pay, at its discretion as the exigencies of the case may warrant. A near relative shall be defined as first cousin, aunt, uncle, niece, nephew, brother-in-law, sister-in-law, son-in-law and daughter-in-law.

## ARTICLE 18
## Leaves of Absence

Section 1. ALL LEAVES

a. All requests for leave under this section must be submitted

-22-

in writing to the employee's immediate supervisor or department head and shall be answered in writing within three (3) working days. Requests for leaves under this section shall be answered before the end of the shift on which the request is made.

b. Employees who apply for and receive a leave of absence without pay at the end of such leave will be entitled to return to a position in their same classification or to a position in a comparable classification with an equivalent rate of pay. The employee shall retain all accrued benefits earned, but not used prior to taking such leave.

c. Fringe benefits and service credit shall continue to accrue during paid leaves of absence, but shall not accrue during unpaid leaves of absence. However, employees shall be entitled upon their return from leave of absence without pay to all fringe benefits and service credits earned up to the date the leave commenced.

d. The provisions of subsections a., b. and c. of this Article shall apply to all leave outlined in this Article, except where said provisions are specifically modified by other sections of this Article.

Section 2. CHILDBIRTH LEAVE

a. All permanent employees who become pregnant or whose spouse becomes pregnant and/or adopts an infant shall be granted leave in accordance with the Family and Medical Leave Act of 1993 (FMLA).

b. Requests for childbirth leave shall be granted for a period of up to six (6) months, and may be renewed for an additional six (6) months by submission of another written request.

-23-

c. An employee who is on childbirth leave is entitled to use all accrued sick, vacation and emergency leave during such childbirth leave. All other periods of childbirth leave shall be leave without pay.

Section 3. CIVIL LEAVE. Employees called for jury duty or subpoenaed as a witness (not a party) to attend court shall be granted leave with pay while attending court. In addition, an employee subpoenaed to testify by any government entity possessing subpoena powers shall be granted leave with pay while honoring said subpoena. Evidence of such duty in the form of a subpoena or other written notification shall be presented to the employee's immediate supervisor as far in advance as practical. In addition, the employee shall be required to reimburse the District any witness or jury fees received by the employee.

Section 4. EDUCATION LEAVE. After completing five (5) years of service, an employee may be granted a leave of absence without pay at the sole discretion of the employer for the employee's educational purposes. Such leave shall not exceed two (2) years and shall not be granted more than once every four (4) years.

Employees shall receive tuition reimbursement for up to six (6) credits per fiscal year at the appropriate level of assignment, with prior approval by management.

Section 5. MEDICAL LEAVE. Employees who have completed their probationary period shall be entitled to an unpaid medical leave of absence. A written request for such leave is required in all instances. Proof of illness in the form of a doctor's certificate shall be required, which includes a prognosis and expected date of return. The request for leave may be granted for a period of up to six (6) months, and may be renewed by the submission of additional written request in accordance with this

-24-

Section for each period of six (6) months thereafter, provided the total length of such leave does not exceed two (2) years.

Section 6. MILITARY LEAVE. Employees who are members of the Pennsylvania National Guard/Reserves are entitled to leave with pay up to fifteen (15) calendar days during which they shall, as members of the National Guard/Reserves, be engaged in the active service of the Commonwealth or in authorized field training consistent with the School Code of 1949 or Federal Forces, provided such active service does not occur during the period of the year when the employee is not in compensable status.

Section 7. OFFICIAL MEETINGS. Attendance at official meetings, during an employees regular scheduled work hours, including grievance under contract, labor/management and negotiations between the employer and the union shall be considered as time on duty and paid for such. Employees shall notify their supervisor or designee before leaving the job to attend such functions. Said meeting must be a mutually scheduled meeting.

Section 8. UNION BUSINESS LEAVE. The Executive Board and the Officers, not to exceed seven (7) members, shall be provided two (2) days per year with pay for union delegates or representatives to attend conventions and educational workshops. If the employer is notified in writing at least one (1) week in advance, such leave shall be scheduled and granted for periods of time requested by the union, subject to management's responsibility to maintain efficient operations.

## ARTICLE 19
### Classification/Reclassification

Section 1. If an employee temporarily performs the normal duties and functions in the position of a person in a higher clas-

-25-

sification, he/she shall be paid an amount equal to the difference in the minimum hourly rate of pay of his/her classification and the minimum hourly rate of pay of the higher classification after performing duties in the higher classification. Differential will begin with the first full day of performing the duties in the higher classification.

Section 2. If the employer assigns an employee on a temporary basis to a lower classification, or if an employee performs some duties and functions assigned to a lower classification, the person so assigned shall not be reduced in compensation because of such assignment.

Section 3. The employer shall notify the union prior to establishing any new jobs or classifications which would be covered by the certification of the Pennsylvania Labor Relations Board. The employer agrees to meet with the union and negotiate any new classifications and the rate of pay applicable to them.

Section 4. The employer and the union shall meet during the length of this agreement, upon request of either party, to negotiate a procedure to identify and accommodate reclassifications, and/or promotions.

## ARTICLE 20
## Seniority

Section 1. For the purpose of this agreement, the term "seniority" means a preferred position for a specific purpose which one full-time employee may have over another full-time employee because of a greater length of continuous service.

Section 2. The following shall constitute a break in continuous service: resignation, separation for just cause, retirement,

absence without leave for five (5) days, failure to report within three (3) days of recall, failure to report to job after leave, and acceptance of other permanent employment while on leave. If continuous service is broken by any of the above, the employee shall lose seniority credits. This shall not restrict the employer's right to take whatever personnel action it deems warranted for any of the above, subject, however, to the grievance procedure. If an employee is returned within one (1) year of such break in service, the employee shall be entitled to credit, for seniority purposes, for the time accrued up to the time the break in service occurred, but shall not be entitled to any credit for the time represented by such break in service.

Section 3. Seniority lists shall be prepared for full-time employees for each job classification and revised, where necessary, every twelve (12) months. Such lists shall be posted on the appropriate bulletin boards and a copy provided to the local president.

