ORIGINAL

36
3/5/0

2 to CV

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM A. HAZZARD       )      **CIVIL ACTION LAW**

           **Plaintiff**          )

                       )      **No. 1:CV-00-1758**

           **Vs.**              )

                       )

**TIM CURTIS,**             )

**MACK MCMURRAY,**       )

**AFSCME, DISTRICT 90,**     )

**AND THE HARRISBURG**    )

**SCHOOL DISTRICT**        )      **JURY TRIAL DEMANDED**

                       )

         **Defendants**       )

FILED
HARRISBURG
MAR 0 4 2002
MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

## PLAINTIFFS EXHIBITS TO HIS BRIEF IN OPPOSITION TO DEFENDANTS SCHOOL DISTRICT AND CURTIS

1.) Deposition of Robert Tapper.................................... "A"

2.) Deposition of Robert Epps...................................... "B"

3.) Deposition of Wanda Williams............................... "C"

4.) Deposition of Nichelle Chivis................................ "D"

5.) Deposition of Robert McCollum............................. "E"

6.) Plaintiffs PHRC/EEOC  Complaint......................... "F"

7.) Complaint................................................................ "G"

Plaintiff also incorporates by reference the following Harrisburg School District and Timothy Curtis (hereinafter collectively "District") Exhibits to their brief in support:

1.) Deposition of William Hazzard
    District Exhibit.................................................... "A"

2.) Deposition of Mr. Curtis
    District Exhibit.................................................... "B"

3.) Deposition of Robert L. Mac Murray
    District Exhibit.................................................... "C"

4.) Deposition of Lance Freeman
    District Exhibit.................................................... "D"

**EXHIBIT "A"**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM HAZZARD,
        Plaintiff,
   vs.
TIM CURTIS, ROBERT
MacMURRAY, AFSCME DISTRICT
90, HARRISBURG SCHOOL
DISTRICT, et al.,
        Defendant

:
:
:
:
:
:
:
:
:
:
:
:

1-CV-00-1758


JURY TRIAL DEMANDED

---

Proceedings:     Video Deposition
                 Robert Tapper

Date:            January 29, 2002

APPEARANCES:

         For Plaintiff:     Donald Bailey, Esquire
                        4311 North 6th Street
                        Harrisburg, PA 17110

         For Defendant:    Shawn Lochinger, Esquire
                        Rhoads & Simon LLP
                        1 South Market Street
                        Harrisburg, PA 17112

                        Eric Fink, Esquire
                        Willig, Williams & Davidson
                        1845 Walnut St. 24th Floor
                        Philadelphia, PA 19103

1           MR. BAILEY:  Ladies and Gentlemen let me

2    advise everyone before we begin that there are electronic

3    recording devices in operation. Attorney's in particular

4    please be aware that sometimes these microphones pick

5    up particular stray comments and we don't want to do

6    anything to hurt your causes or your clients so be aware

7    that there are microphones recording a tape.  This is a

8    videographic deposition and there will be a TV recording

9    available.  Mr. Tapper as the witness here you are

10    advised that a copy will be maintained here at this office

11    and you have every right to contact us and come and

12    review it okay please if you want to purchase a copy you

13    have to arrange that with the videographer okay? We

14    have a Mr. John Kochinski that is here in place of Mr.

15    Fink today. He is from the same law firm, Willig,

16    Williams and Davidson in Philadelphia Pa. Welcome Mr.

17    Kochinski. We're happy to have you here today and a

18    Shawn, who do you, you are representing who are you

19    representing? Shawn Lochinger who are you

20    representing?

21           MR. LOCHINGER:  Harrisburg School District

22    and Mr. Curtis.

23           MR. BAILEY:  And your clients John are?

24           MR. CHINSKI:  AFSCME District Counsel 90

25    and Mr. MacMurray.

1              MR. BAILEY:  Mr. MacMurray. We have a
2      stenographic reporter here that the defendants have
3      brought here and before the videographer swears you or
4      the stenographer can it doesn't matter to us. You just
5      beware you have to keep your voice up, be aware you
6      can't respond with gestures the TV camera can get that
7      but of course the stenographer can not. And the other
8      thing that we have to be careful about is that we
9      separate our questions and answer a little bit of time so
10     that there can be a change up and the question and
11     response can be identified.  If I talk over you if I
12     interrupt you before you have an opportunity to respond
13     completely please make sure, Mr. Tapper that you
14     correct me and get your full and complete answer in
15     okay?  Now with the stenographer you'll also have, since
16     your not represented by counsel here today you also
17     have a right to do what's called a read and sign alright
18     because if they want to use that deposition in trial
19     which they usually can hear you know to ask you
20     questions from or prepare responses and that kind of
21     thing typically which depositions are also used for
22     addition to providing information.  You can go in and
23     you can look at the deposition with the stenographer
24     and at the end of the deposition she will have for you
25     what's called an errata sheet. And on the errata sheet

1    you can um take issue you can says hey and you can

2    recite the Lords prayer it doesn't make any difference it

3    does not come apart of the deposition her record stands.

4    Well lets say that you feel there's a misunderstanding or

5    a misspelling and correction you put it down and it

6    becomes apart of the deposition and you can refer to it

7    but the stenographic record stands.  The TV record is

8    there that's also there. So you know that's also part of

9    the proceedings we will make a transcript of that and if

10   you know, typically my practice is to let them purchase

11   them from the videographer.  Now Mr. Marceca do you

12   want to get started on that?

13          MR. MARCECA:  Good morning, be advised

14   that the video and audio are in operation.  My name is

15   Tony Marceca in live at 2219 Dixie Drive, York Pa.  I've

16   been contracted by PR video to be the video operator for

17   this deposition.  The case is The United States District

18   Court of the Middle District of Pennsylvania.  The

19   caption is William H. Hazzard plaintiff versus Tim

20   Curtis, Mac MacMurray, AFSCME District 90, The

21   Harrisburg School District and all of the defendants.

22   The case number is 1:CV-00-1758. The time right now

23   is 10:08.  Please raise your right hand and I'll swear you

24   in. Do you swear to tell the truth the whole truth so help

25   you God?

1    MR. TAPPER:  Yes I do.

2    MR. MARCECA:  Your name is?

3    MR. TAPPER:  Robert E. Tapper Junior.

4    MR. MARCESA:  Thank you Mr. Bailey would

5    you do a sound check please?

6    MR. BAILEY:  Yes sir my name is Don Bailey I

7    represent the plaintiff Mr. Hazzard in this matter Mr.

8    Tapper has just spoken. And maybe John you and

9    Shawn can just identify your voice so that when they do

10   the transcript they can pick you voice off.

11   MR. KOCHINSKI:  My name is John

12   Kochinski. I represent the defendant District 90

13   MR. LOCHINGER:  My name is Shawn

14   Lochinger and I represent the Harrisburg School District

15   and Mr. Curtis.

16   MR. BAILEY:  I'd like to apologize to Shawn I

17   said Lochingger. It's Lochinger forgive me for ending and

18   I apologize.  As an attorneys let me just ask you a

19   question, the usual stipulations and objections to the

20   form of the question served to time of trial is that okay?

21   MR. LOCHINGER: Yes.

22   MR. KOCHINSKI: Yes. I'm new here at these

23   proceedings and I don't know exactly, I've got to ask you

24   something, with the reserve to time of trial?

25   MR. BAILEY: That's the way we've been

5

1    proceeding.

2    MR. KOCHINSKI: With the waiving and sign

3    MR. BAILEY: We haven't gotten to the issue of

4    waiving, which I believe that is referring to. Now a read

5    and sign, that's a right that exists for him. What we had

6    proceeded on, to paraphrase exactly what you're

7    referring to, that's what we had done previously to save

8    time and that's typical. That's what I mean by usual

9    stipulations. I didn't mean in other words that I would

10   meant that there were any other stipulations that might

11   be indigenous to these proceedings. We didn't have

12   anything else I can represent that so I was only, you

13   were correct. I was only referring to the form. ok?

14   MR. KOCHINSKI:     Ok.

15   MR. BAILEY: Thank you sir. So let's move

16   along then. Let me give you just a few more

17   instructions. It's important because John again is new

18   to the proceedings, from time to time its possible there

19   may be an objection by an attorney. Now typically, Mr.

20   Tapper what's going to happen is an attorney will say

21   objection, the stenographer will get that down. It will be

22   noted, you know, the answer and one of us will say you

23   may respond. If we don't and we get into a discussion

24   just wait until we finish with all the lawyer stuff so to

25   speak and then we can continue on from there. Now you

1    have a right to read and sign or not read and sign.

2    That's something that you need to let the stenographer

3    know. In other words that's a choice that you have. So

4    do you want to read and sign?

5        A:   So what's all this read and sign stuff.

6    You're not going to waive me no rights for this here.

7    What do you mean by read and sign?

8        Q:   Ok when the stenographer, typically

9    depositions are not done by video. It's a relatively new

10   thing, probably in five years that's all you're going to

11   see, but most depositions are done by stenographer,

12   they take down what you say. The idea behind read and

13   sign is that the person who is being asked the

14   questions, he is the depone approves or at least reviews.

15   Now you can't change what the stenographer says but

16   you can comment and note the page and the line where

17   you agree, disagree, you can embellish and enlarge. Ok?

18   It doesn't change the transcript, it stands as is, but it

19   gives you an opportunity to review.

20       A:   Yeah, I'll review.

21       Q:   Ok, 90%, most of the time I tell them, I'll

22   be honest with you most of the time I tell my people to

23   waive it particularly if there is audio or a video record of

24   it, but you because you are not represented. I don't like

25   to tell you if you're not represented. But my own clients

1    I do.

2              A:    I want to read through it.

3              Q:    All right. Here's what you will do . When

4    we're done with the deposition you make arrangements

5    with the videographer and she will tell you want needs

6    done. Usually what you do is they have you come to

7    their office and review, ok? Maybe I can ask her. Ma'am

8    is your office local?

9              STENOGRAPHER: Yes it's right off of Progress

10   Avenue, an office complex up there. It's like 10 minutes

11   from here.

12             MR. BAILEY: What you do is you give her

13   your address, your phone number. You have thirty days

14   once she notifies you and you make arrangements with

15   her. The other attorneys will be notified and you can go

16   ahead and do what you're going to do.

17             A:    Yeah cause I always want the option.

18             MR. BAILEY: Well, hey that's good policy. Ok

19   Mr. Tapper, your full name is Robert E Tapper. My

20   understanding is you go by Rob?

21             A:    Yeah.

22             Q:    if I refer to you from time to time as Rob

23   or Mr. Tapper whatever that's ok?

24             A:    I'd rather go by Rob anyway.

25             Q:    Ok, Rob, I'm going to be asking you a

1    series of questions here and while I do so just let me tell

2    you when I do so I want you to answer fully and

3    completely, don't guess or speculate wildly, answer to

4    the, you can qualify an answer with I'm almost certain

5         A:    To the best of my knowledge

6         Q:    I call the degree of certainty. You answer

7    the best way that you can. Now one of the things that I

8    don't mind doing that's different than most attorney's

9    do, if you have a question about a question I ask I have

10   no objection, I'm just after a good fact record. I'm not

11   interested in tricking people. I'm not smart enough to do

12   that. All I want you to do is answer completely. If you

13   wonder where I'm going with a group of questions

14   because I may change pace from time to time or

15   direction, you feel free to ask. Ok?

16        A:    Yeah.

17        Q:    And I will give you an explanation. I do

18   not mind you asking me where I'm coming from. If I

19   have some reason for not telling you then I'll tell you

20   whatever that might be, ok?

21        A:    Yes.

22        Q:    All right Rob; do you know the plaintiff,

23   Mr. Hazzard?

24        A:    Yes sir I do.

25        Q:    How do you know Mr. Hazzard?

1         A:    I was employed at the Harrisburg school

2    district and so was he. He was having problems, things

3    not going his way and I was giving him some from

4    friendly advice.

5         Q:    What do you mean by things weren't

6    going his way?

7         A:    Well the school district screwed him and

8    the union screwed him.

9         Q:    Ok. Keep responding, could you please

10    provide details as to what you mean when you say the

11    school district screwed him? What do you mean by that?

12         A:    Well he bidded for a job, the job was

13    posted, he had bidded for it and they denied him that

14    job. They filled it with an employee that didn't have his

15    seniority that Mr. Hazzard has. And their union contract

16    states that even I a board meeting at Marshall school, a

17    board member asked Lance Freeman what gave the final

18    decision on the job. Joe Brown was the board member

19    that asked him this. And Lance Freeman said the

20    ultimate decision is seniority.

21         Q:    Ok, who is Lance Freeman?

22         A:    At that time he was the personnel thing,

23    the Personnel Director for the Harrisburg School

24    District.

25         Q:    You say this was at a board meeting?

1          A:    Yes.

2          Q:    And the gentleman that you are referring

3    to is a Mr. Davis?

4          A:    No, Joe Brown.

5          Q:    Mr. Joe Brown?

6          A:    Well they both actually asked the same

7    question. Joe Brown and Ricardo Davis.

8          Q:    I have heard the name Davis before in

9    this litigation and I don't think I've heard Joe Brown.

10   Ricardo Davis?

11         A:    Davis yeah.

12         Q:    They directed this question to Mr. Lance

13   Freeman. Is that F-R-E-E-M-A-N?

14         A:    I think it's F-R-E-E-D-M-A-N. I'm not

15   sure if it's Freeman or Freedman.

16         Q:    Is Joseph Brown black?

17         A:    He looks white but he is black.

18         Q:    How about Mr. Ricardo Davis?

19         A:    Yes he is black.

20         Q:    How about Mr. Freeman?

21         A:    Yes he is black.

22         Q:    All right now are you familiar with the

23   complaint in this case?

24         A:    For Hazzard?

25         Q:    Yes sir. Mr. Hazzard's complaint.

11

1    A: We went through the union first. Mr.

2 McCollum and myself took it upon ourselves to do some

3 checking on the procedures for the district. There is a

4 complaint procedure but in order to go through that you

5 have to go through all the avenues of the grievance

6 procedure. So we went through the grievance procedure

7 and then we went and filed the complaint.

8    Q: The complaint that you are referring to

9 is a complaint procedure that the school district has?

10    A: Yes. It has nothing to do with the union.

11    Q: It has nothing to do with the union. The

12 union procedure is a grievance procedure.

13    A: That is correct.

14    Q: Now your testimony is that Mr. Hazzard

15 utilized the grievance procedure. He was not successful.

16    A: No Nichelle Chivis was his staff rep and I

17 looked at the paperwork and she had taken it upon

18 herself to withdraw his grievance and I had questioned

19 her on that and she said she thought it didn't have

20 merit.

21    Q: Ok, thanks to the question I'm getting

22 lost. I have a bunch of little side questions I need to ask.

23 Let me try to come back. When I asked you about the

24 complaint you responded and told me about the

25 complaint process with the school district. Do you

1    remember that?

2            A:    Yes.

3            Q:    And this is my fault because I certainly

4    was going to go there. I was referring to, what I meant to

5    ask and should have more clearly was are you familiar

6    with the complaint that Mr. Hazzard, and by familiar I

7    mean have you seen it or read it, that Mr. Hazzard filed

8    with the United States District Court with the Middle

9    District of Pennsylvania. I don't know if you've ever had

10   opportunity to read it.

11           A:    I did not read through it but I was also a

12   person that had said go the whole way until you are

13   comfortable with the decision. And he had mentioned

14   this to me about doing this and I had said if it was me I

15   would have done the same thing.

16           Q:    Do you know whether Mr. Hazzard has

17   raised the complaint that race, discrimination against

18   him, what's called reverse discrimination, that he has

19   raised a complaint. That one of his complaints is that he

20   is being discriminated because he is white. In other

21   words on account of his race.

22           A:    Yes. Mr. Hazzard and I had discussed

23   that and I told him that I agreed with him and he was

24   on the right track to do that.

25           Q:    I want to ask you some questions about

1    that so I'm going to come back and I'm going to ask you

2    some questions about the issue of race and Mr.

3    Hazzard's allegations that he was injured because of his

4    race which in this case is white. I will return to that area

5    in just a little bit, we're just going to take a moment.

6          A:    Can I bring a point on that?

7          Q:    Yes sir you can.

8          A:    I took it upon myself when this was all

9    taking place. Mr. Hazzard and myself had never

10   discussed this. I was kind of saving this until this came

11   up. Mr. McCollum and myself had done our own little

12   checking on different issues.

13         Q:    Bu McCollum do you mean Steve

14   McCollum?

15         A:    Yes, Steve McCollum. And we wrote

16   down all the schools and we wrote down all the black

17   head custodians and all the white custodians. Through

18   this transfer all the black custodians that were in a

19   minor building, which was a smaller building was

20   transferred to a major building which means that

21   through the union contract they were entitled to more

22   money. There's two white, at that time there was two

23   white head custodians. They both went from a minor

24   building to a minor building. That could appear to be

25   racist.

1      Q:    Are you saying that the black custodians

2      went from the, the black custodians went from the

3      minor schools to the major?

4      A:    That is correct.

5      Q:    Are you saying that the occurred in

6      cases, well particularly in the case of Mr. MacMurray

7      when he had less seniority than a white custodian and

8      that was not only a bid job but Mr. McMurray went to a

9      major school as a black custodian from a minor school.

10     A:    Well in that case, there were some cases

11     where they went from a major building to a major. It

12     was a lateral transfer. But on some of the other cases

13     some of the black custodians went to a major building

14     which means so: for instance if you're in a major

15     building and there were some black custodians that

16     were transferred to a minor building. They still had to

17     keep that pay. So most of all the black custodians

18     whether they were in a minor or major building were

19     making major pay.

20     Q:    That wasn't true of the whites though?

21     A:    That wasn't true of the white. And the

22     two white people that were there went from a minor to a

23     minor. Why would you, what's? There are thirteen

24     schools. There are two white people out of thirteen

25     buildings you would assume that one of the chances as

1    far as one of the white custodians going to a major, well
2    that's pretty good odds.

3              Q:    Nichelle Chivis? White or black?

4              A:    She is black.

5              Q:    All right. What position, you had
6    indicated Nichelle Chivis withdrew Mr. Hazzard's
7    grievance without notifying him. Am I correct? Did I
8    hear that?

9              A:    Yes. She had sent him a letter stating
10   that she had withdrawn the grievance. To the best of my
11   knowledge she never discussed it with Hazzard and she
12   never discussed it with his steward, which was Robert
13   Epps, I believe was the person that filed that grievance.

14             Q:    Do you know Mr. Epps?

15             A:    Yes.

16             Q:    Did you have conversations with him?

17             A     Yes we had discussed on this and he
18   had called me on this numerous times and asked me,
19   you know, how I felt and if they were going the right
20   direction. And Mr. Epps is black. He's a black guy. He's
21   an exceptional person and he saw that Hazzard was
22   being screwed so he stepped up to the plate.

23             Q:    So Mr. Epps is black and he felt that Mr.
24   Hazzard was being mistreated?

25             A:    Yes, that's correct.

1         Q:   And that the, Mr. MacMurray, what is

2  Mr. MacMurray's race?

3         A:   He is black.

4         Q:   Do you know if Mr. MacMurray has any

5  position which any of the local unions in this case the

6  AFSCME local or the larger Council 90?

7         S:   Yes. At that time he was a, they kind of

8  created a position. I'm trying to remember what they

9  called him. He was kind of like a steward for the first

10  line supervisors and they wanted MacMurray, they kept

11  saying that McMurray should have filed the grievance

12  for Hazzard. But that's a big conflict of interests because

13  he is the one that came and took the job that Hazzard

14  should have been awarded.

15         Q:   I'm now going to ask you some questions

16  that have to do with what you referred to as a complaint

17  procedure. You had indicated that the job was posted.

18  What was the job? Do you recollect?

19         A:   The job was a Head Custodian for a

20  major building. Which was a new school, which was

21  being built.

22         Q:   To the best of your knowledge how many

23  people bid on that posting?

24         A:   I can go by what I was told. That there

25  was one person that bid on it.

1      Q:    And who told you that only one person

2  bid?

3             A:    Mr. Curtis had stated that Robert

4  MacMurray had bidded on that job and that wasn't in

5  the regular meeting that was in his office. But I never

6  went to Lance with it but Tim Curtis had said that

7  Robert MacMurray bidded.

8             Q:    Mr. Curtis told you that?

9             A:    Yes.

10            Q:    What is Mr. Curtis' race?

11            A:    He's black and Robert MacMurray also

12  said that he bid on it. He said that nobody else bidded

13  on it.

14            Q:    Did you eventually learn that the, were

15  you eventually made aware that Mr. Hazzard was the

16  only person that bid on that job?

17            A:    I did hear that later on down the road.

18  But I had saw Mr. Hazzard's bid for that job. I can only

19  go by what they told me. I mean whether or not

20  somebody bid on that job I don't know. I can only go by

21  what they tell me.

22            Q:    And you'd also in response to an earlier

23  question indicated that Mr. Hazzard had seniority?

24            A:    Yes he did.

25            Q:    Ok and under the union contract was,

1    were both Mr. MacMurray and Mr. Hazzard equally

2    qualified except that Mr. Hazzard had more seniority?

3            A:    To the best of my knowledge, yes.

4            Q:    And was that admitted by the school

5    board members that Mr. Hazzard had more seniority?

6            A:    Yes that was admitted at Marshall

7    school. No wait; hold on, I'm getting confused. No that's

8    when they brought up that seniority being the ultimate

9    decision. But Mr. Freeman I believe had sent a letter to

10   the union and I have that letter from him admitting that

11   Mr. Hazzard had seniority. But they said that this was a

12   management decision to award Mr. MacMurray.

13           Q:    So the union went along with the

14   management decision to disregard seniority in the case

15   of Mr. Hazzard. Withdrew Mr. Hazzard's grievance and

16   agreed with management that Mr. MacMurray should

17   have the job and Mr. Hazzard bid on?

18           A:    Yes that's how I feel.

19           Q:    But in addition to the best of your

20   knowledge you at least were told, you don't know

21   because you didn't see anything, that am I correct that

22   you were told Mr. MacMurray had also bid for the job?

23           A:    Yes.

24           Q:    Did you ever see any of these bids in

25   writing other than Mr. Hazzard's? In other words did

1    you ever see a written bid other that Mr. Hazzard's?

2    A:    No I did not.

3    Q:    You saw a written bid by Mr. Hazzard?

4    A:    Yes. And then that question had come

5    up about whoever bid and then somebody had stated

6    that they never posted the job. And we showed them a

7    posting and they said that was posted by mistake.

8    Q:    Who said it was posted by mistake?

9    A:    Mr. Lance Freeman had stated that and

10    the postings come out of his office.

11    Q:    Have you ever seen Mr. Lance Freeman's

12    deposition in this case?

13    A:    No I did not. I actually didn't know he

14    had one.

15    Q:    So you don't know how he responded to

16    questions about whether or not that job was posted

17    either by mistake or whether it was posted period?

18    A:    No I don't but I had heard him tell me

19    that.

20    Q:    Rob I want to ask some questions about

21    these sort of separating my questions into different

22    groups and now I'm going to change directions and ask

23    you some questions about the, this complaint procedure

24    ok? Can you complaint to the school district at any

25    time?

A:    They say you can but if you go to do it they can say well you didn't go through the proper procedure and everything else. And I had gotten books from the school board's office and I followed that procedure and helped Mr. Hazzard. We went through all of the steps the correct way.

Q:    Ok did you go to a meeting sometime where you were not allowed to speak?

A:    Yes. Actually I was at the meeting and I wasn't the one that was going to speak. Mr. Robert Epps had said, he was going to speak, that since we had exhausted every option that was possible through the grievance procedure, we had discussed it and he was going to go to a public board meeting at Marshall school and speak on the issue. And as soon as he had stood up and started discussing well I have a grievance she went "uh-uh-uh, stop. We're not hearing that here." She had shut him up. But prior to that, I know this for a fact. I heard it with my own two ears. I was out at Council 90 and we were discussing different issues and Nichelle Chivis had said about someone going to the board meeting. This was after the meeting had taken place and she said "Well I called Wanda and took care of that. He didn't get to speak his peace. That's not the time or place to do that."

1      Q:    Now Wanda is who?

2      A:    She is the school board president. She is

3  also a member of AFSCME as well.

4      Q:    now wait a minute, do you know what

5  AFSCME local she was a member of?

6      A:    I'm really not 100% sure. I think it's

7  through the state or something. I think she was in a

8  local, I really don't know what local.

9      Q:    I'm really not sure what local that would

10  be. We'll just wait and see. How do you know she in fact

11  that she? All right let's go back.

12      A:    I had something else to state on that.

13  Nichelle had made the statement, I don't recall where

14  and when it was made but she said that Wanda

15  Williams was one of her own and she stated that she

16  was in with it, some local, somewhere.

17      Q:    Was it your understanding that Wanda

18  William was a member of an AFSCME local at the time,

19  during the period of time that was complained about in

20  the complaint. During this hearing and this complaint

21  process that Mr. Hazzard alleges was an improper

22  treatment of him trying to get that job, at that time?

23      A:    It's my understanding. I don't have

24  stone proof that she was a member at that time.

25      Q:    What were you doing at the Council 90

22

1    meeting where you indicated that this was sometime

2    after Mr. Epps was denied the opportunity to speak?

3    How, where was this meeting and how long was it after

4    the school board meeting?

5         A:    It was after the school board meeting. It

6    was a few days, a week; it wasn't much more than that.

7    My memory is not that good but I know it was after the

8    fact. The meeting was out at Council 90 and we were

9    out there, as a matter of fact it was when Reed had first

10   got the Ok to take over the school district. We were just

11   in there talking and Judy Hay came in and said I just

12   want to tell you guys something. I had spoken to the

13   mayor about him taking the school board over and you

14   guys or your local will not be affected by it.

15        Q:    But where was this Council 90 meeting?

16   At that AFSCME building out there near.

17        A:    Chambers Hill Road.

18        Q:    Chambers Hill Road.

19        A:    That is correct. It was in there in a little

20   conference room off to the side.

21        Q:    Ok, why had you gone to that meeting?

22        A:    I was really involved in the union. I was

23   a steward at the time and I was helping a lot of people

24   out on grievances. For some reason, I don't recall why

25   but they had asked me to come to that meeting.

1    Q:    You were, I need to understand, you

2    were a union steward at that time so you weren't just

3    some activist interested in things or a friend of Mr.

4    Hazzard. You were a union steward.

5    A:    Yes.

6    Q:    Now were you in, I'm sorry

7    A:    Yes I was a steward and I was really

8    starting to get involved and they asked me to come. At

9    that time I was not an officer but later on I was voted in

10    as the vice president of my local.

11    Q:    All right. Are you a union official now?

12    A:    No I'm not. I quit the school district and

13    I went to another union, another job, but previously I

14    was.

15    Q:    Are you active in this union here?

16    A:    A little active. I'm not as active as I was

17    in the last union.

18    Q:    What union is that?

19    A:    United Service workers but they are out

20    of New York. In order to be an officer there I would have

21    to drive to New York a couple days a week. I don't want

22    to do that.

23    Q:    All right. At the time that Mr. Hazzard

24    was grieving his disagreement over not being given the

25    position that he alleges he bid for, were you the, were

24

1   you his union steward at that time? That was, I'm sorry;

2   Mr. Epps was his union steward at that time.

3           A:    Mr. Epps was his steward for that but I

4   had sat down with Robert Epps and we had discussed

5   this over and over ad over again to make sure we were

6   going in the right direction.

7           Q:    Ok.

8           A:    Robert Epps, myself and Steve

9   McCollum we all stayed in contact through this whole

10   procedure.

11           Q:    Do you know whether Mr. Epps ever

12   complained to any AFSCME officer or official about

13   being denied an opportunity to speak at the school

14   board?

15           A:    To be honest with you I don't recall.

16           Q:    Did Mr. Epps ever indicate whether

17   Nichelle Chivis had spoken to Wanda before that school

18   board meeting?

19           A:    You asking if Epps ever mentioned to me

20   about it?

21           Q:    Strike the question. I will try to lay a

22   little foundation.  Do you have any knowledge or know

23   of any facts, which would indicate Nichelle Chivis has

24   spoke to Wanda, what's Wanda's last name?

25           A:    Wanda Williams.

1          Q:    Wanda Williams. That's it. Spoke to

2   Wanda Williams who is apparently head of the school

3   board at that time?

4          A:    Yes she was the president.

5          Q:    The question is this. Do you know of any

6   facts which indicate that Nichelle Chivis had spoken to

7   Wanda Williams prior to that school board meting about

8   union members coming down to complain to what

9   happened, was happening to Mr. Hazzard?

10         A:    Yes. Nichelle had told us in that meeting

11   that she had called Wanda Williams because she knew

12   we were going to that meeting. It got out. There had

13   been rumors and it got out that we were going to that

14   meeting.

15         Q:    So when Nichelle made these remarks in

16   the meeting she was referring to something that she had

17   taken care of before the school board meeting.

18         A:    Yes. And Margaret Fuller, which is the

19   president at this time of that local, her and I had talked

20   about this, at that time she told Steve McCollum and

21   myself that we need to fight for Hazzard because nobody

22   else is going to be able to step up and do it. We had

23   also, she knows and she was aware of that statement

24   that she said that she called Wanda Williams and took

25   care of that situation.

1    Q:    So union members who were voicing

2    concern at public meeting about their view that an

3    AFSCME member was being injured shut off, they were

4    prevented from speaking out. Now that's at the school

5    board, Mr. Epps was not allowed to speak.

6    A:    That's correct. Wanda Williams told him

7    to stop right there. That he was not allowed to go any

8    further with that situation in that meeting.

9    Q:    Do you know whether the grievance

10   process was over at that time?

11   A:    Yes it was over and Nichelle had

12   withdrawn it. That's why we had come to the decision to

13   go there. We had already went through all the proper

14   procedures.

15   Q:    Yes, well you've anticipated my next

16   question. My next question was, are you reasonably

17   certain that Nichelle Chivis had withdrawn the Hazzard

18   grievance? Your testimony is without his permission or

19   without consulting him prior to when he went to this

20   public meeting and then had called a school board

21   member in the public meeting to prevent the union

22   steward and Mr. Hazzard any other people from

23   speaking out on that issue or complaining about that

24   issue.

25   A:    That is correct.

1    Q:    Do you know of AFSCME leaders ever

2    doing that on any other occasion, on any other issue?

3    A:    Yeah, I remember it. I just have to

4    picture it. I know it was Steve McCollum, actually I

5    think it was after the fact. It was after that meeting I

6    believe. Mr. McCollum, there was different problems in

7    the district. He had went to the school board meeting,

8    which was at the administration building. Upstairs in

9    the board room and he had stood up and he had spoke,

10   she left him speak.

11   Q:    Who left him speak?

12   A:    Wanda Williams. She didn't shut him up

13   like she did Robert Epps. She let him because she

14   wasn't aware that he was coming at that time. We kind

15   of kept it hush-hush. We just showed up, no warnings,

16   no nothing.

17   Q:    So you don't know of any policy on the

18   school boards part to prevent generally, a discussion of

19   employee concerns or union problems. You just know

20   that in the case of Hazzard, the Hazzard matter that the

21   public debate was cut off that prevented Epps.

22   A:    That is, yes, that's what happened. But I

23   know for a fact, and I have this book at home to this

24   day. It's the <u>Harrisburg School District Board</u>

25   <u>Procedures and Policies</u>

1    Q:    Could you produce that for me?

2    A:    I can give you that book.

3    Q:    And you also mentioned another

4  document you said you had a copy of a letter of some

5  kind?

6    A:    Yes I have a file of

7    Q:    Do you have any objection, if you do we

8  can subpoena

9    A:    I can get copies.

10    Q:    I want copies for opposing counsel. If

11  you can produce that. I would just like to copy. You can

12  come here and I don't even want you to leave it here. I

13  would prefer you to come and stay here and we'll copy it

14  with your kind permission and I will require a copy for

15  opposing counsel.

16    A:    Yeah and where I was going that book

17  we've looked, there is nothing in there that states as an

18  employee that you are not allowed to speak at board

19  meeting. There is nothing in that book that states that.

20    Q:    How many school board meetings have

21  you been at where employee matters came up or were

22  discussed?

23    A:    I've been at numerous, I can't ell you

24  how many. But when I first started getting involved I

25  went to every school board meeting because I wanted to

29

1    know what's going on. You never know what can help

2    you in those meetings down the road. And you know

3    what the problems are and there were other issues

4    where plenty of teachers had stood up and spoke. There

5    were some other district employees.

6            Q:    Are those teachers members of

7    organized labor?

8            A:    Yes. They are not AFSCME they are

9    members of the teachers union, of HEA.

10           Q:    But they're members of the union.

11   They're unionized right?

12           A:    They let them talk.

13           Q:    But in this case, Mr. Hazzard you feel

14   was singled out?

15           A:    I know he was.

16           Q:    All right.

17           A:    Because she knew we were coming to

18   that meeting. She was warned ahead of time that we

19   would be there.

20           Q:    That's Wanda?

21           A:    Wanda Williams was notified prior to us

22   getting there.

23           Q:    Now let me go back and again I'm going

24   to change direction. And we're going to talk about Mr.

25   MacMurray. You had indicated earlier, and Mr.

1    MacMurray is black?

2            A:    Yes.

3            Q:    Do you remember what school, on or

4    about the summer of I guess 1999 when these events

5    occurred, let me double check the complaint so I don't

6    make an error, yeah. On or about the summer of '99

7    what school was Mr. MacMurray in? Do you remember?

8            A:    Like it was yesterday. He was

9    transferred from William Penn School; he was

10   transferred, never bidded on it, from William Penn to

11   Hamilton.

12           Q:    But there was never a posting for that.

13   Unlike the Hazzard situation where there was a posting.

14   Whether the defendants can carry the burden that it

15   was by error or not. There was not a posting was there

16   in the change from William Penn to, what's the school

17   again?

18           A:    Hamilton.

19           Q:    Hamilton.

20           A:    No what had happened was Mr. Curtis

21   had decided he was going to do a massive transfer

22   throughout the district. So that's when he came and

23   transferred all the custodians and they all got

24   transferred from building to building. Mac, Robert

25   MacMurray got transferred from a major building which

31

1    was William Penn to a minor building which was

2    Hamilton. He still kept major pay, and that's what I said

3    form the beginning when I said they were all

4    transferred. They were all getting more money but the

5    two white custodians.

6          Q:    Now Mr. Tapper, I invite my colleague to

7    correct me if I mischaracterize. My best recollection of

8    what Mr. Curtis had testified that the transfer of Mr.