Section 4. The employer agrees to post at appropriate work locations unit vacancies that are to be filled. Said postings shall be done at least five (5) working days prior to the filling of such vacancies. The posted notice shall include the salary for the position. A copy of the notice shall be given to the president of the union. If the employer decides not to fill the posted vacancy, the employer agrees to meet and discuss with the union the reason for its decision.

Section 5. Layoffs or furloughs of full-time employees shall be made in inverse order of seniority within the job classification affected by the layoff/furlough. If the affected employees previously worked in another job classification within the unit, the employee shall be entitled to bump back into the job classification previously held, if the affected employee's seniority status exceeds the seniority status of any employee in the prior job classification.

If an affected employee is unable to bump into a previously held position, he/she may bump into any equal or lower paying job classification in the District, provided he/she has the ability to perform the job, and he/she has seniority status in excess of an employee within the affected classification. Except for previously held positions, the determination of qualifications shall not be grieved. However, if a vacancy occurs in an affected employee's previously held classifications, said employee shall be able to exercise recall rights to such vacancy according to seniority.

Section 6. The employer shall establish a preference list for those full-time employees who have been furloughed or laid off under the provisions of this Article in inverse order of such lay-off/furlough. This list shall remain in effect for a period of one (1) year and shall be used in order of seniority to fill vacancies within a classification from which the persons on the preference list may have been furloughed or laid off. In the event a person refuses an offer of a position under this Section, that person shall be removed from the list.

Section 7. When a vacancy in a position occurs and the position is posted in accordance with Section 4, of this Article, any employee in the bargaining unit may bid for such job vacancy provided they have passed their initial probationary period. However, preference in hiring will be given to employees within the same or a lower classification bids as the vacancy, provided the employee meets the minimum qualifications of the classification. If no such employee meets the minimum qualifications, then the most senior qualified employee based on total School District service who bids on the job and who has the ability will be awarded the job. If there are no employees as described above who bid on the job and are qualified, then the employer may fill the vacancy by hiring outside of the bargaining unit. The employee may be given a thirty (30) work

-28-

day trial period in order to be evaluated on their ability to do the job. If it is determined during this period the employee is unable to perform the duties of the position, he/she will be returned to his/her old position or one with similar duties and pay.

Section 8. Except for employees assigned the vehicles for special education and physically handicapped children, bus drivers shall be permitted to bid for runs prior to each school year. In the event of duplication of bids for the same run, preference shall be granted on a seniority basis. The employer is not restricted from altering routes during the school year.

Section 9. For the purpose of furlough, the seven (7) officers of the local union shall have super seniority. The union shall notify the employer of the names of the individual employees who are entitled to super-seniority under this Section. The employer is entitled to rely upon the last notification from the union received prior to issuing any furlough notices.

Section 10. When the employer deems it necessary to transfer any employee to a different classification, the employer shall meet and discuss said transfer with the union. Transfers of bargaining unit employees shall only be made by the School Board, or by the Superintendent, where authorized by the School Board.

Section 11. All employees shall serve a forty-give (45) work day probationary period. During such probationary period, the employee shall not have access to the grievance procedure of this contract. Upon completion of the probationary period, employees will be credited with seniority retroactive to their date of hire.

-29-

## ARTICLE 21
## Non-Discrimination

Both the employer and the union agree not to discriminate against any employee on the basis of race, creed, color, age, sex, national origin, union membership, political affiliation, residency, marital status, sexual preference, orientation, non-job related handicap, or job classification.

## ARTICLE 22
## Discipline

Section 1. The employer shall not demote, suspend, discharge or take any disciplinary action against any employee without just cause. An employee may appeal any disciplinary action beginning at the second step of the grievance procedure. The union shall be notified in writing of any disciplinary action taken by the employer within five (5) days of its occurrence. A copy of any disciplinary letters will be sent to the union.

Section 2. All disciplinary action instituted by the employer shall be implemented within a reasonable period of time after the event giving rise to such disciplinary action.

Section 3. When it is necessary to implement disciplinary action, the employer agrees to discipline employees in an appropriate manner for all related infractions.

Section 4. The employer will attempt to discipline employees in such a manner so as not to embarrass the employee before the public or other employees. It must be kept in mind, however, that when insubordination or flouting of authority by an employee in public and in the presence of other employees takes place, the employer shall not be restricted by the operation of this

Section. Disciplinary action and personnel matters shall be confidential, and shall not be discussed at public gatherings or in the presence of students, parents or teachers.

Section 5. In the event an employee is intimidated, harassed or interfered with during the performance of his/her professional duties, by a parent, student, or other person(s), the Board shall investigate the matter and take such corrective action as it deems appropriate. The result of any investigation or action taken, if any, shall be treated on a case by case basis, and the determination in one case shall not be deemed precedent for any other. The Board's existing complaint procedures shall apply to this Section.

## ARTICLE 23
## Successors

This agreement shall be binding upon the parties hereof, and the heirs, executors, administrators, successors and assigns of each.

## ARTICLE 24
## Severability

If any provisions of this agreement or the application thereof to any person or circumstance is held invalid, the remainder of this agreement or the application of any such provision to any other person or circumstance shall not be affected thereby, and the provisions of this agreement are hereby declared to be severable.

## ARTICLE 25
## Union Business

Section 1. The employer agrees to provide space on bulletin boards to the union for the announcement of meetings, election

of officers of the union and any other material related to union business. Furthermore, the union shall not post material detrimental to the labor-management relationship nor of a political or controversial nature. The union may send mail or interoffice correspondence related to union business to local official union representatives at appropriate facilities to which mail or interoffice correspondence is delivered.

Section 2. The union shall be allowed the reasonable use of School District buildings for meetings before or after school hours provided such meetings are held during scheduled hours of custodial service and do not interfere with scheduled programs. Employees shall not attend such meetings during their working hours. Arrangements for such meetings shall be made with the Secretary of the Board. The use of the Board Room for such meetings shall be at the sole discretion of the employer.