9    MacMurray from William Penn to Hamilton was

10   temporary. Shawn if that's incorrect I'll back off here.

11         MR. LOCHINGER: No that's my recollection.

12         MR. BAILEY: That's my recollection because

13   Mr. Curtis' explanation was this Mr. Mac Murray's case

14   was the transfer concerning form William Penn to

15   Hamilton was temporary. Based upon your recollection

16   of events at that time can you tell me if there was any

17   information know to you that would indicate that it was

18   temporary as opposed to it being a permanent transfer.

19         A:    I know for a fact that if you're going to

20   transfer someone temporarily you would put 'we're going

21   to house him there' or something. MacMurray got a

22   letter as well as all the other custodians and I'm sure

23   you can get that letter that his transfer was approved

24   from William Penn to Hamilton School, cause they had

25   given Mr. Hazzard a letter stating that your transfer was

32

1   approved from Marshall School to Shimmel. But no one

2   ever asked for a transfer. Mr. Curtis had taken it upon

3   himself and I had brought it to his attention and I had

4   said, you know, and asked what was the reason of the

5   transfer?

6                          **END AUDIOTAPE SIDE ONE**

7              MR. BAILEY:    Ok Mr. Tapper let me go back

8   and ask that last question again. You were talking about

9   this letter that Mr. Curtis had had language in that it

10  was approved, and if I'm not mistaken your response

11  was that no one had requested these transfers.

12             A:    No one to my knowledge, and I've asked

13  a lot of the custodians had filled out a transfer slip. Mr.

14  Curtis had taken it upon himself to transfer. And I

15  mentioned it to him about the transfer and he, more or

16  less; I forget how he worded it. More or less he didn't

17  want the custodians to getting in the comfort zone

18  where they were. That's why he did that.

19             Q:    Now do you know whether he had

20  consulted any AFSCME officials before he did all of

21  these transfers?

22             A:    To the best of my knowledge, no. We had

23  mentioned it to Nichelle; we went to her with it. Mr.

24  McCollum had filed a grievance on it and I don't

25  remember what happened to the grievance. I had other

33

1    things on my mind. I really didn't get involved in that

2    one but I know there was a grievance filed on that.

3              Q:    Based on your recollection on the

4    summer of 1999, aside from the position, because that's

5    when the new school opened right?

6              A:    Yes.

7              Q:    And the name of that school was?

8              A:    That was Rowland.

9              Q:    And that's the position that Rowland

10   Head Custodian position that Mr. Hazzard had bid upon

11   which had been posted. Is that correct?

12             A:    Yes. One other point I want to point out

13   too. I also have a letter at home that you two guys are

14   welcome to have. It states and Lance Freeman even

15   admitted that a posting, in case they tried to say he did

16   it before it was posted. That this letter states that at any

17   time whether the position, anytime whether the position

18   is available or not, an employee can fill out a bid for that

19   position.

20             Q:    Did Mr. Freeman in fact, admit that Mr.,

21   admit that he was not arguing with the fact that Mr.

22   Hazzard had bid on the position? If you remember, and

23   by the way.

24             A:    I'll be honest with you, I know it's in my

25   papers somewhere I have a stack like that

1    Q:    Let me say this to you. Anytime I ask a

2    question, if you don't know the answer, as long as that's

3    a truthful answer that is the answer. Sometimes

4    witnesses get into a think where they sort of feel a need.

5    Don't do that. If the answer is I don't know then the

6    answer is I don't know.

7    A:    I believe there is something in my file on

8    that and, but I don't remember how it's worded but I will

9    look and you're welcome to read it. He did admit that,

10   he did state something about that Hazzard had the

11   seniority for that job. But he also said later on down the

12   line that this was a management decision to put Robert

13   MacMurray there.

14   Q:    But when the question arose was it a

15   management decision to post a job? Did he indicate that

16   that was a mistake?

17   A:    He did state that that was a mistake

18   that it was posted by mistake. The posting comes out of

19   his office but that was after the fact. There was never to

20   my knowledge, they never stated about it being posted

21   by mistake until we pushed this issue. Do you see what

22   I'm saying? Like after the fact that it was a mistake but

23   whether it was, whether it was a mistake or not, a

24   mistake or not it was posted and somebody bidded for

25   the job that had the seniority.

1    Q:    Mr. Tapper give me just a couple
2    minutes to review my notes. And I think, I'm sure these
3    gentlemen are going to have some questions for you.
4    Let me just step outside with my client and then I don't
5    think I'll have any more questions for you. Also I'll get in
6    touch with you about those. I may ask you in court
7    about those. Please remember, I'm sorry.

8    A:    I want to state on the record that there
9    was another meeting later on down the road. After we
10   went through we requested a board hearing.

11   Q:    Go ahead.

12   A:    We requested a board hearing. Myself,
13   Steve McCollum and Hazzard had filled out all the
14   paperwork and all the procedures to get that. The set up
15   a board hearing and Joe Brown and Ricardo Davis was
16   in that hearing. In the hearing, the whole time, Jim
17   Brown kept saying that it looked like Tim Curtis and
18   Lance Freeman was lying. And he also made a
19   statement, Joe Brown had said it looks like you guys
20   were, something more or less looking for a soldier,
21   something soldiers to run that building or something.
22   That's how he stated it, something like that.

23   Q:    Who did he say that too?

24   A:    He said it to Mr. Curtis and Mr.
25   Freeman it looks like you two were just going around

1    plunking toy soldiers or something, to pick someone

2    that more or less is on their side. They were referring to

3    Robert MacMurray. And I had spoken to the board

4    members, Ricardo Davis and Joe Brown on their

5    decision not to go on Hazzard's side, you know later on.

6    And they said they believed Hazzard was in the right but

7    the only reason they didn't go on his side was the

8    information that was given to them by Mr. Curtis and

9    Mrs. Conner's and Freeman. So they more or less had

10   an influence from those three on their decision for

11   Hazzard's case.

12        Q:    That information was not at the

13   hearing?

14        A:    That was later on. I went up to them and

15   said hey you gave Hazzard a raw deal what's going on?

16   You looked at the paperwork; you know he's right. They

17   more or less says yeah it reflects, we were going by what

18   Mrs. Connors and Mr. Curtis and Freeman was saying.

19        Q:    Well whatever they had to say, did they

20   say it at the hearing?

21        A:    About?

22        Q:    About Mr. Hazzard.

23        A:    No that was more or less behind closed

24   doors. I don't know where they discussed that.

25        Q:    Who told you the reason was because

37

1    things that were said that wasn't brought out at the

2    hearing? Who said?

3              A:    Mr. Davis and Mr. Joe Brown.

4              Q:    They decided Mr. Hazzard's complaint

5    also hadn't they?

6              A:    Yes but the only reason they come up

7    with that decision was information that was given to

8    them by Mr. Curtis, which were lies.

9              Q:    Do you know what that information

10    was?

11              A:    No I do not. They had never told me any

12    specifics about what Mr. Curtis or Freeman or Mrs.

13    Connors ever said to them. But they do and even in that

14    hearing they called Mr. Curtis and even Mr. Freeman,

15    they kept saying you're lying, you're lying. And they

16    were lying so much. I'd like to know why they didn't

17    award him the job. And they also, and Mr. Brown had

18    brought it up at the hearing, not the hearing I'm sorry.

19    The school board meeting what is the ultimate decision

20    of a job placement. And I think they brought that up

21    because of this case. And Mr. Freeman said the ultimate

22    decision was seniority.

23              Q:    Was that recorded?

24              A:    There were minutes on that and I

25    requested those minutes and they never turned those

1   minutes over to me. I had asked the school board

2   secretary for the minutes.

3          Q:    This hearing you're talking about. You

4   were talking about where Mr. Brown and Mr. Davis were

5   there with you, was that recorded? Were there any

6   video, audio or stenographic

7          A:    No, the way they did it was wrong. I

8   mean it wasn't right. It was just Mr. Curtis, Mr.

9   Freeman, Joe Brown, Rick Davis, myself, Steve

10  McCollum and Hazzard. I don't recall if somebody else

11  was in there at all. I think that was it.

12         Q:    Let me step out a minute with Mr.

13  Hazzard. I don't think we'll be that long. I'm just going

14  to leave the equipment running. Be aware as we step

15  out that it's running.

16         BREAK

17         Q:    Let me ask counsel do you know when

18  discovery ends? Do you have the case management?

19         MR. LOCHINGER: I don't know but I can

20  check. We're pretty close. 03/02.

21         MR. BAILEY: The reason is, Shawn, I want to

22  get these documents.

23         MR. LOCHINGER: We can get copies.

24         MR. BAILEY: I want to take a look at his files.

25  He's noted things here he voluntarily advised us and

1    said we can copy. I know you don't want it cropping up

2                MR. LOCHINGER: I guess the only was he

3    might be talking about things we already have in the

4    record.

5                MR. BAILEY: Here's what I'm going to suggest

6    then I don't know if you have a list of the stuff you have.

7    I have not interviewed this gentleman except for maybe

8    two minutes out here that I told him to answer

9    questions and stuff. So I'm hearing this stuff for the first

10   time also. Do you have a desire when you're done with

11   any questions for any further follow-up depositions, or

12   any additional summaries? I do want you to know that

13   based on information right now we may be dealing with

14   a first amendment complaint. Ok, I'm done folks. Thank

15   you very much and do you want to suspend for a little

16   bit fellows?

17                A:    Yes.

18                MR. BAILEY: Tony would you please shut

19   everything down?

20                MR. MARCECA: It's 11:04 January 29, 2002

21   and we're suspending.

22                BREAK

23                MR. BAILEY: Ladies and gentlemen

24   please be advised that a tape recorder is in operation.

25                MR. MARCECA: It is now 11:14 and we're

1    continuing the deposition.

2            MR. LOCHINGER: All right we'll keep this real

3    short and sweet. Mr. Tapper we didn't formally meet. I'm

4    Shawn Lochinger. I represent the school district and Mr.

5    Curtis. I really only have one question for you to clear

6    up something and just to assess where we are. You

7    talked about Nichelle Chivis and about contacting

8    Wanda Williams before the meeting. I just want to clarify

9    one small point of that. Am I correct that you don't

10   really know what the substance of that conversation

11   was, do you, between Wanda Williams and Nichelle?

12           A:    Do you mean what she had stated to

13   her?

14           Q:    I'm talking about, correct. Did Nichelle

15   Chivis at any time say exactly what was said during that

16   conversation?

17           A:    She had said that some people was

18   going to go to a union meeting and went to a union

19   meeting  and she had called Wanda Williams and had

20   them shut up and took care of that problem.

21           Q:    Now that's not what you had said before.

22   You did not talk about the shut up part.

23           A:    Well stopped them.

24           MR. BAILEY: Objection. I agree that he didn't

25   say shut up

41

| | |
|---|---|
| 1 | MR. TAPPER: She didn't say shut up but she |
| 2 | said she had took care of the problem. |
| 3 | MR. LOCHINGER: Ok that's what you had |
| 4 | said. |
| 5 | MR. TAPPER: That's what I meant but I'm |
| 6 | using shut up as Wanda Williams shut them up. |
| 7 | MR. LOCHINGER: My question for you then |
| 8 | is, were you a part of that conversation between the two |
| 9 | of them? |
| 10 | A:    No I was not. |
| 11 | Q:    Did she report back other than what you |
| 12 | just said any substance of that conversation? |
| 13 | A: No she did not. |
| 14 | MR. LOCHINGER: Thank you I have nothing |
| 15 | else. |
| 16 | MR. BAILEY: John? |
| 17 | MR. KOCHINSKI: No. |
| 18 | MR. BAILEY: Mr. Tapper I have nothing |
| 19 | further. I'd like to thank you very much for coming in. |
| 20 | please remember to make arrangements with the young |
| 21 | lady on your read and sign and again please be aware |
| 22 | that you can come here and you can view the videotape. |
| 23 | So if either of you gentlemen wants a copy of the video |
| 24 | or a copy of the transcript you need to take that up with |
| 25 | Mr. Marceca. Ok? Ok that's it we're done. Thank you. |

1    MR. MARCECA: The time is 1620 hours on

2  January 29, 2002. This deposition is now concluded.

3    END OF TAPE ONE

**EXHIBIT "B"**

*Epps*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM HAZZARD, | : | CIVIL ACTION LAW |
| Plaintiff, | : | |
| | : | 1-CV-00-1758 |
| Vs. | : | |
| | : | (JURY TRIAL DEMANDED) |
| TIM CURTIS, | : | |
| ROBERT MACMURRAY, | : | |
| AFSCME DISTRICT 90, | : | |
| HARRISBURG SCHOOL | : | |
| DISTRICT, ET AL | : | |
| Defendants | : | |

| | |
|---|---|
| Proceedings: | Video Deposition<br>Robert Epps |
| Date: | November 19, 2001 |
| Appearances: For Plaintiff: | Donald Bailey, Esquire<br>4311 North 6th Street<br>Harrisburg, PA 17112 |
| For Defendants: | Shawn Lochinger, Esquire<br>Rhoads & Sinon LLP<br>1 South Market Street<br>Harrisburg, PA 17112 |
| | Eric Fink, Esquire<br>Willig, Williams & Davidson<br>1845 Walnut Street 24th Floor<br>Philadelphia, PA 19103 |

---

1  MS. LYDE: Are you on?

2  MR. BAILEY: Yes, go ahead.

3  MS. LYDE: Good morning ladies and gentlemen. Please

4  be advised that video and audio are in operation. My name is Crystal

5  M. Lyde, L-Y-D-E. My address is 4310 Hillsdale Road, Harrisburg,

6  Pa 17112. I've been contracted PR Video to be the operator for this

7  deposition. The case is in the United State District Court, for the

8  Middle District of Pennsylvania. The caption is William Hazzard vs.

9  Tim Curtis, Mac MacMurray, AFSCME District 90, and the

10  Harrisburg School District. The docket number is 1:CV-00-1758. The

11  date is November 19, 2001. The time is 9:54 a.m. The deposition is

12  being held at the law offices of Don Bailey, 4311 North Sixth Street,

13  Harrisburg, PA 17110. The witness name is Robert Epps. The video

14  deposition is being taken on behalf of plaintiff William Hazzard. Mr.

15  Epps will you raise your right hand please. Will you state your name

16  for the record and spell it please?

17  MR. EPPS: Robert Epps. R-O-B-E-R-T E-P-P-S.

18  MS.LYDE: Please, keep your hand up. Do you so swear

19  to tell the whole truth and nothing but the truth, so help you God?

20  MR. EPPS: Absolutely so help me.

21  MS. LYDE: Thank you Mr. Bailey, sound check around

22  the room.

23  MR. BAILEY: Yes my name is Don Bailey I'm an

24  attorney I represent the plaintiff in this matter William A. Hazzard,

25  Eric please identify yourself.

---

1  MR. FINK: Eric Fink and I'm representing the defendant

2  AFSCME.

3  MR. BAILEY: Shawn.

4  MR. LOCHINGER: And I'm Shawn Lochinger

5  representing the Harrisburg School District.

6  MR. BAILEY: Okay alright Mr. Epps let me just a few

7  preparatory things here this a deposition, it is video deposition there is

8  a recording being made if you want to come in a view the video at

9  some times I have to point this out to witnesses. We will make it

10  available to you can come in and review it ok?

11  MR. EPPS: All right.

12  MR. BAILEY: Now as the record is being taken there is

13  also a, what's called a stenos, that's this young lady here, there's a

14  stenographic record being taken and because she is taking this down

15  by hand it places a premium on you and I allowing enough time to

16  transpire between question and an answer so that there is not an

17  overlap.

18  MR. EPPS: All right.

19  MR. BAILEY: All right I don't expect that you'll violate

20  that rule but I probably will and if I do and you don't get a chance the

21  answer fully and completely please warn me and let me know.

22  MR. EPPS: Absolutely, I'll note it too.

23  MR. BAILEY: Okay sir the other thing that I want to

24  bring to your attention is that I do things a little bit differently if you

25  are curious or want to know where I'm going with a question or where

---

1  I'm going with a group of questions I want you to feel free to ask me

2  don't feel bashful or shy.

3  MR. EPPS: I don't.

4  MR. BAILEY: No I don't think , I don't think you will

5  be either but the point is I don't mind being asked and a lot of times

6  attorneys object and they get a little tough with witnesses and I want

7  you to know that I empathize with you as a witness and I know that

8  that's a difficult position to be in and although your not the type to be

9  intimidated obviously I want you to feel free and open to share

10  everything that we have.

11  MR. EPPS: All right.

12  MR. BAILEY: Now so you feel free if you want to ask

13  me any question. If at any time you want a break I think one thing we

14  need to establish here for purposes of the deposition are you being

15  represented by counsel?

16  A:  No.

17  Q:  All right. Then let me explain something that's

18  important to you particularly because you don't have an attorney here

19  and something that is to do with a right that you have.

20  A:  I understand that right.

21  Q:  Okay well if you have a right under the rules to do

22  what's called a read and sign.

23  A:  Yes.

24  Q:  Because you have a stenographic record being

25  taken

**Page 5**

A:   Yes.

Q:   You have a right and the stenographer will send you or make arrangement with you somewhere that she call explain to you for you to review your deposition.

A:   Right.

Q:   Now your not allowed to change it but you will be provided with what's called an a errata sheet and on a particular page or line you can make reference to something in the deposition that you may disagree with or want to correct every thing from a spelling to a response.

A:   Yes.

Q:   That errata sheet becomes a part of the deposition so you can take issue with something if you want to. Now most people, don't read anything into this, most people waive the reading and signing but that's something that you have every right to you know.

A:   Yes.

Q:   To do it won't cost you any thing or anything like that. Usually its done within thirty days of your, usually, you know, that's up to the court reporter. She's taking this by alternative means you still have a right to do that. Do you want to read and sign or do you just want to waive?

A:   So what are you telling me I need an attorney?

Q:   No. I'm not advising you that you need an attorney.

**Page 6**

A:   But I'm asking you a question though, you said if I have a question to ask right?

Q:   Right.

A:   You just telling me I need an attorney?

Q:   No.

A:   Before I give a deposition?

Q:   No.

A:   Do I need representation?

Q:   I don't think, I can't think of any reason in the world I why I think you need representation.

A:   Okay you said that if I had a question to ask you and I'm going to ask you.

Q:   No that's okay.

A:   All right.

Q:   I don't object to the question read and sign is to read and sign the deposition.

A:   I understand that.

Q:   Do you want to read and sign or?

A:   I can read it.

Q:   Okay why don't you put him down for read and sign, okay? She'll send it to you and then you can review it.

A:   All right.

Q:   Okay Mr. Epps now before we start, do you have any other questions for me, or anything you can think of?

A:   No.

**Page 7**

Q:   For the attorneys, do you, everybody usual the stipulations ok? That the objections except as to the form of the questions are reserved till time of trial.

MR. FINK: Ok.

MR. BAILEY: Ok Mr. Epps thank very much for your patience on all that gobblety gook, ok.

A:   All right.

Q:   Are you familiar with I assume your familiar with the fact that Mr. Hazzard as filed a law suit in federal court surrounding some of the issues having to do with the grievance that he filed for the position at Roland school. Is that fair to say?

A:   Yes.

Q:   Now its my understanding that originally when Mr. Hazzard wanted to file a grievance that he came to you. Is that correct?

A:   Yes it is.

Q:   And Mr. Epps you're a union official?

A:   I'm a union rep.

Q:   Union rep, and what's what position is that like a shop steward?

A:   Yes a steward.

Q:   And what's the local?

A:   2063.

Q:   I want you to please forgive me cause some of these questions are going to be down right dumb, but I don't know

**Page 8**

what you know. So I'm not trying to be cute or anything.

A:   All right.

Q:   Its just one of those things that we just need to get down here. Why does the entire local have just one steward or do they have a steward in each facility?

A:   They have stewards throughout the district, that are assigned to each building.

Q:   Okay why did Mr. Hazzard come to you?

A:   Because I was assigned to that building.

Q:   Okay was Mr. MacMurray his steward?

A:   That I can't answer.

Q:   Okay now I want you to go back in your mind to when these events took place its roughly the summer of 1999. Do you remember what Mr. And some of these question by the way, you know, I realize you may not remember if you don't, you know just, if that's the right answer. Do you know remember what Mr. Hazzard said when he came to you on the grievance?

A:   Not vaguely but bits and pieces. He told me that he wanted to file a grievance, I said on what basis and what merits? You know then he explained it to me. I said well this is what I need from you. I need you to give me something saying that you bid for the job. He showed it to me so I helped him to file a grievance.

Q:   Now I realize some of these things may seem self-serving but is it fair to say that you have a reputation among the membership of being very fair and very honest with them?

1  A:   Well I'm not an attorney and I don't try to be and I
2  always advise them of their labor rights you know what I mean?
3  Q:   Yes I do.
4  A:   And go by the contract you know.  That's all I can
5  do.
6  Q:   Is it also fair to say that you have a reputation for
7  fighting although very fair, fighting very hard for union members?
8  A:   I would say so.
9  Q:   And that's regardless of the situation, regardless of
10 the circumstances. Is that fair to say?
11 A:   Absolutely.
12 Q:   Now Mr. Epps I'm pronouncing that right Epps E-
13 P-P-S?
14 A:   Yes.
15 Q:   Okay Mr. Epps isn't it, is it your understanding that
16 the union is supposed to fight for its membership vigorously and in
17 accordance with the rules?
18 A:   Absolutely.
19 Q:   Now when Mr. Hazzard came to you, I believe I
20 understand your testimony correctly you ask him if he had bid on the
21 position?
22 A:   Right.
23 Q:   And my understanding is that he had advised you,
24 yes, that he had bid on the position and I what to ask you this
25 question. Did he indicate whether or not if the position had been

9

1  posted?
2  A:   Well that I couldn't tell you, because the job was
3  posted but I don't know when.
4  Q:   Ok. Lets just stop and ask a couple of questions
5  about that at this time.  Did you ever I know you don't know when it
6  was posted but did you ever see the posting you self?
7  A:   Yes I'd seen the posting.
8  Q:   And Mr. Epps how was it posted can you tell me in
9  other words was it a piece of paper was it a E-mail?
10 A:   No it was a employment opportunity sheet that had
11 several jobs on it and that job was posted on it.
12 Q:   How did they usually, how does the school district
13 usually, at that time, did the school district usually post jobs that were
14 available?
15 A:   They normally send a job opportunity,
16 employment opportunity sheet to each building or to steward there.
17 Q:   Okay we have had and I think counsel would agree
18 with me if they object to this they certainly will let me know I'm sure.
19 We have what I, it seems to me be perhaps conflicting testimony that
20 the position was posted in error an another witness that I think
21 indicated that it was posted but it wasn't posted in error. My question
22 to you do you have any recollection of being told by anyone that the
23 position was posted in error?
24 A:   Absolutely.
25 Q:   Who told you that?

10

1  A:   Mr. Freeman and Tim Curtis.
2  Q:   And Mr. Epps can you tell me everything you can
3  remember about that, what those gentlemen told you?
4  A:   Well I handled it at the first step.  My question to
5  him was if that job is a misprint when your telling all these jobs they
6  posted is a misprint.  They said no, no just that particular one.  I said
7  why.  They never gave me an answer.
8  Q:   Do you remember in response to the questions you
9  asked if it was Mr. Curtis or Mr. Freeman or both if you remember
10 who responded to you?
11 A:   Both of them responded.
12 Q:   Do you remember where you were when you
13 asked them that question?
14 A:   It was in the boardroom at the administration
15 building, 1201 North 6th Street.
16 Q:   And Mr. Epps do you remember when that was?
17 A:   When the grievance was filed. I don't know exactly
18 what day but when the hearing was scheduled for us to go to the first
19 step.
20 Q:   Ok, so it was early in the grievance process?
21 A:   Right.
22 Q:   It was the.
23 A:   The first step of the grievance.
24 Q:   Yes sir.  Would that had been the first formal
25 meeting?

11

1  A:   Right first hearing.
2  Q:   Yes sir Mr. Epps who I know that you indicated
3  that Mr. Curtis, and yourself and Mr. Freeman, was at that meeting
4  was anyone else there that you can recollect?
5  A:   The union rep, the shop steward, the vice
6  president, the president, and executive board members, myself, Mr.
7  Hazzard, Tim Curtis, Mr. Curtis and Mr. Freeman.
8  Q:   Okay I'm trying to think of her name the lady that
9  who was the union president?
10 A:   Doris Manning.
11 Q:   Yes sir, that was her. Did you say the vice
12 president also?
13 A:   Right.
14 Q:   And who is that?
15 A:   No not the vice president she wasn't the president
16 just the president ok.
17 Q:   One thing caught my ear I believe you said the
18 executive board member?
19 A:   In other words there like a shop steward I guess
20 there other top of the union stewards.
21 Q:   Okay do you know who that was?
22 A:   No I can not. Not at this time.
23 Q:   Ok, was any body from counsel 90 there?
24 A:   Yes the union rep. The union rep, the president.
25 Q:   I'm sorry you said union rep. I'm sorry sir. My

12

error. Do you remember who that union rep was?

A:   Ms. Chivis.

Q:   Nichelle Chivis.

A:   Right.

Q:   All right. Now when Mr. Curtis and Mr. Freeman indicated that the posting was a mistake, you then asked them some questions, they never, your recollection is they did not, they never actually responded to you. Is that correct?

A:   Absolutely.

Q:   Mr. Epps do you know if they ever responded to your questions about this alleged error at anytime?

A:   Not until at the hearing. That's when they said the job was a mistake and my question to them was if that job posting was a mistake then all them were a mistake. They said no that particular one. I said why that particular one. I said aren't you aware of the contract any job that's posted any union member has the right to bid on that job. So your telling me that all these jobs you can't bid on them. All of these are a mistake. They said just that particular one. I said why? They never told me why.

Q:   Did you ever get a response from anyone, either Council 90, like Nichelle Chivis for example or any union official that was above you with the union or any school official, did you ever get an explanation of how this job posting was a mistake or an error?

A:   I never got one. Not to my recollection. I don't recall it.

13

Q:   Ok sir. Now Mr. Epps after that first hearing did you attend any other hearings with any school district officials after that, any other additional hearings?

A:   No I didn't. I went to a board meeting and I brought it up. they told me I couldn't do that and that was the last time and it out of my hands because it was a complaint. It wasn't a grievance any more.

Q:   When you went to the school board meeting, let me see if I can sort this out. Had Mr. Hazzard filed a complaint at that point or was it still a grievance. Do you remember?

A:   I think it was still a grievance.

Q:   Do you remember the date the one that?

A:   No I don't. I have all the information but I don't have it with me.

Q:   Was Mr. Hazzard at that school board meeting?

A:   I don't recall. It's been a while ago.

Q:   Ok but how long, why I'm just curious.

A:   Some things I can remember, some things I can't, you know.

Q:   Yes. But I mean you're obviously, you know, pretty sharp and I'm wondering. I'm asking why you'd would bring up a grievance at a school board meeting?

A:   Because. I'll tell you why. I didn't bring, I wasn't going to discuss the grievance I was going to let them know do you know are you aware of this grievance filed blah, blah, blah, you know,

14

just bring it to their attention.

Q:   Ok so you.

A:   But I was stopped in the process though.

Q:   Well I think that's going to become a very key issue at least from the plaintiff's point of view in this case. I want to ask you some questions about that. Your purpose in mentioning the issue of Mr. Hazzard's situation to the school board was not to get into the right or wrong of the merits grievance. It was just to say, "Hey are you aware this grievance is there?"

A:   Right.

Q:   What encouraged me is you said that they wouldn't even let you address it. How far did you get or what did you get to say? I mean in other words they wouldn't let you talk about it?

A:   Well I was in the beginning of it and they said, well you can't do that here. I said, I started to go into legal technicalities but I didn't because that would of started and argument and.

Q:   Ok.

A:   I'm not an attorney but I do know my rights.

Q:   Ok.

A:   I have the right to address the public forum under the constitution of freedom of speech.

Q:   Yes sir. Who stopped you?

A:   Mrs. Williams and Mrs. Payne.

STENOGRAPHER: I'm sorry what the last name?

15

MR. EPPS:  Mrs. William and Mrs. Payne.

MR. BAILEY:  Do you know how Mrs. Payne spells her name?

A:   I think its P-A-Y-N-E.

Q:   P-A-Y-N-E?

A:   I think so.

Q:   Ok. They were school board members?

A:   Absolutely.

Q:   And do you know Ms. Williams first name?

A:   Wanda Williams.

Q:   Do you know whether Nichelle Chivis had talked to Wanda Williams before else this school board meeting?

A:   That I don't know because I wasn't in that conversation.  But from my perspective they were aware that I was coming.

Q:   Mr. Epps this is awfully important if you can just think back in your mind.

A:   But I can't say they knew, they may have. But I was under the impression they knew.

Q:   Yes that's exactly what my questions goes to. Can you think back and can you share with use why, you know, what made you feel that they knew you were coming?

A:   Because when I brought it up the stop me immediately. So I said, "Oh, ok, no problem."

Q:   Did you tell Nichelle Chivis that you were going to

16

1    the school board meeting?
2           A:    Absolutely.
3           Q:    And what did you tell Nichelle?
4           A:    I just said I'm going to the school board meeting
5    and let them hear the case. To my acknowledgement I might not you
6    know what I mean?
7           Q:    Yes what did Nichelle say?
8           A:    I don't remember her response sir.
9           Q:    At some point it's my understanding the grievance
10   was withdrawn is that correct?
11          A:    Absolutely.
12          Q:    And who did that sir?
13          A:    Ms. Chivis withdrew the grievance.
14          Q:    Okay you didn't do that did you?
15          A:    No I didn't.
16          Q:    Did you recommend that it be withdrawn?
17          A:    No I don't.
18          Q:    Did Ms. Chivis, did Mrs. Chivis tell why she withdrew
19   it?
20          A:    She said it has no merit or it has no warrant. I said
21   show me where it has no warrant or no merit. Then I'll withdraw it
22   myself. I said this grievance show be taken to the next step.
23          Q:    And what did she say?
24          A:    She said its not grievable I said all grievances are
25   grieveable.

17

Q:    That.
       A:    To my recollection now I may not be saying it
word for word or verbatim or whatever; but to my recollection.
       Q:    Its that's normal testimony sir and you can only go
by what you basically remember. I want to read something to you to
respond tell if you have ever heard this before. Protect the grievant's
interest completely. (paragraph) Even if the claim seems weak,
prosecute the grievance as if valid and maintain a positive attitude.
Select an arbitrator who will be objective and unbiased.  If post-
hearing briefs are requested carefully prepare the union grievance
submitted in a timely fashion. (paragraph)  In one case the employee
was discharged for publishing a pamphlet critical of its employer.
The union's representative didn't even examine the pamphlet until just
before arbitration proceedings. He failed to argue important points,
and failed to adequately protect the grievant in questioning by the
arbitrator.  This perfunctory representation was found to constitute a
breach of the fair representation duty.  How do you interpret 'protect
the grievance interests completely?'
       A:    I normally go through all the procedures.
       Q:    Ok.
       A:    And what ever the out come I just have to live with
it.
       Q:    Ok. I want to read some other language to you Mr.
Epps. It says, "However the decision not to continue the grievance
should be for a proper reason.  If the union decides to discontinue a

18

1    grievance the grievant should promptly be informed in writing of the
2    decision along with supporting reasons.  You should establish
3    procedures to discontinue grievances." Has counsel 90 ever given
4    you any procedures on discontinuing grievances?
5           A:    Not to my knowledge.
6           Q:    Ok, so you don't know of any. Have you ever seen
7    Council 13 AFSCME this guidelines investigation of duty and fair
8    role?
9           A:    Absolutely I went to class for that.
10          Q:    Can you take a look at that?  You have seen that?
11          A:    This a union reps, sort of like, handbook.  I mean a
12   guidelines to go by to get all the information before you process a
13   grievance.
14          Q:    Ok is it fair to say that you felt strongly that Mr.
15   Hazzard's grievance should be carried forward particularly because
16   you were never given a response on how this position had been
17   erroneously posted?
18          A:    I wouldn't say. I would say this I went to union
19   steward school.  My job is to represent any union member to the best
20   of my ability and that's all I do.
21          Q:    Ok.
22          A:    And if I feel that there is a grievance is grievable
23   I just have to grieve it you know. Its always best to take it to the last
24   steps to find out the results because you never know if you stop.
25          Q:    Have you ever had any other grievances that has

19

1    gone as far as Mr. Hazzard's grievance had gone that Council 90
2    withdrew on?
3           A:    No it was always resolved.
4           Q:    So how many years do you have with the district?
5           A:    Approximately seventeen plus.
6           Q:    How may of those years of that period of time as
7    of 1999, excluding from 1999 to now, how many years of that time
8    had you been a shop steward?
9           A:    Its been awhile. I was shop steward since ninety-
10   one, I'm not for sure I now its been since the early ninety's.
11          Q:    Many years right?
12          A:    Yes.
13          Q:    It is fair to say in those many years that you
14   participated in hundreds of grievances for the union members?
15          A:    I wouldn't say hundreds grievances but several
16   grievances.
17          Q:    And the other question that I have you ever seen
18   beside the situation with Mr. Hazzard another situation where a job
19   was posted in error?
20          A:    Not to my recollection.
21          Q:    The union rep was Nichelle Chivis?
22          A:    Correct.
23          Q:    You don't remember who the executive board
24   member was. Is that correct?
25          A:    Executive board member.