## ARTICLE 26
## Retirement Bonus and Benefits

Section 1. MONETARY PAYMENT Any full-time employee covered by this contract who is 55 years of age or older and who has fifteen (15) years or more of total service with the Harrisburg City School District, shall be entitled to twenty (20) percent of their highest salary with the District, upon retirement from the District. One-half of the total payment shall be made on October 15 of the school year following retirement, and one-half of the total payment shall be made on the following February 15.

Section 2. HEALTH BENEFITS The District shall pay until the recipient reaches age 65, the following health care benefits:
a. Enrollment in a recognized health maintenance organiza-

tion (HMO) of the employee's choice, or the District's medical insurance, whichever is less costly.

b. Prescription drug expense benefits, as provided employees covered by this contract.

Section 3. ADMINISTRATION

a. No more than ten (10) employees may receive a retirement bonus in any one fiscal year.

b. Eligibility for this retirement bonus shall be determined at the conclusion of the fiscal year by ranking according to seniority in the School District, those employees who have retired during the fiscal year and selecting the ten (10) most senior.

c. No retired employee who has received a retirement bonus, except as a substitute, may be rehired by the School District, unless they pay back in full the retirement bonus. Such employees shall be eligible for the retirement bonus if they retire a second time.

The insurance provided herein shall not apply to any employee who retired before August 1, 1997.

## ARTICLE 27
## Travel Expenses

Section 1. Employees who are required by the employer to use their personal vehicle for the business of the employer shall be granted an allowance at the rate currently approved by the Board. An employee who is required to be on overnight travel status shall be reimbursed in accordance with the Board Policy. The employee shall provide detailed proof of such expenditures to the employer.

Section 2. The amounts set forth in Section 1. will be increased in amount at the time when travel expenses for other employees in the District are increased.

Section 3. Employees in the maintenance department shall not be required to use their personal vehicles for transportation during the work day. Employees, however, may agree to the use of their vehicles. Employees may be required to report directly to work sites at the beginning of the work day rather then the present reporting location.

## ARTICLE 28
## Work Related Injuries/Accidents

Section 1. WORKERS' COMPENSATION. All employees of the Harrisburg School District in compensable status are eligible for Pennsylvania Workers' Compensation.

a. For a period of up to thirty (30) work days, an employee shall not lose any sick leave days, emergency leave days, benefits or salary as a result of being absent from work due to an injury received from an assault during the time said employee is acting in the performance of his/her duties or if the assault arising in the performance of his/her duties. The foregoing thirty (30) work day entitlement shall only be used if the employee is unable to report to work and shall not continue after the point in time the employee recovers from his/her assault-related injury. In cases of a work-related accident unrelated to an assault, an employee shall be entitled to up to fifteen (15) work days of pay and benefits without a reduction of sick or emergency or vacation leave, provided that such leave shall not continue after the point in time the employee recovers from his/her work-related injury. In the event that an employee's workers' compensation claim is denied a deduction of sick and/or emergency and/or

-34-

vacation leave to compensate for the fifteen (15) days or a portion thereof shall be made.

b. On the thirty-first (31) or sixteenth (16) work day following a compensable injury, an employee's sick leave shall be reduced by one-third (1/3) of a sick leave day for each work day the employee is absent and receives workers' compensation payments and supplemental payments from the District. Coincident with receipt of workers' compensation benefits, the District agrees to pay the difference between the amount payable under the Workers' Compensation Act and the employee's take-home pay. This "supplemental benefit" is to be paid directly to the injured employee. The employee shall be paid full pay reduced by the amount that yields a net pay including workers' compensation that is equal to the employee's net pay. Net pay is defined as the gross base pay minus the federal, state and local taxes, social security and retirement contributions.

c. Once an employee exhausts his/her sick leave in accordance with paragraph (b) herein, the District shall not have any further salary obligation, except in cases of medical leave, to the employee.

d. The District shall pay an employee's health care and other insurance premiums as if he/she were reporting to work for the entire period of disability or until the employee's sick or medical leave is exhausted, whichever is later.

e. An employee shall be entitled to maintain his/her employment status with the District while receiving workers' compensation payments for a period of two (2) years or until such employee's sick leave and/or medical leave is exhausted whichever is later. A second medical leave only will be considered when medical evidence obtained by the District strongly suggests that the employee can return to active service following

-35-

the second medical leave. The Board's decision regarding the award of a second medical leave shall be discretionary, non-precedential, final and binding. The employee shall be entitled to receive his/her medical leave salary and benefit payments and workers' compensation. At the end of two (2) years, or upon the exhaustion of an employee's sick leave and medical leave, if the employee is unable to return to work, his/her employment with the District shall be severed.

## ARTICLE 29
## Uniforms

Section 1. The employer shall provide coveralls for employees who are regularly assigned as trash collectors, painters, custodians, maintenance helpers and groundsmen. New employees will be provided with two (2) sets of coveralls. Coveralls shall be replaced as needed by the employer after one (1) year of service, provided the employer shall not be required to provide more than two (2) sets of coveralls for any employee in any contract year. The employees furnished with such coveralls shall be responsible for their maintenance and cleaning. Employees who have received two (2) sets of coveralls and replacements, as needed, shall return two (2) sets of coveralls to the employer at the time of termination.

Section 2. Cafeteria helpers will be provided with two (2) uniforms each contract year. The employees furnished with such uniforms shall be responsible for their maintenance and cleaning. The School District will pay for cleaning once a month.

Section 3. Lunch Aides will be provided with smocks which are to be used during the work day. The employer will continue the present practice of providing uniforms and jackets for truck drivers in the cafeteria department.

Section 4. The employer will provide jackets for bus drivers, bus monitors and hall monitors. The employees furnished with such jackets shall be responsible for their maintenance and cleaning. Jackets shall be replaced as needed by the employer, provided that the employer shall not be required to provide more than one (1) jacket for any employee in any contract year.