20

| | |
|---|---|
| 1    Q:   At the meeting, at the hearing? | 1    or? |
| 2    A:   Rob Tapper. | 2    A:   No the secretary of the union Council 90 Local |
| 3    Q:   Ok I understand. Mr. Tapper. Ok that's Rob? | 3    2063. |
| 4    A:   Robert Tapper. | 4    Q:   Okay, not Council 90 then, its a local? |

At the meeting, at the hearing?
A: Rob Tapper.
Q: Ok I understand. Mr. Tapper. Ok that's Rob?
A: Robert Tapper.
Q: Robert Tapper T-A-P-P-E-R. Now was there any recordings made of that meeting or like this young lady here, somebody taking a record anything like that?
A: No.
Q: They normally aren't recorded right?
A: Just write down what the, you just write down the response that you get from management. No way to take notes without a secretary but the secretary should take notes or minutes.
Q: Did the school district have somebody there taking notes do you remember?
A: Not unless Mr. Freeman was taking notes.
Q: Do you know of any notes of that meeting for example did you have some? Does Nichelle Chivis have some? If you know.
A: Do you mean like written?
Q: Yes sir. Like you know somebody take notes or what went on at the meeting yes some kind of record?
A: Well the secretary should have that.
Q: Ok and who would that be?
A: I don't know at the time. I don't know.
Q: Mr. Epps would that be the secretary of the district

21

or?
A: No the secretary of the union Council 90 Local 2063.
Q: Okay, not Council 90 then, its a local?
A: Right.
Q: Now Mr. Hazzard is claiming that he was, he alleges that he was the only person who bid on that position. Do you as you sit here to day do you recollect if any other union members bid on that position?
A: Not to my knowledge.
Q: Okay now I want to switch gears just a little bit and ask some questions about the issue of transfer. There has been testimony here that there was, before this position was posted there had been some transfers among the custodial work force and there was some disputes etc that sort of thing. But just generally can you tell us if you have a recollection of that transfer?
A: Yes I do.
Q: Can you tell us what you remember?
A: Well they shipped all the head custodians to different buildings. So they was assigned to those buildings, that's from my knowledge, what I gather.
Q: Was Mr. MacMurray ever transferred to Hamilton school if you know?
A: Yes he was.
Q: And he has testified here and again I will rely on

22

counsel and if they disagree please tell me. He has testified here that he was in fact transferred to Hamilton but that it was, his word was temporary, that it was temporary transfer?
A: I have not knowledge of a temporary transfer. From what I was told that they were permanent transfers.
Q: Now Roland was coming on line as a school. It was, as far as schools go it wasn't a new building is was a refurbished building, but it was a new location. Is that correct?
A: Absolutely.
Q: Now at or near the time that Roland came online for the district was there a vacancy either by retirement or illness or something in one of the custodial positions head major or minor custodian positions?
A: I have no knowledge of that.
Q: Now when Roland School came on line is my understanding that there was also, is it Scott?
A: Right.
Q: Scott came on line is that right?
A: Absolutely.
Q: And that meant that more, obviously more people employees were going to be needed. Is that correct?
A: Right.
Q: Do you recollect any custodians, major or minor, being hired from outside the district for any school around the summer of 1999 or where they all promotions from within?

23

A: I can't remember, I don't.
Q: Okay do you know if Mr. MacMurray is a union official?
A: He's a union rep.
Q: Do you remember if he participated in any of the meetings that had to do with Mr. Hazzard?
A: No he didn't. Not to my knowledge.
Q: Okay do you recollect, Mr. Epps, if Mr. MacMurray was at any of the school board meetings that you attended where the issue of Mr. Hazzard came up?
A: No he was not at the meetings.
Q: Did you attend of committee of the board, let me just give you a look. Mr. Freeman had indicated to us that there was a committee of the board to hear the Hazzard complaint when it had became a complaint.
A: Right.
Q: Did you attend any of those?
A: No I didn't because it was out of my hands.
Q: Ok.
A: Because it was not a grievance then, it was a complaint. So it was out of my hands.
Q: And that would of occurred after?
A: The first and second step.
Q: Okay and it would have occurred after AFSCME Council 90?

24

**Page 25**

1    A:   Right withdrew.

2    Q:   Withdrew the grievance. Did Nichelle Chivis tell

3 you who made the decision to withdraw the grievance?

4    A:   She said she made the decision. I said well,

5 withdrew why.

6    Q:   Did she indicate where or not she had discussed

7 the decision that she decided to withdraw the grievance with Mr.

8 Hazzard?

9    A:   All I know is I seen a letter saying that she had

10 withdrew and that was it, and I said "Why?" I called her and ask her

11 "Why?" She said it had no warrant or merit I said "Well explain it to

12 me then."

13    Q:   And she had no explanation she didn't?

14    A:   She just said it has no warrant or no merit. It's not

15 grieveable because the job is a vacancy that had been filled. I said but

16 the job has posted. So we went into another thing about

17 representation.

18    Q:   Can you share with us what that was?

19    A:   I wasn't politically polite though, you know, I not

20 going to give you a brief on what I said to her.

21    Q:   If you would.

22    A:   I said my job is to protect the people my job is to

23 represent to the cause to the best of my ability if I can do my job you

24 need to do yours To savor it to live with the out come that's we I can

25 do. Well I withdrew it. She withdrew it I was done with her. I was a

25

**Page 26**

1 little upset you know.

2    Q:   What did you mean that you weren't politically

3 correct?

4    A:   Well there was a little profanity on my part.

5    Q:   Ok I probably won't to ask you to repeat that.

6    A:   No.

7    Q:   Once Council 90 made the decision to withdraw

8 the grievance did you have any discussions with Mr. Curtis about the

9 matter?

10    A:   No I didn't.

11    Q:   During the process of, daring the grievance

12 process did you have any conversations with Mr. Curtis?

13    A:   No.

14    Q:   Did Mr. Curtis ever indicate his feelings about Mr.

15 Hazzard?

16    A:   Not to me.

17    Q:   Who did he indicate to?

18    A:   I don't know but it wasn't to me, though.

19    Q:   Okay I understand I see I' sorry I thought maybe

20 you heard of something but he never said any thing to you about Mr.

21 Hazzard?

22    A:   Not to my knowledge.

23    Q:   Did Mr. MacMurray ever express any opinions to

24 you about Mr. Hazzard?

25    A:   Not to my knowledge.

26

**Page 27**

1    Q:   Do you know whether Mr. MacMurray ever

2 attended the local union executive committee meetings?

3    A:   Well he was on the board that all I know I mean

4 the executive board.

5    Q:   It's still a little bit confusing to me, although I've

6 learned quite a bit during these depositions. My understanding is that

7 he represented in some capacity first line supervision?

8    A:   Right.

9    Q:   And was that as like a shop steward it his location

10 or was he?

11    A:   Like a shop steward.

12    Q:   But did he do more things than that like did he was

13 he like a designee as an executive board member like that or did he

14 just take it upon his self to attend?

15    A:   He was elected into that position appointed or

16 something.

17    Q:   Ok.

18    A:   He was either elected or appointed.

19    Q:   To the executive?

20    A:   Yes. Right you get elected on executive board you

21 get appointed for different positions.

22    Q:   Now when these transfers took place we had some

23 testimony that indicates that there was a dispute about the payment of

24 wages, wage differential?

25    A:   Right.

27

**Page 28**

1    Q:   Do like you know like a custodian from a major

2 school would be assigned to a minor school and there's a pay

3 differential and the union got involved and I'm taking this from

4 Nichelle Chivis. And was able to get that straightened out do you have

5 any recollection of that?

6    A:   I have recollection of that. Me and Mr. McCollum

7 we wrote the class action suit or grievance.

8    Q:   Okay and what role did Nichelle Chivis play in

9 that?

10    A:   She was a union rep I can't tell you what role she

11 played far as my recollection and my knowledge, she represents, she

12 was supposed to represent the union on that.

13    Q:   But did you indicated that you and Mr. McCollum,

14 did you say wrote it?

15    A:   Yes because he brought it to my attention I say

16 you're right, you're absolutely right.

17    Q:   And did Nichelle Chivis participate with you in

18 negotiating that issue with the district?

19    A:   See I know I had nothing to do with that grievance

20 all I did was just give my opinion.

21    Q:   But in any event that issue was corrected?

22    A:   It was corrected.

23    Q:   Do you have a recollection?

24    A:   To my knowledge it was corrected.

25    Q:   Okay.

28

A:  Far as I know, far as I was told it was corrected.

Q:  Did you have any discussions with Mr. Curtis about that issue?

A:  No I didn't I try to have as less contact with him as possible.

Q:  Have you ever been present when Mr. Curtis was talking to Mr. Hazzard?

A:  Only at different building complaints did I go in and represent him.

Q:  Do you have a recollection of Mr. Curtis being, I don't know how to use the description because I know union work is tough work, been there and done that.

A:  That's ok.

Q:  Its tough but you did have a recollection of a meeting where Mr. Curtis was unusually tough on Mr. Hazzard or dressing him down or that sort of thing?

A:  Well when I represented him I don't see all of that generally, you know I guess he knows the kind of guy I ain't and he knows I'm not going to allow it you know what I mean.

Q:  He doesn't mess with you?

A:  And then I'll file a grievance on him.

Q:  Ok.

A:  That's the kind of person I am you know.

Q:  Yes I ok could you give me a couple of minutes Mr. Epps the other attorneys may have questions for you.

29

A:  Ok.

END OF TAPE ONE - SIDE ONE.  BEGIN SIDE TWO

MR. BAILEY:  Mr. Epps obviously as a African American you know what, particularly in this part of our country in my view at least that personal so you can disregard, that but as a African American you've probably seen an awful lot of mistreatment and prejudice in your life. Is that correct?

A:  Absolutely.

Q:  Mr. Hazzard this a what's you call a reverse discrimination suit I'm a civil suit lawyer ninety-nine point nine of the cases that I do are abuses of black citizens of white Americans.

A:  Right.

Q:  In this case it's a White American who is complaining that he was discriminated against because of his race it's the reverse situation.

A:  Right.

Q:  It doesn't happen very much in America but every now and then it does. Mr. Hazzard has alleged that race played a role and somebody that has to put up with nonsense with anybody I would just like to ask you if you have any, if based upon your experience with the Hazzard grievance, if you, is there anything that leads you to believe that race play any issue here based on your experience?

A:  Well you see I can't say it did. I can't say it didn't because after the second step I was done with it. You know what I

30

mean what ever transpired after that I had no knowledge of it.

Q:  Ok, Mr. Epps I don't have anymore questions for you at this time.

A:  All right.

MR. BAILEY:  Opposing counsel may have some questions for you.

MR. FINK: I have some do you, Shawn?

MR. LOCHINGER: I just have one.

MR. FINK: Why don't you go first.

MR. LOCHINGER: Hi Mr. Epps I'm Shawn Lochinger I represent the Harrisburg School District.  The only question that I have for you is at the board meeting you were discussing, did you ever bring up Mr. Hazzard's name specifically?

A:  No I didn't. I just said an employee.

Q:  Ok.

A:  So I don't bring up names.

Q:  Were you told that it's a personnel matter and that can not be discussed?

A:  They told me that could not be discussed that thing and because I wasn't going to into detail. See I know basically about the labor and the union guidelines you know what I mean. But in the constitution, she violated my constitutional rights by not allowing me to speak in public.

Q:  But if I have what you're saying correctly you started out by saying that an employee has a grievance filed against

31

you?

A:  No I said I want to talk about a grievance that was filed.

Q:  Ok.

A:  And at that point they stopped me.

Q:  Ok.

A:  We will not discuss that thing.

Q:  All right that's all I have thanks.

MR. FINK: Mr. Epps we've met before but I'm Mr. Eric Fink and you know that I am the lawyer for AFSCME I just have a few, a couple of things I want to ask you about. Following up on Shawn's question, so you went to the board meeting and you intention was to ask some questions about?

A:  To address that complaint and the grievance.

Q:  The grievance that?

A:  So I set up a meeting or hearing with them so they can hear the grievance.

Q:  Okay so you wanted?

A:  But I never got the opportunity.

Q:  So your goal was to set up a hearing with the school board?

A:  Absolutely.

Q:  Ok now you said you've been to steward's training right.

A:  Right.

32

Q: And you know that theirs a grievance procedure in the contact right?
A: Absolutely.
Q: And the grievance procedure provides for various escalating steps?
A: Right.
Q: So that you understand that goes from step one to step two and so on?
A: But it was already held at one and two.
Q: Okay but so I'm saying, but in general you're familiar with the steps a grievance procedure goes through?
A: Right.
Q: And as a shop steward you handle the grievances at the early steps. Is that right?
A: This particular grievance was held at the first and second step combined.
Q: Ok. I'm asking you in general I'm not asking you about this particular grievance now?
A: All right.
Q: Normally you handle grievances at the beginning of the process right?
A: And the second step.
Q: At the first step and the second step is what normally your involvement is?
A: Right?

Q: And then if it goes be on the second step does somebody else come in and get involved?
A: Well the union rep normally takes it over.
Q: And that?
A: And the union president and they normally get involved well they already be there anyway.
Q: And when you're talking about the union rep your talking about somebody for District council 90?
A: Right.
Q: And in the case that I have
A: Union rep from local 2063.
Q: And in the case of local 2063 the union rep currently and in 1999 the union rep was Nichelle Chivis?
A: Right.
Q: Previously it had been somebody else right Mary Schwanger, right?
A: Doris Manning.
STENOGRAPHER: Excuse me what was that?
MR. EPPS: Doris Manning oh yeah.
MR. FINK: The union rep?
MR. EPPS: Oh yeah right.
MR. FINK: The counsel rep the union rep was Mary Schwanger previously but in 1999 when Mr. Hazzard had the grievance over at the Roland school Ms. Chivis was already on the seen is that right?

MR. EPPS: Right.
Q: And she is still there today?
A: Right as far as my knowledge.
Q: So the way things work in your local, at least, after the second step Ms. Chivis is the person who takes over the grievance is that right?
A: No I can go to the third step.
Q: Sometimes you go to the third step?
A: Well I can go to the third step.
Q: Ok.
A: But normally I handle it at the first step and they take it to the second step.
Q: Normally who takes it?
A: Because I don't never go to the second step.
Q: Who normally takes?
A: The union itself local 2063.
Q: Ok and Ms. Chivis would get involved in the second or third step?
A: Right well she's involved in the.
STENOGRAPHER: I'm sorry excuse me , can we
MR. FINK: Yes, Mr. Ah, ah, lets do it this way. Let me finish my question and then I'll let you finish your answer. Ok?
MR. EPPS: All right.
MR FINK: Let's start from the beginning you filed a grievance and you start?

MR. EPPS: I don't file a grievance.
Q: Mr. Epps wait let me finish my question and then you give me an answer. If a member comes to you and says I have a grievance over 'X', all right what do you do?
A: I get a pen and piece of paper. I find time and ask them what happened and I write down everything they tell me then I go over it again and ask them again. If there is something different I ask them well look you said this and then you said that. This got to be right now what happened? I'm very thorough. I don't lose.
Q: And where do you write that down on a special kind of form?
A: Just write it on a piece of paper like a tablet like that.
Q: Ok and after you've done that what do you do next if you decided that there's some grievance there what do you do?
A: I tell them what the contract or that the book says in the contract or the page and I explain it to them. I say read this.
Q: Ok and at some point you fill out an actually grievance form right?
A: Yes, after I read the contract union book I know it by heart anyhow but after but after I have them read it I say well look it grieveable. We'll file a grievance on it, you know.
Q: So if you decide your going to file a grievance you fill out, there's a special form?
A: There's a form that you fill out and then you have

1    to call to get a grievance number.
2         Q:   And who do you call?
3         A:   I guess the union president of 2063.
4         Q:   Ok, and once you have a number, what do you do
5    with that grievance form? Do you give it to somebody or what do you
6    do with it?
7         A:   You send one to council 90, you keep one and you
8    send one to management.
9         Q:   Ok, you send one to management?
10        A:   Right.
11        Q:   Ok, so you send one to management. And is that
12    considered the first step when you give it to management?
13        A:   The first hearing, no that's not the first step. The
14    first step is when they set the hearing up, when you go to the first
15    hearing.
16        Q:   And that follows after you first send it to
17    management?
18        A:   Right they have five to ten days to respond. If they
19    don't respond in ten days I normally suggest that they go to the next
20    step.
21        Q:   Ok.
22        A:   Regardless if they do send you a letter they
23    violated the filing procedures. I mean the hearing procedures, so you
24    take it to the next step the first step is irrelevant.
25        Q:   When you say the first step is irrelevant what do

<center>37</center>

1    you mean by that?
2         A:   What I mean is that they violated the contract so
3    that first step, you don't need to hear that first step because they have
4    to respond in a certain amount of time.
5         Q:   Okay.
6         A:   If they don't respond in a certain amount of time
7    you take it to the next step.
8         Q:   Ok so if you don't get?
9         A:   And if they don't respond on the second step you
10    take it to the third step and if they don't respond on the third step you
11    take it to arbitration.
12        Q:   Ok so arbitration is the last step?
13        A:   It's the last step.
14        Q:   So that would be equivalent to the fourth step?
15        A:   Right.
16        Q:   In your contract there's one, two, three and then
17    arbitration is the fourth?
18        A:   Right.
19        Q:   Ok and you've been a steward since the early
20    ninety's sometime in the early ninety's?
21        A:   Right.
22        Q:   Okay about ten years?
23        A:   Yes.
24        Q:   You've handled
25        A:   I had a separation from my job you know.

<center>38</center>

1         Q:   At one point you left the school district and then
2    you came back?
3        A:   Right.
4        Q:   Ok and but during the time that you've been a shop
5    steward you've handled dozens of grievances right?
6        A:   A quite a few.
7        Q:   They don't all go to arbitration do they?
8        A:   Not all of them.
9        Q:   Many of them get settled at an earlier step?
10        A:   Right.
11        Q:   And some times it happens that the union
12    concludes that there's no basis to go forward right?
13        A:   Right.
14        Q:   Ok and in that case the union will withdraw the
15    grievance if its settled then its satisfactory?
16        A:   But if the contract states that its grievable then its
17    grievable. You have a violation in the contract right
18        Q:   I understand.
19        A:   Now I understand you're the attorney.
20        Q:   Yes.
21        A:   If theirs a violation in the contract right that union
22    rep or who ever is filing the complaint, that union rep has the sole
23    duty to represent it if he doesn't represent it then he fail and that's
24    unfair misrepresentation is that right?
25        Q:   I understand but if the union rep concludes that

<center>39</center>

1    there's not a violation of the contract if they look at the facts and they
2    look at the contract and they see well there isn't any there is not
3    violation here, then you end the grievance right?
4        A:   Well they come to some kind of agreement.
5        Q:   Yes what do you mean by that?
6        A:   Management comes to some kind of agreement if
7    its not grievable then its not grievable.
8        Q:   So if its not, if you look at the contract and you
9    look at the facts and you see there's no grievance and there really isn't
10    any grievance then you withdraw the grievance right? Isn't that what
11    you learned in stewards training?
12        A:   Let me tell you what I learned in stewards training.
13        Q:   Ok.
14        A:   All right. Regardless if a person wrong or right you
15    fight for them because ninety-nine point nine percent of the time
16    management is always wrong and I know that.
17        Q:   Ok but a steward training you didn't learn that
18    you should take every grievance to arbitration did you?
19        A:   If it's grievable you file a grievance.
20        Q:   Yes.
21        A:   If its not grievable you file a complaint.
22        Q:   Ok.
23        A:   So what was the question?
24        Q:   Well my question was, I don't even remember
25    what my question was. Let me ask you a different question out of all

<center>40</center>

of the grievances you've handled you don't always go and speak to the
school board about those grievances do you?

  A: No.

  Q: In fact this was the only. Besides Mr. Hazzard's
grievance you ever go to the school board for any other grievance?

  A: Well I go and always talk to them about, this is in
the past, because of my job interrupt, how they could of prove I talk
about a lot things like education and everything.

  Q: About general issues?

  A: Right. Right.

  Q: But did you ever go to talk about a specific
grievance to the school board other than when you went to talk about
Mr. Hazzards grievance?

  A: Well since I've been a steward I've gotten more
involved than what a steward is all about.

  Q: Yes.

  A: So let me put it to you this way maybe I cant you
know what I mean.

  Q: Yes.

  A: If you can understand this if you don't get results at
the first step, second steps then you bring to their immediate attention.
This way they can't say we didn't know.

  Q: Let me take a step back you said you're familiar
with the contract right?

  A: A little bit you know what I mean bits and pieces.

41

---

  Q: What is the first step if we talk about the grievance
procedure what happens what is the first step of the grievance
procedure?

  A: The first step is the grievance process, in other
words there who over the grievance is filed on and the Human
Resources director. It goes to that step there is only two people there.

  Q: Ok.

  A: Or maybe if they require an attorney, they had an
attorney there. But normally it doesn't. An attorney doesn't come on
the first step. And the union rep , the steward, president , secretary,
and other executive board members.

  Q: Those people are usually involved in the first step
meeting?

  A: Right.

  Q: And if you don't resolve things in the first step and
if you take it to the second step, what is the second step under the
contract?

  A: The second step is go to the superintendent.

  Q: Ok the superintendent of the school district?

  A: Right.

  Q: And if you resolve it with the superintendent then
you're done?

  A: Right.

  Q: If the superintendent says yes, you're right and we
made a mistake here. We acted incorrectly we violated the contract?

42

---

  A: Right the last superintendent didn't handle any
grievances.

  Q: The last superintendent didn't deal with them?

  A: When you went to the first step you heard the first
and second steps then you took it from there to the third step.

  Q: And the third step is what?  What's the third step
under the contract and again Mr. Bailey just handed you a copy of the
contract if you need to look it up?

  A: The third step is to take it to the school board and
address the issue.

  Q: So the third step the school board is the body on
the management side?

  A: Right. Right.

  Q: And on the union side it's the local and council
90?

  A: Right.Right.

  Q: And after step three it would be arbitration?

  A: Arbitration and whatever the results of that, you
live with it.

  Q: And who normally makes the decision whether to
go to step three?

  A: The union rep.

  Q: That would be the person from in this case it
would be Nichelle Chivis.

  A: Right.

43

---

  Q: And who normally makes the decision whether to
go to step four to arbitration?

  A: The union rep.

  Q: Ok so that not a decision that the shop steward
makes?

  A: They can always give their opinion that's about it.

  Q: But the decision is made by district counsel 90's
union rep?

  A: Right. Right.

  Q: And they sometimes decide that we're not going
forward right?

  A: Right

  Q: And in Mr. Hazzard's case that was one example?

  A: It never went to the third step.?

  Q: In Mr. Hazzard's case it never went to the third
step?

  A: Well it let me see it might have went to the third
step. I don't know if they had a meeting with the school board or not I
didn't participate.

  Q: Certainly it didn't go to the fourth step we all agree
that it didn't go to arbitration.

  A: Right.

  Q: But that not, there were other grievances that you
know of that didn't go to the fourth step right?

  A: Right because they resolved it.

44

Q:   Do you know of any other grievances where the union after the first or second or third step, the union took a look at the facts and took a look at the contract and the union said you know what? There's no violation here?

A:   No that I can recall.

Q:   Ok you don't know of any?

A:   No.

Q:   Okay when Nichelle Chivis, you saw the letter from Nichelle Chivis saying that we're withdrawing the grievance, right? How did you see that letter?

A:   Mr. Hazzard showed it to me.

Q:   Mr. Hazzard got a copy of the letter?

A:   Yes.

Q:   And then you?

A:   I think he mailed me a letter too, I'm not sure, I can't say I don't want to you know what I mean.

Q:   Ok but certainly Mr. Hazzard came to you and said what's this about right?

A:   Right.

Q:   And you spoke to Ms. Chivis and asked her what's going on?

A:   Right.

Q:   Ok her answer to you was the grievance has no merit right?

A:   Right and I told her it does.

45

Q:   Ok she didn't say anything about Mr. Hazzard's race the fact that he's white, did she?

A:   No.

Q:   At anytime do you remember anyone discussing the fact that Mr. Hazzard was white?

A:   Not that I remember.

Q:   So do you remember any discussion of anybody's race in relation to this grievance? You have to say yes or no.

A:   No.

Q:   Ok so the let me go back a little bit. The third step, we all agree the third step under the contract is the grievance goes to the school board right?

A:   Right.

Q:   Then normally if you take a grievance to the school board do you is the normal procedure for the shop steward to go to the school board meeting and tell the school board. Is that the normal procedure to bring the grievance to the third step?

A:   Normally you address them with a letter.

Q:   You said you do that in writing?

A:   By a certified letter.

Q:   And Ms. Chivis is the one who normally sends that letter?

A:   Right or council 90.

Q:   Ok, so in this case you went to the school board to tell the school board about a grievance?

46

A:   I went to address the issue about a grievance. No names or nothing

Q:   You didn't you didn't?

A:   I wanted to set up a hearing with them where they could have heard the grievance you know what I mean just heard a grievance.

Q:   Okay.

A:   Well hear the complaint though.

Q:   What?

A:   But at that point it wasn't a grievance, it was a complaint

Q:   Alright that's why I'm confused now when you went to the school board was it a grievance or was the grievance procedure done and were you now talking about Mr. Hazzard's school district complaint when you went to the school?

A:   I had the grievance at the time when I went to address the board.

Q:   Yes so when you went to the school board meeting is was still a grievance?

A:   I assume it was I'm not for sure now I don't want to perjure myself.

Q:   That's ok if you're not sure I want you to tell me your not sure.

A:   I'm not sure.

Q:   Ok so you're not sure?

47

A:   Well I think it was.

Q:   Ok and think it was and you think you went there to tell them not by name but tell them hey there's a grievance that you need to be aware of?

A:   Right

Q:   Do know of any other case besides Mr. Hazzard's grievance can you think of any case where you as a shop steward went to the school board when to say hey there is a grievance that you need to be aware of?

A:   No.

Q:   No so this is the only time you went directly to the school board rather than?

A:   I mean I go to the school board meeting I have that right under the constitution you know what I mean.

Q:   But you went for other purposes you never went in the past you never went to discuss a grievance?

A:   No.

Q:   You went to express your views about general issues?

A:   See it was already in the out the first and second step the third step was ended. You know what I mean.

Q:   All right that's all thank you Mr. Epps.

MR. BAILEY: Mr. Epps just a follow up question here. Nichelle Chivis had testified that she had spoken to Wanda William's before an upcoming school board meeting and told her that members

48

would coming to talk, about she testified under oath and this counsel can correct me if I mischaracterize. I believe that she testified she didn't get many details and she may very well testified I think she did but she didn't give any names. She just said, I going to have some, there is going to be some members going show up at this meeting. Now we believe and we've alleged of course that you went to that meeting?

A:  Absolutely.

Q:  Ok did Ms. Chivis ever inform you before you went to the meeting that she had told the school board that members were coming?

A:  No I wasn't aware of it. But I got wind of it when they told me they, we don't want to hear this.

A:  So the way they treated you at the meeting made you think that, made you feel that they had been tipped off or made aware of or something of that sort?

A:  I had that idea.

Q:  Ok.

A:  That they had been made aware about what I was going to say so they stopped me.

Q:  And if I understand your testimony correctly you just want to make sure you're purpose was to make sure that were aware?

A:  Right cause the grievance was going to the next step it should of went to the next step.

49

A:  Ok.

Q:  How many third step procedures have you gone through as shop steward if any?

A:  I can't recall.

Q:  Have there been?

A:  Normally they're resolved right there I mean.

Q:  Before they go to the board?

A:  Right because they know they losing, management knows there losing so they resolve it then.

Q:  And a board meeting is a public event?

A:  Absolutely.

Q:  And I mean this in a positive way it's a political event? In the sense that its open to the public?

A:  Right.

Q:  So there's a lot of pressure on elected members to at least provide a hearing?

A:  Well they have to provide a hearing.

Q:  But they did provide you with an opportunity to be heard?

A:  Absolutely and that a violation of the constitution, freedom of speech law. Can you agree?

A:  Alright sir. I'm a true believer when it comes to know doubt that constitution the first amendment part of it I certainly, that's the only difference between us and the rest of the world the way I see it. That's it. You've gone to when you  go to a school board

51

Q:  Right.

A:  In other words it was going before the board to hear the grievance on a formal complaint or whatever them may have.

Q:  Yes I think that's one of the things you have educated me about that I didn't fully understand. And Mr. Fink and his questions and your responses I think a clarified some things for me. The third step apparently is going to the board?

A:  Right.

Q:  Now that helps me because, do you know if a committee of two members of the board is the same as the board in the third step or is the board the board in terms of like a quorum or you know how many members or I don't?

A:  Well I assume that you have to have at least five members to have a meeting. You know if you don't have five you can't have a meeting.

Q:  Yes the reason why I?

A:  Like any other organization if you don't have seven of ten members then you can have a meeting, you know.

Q:  Yes that's why I ask you?

A:  The majority has to be present.

Q:  You attend a lot to school board meetings?

A:  Yes.

Q:  You've done, attended a lot of them through out the years.  Now how many third step hearing beside from the effort to notify the board that you the Mr. Hazzard case forget Mr. Hazzard?

50

meeting do they ask you to sign up to speak or is there an agenda how does it work?

A:  Yes you sign up on a little card and it tells you what you want to speak about but I never specify. I always top open. So this way I can say about what I want to say I don't be on there specific topic. You know this way this way, it's alright. I know what your saying.

MR. BAILEY:  No my mind goes back to this old Lincoln saying I'm just thinking of something, you're just making me think that all. So you did put in a card?

MR. EPPS:  Right.

Q:  And they knew you from previous meetings?

A:  Right they know I ask the questions that get under their skin.

Q:  And they know that Mr. Epps is a dedicated AFSCME man who fights for what he believes is right but he's a union official?

A:  I assume they do.

Q:  Ok and you're sure that when you went that night you put down your name and you put open?

A:  Absolutely I always do that.

Q:  And you're familiar with the board and how they interact with people and respond to people?

A:  Absolutely.

Q:  And its your opinion that they knew that your were

52

1    coming an that they intend to cut you off without letting you to speak?

2          A:    They knew what I was talking about.

3          Q:    Okay

4          A:    And they stopped me. I wasn't allowed.

5          Q:    Do you know if before, before you went to that

6    board to speak your piece, there had been know third step meetings

7    with the board or you would have known about it. Isn't that correct?

8          A:    Absolutely.

9          MR. BAILEY:  I have no further questions sir. Thank

10    you very much.

11          MR. FINK:  Nothing further.

12          MR. LOCHINGER: Nothing.

13          MR. BAILEY:  I would like to express my gratitude to

14    you for coming here today and for participating and I for one

15    personally very much appreciate your integrity and your response I

16    want to thank you very much.

17          MR. EPPS:  Thank you.

18          MR. BAILEY: Yes sir.

19          MS. LYDE:  Is that it?

20          MR. BAILEY: Yes.

21          MS. LYDE: 12:04 PM. The deposition of Robert Epps is

22    completed. Thank you.

23                  **END OF TAPE**

**EXHIBIT "C"**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM HAZZARD,
      Plaintiff,
  vs.
TIM CURTIS, ROBERT MacMurray,
  AFSCME DISTRICT 90,
  HARRISBURG SCHOOL
  DISTRICT, et al.,
      Defendant

          1-CV-00-1758

      JURY TRIAL DEMANDED

| | |
|---|---|
| Proceedings: | Video Deposition<br>Wanda Williams |
| Date: | January 29, 2001 |

Appearances:

| | |
|---|---|
| For Plaintiff: | Donald Bailey, Esquire<br>4311 North 6th Street<br>Harrisburg, PA 17112 |
| For Defendants: | Shawn Lochinger, Esquire<br>Rhoads & Sinon LLP<br>1 South Market Street<br>Harrisburg, PA 17112 |
| | Eric Fink, Esquire<br>Willig, William & Davidson<br>1845 Walnut Street 24th Floor<br>Philadelphia, PA 19103 |

1

1    MR. BAILEY: Why don't we do it this way.

2    We'll have a, we're doing a video deposition. Mr. Marceca

3    will start the deposition off and then I'll just give you

4    some instructions, or your attorney may have some

5    things to say and do a few things here and describe

6    what's going on. Ok?

7    MS. WILLIAMS: Could you please identify

8    everybody.

9    MR. BAILEY: Sure I was going to do that so

10   we have it all in the deposition itself.

11   MS. WILLIAMS: Ok, that's fine, thank you.

12   MR. MARCECA: Good afternoon please be

13   advised that the video and audio are now in operation.

14   My name is Tony Marceca.  My address is 2219 Dixie

15   Drive, York, Pennsylvania. I've been contracted by PR

16   Video to be the videographer for this deposition.  The

17   case in the Middle District of the United States Court is

18   William A. Hazzard plaintiff versus Tim Curtis, Mac

19   MacMurray, AFSCME District 90, and the Harrisburg

20   School District et al. The case is numbered 1:CV-00-

21   1758. The date today's date is the 29th of January 2002.

22   And this deposition is being held at the law office of Mr.

23   Don Bailey, 4311 North Sixth Street, Harrisburg,

24   Pennsylvania. The video deposition is being taken on

25   behalf of the plaintiff.  And would the witness please

1    raise her right hand and I'll swear you in.  Would you

2    state your name and do you swear

3              MS. WILLIAMS:  My name is Wanda RD

4    Williams.

5              MR. MARCECA: To tell the truth the whole

6    truth so help you God?

7              MS. WILLIAMS: Yes I do.

8              MR. MARCECA: Mr. Bailey could we have

9    sound check around the room.

10             MR. BAILEY: Sure my name is Don Bailey

11   and I represent the plaintiff William Hazzard in this

12   matter. Shawn?

13             MR. LOCHINGER:  Yes I'm Shawn Lochinger

14   and I represent the Harrisburg School District and Mr.

15   Curtis.

16             MR. KOJINSKI: My name is John Kojinski I'm

17   with Wade William and Davidson and I represent

18   AFSCME Counsel District 90 and Mr. MacMurray.

19             MR. BAILEY: All right from my understanding

20   if for this deposition Mr. Lochinger is representing you is

21   that correct?

22             MR. LOCHINGER: That's correct.

23             MR. BAILEY: Okay let me just give you some

24   instructions.  This is a deposition.  It's a video

25   deposition we do all our depositions that way. Now you

3

1   have a right as someone who's being deposed to come
2   here and we will maintain a copy a you may watch and
3   listen to the deposition.  If you have any desire to
4   purchase a deposition or transcript of the deposition
5   that's not me. I don't deal with that you would have to
6   check with Mr. Marceca. We do have a stenographer
7   here that has been ordered by either your attorney or
8   the AFSCME attorney and she will be taking what's
9   called a stenographic record. That puts a premium on
10  our not talking over each other. Sometimes with a
11  camera you can sort those things out but it's very
12  difficult for a stenographer. So during the deposition if
13  we make sure that we let a little time lapse between
14  answer and question. And if I tramp on the toes of one
15  of your answers or something, you make sure you
16  correct me and get a complete and full response in.
17  Okay.
18              MS. WILLIAMS: Yes.
19              MR. BAILEY: Now with the stenographic
20  reporter um do you what me to do the, you want me to
21  do the read and sign description or do you want to do
22  that or.
23              MR. LOCHINGER: I'll handle it Don.
24              MR. BAILEY:  Okay during my quest, what
25  pertains to me because I its actually is a plaintiff

4

1    ordered to deposition. If you have any confusion or
2    concern or even a curiosity about a question that I ask, I
3    want you to feel free to ask me what I mean by the
4    question. We are not here to trip you up. We're not here
5    to, you know, sort of lead you into some cul-de-sac, and,
6    you know, this kind of nonsense that you see on TV. We
7    want a full complete and thorough accurate fact record
8    that's all I really have an interest in. I'm going to be
9    asking you questions during this deposition about
10   events having to do with having to do with the complaint
11   the complaint that Mr. Hazzard has filed. If you want to
12   see the complaint or have not had a opportunity to
13   review it certainly we'll suspend and
14            MS. WILLIAMS: I'd like that.
15            MR. BAILEY: We can do that. Okay you know
16   what as soon as we're done with our preparation stuff
17   here I give you a copy of the complaint, or right now I'm
18   going to be talking to the attorneys if you want to start
19   taking a looking at it that's fine.
20            MS. WILLIAMS: Thank you.
21            MR. BAILEY:  It's not a whole lot to it, to be
22   very honest with you. I would assume the usual
23   stipulation a by that I mean the objections etc. to the
24   form of the question be reserved until time of trial. Is
25   that acceptable? Is that okay with counsel?