## ARTICLE 30
## Grievance and Arbitration Procedure

Section 1. The parties hereto agree that an orderly and expeditious resolution of grievance arriving out of the applications and interpretation of the terms of this agreement shall be provided for in accordance with the following process:

STEP 1 An employee, either alone or accompanied by a union representative, or the union where entitled, shall present the grievance in writing to his/her department head within twelve (12) work days of the date of its occurrence, or knowledge of its occurrence. The department head shall attempt to resolve the matter and report his/her decision to the Union, in writing, within ten (10) work days of its presentation.

STEP 2 In the event the grievance is not settled at STEP 1, any appeal must be presented in writing by the employee or his/her union representative to the Superintendent within ten (10) work days after the department head's response is due under STEP 1. The Superintendent or his/her designee shall respond in writing to the employee and the union representative within ten (10) work days after receipt of the appeal.

STEP 3 Any appeal from an unfavorable decision at STEP 2 shall be initiated by the union serving upon the employer a notice in writing of its intent to appeal the decision to the Harrisburg

School Board. Upon receipt of such appeal, the School Board shall respond in writing within ten (10) days after their next regularly scheduled meeting.

STEP 4 Any appeal from an unfavorable decision at STEP 3 shall be initiated by the union serving upon the employer a notice in writing of its intent to proceed to arbitration within ten (10) work days after receipt of the STEP 3 decision is due. Said notice shall include a copy of the grievance.

The arbitrator is to be selected by the parties jointly within ten (10) work days after the notice has been given. If the parties fail to agree on an arbitrator, either party may request the Bureau of Mediation to submit a list of seven (7) possible arbitrators.

The parties shall, within ten (10) work days of receipt of said list, meet for the purpose of selecting the arbitrator by alternately striking one name from the list until one name remains. The employer shall strike the first name.

Each case shall be considered on its own merits and the collective agreement shall constitute the basis upon which decision shall be rendered. The decisions at STEPS 1, 2 and 3 shall not be used as a precedent for any subsequent case. The arbitrator shall neither add to, subtract from, nor modify the provisions of this agreement. The arbitrator shall be confined to the precise issue submitted for arbitration and shall have no authority to determine any other issues not so submitted.

The decision of the arbitrator shall be final and binding on both parties, except where the decision would require an enactment of legislation, in which case it shall be binding only if such legislation in enacted. The arbitrator shall be requested to issue his decision within thirty (30) days after the hearing or receipt of the transcript of the hearing.

-38-

All of the time limits contained in this section may be extended by mutual agreement.

All fees and expenses of the arbitrator shall be divided equally between the parties. Each party shall bear the costs of preparing and presenting its own case. Either party desiring a record of the proceedings shall pay for the record and make a copy available without charge to the arbitrator.

Section 2. Where the parties agree to a meeting during working hours to discuss a grievance at any step, an employee shall be permitted to have a representative of the union present, subject, however, to Section 606, Article VI, of the Public Employees Relations Act. The aggrieved employee and union representative, if an employee, shall suffer no loss of pay or leave time if such meeting is held during working hours.

Employees selected by the union to act as union representative shall be known as stewards. The union shall furnish the employer with the names and work locations of grievance representatives and shall notify the employer of any changes.

An aggrieved employee and union representative, if employees of the employer, shall be granted reasonable time during working hours to process grievances in accordance with this Article without loss of pay or leave time.

A reasonable number of witnesses, when required, shall be allowed to participate in the grievance procedure.

-39-

# ARTICLE 31
## Management Rights

Section 1. It is understood and agreed that the employer, at its sole discretion, possesses the right, in accordance with applicable laws, to manage all operations including the direction of the working force and right to plan, direct and control the operation of all equipment and other property of the employer, except as modified by the agreement.

Matters of inherent managerial policy are reserved exclusively to the employer. These include, but shall not be limited to, such areas of discretion or policy as the functions and programs of the employer, standards of service, its overall budget, utilization of technology, the organizational structure and selection and direction of personnel.

Section 2. The listing of specific rights in the agreement is not intended to be, nor should be considered restrictive or a waiver of any of the rights of management not listed and not specifically surrendered herein, whether or not such rights have been exercised by the employer in the past provided such rights do not violate provisions of the labor agreement.

# ARTICLE 32
## Miscellaneous Provisions

Section 1. The employer agrees that it will not contract out any bargaining unit work that would result in the layoff of any regular bargaining unit employee.

Section 2. Employees and/or their union representative when accompanied by the employee shall be entitled to see the contents of their personnel file (except confidential information such

as letter of recommendation) and shall be entitled to insert into the personnel file written comments concerning any material contained therein. All personnel files shall be kept in the Personnel Office in the Administration Building.

Section 3. It shall be the duty of the employer to remedy all unsafe or unhealthy conditions within a reasonable time after notification by the union of the existence of such conditions.

Section 4. A copy of all Board Reports shall be given to the union president, and a copy sent to AFSCME District Council 90's representative.

Section 5. Committees composed of representatives of the union and the employer are to be established to discuss labor management problems that may arise. Any such labor management meetings held during the employees work day shall not result in the loss of any pay by the employee as a result of attending such meetings.

Section 6. The Board shall continue present practice in regard to benefits for part-time employees.

Section 7. Beginning with the first day, any employee who at the request of the employer performs the work of a supervisor on a temporary basis, will receive the minimum salary of said supervisor or fifty (50) cents an hour over and above their regular rate of pay for all hours worked as a supervisor, whichever is greater.

Section 8. All departments of the employer will establish a standardized procedure for late reporting. This procedure will be posted on all departmental bulletin boards.

Section 9. All affected employees will be provided a "reasonable assurance letter" prior to the end of the school year

Section 10. The employer agrees that if an emergency day is declared by the employer resulting in the closing of the entire District including the Administration Building, then those employees, who because of the nature of their work are required to work on said day, will be given compensatory time off at the option of the employer.

The Union and the School District agree to establish a policy regarding provisions for all employees in the event of school closings.