1      MR. LOCHINGER:  It's fine with me.

2      MR. KOJINSKI:  Yeah that's okay.

3      MR. BAILEY:  Okay with that being said and

4 if there's is anything else to offer, Shawn if you have

5 something or John if you have something go ahead.

6      MR. LOCHINGER:  No I don't have anything.

7      MR. BAILEY:  You read and sign do you want

8 to reserve the right to the read and sign or?

9      MR. LOCHINGER:  Sure we'll reserve that

10 right.

11      MR. BAILEY:  Okay why don't we just a wait a

12 few couple of minutes and we, Wanda do you have any

13 particular way about the way you want me to refer to

14 you Ms. Williams or Wanda?

15      MS. WILLIAMS:  Ms. Williams please.

16      MR. BAILEY:  Ms. Williams okay.

17      MS. WILLIAMS:  Thank you.

18      MR. BAILEY:  All right you're welcome.

19      MS. WILLIAMS:  Okay. Here.

20      MR. BAILEY:  Thank you Ms. Williams.

21      MS. WILLIAMS:  Yes.

22      MR BAILEY:  Ms. Williams we're going to get

23 into the substance of the deposition now. From time to

24 time the attorney's have agreed there maybe an

25 objection that's stated for the record. Naturally you

1    follow the instructions that Shawn gives you but don't

2    be offended by that and these are objections that as to

3    things like relevancy, immateriality and Lord know what

4    else that the attorney's place on the record and most of

5    them will be reserved for time of trial unless you get

6    instructions from your attorney not to respond.  When

7    that occurs hopefully counsel will follow that up with

8    'objection you may respond' in which case you, know

9    you, unless Shawn says otherwise we can continue.  So

10   don't be concerned about that, okay?

11          MS WILLIAMS:  Yes you're welcome.

12          MR. BAILEY:  All right thank you.  Do you

13   know William Hazzard?

14          MS. WILLIAMS:  Not personally no.

15          Q:    All right to do know anything about keep

16   your voice up just a little bit.  Do you know anything

17   about him?

18          A:    I know just somethin the grievance.

19          Q:    Okay let talk.

20          A:    The lawsuit.

21          Q:    I'm sorry the lawsuit.

22          A:    The lawsuit.

23          Q:    The lawsuit okay.  Do you know

24   anything about a grievance that he may have filed at

25   sometime?

1    A:    I don't know what the contents of the
2    grievance but my understanding is that he filed a
3    grievance.
4    Q:    Let me see if I, are you aware that he at
5    sometime had filed a grievance over a contract dispute
6    with district?
7    A:    No I'm not.
8    Q:    Okay when did you first become aware
9    of Mr. William Hazzard?
10    A:    We probably house check every member.
11    I don't remember.
12    Q:    Okay incidentally if the respond to a
13    question is that you don't remember provided that that's
14    a truthfully answer
15    A:    Yes.
16    Q:    Okay that it is of course is a correct
17    answer cause your under oath and everything naturally,
18    and please don't be afraid to respond that way.
19    Sometimes witness's have a tendency to think that they,
20    you know, they need to respond and come up with some
21    kind of answer. We don't want to speculate wildly.
22    A:    Well I don't want to speculate but I meet
23    thousands of people in the course being president and I
24    have individuals call and come face to face contact with
25    me on a daily basis. So I don't know remember Mr.

1   Hazzard.

2           Q:    Okay do you remember any issues

3   concerning Mr. Hazzard?

4           A:    Some with, something has been going on

5   with this lawsuit but that's all.

6           Q:    Well when did you first hear about this

7   lawsuit that were discussing here today?

8           A:    Through a letter through Mr. Ellison.

9           Q:    Okay do you have a recollection of what

10  that letters said?

11          MR. LOCHINGER: I'm going to object to that.

12  It was a letter from somebody in our firm.

13          MS. WILLIAMS: Yes.

14          MR. LOCHINGER:  I'm going to object

15  because on attorney client privilege basis.

16          MR. BAILEY:  Okay but at some point some

17  attorney informed you about this lawsuit right?

18          A:    Exactly.

19          Q:    Okay aside from any discussions that

20  you may have had with one of your attorney's have you

21  ever discussed this lawsuit with anyone?

22          A:    No I didn't know that his he was filing a

23  lawsuit.

24          Q:    I'm sorry you I didn't understand.

25          A:    I wasn't aware that Mr. Hazzard was

9

1    filing a lawsuit.

2         Q:    Okay but now, you weren't aware that

3    he was filing a lawsuit?

4         A:    That I had a lawsuit pending.

5         Q:    A lawsuit pending until you got this

6    letter from the attorney's?

7         A:    Yes exactly.

8         Q:    Okay so is it fair to say that other than

9    with your attorney's you have never discussed Mr.

10   Hazzard's lawsuit with anyone?

11        A:    No.

12        Q:    Okay now when were you president of

13   the, I understand you were president at some point of

14   the Harrisburg School Board. Is that right?

15        A:    Yes.

16        Q:    I certainly remember seeing you on TV.

17   Now how long were you president of the school board?

18        A:    Around three years.

19        Q:    And when did you first assume that

20   position?

21        A:    December 1999.

22        Q:    And

23        MR. MARCECA:  I'm going to have to move

24   the camera I'm not getting the audio on this. I'm going

25   to have to move the microphone up closer.

1          MR. BAILEY:  Okay.

2          MS. WILLIAMS:  '98 I'm sorry was it 98 I

3 think 98.

4          MR. BAILEY:  Okay.

5          MS. WILLIAMS:  It was for two years.

6          MR. MARCECA:  I'm going to have to bring

7 the camera right in there between Bill.

8          MR. BAILEY:  I apologize for this interruption.

9          MS. WILLIAMS:  That's okay.

10         MR. MARCECA:  All you can't do anything

11 she's too soft spoken, it's not your fault.  That's good.

12         MR. BAILEY:  Okay you became president of

13 the school board in 1999?

14         MS. WILLIAMS:  '99 December 1999.

15         Q:   Now how long had you been a member

16 of the school board before that?

17         A:   Mm about a year and a half, it's a four-

18 year term.

19         Q:   So you became president in 1999. Do

20 you have a recollection of a Mr. Ebb, is it Mr. Erb.

21         MR. LOCHINGER:  Epps.

22         MR. BAILEY:  Epps do you have a

23 recollection of a Mr. Epps coming out to a school board

24 meeting and asking to speak about a AFSCME or a

25 labor problem.

1        A:    No I don't sir.

2        Q:    Okay do you, did anyone, did anyone

3   ever approach the school board at a public meeting to

4   talk about internal difficulties in the board?

5        A:    That would be a personnel issue and I

6   probably would have set it aside. That would be handled

7   the personnel committee.

8        Q:    Well, does a person identify a personnel

9   issue first? I mean so they how do they identify it so

10  that you know to tell them that its personnel?

11       A:    I don't remember Mr. Epps coming so I

12  can't identify that, but generally if it has something to

13  do with the hiring or firing of that employee.

14       Q:    Well if the employee wants to talk about

15  it its not a matter of concern then is it?

16       A:    We would, it would be advisable that

17  that employee go to the personnel committee that would

18  have an opportunity to sit down with the committee first

19  to talk about that issue.

20       Q:    Well once that person has been to the

21  committee if they felt there's a matter of public concern

22  can they still ask to talk to you about it?

23       A:    After I receive a written report from the

24  committee.

25       Q:    Okay and regardless of what the

1    committee says can that employee still talk to you about

2    it?

3            A:    If he wants to talk to me, yes.

4            Q:    Okay and.

5            A:    I have an open door policy anyone can

6    talk to me.

7            Q:    And that's that open door policy applies

8    to the school board as well doesn't it?

9            A:    Yes.

10           Q:    Okay.

11           A:    Yes it does.

12           Q:    So if I, if I'm an employee at the school

13   district.

14           A:    Yes.

15           Q:    And I have a conflict or a problem?

16           A:    Yes.

17           Q:    And once that issue is resolved for or

18   against me if I want to talk about it publicly via any

19   American citizens right I suppose I can talk about right?

20           A:    Well on the advice of the attorney it's

21   more appropriate that that individual talk about it in

22   private before he comes out in public.

23           Q:    You told him that?

24           A:    And that's for his protection.

25           Q:    Yea but I mean if once they done that I

13

1    mean after all I'd assume that would be the employee's

2    right, but after they've done that after this employee has

3    done it, he still has the right to talk to the public right?

4         A:    If he chose to.

5         Q:    Okay have you ever received a call from

6    any AFSCME leader not to let members of AFSCME

7    speak about a problem?

8         A:    No never.

9         Q:    Never happened?

10        A:    No one can call me and tell me who to

11   speak and not to speak with.

12        Q:    Well

13        A:    I think everybody has an opportunity to

14   speak if they want to speak.

15        Q:    Okay well I'm not suggesting Ms.

16   Williams that anyone dictates or directs you on what to

17   do. My question has to do regardless of whether you

18   agreed or didn't agree, or for that matter if you ever

19   received a call. I'm just asking if anyone ever called you

20   and asked you.

21        A:    No.

22        Q:    Not to entertain.

23        A:    No.

24        Q:    Entertain.

25        A:    No.

14

1     Q:    Let me finish the question first okay.

2     A:    Yes.

3     Q:    Thank you. Did anyone from AFSCME

4  ever call you and ask you not to listen to complaining

5  members?

6     A:    No,

7     Q:    That has never occurred? So if someone

8  indicated that they had spoken to you in that regard

9  they would either be committing perjury or in error or

10  they would be mistaken is that correct?

11     A:    Yes.

12     Q:    All right. Do you know a person by the

13  name of Chivis?

14     A:    Nichelle.

15     Q:    Is it Nichelle Chivis?

16     A:    Yes.

17     Q:    Okay now who is Nichelle Chivis?

18     A:    The staff rep for Council 90.

19     Q:    And what is Council 90?

20     A:    Council 90 is the union that represents

21  the Commonwealth of Pennsylvania employees.

22     Q:    Okay if you can just speak up just a

23  little.

24     A:    Council 90 is a union that represents

25  the Commonwealth of Pennsylvania State Employees.

15

1             Q:    Okay.

2             A:    This is the non-professional.

3             Q:    Yes ma'am and Council 90 that's

4 commonly known as AFSCME American Federation of

5 State County and Municipal Employees is that correct?

6             A:    Yes.

7             Q:    Okay and Nichelle Chivis is a

8 representative or a staff representative.

9             A:    Staff rep.

10            Q:    I honestly don't know her title, staff rep

11 for council 90 is that correct?

12            A:    Yes.

13            Q:    Now Council 90 looks after a number of

14 locals. Am I correct?

15 A:    Yes.

16            Q:    And is one of the locals that Council 90

17 looks after a you know supervises or asserts serves

18 might be the best word, is one of those locals the locals

19 that would included the custodians and maintenance

20 people at the Harrisburg School district?

21            A:    Yes.

22            Q:    Okay and I like to know the area that

23 you may have with this lawsuit do you have any reason

24 to believe that the plaintiff Mr. Hazzard is not a member

25 of a local that Council 90 services?

1              A:    To be perfectly honest with you sir I

2    don't know.

3              Q:    Okay that's fair enough.  You did

4    indicate that you didn't know who Mr. Hazzard was

5    before this lawsuit arose.

6              A:    Yes.

7              Q:    Now is specifically, Ms. Williams, let me

8    ask you a series of questions. I'm going to ask you a

9    series of questions that have to do with Nichelle Chivis

10    and communications that she may have had, or may

11    have alleged, or others may of alleged that she had with

12    you?

13              A:    Okay.

14              Q:    You are not, please to read into any of

15    my questions an implication that something has

16    occurred. These are just questions. And therefore don't

17    take them to mean, unless I say I have some source of

18    information, don't take any of my questions to imply

19    that they contain facts that actually happened okay?

20              A:    All right.

21              Q:    Okay did Nichelle Chivis ever call you

22    about any matter pertaining to William Hazzard?

23              A:    I can't remember.

24              Q:    Okay that's fine. Did Nichelle Chivis ever

25    call you and ask you sometime on or about the spring,

1   the early winter or spring of the year 2000, not to

2   entertain objections or comments from a group of

3   AFSCME workers?

4           A:   No.

5           Q:   On or about late 1999, early 2000 were

6   you a member of any AFSCME local or AFSCME

7   organization?

8           A:   I've been a member of AFSCME for

9   twenty-nine years.

10          Q:   And as a member of AFSCME for

11  twenty-nine years is it fair to say that you are at least

12  generally familiar with the contract rights which

13  AFSCME seeks on behalf of its employees? Is that

14  correct?

15          A:   Yes, I'm very familiar with it.

16          Q:   Is there any limitation as a matter of

17  contract that you know of between AFSCME and one of

18  their members where are limited from speaking before a

19  public party on a matter of personal concern if you

20  know?

21          A:   No, not that I'm aware of.

22          Q:   Okay and I've already questioned and I

23  think your response has been that you have had a well,

24  let me be more specific. Has Nichelle Chivis ever called

25  you to discuss matters that might be of concern to

1    AFSCME or to AFSCME members or an AFSCME

2    member? Do you understand that question? Sort of all

3    three so.

4              A:    No be more specific.

5              Q:    Okay let me be more specific has

6    Nichelle Chivis ever called you to discuss any grievance

7    pending before the Harrisburg school board regarding

8    any Harrisburg school board employee?

9              A:    Not that I can remember sir. If Nichelle

10    would call she would call and talk to our personnel

11    director.

12              Q:    And that person was?

13              A:    Mr. Freeman.

14              Q:    All right Mr. Freeman. Freedman right?

15              A:    Freeman.

16              Q:    Freeman. All right we've had two

17    spellings F-R-E-E-M-A-N or F-R-E-E-D-M-A-N if you

18    know?

19              A:    F-R-E-E-M-A-N. Lance Freeman.

20              Q:    Thank you I think we did have a

21    different spelling earlier today I thought it was Freeman

22    but I was told it Freedman okay. Do you have a

23    recollection of ever discussing William Hazzard with Mr.

24    Freeman?

25              A:    No.  No.

1   Q:   Okay, do you have a recollection of ever
2   discussing Mr. Hazzard with a Mr. Curtis?
3   A:   No I don't.
4   Q:   You know who Tim Curtis is right?
5   A:   Yeah.
6   Q:   Okay and my question was poorly
7   crafted it should have been Tim Curtis. You never
8   discussed Mr. Hazzard with Tim Curtis correct?
9   A:   Let me just say this. May I say this
10   please? It's not a practice that the board president
11   discuss anything with a union supervisor. If I did have a
12   problem concerning the grievance then it would be a
13   personnel committee set up with Mr. Freeman to
14   discuss that particular meeting.  But I wouldn't attend
15   until there was an agreement or resolution.
16   Q:   Okay lets set grievance aside then.
17   A:   Well, any type of problem concerning
18   employees of the Harrisburg School District.
19   Q:   Well you do have a procedure that
20   whereby a citizen or employee for that matter can
21   initiate a complaint?
22   A:   Sure.
23   Q:   Isn't that correct?
24   A:   Exactly.
25   Q:   Do you have any know of Mr. Hazzard

1    ever initiating or utilizing the complaint procedure,

2    which the board provides?

3        A:    Yes he did.

4        Q:    He did how do you know that?

5        A:    I, because I just went through

6    correspondence months, six months ago and I happen

7    to see this correspondence concerning him.

8        Q:    Okay do you have any reason, is there,

9    are there any facts known to you which would indicate

10   that Mr. Hazzard's complaint process was treated

11   differently anyone else's complaint process?

12       A:    No I don't. Okay.

13       Q:    If at the end of the complaint process as

14   it is described in Harrisburg School Board policy and

15   procedures either by practice or by word in some

16   document, can a person who still feels grieved or is

17   unhappy with the outcome of a complaint procedure can

18   they still come to the board and speak to the board in a

19   public meeting?

20       A:    Of course and I would invite them to a

21   private meeting with me. I will set aside a date and time

22   to meet with them, if they still have a problem, or if they

23   weren't satisfied with the outcome.

24       Q:    Ma'am, if I indicated to you that we have

25   had testimony that Nichelle Chivis had a conversation

21

1    with you prior to a school board meeting, I'm not going

2    to characterize it but about AFSCME members showing

3    up at a meeting to talk, does that refresh your

4    recollection at all?

5             A:    I can't remember. We've had a lot of

6    AFSCME members come to the board meetings

7    disgruntled members.

8             Q:    Right.

9             A:    That weren't satisfied with some of the

10   resolutions of cases.  So AFSCME members did make it

11   a practice of coming to meetings to have the freedom to

12   speak in front of the public. So it has never a case

13   where AFSCME members couldn't come.

14            Q:    And that is consistent with the first

15   amendment clause.

16            A:    Sure.

17            Q:    Of which our Supreme Court of

18   whatever political persuasion they maybe present one

19   included is very jealous and that is that people have a

20   right to come to their government to seek and the

21   language that they use if I remember correctly readdress

22   of grievance's. So what you're telling us is, if I

23   understand you, is that anybody has a right to come?

24            A:    Sure.

25            Q:    Now.

1          A:    I invite, I invite them to come. There

2   were a lot of issues that were going on at the Harrisburg

3   School District that the Harrisburg School board of

4   Directors were not aware of.

5          Q:   Yes ma'am, I sure that's the case in

6   every.

7          A:    So I tell them. I tell them, the

8   disgruntled employees that come before the board we

9   weren't aware of it, we didn't know about it.

10         Q:   Now for what its worth I happen to think

11   that an elected school board member is the toughest job

12   in the United States of America. Believe me it's the

13   toughest and most thankless by the way, so I don't envy

14   you. I don't envy you for what you had to go through but

15   in this case. I don't know if these questions have

16   refreshed your recollection at all and I see you shaking

17   you head but you.

18         A:    I don't remember Mr. Hazzard like I see

19   him, a facial. Its like I encounter a lot of people on a

20   daily basis even now so I couldn't name him personally.

21         Q:   Sir, ma'am I, you know I know that, and

22   I mean I understand. Do you know Mr. Epps? Does that

23   name mean any thing to you?

24         A:    I know the name Epps itself because I

25   know a lot of people with the last name of Epps.

1           Q:    So that's a name that that you?

2           A:    That's very familiar with me. I don't

3 know the gentleman that your speaking of I would have

4 to see a facial.

5           Q:    But you can tell us as you sit here today

6 that, that, is it fair to say that you would of reacted

7 angrily if anyone would of called you and told you not to

8 listen to someone? Or asked you not to listen to

9 someone?

10          A:    I wouldn't acted angrily but I would have

11 advised them that everyone has a right and I probably

12 would have referred them to the attorney, the solicitor to

13 ask his opinion first. And probably in Mr. Hazzard's case

14 if he came to the board meeting I'm sure Mr. Waters,

15 who was the attorney at the time, would of probably

16 said to him that a that's a topic that needed to be

17 discussed in a personnel committee meeting.

18          Q:    And in a situation like that is a person

19 given a choice for example is a person told?

20          A:    Well I think its more or less to keep

21 them out the negativity off the person. Not let them not

22 to let the public know without giving the person

23 opportunity to discuss it.

24          Q:    See it's my understanding that there

25 had already been at the time this request was made to

1    speak to the school board, that there had already been

2    its my understanding I counsel my correct me that there

3    was a committee meeting already where I believe that

4    Mr. Brown and Mr. Davis had conducted a hearing and

5    that there was a report; and that there was then an

6    attempt made to speak to the board; and I think that

7    the graviment of the testimony is that there was a

8    request made to you not to let these people present

9    there view or speak.

10            A:    If board members have a hearing with

11    the party and their decision is then sent to the other

12    seven board members and we put that on the agenda to

13    be voted on.  At their discretion it need's to be, you

14    know, dealt with the particular incident then we go in

15    private session, to discuss that. Personnel issues are

16    generally more in a private session. We don't usually do

17    personal issues out in the public.

18            Q:    Well that's done to protect the person as

19    you correctly said and I don't disagree with you.

20            A:    Well to protect the person and protect

21    board members because there are incidents where

22    individuals had stated that board members had made

23    statements.

24            Q:    Right.

25            A:    And this gives them the opportunity to

1    comments you made.

2             A:    Oh, okay.

3             Q:    Be sure.

4             A:    Okay I want to make sure that if they're

5    making certain allegations.

6             Q:    No let me try to clarify. I believe he was

7    referring to being and in fact I feel quite sure. He was

8    referring to being at a Council 90 meeting where he

9    alleges that that Ms. Chivis made some comments about

10   contacting you in regards to this matter appertaining to

11   Mr. Hazzard.

12            A:    But they already knew about this

13   because Mr. Tapper is in a different local.  I'm an

14   executive board member in my local so I would not have

15   had a meeting with Mr. Tapper.

16            Q:    No you weren't involved in this meeting

17   he.

18            A:    I would not be in front.

19            Q:    He, he was, he didn't allege that you

20   were.

21            A:    Okay.

22            Q:    He was saying that he was at a Council

23   90 meeting and he was saying that Ms. Chivis had

24   indicated that she had contacted you and taken care of

25   some, an appearance at the school board that was

1    deal with the statements the employee, the disgruntled

2    employee may say.

3         Q:    So you would have let Mr. Epps at least

4    say enough to find out what he was asking about. Now

5    maybe he got up there to talk about, you know, I don't

6    like the conditions on campus or something but I mean

7    the point is that you would of listened to him enough to

8    know what it was about right?

9         A:    Exactly. I would have listened to him

10   long enough to find out exactly what he wanted to do. At

11   that time, to keep the embarrassment off of him and the

12   board members I probably would of set up a meeting to

13   talk with the two board members who set in on this

14   hearing. I don't, as the president, I don't sit in on any

15   personnel meetings.

16        Q:    We have testimony here today of a

17   gentlemen that comments were made at a Council 90

18   meeting and again I invite counsel, because both of

19   them were here during the earlier deposition to correct

20   me if I mischaracterize. But the graviment of what this

21   gentlemen said someone had made comments that they

22   had gotten in touch with you and a problem having to

23   do with the dis__, or comments by some AFSCME

24   members at a school board meeting had been taken care

25   of was the word the quote that was used. The fact is, the

26

1    individual that made that claim is an individual named
2    Robert Tapper. He claims that he was present at a
3    school board meeting where Mr. Epps, who has
4    incidentally testified similarly to the experience in front
5    of the school board. Not to the other part of it that I
6    know of, I'm not sure, his deposition will speak for itself.
7    But the most important thing for us to establish here in
8    this deposition is a high degree of certainty on your
9    part.

10          A:    Yes.

11          Q:    That you simply have no recollection of
12   this and to the best of your knowledge it did not occur.
13   Am I correct?

14          A:    I cannot remember that and I am very
15   upset behind the fact that Mr. Tapper would make a
16   statement indicating that there was something said
17   about me, the president. Mr. Tapper was involved also
18   in a grievance process himself and I refused to hear that
19   particular grievance. Especially outside, he was outside
20   with a number of individuals including your newscast
21   and I was not agreeable to discussing a grievance with
22   him outside when  was being interviewed with the TV
23   new camera in front of us.

24          Q:    Okay make sure I don't, I'm not so sure
25   Mr. Tapper in fact, I don't think he was talking about

27

1    planned by some employees that was complaining about

2    the issue surrounding Mr. Hazzard's bidding on a

3    posted position for a head custodian at Rowland School

4    and in the summer of 1999. That's what the.

5              A:     I still, I still, I still have a question

6    regarding Mr. Tapper being at a Council 90 meeting. A

7    Council 90 delegate's meeting is only for delegates. So

8    why would Mr. Tapper be at a Council 90 delegate

9    meeting?

10             Q:     What would that?

11             A:     And Nichelle say that amongst a

12   hundred people.

13             Q:     Okay I.

14             A:     I have no problem with that now. Mr.

15   Tapper therefore is not telling unless he was at a local

16   union meeting.

17             Q:     Okay does that go, would that go for

18   Mr., Mr., let's see Mr. MacMurray? Would he be in a

19   council 90 meeting?

20             A:     I don't know Mr. MacMurray.

21             Q:     You don't know if he's a delegate?

22             A:     No I don't.

23             Q:     A Council 90, did Council 90 meetings

24   exclude the stewards, union activists and other people

25   from meetings?

29

1      A:    No Council 90 meetings are delegate

2   assembly meetings that, by the elected bodies of each of

3   three locals that the elected delegates to represent them

4   at these meetings.

5      Q:    Okay but I have never known a union

6   council meeting to exclude members. I've never known

7   that to be.  I've knocked around a lot of union meetings.

8      A:    You're talking about two different

9   meetings.

10      Q:    Okay.

11      A:    Is he talking about his general meeting

12   of his local?

13      Q:    He said council.

14      A:    Or is he talking about council its all

15   Council 90.

16      Q:    Okay.

17      A:    We have different locals.

18      Q:    Okay.

19      A:    And each local has their meeting at a set

20   and present time.

21      Q:    Do he could be talking about.

22      A:    So he could of talked about his local

23   meeting and which him and other employees are at the

24   bargaining unit or that local.

25      Q:    Had

1             A:    Had no with Nichelle

2             Q:    Had

3             A:    Who is council 90.

4             Q:    Okay well, you know, in fairness to him

5   I've got to be honest with you. I'm not so sure that was

6   material for what he was responding to and I'm not sure

7   he was clear about that. I was just wondering because I

8   had never and I don't know the answer to this, if

9   Council 90 staff representatives or Council 90 has a

10   delegate meeting or maybe they have a meeting where

11   they even host presidents of locals, whatever it might be

12   conference's or what not. I have simply never known a

13   membership to be excluded in my experience.

14             A:    You don't exclude your members.

15             Q:    Yeah

16             A:    You don't exclude your members from

17   any meetings.  But Mr. Tapper obviously had to go to

18   the president of his local.  And that's my concern. Why

19   he did not go to his president of his local before he ever

20   went to Nichelle.

21             Q:    I don't know whether we know if he did

22   or not.  He was just saying that, all he was testifying to

23   as I understand it and I'm not here to defend it.

24             A:    Right.

25             Q:    That he was present at a meeting when

1  this was said. I believe Chivis, I believe Nichelle has

2  testified directly on her own that she spoke to you, to be

3  quite honest about it. But I don't want to characterize

4  her testimony either so I won't do that. But I believe

5  she's made some comments that she did say something

6  to you in effect, and I'm not sure that.

7          A:    I don't remember Nichelle, Nichelle

8  spoken a lot of you know somethin and a lot of situation

9  has happened with the Harrisburg School District. Its

10  been in turmoil for the last three years.

11          Q:    Yeah and I don't want to.

12          A:    So we have pending cases that we've

13  constantly been speaking about so I don't remember her

14  speaking to me on Mr. Hazzard's behalf. Okay?

15          Q:    You know I, I've got to tell you I don't

16  even know if she mentioned or even indicated she

17  mentioned Mr. Hazzard's name. The reason I was

18  interested ma'am from an attorney representing Mr.

19  Hazzard and as a civil rights attorney, on issue

20  pertaining to the Constitutional Rights.

21          A:    Yes.

22          Q:    Was the idea of precluding someone

23  from speaking, which I'm not accusing you of, it's just

24  the information, and that's why I'm asking you, that we

25  received and that's why I'm asking you these questions.

1    A:    Oh as a matter of fact I gave out my

2    home phone number at the various board meetings to

3    invite people to come and speak with me and after hours

4    after the meetings.

5    Q:    Right, so there was never an opportunity

6    that Mr. Hazzard could not personally come sit and

7    meet with me to talk with me about the complaint he

8    had.

9    Q:    Okay.  Now you had mentioned Mr.

10    Freeman. He's a, his title is it personnel director,

11    manager or human resources or something of that sort?

12    A:    Personnel Director.

13    Q:    Personnel Director do you have a

14    recollection of any discussions with Mr. Freeman about

15    a conflict over a posting of a job for head custodian at

16    Rowland school?

17    A:    No I don't and when you about Mr.

18    Freeman who is Personnel Director of Human Resources

19    Manager you're talking about we have a grievance

20    committee too with the Harrisburg School Board of

21    Directors which consists of several board members who

22    will take the time to listen to grievances.

23    Q:    All right.

24    A:    So you're also talking about individuals

25    who may have an opportunity to talk to Mr. Hazzard.

1    And it doesn't come to my level until we've talked to the

2    solicitor and decided that we need to meet with this

3    individual, because we couldn't resolve it with either

4    committee.

5              Q:   I'm not so sure that the grievance what

6    level it reached because my understanding is that the

7    grievance was withdrawn by the union without

8    consultation or approval.

9              A:   I see we were not aware of that, were not

10   aware of that.

11             Q:   Okay and you would not be you would

12   not be involved at a level where that may have occurred?

13             A:   No I wouldn't that's right.

14             Q:   In response to an earlier question earlier

15   question you had more or less tangentially responded

16   that you don't know a Mr. Mac MacMurray is that

17   correct?

18             A:   I don't know him by the name. I may

19   know him through facial.

20             Q:   Okay.

21             A:   Recognition.

22             Q:   But it doesn't bring anything in

23   particular to mind?

24             A:   You're talking about a whole host of the

25   people that I meet on a day. I can't remember.

1          Q:    No, no Ms. Williams I.

2          A:    If it sounded familiar with individuals

3  that I had problems with that I could say to you yes Mr.

4  Bailey I do know that individual.

5          Q:    That's the reason I yeah.

6          A:    And I don't know Mr. MacMurray has if

7  he was standing right here and I couldn't tell you if that

8  it was him.

9          Q:    Yes ma'am I've been in public life and I

10  know that that you'll sometimes get questions, like

11  you'll have people that might come up to you, do you

12  remember me? They ask you if you know their name

13  and it sort of hurts because you care but you may not

14  remember their name because you meet so many

15  people.

16          A:    I do.

17          Q:    But I have to ask because there may be

18  an affirmative knowledge. You know, maybe some

19  knowledge you have and that's why I'm asking.

20          A:    No I don't then.

21          Q:    In fairness to you.

22          A:    To answer your question.

23          Q:    Okay in fairness to you I don't expect

24  you to know everyone. I understand, I really do

25  understand that.  So I'm not trying to put you on the

1    spot.

2            A:    Yes.

3            Q:    With that I just have to make sure I

4    clear these questions because if I don't ask them I'm

5    never going to know.  Now, we, I'm going to ask you a

6    few questions about Mr. Curtis.

7            A:    Okay.

8            Q:    Do you know what function Mr. Harris,

9    Curtis was performing for the Harrisburg School District

10   in the summer of 1999?  Do you know what he was

11   doing for the district at that time if you remember?

12           A:    There was a lot of discussion regarding

13   Mr. Curtis' responsibilities and duties.  So I'll say this,

14   we were under the impression that he was supposed to

15   be the head custodial, over the other, the head

16   custodians. We found out through Dr. Yates, who we

17   didn't have good communication skills with that he had

18   promoted him. And we had no knowledge of that until it

19   came on the board agenda.  So at that capacity we knew

20   that Dr. Yates had put him over the janitorial and the

21   ground crew.

22           Q:    Okay so let me, Dr. Yates had placed

23   Mr. Curtis in that position. He had not sought through

24   the board?

25           A:    No.

1           Q:    Approval before he had done that?

2           A:    No he did not. Not until we, not until we

3   came under the board agenda and we had to vote on

4   that.

5           Q:    All right.  If there is a, wait let me see if I

6   can get this straightened out.  If you have a transfer of

7   personnel, transfers of personnel, and the case that I'm

8   thinking about has to do with transfers of the

9   custodians from school to school

10          A:    Yes.

11          Q:    Does, is board approval needed for that

12   kind of decision before its done?

13          A:    Let me say this to you. In the capacity

14   that Mr. Curtis was placed in by Dr. Yates because was

15   restructuring the district, and also restructuring his

16   staff. He had gave him responsibilities to make decisions

17   and that's where we were first made aware of the fact

18   that transfers and downgrades and whatsoever were

19   being made.

20          Q:    I maybe in error, but it is my

21   understanding that typically, particularly when there

22   are large numbers of moves or restructuring, that prior

23   consultation with the board is not only desired but it is

24   my understanding that consultation with the board is

25   necessary before wholesale reorganization plans are

1    entered into.

2          A:    No.

3          Q:    Is that that's not correct?

4          A:    Not with Dr. Yates no.

5          Q:    Okay.

6          A:    As him being the superintendent, we

7    gave him the flexibility to make decisions.

8          Q:    Okay.

9          A:    To run this district.

10         Q:    Now would that, and  he gave that

11   authority to Mr. Curtis?

12         A:    Yes.

13         Q:    Okay.

14         A:    But it wouldn't have been without board

15   approval the transfer had to come on the board agenda.

16         Q:    Sooner or later?

17         A:    Yes.

18         Q:    So the board would ratify it?

19         A:    Right.

20         Q:    Now the power to hire, most public

21   bodies reserve the ultimate authority, not that you can

22   review everything.

23         A:    Yes.

24         Q:    I understand that. To an elected board

25   typically sometimes those powers are delegated but the

1    power to hire in the Harrisburg School District on or

2    about 1999-2000 was that in the board? Or could Dr.

3    Yates, or for that matter Mr. Curtis hire some, someone

4    at will? Could, were they authorized to hire people?

5            A:    No our personnel director dealt with that

6    and then that had to be approved by Dr. Yates.

7            Q:    And ultimately by the board?

8            A:    Yes.

9            Q:    All right. Now those of us that's been

10   around the horn a couple of times know that in a public

11   body the elected official get numerous requests.

12           A:    Yes.

13           Q:    For, you know, for jobs people need

14   work.