Section 11. Employee benefits and working conditions now existing and not in conflict with agreement shall remain in full force and effect.

Section 12. The employer shall provide all maintenance, grounds, commissary, truck drivers and utility person employees with steel toes safety shoes, and shall replace said shoes as needed. The employer shall not be obligated to supply more the one (1) pair of shoes per employee per contract year, except the grounds crew shall receive two (2) pair of shoes.

Section 13. Early dismissals given on Thanksgiving and Christmas holidays to other School District employees shall also be given to bargaining unit employees. Employees required to remain on duty by management shall be given compensatory time.

whether or not they will be returning to their jobs at the beginning of the new school year.

## ARTICLE 33
## Termination

This agreement shall be affective as of July 1, 1997, and shall continue in full force and effect up to and including June 30, 2001. It shall automatically be renewed from year to year, thereafter, unless the union notifies the employer in writing by such time as would permit the parties to comply with the collective bargaining schedule established under the Public Employee Relations Act.

Intending to be legally bound, the parties hereto have hereunto set their hands and seals this 30th day of April, 1998.

AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES DISTRICT COUNCIL 90

THE SCHOOL BOARD OF
THE SCHOOL DISTRICT OF
THE CITY OF HARRISBURG

Attest

Attest

School Board President

Attest 4-30-98

## MEMORANDUM OF UNDERSTANDING

From July 1 to July 31, 1997, the District will provide special retirement bonus and benefits pursuant to ARTICLE 26 of this Agreement as follows:

1. The same level of benefits provided in Article 26, with the exception that the negotiated insurance benefits effective July 1, 1997 shall be provided to the employee.

2. There shall be no cap on the number of employees eligible for this special ERIP for the above stated period.

3. There shall be no cap on the number of employees eligible for the regular ERIP pursuant to Article 26 pursuant to the above stated time period. After July 31, 1997 the cap of ten (10) as provided in Article 26, Section 3(2), shall apply.

4. Eligibility requirements shall be 50 years of age and 25 years of services to the District.

5. This Agreement shall not constitute a past practice nor shall it be construed as a past practice or subject to the arbitration procedure provided herein.

6. This Agreement shall expire and terminate at midnight August 1, 1997.

## MEMORANDUM OF UNDERSTANDING

In consideration of the Agreement by an between Harrisburg City School District and AFSCME Council 90, regarding the contracting out of transportation services pursuant to Article 32, Section 1, the parties hereby agree that:

1. The District shall guarantee placement of four (4) full time employment positions for transportation employees on seniority basis.

2. Effective July 1, 1997, full time employees shall have recall rights based upon seniority for three (3) years for vacancies in the District if the employee meets the minimum qualifications.

3. Effective July 1, 1997, part time employees shall have recall rights for eighteen (18) months for vacancies in the District if they meet the minimum qualifications.

4. If not reasonably related to the vacant position prior experience shall not be a requirement for eligibility.

5. This Agreement shall not constitute a past practice, nor shall it be construed as a past practice.

6. This Agreement shall expire and terminate at midnight July 1, 2000.

**HARRISBURG SCHOOL DISTRICT**
**EXHIBIT A**
**STARTING SALARIES FOR CLASSIFIED POSITIONS**
**LISTED BY SALARY CATEGORY**

| Category | Job Title | Starting Salary | Hours | Days Per Year |
|---|---|---|---|---|
| Category I | Substitute Lunch Aide | 6.00 per hour | 2.5/4.0/5.0/8.0 | On call as needed |
| Category I | Lunch Aide | 6.00 per hour | 2.5/4.0/5.0/8.0 | 184 |
| Category I | Lunch Aide | 6.00 per hour | 2.5/4.0/5.0/8.0 | 184 |
| Category II | Hall Monitor | $6.25 per hour | 8.0 | 184 |
| Category II | Cafeteria Helper I | $6.25 per hour | 4.0 | 184 |
| Category II | Cafeteria Helper II | $6.25 per hour | 8.0 | 184 |
| Category III | Lunch Aide Leader | $6.50 per hour | 5.0 | 184 |
| Category IV | Courier/Mail Clerk | $7.00 per hour | 7.5 | 260 |
| Category IV | Instructional Aide | $7.00 per hour | 7.5 | 184 |
| Category IV | ESL Aide | $7.00 per hour | 7.5 | 184 |
| Category V | Assistant Cafeteria Manager | $7.25 per hour | 8.0 | 204 |

-46-

**HARRISBURG SCHOOL DISTRICT**
**EXHIBIT A**
**STARTING SALARIES FOR CLASSIFIED POSITIONS**
**LISTED BY SALARY CATEGORY**

| Category | Job Title | Starting Salary | Hours | Days Per Year |
|---|---|---|---|---|
| Category VI | Substitute Custodian | $7.50 per hour | 8.0 | On call as needed |
| Category VI | *Facility Service Worker I | $7.50 per hour | 8.0 | 260 |
| Category VI | Clerk-Typist I | $7.50 per hour | 7.5/8.0 | 214/260 |
| Category VII | Special Education Aide | $7.75 per hour | 7.5 | 184 |
| Category VII | Parent Coordinator | $7.75 per hour | 7.5 | 260 |
| Category VIII | Community Liaison Worker | $8.00 per hour | 8.0 | 260 |
| Category VIII | Warehouse Person | $8.00 per hour | 7.5 | 260 |
| Category VIII | *Facility Service Leader | $8.00 per hour | 8.0 | 260 |
| Category VIII | Reprographic Specialist | $8.00 per hour | 8.0 | 260 |