15           A:    Okay.

16           Q:    And I'm not suggesting that that's an

17   improper thing, but is it fair to say that someone can't,

18   when you have a union, you can't go hiring people for

19   positions that are filled by your union people, which

20   they may have a right to fill, if they're qualified. Is that

21   fair to say?

22           A:    Yes.

23           Q:    Okay.

24           A:    Let just say to you that I'm a real

25   stickler when it comes following the union contract.

1     Q:    Right.

2     A:    Why was.

3     Q:    I suspected that.

4     A:    I was stickler when it came to the union

5    contract.

6     Q:    Well there's an allegation in this

7    complaint, I'm an old, I come from a union family and

8    old union support. Nothing bothers me more than the

9    idea that the union doesn't represent. I don't care who it

10   is.  I mean the worker comes first, the union staff, union

11   leadership comes second that's what my father taught

12   me.  Now I represent an individual that has made a

13   claim that that there has been a failure to represent. It's

14   a very serious claim against the union.

15        A:    Exactly.

16        Q:    And went I investigated this matter,

17   because quite frankly I would consider myself an

18   AFSCME supporter for what that's worth.  But I believe

19   that those rights, and rights of workers, is absolutely

20   the most important things in the world.  Now certainly

21   the right to unionize, I mean I'm a deep believer in that.

22   This gentleman, Mr. Hazzard, has made an allegation

23   that the union failed to represent him in a nutshell.

24   Someone that's an experienced public leader someone

25   that's a union member, are there any facts known to

1    you that which would indicate that AFSCME or any

2    AFSCME agents or representatives failed to represent or

3    refused to properly represent Mr. Hazzard under the

4    terms and conditions of the contract?

5           A:    No, not that I'm aware of.

6           Q:    Okay, if a job is posted as per union

7    contract and all other things as per contract are equal,

8    one person has seniority is it your understanding that

9    the person with seniority is the person that should have

10   the position?

11          A:    Exactly.

12          Q:    Seniority is an extremely valuable and

13   necessary part of every union contract of which I have

14   any knowledge and I want to ask you the rights of

15   seniority play a role in the AFSCME contract as I

16   understand it with the Harrisburg School District is that

17   correct?

18          A:    Exactly but then you must understand

19   to that as the position, if its an entry level position the

20   seniority rights are not standard.

21          Q:    Yes ma'am I understand that.

22          A:    So if the position was entry level then

23   it's a position that anyone could bid for and seniority

24          **END OF SIDE A/ BEGINNING OF SIDE B**

25          Q:    Okay let me review because I think

1    that's basically the end of the questions I might have I

2    don't know if the other just give me one second here.

3    Part of this complaint is a section 1981 complaint. I file

4    many 1981 complaints. In a section 1981 complaint and

5    I filed probably dozens if not hundreds, I represent

6    black people who have been victimized in a racist

7    society. Okay?

8        A:    Yes.

9        Q:    In this case Mr. Hazzard is alleging

10   what's called reverse discrimination.  He's saying that

11   he's was victimized on account of race by black

12   individuals who comprised the school board one of them

13   would be yourself as an African American or by

14   AFSCME who he contends the leadership of which are

15   black and Mr. MacMurray who are black. Well this is his

16   allegation and this may not be something that is

17   palatable to you.

18       A:    No.

19       Q:    This is his allegation ma'am and my

20   question is a very simple one and its and unfortunate

21   one and its one that I have to ask and I certainly mean

22   know insult or anything by it.  Are there any facts

23   known to you based on upon your experience with the

24   Harrisburg School district that would indicate that any

25   person be they white or black I've filed any 1981 actions

1  against black persons that victimized black persons by

2  the way and succeeded with them. But the question

3  asking is do you know of any race relations difficulty in

4  the city and the city I didn't mean in Harrisburg School

5  board where by white employees in any classification or

6  any category were discriminated against on account of

7  the color of there skin?

8      A:    No.

9      Q:    Alright has anyone ever indicated to you

10  we had a little testimony today for example, has anyone

11  ever indicated to you that maintenance people or

12  custodians were white custodians and white

13  maintenance white people were discriminated against

14  because of the color of there skin?

15      A:    No. No.

16      Q:    All right.

17      A:    And have you ever seen situation in the

18  um Harrisburg school district because these things

19  happen I've seen them where black leadership or black

20  supervisors mistreated black workers because of the

21  color of their skin?

22      A:    No.

23      Q:    Okay I think basically gentlemen that's

24  about what I have. Let me step out

25      A:    Sure.

1             Q:    With Mr. Hazzard for a minute and I'm

2    just going to let the equipment run it will just be thirty

3    seconds please be advised that the microphones are still

4    on and I think we're about finished.

5             REPORTER: Can I get the name of the

6    foreman that you mentioned?

7             A:    Waters, Nathan Waters.

8             REPORTER: Oh, W-A-T-E-R-S.

9             MS. WILLIAMS: And is that Mr. Hazzard?

10           REPORTER: Yes.

11           MR. BAILEY: Ladies and gentlemen I don't

12   have any thing further thank you very much.  Sure.

13           A:    I have a question of you.

14           MR. BAILEY: Sure.

15           MS. WILLIAMS: Why didn't you identify Mr.

16   Hazzard to me he's sitting right here personal.

17           Q:    Mr. Hazzard its my error I apologize.

18           A:    Yes.

19           Q:    To you this is Ms. Williams, I didn't

20   know her before today except as a television personality

21   and I've been working with Mr. Hazzard for awhile.

22           MR. HAZZARD:  Hello.

23           MR. LOCHINGER:  I do have just some couple

24   of question.

25           MR. BAILEY:  Sure.

1        MR. LOCHINGER:  To clarify the record a

2    little bit.

3        MR. BAILEY:  Yes.

4        MR. LOCHINGER:  Ms. Williams could you

5    tell us just real briefly.

6        MS. WILLIAMS:  Yes.

7        Q:    Did the Harrisburg School district when

8    you were present have a standard procedure for

9    allowing people to make public comments to you?

10        A:    Sure everyone was given three minutes

11   and if there was needed, additional time as the

12   president and the other board members did not like it.

13   And even our solicitors did not like but I gave additional

14   time.  Most of the time when individuals come to the

15   board there already angry and they're disgruntled

16   employees and if has anything to do with a personal

17   issue to keep the embarrassment off of them and not let

18   it be publicly known I want them I give them the afford

19   the opportunity to have some time you know private.

20   And that's why if they would go into a you know

21   situation where they would try to go into a explain what

22   was going on I would basically say to them could you

23   please meet with the personnel committee and if there

24   not satisfied with the recommendation's then I will

25   publicly meet, personally meet with you, at another

1    time.

2             Q:    Did that, you're talking about in essence

3    stop them to some regard?

4             A:    Not well if I felt that is was you know

5    something that could be resolved without the public

6    knowing it and without anybody, that the individual

7    making the comment he or she making a comment

8    would make a statement about a board member meeting

9    them saying outside saying something to them,

10   promising him something.  I wanted them to afford the

11   opportunity to do it in private so that we could address

12   whatever's was being said.

13            Q:    Did that happen on more than one

14   occasion?

15            A:    Oh my gosh yes, yes. Yes we had

16   individuals always coming to the board indicating that

17   board members said that they could do this and board

18   members said they could do that.  And it was standard

19   practice I guess prior to us coming on board as me

20   being president board members would allow certain

21   employees to do that.  When I became president I always

22   try to um inform the employees of the Harrisburg School

23   district that it was not necessary to always bring

24   everything out in public to the eye of the camera.  Lets

25   do some things in private especially if it has something

1     to do with a personnel issue.

2          Q:   But those people that you informed of

3     that during a meeting were any of them black African

4     Americans?

5          A:   Oh my gosh yes. Yes and there were

6     some. There were two that were, an Hispanic female

7     Hispanic and a male Hispanic, several as a matter of

8     fact we even had a German woman you know there was

9     a instances where she thought her child was being

10    discriminated against because he wasn't getting the

11    proper teaching because of the cultural language. No

12    one to, needless to say we didn't have services of

13    English as a second language.  Where I informed her

14    that we were trying to recruit individual teachers from

15    other areas to teach these particular students.

16         Q:   And last question did you ever make

17    decisions as to who to inform to take it privately and

18    who not to? Did ever make any of those decisions based

19    upon race?

20         A:   No.

21         Q:   Personally.

22         A:   No, no, as you can see I'm of light

23    skinned so I could never do that. I've had discrimination

24    you know my whole childhood so I would never do that.

25    I'm a victim of discrimination you know of being of light

1    skinned so that has always galled me.

2             Q:    Okay I don't have anything further

3    thank you.

4             :    Okay.

5             MR. BAILEY: Ms. Williams he's going shut

6    take one second he's going to shut the deposition down.

7    On behalf of the plaintiff and the attorneys here I would

8    like to express my appreciation.

9             MS. WILLIAMS:  You're welcome.

10           MR. BAILEY:  For being here and your

11    testimony. Thank you.

12           MS WILLIAMS:  You're welcome.

13           MR. MARCESA:  It is 5:32 January 29, 2002

14    and this deposition is now concluded.

15                     END OF TAPE

EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

:WILLIAM HAZZARD,
    Plaintiff,
    vs.
TIM CURTIS, ROBERT MacMurray,
AFSCME DISTRICT 90,
HARRISBURG SCHOOL
DISTRICT, et al.,
    Defendant

1-CV-00-1758

JURY TRIAL DEMANDED

Proceedings:   Video Deposition
                 Nichelle Chivis

Date:          November 15, 2001

APPEARANCES:
        For Plaintiff:    Donald Bailey, Esquire
                         4311 North 6th Street
                         Harrisburg, PA 17110

        For Defendant:   Shawn Lochinger, Esquire
                         Rhoads & Simon LLP
                         1 South Market Street
                         Harrisburg, PA 17112

                         Eric Fink, Esquire
                         Willig, Williams & Davidson
                         1845 Walnut St. 24th Floor
                         Philadelphia, PA 19103

1

---

1  MR. BAILEY: It does have tape now and it's reading. It's working. Ok.
2     Tony.
3  MR. MARCECA: Please be advised the video and audio is in operation. My
4     name is Tony Marceca. My address is 2219 Dixie Drive, York,
5     Pennsylvania. I've been contracted out by PR Video to be the
6     operator for this deposition. The case is in the United States District
7     Court of Pennsylvania, the Middle District. It is William Hazzard
8     versus the Harrisburg School District and the caption number is 1:CV-
9     00-1758. Today's date is November 15, 2001. The time is 3:04 PM
10    and this deposition is taking place in the law office of Don Bailey at
11    4311 North 6th Street, Harrisburg, Pennsylvania 17110. The video
12    deposition is being taken on behalf of the plaintiff, William Hazzard
13    and the witness' name is Nichelle Chivis.
14  MR. BAILEY: It's pronounced Chivis.
15  MR. MARCECA: Chivis. Would you please rise?
16  MR. BAILEY: No. No. She doesn't rise. Stay sitting. Just raise your hand.
17  MR. MARCECA: Would you raise your right hand? State your name for
18    the record.
19  A:   Nichelle Chivis.
20  MR. MARCECA: And do you swear to tell the truth, the whole truth, so
21    help you God?
22  A:   I do.
23  MR. MARCECA: Thank you. Mr. Bailey can I get a sound check around
24    the room.

2

---

1  MR. BAILEY: Ok now that you're sworn I'll take over. My name is Don
2    Bailey. I'm attorney for the plaintiff in this matter. Nichelle, am I
3    pronouncing that correctly?
4  A:   Yes.
5  MR. BAILEY: Thank you Nichelle. Nichelle we already have a voice check
6    on you. Mr. Fink?
7  A:   Yes.
8  MR. BAILEY: And Shawn. Ok. We're good. Ladies and Gentlemen this is a
9    video deposition. There is a microphone in the room just so the record
10    is clear that you're aware of that fact. The microphone is on the table.
11    Attorneys and their clients please be advised that any inadvertent
12    comments might be caught by the mike and recorded so you should
13    conduct yourself accordingly. Before we move into the deposition
14    itself for opposing counsel, is it agreed that what are generally
15    referred to as usual stipulations, all objections except as to the form of
16    the question be reserved until time of trial. Is that acceptable?
17  A:   Agreed.
18  MR. BAILEY: Ok thank you very much gentlemen. Nichelle, may I refer to
19    you as Nichelle?
20  A:   Yes.
21  MR. BAILEY: Nichelle my name again is Don Bailey. I don't mind if you
22    refer to me as Don or whatever you want to call me. I'm pleased to get
23    anything short of what I'm usually called. So I'll be please with any
24    reference and I'm sure you'll treat me properly. And I certainly want
25    you to know that I'll treat you properly and with respect. And in that

3

---

1    regard, if I inadvertently or improperly make an error where I
2    interrupt you before you have had an opportunity to completely finish
3    a question then I want you to make certain that you tell me. Stop me
4    or if you're in the middle of a thought process, being a witness is very
5    difficult and I am one attorney who sympathizes with any human
6    being regardless of the nature of the action because being a witness is
7    difficult sometimes. So we want to cooperate with you. We want to
8    get a completely full and complete fact record and in that regard I am
9    one that follows a little bit of a different thought process then most
10    attorneys do. I don't have any objection if during the course of the
11    deposition if you or for that matter your fine lawyer here has a
12    question of me about where I'm going with a question or a group of
13    questions. I'll be happy to provide an offer if you will. In other words
14    if you have a question about what I'm trying to get at or you're
15    curious about that I don't mind you asking me. I'll do my best to
16    answer you. Please bear in mind, however, that I don't know what you
17    do. I don't have your knowledge of facts. And for that reason I may,
18    from time to time, may ask a question that may seem foolish or may
19    not seem relevant to you and if I do that please forgive me and please
20    bear with me. Those things being said the only other important thing
21    for us to remember is that I don't interrupt you and tramp on the toes
22    of your questions and you let a little time pass before you answer so
23    the person who does the transcription work can separate things. Last
24    request is that from time to time there may be a need to spell names
25    and that sort of things on the record so that the person who's doing the

4

1 transcription can understand and be able to spell out the names. So if
2 both of us can try to remember that and spell out names that will help.
3 Nichelle, do you have any questions for me before we begin.
4 MR. FINK: Don't look at me either.
5 MS. CHIVIS: I'm diabetic and I tend to use the restroom frequently.
6 MR. BAILEY: Anytime for any reason you desire. The only prohibition
7 during a deposition is that in the middle of a question you can't confer
8 with an attorney except by leave of the other side. If you at anytime,
9 even though you're not supposed to do it, I don't object if you want to
10 talk to your attorney, you want to confer, you want to suspend for a
11 comfort reason whatever you need we'll do.
12 MS. CHIVIS: And where is your bathroom located?
13 MR. BAILEY: Ma'am if you go up to the stairs to the immediate right. Do
14 you want to make a pit stop before we begin?
15 MS. CHIVIS: I feel comfortable right now.
16 MR. BAILEY: Well don't you be afraid don't be bashful.
17 MR. FINK: She's not bashful.
18 MR. BAILEY: Now being a union leader I don't imagine you are. You folks
19 are pretty tough. Nichelle have you at least had an opportunity to
20 review or read the complaint.
21 A: Yes I did.
22 Q: Most of the questions that I ask you are going to be directly on the
23 complaint. There will be some related matters when I make changes
24 I'll advise you of my changing direction so we can switch gears ok?
25 Before we get into those questions I have some preparatory things I

<center>5</center>

1 want to ask you. For the record if you can give us your full name. I
2 know you already stated it but so it flows though the deposition give
3 us your full name and your business address. I don't need your home
4 address.
5 A: Nichelle. N-i-c-h-e-l-l-e. Chivis. C-h-i-v-i-s. 4031 Executive Park
6 Drive, Harrisburg, 17111-1599.
7 Q: How are you employed Nichelle?
8 A: I am employed as a staff representative with AFSCME District
9 Council 90.
10 Q: And that's the American Federation of State, County and Municipal
11 Employees and it is a Labor Union, a Labor Organization. Is that
12 correct?
13 A: That is correct.
14 Q: Now you're a staff representative. Can you very briefly tell us what
15 your duties as a staff representative are for AFSCME? What do you
16 do?
17 A: Presently I service eight separate locals, eight separate local unions; I
18 negotiate contracts; I arbitrate grievances; I attend legal management
19 meetings; I process grievances. That's a snapshot. There are other
20 things that I do related as far as political activity and things of that
21 nature. Being a full service representative I also deal with, members
22 or non-members may approach me with questions, comments or
23 concerns. I field those and try to move them toward resolution the best
24 I can.
25 Q: How long have you served as a staff representative for AFSCME?

<center>6</center>

1 A: Five years.
2 Q: And what did you do, assuming you worked for AFSCME before that,
3 what did you do before you assumed the position of Staff
4 Representative with AFSCME?
5 A: I worked for the city of Harrisburg.
6 Q: In what capacity?
7 A: I was a Customer Service Representative with the Bureau of
8 Operations and Revenue.
9 Q: You indicated that you served eight separate locals. Now off the top
10 of your head do you know the numbers of those locals?
11 A: Yes.
12 Q: Can you list them for us?
13 A: Local 1420, Local 2063, Local 1022, Local 2523, Local 2527, Local
14 2716, Local 3130, and Local 3334.
15 Q: Now you're familiar with Mr. Hazzard, at least, I'm sure you're
16 familiar with him since this litigation you're familiar with him?
17 A: Yes.
18 Q: What local is he out of?
19 A: Local 2063.
20 Q: Now jurisdictionally what does local 2063, where is that bargaining
21 unit?
22 A: They're in Harrisburg in Dauphin County. They are the Harrisburg
23 School District.
24 Q: Now Harrisburg and Dauphin County.
25 A: No they're in Harrisburg, which is in Dauphin County.

<center>7</center>

1 Q: Yes ma'am. Now Local 2063, is the bargaining unit just Harrisburg or
2 does it include others?
3 A: No it is just the Harrisburg School District.
4 Q: What occupations if you will does that bargaining unit encompass? If
5 you can. That may be a little unfair a question but, you know, the best
6 you can recollect.
7 A: Ok, there is some, there are lot of different classifications within the
8 bargaining unit, but I have the Facilities Department which would
9 cover Custodians, Head Custodians, the HVAC all the Maintenance
10 duties of the district and there are other titles under that. But also the
11 paraprofessionals which are Instructional Aides, Health Assistants,
12 Clerical and that sort of as well.
13 Q: Are the teachers PFA or NEA, what are they?  PSCA? What are the
14 teachers if you know?
15 A: I believe they're HEA.
16 Q: Ok so they have their own, well, I shouldn't say that. Now one of the
17 entities in the bargaining unit you indicated that you covered was the
18 Facilities, Custodians and Head Custodians. To the best of your
19 knowledge would that include, would that be one of the classifications
20 where Mr. William A. Hazzard would work, in one of those
21 classifications?
22 A: Yes.
23 Q: And now was Local 2063 one of the locals that you represented as a
24 staff member for AFSCME for the last five years? In other words you
25 came aboard as a staff rep, assuming you went through some training,

<center>8</center>

1   an adjustment period and all that sort of thing. Local 2063 were

2   assigned to you or you were assigned to them?

3  A:  I was assigned to them a couple of years after I started. It wasn't right

4   away.

5  Q:  So you've been staff rep at AFSCME for Local 2063 for, from today

6   going back, at least three years?

7  A:  I'm not exactly sure. I'm not exactly sure, I believe…May I ask my

8   counsel a question?

9  Q:  I don't object to that. He may object to that but I don't.

10  MS. CHIVIS: When was the international in Hawaii?

11  MR.LOCHINGER: Oh, that's a good question. Was it 98? I can't remember.

12   It must have been 98. It couldn't have been '97 because I wasn't with

13   the firm yet. So it must have been '98.

14  A:  I believe, thank you. To the best of my recollection it must have been

15   about the spring of 1998.

16  Q:  Are you familiar with the complaint of the time frame Mr. Hazzard is

17   complaining about, in the complaint.

18  A:  I read the complaint but I didn't commit it to memory. I didn't commit

19   it to memory.

20  Q:  You want to review, you know what may help me for just a moment,

21   why don't you just review that thing. Just take a minute and skim

22   through it because it's important to have it in front of you. When

23   you're ready, you let me know.

24  A:  Do you want this back or can I use it?

9

1   of 1999.

2  Q:  Now, Nichelle so you have a recollection of how it came to your

3   attention?

4  A:  I received a grievance.

5  Q:  Do you normally receive a grievance when they are initially filed? A

6   copy of all grievances when they are initially filed by an employee?

7  A:  I receive the grievances when the local leadership forwards them to

8   me. It may not be immediately but I do as a rule receive them.

9  Q:  You know, for those who may not be , I'm generally quite familiar

10   with these procedures, of course you probably know them better than I

11   do, but for the record, very quickly if you can just give us a brief

12   summary of the procedures when an employee feels aggrieved by

13   something, how that process works. There's steps etc. can you give us

14   a very brief summary of how with the AFSCME Union how the

15   grievance procedure works under this particular contract? I'm sure it's

16   standard but if you could tell us please?

17  A:  Ok. If an employee has a concern about anything really that has

18   happened in the workplace they can immediately go to a steward, a

19   shop steward. If a shop steward is not available generally they

20   approach any of the people who are in leadership who are duly elected

21   by the local union to issue a complaint that may lead into a grievance.

22   All complaints do not manifest as grievances but that is how they

23   start. If a grievance is in order it's reduced into writing. The local

24   Steward, Chief Steward, somebody from the local would reduce it to

25   writing and serve a copy upon management, and they make copies for

11

1  Q:  You can keep it. Is it fair to say that at the time that Mr. Hazzard is

2   complaining of in the complaint that you were a staff rep with

3   AFSCME and the Local 2063 was in your jurisdiction, within your,

4   was one of your assigned duties?

5  A:  Based on the information in front of me yes, that is true.

6  Q:  Now I want to try to get a little more specific now in terms of some of

7   the allegations in the complaint. Let me lay a little better foundation.

8   Was there a time when you first became aware of Mr. Hazzard? That

9   you recollect first becoming aware of William Hazzard?

10  A:  I don't recall when I first became aware of him but I am aware of him.

11  Q:  At some point did you become aware that Mr. Hazzard was filing a

12   grievance?

13  A:  Yes.

14  Q:  And do you recollect when that was? Now I understand, I want you to

15   know, I don't think anyone expects you to pick dates out of the air so

16   don't be frustrated or offended by that. It's nothing to trip you up or

17   trick you. But your best recollection you know, if it's a year, a month,

18   a season of the year, so we can move through this. What I'm looking

19   for, what I'm trying to get at is when you first became aware of Mr.

20   Hazzard, who he was and the grievance that's become an issue, over

21   this job assignment thing, the grievance becomes an issue of this

22   litigation. That's where I'm going ok? So if you can tell us thinking

23   back when you first became aware that Mr. Hazzard was filing a

24   grievance over this assignment, this Head Custodian assignment.

25  A:  The best I can actually recollect would have been the summer or fall

10

1   themselves. I'm not sure they always make a copy for the aggrievant

2   but they then do forward a copy of the grievance, the fact sheet and

3   any applicable information for the grievance to my attention. They

4   can hand deliver it to me, mail it.

5  Q:  What happens then? Is that the grievance?

6  A:  That's just the grievance being filed.

7  Q:  What do they mean when they say first step?

8  A:  There's a meeting. Usually it's an informal meeting with the

9   immediate supervisor, whoever is involved to hear the facts. What's

10   going on? Was it a misunderstanding? Can it be resolved? If not we

11   move it on to a more formal setting.

12  Q:  Now what happens at the second step? Now the informal meeting by

13   the way you would probably not be involved with that. Is that correct?

14  A:  That is correct.

15  Q:  And that is usually something that takes place with the individual and

16   with management, usually at the work site or job site or somewhere

17   near there.

18  A:  That's correct.

19  Q:  And the individual sits down with whoever the person management

20   has assigned to be in with that type of function. And their shop

21   steward or union representative and they discuss the issue. It's sort of

22   like a meet and discuss. Is that fair to say?

23  A:  No. A 'meet and discuss' is a separate animal completely. At the

24   informal meeting to my knowledge the grievant may be there or if the

25   grievant is unavailable or doesn't wish to face the supervisor or

12

1  management for whatever reason the steward may go in and try to
2  work it out and report back to the grievant.  It would vary with the
3  situation.
4  Q:  Ok. Typically what happens is if the thing is not resolved or let's say
5  it's turned down and the grievant wants to go forward something else
6  happens. That's when it's sent to you?
7  A:  Yes.
8  Q:  And what step is that called?
9  A:  Depending on which contract we're looking at that could be step two
10  or three.
11  Q:  That's where my confusion came in and I appreciate you clearing that
12  up. In this particular case what step that occurred in this case didn't it?
13  A:  Yes. We did have a formal meeting.
14  Q:  And is that step, for purposes of this litigation, is that step one or step
15  two?
16  A:  I would need to refer to the contract please. Do you have a copy?
17  Q:  Not necessary, we can move on. In my event there was some type of a
18  meeting because apparently, if I'm not wrong, I think it was maybe it
19  was Mr. Curtis decided that Mr. Hazzard did not have a legitimate
20  complaint or something of that sort. Regardless of what happened it
21  came to your attention.
22  A:  I received a grievance, yes.
23  Q:  You received a grievance. Now who sent that grievance to you? Do
24  you know?
25  A:  Off the top of my head I don't recall if it was sent to me in the mail or

13

1  if it was hand-delivered. I don't know.
2  Q:  Do you remember who was responsible for sending it to you or
3  mailing it to you?
4  A:  In 1999 the Chief Steward was not doing an exceptionally good job so
5  we had to appoint an Assistant Chief Steward.
6  Q:  Who was the Assistant Chief Steward?
7  A:  I cannot remember if it was Robert Tapper or Terry Mathis.  I'm not
8  sure which of those two men it were, it was.
9  Q:  Did you say Terry Mathis?
10  A:  M-a-t-h-i-s.
11  Q:  Right. Now what role at this stage, if any, did Mr. MacMurray have,
12  did he have any relevant role at this time?
13  A:  Mr. MacMurray was not a steward in this case.
14  Q:  At the time that the Hazzard grievance, that forms part of the material
15  facts or the basis for some of the material facts for this litigation came
16  to your attention, which you testified was on or about the summer of
17  fall of 1999, to you best recollection, you're not certain. Was Mr.
18  MacMurray serving in any capacity with AFSCME Local 2063?
19  A:  Yes.
20  Q:  What capacity please?
21  A:  Mr. MacMurray was a Head Custodian, which means he's part of the
22  first line supervision with the district local and there is a rank and file
23  unit and also a first line supervision unit. He was with the first line
24  supervision unit and he is also a steward for the first line supervisors
25  but he was not active in this particular grievance.

14

1  Q:  Let's talk about that for just a minute. AFSCME has, I know a little
2  history on this and let me just try to test your knowledge on this.
3  AFSCME in the past has won the right to represent the lowest level of
4  management supervision in a number of their contracts. For example
5  the State Government in many capacities some of the Auditor General
6  for example, I know that they represent them there. So when we talk
7  about first line supervision, what we mean is it not the lowest level of
8  I used to call them quasi-managers but managers and they are
9  represented but they're a separate part of the bargaining unit. Is that
10  correct?
11  A:  They have a separate
12  Q:  Classification?
13  A:  They have the rights under the main agreement.
14  Q:  The master agreement?
15  A:  Well in this case I'm talking about the School District, though. Well if
16  you want to say Master Agreement for the state purposes to illustrate
17  it, they also have a Master Memorandum. It's a separate one in
18  addition to, it doesn't replace it. It's in addition to. With the
19  Harrisburg School District there is a contract but the first levels also
20  fall under a M.O.U. Memorandum of Understanding.
21  Q:  And in that capacity, being in that classification, can Mr. MacMurray
22  represent or process a grievance on behalf of a rank and file member?
23  A:  I do not know that Mr. MacMurray. I do know of, in one case for
24  example where a rank and file steward represented a person who is a
25  first level. I do not approve of that but the grievance was filed at the

15

1  time so I had to play it out. We generally try to keep the two separate.
2  Q:  Yes, I know that and the reason I'm asking is do you have a
3  recollection of Mr. MacMurray or anyone in his capacity ever
4  representing someone with a rank and file classification? In the
5  Auditor General's office they weren't allowed to do it.
6  A:  Yeah, I do not encourage it.
7  Q:  But I don't have personal knowledge of any other and I know you
8  don't encourage it, you just said that and that very clearly. Do you have a
9  recollection of Mr. MacMurray or any other steward or representative
10  of first line supervision ever representing someone from a rank and
11  file classification?
12  A:  It is possible that happened. What I'm thinking of is class action
13  grievances in which everyone would be affected.
14  Q:  Whenever there's something that covered both categories.
15  A:  Right. All the classifications. I'm thinking of that but also I do have
16  another steward who is a first line supervisor steward and he has filed
17  grievances. I can't remember right now who they were for so they
18  could have been for rank and file. I can't swear to it right now but I do
19  have another steward who files grievances. A first line supervisor
20  steward who files grievances. Yes I do.
21  Q:  Going back to Mr. MacMurray, you had indicated that he was not
22  involved in the grievance procedure in behalf of Mr. Hazzard ion any
23  event. Is that correct?
24  A:  That's correct. He wasn't the steward of record.
25  Q:  Was the steward who represented, undertook to represent Mr. Hazzard

16

1   in this grievance that he had with the school district, was that Mr.
2   Robert Tapper do you remember?
3   A:   I don't believe it was Mr. Tapper.
4   Q:   Ok. Was it Mr. Ebbs?
5   A:   Epps yes.
6   Q:   Epps. E-p-p-s.
7   A:   Yes I believe it was Mr. Epps. To my recollection it was Mr. Epps.
8   Q:   And do you remember where, what school Mr. Epps was at? If you
9   remember.
10   A:   I don't know. I don't remember that at all.
11   Q:   In any event you became aware of this grievance because it was sent
12   to you. What action did you take?
13   A:   I did the intake form. That's what we do when we process grievances.
14   I believe I called the president. At the time it was Doris Manning and
15   had a conversation with her about the grievance to get more
16   information. There was no supplemental information attached to the
17   grievance other than the grievance and the fact sheet I believe. And I
18   needed to know basically what's going on.
19   Q:   And what did Doris tell you?
20   A:   To my recollection she was telling me about Mr. Hazzard filing a
21   grievance because he wanted a specific school. And she didn't have a
22   whole lot of information but she did know that much. I didn't see any
23   reason not to so I contacted the district to schedule a formal grievance
24   hearing and we had the grievance hearing.
25   Q:   Do you remember when that grievance hearing was held and tell me

17

1   what step in the process with that local.
2   A:   I would need to refer to the contract. It could be step two or three.
3   Q:   Ok just go ahead and tell us, do you know when the grievance hearing
4   was held?
5   A:   Not off the top of my head.
6   Q:   Do you have any kind of internal standard operating procedure as to
7   how soon you like to schedule grievances or is there any schedule of
8   how soon they should be done or anything like that.
9   A:   It should be outlined in the contract.
10   Q:   Now did you become aware at some point that the conflict regarding
11   the grievance implicated, I don't mean that in a negative way, by the
12   way implicated Mr. MacMurray? That it involved him in some way.
13   Do you understand the question?
14   A:   I understand the question. I don't agree with it because Mr.
15   MacMurray wasn't involved.
16   Q:   My questions get taken apart quite frequently so you go right ahead
17   and take the question apart but tell me about Mr. MacMurray's
18   involvement if any, in the grievance.
19   A:   Mr. MacMurray was the Head Custodian. He is a Head Custodian and
20   he was laterally transferred, by management, to another building. To
21   my knowledge, Mr. MacMurray did not bid or ask to be transferred.
22   Management transferred him. Mr. MacMurray did not file a grievance
23   about it. He went to work where he was assigned and then he was
24   transferred a second time. And again he didn't file a grievance he
25   went to where he was assigned and worked.

18

1   Q:   So he wasn't happy with this in other words.
2   A:   No, I don't know if he was happy or not. I just know that he didn't file
3   a grievance.
4   Q:   Well what was the first building he was transferred to?
5   A:   Hamilton.
6   Q:   And the second was?
7   A:   I get the names of the buildings confused. It's either Roland or Scott.
8   They sit right next to each other. Intermediate Schools.
9   Q:   Roland was new construction wasn't it?
10   A:   Both of them were.
11   Q:   Roland was one of them and what was the other?
12   A:   Scott. S-c-o-t-t.
13   Q:   Now when Mr. MacMurray was transferred from Hamilton to Roland
14   is that what occurred? Was that the second transfer you referred to?
15   A:   If that's where he ended up, yes. I get Roland and Scott confused. But
16   if that was where he ended up then that's true. That was the second
17   transfer.
18   Q:   Your response would probably be if that were where he ended up after
19   Hamilton, which was the first transfer.
20   A:   That is what I meant, correct.
21   Q:   That's what you mean. Ok. Let's assume for the sake of argument it's
22   Roland. I think it is.
23   A:   Ok
   MR. LOCHINGER: Yeah, I mean we can stipulate that it is.
   A:   Ok, I'm just not sure off the top.

19

1   MR. BAILEY:   That will help.
2   MR. LOCHINGER: I can't keep these names straight either. They are side-
3   by-side, right across the street.
4   Q:   Ok, he goes to Hamilton. He goes to Roland and if I remember your
5   testimony correctly Roland was what you refer to as a lateral transfer
6   also but it would be the second lateral transfer. Right?
7   A:   Yes. He was not put in a position of a regular custodian. He was still
8   in the position of a Head Custodian. There was no loss of pay or
9   anything.
10   Q:   Ok when he went through this what you have termed as a lateral
11   transfer to Roland, isn't it correct that that position in Roland
12   represented a new Head Custodian position? Let me try to do a little
13   explanation where I'm going. My understanding is, I may be wrong
14   that when he, Mr. MacMurray was at Hamilton, let's say there were X
15   number of Head Custodians in the district. When he was laterally
16   transferred to Roland he was filling a newly created position by virtue
17   of a building that had been newly built so there was X+1. At least
18   X+1. Am I correct?
19   A:   I still really don't understand what you are saying. Mr. MacMurray
20   filled a position at Roland per management's direction. I don't
21   understand about, are you asking me? I really don't know what you're
22   asking me.
23   Q:   I understand. Let me try to explain because it's a poorly structured
24   question. It's a tough one to get at. When Mr. MacMurray was
25   transferred to Hamilton there were no new positions available for

20

1     Head Custodians. There were a set number. Isn't that correct?

2  A:  I do not know what the compliment was at that time.

3  Q:  Good word. The compliment of Head Custodians.

4  A:  I do not know what they were.

5  Q:  Do you know if when Mr. MacMurray was transferred to Roland if

6     that position had opened up a new, it was in addition to the

7     compliment for a Head Custodian at Roland? Do you understand the

8     question now?