-47-

**HARRISBURG SCHOOL DISTRICT**
**EXHIBIT A**
**STARTING SALARIES FOR CLASSIFIED POSITIONS**
**LISTED BY SALARY CATEGORY**

| Category | Job Title | Starting Salary | Hours | Days Per Year |
|---|---|---|---|---|
| Category IX | Clerk-Typist II | $8.50 per hour | 7.5 | 214/260 |
| Category IX | Library Aide | $8.50 per hour | 7.5 | 184 |
| Category IX | *Facility Service Worker II | $8.50 per hour | 8.0 | 260 |
| Category IX | Cafeteria Manager | $8.50 per hour | 8.0 | 204 |
| Category IX | Production Manager | $8.50 per hour | 8.0 | 260 |
| Category X | Facility Service Driver | $8.75 per hour | 8.0 | 260 |
| Category X | Stenographer | $8.75 per hour | 7.5 | 260 |
| Category X | Warehouse Person Driver | $8.75 per hour | 8.0 | 260 |
| Category X | Truck Driver | $8.75 per hour | 8.0 | 260 |
| Category XI | Substitute Secretary | $9.75 per hour | | |
| Category XI | Secretary | $9.75 per hour | 7.5 | 214/260 |
| Category XI | School Secretary | $9.75 per hour | 7.5 | 214/260 |

-48-

**HARRISBURG SCHOOL DISTRICT**
**EXHIBIT A**
**STARTING SALARIES FOR CLASSIFIED POSITIONS**
**LISTED BY SALARY CATEGORY**

| Category | Job Title | Starting Salary | Hours | Days Per Year |
|---|---|---|---|---|
| Category XII | *Facility Service Worker III | $9.50 per hour | 8.0 | 260 |
| Category XII | *FacilityService Foreman 1A | $9.50 per hour | 8.0 | 260 |
| Category XIII | Campus Security | $9.75 per hour | 7.5 | 184 |
| Category XIII | Health Aide | $9.75 per hour | 7.5 | 184 |
| Category XIV | *Facility Service Foreman 1B | $10.00 per hour | 8.0 | 260 |
| Category XIV | Junior Accountant | $10.00 per hour | 7.5 | 260 |
| Category XV | PC Support Specialist | $10.50 per hour | 7.5 | 260 |
| Category XVI | *Facility Service Foreman II | $10.75 per hour | 8.0 | 260 |

-49-

**HARRISBURG SCHOOL DISTRICT**
**EXHIBIT A**
**STARTING SALARIES FOR CLASSIFIED POSITIONS**
**LISTED BY SALARY CATEGORY**

| Category | Job Title | Starting Salary | Hours | Days Per Year |
|---|---|---|---|---|
| Category XVII | *Facility Service Foreman III | $12.00 per hour | 8.0 | 260 |
| Category XVIII | Unix Operator | $12.25 per hour | 7.5 | 260 |
| Category IX | *Facility Service Foreman IV | $12.50 per hour | 8.0 | 260 |
| Category XX | Accountant | $14.50 per hour | 7.5 | 260 |

-50-

| | |
|---|---|
| *Facility Service Worker I | formerly Custodian |
| Facility Service Leader | formerly Custodian Leader |
| Facility Service Worker II | formerly Groundskeeper/Painter |
| Facility Service Worker III | formerly Maintenance Mechanic/Fireman |
| Facility Service Foreman 1A | formerly Head Custodian Minor |
| Facility Service Foreman 1B | formerly Head Custodian Major |
| Facility Service Foreman II | formerly Grounds/Painter Foreman |
| Facility Service Foreman III | formerly Head Maintenance/Fireman Foreman |
| Facility Service Worker IV | formerly HVAC Mechanic |

# KNOW YOUR RIGHTS AND USE THEM

Under your AFSCME contract and federal law, you are guaranteed certain rights to union representation. Know them. Use them.

1. You have a right to union representation, not a specific union representative, at any meeting with management which could possibly result in disciplinary action against you.

2. Whenever you are called to a meeting with management, explicitly ask about the specific nature of the meeting.

3. Before beginning the meeting, or at any time you believe the meeting is covering areas that might result in discipline, you must explicitly ask for union representation.

4. Prior to proceeding with the meeting, confer with your union representative and discuss the matters at issue in the meeting.

5. If you have any questions, ask your union representative.



Position Guide

| | |
|---|---|
| **TITLE:** | **Facility Service Foreman 1A** (formerly Head Custodian I-Minor) |
| **REPORTS TO:** | School Principal |
| **JOB GOAL:** | Maintain the physical school plant and grounds in a condition of operating excellence so that full educational use may be made at all times. |
| **WORK ENVIRONMENT:** | Works inside and outside the building, sometimes in uncomfortably warm, cold or inclement weather. |

**PHYSICAL DEMANDS:**

1. Constant bending, lifting, pushing, pulling and reaching necessary.
2. Walking for extended/limited periods of time.
3. Climbing ladders.

**MINOR SCHOOLS:**

Baton-Felton Academy
Downey Elementary School
Foose Elementary School
Lincoln Elementary School
Marshall Elementary School
Melrose Elementary School
Riverside – Math/Science Academy
Shimmell Elementary School
Steele Elementary School
Woodward Elementary School

**ESSENTIAL JOB FUNCTIONS:**

1. Keeps buildings and premises, including sidewalks, driveways and play areas neat and clean at all times.
2. Plans and oversees all maintenance and repair work, maintenance of a high standard of safety, cleanliness and efficiency.
3. Assigns, schedule, evaluates and trains members of the facility staff.
4. Scrubs, hoses and disinfects toilet floors daily and cleans all sanitary fixtures and drinking fountains daily.
5. Shovels snow from walks, doorways, entranceways and steps and spreads ice melting materials and can operate snow removal equipment.
6. Monitors the time recorders of all custodial employees in the school and certifies them for salary payment.
7. Maintains an inventory, recommends purchase and orders of suitable supplies, tools, and equipment.
8. Opens and closes school and raises and lowers flags.
9. Checks on work of shift crews.
10. Checks fire extinguishers, and emergency generators weekly.

EXHIBIT

Hazzard - 9

Pat        A-R-01

## ESSENTIAL JOB FUNCTIONS (Cont'd):

11. Washes all windows inside and out.
12. Keeps all floors in a clean, attractive condition and in a good state of preservation.
13. Moves heavy boxes to storage areas, i.e., books, supplies, etc.
14. Checks roof areas for debris and removes when necessary.
15. Uses low and high ladder as required.
16. Assumes responsibilities for all employees on this shift, i.e., their cleaning habits, giving additional instructions when needed and resolving problems necessary.
17. May work days, evenings and weekends.
18. Performs other duties as assigned.