9  A:  I believe I do.

10  Q:  Let me do it this way. I'll do it hypothetically. Let's say a district got

11     ten schools and let's say each one of those schools has a Head

12     Custodian right? And let's say they build a new school. They're going

13     to have eleven schools; they're going to need eleven Head Custodians.

14     My question is very simple. When the lateral transfer was made was

15     Mr. MacMurray transferred into a pre-exiting Head Custodian

16     position of a new Head Custodian position that came into being

17     because Roland was a new school? Do you understand it now?

18  A:  Um-hmm. When the old Middle School as it was referred to, the

19     Junior High School was torn down that predated my involvement with

20     the local. I do not know how many, cause Scott and Roland at that

21     point were all in one school, I do not know how many Head

22     Custodians were in that school. I do not know if it was one for Scott

23     and one for Roland. That I do not know. But I do know that the

24     building was leveled. Was demolished and the students were shifted

25     around the district. The two, they were insurance buildings previously

21

1     on Derry Street, were acquired and one was the Scott School. Well

2     one is the Scott School now one is the Roland School. I don't know if

3     the bargaining unit absorbed those Head Custodians, Head Custodian

4     or Head Custodians from the school that was leveled. But I do know

5     that Mr. MacMurray was transferred to Roland ultimately. So I don't

6     know if the compliment was increased.

7  Q:  Would the number of Head Custodian positions available, the number

8     of vacancies for example retirements or that sort of thing have any

9     relevance to the transfer or if the district just free to laterally transfer

10     at will.

11  A:  Would the retirements effect?

12  Q:  Sure if you have a, let's say there is a vacancy that occurs by virtue of

13     retirement. Is the district, I'm going to try to simplify this. Is the

14     district required to bid that position, can they laterally transfer

15     somebody or arbitrarily at their wish promote somebody to fill that

16     vacancy?

17  A:  If I'm understanding you correctly. If there was a retirement and there

18     was a vacancy there, the district is responsible to according to the

19     contract to post vacancies. Laterals, lateral transfers have occurred

20     and so long as it didn't remove a vacancy like it reduced the

21     compliment, they have done that.

22  Q:  Well in this case didn't the district, at least initially at some point post

23     this position?

24  A:  It was brought to my attention that it was in the board report, that's

25     true.

22

1  Q:  The fact is that at some point and I'm going to ask you some questions

2     about what knowledge you may have about what Mr. Hazzard

3     believes was a posted position somehow became a lateral transfer. I'll

4     ask you some questions about that but from the standpoint of just what

5     the facts were, just what the district did, is it fair to say that to the best

6     of your knowledge that at some point the position for Roland School

7     Head Custodian was in fact posted.

8  A:  I saw that it was in the board report and a copy of that was given to

9     me yes.

10  Q:  How did it become unposted?

11  A:  At the grievance hearing the formal hearing that we had this was

12     raised. I had been told this information by; I believe it was Mr. Epps,

13     if I'm correct. Mr. Epps or Ms. Manning, I think it was Mr. Epps and

14     Mr. Lance Freeman who was the Human Resource Director at that

15     time told me that it was posted in error.

16  Q:  Did you represent Mr. Hazzard at that time?

17  A:  Yeah.

18  Q:  And you have testified to us that Mr. MacMurray never grieved, the

19     implication to me would be, I realize you cannot testify for Mr.

20     MacMurray but the implication I would take from that would be that

21     he did not play a role in the transfer. He was simply transferred, and

22     we're talking about your knowledge, and he didn't grieve it. And so

23     what I took from that, maybe I'm wrong in doing so but I assume that

4     means that he simply was transferred due to what the district did and

5     he wasn't requesting a transfer although he didn't object to it.

23

1  A:  That is correct. That is my understanding also.

2  Q:  Why did the union not fight for Mr. Hazzard's rights? I mean he has

3     made a claim here that AFSCME did not represent him diligently as

4     the law and as union ethics require. My dad is an union teamster and I

5     come from a union family and I know what it means. And I know you

6     do because you're a union person. Can you tell us why the union did

7     not fight for Mr. Hazzard particularly since Mr. MacMurray was at

8     least formally not objecting to what you have termed a lateral

9     transfer?

10  A:  The union did fight for Mr. Hazzard. Yes we did.

11  Q:  Explain to us because I am aware of some of your correspondence and

12     some of your activities on this of course, explain to us how the union

13     fought for Mr. Hazzard to represent him. What did you do?

14  A:  We presented the grievance forward at the formal grievance hearing

15     that was held. Mr. Hazzard was in attendance as well as his steward

16     president as well as members of management and myself. We

17     presented the grievance. They already had it in writing but of course I

18     always read the grievance out loud. And it was our statement of fact

19     as to what we knew and what we believed and as to why Mr. Hazzard

20     was not transferred to Roland, why he wasn't given a position as

21     opposed to Mr. MacMurray. The district gave their explanation. Based

22     on labor management meetings that I told you were part of my job

23     that we had with the district ongoing for the better part of a year or

24     longer, prior to this going on, I addition to another grievance, separate

25     from Mr. Hazzard's grievance that had been filed as a class action and

24

had been sustained, to the union one grievance was about transfer of
personnel based on my knowledge of what transpired in labor
management meetings and the previous grievance. Management's
explanation did not raise flags to me at all. I further fought for Mr.
Hazzard because when I questioned Mr. Lance Freeman as to 'Well
Lance you've been saying for X amount of months or whatever how
the positions were going to go, how the buildings were going to go,
how the personnel were going to be assigned to the buildings. Why
then you told me this months and months ago. But then why did you
post it in the board report. Lance Freeman responded to me that it was
posted in error. We had an exchange about that. Ultimately I told Mr.
Freeman that I understood what he was saying based on the other
grievance in our labor management meetings that had gone on.
Nonetheless it was posted. Error or otherwise. Mr. Hazzard applied
for the position based on management's mistake. And I said to him at
the hearing, it's your error. Not Mr. Hazzard's. At the very least pay
him the money. Mr. Hazzard is a Head Custodian from a minor
school. The school in question is major school and there is a
difference in pay.

Q: I've studied the contract and I failed to see where the contract
makes any distinction. It may be an error again. I need your help.
Where that's a qualification. Or am I in error?

A: I don't even understand what you just said.

Q: Well let me put it this way. I'm a Head Custodian. My name is John
Doe, and I'm a Head Custodian at school X and I've been with the

25

school district for ten years. And school X is major school. My name
is Jane Doe and I have been a school custodian for twenty years, and I
am at a minor or small school. John Doe is at a major school; Jane
Doe is at a minor school. Both are head Custodians. I agree I've seen
paperwork that classifies these schools as major and minor. What it
means though, I think we can show it doesn't mean a whole lot but the
point in fact is they are there. Now as I understand the contract the
issue of seniority if I'm qualified major school or minor school, both
John and Jane Doe in this case are qualified to become a custodian in
a major school. The determining factor is seniority as I read the
contract. Now I'm an advocate and I believe in my client and in my
clients cause so I may be seeing things through rose colored lenses,
based upon any grievances you know of, any rulings, any opinion
letters, stipulations, practices, usage, is whether a person is, and this is
the question, is whether a person is at a major school or a minor
school, is that a determining factor in their selection for a custodian
position at a major school?

A: That wasn't my testimony. What I was saying is between a major
school and a minor school there is a difference in pay. I prevailed
upon the district because of their error in posting that position in error
as they stated. They told me that.

Q: That is correct. That is what you testified to. The question was
different, but you are right.

A: Ok, I want to finish the thought that at the grievance hearing the
district paid Mr. Hazzard the difference because of their error. I was

26

saying all that in response to your question about why didn't we
represent him. We did. I even tried to get something else out of it for
him.

END AUDIOTAPE SIDE ONE – TAPE ONE

MR. BAILEY: Just a couple more questions and actually it would be a good
time. Now do you recollect, Nichelle, whether there was a differential
in pay between the position that Mr. MacMurray held at Hamilton
held at Hamilton school and the position that he was "laterally", a
term incidentally that we don't agree to, agree with, to Roland school.
Do you know if his pay was the same?

A: To my knowledge Mr. MacMurray did not suffer a loss in pay at all.

Q: Did he enjoy an increase in pay, as if you recollect, as a result of the
transfer from Hamilton to Roland.

A: To my knowledge no. The only increase Mr. MacMurray received
because that did happen over the summer, that much I do recollect as
far as the transition of schools is that July first is their unilateral across
the wage, across the board wage increase that the union negotiated.
That's the only thing that everybody enjoyed but as far as him moving
from one school to the other, no. To my knowledge no he did not.

Q: So your best recollection is that the pay rate available to Mr.
MacMurray at the Hamilton School was similar to or the same pay
rate he would have been paid at Roland School?

A: Mr. MacMurray did not suffer a loss or increase in pay other than the
wage increase across the board.

Q: But your recollection is that you were fighting for Mr. Hazzard based

27

upon the theory that the school district made an error. That he should
get the benefit of their error because he bid on the position and
therefore he would either keep his minor school position but be paid at
a major custodian level because there is a pay difference, right?

A: At that rate that is correct.

Q: Just a couple more questions and then we can just break. Take a five-
minute break here. Now to what extent did you investigate? And I'm
not saying it's like you had grand jury subpoenas available to you or
something. But to what extent did you investigate the representation
by the management, school district that they had "made a mistake"?
And I have a whole bunch of questions about that so I'll give you that
to think about and maybe before we answer that because I think there
are a whole lot of related questions there we'll take a little break. And
when we come back what I want to ask you is what was done to
ascertain how they made this mistake because it's our contention that
it wasn't a mistake. So we're prepared to argue that factually legally
so I'm going to ask you some questions about that ok?   Tony if you
could just suspend and state the time.

MR. MARCECA: the time is 3:55. We are now going to stop.

BREAK

MR. BAILEY: Ok you used the phrase 'did not raise any flags' and then you
also made reference to some other grievances. Do you remember what
the other grievance was that had to do with the issue of transfer that
you referred to?

A: Yes.

28

1  Q:  What was it?

2  A:  In June, round about the middle of the month to my recollection, but I

3     believe, the memo could have come out the middle of the month but

4     the effective date was going to be like toward the end of the month.

5     Tim Curtis who was the director or Manager of the Facilities

6     Department issued a memo to all Head Custodians stating that

7     effective that date later in the month that these transfers were going to

8     be in effect. And he had it listed the schools and the head custodians

9     names, down at the bottom of that memo. Steve McCollum, who's a

10    steward, he's a rank and file steward but he's a steward, at the time he

11    was a steward. He did file a grievance saying, because what was going

12    on, people were being moved from minors to majors, from majors to

13    minors and there was no indications that their pay, the people who

14    were going from minors to majors was going to be increased. So Mr.

15    McCollum did file a grievance and we processed that grievance

16    through and it was sustained.

17 Q:  Yeah, you won that grievance. That was a case where you couldn't

18    take somebody from a major put them in a minor and reduce their pay.

19 A:  And also from a minor to a major and not increase their pay.

20 Q:  Sure.

21 A:  But that was the immediate grievance I was speaking of about the

22    transfers that I was aware of.

23 Q:  And it's your position that impacted directly on the issue involving

24    Mr. Hazzard and the posting. Is that what you're saying?

25 A:  No that's not what I said. You were asking about what grievance was

29

---

1    it that I had spoken of, that's the one I was referencing.

2  Q:  When do you first remember hearing that the district had made a

3     mistake and I think you had indicated that was Mr. Freeland?

4  A:  Freeman. F-r-e-e-m-a-n.

5  Q:  Freeman. Ok. When did you first hear that the district claimed to have

6     made a mistake?

7  A:  To my recollection it was at that formal grievance hearing.

8  Q:  Had they ever indicated that they had made a mistake before that?

9  A:  Not to my knowledge. No.

10 Q:  And so you dropped the grievance at that point?

11 A:  No.

12 Q:  You did not drop the grievance at that point?

13 A:  No I did not.

14 Q:  Why didn't you just drop the grievance at that point if they just made

15    a mistake?

16 A:  I still had an offer on the table to settle the grievance by paying Mr.

17    Hazzard and although Mr. Hazzard indicated that that was not what he

18    was seeking I still was trying to get it and I was not going to close it

19    until I had some indication.

20 Q:  Well was he supposed to be paid as a Head Custodian for the rest of

21    his tenure with district?

22 A:  That was the intent of my settlement offer yes, unless he went to

23    another position that paid higher. But at the time when I made that

24    statement yeah that was my intent.

25 Q:  Well there was no way at that time that Mr. MacMurray could have

30

---

1    been hurt because the issue of him receiving less pay for example at a

2     minor school was moot. He would have no, no matter where he would

3     have gone from Roland he would have received the same pay.

4  A:  From Roland.

5  Q:  Sure if Mr. MacMurray who was at Roland had to be transferred from

6     Roland to accommodate Mr. Hazzard, let's hypothesize and had been

7     sent to a minor he would not have suffered a diminution in pay, a drop

8     in pay right?

9  A:  I would have argued that yes.

10 Q:  Well according to the understanding you had with the district he

11    wouldn't have received that.

12 A:  Which is why I would have argued that.

13 Q:  Well it seems fair to assume you probably would have won that, it

14    was established. But we don't know that's true. Do you remember

15    when roughly when that meeting was where the district or Mr.

16    Freeman, do you remember like what month it was for this formal this

17    first formal meeting was when Mr. Freeman said at this grievance

18    meeting, we made mistake. Do you remember when that was?

19 A:  Off the top my head, no.

20 Q:  Did you at some point decide not to continue fighting the grievance?

21 A:  A decision was made to withdraw the grievance eventually.

22 Q:  Had you consulted with Mr. Hazzard about that?

23 A:  I attempted to have a meeting with Mr. Hazzard. It never happened.

24    Now if it was before the grievance was filed, or there about, when

25    I mean withdrawn or there about, I can't recollect the exact date. But

31

---

1    after that first formal grievance hearing, once Lance had, Lance

2     Freeman had denied the grievance I received information. I don't

3     know if it was from Mr. Hazzard, Mr. Epps or Ms. Manning but I did

4     receive information from the local. That because I had raised the issue

5     about when, I raised this with the local union, when did Mr. Hazzard

6     bid on the job. It seemed from the information that he bid before the

7     job was even vacant or had been whatever before it had been in the

8     board report he had submitted a bid and I had questions about that.

9  Q:  Sure. He had written them hadn't he? He had written them.

10 A:  It was a memo.

11 Q:  it was common knowledge. I mean it was not like the members of the

12    union didn't know that there was going to be a position at Roland.

13    That was common knowledge and common sense. I'm sure you would

14    agree with that and maybe you don't know that so maybe that's not a

15    real fair question. If Mr. Hazzard had in fact written and announced

16    his intentions I want to bid on that position or I want that position or

17    something to that effect. Right?

18 A:  It was something. It was either a bid transfer, it was clearly indicated

19    that Mr. Hazzard had given clear indication that he was interested in

20    the school.

21 Q:  Now, Nichelle, Mr. Freeman acknowledged that they were aware of

22    that fact didn't he?

23 A:  This was after the first, not the first, the formal grievance hearing. The

24    first, the formal grievance hearing, the first formal hearing that we

25    had. It was after that because it was when my, in reviewing the file, I

32

1   was concerned that the reason why he didn't get the job was that he
2   didn't bid on it when it was vacant. He jumped the gun. That was
3   what I was thinking at the time. Speaking with the local at length they
4   told me, like I said I don't know who told me but I did get the
5   information. Bids are accepted at anytime whether a position is vacant
6   or not. I sent that in a letter to Mr. Freeman to verify that point. And
7   he did issue a response. But at that time which is why I didn't raise
8   that at that first hearing we had, the hearing we had. Because at that
9   time I was not even aware of that, I was looking at the facts as they
10  were. But as I dissected them further, I questioned the local. They
11  responded. I then forwarded it on to management. Well then if they're
12  accepted at any time why wasn't he given the position?
13  Q:  And what was Mr. Freeman's response? You indicated that he
14      responded. Can you tell us what his response was?
15  A:  He did. He responded in writing. He acknowledged, I'm pretty sure
16      that he did in his letter that he did acknowledge that bids are accepted
17      at any time. I can't quote the letter but it was something to the effect
18      that, I don't know if it quoted managements right to assign and
19      transfer personnel or not. I can't swear that he did that. It was a
20      lengthy letter quite honestly. But he did respond to that. He did at
21      least acknowledge that bids can be accepted, whether they are
22      approved or not. He also indicated that Mr. Hazzard's bid was
23      considered prior to any action being taken.
24  Q:  Here's my next question. What possible harm could have come to Mr.
25      MacMurray, to any other member of AFSCME in any capacity, to the

33

1   union itself, what possible harm could any of those three suffered in
2   carrying Mr. Hazzard's grievance forward and letting an arbitrator
3   let's say, or Commonwealth Court if it needed to go that far, look at
4   whether or not he was entitled to that position by virtue of it being
5   posted? Do you have, and the reason I'm asking that question is do
6   you have law? Why would you drop a grievance if the only way to go
7   is up and win for Mr. Hazzard? Why?
8   A:  Based on all the information that I had at the time. Based on my
9       knowledge of the labor/management meetings in which the new
10      construction or rehab of the buildings had been ongoing discussion for
11      the better part of a year, based on all that information that is why the
12      grievance was withdrawn. There was no other reason than based on
13      the facts that I had at the time.
14  Q:  All right. Well the how about you telling us what those facts were.
15      Because ma'am honestly, I'm not trying to be contentious to be
16      contentious with you. I personally don't feel that answer is responsive
17      and I'm not trying to offend. I apologize if I do or sound that way. I'm
18      looking for the reasons, if you could be a little more specific, as to
19      why. Because as we are going through this deposition I have
20      fastidiously approached the questioning from the standpoint of Mr.
21      MacMurray and we know that Mr. MacMurray, from what I can tell
22      could not and would not have been harmed. I don't how in analyzing
23      this situation, given the fact that Mr., that the district said it had made
24      a mistake. Why was it not taken forward? You've told me that it had
25      something to do with the projects and how they were classified or

34

1   something. I'm not sure I understand. Could you give me more details
2   please? Why not take the grievance forward? You've admitted that
3   Mr. Hazzard was not happy with the pay differential as an issue. He
4   wanted the position. You've told us that Mr. MacMurray didn't ask to
5   be there but he didn't grieve it. And you've told us that they admitted,
6   that they at least admitted that they made a mistake. I don't think they
7   made a mistake. I don't believe that. But that's irrelevant, what I
8   think. You were there and they admitted to you that they made a
9   mistake in posting that. They at least said they made a mistake. Their
10  position was that they had a right to forget about their mistake or
11  rescind it whatever it was and to laterally transfer. You withdrew and
12  you've also admitted without Mr. Hazzard's permission the grievance.
13  Why? And I can't give you more background or make more of an
14  offer on the question. I honestly do not understand why you would
15  withdraw the grievance given the information in this deposition so far.
16  Why did you not stand with Mr. Hazzard and fight? Why?
17  A:  A couple things you said are misleading. Number one, once the
18      grievance reaches the counsel level, which is my position, we have,
19      and the grievance is ours. It's not the individuals. The grievance
20      belongs to the union. As far as you're saying without his permission,
21      the grievance belongs to the union. Based on the information that I
22      had at that time, that is why the grievance was withdrawn. Previously
23      as I have stated in the labor and management meetings leading up to
24      this new school being completed and opened, management well
25      before Mr. Hazzard sent in his bid, before any of that well before that,

35

1   management had consistently stated over and over again that they
2   were going to transfer people into the building, the two intermediate
3   schools because they didn't want all new people being hired going
4   right into the school but they didn't want all seasoned employees
5   having the school as well. They wanted a mix of both. They had been
6   saying that since it first started. This was before Mr. Hazzard entered
7   into it, before any grievance, before anything. That coupled with
8   Lance saying that was posted in error we didn't need to do that. That
9   sustained, supported his statements from all the year before, which is
10  why I didn't think management was misleading me at that time.
11  Because in a labor management meeting where there was no pay
12  issue, no one had anything to lose they had already stated that. That is
13  why.
14  Q:  Did Mr. MacMurray ever serve on the union executive board in any
15      capacity?
16  A:  During my tenure as having the local, I do not believe he was on the
17      board. I know he was representing the first levels as far as being
18      informed, as being the steward. But if he actually served like in an
19      officer's capacity or on the board, while I've had the local to my
20      knowledge, I don't believe that's true.
21  Q:  Did he attend meetings?
22  A:  Yes.
23  Q:  What kind of meetings did you hold for the local?
24  A:  Ok, they have monthly local meetings. Except for two months for the
25      summer they might suspend. But they do have, the local as a rule

36

1    meets monthly. The executive board I believe meets monthly and if
2    there is a labor / management meeting where first level issues were to
3    be discussed, at that time he was a representative to that committee, he
4    would attend those meetings. And even we had a meeting of all first
5    level and he attended that meeting.
6  Q:  Now the meeting of all first level what, for want of a better word,
7    what level was that held at? In other words would that be all of the
8    unions in your jurisdiction, all of their first level people? You
9    wouldn't just have for that local a first level meeting would you?
10  A:  Yes. That's exactly what that was. It was just for that local, the first
11    levels.
12  Q:  Ok and did you ever have a meeting of first level representatives for
13    all of the locals?
14  A:  All of my locals don't have first levels.
15  Q:  Those that do. Do you have meetings where they are composite
16    meetings where you bring them all together?
17  A:  No. I represent state locals and non-state locals. And my non-state
18    locals include two school districts and the Harrisburg Housing
19    Authority. It's apples and oranges here. No that's not true. I do have
20    one other local that I have foreman but this local is the only one that I
21    have per say first levels.
22  Q:  So it wouldn't make much sense to bring them together?
23  A:  Right. It's just not applicable here.
24  Q:  When Mr. MacMurray testified, my recollection is that he testified
25    that he attended either some executive board meeting or something of

37

1    that sort. Do you have any idea what he might have been talking
2    about?
3  A:  There were executive board meetings held when Ms. Doris Manning
4    was the president in which, even though he was not a formal member
5    of the board, he was still called upon to report on what's going on
6    with the first level. He would be there. The trustees would be there but
7    she expanded it. Which at the present she could do that to include
8    more than just the seven people who were elected to the board, and
9    she did.
10  Q:  Do you remember what period of time that was that he attended those
11    executive board meetings? And by period of time I mean month,
12    season, year. Let me be more specific. Did he attend executive board
13    meetings during the fall of 1999?
14  A:  I really wouldn't recall that right now. I don't know.
15  Q:  What about during the summer of 1999?
16  A:  I don't really recall if they met at all in the summer of 1999. I don't
17    know.
18  Q:  Am I correct that you went to that first either first or second step,
19    we're not clear on that. At least I'm not clear on it. At least the first
20    formal meeting that you had with management over the grievance that
21    was sent to you by Mr. Hazzard or his representative, would that have
22    been sometime in the fall of 1999?
23  A:  It very well could have been. Without, I don't know off the top of my
24    head.
25  Q:  And you withdrew sometime in the very late winter, early spring of

38

1    1999, excuse me of the year 2000. Isn't that correct?
2  A:  Again without the documentation, but if that's what you have it could
3    be true.
4  Q:  I'm not sure either, Nichelle. But what does occur to me my best
5    recollection is that there was quite a lapse of time in there. And I'm
6    wondering if based on your recollection, you could tell me why so
7    much time went by over this idea of withdrawing? Why it took so
8    long to understand that or reach that position? The reason I ask that
9    very simply, again in the interest of letting you know where I'm
10    coming from. Mr. Hazzard's position is that it is a sort of Johnny-
11    come-lately excuse. It didn't crop up for actually quite some time.
12    And when it came he wasn't happy and he objected to it and he wasn't
13    happy with it when it came up and he felt that the union, obviously
14    that is what some of this partis litigation is about, that the union had
15    for some reason backed off. And you have responded to questions
16    about that. My question is do you have a recollection of how much
17    time passed between when the grievance process first began and you
18    learned that the position of Mr. Freeman and the district was that they
19    had made a mistake? How much time passed in there if you recollect?
20  A:  No, I don't.
21  Q:  But I think you did testify the best of your recollection that at the first
22    formal meeting is when they first said it was a mistake.
23  A:  Yes to the best of my recollection, yeah. They did say that at that
24    meeting, yes.
25  Q:  So your best recollection is, now was Mr. Hazzard at that meeting?

39

1  A:  Yes.
2  Q:  And was Mr. Epps at that meeting?
3  A:  Yes.
4  Q:  Was Steven McCullough at that meeting?
5  A:  I don't recall if Steve was there. He could have been but I don't recall
6    if he was though.
7  Q:  And who else was there from the union side if you recollect?
8  A:  I believe Doris Manning was there and Terry Mathis and Rob Tapper
9    may have been there. I can't swear to it but they may have been there
10    from the union side.
11  Q:  I want to ask you some; you have the complaint there, some questions
12    bearing directly on the allegations of the complaint. Paragraph eleven
13    alleges that on or about the summer of 1999 the plaintiff was the only
14    person to bid on a job posted for promotion to Head Custodian at
15    Roland Intermediate School. Are there any facts known to you that
16    indicate that anyone bid on that position other than Mr. Hazzard?
17  A:  Not to my knowledge.
18  Q:  Paragraph twelve you've answered a lot of questions about. Paragraph
19    fourteen says plaintiff was the only person to bid on the posted job
20    and plaintiff had "seniority" over the defendant MacMurray. Do you
21    have any recollection of looking at the issue of seniority and reaching
22    any conclusion of who had most seniority under the contract, Mr.
23    MacMurray or Mr. Hazzard?
24  A:  Repeat that for me again.
25  Q:  Sure. Who had more seniority? Mr. MacMurray or Mr. Hazzard?

40

A:  To my knowledge, Mr. Hazzard has more district seniority that Mr. MacMurray.

Q:  Ok. Now paragraph 16 says that on or about March 2000, and I'm going to get into questions about race in a minute or two here, the defendant asked me by and through union staff representative Nichelle Chivis, African-American informed plaintiff they were unilaterally withdrawing plaintiff's grievances. And one thing you cleared up for us is a grievance is something that is a union prerogative. An individual does not have a right to insist that a union go forward with a grievance but I want to ask you a question in that regard that's a little different. Does the union have to withdraw a grievance or can they say to the individual that we will no longer defend the grievance but you can carry it forward on your own? Have you ever seen that happen?

A:  No I haven't.

Q:  So the union withdraws the grievance then the employee is left in a position where they have no jurisdictional basis to continue right? They can't go on, on their own, once the union withdraws it because it's a union grievance, they can't carry the fight forward because it's not their grievance. Right?

A:  The grievance belongs to the union and to answer your question is my understanding that under the guise of this being grievance number 1-2-3-4-5-6 whatever for AFSCME it is my understanding that no, they cannot take it forward under that. But if they, under that umbrella, but if they want to go to human relations or something like that, I

41

wouldn't have authority over that as to what they could do.

Q:  Oh no we're talking about a contract dispute. We're not talking human relations right now. Is there anything a union can do if they say are let's say sympathetic to an employees cause but feel for whatever reason they might have that they shouldn't go forward is there any mechanism by which the union can say all right Mr. Hazzard, you know, we're not going to defend this grievance, we're not involved in it anymore but you can take it forward. You can't do that because it's the union's grievance and it's not his grievance. Right?

A:  The grievance belongs to the union right.

Q:  Now paragraph sixteen goes on and says at that time upon belief and information they told the defendant school board that the grievance had no merit even though the promotion of MacMurray over plaintiff was a clear violation of the contract. Now you've already answered a lot of questions and there is no reason to revisit them. Obviously there was a contract interpretation made here or was it a case where AFSCME through you was accepting the factual interpretation of the district. And that's where I want to get to the question that I had raised before we left for the break and that was about investigation. Was AFSCME's decision to withdraw based upon an issue of law, in other words an interpretation of the contract or simply accepting and believing that the school district had made a mistake? And what I'm going to ask you after you answer that question, which I'm sure you will is I want to ask you what you did to find out whether or not the school district, who's an adversary was telling the truth that they made

42

a mistake? What you asked them to produce as proof and as to evidence to them making that error as to posting and then changing their mind because somebody prevailed upon them to do that? Do you understand where I'm coming from? Was the decision to withdraw based upon the facts, as you knew them to the contract? And if it was based upon facts as you knew them and applying them to the contract did you simply accept the school districts version or did you investigate this issue of error.

A:  It was based upon, the decision to withdraw was based upon the facts that I had. No I did not send any correspondence or have a conversation with the district as far as prove to me that this was an error. I did not do that based upon our labor management meetings that had taken place before, up to a year or longer before this whole issue came to light where they had stated from the very beginning about how that school, how personnel were going to be assigned to that school.

Q:  In fairness to you, what you're telling us that there had been a number of discussions with the district where they had expressed an intention to transfer people to the position in Roland school. And because of your knowledge of that background of facts that it seemed to you that the school districts decision to, the school districts actions in posting the position was an error. It seemed plausible to you that that was not consistent to their previously held position. Is that right?

A:  That is correct.

Q:  Now their previously announce intention to transfer folks over to

43

Roland School, did that include Head Custodian? Now that's quite a plum so I'm just asking did they include that or did they just speak generally about personnel?

A:  When we were talking in labor / management we were talking, indicating all classified personnel, form instructional aides, library aides, all personnel, clerical, custodians, Head Custodians, the whole ball of wax. We were speaking of everyone because that school and the Scott School both had to be staffed.

Q:  Was Mr. MacMurray present at any of those meetings?

A:  He could have been but I can't swear that he was.

Q:  So they spoke generally but your understanding was that Head Custodian would have been included in those discussions?

A:  Yes. Lance Freeman commonly would say AFSCME personnel and that would include Head Custodians.

Q:  Well in your experience with the school district, when somebody bids on a position at the school district who do they go through at the school district?

A:  When someone bids on a position?

Q:  Sure I want to bid on this. They posted this. A position is posted. Who do I go through? What do I do? Who do I write to?

A:  To my knowledge you go through human resources.

Q:  And that is Mr. Freeman right? Who is head of Human Resources?

A:  At that time, yes it was.

Q:  Did you ever ask them how they made the mistake of posting this position? You know look at the problem you caused here. You made a

44

1    mistake. Who made it? How did this happen?
2  A:  His response, yes I did ask questions along that same line.
3  Q:  And what did he say?
4  A:  And he said it was erroneously posted in error, it was an accident, it
5      was a mistake but it was posted in error. It should have never gone
6      into the board report. It was a mistake is what he said.
7  Q:  And you agreed with them that it was not a mistake that they were
8      stuck with. They didn't have to, they posted the position and the
9      union's position was Oh. Ok. You made a mistake. It's that simple,
10     you made a mistake and we accept that. Right?
11 A:  No that's not what happened.
12 Q:  Well what did happen?
13 A:  I told you a little while ago I told Lance that if you made a mistake it
14     was your mistake not Mr. Hazzard's and he shouldn't be harmed
15     because of it. Pay him the difference.
16 Q:  Well did you talk to Mr. MacMurray about it at all?
17 A:  No.
18 Q:  Why not?
19 A:  He wasn't involved.
20 Q:  Why wasn't he involved? Why couldn't you say to Mr. MacMurray
21     gee, you know you didn't grieve this position? They transferred you
22     over here. Let's see if we can work this out since this position was
23     posted. It prevents a conflict. There's no reason to talk to Mr.
24     MacMurray about it?
25 A:  Mr. MacMurray was not involved in this grievance at all.

45

1  Q:  Did you ever learn at any point that Mr. Hazzard had attempted to
2      appeal his dispute with the district, to the district itself?
3  A:  About this matter?
4  Q:  Yes ma'am.
5  A:  Yes.
6  Q:  How did you learn about that?
7  A:  From the local.
8  Q:  Aside from the local?
9  A:  Oh no, no, no. Someone else in the local must have told me. It could
10     have been Doris the President or a steward or something. But it did
11     come to my attention that Mr. Hazzard had gone to a school board
12     meeting.
13 Q:  And do you know whether or not the school board listened to him?
14 A:  I don't have anything that says they did or didn't.
15 Q:  But it was your view and AFSCME's view that they had not only a
16     duty to appear with him at the, at any school board meeting but that
17     would not have been proper because you had withdrawn the
18     grievance. Correct? You had withdrawn the grievance. Right?
19 A:  I don't know when Mr. Hazzard went to the school board, whether it
20     was before the grievance or after but as a matter of fact the union,
21     myself representing AFSCME local 2063 do not attend school board
22     meetings. We have a grievance process. I don't mix the two. I have a
23     grievance process, that's what I follow. I don't go to school board
24     meetings.
25 Q:  Does the union ever take a position on school board members at

46

1     elections?
2  A:  Oh yeah. We endorse people or support people, sure.
3  Q:  And you probably, I hope you run people for the position. I would if I
4      were you. But I'm not saying you do and I'm not trying to tell you
5      your business obviously you folks are far more successful than I'll
6      ever be, or was. The point in fact is though that you do get involved in
7      elections and you do endorse people but you never go to school board
8      meetings?
9  A:  I have never been to a school board meeting.
10 Q:  Has AFSCME taken any political position on the school board
11     members that passed on Mr. Hazzard's position?
12 A:  What? Who are they?
13 Q:  I don't know. Do you know?
14 A:  No, I mean, I'm saying.
15 Q:  I'm not trying to be funny and I'm not and I'm not trying. As I sit here
16     I don't know and maybe it's not fair to you, given the area you have to
17     deal with let me withdraw the question. I really don't think it's a fair
18     question to you. The fact is you don't know who they are.
19 A:  Who they were at that time?
20 Q:  Ok. Who they were at that time.
21 A:  And you're asking me did we take a position on those who passed on
22     his case?
23 Q:  Let me do it this way. Did you ever have any discussions about Mr.
24     Hazzard with any member of the Harrisburg School District at any
25     time?