**Also, since Head Custodians are first line supervisors, they shall perform the following duties:**

1. Implement school district policies in the area of assigned work.
2. Schedule work for assigned personnel and ensure that work is accomplished in a satisfactory manner.
3. Evaluate personnel assigned to them according to school district policies.
4. Implement changes needed to improve employee performance.
5. Institute disciplinary measures where needed to improve job performance for assigned personnel.
6. Participate, upon request, in the screening and interviewing of employees for hiring and promotion.
7. Participate in the process of terminating employees when necessary.
8. Perform other duties customary of first line supervisors.

**OTHER JOB FUNCTIONS:**  Other duties that fall within the framework of this general guideline as may be assigned.

## MINIMUM QUALIFICATIONS:

1. High School Diploma or GED.
2. Five (5) years' experience as a school custodian or the equivalent in custodial service in other institution or firms.
3. Demonstrates knowledge in the basic techniques of electrical repair and maintenance.
4. Physically able to perform essential functions of job.
5. Satisfactory work record.
6. Criminal history/child abuse clearances (Acts 34 and 151).

## TERMS OF EMPLOYMENT:

Salary according to current AFSCME Basic Labor Agreement.
260 day work year – 8.0 hours per day.

REVISED: JULY, 1998
FSVFMN1A.DOC/LDF/dgt

EXHIBIT

Hazzard - 10

Leh   10-19-01

Exh 10

**Position Guide**

**TITLE:**                    Facility Service Foreman 1B (formerly Head Custodian I-Major)

**REPORTS TO:**          Manager of School Facilities and School Principal

**JOB GOAL:**             To maintain the physical school plant and grounds in a condition of operating excellence so that full educational use may be made at all times.

**WORK ENVIRONMENT:** Works inside and outside the building, sometimes in uncomfortably warm, cold or inclement weather.

**PHYSICAL DEMANDS:**

1. Constant bending and reaching necessary.
2. Walking for extended/limited periods of time.

**MAJOR SCHOOLS:**     Administration Building/Ben Franklin Academic Prep School
Camp Curtin Early Childhood Center
William Penn Intermediate School
John Harris Campus

**ESSENTIAL JOB FUNCTIONS:**

1. Keeps buildings and premises, including sidewalks, driveways and play areas neat and clean at all times.
2. Plans and oversees all maintenance and repair work, maintenance of a high standard of safety, cleanliness and efficiency.
3. Assigns, schedule, evaluates and trains members of the facility staff.
4. Scrubs, hoses and disinfects toilet floors daily and cleans all sanitary fixtures and drinking fountains daily.
5. Shovels snow from walks, doorways, entranceways and steps and spreads ice melting materials and can operate snow removal equipment.
6. Monitors the time records of all custodial employees in the school and certifies them for salary payment.
7. Maintains an inventory, recommends purchase of suitable supplies, tools and equipment.
8. Opens and closes school and raises and lowers flags.
9. Checks on work of shift crews.
10. Checks fire extinguishers and emergency generators weekly.
11. Washes all windows inside and out.
12. Keeps all floors in a clean, attractive condition and in a good state of preservation.
13. Moves heavy boxes to storage areas, i.e., books, supplies, etc.
14. Checks roof areas for debris and removes when necessary.
15. Uses low and high ladder as required.
16. Assumes responsibilities for all employees on this shift, i.e., their cleaning habits, giving additional instructions when needed and resolving problems necessary.

**Also, since Facility Service Foremen are first line supervisors, they shall also perform the following duties:**

1.  Implement school district policies in the area of assigned work.
2.  Schedule work for assigned personnel and ensure that work is accomplished in a satisfactory manner.
3.  Evaluate personnel assigned to them according to school district policies.
4.  Implement changes needed to improve employee performance.
5.  Institute disciplinary measures where needed to improve job performance for assigned personnel.
6.  Participate, upon request, in the screening and interviewing of employees for hiring and promotion.
7.  Participate in the process of terminating employees when necessary.
8.  Perform other duties customary of first line supervisors.

## MINIMUM QUALIFICATIONS:

1.  High School Diploma or GED.
2.  Five (5) years' experience as a school custodian or the equivalent in custodial service in other institutions or firms.
3.  Demonstrates knowledge in the basic techniques of electrical repair and maintenance.
4.  Physically able to perform essential functions of job.
5.  Satisfactory work record.
6.  Criminal history/child abuse clearances (Acts 34 and 151).

## TERMS OF EMPLOYMENT:

Salary according to current AFSCME Basic Labor Agreement.
260 day work year – 8.0 hours per day.



COUNCIL 13
**AMERICAN FEDERATION OF STATE, COUNTY
AND MUNICIPAL EMPLOYEES, AFL-CIO**

*Exh 11*

RECEIVED
PERSONNEL OFFICE
99 AUG 17 PM 2:12

# GRIEVANCE FORM
*(Type or print information, filling in all blanks.)*

District Council **90**            Local Union **2063**        | **00095** |

Grievant (s) **CLASS ACTION**                    Social Security No. _____

Employer **HBG. SCHOOL DIST.**

Department **SCHOOL FACILITIES**                Job Title _____

Supervisor **TIM CURTIS**                Work Location _____

| **EXHIBIT** |
| *Hazzard-11* |
| *Reb    10-19-01* |

## VIOLATION

Article # **19**        Section # **1**

### STATEMENT BY GRIEVANT OR UNION

EFFECTIVE JUNE 28, 1999 ALL HEAD CUSTODIAN'S WERE TRANSFERED
TO OTHER BLDGS. BY MANAGEMENT, AUGUST 12, 1999 A LETTER
WAS SENT TO ALL HEAD CUSTODIAN'S. IT STATED / THIS IS
TO NOTIFY YOU THAT YOUR TRANSFER WAS APPROVED. THIS
IS NOT ACCURATE. NO HEAD CUSTODIAN REQUESTED A TRANSFER

### RELIEF OR REMEDY SOUGHT

ALL HEAD CUSTODIAN'S WHO WENT FROM MINOR CUSTODIAN TO A
MAJOR HEAD CUSTODIAN POSITION SHALL BE PAID IN ACCORDANCE
WITH ARTICLE 19 SECTION 1 OF A.F.S.C.M.E. CONTRACT RETROACTIVE
PAY STARTING BACK TO JUNE 28, 1999. AND MADE WHOLE.