47

1  A:  Yes.
2  Q:  Who? Tell me what, tell me who, tell me what it was about, tell me
3      where. I want to know everything about it. I want to know every
4      single meeting, discussion, conference, communication you had with
5      a school board member about Mr. Hazzard please.
6  A:  Ok. Your question was school district person. I took that to mean
7      Lance.
8  Q:  Let me be clear because my question may not have been clear.
9  MR. LOCHINGER:  Yes ask the question again.
10 MR. BAILEY:  My question may not have been clear. School board member.
11     I'm talking about people who decide how vacancies are being filled,
12     are elected and they sit as the school board and govern in accordance
13     with the law the set policy for the Harrisburg school district. These are
14     the elected board members. I want to know if you've ever discussed
15     Mr. Hazzard with any of them.
16 A:  Yes but not by name.
17 Q:  All right. Then please tell me and don't leave anything out, every
18     circumstance, what you mean by not by name, whatever you want but
19     I want to know everything about it. Ok?
20 A:  I had gotten wind that, I don't know if it was from Mr. Hazzard or Mr.
21     Epps, I'm not sure, were going to go to the school board about this
22     situation. At that time the grievance, again I'm not sure if the
23     grievance had been withdrawn or not. I had an occasion to see Wanda
24     Williams at the AFSCME conference center. And she and I were
25     talking about a separate issue and I said to her, I said by the way you

48

1     may have some of my members at the board meeting trying to discuss

2     a grievance. And she said something to the effect of well what about

3     it. I said well, it's a grievance and that was it.

4  Q:  And that was the total extent of that discussion with her.

5  A:  About Mr. Hazzard, I was referring to Mr. Hazzard.

6  Q:  He was not mentioned by name and obviously she knew who you

7     were talking about.

8  A:  I don't know if she did. No, because I don't know if it had come up

9     yet.

10  Q:  Maybe she didn't. Fair enough. The way you recount the discussion

11     it's possible she knew who you were talking about but you don't

12     know whether she did or not. And Mr. Hazzard's name was not

13     mentioned. Is that correct?

14  A:  Yes, that's correct.

15  Q:  Any other circumstances where Mr. Hazzard was discussed directly or

16     indirectly with any other school board member?

17  A:  Not to my knowledge at all.

18  Q:  At the time that you had the discussion you made reference to had

19     AFSCME withdrawn the grievance?

20  A:  I don't know for sure but I don't think so because I said to her it's a

21     grievance and I know for a fact that I was speaking in the present

22     tense but I don't, I can't swear that it was already withdrawn or not.

23  Q:  Well if it was a grievance why would you warn her about that?

24  A:  Because she would not have known that this was a grievance.

25     Someone could have just been coming to the board to say oh I have a

49

1     question or concern about such and such and not know that it was, had

2     already gone through the grievance procedure.

3  Q:  Do you believe that that might be unfair to your member to talk to the

4     entity that is going to be passing judgment eventually on him or

5     making a decision on him, or you think he might be coming to a

6     meeting. I understand you didn't mention his name but if a grievance

7     is pending at that time aren't you doing the same thing that you're

8     telling her, not to listen to the member but you're talking to her. Is that

9     fair or reasonable?

10  A:  Wanda Williams was on the school board at that time, he still could

11     be, I'm not exactly sure. She is also a AFSCME member. In the past

12     when we had another case that did through the grievance procedure

13     have to go before certain members of the board. The board, how they

14     picked who would hear grievances or whatever I don't know, I don't

15     know if it was a personnel committee, I'm not exactly sure. But Ms.

16     Williams always recused herself from that so she would not have

17     heard the case.

18  Q:  Ok what I mean, all I'm saying is if the grievance is pending why

19     would you tell somebody on the other side in an adversarial position,

20     pre-warn them that your people, rightfully or wrongfully, whether

21     they are in order or not are coming. She's going to know what to do

22     and who cares. Maybe she'll say something that will help your people,

23     you know. Why would you tip her off? How does it help Mr. Hazzard

24     or the union to tell the school board member that one of your

25     members is coming down. Isn't that currying favor with the

50

1     opposition? You don't think it is?

2  A:  No.

3  Q:  Ok. How did you expect her to respond to the information you were

4     providing?

5  A:  I don't know I expected a response. I wanted her to know that it was a

6     grievance. It was being or had been addressed in the proper form.

7  Q:  Well, you didn't get, how much information did you give her for her

8     to know what the grievance is about?

9  A:  I didn't give her any information. I just told her that it was a

10     grievance. That's what I said.

11  Q:  Well given the information that you told us how would you expect her

12     to even know what you are talking about. There's not much

13     information there according to what you've told us.

14  A:  I told her it was a grievance. That's all I told her.

15  Q:  Let's suspend for just a moment please.

16     **END OF AUDIOTAPE ONE – BEGIN TAPE TWO – SIDE ONE**

17  MR. BAILEY: Thank you very much. Nichelle, paragraph eighteen Mr.

18     Hazzard alleges that the defendant Harrisburg School District has

19     even denied the plaintiff an opportunity to appeal to them and be

20     heard. Do you have a recollection of anyone telling you that the

21     Harrisburg School District either intended not to listen to Mr. Hazzard

22     or would not listen to him?

23  A:  No not to my recollection.

24  Q:  Now I had asked you a question about school district, elected school

25     district members and your response to me, because there was some

51

1     confusion over the question, and I apologize to you for that, your

2     response indicated to me that you might have talked to other people.

3     Now the record's quite clear that you spoke to Mr. Freeman.

4  A:  Yes.

5  Q:  Is that correct?

6  A:  That's true.

7  Q:  Now excluding this elected school board member that you spoke to

8     and excluding Mr. Freeman who else, if anyone else at the Harrisburg

9     School District in an official position did you discuss Mr. Hazzard

10     with. Did you talk about Mr. Hazzard with, anyone else? Aside from

11     Mr. Freeman, do you understand the question?

12  A:  Yes.

13  Q:  Aside from Mr. Freeman and this elected school board member did

14     you discuss Mr. Hazzard with anyone out at the school district?

15  A:  Yes. Tim Curtis was at the meeting as well.

16  Q:  Ok, now, which meeting though?

17  A:  The formal grievance hearing.

18  Q:  Ok, well he would have been there as the, in some official capacity. Is

19     that correct?

20  A:  Yes.

21  Q:  Now aside from that meeting did you ever discuss Mr. Hazzard? Just

22     a moment. Are you having an elapsed time problem there?

23  MR. MARCECA: No I've got 15 more minutes.

24  MR. BAILEY: During the time that this, you called it informal grievance

25     hearing?

52

1 A: No, formal.
2 Q: Formal, yes, I'm sorry. Thank you. This formal grievance meeting,
3    Mr. Curtis was there. Aside from that did you ever discuss Mr.
4    Hazzard with Mr. Curtis?
5 A: Yes. For other grievances yes.
6 Q: Any of those other grievances have anything to do with the subject of
7    this lawsuit?
8 A: No.
9 Q: Now when did those discussions about the other grievances take
10    place? Were they prior to this, prior to the end of June 1999?
11 A: Whenever I would have had a grievance filed on behalf of Mr.
12    Hazzard is when I would have had the discussion with Mr. Curtis.
13 Q: Ok, Nichelle do you remember if after late June of 1999 you had any
14    discussion about a Hazzard grievance other that this thing with the
15    school? If you remember.
16 A: I believe so.
17 Q: Do you remember what it was about?
18 A: To the best of my recollection I thought there were two filed on
19    employee treatment and I believe there was one filed about an issue
20    with bereavement leave. I believe, to the best of my recollection that's
21    what I believe.
22 Q: To your knowledge how was the bereavement leave resolved? Or is it
23    still pending? If it's still pending I don't want you to refer to, I don't
24    think that's fair.
25 A: Right off the top of head, I don't recall. I believe it was sustained. I

53

1    believe it was something to the extent that after Mr. Hazzard had to
2    use bereavement leave but then Mr. Curtis did at some point later
3    apparently started questioning him about it and the relationship maybe
4    to the person who had passed.
5 Q: Yes it was a brother in law, right.
6 A: And I believe it was something along those lines and to the best of my
7    recollection I believe the remedy could have been a cease and desist
8    or something along those lines.
9 Q: And Mr. Hazzard prevailed if I'm correct on that.
10 A: I believe.
11 Q: Do you know what the other ones were about?
12 A: I believe there were two.
13 Q: This would be since this thing came up with the transfer.
14 A: I don't know if it was since or before. It would all run together. I
15    really don't know that.
16 Q: I'm sorry. Go ahead.
17 A: I believe there were two grievances filed about employee treatment
18    and I believe it was something about Mr. Curtis harassing him, that
19    may not be the verbiage but it was something along that, and not
20    treating him in a respectful manner, or demeaning his dignity or
21    something like that and again I believe, to the best of my recollection I
22    believe that Mr. Hazzard prevailed in both of those as well. I think.
23    It's been awhile.
24 Q: Did you ever discuss Mr. Hazzard with Mr. MacMurray?
25 A: Oh my goodness. I could have. I believe I could have.

54

1 Q: Do you have any recollection about what you and Mr. MacMurray
2    discussed regarding Mr. Hazzard?
3 A: Insofar as I was telling you how Mr. MacMurray would come to the
4    ah...
5 Q: Executive board?
6 A: Executive Board meetings and he was seeing basically what was the
7    status of the first levels. And if there was something going on in Mr.
8    Hazzard's school, or if there was an issue about Mr. Hazzard at all, it
9    would come up then. Could I pinpoint that I definitely did. No. But
10    I'm saying that I could have. I just, they weren't formal discussions.
11    They were in a meeting.
12 Q: Do you have, is it fair to say then that you have no recollection of any
13    specific discussion about Mr. Hazzard with Mr. MacMurray but that
14    you may have discussed Mr. Hazzard with Mr. MacMurray?
15 A: That is correct.
16 Q: And is it fair to say that you may have discussed Mr. Hazzard with
17    Mr. MacMurray at sometime prior to the AFSCME decision to
18    withdraw the grievance that Mr. Hazzard had initiated? Let me do it
19    this way. Do you have any recollection of discussing Mr. Hazzard
20    with Mr. MacMurray since AFSCME withdrew Mr. Hazzard's
21    grievance?
22 A: Yes.
23 Q: And tell me about those discussions?
24 A: When I became aware of this civil action law I had to contact Mr.
25    MacMurray to tell him about it because his name was listed.

55

1 Q: And what did you folks discuss?
2 A: I don't know if I gave him a copy of this. I don't recall giving Mr.
3    MacMurray a copy of this but I did tell him, I basically summarized
4    what was being said.
5 Q: What did he say?
6 A: I don't recall verbatim what he said but it was something to the effect
7    of 'what am I supposed to do?' And I said at this point, nothing, but
8    we do have attorneys and I'll keep you appraised. It wasn't like an in
9    depth conversation but I did let him know about it.
10 Q: All right. Beyond that type of discussion do you have a recollection of
11    anything that was said?
12 A: Not off the top of my head no.
13 Q: All right. I have information that indicated that you talked to some of
14    the people that we have discussed with your attorney as witnesses in
15    this matter, before this deposition today. Within the last month have
16    you discussed Mr. Hazzard with any of the people that you believe
17    might be a witness in this matter?
18 A: Yes.
19 Q: And who might those people be?
20 A: Robert Epps, Steve McCollum. In the last month? I told you I talked
21    to Mr. MacMurray.
22 Q: Right.
23 A: I believe I talked to Doris Manning but that may be a little longer than
24    a month but thereabouts a month. And Terry Mathis perhaps.
25 Q: Now I'm going to have a few questions about that. Now how much

**[Page 57]**

1     elapsed time do you have left?

2   MR. MARCECA: I have 15 more minutes.

3   MR. BAILEY: Oh 15 more minutes. Well I want to run that tape continuous

4     because they need a copy of that.

5   MR. MARCECA: Sure.

6   MR. BAILEY: Tell me what was in the conversation with Mr. Epps. What

7     you said to him, what he said to you.

8   MR. FINK: I might have an objection. This may be privileged. Nichelle are

9     you talking about a conversation in which I was involved or a

10     conversation which you had one on one with Mr. Epps?

11   A:   Both.

12   MR. FINK: I'm going to object on any conversations that were attorney

13     work product and attorney client communications. She can answer the

14     question about any conversations she had with these people where I

15     was not a party to the conversation.

16   MR. BAILEY: Ok. Let me tell you my response to that because I want to

17     make it very clear on the record. I don't believe that counsel's

18     position is well taken. I believe that in a meeting where you and Mr.

19     Fink discuss issues that have to do with legal representation I am with

20     Mr. Fink 1000%. I have no right to ask any questions and you have no

21     obligation to answer any questions. I don't care where that might be

22     about those things unless somebody in a grand jury can grant us all

23     immunity thing. The much abused grand jury. That aside. I believe the

24     law is very clear that if you bring an outside person who is not a party

25     and is not represented by that attorney into that discussion the

57

**[Page 58]**

1     privilege is lost. And so you do what your attorney says of course but

2     I wanted to make it clear that the deposition, I want it to technically

3     remain open until I can ask you about that so I'm not waiving any

4     objection I'm just going to move along. And your attorney I believe is

5     telling you, if I understand his advice you are not to comment about

6     that. I think he is in error. We have a respective and respected legal

7     difference. I want you to tell me, and I object to his instructions, but I

8     want you to tell me about any meeting that you had with Mr. Epps

9     where your attorney was not involved.

10   A:   Ok. It was not a meeting. It was a conversation over the telephone. I

11     told Mr. Epps before about this complaint even though he was not

12     listed in it. When it was indicated to me that Mr. Epps was going to

13     need to appear for a deposition I contacted him and I told him that.

14   Q:   Ok. What did you say to him and what did he say to you? Forgive me,

15     let me enunciate for the record, excuse me ma'am. What did you say

16     to Mr. Epps and what did he say to you. Was there just one

17     conversation where your attorney wasn't involved?

18   A:   Yes.

19   Q:   Ok.

20   A:   No, no, no.

21   Q:   There was more than one?

22   A:   No, there was two.

23   Q:   Ok well tell me what happened, what both of you said to each other

24     and who was parties to the conversation. Who were parties to the

25     conversation? Ok? Who were parties to it and what you said to each

58

**[Page 59]**

1     other and just tell me what was said.

2   A:   Ok now, I made a mistake. There were three separate occasions. The

3     first time, in this case recently, it was when I, I want to be 100% clear

4     about what I'm saying. The three occasions I'm talking about are the

5     recent occasions. Because Mr. Epps was not named in this I really

6     didn't have any discussion with him. Besides I told him about this a

7     while ago. But that was just telling him about it.

8   Q:   Ok, number one. That's out of the way.

9   A:   All right. No that was one from before so I guess the three most recent

10     so I guess it was four then. It was I called him to ask him, I forget

11     what day it was, but to come out there at a certain time in our

12     conference room to meet with me and our attorney about the situation.

13     That was the conversation. On the date and time he did show up and

14     at that time there were car troubles and our attorney didn't show up.

15     So I did talk to Mr. Epps briefly.

16   MR. BAILEY: A fortuitous event for the plaintiff.

17   MR. FINK: It happened on the eleventh so there were traffic problems.

18   MR. BAILEY: All right tell me what was said.

19   A:   I did talk with him on that day specifically about the complaint. Mr.

20     Epps was upset because he had, he works two jobs apparently and that

21     was like his only afternoon off or whatever from his second job and

22     he was upset that he was there and our attorney wasn't there. So we

23     had that sort of discussion. Also we talked about some other problems

24     he was having at Hamilton, that's where he works. And I believe I

25     questioned Mr. Epps about a document that I had that said something

59

**[Page 60]**

1     about, I just didn't understand it. It was something to the effect that

2     how they were going to take this on whether I liked it or not.

3     Something like that. It was an old document but I never had asked him

4     before and I was just asking him. So I took it for what it was worth

5     and I never took it any further. The fourth total conversation then was

6     on the day that we met there.

7   Q:   And the attorney was involved?

8   A:   Yes, Eric was there.

9   Q:   Well I've objected to his instructions but that's ok. Now did you ever

10     advise Mr. Epps, I'm rather flattered by the advice by the way, but to

11     watch out for me or be careful because I supposedly ask tricky

12     questions or something of that sort?

13   A:   No this is my first time meeting you today.

14   Q:   You're allowed say that to him.

15   A:   No but I don't know you, it's the first time here today and no I did not

16     say that.

17   Q:   Well as you can see I'm not much on tricky questions but I try not to

18     outsmart myself and I'm not that smart. Did you ever ask Mr. Epps

19     how he might answer a particular question?

20   A:   No. I did tell him to answer the question that's asked.

21   Q:   Well that's good advice. I certainly would share that. Did you ever ask

22     how he might respond to a particular question or did you give him a

23     hypothetical question or anything like that?

24   A:   To my knowledge no. We didn't do like a run through. Our

25     conversations were short. They weren't drawn out at all.

60

Q: Ok. Well we can certainly question him about those. He can talk about that. Now are there any other witnesses or potential witnesses to this matter that you talked with?

A: Yes. Steve McCollum and I talked with him again I don't know the dates or times but to ask him to come to our office for a meeting.

Q: The same type of thing with Mr. Epps?

A: Yes.

Q: And did you have any private meetings or discussions with him? And by that I mean, meetings or discussions, you understand your attorneys advice and you understand my objections, aside from with the attorney present and involved did you have any meetings or discussions with Mr. McCollum?

A: No not to my knowledge. No.

Q: How about anyone else? Any other witnesses or potential witnesses to this matter?

A: Doris Manning. She was the president at the time and I informed her about the case. I don't know that she's been deposed but I did tell her about it. I told Terry Mathis about it. He's the chief steward now. I did tell him. Doris was the president at the time. I did tell Margaret Fuller. She's the current president. And I told her about it.

Q: Well any Harrisburg School District officials or elected representatives?

A: Yeah. I talked to, at the time Lance was still there because I needed to have Steve McCollum and Robert Epps released from work to come out for the meeting.

61

Q: Is that the only discussion you had, Lance, is that Mr. Freeman?

A: Yes.

Q: Any other discussions with Mr. Freeman? Is Mr. Freeman a friend of yours? Is he a friend?

A: Not a personal friend, no. I've worked with him.

Q: Ever socialize with him?

A: No.

Q: How long have you known Mr. Freeman?

A: When I took over the local, which I believe was in 1998.

Q: Your attorney probably does not have questions. Shawn do you have questions?

MR. LOCHINGER: No I think you've covered the ground.

MR. FINK: No I don't have questions.

MR. BAILEY: May I request that we suspend and let me speak to my client and we may be able to wrap this up.

MR. MARCECA: Ok the time is 5 o'clock and we are going to go off camera for a moment.

BREAK

MR. BAILEY: Back on tape. The recording device is back on.

MR. MARCECA: The time is 5:04 P.M. We are back on camera.

MR. BAILEY: Ms. Chivis, Nichelle, I'd like to thank you very much. I don't have any further questions for you. I'd like to express my appreciation for your coming here and testifying today. And I'd also like to express my thanks for your cooperation.

A: You're welcome.

62

MR. BAILEY: Tony. He has to officially end this and we are all set.

MR. MARCECA: It is now 5:05 P.M. and this deposition is now ended.

END OF DEPOSITION

63

EXHIBIT "E"

McCollum

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM HAZZARD,
　　　　　Plaintiff,
　　　vs.
TIM CURTIS, ROBERT MacMurray,
AFSCME DISTRICT 90,
HARRISBURG SCHOOL
DISTRICT, et al.,
　　　　　Defendant

1-CV-00-1758

JURY TRIAL DEMANDED

Proceedings:　Video Deposition
　　　　　　　Steven McCollum

Date:　November 19, 2001

Appearances:

For Plaintiff:　Donald Bailey, Esquire
　　　　　　　4311 North 6th Street
　　　　　　　Harrisburg, PA  17112

For Defendants:　Shawn Lochinger, Esquire
　　　　　　　　Rhoads & Sinon LLP
　　　　　　　　1 South Market Street
　　　　　　　　Harrisburg, PA  17112

　　　　　　　　Eric Fink, Esquire
　　　　　　　　Willig, William & Davidson
　　　　　　　　1845 Walnut Street 24th Floor
　　　　　　　　Philadelphia, PA  19103

---

1　　MS. LYDE: Good afternoon ladies and
2　gentleman please be advised the video and audio is in
3　operation. My name is Crystal M. Lyde. My address is
4　4310 Hillsdale Road, Harrisburg, PA  17112. I've been
5　contracted by PR Video to be the operator for this
6　deposition. This case is the United States District Court
7　for the Middle District of Pennsylvania the caption is
8　William Hazzard vs. Tim Curtis, Mac MacMurray,
9　AFSCME, District number 90, and the Harrisburg School
10　District. The docket number 1:CV-00-1758. The date is
11　November 19, 2001. The time is 12:53 p.m. The
12　deposition is being held at the law offices of Don Bailey,
13　4311 North Sixth Street, Harrisburg, PA  17110. The
14　video deposition is being taken on behalf of plaintiff
15　William Hazzard its also being taken
16　stenographically. The witness' name is Steven
17　McCollum. Will you raise your right hand please? Will
18　you state your name for the record and spell it?
19　　MR. MCCOLLUM: Steven Thomas McCollum,
20　spell my whole name?
21　　MS. LYDE: Last name.
22　　MR. MCCOLLUM: M-C-C-O-L-L-U-M.
23　　MS. LYDE: Do you so swear to tell the whole
24　truth and nothing but the truth so help you God?
25　　MR. MCCOLLUM: I do.

---

1　　MS. LYDE: Thank you Mr. Bailey can I get a
2　sound check around the room please.
3　　MR. BAILEY: My name is Don Bailey I'm an
4　attorney and I represent the plaintiff. Just so we can
5　double check Eric.
6　　MR. FINK: Oh yes Eric Fink for the defendant
7　AFSCME.
8　　MR. BAILEY: And Shawn.
9　　MR. LOCHINGER: And Shawn Lochinger for
10　Harrisburg School District.
11　　MR. BAILEY: Ok, Mr. McCollum, what we're
12　going to do here we're going to be taking deposition
13　testimony its called if you haven't done one things
14　before? But I'm going to ask a series of question and its
15　important that as we go through the process for you to
16　know that we're also taking the deposition by
17　stenographic means did you swear him in yet, Crystal?
18　　MR. FINK: Yeah.
19　　MR. BAILEY: I was over here concentrating on
20　this timer and I should have been paying attention but in
21　any event, we're going to be going through this process
22　and we need to try separate time wise, answers and
23　questions just so the stenographer can switch gears ok?
24　And one thing that I forgot in the previous deposition,
25　Steve, if you can when we come to a proper name, spell it

3

---

1　if you can, if you know how to spell it. So she the
2　stenographer can get it down and when we do
3　transcription we'll be able to get it clearly okay?
4　　MR. MCCOLLUM: Okay.
5　　MR. BAILEY: The other thing is you have to
6　answer verbally so you have to keep your voice up. I
7　don't mind if I should ask a question that's not clear,
8　doesn't make sense, or you just plain curious about what
9　I mean please feel free to ask me I don't mind being
10　questioned, you know, we're not suppose to argue at
11　each other or anything like that but you understand
12　what I'm saying.
13　　MR. MCCOLLUM: Yes.
14　　MR. BAILEY: If you have any curiosity about
15　what I'm asking or what I'm doing. The deposition is
16　being taken by video and you do have a right to come in
17　and sit down and view the deposition if you want to view
18　it and it will be available here for you to do that if you
19　want to. Now I assume that your not represented by
20　counsel here by an attorney here at this deposition?
21　　MR. MCCOLLUM: No.
22　　MR. BAILEY: And I'm not suggesting that
23　theirs any reason that it should be but it does bring up
24　something that I have a duty to inform you of all of us
25　attorneys here do I guess. And that is your right to read

4

and sign. Because the deposition is being taken stenographically there is a provision when the deposition testimony is taken in that manner that there is a, as the stenographer takes your words and question and conversation here in this deposition down, she will provide you or can provide you if you elect to do this a copy of the deposition and you do what's called a read and sign. She'll make the arrangements with you its not through me or any of the attorneys here. It will be done through her and she'll take care of that. But there is what's called an errata sheet. And that errata sheet is just a, you know, a piece of paper where you lets say that you disagree with something in the deposition or you want to correct something or change it or something of that sort you can write it down there. It will not change the transcription but it puts your thing in there if you want to do that. Now she needs to know, we're going to ask the court for an enlargement time to do a little more discovery in this case the attorneys have agreed. It still doesn't give us a whole lot of time because we're not going to ask for that much time. So if you want to do this, it would probably have to be done in like thirty days or so and she'll take care of that arrangement with you. Do you want to read and sign or you can waive that if you want to its up to you?

MR. MCCOLLUM: No I waive it.

MR. BAILEY: Ok, there is a recording made which will be available for you to listen to so if theirs a problem but I can't see you having a problem. Now ok, lets go on and see if we can't get into the substance of the questioning. Steve you are where are you employed?

MR. MCCOLLUM: Harrisburg School District.

Q: And can you tell us in what capacity?

A: Right now I'm a custodian.

Q: And how long have been working with the Harrisburg School District?

A: Twenty-two years

Q: And during that period of time have you performed any roles as a union official of any type?

A: I was a steward, chief steward, and executive board member.

Q: Ok and the, when were you last an executive board member?

A: It was just six months ago.

Q: And during the period of time, let me rephrase that. Are you aware of the fact that William Hazzard had filed a complaint in Federal Court which AFSCME council 90 is a defendant and Harrisburg School District is a defendant, Tim Curtis and Mac MacMurray are defendants?

A: Yes.

Q: And what I'll do is go back and ask you some questions about what occurred beginning around the summertime of 1999. So if we could sort of switch gears and get your mind back on that period. At some point and time did you learn that Bill Hazzard was filing a grievance against the school district?

A: Yes.

Q: What do you remember about that and what I mean by that question is you know how did you learn about it and what were the initial discussions that you might have had regarding with anyone regarding that grievance?

A: Well I know that Mr. Hazzard put in for a position at the new Roland building and the job was awarded to somebody else and I was working at Shimmel school at the time and Mr. Hazzard brought it to my attention that he applied for this job but they gave it to somebody else. And according to contractual language if he was if he put in a bid for the job opening that was posted and he was the only one that put in for the job then he should have been awarded the job but he wasn't awarded the job. So he had to file a grievance.

Q: Ok now at some point did Mr. Hazzard come to you for help?

A: Yes.

Q: And what was his reason, if you know for him coming to you?

A: He needed help.

Q: And.

A: That's what I'm there for.

Q: And did you have a position with the union at that time?

A: Yes I did.

Q: And what was that?

A: It was it 99, I was probably on the executive board then.

Q: Ok and the position at Roland, Roland school is that a new position?

A: Actually it was and old insurance building that school district had brought it.

Q: Ok.

A: And they refurbished it.

Q: Was the position as custodian or as head custodian a additional position for the district or was it like a vacancy?

A: Well there was nobody in that building so I would say and the job was posted, so I would say it was a vacancy.

Q: Why was it posted Steve?

A:    Cause positions that are to be filled are normally posted.

Q:    And do you remember it being posted?

A:    Yes.

Q:    And can you tell us your recollection of how it was posted. I mean you know the mechanics of it?

A:    Like normal policy, they send out job bids to schools and they're to be put into appropriate places for people to see.

Q:    Ok.

A:    And to people who already work for the district have a right to put in a bid before they go outside or whatever else.

Q:    Ok and was there some kind of transfers maybe just prior to this thing being posted or around the same time maybe a little after I'm not really sure. Some kind of issue where people were being transferred?

A:    Yes.

Q:    And to your recollection the position at Roland school was the only that was posted?

A:    There was other job postings on the flier.

Q:    Ok was Roland school the only head custodian position that was posted if you remember?

9

A:    To the best of my recollection there may have been another posting for a custodian but to the best of my recollection yes.

Q:    Now you had indicated that I thought you indicated that Mr. Hazzard was the only person to bid on that position. Is that correct?

A:    That's my understanding yes.

Q:    Now on those transfers were any of those transfers that were being made at the time were they temporary or were they suppose to be permanent or what?

A:    Transfers are transfers. You know what I mean, you know when they transfer you to a building you're there. I guess until they decide what there going to do transfer again. I don't know. I was transferred.

Q:    Where did they transfer you to?

A:    Lincoln school.

Q:    Ok, now when Mr. MacMurray was here he said his transfer his testimony was that his transfer to Hamilton school was temporary. Do you remember if anybody's transfer being temporary?

A:    No.

Q:    Ok now at some point Mr. MacMurray was put in the position as Rowland's custodian, head custodian. Is that correct?

10

A:    Yes.

Q:    And that was the position, that was the situation, is it your understanding that was the situation that Mr. Hazzard was grieving?

A:    Yes.

Q:    Now can you tell us in your own words what happened with the grievance procedure as you recollect it?

A:    As I recollect it I didn't take the grievance through any procedure. I helped Mr. Hazzard write it but I didn't take it through any procedure. Mr. Peps did the procedure.

Q:    Ok and Mr. Peps had testified earlier here this morning. He at that time was a union steward?

A:    Yes.

Q:    Ok now did Mr. MacMurray have a position with the union at that time Steve, if you know?

A:    Yes.

Q:    What position did he have?

A:    He had a position where he was in charge of all the head custodians in case of any contractual disputes or any problems he was supposed to look out for their interest.

Q:    Ok and he was he had testified and I honestly can't remember I think for the local that he was

11

on the executive board, I believe it was of the local and not council 90 but he was on the executive board. Do you have any knowledge of that?

A:    I don't think he was on the executive board no.

Q:    Do you know whether he attended the Executive Board or Council 90 meetings?

A:    Yes.

Q:    And why did he do that, if you know?

A:    Well like I said he was the overseer for all head custodians and actually, he was nominated through the executive board to have that position.

Q:    Ok and who would have been responsible for nominating him for the position?

A:    The executive board.

Q:    And who was president of the union at that time.

A:    Doris Manning.

Q:    Ok, now do you know a woman named Nichelle Chivis?

A:    Yes.

Q:    And what position does she hold if you know?

A:    She's representative for our local.

Q:    And that's from Council 90?

12

A:  Right.

Q:  So she, now do you have a recollection of learning at sometime that council 90 had withdrawn the grievance that Mr. Hazzard had filed?

A:  Yes.

Q:  Do you have a recollection of how you learned that?

A:  I saw a letter but I can't remember who I saw it from. It could have been either Mr. Hazzard or Mr. Epps but I did see it over it being withdrawn.

Q:  Now we had testimony this morning that the bid or excuse me, I'm sorry, that the grievance procedure involves a number of steps and that the third step is this the grievance procedure now, not a complaint.

A:  Right.

Q:  The third step of the grievance procedure is to go to the board is that correct based on your knowledge?

A:  Yes.

Q:  Now have you, excluding anything having to do with this litigation Mr. Hazzard in this litigation here, have your ever been involved in any step three proceedings on any grievances with the board?

A:  No.

13

---

Q:  Do you know how the board handles a step three grievance?

A:  No.

Q:  Did you ever attend any board meetings to inform the board or to assist anyone informing the board that there was a step three grievance that had been filed?

A:  Yes, two of them.

Q:  Ok tell us about those circumstances?

A:  Well I remember one being at Marshall elementary and myself, Mr. Epps and Mr. Hazzard were present. And Mr. Epps got up and you get three minutes to speak at a board meeting; he got up and started to speak and wanted to speak on Mr. Hazzard's grievance but soon as he got to speaking, one of the board members believe it was Wanda Williams told Mr. Epps that we don't discuss grievances at board meetings and that was the end of that discussion. Not that she said that that was the end of the discussion but that's where it ended right there.

Q:  Do you, did you go to that board meeting that night with the intention of assisting in notifying the board about this grievance? Steve let me withdraw that question and lay the foundation a little differently. Do frequently attend school board meetings?

14

---

A:  Not frequently but I've been to a few.

Q:  And what was your reason in going that night?

A:  The grievance the complaint, well it was a grievance at that time.

Q:  Now there's been some discussion and some questions asked about that and it's not been I don't think it's been clear. At least not clear to me. You said it was a grievance at that time but it was not yet a complaint. What do you mean by that?

A:  We tried to go through the grievance procedure and when we got the letter that it was withdrawn that's when we decided to move it to the complaint procedure. You have many procedures, first you try to go through the union procedures then when its dropped or carried over whichever it maybe and in this case it was dropped well then you have another options which in complaint procedure through the Harrisburg School District.

Q:  Do you know if when you went to the board meeting, the night that Wanda Williams stopped or prevented Mr. Epps from going forward do you know if the, you were aware that the grievance had been withdrawn at that meeting?

15

---

A:  Oh man, no I don't think it was withdrawn yet. I'd have to look at paperwork and get dates.

Q:  Do you remember who all attended that meeting at the school board that night we know Mr. Epps was there, we know you were there, we know Mr. Hazzard was there. Was anyone else there in your group, any other AFSCME employees that you know of?

A:  I not quite sure if Rob Tapper might have been there I not quite sure though. He might have been there.

Q:  Rob Tapper?

A:  Yes.

Q:  And Mr. Tapper what position is he a shop steward?

A:  He's nothing he no longer works with the district.

Q:  He's retired?

A:  Yes. Or went to another job.

Q:  Now did you ever participate at many meetings with a committee of the school board to discuss the Hazzard situation?

A:  A committee, do mind rephrasing that?

16

Q: Yes sir. Did you ever attended a meeting where Mr. Freeman and the school board members were present to discuss the Hazzard matter?

A: Yes.

Q: And who was at that meeting?

A: Mr. Curtis, Mr. Freeman, Mr. Brown, and Mr. Davis and Rob Tapper.

Q: Is Rob Tapper black or white?

A: He's white.

Q: Ok, Mr. Brown and Mr. Davis are school board members?

A: Yes.

Q: Is that Ricardo Davis?

A: Yes.

Q: And do you know Mr. Brown's first name?

A: I think its Joseph.

Q: Now aside from the meeting you just told us about did you attend any other meetings about the Hazzard matter where school board members were present?

A: Yes.

Q: And where was that? And when was that?

17

A: That was at the administration building on North Sixth Street. Time and date I don't recall right now but I do have paper work on that but I don't recall the exact date.

Q: Do you know who was there?

A: As far as.

Q: Who ever you can recollect?

A: Board members or.

Q: Whatever sure and anyone else?

A: I was there and Mr. Hazzard was there I think all the board members were present.

Q: And what happened at that meeting?

A: And I stood up and spoke on Mr. Hazzard's issue. I more or less went to them with a personnel facilities matter and a couple other issues and I mentioned Mr. Hazzard's issue and ask for an explanation why a man with thirty-one years of service was not awarded a job?

Q: And did any of the board members respond?

A: No.

Q: Did they give any response at all?

A: No.

Q: Was Mr. Freeman at that meeting?