*Steven T. McCollum*    8-17-99

| Steward Signature | Date | and/or | Employee Signature | Date |

93

**UNION**



Exh 12

## COUNCIL 13
### AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO

# GRIEVANCE FORM

*(Type or print information, filling in all blanks.)*



District Council **90**    Local Union **2063**    **JO118**

Grievant (s) **WILLIAM HAZZARD**    Social Security No. **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**

Employer **HBG. SCHOOL DIST**

Department **SCHOOL FACILITIES**    Job Title **F.S.F. 1A**

Supervisor **TIM CURTIS**    Work Location **SHIMMEL**

## VIOLATION

Article # **22**    Section # **5**

> **EXHIBIT**
> Hazzard - 12
> ____ 10-19-01

### STATEMENT BY GRIEVANT OR UNION

ON JUNE 6, 2000 MR. CURTIS CALLED ME AT WORK AND STATED THAT HE HAD A PROBLEM WITH A BEREAVEMENT THAT OCCURED IN OCT. OF 99. MY BROTHER IN LAW PASSED AWAY, MY BROTHER IN LAW WAS RESIDING IN MY HOME AT THE TIME OF HIS DEATH. ACCORDING TO AFSCME CONTRACT I AM PERMITTED 5 DAYS OF BEREAVEMENT LEAVE. MR. CURTIS INSIST THAT I PUT IN A VACATION SLIP TO COVER THESE DAY. I FEEL AS THOUGH MR. CURTIS IS HARRASSING AND TRYING TO INTIMINATE ME. MY BROTHER IN-LAW PASSED AWAY IN OCTOBER, EIGHT MONTHS AFTER HIS DEATH MR. CURTIS STILL INSIST I SEND A VACATION SLIP

### RELIEF OR REMEDY SOUGHT

TO STOP IMMEDIATELY, THE CONSTANT HARRASSMENT AND INTIMIDATION THAT HAS OCCURED, ALSO TO SEEK PROFFESSIONAL HELP IN DEALING WITH SUCH CRISIS

Steward Signature     Date    and/or    William A. Hazzard   6-7-00

     Employee Signature    Date

`-93`

**UNION**



# AFSCME.®

*Exh 13*

RECEIVED
PERSONNEL OFFICE

American Federation of State, County, and Municipal Employees  •  AL FEB -8 PM 5: 31
Dauphin County Pennsylvania Public Employees District Council 9
4031 Executive Park Drive  •  Harrisburg, Pennsylvania 17111-1599  •  717-564-51
FAX 717-564-49

**JUDITH HEH**
*Council Director*

**TYRONE MITCHELL**
*President*

**JOYCE CULPEPPER**
*Vice President*

**JOHN WATERS, JR.**
*Secretary*

**KARLA HODGE**
*Treasurer*

**Executive Board:**
CHARLOTTE SMITH
DALE KICHMAN
GEORGE L. FULTZ
TODD SINGER

**Trustees:**
ELIZABETH HOLLERN (2001)
TYRAN COBB (2002)
RACHELLE REID (2003)

**LENORA WILBON**
*Vice President*
*Council 13*

February 6, 2001

Lance Freeman, Chief
Human Resources
Harrisburg School District
1201 North Sixth Street
Harrisburg, PA 17102

Re: AFSCME Grievance #90-2063-00118    William Hazzard

Dear Mr. Freeman:

The response from Management in this matter is as follows:

While not conceding a violation of the Agreement, the Harrisburg
School District agrees that mutual respect and dignity should
prevail at all times in employee relationships.

Please affix your signature and return original or copy to me within five
(5) days. Should you have any questions, comments or concerns, please contact
me at 561-7084.

Very truly yours,

*M. Nichelle Chivis*

M. Nichelle Chivis
Staff Representative

cc:    File

*Lance Freeman*          2/9/01
Lance Freeman       Date

**EXHIBIT**
Hazzard-13
10-19-01

Exh 14



# AFSCME®

American Federation of State, County, and Municipal Employees • AFL-CIO

## Dauphin County Pennsylvania Public Employees District Council 90

4031 Executive Park Drive • Harrisburg, Pennsylvania 17111-1599 • 717-564-5123
FAX 717-564-4914

**JUDITH HEH**
Council Director

**TYRONE MITCHELL**
President

**JOYCE CULPEPPER**
Vice President

**JOHN WATERS, JR.**
Secretary

**KARLA HODGE**
Treasurer

**Executive Board:**
CHARLOTTE SMITH
DALE KICHMAN
GEORGE L. FULTZ
TODD SINGER

**Trustees:**
ELIZABETH HOLLERN (2001)
TYRAN COBB (2002)
RACHELLE REID (2003)

LENORA WILBON
Vice President
Council 13

February 20, 2001

William Hazzard
1940 Brookwood Street
Harrisburg, PA 17104

Re: Grievance #90-2063-0118

Dear Mr. Hazzard:

This is to notify you that the above referenced grievance has been settled to our satisfaction and we are withdrawing this grievance from the grievance procedure.

Enclosed is a copy of the signed settlement.

If you have any questions, comments or concerns, please feel free to contact me at 564-5123.

Very truly yours,

*M. Nichelle Chivis*

M. Nichelle Chivis
Staff Representative

Enclosure

cc:   Margaret Fuller
      Rob Tapper
      File

EXHIBIT
Hazzard-14
10-19-