A: Yes.

18

Q: Did he respond?

A: No.

Q: Did any one respond on the part of the school board?

A: No not as far as I recall.

Q: So they just.

A: They let me speak my three minutes and.

Q: And never responded and let then you step down?

A: Yes.

Q: Now that meeting when I'm assuming, and perhaps erroneously, I'm assuming that meeting was after the meeting where Mr. Epps attempted to speak?

A: Right.

Q: And do you know if that was during time that Mr.; did it come a point when Mr. Hazzard's complaint to the school board was either dismissed or ignored or whatever what happen to it? what happened to it?

A: The complaint?

Q: Yes.

A: We took it through school district complaint procedures to the board. I guess, and they have like a personnel committee a facilities committee

19

that was made up of one or two people instead of the whole board.

Q: All right.

A: We finally went through all the procedures and got to that point and that was Ricardo Davis and Mr. Brown who we ended up taking the final step of the complaint procedure to.

Q: And did you know do you know whether Mr. Brown and Mr. Davis did a report or came up with some kind of finding or decision?

A: Yes they came up with that they are agreeing with the administrative decision.

Q: And after they did that is when you had a right to take it to the board in other words the final process?

A: That was the final process as far and as to our knowledge because when that meeting started Mr. Brown asked if we went through all the right procedures and this is the last step of these procedures and Mr. Frank Freeman responded yes. So as far as we were concerned that was it.

Q: Ok.

A: We could take it no more.

Q: Now at some time during this process do you have recollection of any representative of the school

20

board saying that the job had been posted in error, that it
was a mistake?

A:   I've heard that.

Q:   Did you hear that from Mr. Freeman?

A:   No.

Q:   Who did you hear it from?

A:   I heard that from Mr. Epps.

Q:   And did Mr. Epps tell you what his
source of information was?

A:   I believe it was at the first meeting the
first grievance meeting.  I wasn't there so.

Q:   Did you ever have any conversation about
this matter with Mr. Hazzard with Nichelle Chivis?

A:   I'm not quite sure I understand the
question.

Q:   Were ever at any meetings or did you ever
have any conversations with Nichelle Chivis about the
Hazzard matter?

A:   I remember back, I believe in November of
99 I was at an executive board meeting and I brought it
to there attention that Mr. Hazzard would that this all the
way to arbitration if necessary.  Yes so I guess you could
say that I spoke to her then at an executive board
meeting.

<center>21</center>

Q:   Now so this was an executive board
meeting at a local?

A:   Yes.

Q:   And just for the record what's the local
number twenty?

A:   2063.

Q:   2063 and when Nichelle Chivis was there.
Is that correct?

A:   Yes.

Q:   Was Mr. MacMurray there?

A:   I don't think so.

Q:   Ok at that time you recollect if Mr.
Hazzard was there?

A:   Oh no, Mr. Hazzard wasn't there.

Q:   He wasn't there?

A:   No the executive board is the seven
officers getting together.

Q:   Right.

A:   And having a meeting.

Q:   Now did anyone react at all when you
said that?

A:   At the meeting yes.  I remember Doris
Manning saying that's just the type of person Mr.
Hazzard is.

<center>22</center>

Q:   That's just the type of person Mr.
Hazzard is?

A:   Yes.

Q:   Now that executive board meeting, can
you tell me; you know Doris Manning was there you
know that Steve McCollum was there you know that
Nichelle Chivis was there right?

A:   Yes.

Q:   Ok if you can help me who else was
there?

A:   Margaret Fuller I could be wrong but
these are the people who are normally the executive
board meetings I'm pretty sure she was probably there,
Margaret Fuller.

Q:   Ok.

A:   Juanita Hillyard, who at that time
believes she was the treasurer who was the secretary?  I
think Linda Mowers.

Q:   Linda Mowers?

A:   Yes.

Q:   M-O-W-E-R-S?

A:   Yes.

Q:   Okay.

<center>23</center>

A:   And I'm trying to think who our secretary
was.  I'm going to say Regina Trimiera.  I don't know how
to spell her last name.

Q:   Well I don't either.  I'm going to try
Trimiera T-R-I-M-I-E-R-A just for the sake of.

A:   A-R something like that.

Q:   Now Doris Manning, who was the
president of the union, said that that just the type of
person?

A:   Mr. Hazzard is.

Q:   Mr. Hazzard is do you have a recollection
of any impression from her facial expressions, body
language or tone of her voice by what she may of meant
by that?

A:   It wasn't the politest thing.

Q:   No of course not but I mean why don't I
withdraw the question and ask you this bases upon your
knowledge and awareness of Doris Manning and the
experience that you've had in being around her and of
course of knowing Mr. Hazzard is there any other
impressions or any other facts known to you which
would indicate by what she had meant by the type of
person Mr. Hazzard was, obviously it wasn't polite?

A:   All I can say is that she just didn't like
the fact that I said what I said you know.  I mean you

<center>24</center>



have to be there to see a person body language and you know and to see her reactions, you know.

Q:   Do you have any recollection of any impressions or facts known to you that would indicate that face played a role in any of these decisions?

A:   Oh man at what point I mean there comes a point.

Q:   Well let me ask you generally, do you have any facts known to you experiences or knowledge or for that matter any awareness of things that have happened with other people that would indicate that race plays a role in the decisions by the Harrisburg School District or by the AFSCME local or Council 90?

A:   I can give you an example that might have happened you know, like I said it all depends on how you look at things and this had happened to me years ago in 1995. Where, when the supervisor is off somebody is put in to fill his spot. That person fills his spot is to get a differential pay; between whatever his position is and the supervisor theirs a differential. Two guys acted as supervisor they were paid. I was acted as supervisor I was not paid. It just so happened that the two guys that were paid were black and I wasn't paid. And like I said it come a point sometimes when you may look at something and say hey what is this.

25

Q:   All right, Steve, aside from that circumstance any other circumstances to indicate to you racism you know I use the example when I had spoken with Mr., just to explain where I'm coming from explain to Mr. Epps this morning. I'm a civil rights lawyer the vast amount of cases that I do are based on a race based cases being with mistreatment of black people by white but its just as wrong when it happens although its relatively rare but whites are mistreated by blacks in have seen a lot of cases where blacks mistreat blacks believe it or not as supervisors on bases of race as hard as that is to understand for many whites to understand it does its not uncommon at all. Now my question is going by to your experiences with the district Mr. Hazzard in the complaint maybe the best way to do this to let you know where I'm coming from with this group of questions is to refer to some of the allegations in the complaint and just read them. It says that in the summer of 99 the plaintiff Mr. Hazzard was the only person to bid on a job posted for promotion to head custodian at Roland Intermediate School. You already testified to the best of your knowledge that is correct?

A:   Yes.

Q:   Ok it says the defendant AFSCME in the defendant School District decided not to promote the

26

plaintiff now we certain had testimony contrary to that and AFSCME denied and the School District denied that they decide not to promote the plaintiff and AFSCME obviously does not promote, the issue there is represented so that's been I think we pretty much covered that. Do you, in paragraph fourteen, do you know if Mr. Hazzard had seniority over Mr. MacMurray?

A:   Yes.

Q:   Paragraph sixteen says on or about March 2000 the defendant AFSCME by and through union staff representative Nichelle Chivis, African American, informed plaintiff that they were unilaterally withdrawing plaintiff's grievances. Do you know whether AFSCME, the AFSCME representative Ms. Nichelle Chivis or any AFSCME representatives negotiated or informed Mr. Hazzard of there intention this is before they did it now, their intentions to withdraw the grievance? Do you know whether they warned him before hand or talked with him?

A:   To the best of my knowledge, no.

Q:   So he was informed after the fact that they withdrew the grievance?

A:   The only thing that we got was that letter saying that it was going to be withdrawn.

Q:   Going to be withdrawn or?

27

A:   No it is withdrawn without prejudice.

Q:   Without prejudice ok? Now at that time upon belief and information they, they being Nichelle Chivis and AFSCME, told the defendant school board that the grievance had no merit. Now it's my understanding from Mr. Freeman's testimony that he was informed by the union that grievance had no merit.

A:   I wouldn't know that.

Q:   Now Mr. Hazzard goes on in paragraph sixteen to say that the promotion of MacMurray over plaintiff, now bear in mind please, in fairness to the defendant's, the school board defendants to my knowledge claimed that this was a transfer. It was not an issue of promotion. We've had conflicting testimony on whether it was an error or not. Mr. Freeman says that it was not an error and I'm not going to try to tear apart his testimony in terms of what he may have said in any meetings, but I know that he did testify and I'm sure opposing counsel would concur on this, to the best of his knowledge that they did post it but that they had a right beyond that to fill it with Mr. MacMurray. Now my understanding from you, is based upon your knowledge and your perception of the union contract, putting Mr. MacMurray in that position ahead of Mr. Hazzard was a

28

violation of the union contract. Am I understanding you
correctly?

A:   Yes.

Q:   Ok and paragraph its a typographical
error in the complaint sixteen A, it says the only
difference between the plaintiff and MacMurray except for
plaintiff having seniority over MacMurray and plaintiff
having been the only person to put a bid on the job that
was posted is that MacMurray is black and plaintiff is
white.  Now I'm sure that the defendants are not going to
agree with that.  But whether they do or not let me just
ask you this.  Based upon your understanding of the
contract, you've testified that Mr. Hazzard had a right to
that position because it was posted and he had bid on it.
In other words he was qualified?

A:   Yes.

Q:   Ok there is no doubt in your mind that
he is qualified for the position?

A:   Not in my mind.

Q:   Did the school district or any of its
representatives ever indicate that Mr. Hazzard was not
qualified for the position?

A:   Not to my knowledge.

29

---

Q:   Did any one from AFSCME ever indicate
or say that Mr. Hazzard was not qualified for the
position?

A:   Not to my knowledge.

Q:   Ok, paragraph seventeen say virtually
every entity and decision-maker that plaintiff has
appealed to, to correct the injustice he is suffering is
African-American.  Now based on my interviews the
plaintiff and I composed this complaint of course it is my
understanding that the council 90 leadership that he
dealt with, which was I guess was Nichelle Chivis I don't
know of any others but tell me first lets deal with that
first aside form Nichelle Chivis, who is an African-
American, do you know whether there were any other
AFSCME leaders or personnel that were involved with
dealing with Mr. Hazard's grievance?

A:   In the grievance?

Q:   The grievance?

A:   I'd say Mr. Epps because he was the
original steward.

Q:   Right.

A:   Nichelle Chivis.

Q:   Mr. Epps is not a decision-maker in a
grievance.  He's a representative who represents the
grievance.  I'm looking at the appeal process as you go

30

---

through the negotiation and what I'm saying to you is, at
some point Nichelle Chivis took over the grievance
procedure?

A:   Right.

Q:   She testified and informed us that the
grievance is the union's grievance is not the griever's
grievance.  That's what she testified to me and what the
council 90 decision, whether its her decision its or
council 90, it's a union decision to withdraw the
grievance.  My question is were you ever consulted on the
decision to withdraw the grievance?

A:   No.

Q:   Do you whether Mr. Tapper was ever
consulted on it?

A:   No.

Q:   You have already testified to the best of
your knowledge Mr. Hazzard was not consulted on it.  Is
that correct?

A:   To the best of my knowledge no.

Q:   Mr. Epps testified here earlier today I
don't know if he was consulted about it but he certainly
had discussions with Nichelle Chivis about it.  I honestly
don't remember if it was before or after the fact I think it
was after but do you know whether he was informed, Mr.

31

---

Epps was informed before the grievance was withdrawn,
that council 90 was going to withdraw the grievance?

A:   No.

Q:   Do you know whether the union leaders
local of 2063 were consulted before the grievance was
withdrawn?

A:   I can't answer that.

Q:   Do you know whether Nichelle Chivis
spoke with any member of the school board to tell them
that you might be coming, you and some of your
colleagues as AFSCME union members, might be coming
to a school board meeting to talk about; I think her
testimony was talk about grievances.  I believe that she
testified that no names were used and what she didn't
indicate who it was but some members might be showing
up more or less informed them of that fact.  Do you have
any knowledge of that?

A:   I heard that.

Q:   And who did you hear that from?

A:   Mr. Tapper Rob Tapper.

Q:   Do you know if when Mr. Tapper
indicated when he learned that?

A:   At an executive board meeting that I was
not at from my understanding.

32

**END OF TAPE 1 SIDE A. BEGINNING OF
TAPE 1 SIDE B**

Q:  You know, I need to explore this just a little bit.  I know, Mr. Tapper indicated at some point that he had been at an executive meeting?

A:  Yes.

Q:  And was there some type of discussion there about notifying the board or telling the board that some members may be showing up?

A:  I wasn't there.  I don't know.

Q:  What did he tell you?  If you recollect what Mr. Tapper told you?

A:  That he called that Nichelle spoke to a board member about Mr. Hazzard's case.

Q:  And did he indicate who, well he said he learned this at an executive board meeting.  Is that correct?

A:  Yes.

Q:  Did he say it was apart of the discussion of that executive board meeting or that he heard from someone or what the circumstances were?

A:  He didn't elaborate.

Q:  And what was his, did display any reaction to that?

A:  I couldn't tell you.

33

Q:  Did he say he was angry or upset?

A:  I couldn't tell you.

Q:  Did he say he was disappointed?

A:  No he didn't he really didn't say anything just said except Nichelle spoke to a board member.

Q:  Well what I'm searching for Mr. McCollum if you know at all or have any indication at all, is why he would bring that to your attention?

A:  I, ah, because he knew about the Hazzard case.

Q:  Right.

A:  And I know about it and I guess he though that he would tell me about it what was said but that's all he said.

Q:  Ok fair enough I appreciate your just you telling us what you know.  When he told you about the executive board meeting did he say anything else about what went on at the meeting if you remember?

A:  No he didn't.

Q:  He just told you that?

A:  Yes.

Q:  When he informed of that do you of that do you know whether that was before Mr. Epps stood up at the school board meeting I know its tough its difficult I know its difficult to remember these things but?

34

A:  I would take a stab after but I could be wrong.

Q:  He went to that meeting though?

A:  From my understanding, yes.

Q:  When I say he went to that meeting I mean he went to the school board meeting?

A:  The one with Ricardo Davis and Joseph Brown or?

Q:  The public one where Mr. Epps stood up and the said I want to?

A:  I'm pretty sure he was at Marshall school.

Q:  And that's the one that was a public meeting right?

A:  Right.

Q:  Do you remember whether he mentioned it that night or was it some time later that Nichelle had spoken to a board member?

A:  If think it might have been after.

Q:  Might have been after?

A:  Yes.

Q:  But you're not certain?

A:  I'm leaning more towards after but not a hundred percent.

Q:  I'll have to ask Mr. Tapper.  Are you ok?  Do you need a break or something?

35

A:  Yes I'm fine.  _____

Q:  Now paragraph eighteen Mr. Hazzard makes this allegation, Mr. McCollum.  He says the defendant Harrisburg School District has even denied the plaintiff an opportunity to appeal to them and be heard even though they promised him that opportunity.  Now do you know what he meant by that, what Mr. Hazzard meant by that?

A:  No, I don't.  I mean other than going to that meeting and sitting there and saying this was the final step, no I don't.

Q:  Ok even though that is the excepted procedure that black persons in similar positions have a right to expect in that experience?

A:  I guess everybody as that right.

Q:  Well let me ask you about that.  Do you know of any circumstance where other union members, black or white, went to school board meeting and raised an issue about a term of condition of employment or something to do with employment or something to do with the union or maybe even a grievance, I don't know?

A:  Not first hand knowledge but I've heard of people going to board meetings and complaining.

Q:  Ok.

A:  Different issues.

36

Q:  Ok now do you know Mr. Curtis?

A:  Yes.

Q:  Have you ever seen Mr. Curtis mistreat an employee? by that I don't mean I don' t mean physically but verbally abuse an employee or insult and employee any thing like that?

A:  Yes.

Q:  Have you ever seen Mr. Curtis mistreat or over do it, so to speak? I'm not sure of the adjectives here but any of Mr. Hazzard?

A:  Seen no.

Q:  Heard?

A:  Yes.

Q:  Explain please?

A:  Tim would, Mr. Curtis would come to his building and just be picking on him for anything.  There's been a few other instances like bereavement leave is used vacation is used.

Q:  Did this occur before or after Mr. Hazzard filed this federal complaint?

A:  I would say after the bulk of it.

Q:  Did Mr. Curtis is your experience treat Mr. Hazzard differently before Mr. Hazzard grieved the board's decision to not respect the posting of the job at the Roland school?

37

A:  It appears that way.

Q:  On the issue of the transfers do you know who made the decision to transfer people around in the summer of 1999?

A:  Mr. Curtis.

Q:  Did he have a meeting with the employees to discuss it before hand?

A:  Not to my knowledge. He might have, I don't know.

Q:  You don't have a recollection of being invited to any meeting or the union being invited to a meeting to discuss it?

A:  No.

Q:  Do you have a recollection and any vacancies or positions for head or you know major or minor custodians in the summer of 1999 I don't mean Roland or Scott?

A:  No.

Q:  The position that Mr. MacMurray was put into at Hamilton school was that to replace someone who had retired or quit or something like that?

A:  No that was just the whole transfer thing.

Q:  In other words these transfers were just round robin things?

38

A:  All head custodians were transferred to different buildings?

Q:  All head custodians what, what was the reason for that?  If you know I'm not saying that you know but what did you understand the reason for it to be?

A:  I didn't understand it.

Q:  Are you telling me that virtuously ever head custodian major or minor was transferred around?

A:  Yes head custodians, yes.

Q:  No reason was given?

A:  No, to the best of my knowledge.  I know none of the head custodians were happy with it.

Q:  Do you know of any head custodian, major or minor, that ever bid on a posted job and did not have an equal opportunity at that job, other than Mr. Hazzard I understand your position with Mr. Hazzard but he was he was a qualified person and he was the only person that bid on that job.  Do know of any similar situations based on your experience with head custodians?

A:  With head custodians?

Q:  Major or minor?

A:  I couldn't answer that.

39

Q:  You don't have any recollection as you sit here?

MR. BAILEY:  Yeah I don't think I have any more questions at this time.

MR. FINK:     Do you have any Shawn?

MR. LOCHINGER: Do you have some?

MR. FINK: Yes, Mr. McCollum we've met before but I'm Mr. Fink I represent the union I just wanted to ask you about one issue. Actually, more than that every time a lawyer says just one.

MR. MCCOLLUM:  Yes I know it's just like moving two boxes.

MR. FINK: There you go there you go just a couple of issues.

MR. BAILEY:  May I borrow that metaphor? I like that.  That's good.

MR. FINK:  That's a good one.

MR. FINK:  You mentioned a couple of things in your employment history you said that a one point let me take a step back you was a regular custodian not a head custodian right?

A:  Right.

Q:  So in June of 1999 when all the head custodians were transferred that didn't effect you personally.  Right?

40

1      A:    No what I meant by when I was
2 transferred was in 1997 when they transferred all regular
3 positions.
4      Q:    Right that was my question at one point
5 you were transferred?
6      A:    Right.
7      Q:    And it wasn't Steve McCollum only, it was
8 all the regular custodians?
9      A:    Um-hmm.
10      Q:    And they were just reshuffled among
11 different schools?
12      A:    Yes, for no reason.
13      Q:    You didn't ok you didn't put in bid on the
14 other schools?
15      A:    No.
16      Q:    At that time you didn't request a
17 transfer?
18      A:    No.
19      Q:    And then again is 1999 as far as you
20 know none of the head custodians put a bid in or
21 requested those transfers?
22      A:    I know they did not put bid in.
23      Q:    You know they did not?
24      A:    They did not.
25      Q:    Ok.

41

1      A:    It was an involuntarily transfer.
2      Q:    So in both of those occasions the school
3 district transferred people even though they didn't put in
4 bids or request to be transferred right?
5      A:    Right.
6      Q:    Ok, now in 1999 when all the head
7 custodians were all transferred you were involved in a
8 grievance over that is that right?
9      A:    Yes.
10      Q:    And what was your role in the grievance
11 as you remember?
12      A:    When a transfer takes place and the
13 Harrisburg School District does it.  If minor person goes
14 to a major a building the major building pays more so
15 therefore there is a differential.
16      Q:    The person should get?
17      A:    Should get the higher amount.  Those
18 who leave a major building and go the minor building
19 take no reduction in pay.
20      Q:    Ok, that's under the contract?
21      A:    Yes.
22      Q:    Ok.
23      A:    So is that the grievance right there?
24      Q:    Yes.

42

1      A:    I just want to see the date on it.  Ok, yes
2 the head custodians came to me and I basically asked
3 the ones that were transferred from the minor buildings
4 to the major buildings.
5      Q:    Yes.
6      A:    If they had received their wages because
7 that's exactly what it is a promotion from a minor to a
8 major, it's a promotion.
9      Q:    Yes.
10      A:    And I was told all they're going to take
11 care of that for us.  They are well we're going to make
12 sure they do.  So we made sure they did.  And no
13 promises from, they just did it.
14      Q:    And I just want to make sure I
15 understand you.  The reason the that you filed this, is
16 that because you were a steward?
17      A:    In 99?
18      Q:    Yes.
19      A:    I was on the executive board probably,
20 and a steward.
21      Q:    Ok even though you weren't a head
22 custodian you can handle, it would be part of your
23 responsibility to handle the grievance on behalf of those
24 head custodians?
25      A:    Yes why not.

43

1      Q:    Ok and when you ask for this grievance
2 was all the people who went from minor to major that
3 they get the bump up in pay?
4      A:    Absolutely, promotion yes.
5      Q:    Ok and what was the out come of this
6 grievance?
7      A:    They all got promoted.
8      Q:    So it was settled it didn't have to go to
9 arbitration did it?
10      A:    No.
11      Q:    Ok and the out come was that all the
12 people who went from minor to major got the raise in
13 pay?
14      A:    Yes.
15      A:    And the people who went from major to
16 minor they didn't lose any pay right?
17      A:    No.
18      Q:    Ok, when you filed this grievance though
19 you didn't try to prevent you didn't try to reassign people
20 back before to where they were before they were
21 transferred you weren't trying to undo the transfers were
22 you?
23      A:    No because when that transfer was done
24 you know it was a done deal.
25      Q:    Once the transfers were done it was done.

44

A:   A done deal.

Q:   Okay I just have, I honestly do have just one other area it may take more than one question but it on area. You mentioned again in your job history an occasion when you were acting as a supervisor but you didn't get paid the acting in grade pay?

A:   Right.

Q:   And you said other people had gotten paid when you didn't get paid did you file a grievance over that issue?

A:   I think I did.

Q:   Ok and do you know what the result of that grievance was?

A:   Yeah.

Q:   What was the result?

A:   Well after two and a half years of fighting my tail off I was awarded my twenty-four dollars but it wasn't about the twenty-four dollars it was about the contractual language.

Q:   Ok so ultimately you ultimately won that grievance even though it took a long time?

A:   There comes a point where a man goes hum,

Q:   Yes.

A:   What is this?

45

Q:   Ok but you won that grievance?

A:   Oh absolutely.

Q:   Ok that's all I have thanks.

MR. LOCHINGER:  I just have a couple.

MR. LOCHINGER:  It really is just a couple though and I guess we didn't really meet before I'm Shawn Lochinger, the attorney for the school district. I want to talk a little bit about you were talking about Mr. Curtis and the his treatment of Mr. Hazzard and you talked about him and I agree with Mr. Bailey its kind of hard to get a handle on this verbiage here but he was a little excessive or too exuberant in the way that he'd treated him. Did you witness that yourself?

A:   Visually no. But.

Q:   Ok.

A:   What I see to be excessive I'll just give you one example when Mr. Hazzard asks for bereavement leave. He was required to bring in a death certificate. The man had twenty-two years with the school district and never, I mean never has a death certificate been required from any individual. But yet from Mr. Hazzard he demanded one. I call that excessive.

Q:   Ok and wasn't there a grievance filed on behalf of Mr. Hazzard for the bereavement leave issue?

46

A:   I want to say yes but there is so many out there. Yes, I'm pretty sure it was.

Q:   Ok back to my original issue though were even actually present when you that you either saw or heard Mr. Curtis in for the use here mistreat Mr. Hazzard?

A:   No I was never present.

Q:   How did you hear about this?

A:   Here about?

Q:   You testified earlier that you heard about him being mistreated by Mr.?

A:   Well the mistreatment comes from the bereavement issue that's one, that's excessive.

Q:   All right.

A:   Being in my opinion that's excessive.

Q:   Any thing else.

A:   Vacation leave issues.

Q:   Wasn't that grieved as well?

A:   Yes.

Q:   Ok any other issues or any other times that you can think of?

A:   No.

Q:   Have you ever heard of Mr. Curtis you know sticking to the language that we have here being

47

excessive or mistreating others in the work force other than Mr. Hazzard?

A:   Have I ever seen?

Q:   Have you ever seen or heard about it?

A:   I've heard about it yes.

Q:   The other people that you've heard about him again in quotes "mistreating" are they any of them black?

A:   Yes.

Q:   Ok and my only other issue is, just to clarify the record, you talked about several meeting several school board meetings one where Mr. Epps tried to speak and one where you did speak. And just so I can be clear were these both public meetings?

A:   Yes.

Q:   And in you're meeting with Mr. Brown and Mr. Davis?

A:   Closed door.

Q:   That was a closed meeting?

A:   Yes.

Q:   Ok, all right I don't have anything further.

MR. BAILEY:  I don't have anything further Mr. McCollum I'd like to thank you very, very for coming here today and providing testimony.

48

1      MR.  MCCOLLUM: No problem.

2      MR.  BAILEY:  Thank you.

3      MS. LYDE:  It's 1:58 p.m. and the deposition of

4  Steven McCollum has concluded.  Thank you.

49

**EXHIBIT "F"**

COMMONWEALTH OF PENNSYLVANIA

GOVERNOR'S OFFICE

PENNSYLVANIA HUMAN RELATIONS COMMISSION

William A. Hazzard,                                    :
                                                      : :
            Complainant                               :
                                                      :
                        v.                            :   PHRC DOCKET No. E-95992D
                                                      :
                                                      :   EEOC Charge No. 17FA02847
                                                      :
AFSCME, District Council 90,                          :
                                                      :
            Respondent                                :

## COMPLAINT

1.    The Complainant herein is:

            William A. Hazzard
            1940 Brookwood St.
            Harrisburg, PA  17104


2.    The Respondent herein is:

            AFSCME, District Council 90
            4031 Executive Park Drive
            Harrisburg, PA  17111-1599


3.    I allege the respondent violated § 5 of the Pennsylvania Human Relations Act, as
      follows:

      a.    On or about March 14, 2000, the respondent withdrew my grievance because of
            my race, Caucasian.

*Exhibit "F"*

(1)   In 1968, I was hired by the Harrisburg School District.

(2)   For seven (7) years, I have been a head custodian.

(3)   In June 1999, I bid on the head custodian job at Rowland Intermediate School.

    (a)   This would have been a promotion for me.

(4)   My employer refused to promote me and promoted a less senior African American.

    (a)   According the union contract, the job should have been awarded to the senior bidder.

    (b)   I was senior bidder.

(5)   About   1999, I filed a grievance with the respondent.

(6)   In March 2000, M. Nicelle Chivis, African American staff representative, informed me that they had decided to withdraw my grievance.

    (a)   Her letter gave no reason for the withdrawal.

(7)   I believe that my race is the reason why the respondent withdrew my grievance.

(8)   Ms. Chivis and the other respondent representatives who handled my grievance are African American.

    (a)   The person who was awarded the job is also African American.

William A. Hazzard          v.      AFSCME, District Council 90


4.    The complainant prays that the respondent be required to provide all appropriate remedies under § 9 of the Pennsylvania Human Relations Act.

5.    This charge has been dual filed with EEOC.


I hereby verify that the statements contained in this complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904, relating to unsworn falsification to authorities.

6-14-00
(Date Signed)

William A. Hazzard

S-1

William A. Hazzard  v.  AFSCME, District Council 90

PHRC Docket No. E-95992-D

EEOC Charge No. 17FAO2847

**Certificate of Service**

Pursuant to the requirements of 1 Pa. Code § 33.31, I hereby certify that I have this day served the foregoing Complaint by first class mail, postage prepaid, as follows:

AFSCME, District Council 90
4031 Executive Park Drive
Harrisburg, PA  17111-1599
    Respondent


William A. Hazzard
1940 Brookwood Street
Harrisburg, PA  17104
    Complainant

Donald Bailey, Esq.
4311 N. Sixth Street
Harrisburg PA  17110
    Complainant Attorney


Dated this 4 day of August, 2000.


_____
Regina Young

4/98

**EXHIBIT "G"**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM A. HAZZARD    )    **CIVIL ACTION LAW**
    )
    **Plaintiff**    )
    )    **No.**
    **Vs.**    )
    )    **1 : CV - 00 - 1758**
**TIM CURTIS,**    )
**MACK MCMURRAY,**    )
**AFSCME, DISTRICT 90,**    )
**AND THE HARRISBURG**    )
**SCHOOL DISTRICT**    )    **JURY TRIAL DEMANDED**
    )    **FILED**
    **Defendants**    )    HARRISBURG, PA

## COMPLAINT

OCT 0 4 2000

MARY E. D'ANDREA, CLERK
Per ——————————
Deputy Clerk

## INTRODUCTORY STATEMENT

1.) This is a reverse discrimination civil rights action brought under the 13th

and 14th Amendments pursuant to 42 U.S.C. §1981. The plaintiff is White. He was

discriminated against by the defendants Curtis and McMurry, who are black, on

account of his race, intentionally, to prevent the proper application of his

employment contract. The defendants' AFSCME and Harrisburg School District,

by and through their top officials and governing body, denied plaintiff his rights to

contract under circumstances that were based upon race.

1

*Exhibit "G"*

## JURISDICTION AND VENUE

2.) This Court has original jurisdiction to hear federal civil rights claims under 28 U.S.C. §1331 and 28 U.S.C. §1343 (a)(3) and (4) and the remedial statute 42 U.S.C. §1981.

3.) Punitive damages are contemplated.

4.) A jury trial is demanded.

5.) This Courts supplemental jurisdiction is invoked as per 28 U.S.C. §1367.

6.) Venue is properly in the Middle District because all parties, events, witnesses and evidence are common to Dauphin County Pennsylvania.

## PARTIES

7.) The plaintiff William A. Hazzard, is an adult White American male citizen residing in Dauphin County Pennsylvania.

8.) The defendants' Curtis and McMurry are black adult American citizens, are employed by the defendant Harrisburg School District, and the defendant McMurry is a Union steward for the defendant American Federation of State, County, and Municipal Employees (AFSCME) Council 90.

2

# OPERATIVE FACTS

10.) Plaintiff is a custodian for the defendant School District.

11.) On or about the Summer of 1999 the plaintiff was the only person to bid on a job posted for promotion to Head Custodian at Rowland Intermediate School.

12.) The defendant AFSCME and the defendant School District decided not to promote the plaintiff.

13.) The defendant School District decided instead to promote the defendant McMurry.

14.) Plaintiff was the only person to bid on the posted job and plaintiff had "seniority" over the defendant McMurry.

15.) In 1999 the plaintiff filed a grievance with the defendant AFSCME against the defendant School District.

16.) On or about March 2000, the defendant AFSCME by and through Union staff representative Nicelle Chivas, African American, informed plaintiff they were unilaterally withdrawing plaintiff's grievances. At that time, upon belief and information, they told the defendant school Board the grievance had no merit even though he promotion of McMurry over plaintiff was a clear violation of the contract.

3

16.) The only difference between plaintiff and McMurry except for plaintiff having seniority over McMurry and plaintiff having been the only person to put in a bid on the job when it was posted, is that McMurry is black and plaintiff is white.

17.) Virtually every entity and decision maker plaintiff has appealed to to correct the injustice he is suffering is African American. This includes the leadership of Council 90 and the Board members of the Harrisburg School District.

18.) The defendant Harrisburg School District has even denied the plaintiff an opportunity to appeal to them, and be heard, even though they promised him that opportunity, and even though that is the accepted procedure that black persons in similar positions, have a right to expect and to experience.

19.) Plaintiff believes and avers that he is being denied his contractual rights, and is even being harassed on the job by the defendant Curtis, also African American, in retaliation for complaining, in an effort to have him retire or quit his employment, and force him to stop pursuing his complaints about the unlawful harassment he is suffering.

## COUNT I

## THE PLAINTIFF AGAINST ALL

## DEFENDANTS FOR THE VIOLATION OF HIS

## 13TH AND 14TH AMENDMENT RIGHTS PURSUANT

## TO 42 U.S.C. §1981

20.) Paragraphs 1 through 19 above are incorporated herein.

21.) The defendants, all African Americans or in the case of AFSCME, are led by decision makers who are African Americans, have all tacitly and overtly acted to deny plaintiff the enjoyment of his contractual rights on account of his race. They have treated the plaintiff differently than other persons (Black), similarly situated, and have denied him clearly discernable rights to promotions and an opportunity to be heard the same as Black persons and have given a position for which he was the most (and only) qualified person, to another person, Black, in violation of plaintiffs rights.

**WHEREFORE** the plaintiff demands judgement of the defendants jointly and severally for the deprivation of his federally guaranteed rights pursuant to 42 U.S.C. §1981 together with fees, costs, attorney's fees, and such other relief as the Court may deem appropriate.

## COUNT II

## PLAINTIFF AGAINST THE DEFENDANT AFSCME FOR

## FAILURE TO REPRESENT/BREACH OF CONTRACT

## AS A SUPPLEMENTAL STATE CLAIMS

22.) Paragraphs 1 through 21 above are incorporated herein.

23.) The defendant AFSCME is a union having the duty and responsibility to represent the plaintiff, a member thereof, in his contractual relationship with the defendant School District.

24.) The defendant AFSCME, without any right or authority to do so, or even the courtesy of informing plaintiff, one of their members, and in violation of their contract with plaintiff, and contrary to AFSCME's custom, practice, and usage governing their duty to represent members like plaintiff, withdrew his grievance against the Harrisburg School district wherein he sought to be placed in the position he had bid for, as aforementioned.

**WHEREFORE** plaintiff seeks judgement of the defendant AFSCME for failure to represent, and breach of contract, together with fees, costs, special damages in an amount equal to salary differentials and interest for the position sought, and such other relief as the Court may deem appropriate.

6

Respectfully Submitted,

Don Bailey, PAID# 23786
4311 N. 6th Street
Harrisburg, PA 17110
(717) 221-9500

Dated: 10-3-00

7